Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone:   (559) 248-4820
Facsimile:   (559) 248-4830

Dennis Stewart. CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway. Suite 3300
San Diego. CA 92101
Telephone: (619) 595-3299
Facsimile: (612) 339-6622

*Attorneys for Plaintiffs Joseph Colon, Shannon Ray, and Kyle McKinley, Individually and on Behalf of All Those Similarly Situated*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| JOSEPH COLON, SHANNON RAY, and KYLE McKINLEY, Individually and on Behalf of All Those Similarly Situated, | CASE NO. <br><br> **<u>CLASS ACTION</u>** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, | |
| Defendant. | |

///

///

///

///

///

**CLASS ACTION COMPLAINT**

Plaintiffs Joseph Colon, Shannon Ray, and Kyle McKinley, (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint alleging antitrust violations and allege as follows:

## INTRODUCTION

1. Defendant National Collegiate Athletic Association ("NCAA" or "Defendant") and its member schools have engaged in a contract, combination and conspiracy to exercise the NCAA's admitted monopsony market power[1] in the labor market for coaches. They agreed, through a binding NCAA bylaw, to fix the compensation of an entire category of college coaches at zero. Persons were hired as coaches by NCAA member institutions, but the schools were prohibited by an NCAA Rule, to which all member institutions agreed to abide, from paying them anything for their work. The rule was wisely finally abandoned in January 2023 (effective July 1, 2023). But the past economic damage suffered by coaches who were required to work for no pay remains and the depression of salary levels, which was the purpose and effect of the Rule, is likely to continue.

2. Just as the NCAA member schools compete during events, they also compete with each other in the labor market for coaches. For years, Defendant and its member schools have agreed to a bylaw that has restricted NCAA Division I schools to a limited number of paid coaches in each sport. Defendant and its member schools have also agreed in another bylaw to allow the member schools (except in football and basketball) to hire one or more additional coaches (depending on the sport) and to pay them nothing.

3. The NCAA bylaws, which have been recognized as constituting a binding agreement among all the member schools, refer to these coaches as "Volunteer Coaches." In reality, that means that skilled coaches who are desired by NCAA schools, but not employed as regular (paid) coaches, must provide very valuable services to the schools for free, or not be employed in their profession of choice. Even if one were the most desirable of such coaches, no member school could offer him or her any salary in order to compete

---

[1] Nat'l Collegiate Athletic Ass'n v. Alston, 210 L. Ed. 2d 314, 141 S. Ct. 2141 (2021).

for their services. These volunteer coaches frequently work full time, weekends, early mornings, and late nights and perform many, if not all, of the same job duties as the paid coaches working out of the same set of Athletic Department offices. Yet the volunteer coaches cannot even receive health insurance, housing, or other benefits, much less an actual salary in exchange for work performed. Advantaging themselves of the career aspirations and love of sport which these coaches bring to their institutions and the student athletes they coach, the NCAA and its member schools abuse their monopsony power by agreeing all will accept the benefits these coaches bring to their respective institutions and student athletes but to pay the coaches nothing for it. The so-called volunteer coach may, indeed, be the only uncompensated employee at the institutions where they work.

4. These agreements among Defendant and its member schools, in antitrust terms, make the member schools a buyer-side cartel: a group of competitors agreeing to abide by naked horizontal pricing restraints to purposefully restrict competition in the labor market for valuable college coaching services so they can collectively reduce their costs. The very purpose and actual effect of this horizontal agreement was to fix and suppress salaries so as to make them unresponsive to a competitive marketplace or even one in which basic wage and hour laws are respected. This amounts to an unlawful restraint under Section 1 of the Sherman Act, 15 U.S.C. § 1.

5. A similar but less draconian NCAA rule regarding a category of so-called "restricted-earnings" coaches was invalidated over 20 years ago in *Law v. N.C.A.A.*, 134 F.3d 1010 (10th Cir. 1998), and was found so plainly unreasonable that it could be condemned as illegal under the Section I Sherman Act "quick look" rule of reason test. The only difference between *Law* and the present action is that restricted-earnings coaches could be paid up to $12,000 per year; these coaches may not be paid anything[2].

---

[2] The term "volunteer coach" is used throughout this Complaint because that is how the price fixed position at issue in this case is referred to in the NCAA's Bylaws. It is a misnomer of course; no coach "voluntarily" agrees to forego an available salary for the position; they are required to forego pay for work as a condition of employment. The volunteer coach rule is, in every sense, simply another version of the "restricted earnings" coach rule which was invalidated in *Law*. The Volunteer Coach rule restricts earnings at zero.

6. This suit seeks to recoup the damages sustained by the plaintiff class of volunteer coaches as a result of these collusive and illegal practices. It seeks actual and treble damages under the Clayton Act and injunctive relief. Although the Volunteer Coach rules have recently been abrogated, at least for now, given the history of the *Law* case and this one, plaintiff seeks to enjoin the NCAA and its members from engaging in this conduct again, so that these or future talented coaches are fairly compensated for valuable work performed.

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff and Proposed Class Representative Joseph Colon is currently a resident of Chicago, Illinois. He worked as a wrestling coach from approximately 2017 - 2020 at Fresno State University. During this time, he was designated a volunteer coach.

8. Plaintiff and Proposed Class Representative Shannon Ray is currently a resident of Orlando, Florida. She worked as a track and field coach from 2019 until 2021 at Arizona State University. During this time, she was designated a volunteer coach.

9. Plaintiff and Proposed Class Representative Kyle McKinley is currently a resident of Edmond, Oklahoma. He worked as a track and field coach during 2022 at the University of Oklahoma. During this time, he was designated a volunteer coach.

10. Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has approximately 1,100 member schools. Its membership includes most of the public and private universities and colleges that conduct athletic programs in the United States. Its rules, codified in the NCAA Manual, are binding on its member institutions which agree to abide by them. The NCAA and its member institutions have a substantial presence in California and in this District and the volunteer coach rule has impacted a large number of coaches in California and in this District. Considering its Division I institutions alone, approximately 24 of them, participating in at least six different conferences are located within the State of California. No other state is home to more Division I schools than California. Several Division I schools, including the University of California at Davis, Sacramento State University, the University of Pacific,

and Fresno State University, who compete in the Big West, Big Sky, West Coast, and Mountain West conferences, respectively, are located in this District. Those member schools have participated in the NCAA cartel that has enacted the illegal horizontal restraint at issue in this case in that, those institutions, on information and belief, have, like the other member institutions, collectively employed significant numbers of coaches pursuant to the NCAA volunteer coach rule. This includes one of the Plaintiffs in this action and the Plaintiff in a related action pending in this District, *Smart v. NCAA*, Case 2:22-cv-02125-WBS-KJN ("*Smart*").

11. Various other persons and entities, including NCAA member schools, engaged in concert with the named Defendant in the conduct alleged herein, and are co-conspirators.

12. Plaintiffs bring this class action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

13. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 in this class action, and some members of the Proposed Class are citizens of a state different from the Defendant.

14. Defendant's conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendant and its member schools transact substantial business in multiple states. Defendant and its member schools routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

15. Venue is proper in this District because Defendant and/or some of its members reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendant and some of its members can be found in this District or transact business in this District. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. The bylaw at issue applies

to volunteer coaches who have worked, or presently work, for NCAA member institutions in this District, the NCAA sanctions Division I events that regularly take place in this District, including events played by local members and members of the Proposed Classes in this case and Smart reside or work in this District.

16. This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under that Clayton Act provision. It also has personal jurisdiction because, among other things, Defendant transacts substantial, continuous business in this State and District; participates in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; it has substantial contacts in this State and District and several of its members reside in this State and District; and it is engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

## CLASS ACTION ALLEGATIONS

17. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, as a class action on behalf of the following:

> All persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball[3] in the position of "volunteer coach," as designated by NCAA Bylaws.

18. While Plaintiffs do not know the exact size of the Proposed Class, Plaintiffs are informed and believe that the Proposed Class includes over 1000 members residing in various parts of the United States. The class is so numerous that joinder of all members is impracticable.

19. Plaintiffs' claims are typical of the claims of other members of the Proposed

---

[3] Plaintiffs in this action exclude baseball coaches because their claim is being asserted in *Smart*.

5
**CLASS ACTION COMPLAINT**

Class. Plaintiffs and the members of the Proposed Class were subject to the same or similar employment restraints and compensation practices arising out of Defendant's common course of illegal conduct. Plaintiffs and the Proposed Class have sustained similar types of damages as a result of these common practices.

20. Common questions of fact or law exists, and they predominate over any individualized questions. They include, inter alia:

   a. Whether Defendant's conduct violates the antitrust laws;

   b. Whether by enacting and implementing the volunteer coach bylaws, Defendant and its member schools engaged in a contract, combination, or conspiracy to unreasonably restrain trade by capping the amount of compensation paid to an entire category of coaches;

   c. Whether that conduct caused Plaintiffs and Proposed Class members to earn less than what they would have in a truly competitive market;

   d. Whether that conduct caused the Plaintiffs and Proposed Class members to earn less than what they would have absent the restraint, including under federal and state wage and hour laws;

   e. Whether Plaintiffs and the Proposed Class suffered antitrust injury or were threatened with injury; and

   f. Whether Plaintiffs and the Proposed Class are entitled to damages and injunctive relief, and the type and scope of that relief.

21. Plaintiffs will fairly and adequately protect the interests of class members in that their interests are aligned, and Plaintiffs have retained counsel competent and experienced in antitrust class-action litigation.

22. A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendant and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendant; and (b) adjudications with

respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

23. Conversely, a class action would, as it did in *Law*, save time, effort, and expense and assure uniformity of decisions for persons similarly situated without sacrificing procedural unfairness or any undesirable result. Plaintiffs do not anticipate any difficulty in the management of this action as a class action, and the Proposed Class has a high degree of cohesion.

24. Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

## FACTUAL ALLEGATION

**A. The NCAA and College Sports.**

25. The NCAA has grown to include some 1,100 member schools, organized into three divisions: Division I, Division II, and Division III. Division I schools are those with the largest athletic programs, and those schools must sponsor at least fourteen varsity sports teams to qualify for Division I. Division I has about 350 members.

26. College sports have enjoyed tremendous revenue growth over the last two decades. In 2021, the NCAA itself earned $1.15 billion. That does not include the amount earned by the NCAA's members individually. In 2019, the NCAA Division I member schools generated close to $16 billion in athletics revenue collectively.

27. The Division I sports programs implicated in this lawsuit are booming too. For example, last year's 17-game Women's College World Series on ESPN averaged 1.2 million viewers per game, with the most viewed game averaging 2.1 million viewers. Similarly last year's NCAA volleyball final drew an ESPN record 1.2 million viewers, and the single-game, regular-season attendance record was set twice back in September. And in 2021, 27,304 athletes competed in indoor track and field and another 30,425 in outdoor track in all college divisions according to several NCAA statistics. When the 2022 NCAA Track and Field Championships were held in Oregon last spring, 170 schools had entries. In the

Division I outdoor preliminaries, a total of 4,224 athletes competed. For the finals, 648 men and women competed, respectively, while another 336 men and women competed in the indoor championships.

28. According to the NCAA Sports Sponsorship and Participation Rates Report (Updated: October 27, 2022), excluding football, basketball, and baseball, men's sports fielded Division I teams in approximately 20 sports in 2020-21 including: cross country (313 teams), golf (295 teams), ice hockey (61 teams), lacrosse (73 teams), soccer (202 teams), swimming and diving (131 teams), tennis (238 teams), track, indoor (265 teams), track, outdoor (288 teams), and wrestling (77 teams). During the same time, women's sports fielded Division I teams in approximately 25 sports including: cross country (347 teams), field hockey (77 teams), golf (263 teams), lacrosse (118 teams), soccer (335 teams), softball (294 teams), swimming/diving (190 teams), tennis (300 teams), track, indoor (329 teams), track, outdoor (339 teams), and volleyball (333 teams).

**B. The illegal unpaid coaching position.**

29. Among the three divisions of competition into which NCAA member teams are organized, the most talented athletes and the most highly paid coaches at the collegiate level are concentrated in Division I sports. Division I essentially *is* the relevant market for the elite level of college sports.

30. The NCAA together with its members have long adopted and enforced rules that regulate college sports. These rules concern everything from how the games are played to standards of amateurism to rules governing the size of athletic squads and coaching staffs.

31. To pursue their competitive goals, the NCAA's member institutions compete with each other in hiring coaches for their Division I athletic teams. Some coaches command salaries in the millions, and even some assistant coaches at top Division I schools are paid hundreds of thousands of dollars.

32. NCAA member institutions place importance on the hiring of coaching staffs which will make their programs competitive and help draw high-level players to their institutions. Coaching staffs, which are limited in size by NCAA rules, have grown

substantially over the last several decades, as more coaches allow more attention to each player, or each aspect of the sport. A competitive program will, in turn, elevate the overall profile of the institution and allow the institution to benefit in many ways, including financially, according higher visibility of the institution, and increasing the number of undergraduates applications.

33. An individual wishing to pursue a Division I coaching career has no choice but to seek employment at an NCAA member institution; these member institutions are the market.

34. In a properly functioning labor market, each Division I school would openly compete for head and assistant coaches and pay them the salaries that the market commanded, and that the school's emphasis on that sport suggested as reasonable.

35. The member schools compete vigorously for head coaches and assistant coaches on compensation, which is why salaries of both categories have increased.

36. Despite this price competition for coaching services, the NCAA and its member schools have allowed each school to hire a prescribed number of so-called volunteer coaches, and have agreed among themselves to pay him or her nothing. This artificial restraint prevents these unpaid assistant coaches from being paid the fair market value of their worth to the team and university or even wage and hour law minimum wages. It is a price fix, pure and simple.

37. The NCAA and its member schools reached and enforce this price-fixing agreement in their bylaws. The NCAA constitution provides that member schools can enact legislation that governs the conduct of the members' athletic programs. The member schools agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation made by the association, even if they disagree with it and vote against it. None of the member schools could have paid one penny to any class member without running afoul of NCAA regulations and being sanctioned.

38. The bylaws and related legislation are thus proposed, drafted, voted upon, agreed upon, and implemented by NCAA members, who are horizontal competitors in the

market at issue.

39. In addition to setting the volunteer coach's salary at zero, the same NCAA bylaw prohibits the volunteer coach from receiving more than two complimentary tickets (i.e., for friends or family) to home sporting events and prohibits the coach from receiving *any* tickets to other sports events hosted by the school (i.e., basketball or football). It also does not allow for meals to be provided, other than for "meals incidental to organized team activities (e.g., pre- or postgame meals, occasional meals, but not training table meals) or meals provided during a prospective student-athlete's official or unofficial visit to the school. Thus, in addition to the prohibition on pay, per the agreement, the member schools cannot pay for housing, health insurance or other employment benefits that the coaches would generally receive in an open market.

40. Upon information and belief, the vast majority of Division I sports programs use this unpaid coaching position, and the bylaws are strictly enforced. Member institutions must comply with these bylaws or face penalties. The NCAA employs a staff to ensure compliance with and to enforce bylaws and other legislation, and it expects the member schools, who likewise have a compliance department, to self-report any instance of noncompliance. Penalties can include fines, scholarship reductions, recruiting restrictions, or even bans from competition.

41. These unpaid coaches perform all or many of the same duties as the paid coaches, and it can, and often is, a full-time job. During many weeks, for many coaches, it requires more than 40 hours of work. During training periods, many volunteer coaches spend hours each workday preparing for practice and working with players before, during, and after practice. During the season, they often spend significant time helping the team prepare for future opponents and assisting in forming strategy plans, and they travel with the team and participate in all team-related activities. Some specialize in overseeing specific aspects of a contest, like offense or defense or particular events. Regardless, the services provided unpaid coaches provide great value. Whether the volunteer coach works full time, overtime, or part time; they are entitled to be paid; and they are not permitted by the NCAA to be so.

42. Indeed, the bylaw prevents the coaches from even making the minimum wages required by federal and state wage-and-hour laws. In the absence of this rule, the coaches (who are not exempt from wage-and-hour laws) would at least earn wages in accord with these laws, but in a competitive market, much more.

43. This market is national in scope. The restraint applies to all member schools, and coaches often leave a school in one part of the country to accept employment in another region. Further, the member schools frequently engage in competitive play with other member schools across state lines, and the games are frequently broadcast across state lines.

44. Since at least 2015, the NCAA's member schools have repeatedly collectively acted to ratify and uphold this bylaw.

45. As a price-fix, the challenged restraint is a per se violation under the antitrust laws. In the alternative, even if considered under the "rule of reason", it is still violative of the law as the rule restrains trade without any procompetitive justification, or any theoretical pro-competitive justifications are outweighed by the Rule's anticompetitive effects or could be achieved by less competition-restricting means.

46. In likely recognition of the illegality of the rule, on January 11, 2023, the Council, which includes NCAA member schools, met as part of the 2023 NCAA Convention and voted to eliminate the volunteer coach designation across Division I, instead including those coaches within a new limit for countable coaches in each of the applicable sports. The coaching limit rules are set to take effect July 1, 2023.

**COUNT I – Violations of Section 1 of the Sherman Act**
**(Brought by Plaintiffs on Behalf of the Class)**

47. Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

48. Defendant and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Since at least four years before the filing of this action, the Defendant's cartel has restrained trade and commerce in violation

of Section 1 of the Sherman Act, and the behavior and its consequences continue today.

49. This combination and conspiracy by the NCAA and its members schools (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the compensation of Plaintiffs and the Proposed Class at the artificially low level of zero; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market.

50. As a direct and proximate result of Defendant's contract, combination, and conspiracy to restrain trade, suppress salaries, and eliminate competition for skilled labor, Plaintiffs and members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

51. As a result, Plaintiffs and the Proposed Class have suffered damages in an amount to be proved at trial.

52. Defendant's agreements and conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

53. Defendant's agreements, combinations, and/or conspiracies violate Section 1 of the Sherman Act, whether under a *per se*, "quick look," or "rule of reason" analysis.

54. Plaintiffs and the Proposed Class seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

**Prayer for Relief**

WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated persons, seek the following relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;
- A finding that Defendant has violated Section 1 of the Sherman Act by

engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiffs and class members have been damaged and injured in their business and property as a result of this violation;

- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;
- Actual damages in an amount to be determined at trial;
- Treble damages awarded under the Sherman Act to Plaintiffs and class members for the damages sustained by them as a result of Defendant's conduct;
- Pre-judgment and post-judgment interest as permitted by law;
- An injunction enjoining Defendant from continuing or reinstating its unfair and unlawful policies and practices as described within this Complaint;
- Reasonable attorneys' fees and costs of the action;
- Such other relief as the Court shall deem just and proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: March 21, 2023            Respectfully submitted,

**COLEMAN & HOROWITT, LLP**

By:   */s/ Darryl J. Horowitt*
Darryl J. Horowitt, CA Bar No. 100898
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone:   (559) 248-4820
Facsimile:   (559) 248-4830
dhorowitt@ch-law.com

Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
Facsimile: (612) 339-6622
dstewart@gustafsongluek.com

Daniel E. Gustafson (#202241 *pro hac forthcoming*)
Joshua J. Rissman (#391500 *pro hac forthcoming*)
Noah L. Cozad (#402643 *pro hac forthcoming*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
jrissman@gustafsongluek.com
ncozad@gustafsongluek.com

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
Facsimile: (619) 231-7423
lens@rgrdlaw.com

*Attorneys for Plaintiffs and the Putative Class*

14
**CLASS ACTION COMPLAINT**