CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
Carolyn.Luedtke@mto.com
JUSTIN P. RAPHAEL (State Bar No. 292380)
Justin.Raphael@mto.com
CHRISTOPHER CRUZ (State Bar No. 346128)
Christopher.Cruz@mto.com
JAVIER KORDI (State Bar No. 348358)
Javier.Kordi@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:(415) 512-4000
Facsimile:(415) 512-4077

*Attorneys for Defendant National
Collegiate Athletic Association*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH COLON, SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and PATRICK MEHLER, individually and on behalf of all those similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>          Defendants. | Case No. 1:23-cv-00425-WBS-KJN<br><br>**DEFENDANT NCAA'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:    Hon. William B. Shubb<br>Courtroom: 5<br>Date:     July 24, 2023<br>Time:     1:30 p.m. |

1      **NOTICE OF MOTION AND MOTION TO DISMISS**

2          PLEASE TAKE NOTICE that, on July 24, 2023, at 1:30 p.m., or

3  as soon thereafter as the matter may be heard, in Courtroom 5 of

4  this Court, located at 501 I Street, Sacramento, California,

5  Defendant National Collegiate Athletic Association ("NCAA") will,

6  and hereby does, move this Court pursuant to Federal Rule of Civil

7  Procedure 12 for an order dismissing Plaintiffs' Amended Complaint

8  in the event that this Court denies the NCAA's concurrent motion

9  to transfer this case to the United States District Court for the

10 Southern District of Indiana pursuant to 28 U.S.C. § 1404(a) for

11 the convenience of the parties and witnesses and in the interest

12 of justice.

13         This Motion is based upon the following Memorandum of Points

14 and Authorities, all other materials supporting this Motion, all

15 pleadings on file, and any other matter submitted before or at the

16 hearing on the Motion.

17 DATED:  May 23, 2023          MUNGER, TOLLES & OLSON LLP

18

19

20

21                              By:   */s/Carolyn Hoecker Luedtke*
                                      CAROLYN HOECKER LUEDTKE
22
                                      *Attorneys for Defendant National*
23                                    *Collegiate Athletic Association*

24

25

26

27

28

_____
DEFENDANT NCAA'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   RELEVANT BACKGROUND.........................................5

      A.   The NCAA and the Challenged Bylaws....................5

III.  LEGAL STANDARDS.............................................8

IV.   ARGUMENT....................................................8

      A.   Plaintiffs Have Failed to Allege Causal Antitrust
           Injury................................................8

      B.   Plaintiffs Have Failed to State an Antitrust Claim
           Under the Rule of Reason.............................12

V.    CONCLUSION.................................................19

1

**TABLE OF AUTHORITIES**

2

<u>Page(s)</u>

3

4   **FEDERAL CASES**

5   *Agnew v. NCAA*,
6       683 F.3d 328 (7th Cir. 2012) ...............................13

7   *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
        190 F.3d 1051 (9th Cir. 1999) .................................9

8   *Am. Needle, Inc. v. NFL*,
9       560 U.S. 183 (2010) .........................................1

10  *Applied Underwriters, Inc. v. Lara*,
        530 F. Supp. 3d 914 (E.D. Cal. 2021) (Shubb, J.) ..............6

11
    *Ashcroft v. Iqbal*,
12      556 U.S. 662 (2009) .........................................8

13  *Atl. Richfield Co. v. USA Petroleum Co.*,
14      495 U.S. 328 (1990) .........................................9

15  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
        9 F.4th 1102 (9th Cir. 2021) ................................19

16
    *Bell Atl. Corp. v. Twombly*,
17      550 U.S. 544 (2007) .........................................8

18  *Campfield v. State Farm Mut. Auto. Ins. Co.*,
        532 F.3d 1111 (10th Cir. 2008) ..........................13, 17
19
    *Catlin v. Wash. Energy Co.*,
20      791 F.2d 1343 (9th Cir. 1986) ...............................8

21  *City of Oakland v. Oakland Raiders*,
22      20 F.4th 441 (9th Cir. 2021) ............................9, 10

23  *Datel Holdings Ltd. v. Microsoft Corp.*,
        712 F. Supp. 2d 974 (N.D. Cal. 2010) .......................18
24
    *Friends of Roeding Park v. City of Fresno*,
25      848 F. Supp. 2d 1152 (E.D. Cal. 2012) .......................8

26  *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
        386 F.3d 485 (2d Cir. 2004) ................................13
27

28

-ii-

*In re German Auto. Mfrs. Antitrust Litig.*,
    497 F. Supp. 3d 745 (N.D. Cal. 2020), aff'd, 2021 WL
    4958987 (9th Cir. Oct. 26, 2021) ..............................13

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    2010 WL 1541257 (N.D. Cal. Apr. 16, 2010), aff'd, 433
    F. App'x 598 (9th Cir. 2011) ...................................16

*Hennessey v. NCAA*,
    564 F.2d 1136 (5th Cir. 1977) .....................1, 4, 16, 19

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ............................12, 17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ........................14

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    2020 WL 6390499 (N.D. Cal. July 15, 2020) ...................14

*Kelsey K. v. NFL Enters., LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017) ........................11

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ................................2

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
    2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), aff'd, 811
    F. App'x 422 (9th Cir. 2020) .................................14

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ........................12, 13, 15

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ...................................12, 14

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ................................18

*Person v. Google, Inc.*),
    2007 WL 832941, at *4 (N.D. Cal. Mar. 16, 2007) .............14

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ...................12, 16

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) .........................9

*Rock v. NCAA*,
    928 F. Supp. 2d 1010 (S.D. Ind. 2013) ...................12, 15

-iii-

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
    2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ....................15

*Smart v. NCAA*,
    No. 2:22-cv-02125-WBS-KJN (E.D. Cal.) ......................1, 2

*Somers v. Apple, Inc.*,
    729 F. 3d 953 (9th Cir. 2013) ...............................11

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) .................................8

*Stearns v. Select Comfort Retail Corp.*,
    2009 WL 1635931 (N.D. Cal. June 5, 2009) .....................9

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
    691 F. Supp. 1262 (N.D. Cal. 1988) ..........................18

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .........................................19

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) .................................6

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
    2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ....................15

**FEDERAL STATUTES**

Sherman Act § 1 ...............................................8

**FEDERAL RULES**

Rule 12(b)(6)..................................................8

**OTHER AUTHORITIES**

NCAA Bylaw 11.7.6, available at
    https://web3.ncaa.org/lsdbi/bylaw?bylawId=40460 ..........6, 10

-iv-

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3    Sports require teams to agree on rules.  "The NCAA together

4   with its members have long adopted and enforced rules that

5   regulate college sports," which "concern everything from how the

6   games are played to standards of amateurism to rules governing the

7   size of athletic squads and coaching staffs."  Am. Compl. ¶ 34.

8   This case is about rules that colleges and universities in NCAA

9   Division I adopted regarding how many paid coaches each of them

10   can hire in dozens of sports other than football, basketball and

11   baseball—from swimming and diving to softball to bowling.[1]  Just

12   as sports leagues of all kinds have rules about how many players

13   and coaches each team can have, the NCAA Division I "bylaws

14   authorize programs in each sport to hire a specific number of

15   coaches," *id.* ¶ 44, and provide for a "limited number of paid

16   coaches in each sport."  *Id.* ¶ 2.

17    Sports "teams that need to cooperate are not trapped by

18   antitrust law," *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 202 (2010),

19   and no court has held that rules limiting the number of coaches or

20   paid coaches on a team are an unlawful antitrust conspiracy.  *See*

21   *Hennessey v. NCAA*, 564 F.2d 1136, 1554 (5th Cir. 1977) (rejecting

22   claim that cap on number of coaches per team violated antitrust

23   laws).  But that is what Plaintiffs allege here.  Their theory is

24   that the NCAA and the members of Division I engaged in "wage

25

26   _____

[1] Plaintiffs here carved out the limit on the number of paid
27   coaches on each Division I baseball team, which is being
    challenged in *Smart v. NCAA*, No. 2:22-cv-02125-WBS-KJN (E.D.
28   Cal.).  This Court related this case to *Smart*.  *See* ECF 9.

fixing" when they "agreed to a bylaw that has restricted NCAA Division I schools to a limited number of paid coaches in each sport." Am. Compl. ¶¶ 1-2. Plaintiffs have patterned that theory on *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998), where a court found NCAA bylaws capping the salaries of certain paid coaches presumptively anticompetitive under a "quick look" standard and ultimately held that those bylaws violated the antitrust laws. Unlike the *Law* case, this case does not involve caps on the salaries of paid coaches. Rather, it involves bylaws regarding the number of coaches who can be paid. The NCAA's Division I members have authorized teams to have volunteer coaches to support student-athletes and have adopted bylaws that prohibit teams from circumventing the limits on paid coaches.

However, this motion does not call upon this Court to decide whether the *Law* case is persuasive or whether NCAA bylaws should be presumed anticompetitive after a "quick look." Regardless of which mode of antitrust scrutiny applies, Plaintiffs have failed to state an antitrust claim because they have failed to allege facts regarding how the alleged bylaws caused them injury, which is a required element of their antitrust claim. Plaintiffs volunteered to coach in various sports at various Division I colleges and universities at various times. In order to show that they lost money and were injured as a result of NCAA bylaws limiting the number of paid coaches, each Plaintiff must show that the Division I institution they volunteered for would have hired an additional paid coach in the sport they coach if the bylaws did not exist. Plaintiffs have not alleged those facts. The NCAA moved to dismiss the related *Smart* case on the same grounds.

1  Plaintiffs amended their Complaint after that motion was filed,

2  but they still have not alleged the facts that the NCAA has argued

3  are missing.

4      To the contrary, Plaintiffs' Amended Complaint alleges facts

5  suggesting that many Division I institutions would not have hired

6  additional paid coaches in many sports.  Plaintiffs seek damages

7  on behalf of coaches in dozens of different sports—by their own

8  count, nearly 5,000 coaches in just one year.  Plaintiffs' own

9  allegations cast doubt on whether colleges and universities would

10  hire additional paid coaches for all of those positions.

11  Plaintiffs allege that "[t]here is a wide gulf among Division I

12  schools," Am. Compl. ¶ 64, with respect to their allocation of

13  resources, and that a "school's emphasis" on a particular sport

14  will affect that school's willingness to pay coaches.  *Id.* ¶ 38.

15  No Plaintiff accounts for those facts with respect to whether the

16  institutions they volunteered for would have hired additional paid

17  coaches in the sport that Plaintiff coaches.  Accordingly,

18  Plaintiffs have failed to allege that the bylaws cause them

19  antitrust injury.

20      Even if Plaintiffs have alleged causal antitrust injury, they

21  have not pled a claim under the "rule of reason" because they have

22  failed to allege that the NCAA has market power in a proper

23  relevant market.  The rule of reason requires Plaintiffs to define

24  a market in order to show that they have market power.  The

25  relevant market depends on substitution to alternatives.  If

26  coaches have alternatives to coaching in NCAA Division I, then it

27  would make no sense for Division I members to try to suppress the

28

coaches' compensation as Plaintiffs allege.  Coaches would simply seek better pay elsewhere, defeating the purported scheme.

Plaintiffs have failed to allege a proper antitrust market for three reasons.  *First*, Plaintiffs have failed to identify a specific relevant market at all.  They closest they come is a passing reference to a "labor market for coaches," which is far too broad and vague.  *Id.* ¶ 1.  Plaintiffs do not allege that the NCAA has market power in a "labor market for coaches" generally. Nor could they.

*Second*, Plaintiffs' market allegations have improperly thrown together jobs coaching dozens of different sports.  The law is clear that market definition depends on market participants' ability to substitute to alternatives, which stimulates competition to offer the most attractive choice.  Plaintiffs' market allegations ignore that principle by grouping jobs coaching many different sports into the same market even though they are not substitutes.  For example, Plaintiffs do not allege that coaching volleyball and track are substitutes, but they include both jobs in the same "labor market for coaches."  Courts reject such markets on the pleadings.  This Court should do the same.

*Third*, Plaintiffs have not accounted for "many opportunities for coaches to pursue their vocations in addition to those now partially limited with Division I members of the NCAA: colleges which are in other divisions of the NCAA; colleges which are not in the NCAA; professional teams; and high schools."  *Hennessey*, 564 F.2d at 1154.  Plaintiffs do not explain why jobs coaching high school or professional teams or individuals in the sports they coach are not substitutes that belong in the market.

-4-

1 Plaintiffs also have not pled cognizable allegations that jobs
2 coaching in Division II or Division III are not substitutes for
3 coaching in Division I.  To the contrary, Plaintiffs allege that
4 coaches have substituted from jobs coaching in Divisions II and
5 III to jobs coaching Division I, which puts jobs in Divisions II
6 and III in the same market.

7    This Court should transfer Plaintiffs' claims to the Southern
8 District of Indiana.  However, if the Court does not do so, it
9 should dismiss Plaintiffs' antitrust claim.

10 **II.   RELEVANT BACKGROUND**[2]

11    **A.    The NCAA and the Challenged Bylaws**

12    The NCAA is a member association of more than 1,000 colleges
13 and universities.  Am. Compl. ¶ 13.  More than 300 of those
14 institutions are members of Division I.  *Id*. ¶ 32.  Plaintiffs
15 allege that Division I institutions fielded teams in approximately
16 20 men's sports and 25 women's sports in 2020 and 2021.  *Id.*  The
17 following chart summarizes Plaintiffs' allegations regarding the
18 number of Division I teams in a select number of sports during the
19 2020-2021 season:

| Men's Sport | Teams | Women's Sport | Teams |
|---|---|---|---|
| Cross Country | 313 | Cross Country | 347 |
| Golf | 295 | Field Hockey | 77 |
| Ice Hockey | 61 | Golf | 263 |
| Lacrosse | 73 | Lacrosse | 118 |
| Soccer | 202 | Rowing | 83 |
| Swimming and Diving | 131 | Soccer | 335 |
| Tennis | 238 | Softball | 294 |
| Indoor Track | 265 | Swimming and Diving | 190 |

---

[2] This Motion recites the facts as alleged in Plaintiffs' Amended
Complaint without conceding their truth.

| Outdoor Track | 288 | Tennis | 300 |
|---|---|---|---|
| Wrestling | 77 | Indoor Track | 329 |
| | | Outdoor Track | 339 |
| | | Volleyball | 333 |

*Id.* As Plaintiffs allege, *id.*, these 4,951 teams are just a subset of the thousands of teams that colleges and universities that members of Division I support each year.

Plaintiffs allege that "[t]he NCAA together with its members have long adopted and enforced rules that regulate college sports," which "concern everything from how the games are played to standards of amateurism to rules governing the size of athletic squads and coaching staffs." *Id.* ¶ 34. Indeed, like the members of many other associations of athletic competitors, the NCAA's member colleges and institutions that compete in Division I have adopted rules that provide for a "limited number of paid coaches in each sport." *Id.* ¶ 2 (citing NCAA Division I Bylaw 11.7.6). "The bylaws authorize programs in each sport to hire a specific number of coaches." *Id.* ¶ 44.[3]

The NCAA's Division I members have also agreed to enable colleges and universities to retain additional personnel to provide additional instruction and support to student-athletes. Thus, the Division I bylaws permit teams to have one "volunteer coach." *Id.* ¶¶ 3, 44. As the name suggests, Division I members

---

[3] *Cf.* NCAA Bylaw 11.7.6, available at https://web3.ncaa.org/lsdbi/bylaw?bylawId=40460. The challenged bylaws are appropriate for consideration on a motion to dismiss because Plaintiffs' Amended Complaint "refers extensively to the document" and because bylaws "form[] the basis of the [Plaintiffs'] claim." *Applied Underwriters, Inc. v. Lara*, 530 F. Supp. 3d 914, 923 (E.D. Cal. 2021) (Shubb, J.)(quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

1  cannot pay a volunteer coach.  *Id.* ¶ 44.  To ensure that a

2  volunteer coach is not simply a paid coach that would violate the

3  limit on the number of paid coaches, the Division I bylaws

4  prohibit teams from offering volunteer coaches compensation beyond

5  minimal, incidental non-cash benefits such as complementary

6  tickets or meals in connection with their team's competitions.

7  *Id.* ¶ 46.

8      In January 2023, the NCAA's Division I membership amended the

9  Division I bylaws to permit an additional paid coach in Division I

10  sports (other than football and basketball) and eliminate the

11  volunteer coach position effective July 1, 2023.  *Id.* ¶ 65.

12  Plaintiffs' Amended Complaint does not allege that these new

13  bylaws violate the antitrust laws.

14      Plaintiffs allege that they volunteered as coaches at various

15  Division I institutions in various sports at various times.  The

16  following chart summarizes Plaintiffs' allegations:

| Plaintiff | Institution | Sport | Years |
|---|---|---|---|
| Joseph Colon | Fresno State | Wrestling | 2017-2020 |
| Shannon Ray | Arizona State | Track and Field | 2019-2021 |
| Khala Taylor | San Jose State | Softball | 2022-Present |
| Peter Robinson | University of Virginia | Swimming and Diving | 2019-2021 |
| Katherine Sebbane | University of Pittsburgh | Softball | 2019-2021 |
| Patrick Mehlert | American University | Men's Soccer | 2019-2021 |

24  *Id.* ¶¶ 7-12.  Plaintiffs do not allege that any Division I

25  institution where any Plaintiff volunteered would have hired an

26  additional paid coach in the sport that the Plaintiff coached or

27  hired the Plaintiff as that paid coach.

28

DEFENDANT NCAA'S MOTION TO DISMISS

1 | III. **LEGAL STANDARDS**

2 To survive a motion to dismiss under Rule 12(b)(6), a

3 complaint "must contain sufficient factual matter, accepted as

4 true, to 'state a claim to relief that is plausible on its face.'"

5 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

6 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[L]abels and

7 conclusions" or "a formulaic recitation of the elements of a cause

8 of action" do not suffice.  *Twombly*, 550 U.S. at 555.  Thus, the

9 court may disregard "allegations that are merely conclusory,

10 unwarranted deductions of fact, or unreasonable inferences."

11 *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

12 2001).  Dismissal is also warranted where a complaint "lacks a

13 cognizable legal theory" or "'relief is barred' for some legal

14 reason."  *Friends of Roeding Park v. City of Fresno*, 848 F. Supp.

15 2d 1152, 1160 (E.D. Cal. 2012) (citations omitted).

16 | IV. **ARGUMENT**

17 Plaintiffs have failed to allege a violation of Section 1 of

18 the Sherman Act because they have not alleged that the NCAA's

19 bylaws caused them any injury, which is a required element of

20 their claim.  In addition, Plaintiffs have failed to plead an

21 antitrust claim under a "rule of reason" theory because they have

22 not alleged a proper relevant antitrust market.

23 | A. **Plaintiffs Have Failed to Allege Causal Antitrust Injury**

24 Plaintiffs have failed to allege a federal antitrust claim

25 because they have not alleged "causal antitrust injury", which is

26 "an essential element of any remedy under the Sherman Act."

27 *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986)

28 (citation omitted).  An antitrust plaintiff must "allege some

-8-

credible injury caused by the unlawful conduct." *Am. Ad Mgmt.,
Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir.
1999).  Even if Plaintiffs were right that this is a price-fixing
case (which they are not), they would still have to prove causal
antitrust injury.  *See Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328, 344 (1990).

Claims of injury "where causation is highly speculative are
not an appropriate basis for an antitrust claim." *Stearns v.
Select Comfort Retail Corp.*, 2009 WL 1635931, at *13 (N.D. Cal.
June 5, 2009); *see City of Oakland v. Oakland Raiders*, 20 F.4th
441, 459 (9th Cir. 2021) (affirming dismissal of antitrust claim
where alleged theory of injury was "too speculative to establish
antitrust standing"); *Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981, 997-98 (N.D. Cal. 2020) (dismissing antitrust
claim where "Plaintiffs have failed to plausibly allege in a non-
conclusory manner that they themselves have been injured").
Pleading that "[t]he removal of some elements of price competition
distorts the markets, and harms all the participants" does not
suffice to allege causal antitrust injury.  *Atl. Richfield Co.*,
495 U.S. at 339 n.8.

That is particularly true where, as here, an antitrust
plaintiff's theory of injury is that the plaintiff would have
bought or sold something that was not bought or sold in the actual
world.  For example, just as Plaintiffs here allege that NCAA
bylaws provide for a "limited number of paid coaches in each
sport."  Am. Compl. ¶ 2, in *City of Oakland*, the City of Oakland
alleged that the NFL's bylaws "limit[] both the number of teams
and the freedom of teams to relocate."  20 F.4th at 450.  The

-9-

Ninth Circuit affirmed dismissal because the City's complaint did not allege facts explaining why, "but for the limited number of teams, *Oakland* would still have an NFL team." *Id.* at 459 (emphasis added).  The Court of Appeals explained that the complaint had not answered questions such as:  "Would new teams have joined the NFL?" and "Would the City have been willing and able to pay a competitive price?" *Id.* at 459-60.  Accordingly, there were "too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries." *Id.* at 460.

The same is true here.  Plaintiffs have challenged a "bylaw that has restricted NCAA Division I schools to a limited number of paid coaches in each sport." Am. Compl. ¶ 2.  Thus, in order to show that they suffered an injury caused by the challenged bylaws, each Plaintiff must show that the Division I institution the Plaintiff volunteered for would have hired an *additional* paid coach in the sport the Plaintiff coached and would have hired the Plaintiff as that coach.  For example, Plaintiff Joseph Colon alleges that he volunteered as a wrestling coach at Fresno State between 2017 and 2020. *Id.* ¶ 7.  NCAA bylaws limit Division I institutions to three paid wrestling coaches. *Id.* ¶ 45.[4]  Thus, in order for Plaintiff Colon to allege that he suffered an injury caused by that bylaw, he must show that Fresno State would have hired four paid wrestling coaches if the bylaws permitted it.

Plaintiffs have not alleged these facts.  To the contrary,

---

[4] NCAA Bylaw 11.7.6, available at https://web3.ncaa.org/lsdbi/bylaw?bylawId=40460.

1   Plaintiffs' Amended Complaint alleges facts that cast doubt on
2   whether the Division I institution each Plaintiff volunteered for
3   would have hired an additional paid coach in the sport the
4   Plaintiff coached.  *See Somers v. Apple, Inc.*, 729 F. 3d 953, 964
5   (9th Cir. 2013) (dismissing antitrust claim where plaintiff
6   alleged that Apple would have charged lower prices but did not
7   account for "contradictory market facts alleged in her
8   complaint").  Plaintiffs' own Amended Complaint alleges that
9   "[t]here is a wide gulf among Division I schools," Am. Compl.
10  ¶ 64, with respect to their allocation of resources.  Plaintiffs
11  further allege that a "school's emphasis" on a particular sport
12  will affect that school's willingness to pay coaches.  *Id.* ¶ 38.
13  Those allegations undermine any inference that every Division I
14  institution would have hired an additional paid coach for every
15  single one of the 4,951 Division I teams identified in Plaintiffs'
16  Amended Complaint, which Plaintiffs do not actually allege.

17      Plaintiffs cannot merely allege that in general volunteer
18  coaches would have earned more if the NCAA bylaws permitted
19  Division I institutions to hire more paid coaches.  This case is
20  "not yet a class action," so "[g]eneralized accusations of
21  wrongdoing against [class] as a whole do not suffice."  *Kelsey K.*
22  *v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1148 (N.D. Cal. 2017)
23  (dismissing an antitrust claim alleging a conspiracy to suppress
24  earnings of NFL cheerleaders).  Rather, Plaintiffs must allege
25  that the Division I institutions they volunteered for would have
26  hired an additional paid coach *in the sports they coach*.
27  Plaintiffs have not alleged this for any Plaintiff.  That is fatal
28  to Plaintiffs' antitrust claim regardless of whether that claim is

-11-

1 evaluated under a *per se*, "quick look" or "rule of reason"

2 standard of scrutiny.  *See* Am. Compl. ¶ 72.

3     **B.**   **Plaintiffs Have Failed to State an Antitrust Claim Under the Rule of Reason**

4     Even if Plaintiffs had pled causal antitrust injury, their

5 claim under the "rule of reason," *id.*, would still warrant

6 dismissal because Plaintiffs have not pled a relevant antitrust

7 market.  *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1106

8 (N.D. Cal. 2022) ("Where a complaint fails to adequately allege a

9 relevant market underlying its antitrust claims, those claims must

10 be dismissed."); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th

11 Cir. 2018) (affirming dismissal of antitrust claim where "proposed

12 product markets are 'facially unsustainable' because they fail to

13 include many 'reasonabl[y] interchangeab[le]' products") (citation

14 omitted); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038,

15 1045 (9th Cir. 2008) (claim is subject to dismissal where it is

16 "apparent from the face of the complaint that the alleged market

17 suffers a fatal legal defect").

18     "[C]ourts usually cannot properly apply the rule of reason

19 without an accurate definition of the relevant market" because

20 "[w]ithout a definition of [the] market there is no way to measure

21 [the defendant's] ability to lessen or destroy competition." *Ohio*

22 *v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (citation omitted).

23 Thus, under the rule of reason, a plausible market definition is

24 "an essential predicate to the entire case." *Reilly*, 578 F. Supp.

25 3d at 1106 (dismissing antitrust claim for, among other things,

26 failure to allege an adequate market); *see also Rock v. NCAA*, 928

27 F. Supp. 2d 1010, 1016, 1020-1023 (S.D. Ind. 2013) (granting motion

28

-12-

to dismiss antitrust claim challenging cap on number of scholarships on Division I football and basketball teams for failure to plead a proper relevant market); *see also Agnew v. NCAA*, 683 F.3d 328, 345-47 (7th Cir. 2012) (same).

"To survive a motion to dismiss, 'the market must encompass the product at issue as well as all economic substitutes for the product.'" *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (quoting *Newcal Indus.*, 513 F.3d at 1045).  In economic terms, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it." *Id.* (citation omitted).  Here, Plaintiffs allege that Division I institutions are a "buyer-side cartel."  Am. Compl. ¶ 4.  In such a case, the relevant market is "comprised of buyers who are seen by sellers as being reasonably good substitutes." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (citation omitted).  Thus, the market definition question here is whether Plaintiffs have alleged a market that includes jobs that coaches would consider substitutes.

Market definition focuses on substitutes because they constrain efforts to harm competition. *See Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.").  If volunteer coaches can switch to other coaching opportunities, then

-13-

it would make little sense for Division I member institutions to exploit coaches as Plaintiffs allege because Plaintiffs could avoid the scheme and find employment coaching elsewhere.

Plaintiffs' Amended Complaint fails to allege a proper antitrust market for three reasons.

*First*, Plaintiffs' Amended Complaint never specifically identifies any relevant product market. The closest Plaintiffs come is to refer in passing to a "labor market for coaches." Am. Compl. ¶ 2; *see also id.* ¶ 4 ("the labor market for valuable college coaching services"). Such a vaguely defined market is insufficient as a matter of law because it would not enable one "to measure [the defendant's] ability to lessen or destroy competition." *Am. Express Co.*, 138 S. Ct. at 2285 (citation omitted). Indeed, Plaintiffs do not allege that the NCAA has market power in a "labor market for coaches" generally.

Courts reject antitrust claims premised on such inchoate markets. *E.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) (dismissing antitrust claim where "the parameters of the people analytics market – as pled – are vague" and it was not clear "what substitutes there are"); *Intel Corp. v. Fortress Inv. Grp. LLC*, 2020 WL 6390499, at *11 (N.D. Cal. July 15, 2020) (same where allegations regarding market were "vague and overbroad"); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *4 (N.D. Cal. Apr. 22, 2019), *aff'd*, 811 F. App'x 422 (9th Cir. 2020)(same where alleged market was "veterinary wellness and medication products" because "one cannot determine what types of products are encompassed by the term 'wellness,' which plaintiffs do not define"); *Person v. Google, Inc.*), 2007 WL 832941, at *4

-14-

1  (N.D. Cal. Mar. 16, 2007) (same where "Plaintiff's definition of

2  the relevant market is vague and overbroad"). This Court should do

3  the same.

4      *Second*, to the extent that Plaintiffs have identified any

5  relevant market, they have improperly included coaching positions

6  in all sports, which are not substitutes.  The law is clear that

7  "the market must encompass the product at issue as well as all

8  economic substitutes for the product." *Newcal Indus.*, 513 F.3d at

9  1045.  Thus, the court in *Rock v. NCAA* concluded that a proposed

10 nationwide market for the labor of student athletes is not legally

11 cognizable" because "it includes all student-athletes in the same

12 labor market without accounting for germane differences such as

13 gender and sport played." *Rock*, 928 F. Supp. 2d at 1022.

14     The same is true here where Plaintiffs allege that they coached

15 swimming and diving, softball, track and field, soccer and

16 wrestling, but do not allege that coaching those sports are

17 substitutes for each other.  Plaintiffs do not allege, for example,

18 that a job coaching wrestling is a substitute for a job coaching

19 soccer, but Plaintiffs appear to include both jobs in the market.

20 That is improper as a matter of law. *E.g.*, *Westlake Servs., LLC v.*

21 *Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7,

22 2015) (dismissing antitrust claim alleging markets that "include

23 products that cannot plausibly be considered substitutes"); *Seirus*

24 *Innovative Accessories, Inc. v. Cabela's, Inc.*, 2010 WL 6675046, at

25 *3 (S.D. Cal. Apr. 20, 2010) (same as to antitrust claim alleging

26 a "cold-weather face, neck and head protection market" that "could

27 include wool hats, scarves, helmets, lotions, and a variety of other

28 products that are not economic substitutes for the products at

-15-

1   issue" (citation omitted)); *Golden Gate Pharmacy Servs., Inc. v.*
2   *Pfizer, Inc.*, 2010 WL 1541257, at *3 (N.D. Cal. Apr. 16, 2010),
3   *aff'd,* 433 F. App'x 598 (9th Cir. 2011) (same as to antitrust claim
4   alleging a market for "all pharmaceutical products" where plaintiffs
5   did not allege that all such products "are reasonably
6   interchangeable with one another" (citation omitted)).

7        *Third*, even considering each sport on its own (which Plaintiffs
8   fail to do in their Amended Complaint), Plaintiffs have not
9   accounted for substitutes for coaching in Division I.  In upholding
10  an NCAA bylaw capping the number of coaches on Division I football
11  and basketball teams, the Fifth Circuit recognized that
12  opportunities to coach outside of Division I can be competitively
13  significant:  "There are, indeed, many opportunities for coaches to
14  pursue their vocations in addition to those now partially limited
15  with Division I members of the NCAA: colleges which are in other
16  divisions of the NCAA; colleges which are not in the NCAA;
17  professional teams; and high schools." *Hennessey*, 564 F.2d at 1154.
18  Plaintiffs' Amended Complaint does not plead facts supporting a
19  plausible inference that a volunteer coach would not switch to one
20  of these other coaching positions if compensation for coaches in
21  Division I declined below the competitive level.  Plaintiffs'
22  "failure to address or analyze these plausible alternatives is fatal
23  to [their] proposed market definition," *Reilly*, 578 F. Supp. 3d at
24  1108, and thus to their ability to show that the NCAA had market
25  power to harm coaches.

26       Plaintiffs completely ignore opportunities to coach sports at
27  high schools.  Plaintiffs do not explain why, for example, working
28  as head swimming or wrestling or field hockey or track coach at an

1  elite high school is not a substitute for working as an assistant
2  coach for a college team.

3      Further, Plaintiffs offer no sound reason why coaching
4  professional athletes in the sports Plaintiffs coach is not a
5  substitute for coaching in Division I. Plaintiffs allege that
6  "[p]rofessional coaching opportunities are non-existent or
7  extremely limited for the NCAA Division I sports involved in this
8  case," Am. Compl. ¶ 54, but they do not allege that there are more
9  Division I coaching opportunities than professional opportunities
10  in all sports.  It is far from obvious, for example, that there are
11  more opportunities coaching Division I golf than working as a golf
12  pro (which further underscores the problem with defining a market
13  that does not account for the particulars of coaching in each
14  sport).  *See Hicks*, 897 F.3d at 1122 (affirming dismissal of
15  antitrust claim alleging market for advertising during live golf
16  broadcasts where plaintiffs "provide no explanation why this group
17  of fans is distinct for advertising purposes from the typical group
18  of golf fans").

19      Plaintiffs allege that the NCAA has "espoused the view that
20  college sports are 'a product that is distinct from professional
21  sports.'" Am. Compl. ¶ 54.  But what matters for market definition
22  in this case is not whether college and professional sports are
23  substitutes for viewers but whether jobs coaching college and
24  professional sports are reasonable substitutes for coaches.  *See*
25  *Campfield*, 532 F.3d at 1118.

26      Although Plaintiffs have not formally defined any market
27  limited to coaching in Division I, their Amended Complaint does
28  allege facts that attempt to distinguish coaching in Division I

-17-

from coaching in Division II or III.  To the extent that Plaintiffs'
Amended Complaint could be read to try to allege a market limited
to coaching in particular sports in Division I without saying so,
Plaintiffs' Amended Complaint does not properly plead such a market.
To the contrary, Plaintiffs allege that Division I teams have been
"attracting new coaches from Division II and Division III to serve
as volunteer coaches" in Division I.  Am. Compl. ¶ 57.  Allegations
that coaches are substituting between jobs across NCAA Divisions
support including jobs across all Divisions in the same market.

Plaintiffs allege that Division I coaching jobs provide coaches
with the "highest quality" players, opponents, equipment, training
methods and fellow coaches.  *Id.* ¶ 56.  However, Plaintiffs cannot
define a market limited to jobs coaching in Division I by alleging
that those jobs are better than coaching jobs in other Divisions.
A "market is composed of products that have reasonable
interchangeability for the purposes for which they are produced—
price, use and qualities considered."  *Paladin Assocs., Inc. v.
Mont. Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003) (citation
omitted); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d
974, 996 (N.D. Cal. 2010) ("Reasonable interchangeability means all
products which could be used for the same general purpose, despite
functional or price differences among them.").

Accordingly, "[c]ourts have repeatedly rejected efforts to
define markets by price variances or product quality variances."
*In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F.
Supp. 1262, 1268 (N.D. Cal. 1988) ("Such distinctions are
economically meaningless where the differences are actually a
spectrum of price and quality differences.").  For example, the

-18-

1  Supreme Court held that cellophane was in the same market as other

2  flexible wrapping "despite cellophane's advantages" because "it has

3  to meet competition from other materials in every one of its uses."

4  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 399

5  (1956).   Even if other coaching "opportunities may not be as

6  rewarding, either financially or emotionally, to many coaches, the

7  fact of their existence must be taken into account in measuring the

8  'market power' of the NCAA Division I teams and the economic effects

9  of the rule."  *Hennessey*, 564 F.2d at 1154.

10      Plaintiffs' failure to allege a relevant antitrust market is

11  fatal to their rule of reason claim.   Unless and until Plaintiffs

12  plead a proper relevant market, their federal antitrust claim cannot

13  proceed unless they abandon their rule of reason theory and instead

14  assume the burden to prove that the challenged bylaws limiting the

15  number of paid coaches are "so plainly anticompetitive that courts

16  need undertake only a cursory examination before imposing antitrust

17  liability."  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,

18  9 F.4th 1102, 1113 n.6 (9th Cir. 2021).

19  **V.**   **CONCLUSION**

20      In the event that the Court does not grant the NCAA's motion

21  to transfer, the Court should dismiss Plaintiffs' claims.

22  Respectfully submitted,

23  DATED:  May 23, 2023            MUNGER, TOLLES & OLSON LLP

24

25                                  By:   */s/Carolyn Hoecker Luedtke*

26                                  CAROLYN HOECKER LUEDTKE

27                                  *Attorneys for Defendant National*
                                    *Collegiate Athletic Association*

28