1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10
                              ----oo0oo----
11

12  TAYLOR SMART AND MICHAEL              No. 2:22-cv-02125 WBS
    HACKER, Individually and on           KJN
13  Behalf of All Those Similarly
    Situated,
14
              Plaintiffs,
15
         v.
16                                        MEMORANDUM AND ORDER RE:
                                          DEFENDANT'S MOTION TO
17  NATIONAL COLLEGIATE ATHLETIC          TRANSFER AND MOTION TO
    ASSOCIATION, an unincorporated        DISMISS
18  association,
              Defendant.
19

20  JOSEPH COLON, SHANNON RAY,
    KHALA TAYLOR, PETER ROBINSON,
21  KATHERINE SEBBAME, and PATRICK        No. 1:23-cv-00425 WBS
    MEHLER, individually and on           KJN
22  behalf of all those similarly
    situated,
23
              Plaintiffs,
24
         v.
25
    NATIONAL COLLEGIATE ATHLETIC
26  ASSOCIATION, an unincorporated
    association,
27
              Defendant.
28
                                  1

----ooOoo----

Plaintiffs in these related cases brought these putative class actions against the National Collegiate Athletic Association ("NCAA"), alleging the NCAA and its member schools illegally conspired to fix the compensation of a category of Division I coach at $0.  (Smart Compl. (Smart Docket No. 1); (Colon First Am. Compl. ("Colon Compl.") (Colon Docket No. 19).)

Plaintiffs Taylor Smart and Michael Hacker (collectively "Smart Plaintiffs"), who seek to represent volunteer baseball coaches, assert claims for (1) violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) quantum meruit under various state laws; (3) unjust enrichment under various state laws; (4) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; and (5) declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201.  (See generally Smart Compl.)

Plaintiffs Joseph Colon, Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbame, and Patrick Mehler, who seek to represent volunteer coaches in sports other than baseball, assert one claim for violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  (See generally Colon Compl.)

Before the court are defendant's motions to transfer the cases to the Southern District of Indiana (Smart Docket No. 6; Colon Docket No. 26) and motions to dismiss (Smart Docket No. 7; Colon Docket No. 27).

I.    Factual Allegations[1]

---

[1]    Because many of the allegations in the complaints are identical, the court will frequently cite only to the Smart

2

1    The NCAA is an unincorporated association with its
2    principal place of business in Indianapolis, Indiana.  (Smart
3    Compl. ¶ 8.)  There are around 1,100 member schools within the
4    NCAA.  (Id. ¶ 8.)  The NCAA and its member schools adopt and
5    enforce the rules regulating college sports.  (Id. ¶ 33.)  There
6    are three divisions within the NCAA.  (Id.)  The top division is
7    Division I.  (Id.)  There are approximately 350 Division I
8    schools.  (Colon Compl. ¶ 28.)  Anyone who wishes to coach for a
9    Division I team must work for an NCAA member school.  (Smart
10   Compl. ¶ 36.)

11   College sports and the NCAA have grown enormously over
12   the past decades.  (Id. ¶ 25.)  In 2019, NCAA Division I member
13   schools generated close to $16 billion in athletics revenue.
14   (Id. ¶ 25.)  In 2021, the NCAA itself earned $1.15 billion.  (Id.
15   ¶ 25.)  College baseball, the sport represented in the Smart
16   case, has shared in the increased growth and popularity of the
17   NCAA.  (Id. ¶ 26.)  For example, in 2019, the College World
18   Series championship game was the most watched baseball game that
19   year on ESPN, including professional games aired on ESPN.  (Id. ¶
20   32.)  The 2022 NCAA College World Series drew a record crowd of
21   over 366,000 fans.  (Id. ¶ 29.)  In 2022, an average of 10,376
22   people attended each home baseball game at the University of
23   Arkansas, the school where Plaintiff Smart worked as a volunteer
24   coach.  (Id. ¶ 26.)

25   The sports represented in the Colon case have likewise
26   shared in the growth and popularity of the NCAA.  (Colon Compl. ¶

27   _____

28   Complaint or the Colon Complaint for convenience.

3

31.)  For example, the 2022 17-game Women's College World Series drew an average of 1.2 million viewers per game on ESPN.  (Id.)  The NCAA volleyball final also drew 1.2 million viewers on ESPN.  (Id.)  In 2022, 4,224 athletes competed at the Division I outdoor track and field 2022 Track and Field Championships.  (Id.)

Division I coaches can earn sizeable salaries.  (Smart Compl. ¶ 38.)  The head baseball coach at the University of Arkansas, where Plaintiff Smart coached, earns an annual salary of over $1 million per year.  (Id. ¶ 33.)  The head softball coach at the University of Oklahoma earns an annual salary of $1.625 million.  (Colon Compl. ¶ 35.)  Both the head wrestling coach at the University of Iowa and the head track coach at the University of Georgia earn annual salaries greater than $500,000.  (Id.)  The two paid assistant baseball coaches at the University of Arkansas earn $225,000 and $300,000 per year along with other benefits.  (Smart Compl. ¶ 33.)  Coaching salaries are also increasing.  (Colon Compl. ¶ 39.)  For example, from 2013 to 2018, the salaries of softball coaches at schools in the five biggest conferences increased by an average of 62 percent.  (Id.)

Division I sports are limited to a specific number of paid coaches per team.  (Colon Compl. ¶ 44.)  Through the adoption of NCAA Bylaw 11.01.06 (the "Bylaw"), NCAA member schools agreed to allow one additional coach – the "Volunteer Coach."[2]  (Id.)  Prior to January of 2023, this coach could not be paid.  (Id.)  There were also numerous other restrictions on

_____

[2]   In January 2023, after the Smart Plaintiffs in the filed their Complaint, but before the Colon Plaintiffs, the NCAA amended the Division I bylaws to eliminate the volunteer coach position effective July 2023 and permit four paid baseball coaches.

the volunteer coach position, including: in what circumstances the member school was allowed to provide meals to the volunteer coach; prohibiting paying for housing, health insurance, or other employment benefits; and forbidding volunteer coaches from recruiting players.  (Smart Compl. ¶¶ 45-46, 49.) Notwithstanding these restrictions on the volunteer coach position, these coaches generally worked over 40 hours per week and performed most of the same duties as paid coaches, such as attending all practices and games, traveling for away games, and preparing game strategies.  (Id. ¶ 48.)

Plaintiff Smart and Plaintiff Hacker worked as volunteer baseball coaches.  Plaintiff Smart worked as a volunteer coach at the University of Arkansas from 2018 to 2020. (Id. ¶ 64.)  Plaintiff Smart's duties included being the first-base coach during games, the team's assistant hitting coach, and developing as well as helping run practice.  (Id. ¶ 66.) Plaintiff Hacker worked as a volunteer coach at the University of California, Davis from 2019 to 2021.  (Id. ¶ 70.)  Plaintiff Hacker's duties included being the pitching coach and developing as well as helping run practice.  (Id. ¶ 72.)  Both plaintiffs allege that they worked five to six days per week and traveled to away games.  (Id. ¶ 67, 73.)

Plaintiff Colon worked as a volunteer wrestling coach at Fresno State University from 2017-2022.  (Colon Compl. ¶ 7.) Plaintiff Ray worked as a volunteer track and field coach at Arizona State University from 2019 to 2021.  (Id. ¶ 8.) Plaintiff Taylor continues to work as a softball coach at San Jose State University, where she began coaching as a volunteer

5

coach in 2022.  (Id. ¶ 9.)  Plaintiff Robinson worked as a volunteer swimming and diving coach at the University of Virginia from 2019 to 2021.  (Id. ¶ 10.)  Plaintiff Sebbane worked as a volunteer softball coach at the University of Pittsburgh from 2019 to 2021.  (Id. ¶ 11.)  Plaintiff Mehler continues to work as a men's soccer coach at American University, where he began coaching as a volunteer coach in 2019.  (Id. ¶ 12.)

II.  Motion to Transfer

     "A defendant for whom venue is proper but inconvenient may move for a change of venue under 28 U.S.C. § 1404(a)." Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1181 (9th Cir. 2004); 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.")  The purpose of this provision "is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'"  Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).

     The moving party has the burden of showing that transfer is appropriate.  Williams v. Bowman, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001); cf. Jones v. GNC Franchising, Inc., 211 F.3d 495, 499 (9th Cir. 2000) (noting that defendant failed to meet burden of showing that the alternative forum was more appropriate).  Because the statute contemplates transfer "to any other district or division where it might have been brought," see 28 U.S.C. § 1404(a), defendant must first make a threshold showing that venue and jurisdiction would be proper in the

district to which it seeks transfer.  Vu v. Ortho-McNeil Pharm., Inc., 602 F. Supp. 2d 1151, 1155 (N.D. Cal. 2009); see also F.T.C. v. Watson Pharm., Inc., 611 F. Supp. 2d 1081, 1090 (C.D. Cal. 2009) ("For transfer under § 1404(a), the threshold issue is whether the case 'might have been brought' in the proposed venue.").  Here, it is undisputed that venue and jurisdiction would be proper in the Southern District of Indiana because the case involves a question of federal law and the NCAA is headquartered in Indianapolis, which is within that district.  (Smart Mot. Transfer at 4-5 (Docket No. 6); Colon Mot. Transfer at 7 (Docket No. 7).)

Next "the [c]ourt must evaluate three elements: (1) convenience of the parties; (2) convenience of the witnesses; and (3) interests of justice."  Anza Tech., Inc. v. Toshiba Am. Elec. Components, No. 2:17-cv-01688 WBS DB, 2017 WL 6538994, at *2 (E.D. Cal. Dec. 21, 2017) (quoting Safarian v. Maserati N. Am., Inc., 559 F. Supp. 2d 1068, 1071 (C.D. Cal. 2008)) (quotations omitted).  This analysis may include a number of factors, such as the plaintiff's choice of forum, the parties' contacts with the forum, the contacts relating to the plaintiff's cause of action in the chosen forum, the differences in the costs of litigation in the two forums, the ease of access to the evidence, and the feasibility of consolidating other claims.  Jones, 211 F.3d at 498-99; Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986).  Section 1404(a) affords district courts broad discretion "to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness."  Jones, 211 F.3d at 498 (quoting Stewart Org. v. Ricoh

1   Corp., 487 U.S. 22, 29 (1988)) (internal quotation marks
2   omitted).

3           The court finds the balance of factors does not weigh
4   in favor of transfer.  First, in considering convenience of the
5   parties, courts generally accord "great weight" to the
6   plaintiff's choice of forum.  Lou v. Belzberg, 834 F.2d 730, 739
7   (9th Cir. 1987).  However, when an individual represents a class,
8   the named plaintiff's choice of forum receives less weight.  Id.;
9   Hawkins v. Gerber Prods. Co., 924 F. Supp. 2d 1208, 1214-15 (S.D.
10  Cal. 2013) ("In part, the reduced weight on plaintiff's choice of
11  forum in class actions serves as a guard against the dangers of
12  forum shopping, especially when a representative plaintiff does
13  not reside within the district.").  A plaintiff's choice of forum
14  also receives less weight where the operative facts have not
15  occurred within the forum and the forum has no particular
16  interest in the parties or subject matter.  Id. at 1215 (citing
17  Pac. Car & Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir.
18  1968)).

19          Here, both cases are putative class actions in which
20  plaintiffs seek to represent classes of volunteer coaches from
21  across the country.  Plaintiff Hacker's job as a baseball coach
22  at UC Davis, which is within this district, gave rise to the
23  Smart litigation.  Plaintiff Hacker continues to reside in the
24  district.  Plaintiff Colon's job as a wrestling coach at Fresno
25  State University, which is also within this district, gave rise
26  to Colon litigation.  Thus, while plaintiffs' choice of forum
27  receives less weight because it is a class action, the fact that
28  these named plaintiffs worked in this district overcomes any

inference of forum shopping.  See Lou, 834 F.2d at 739; Hawkins
v. Gerber Prods. Co., 924 F. Supp. 2d 1208, 1214-15 (S.D. Cal.
2013).

Second, as for convenience to witnesses, "[c]onvenience
of nonparty witnesses 'is often the most important factor [in the
section 1404(a) analysis]." Tolentino v. Mossman, No. 2:07-cv-
1243 GEB DAD, 2008 WL 1787752, at *1 (E.D. Cal. Apr. 18, 2008)
(quoting A.J. Indus., Inc. v. U.S. Dist. Ct., 503 F.2d 384, 389
(9th Cir. 1974)); see also Welenco, Inc. v. Corbell, No. 2:13—cv-
287 KJM CKD, 2014 WL 130526, at *7 (E.D. Cal. Jan. 14, 2014)
(citation omitted).  Defendant states that party witnesses will
include NCAA employees, all of whom are based in Indianapolis.
(Smart Mot. Transfer at 8; Colon Mot. Transfer at 9-10.)  While
this may well be true, defendant has not identified any specific
witnesses.  See Williams, 157 F. Supp. 2d at 1108 ("To
demonstrate the inconvenience of witnesses, the moving party must
identify relevant witnesses, state their location and describe
their testimony and its relevance.").  On the other hand, counsel
for plaintiffs represent that Mr. Hacker, as both a named
plaintiff and potential class representative, wishes to be
present in court for the pretrial proceedings.  Keeping these
cases in this court, only some twenty miles from his residence,
would make it much easier for him to do so.

Third, the court must consider the "interests of
justice," which may incorporate factors including judicial
efficiency, familiarity with governing law, and any local
interest in the controversy.  While plaintiffs in both cases
assert federal claims, the Smart Plaintiffs also allege

1   violations of California's UCL, Cal. Bus. & Prof. Code §§ 17200

2   et seq.  Although it can be said that a federal judge in Indiana

3   would also be able to apply California law, it cannot be ignored

4   that a court in California would likely be more familiar with

5   these state statutes and that California would have a stronger

6   interest in their proper interpretation and enforcement.

7        Because defendant has failed to make the requisite

8   "strong showing of inconvenience to warrant upsetting the

9   plaintiff's choice of forum," Decker Coal, 805 F.2d at 843, the

10  court finds transfer of these cases is not appropriate under 28

11  U.S.C. § 1404(a).

12  III. Motion to Dismiss

13       A.   Legal Standard

14        Federal Rule of Civil Procedure 12(b)(6) allows for

15  dismissal when the plaintiff's complaint fails to state a claim

16  upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

17  "A Rule 12 (b)(6) motion tests the legal sufficiency of a claim."

18  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  The inquiry

19  before the court is whether, accepting the allegations in the

20  complaint as true and drawing all reasonable inferences in the

21  plaintiff's favor, the complaint has alleged "sufficient facts

22  . . . to support a cognizable legal theory," id., and thereby

23  stated "a claim to relief that is plausible on its face," Bell

24  Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding

25  such a motion, all material allegations of the complaint are

26  accepted as true, as well as all reasonable inferences to be

27  drawn from them.  Id.

28        "In order to survive a motion to dismiss under Rule

10

1   12(b)(6), an antitrust complaint 'need only allege sufficient

2   facts from which the court can discern the elements of an injury

3   resulting from an act forbidden by the antitrust laws.'"  Cost

4   Mgmt. Servs. Inc. v. Wash. Nat. Gas Co., 99 F.3d 937, 950 (9th

5   Cir. 1996) (citation omitted).

6       B.   Sherman Act § 1 (Claim 1)[3]

7           Section 1 of the Sherman Act provides: "Every contract,

8   combination in the form of trust or otherwise, or conspiracy, in

9   restraint of trade or commerce among the several States, or with

10  foreign nations, is declared to be illegal."  15 U.S.C. § 1.

11  "Although on its face, Section 1 appears to outlaw virtually all

12  contracts, it has been interpreted as 'outlaw[ing] only

13  unreasonable restraints' of trade."  In re Nat'l Football

14  League's Sunday Ticket Antitrust Litig., 933 F.3d 1136, 1149-50

15  (9th Cir. 2019) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10

16  (1997)).  "Because § 1 . . . only [prohibits] restraints effected

17  by a contract, combination, or conspiracy, the crucial question

18  is whether the challenged anticompetitive conduct stems from an

19  independent decision or from an agreement, tacit or express."

20  Twombly, 550 U.S. at 553 (citations and internal quotations

21  omitted); see Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., 20

22  F.4th 466, 479 (9th Cir. 2021) ("To establish a conspiracy, the

23  available evidence must tend 'to exclude the possibility that the

24  alleged conspirators acted independently.'") (citation and

25  internal quotations omitted).

26          The court will first address whether plaintiffs have

27  _____

28      [3]   Both Smart Plaintiffs and Colon Plaintiffs assert a
    claim under § 1 of the Sherman Act.

1   adequately alleged antitrust injury before addressing whether

2   plaintiffs have adequately pled a claim under § 1 of the Sherman

3   Act.

4          1.   Antitrust Injury

5          Antitrust injury is a "substantive element of an

6   antitrust claim, and the fact of injury or damage must be alleged

7   at the pleading stage." Somers v. Apple, Inc., 729 F.3d 953, 963

8   (9th Cir. 2013); see City of Oakland, 20 F.4th at 456 ("antitrust

9   injury -- is mandatory") (citation omitted).  There are four

10  requirements for antitrust injury: "(1) unlawful conduct, (2)

11  causing an injury to the plaintiff, (3) that flows from that

12  which makes the conduct unlawful, and (4) that is of the type the

13  antitrust laws were intended to prevent." Id. (quoting Am. Ad

14  Mgmt. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1055 (9th Cir.

15  1999) (quotations omitted).

16          Here, plaintiffs allege that they suffered antitrust

17  injury because their compensation -- $0 -- is below the

18  compensation they would have received in a competitive market.

19  (Smart Compl. ¶ 53; Colon Compl. ¶¶ 68-69.)  "Restrictions on

20  price and output are the paradigmatic examples of restraints of

21  trade that the Sherman Act was intended to prohibit." NCAA v.

22  Bd. of Regents of Univ. of Okla., 468 U.S. 85, 107-08 (1984)

23  (citing Standard Oil Co. v. United States, 221 U.S. 1, 52-60

24  (1911)); cf. In re High-Tech Emp. Antitrust Litig., 856 F. Supp.

25  2d 1103, 1123 (N.D. Cal. 2012) ("The Ninth Circuit has held that,

26  where . . . an employee is the direct and intended object of an

27  employer's anticompetitive conduct, that employee has standing to

28  sue for antitrust injury.") (citing Ostrofe v. H.S. Crocker Co.,

1  Inc., 740 F.2d 739, 742-43 (9th Cir. 1984)) (additional citations

2  omitted).  Cf. Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d

3  979, 988 (9th Cir. 2000) ("When horizontal price fixing causes

4  buyers to pay more, or sellers to receive less, than the prices

5  that would prevail in a market free of the unlawful trade

6  restraint, antitrust injury occurs.").

7        Defendant argues that plaintiffs' antitrust allegations

8  are conclusory because neither plaintiff alleges facts showing

9  that he would have received more compensation without the Bylaw.[4]

10  (See Smart Mot. Dismiss at 18 (Docket No. 7); Colon Mot. Dismiss

11  at 9-10 (Docket No. 27).)  Defendant likewise contends that

12  plaintiffs do not allege that their respective teams would have

13  hired them as a paid assistant coach.[5]  (Smart Mot. Dismiss at

14  18; Colon Mot. Dismiss at 10-11.)  In drawing all inferences in

15  plaintiffs' favor, as the court must at this stage, it is not

16        [4]   The cases upon which defendant relies are
17  distinguishable.  (See Mot. Dismiss at 17-19.)  For example, in
   City of Oakland v. Oakland Raiders, 20 F.4th 441 (9th Cir. 2012),
18  Oakland argued that it suffered antitrust injury because, absent
   the challenged practice, Oakland would have either retained the
19  Raiders or acquired another team.  See id. at 559.  The Ninth
   Circuit rejected Oakland's argument, explaining: "[T]here is no
20  way of knowing [] what would have occurred in a more competitive
   marketplace.  Would new teams have joined the NFL?  Would they
21  have found Oakland attractive?"  Id.  Here, by contrast,
   plaintiffs' alleged injury is far less speculative.  Both
22  plaintiffs were hired as Division I baseball coaches but did not
   receive a salary because of the Bylaw.  That an already employed
23  baseball coach would be paid a salary over $0 absent the
   challenged conduct is a far less speculative injury than whether
24  a specific city would be selected to host one of only thirty-two
   NFL teams.

25        [5]   As discussed at oral argument, allegations that
26  plaintiffs would have been hired but for the Bylaw are different
   than allegations that plaintiffs would have been compensated.
27  Because plaintiffs were all hired as volunteer coaches, the issue
   here is whether they would have been paid, not whether they would
28  have been hired.

1   implausible that plaintiffs would have been paid a salary above

2   $0 but for the NCAA's adoption of the Bylaw.  See Cost Mgmt., 99

3   F.3d at 950 ("[A]n antitrust complaint need only allege

4   sufficient facts from which the court can discern the elements of

5   an injury") (citation omitted).

6        Moreover, allegations of horizontal price fixing

7   premised on the creation of the volunteer coach position are

8   sufficient to show antitrust injury.  See Bd. of Regents, 468

9   U.S. at 107-08 ("Restrictions on price and output are the

10  paradigmatic examples of restraints of trade that the Sherman Act

11  was intended to prohibit."); In re High-Tech, 856 F. Supp. 2d at

12  1123 (employee has suffered antitrust injury where it is the

13  "direct and intended object of employer's anticompetitive

14  conduct").  Therefore, the court finds plaintiffs have plausibly

15  alleged antitrust injury.

16            2.   Sherman Act § 1

17        To state a claim under § 1 of the Sherman Act, a

18  plaintiff must show: "(1) a contract, combination or conspiracy;

19  (2) that unreasonably restrained trade under either a per se rule

20  of illegality or a rule of reason analysis; and (3) that

21  restraint affected interstate commerce."  Optronic, 20 F.4th at

22  479 (quoting Tanaka v. USC, 252 F.3d 1059, 1062 (9th Cir. 2011)

23  (quotations omitted)).  Here, the first and third factors are

24  easily satisfied.

25        The NCAA, in concert with its member schools, agreed to

26  adopt the Bylaw.  See Hennessey v. NCAA, 564 F.2d 1136, 1147 (5th

27  Cir. 1977) ("[C]onceptually the adoption and execution of the

28  NCAA [b]ylaw can be seen as the agreement and concert of action

                                14

1   of the various members of the association, as well as that of the

2   association itself . . . ." ); <u>Bd. of Regents</u>, 468 U.S. at 106

3   ("[S]ince as a practical matter all member institutions need NCAA

4   approval, members have no real choice but to adhere to the NCAA's

5   television controls."). Further, the NCAA is a national

6   organization where players, coaches, and teams travel across

7   states. <u>See</u> <u>Hennessey</u>, 564 F.2d at 1151 ("[T]he employment

8   market for collegiate coaches is multi-state, if not national,

9   and []the [b]ylaw has the effect of reducing the movement of

10  coaches between institutions located in different states.").

11  Therefore, this claim rests on what analysis to apply and whether

12  plaintiffs have adequately alleged anticompetitive effects under

13  that analysis.

14        "Courts have established three categories of analysis -

15  - per se, quick-look, and Rule of Reason -- for determining

16  whether actions have anticompetitive effects . . . ." <u>Agnew v.</u>

17  <u>NCAA</u>, 683 F.3d 328, 335 (7th Cir. 2012) (citing <u>Cal. Dental Ass'n</u>

18  <u>v. FTC</u>, 526 U.S. 756, 779 (1999)). "The per se rule condemns

19  practices that 'are entirely void of redeeming competitive

20  rationales.'" <u>Law v. NCAA</u>, 134 F.3d 1010, 1016 (10th Cir. 1998)

21  (citation omitted). "Horizonal price fixing and market

22  allocation are per se Section 1 violations." <u>Optronic</u>, 20 F.4th

23  at 479 (citations omitted). By contrast, the Rule of Reason

24  "requires a court to 'conduct a fact-specific assessment of

25  market power and market structure' to assess a challenged

26  restraint's 'actual effect on competition.'" <u>NCAA v. Alston</u>, 141

27  S. Ct. 2141, 2160 (2021) (quoting <u>Ohio v. Am. Express Co.</u>, 138 S.

28  Ct. 2274, 2284 (2018)). The quick-look analysis is "a truncated

1  rule of reason analysis."  In re NCAA I-A Walk-On Football

2  Players Litig., 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005)

3  (citing FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 459-61

4  (1986)).  "[T]he 'quick-look' analysis . . . is used where the

5  per se framework is inappropriate, but where 'no elaborate

6  industry analysis is required to demonstrate the anticompetitive

7  character of . . . an agreement,' and proof of market power is

8  not required."  Agnew, 683 F.3d at 336 (quoting Bd. of Regents,

9  468 U.S. at 109).

10         Here, plaintiffs allege there was a horizontal

11  agreement to fix price because the Bylaw capped the salary of the

12  volunteer coach position at $0.  Generally, such an agreement

13  would be a per se violation of § 1 as horizontal price fixing.

14  See Bd of Regents, 568 at 100 ("Horizontal price fixing and

15  output limitation are ordinarily condemned as a matter law under

16  an 'illegal per se' approach because the probability that these

17  practices are anticompetitive is so high . . . .") (citation

18  omitted); see also Law, 134 F.3d at 1018 ("By agreeing to limit

19  the price which NCAA members may pay for the services of

20  restricted-earnings coaches, [the rule at issue] . . . .

21  constitutes the type of naked horizontal agreement among

22  competitive purchasers to fix prices usually found to be illegal

23  per se.").

24         However, in NCAA v. Board of Regents of University of

25  Oklahoma, 468 U.S. 85 (1984), the Supreme Court announced that

26  "it would be inappropriate to apply a per se rule" to cases

27  involving the NCAA because it is "an industry in which horizonal

28  restraints on competition are essential if the product is to be

16

available at all." Id. at 100-01 ("What the NCAA and its member
institutions market . . . is competition itself -- contests
between competing institutions.  Of course, this would be
completely ineffective if there were no rules on which the
competitors agreed to create and define the competition to be
marketed.").  Thus, in the context of the NCAA, courts typically
apply a quick-look analysis.  See, e.g., Alston, 141 S. Ct. at
2157 ("[A] quick look will often be enough to approve the
restraints 'necessary to produce a game'") (citation omitted);
Law v. NCAA, 134 F.3d 1010, 1020 (10th Cir. 1998) (adopting
quick-look approach in case challenging restriction on assistant
coaches' salaries); Agnew, 683 F.3d at 336 (suggesting that the
quick-look approach is "the appropriate method for analyzing
whether the NCAA's actions have had an anticompetitive effect").
As such, a quick-look analysis is appropriate here.

          "Under a quick look rule of reason analysis,
anticompetitive effect is established . . . where the plaintiff
shows that a horizontal agreement to fix prices exists, that the
agreement is effective, and that the price set by such an
agreement is more favorable to the defendant than otherwise would
have resulted from the operation of market forces." Law, 134
F.3d at 1020 (citing Gary R. Roberts, The NCAA, Antitrust, and
Consumer Welfare, 70 Tul. L. Rev. 2631, 2636-39 (1996)).  As
discussed above, plaintiffs allege that the NCAA and its member
schools established the additional coaching position as a
"volunteer" position and set the salary at $0.  (Smart Compl. ¶¶
43-45; Colon Compl. ¶¶ 44-46.)  Moreover, "since as a practical
matter all member institutions need NCAA approval, members have

17

1   no real choice but to adhere to the NCAA's [rules]."  Bd. of

2   Regents, 468 U.S. at 106.  Plaintiffs' allegations of both the

3   large salaries received by coaches as well as the overall

4   increase in coach salaries creates a strong inference that the

5   Bylaw was effective.  Therefore, the court concludes that under a

6   quick look analysis plaintiffs have alleged facts sufficient to

7   show a violation of § 1 of the Sherman Act.[6]

8           Defendant argues that plaintiffs cannot sustain their §

9   1 Sherman Act claim because they failed to plead a relevant

10  market.  (Smart Mot. Dismiss at 19; Colon Mot. Dismiss at 12, 14-

11  18.)  Defendant contends that Division I cannot be a relevant

12  market because it does not include other available coaching

13  opportunities such as those at the high school or professional

14  levels.  (Smart Mot. Dismiss at 20-21; Colon Mot. Dismiss at 16-

15  18.)  However, under Regents, proof of market power is not

16  required under a quick look analysis.[7]  See Bd. of Regents, 468

17  _____

18      [6]   The issue of whether the NCAA may cap coaches' salary
    was last addressed over 25 years ago.  Law v. NCAA, 902 F. Supp.
19  1394 (D. Kan. 1995), aff'd 134 F.3d 1010 (10th Cir. 1998),
    involved a rule promulgated by the NCAA which capped the
    compensation of a specific category of Division I basketball
20  coach.  See 134 F.3d at 1015.  The rule was found to violate § 1
    of the Sherman Act.  Id. at 1024.  In so finding, both the
21  District Court and the Tenth Circuit applied a quick-look
    analysis.  Law, 902 F. Supp. at 1405; Law, 134 F.3d at 1020.  Law
22  was related to two other NCAA price-fixing cases: Hall v. NCAA,
    No. 2:94-cv-02392, and Schreiber v. NCAA, No. 2:95-cv-02026.
23

24      [7]   The Supreme Court's conclusion that proof of market
    power is not required under the quick look analysis does not mean
25  that "the existence of a relevant market cannot be dispensed with
    altogether . . . . [as] [i]t is the existence of a commercial
26  market that implicates the Sherman Act in the first instance."
    See Agnew, 683 F.3d at 337.  Rather, not requiring proof of
27  market power means that "the conduct itself is sufficient
    evidence of the requisite market power.  No elaborate industry
28  analysis, market definitions, or complicated testimony of high-
    priced expert economists will be required to establish what the

1  U.S. at 109.  Further, courts have upheld relevant market

2  definitions which distinguish between levels in the sports

3  context.  See e.g., Rock v. NCAA, No. 1:12-cv-1019, 2013 WL

4  4479815, at *11-13 (S.D. Ind. Aug. 16, 2013) ("[A]t least in the

5  context of sports, some courts have accepted a relevant market

6  definition based on a quality distinction of one league over

7  another, particularly where that distinction results in increased

8  revenue and opportunities for the participants."); see id.

9  (collecting cases).[8]

10       At this stage, plaintiffs' allegations that the market

11  for Division I coaches is distinct from the market for high

12  school and professional coaches are sufficient.  See Newcal

13  Indus., Inc. v. Ikon Office Sols., 513 F.3d 1038, 1045 (9th Cir.

14  2008) ("[Because] the validity of the 'relevant market' is

15  typically a factual element, alleged markets may survive scrutiny

16  under Rule 12(b)(6) subject to factual testing by summary

17  judgment or trial.") (citations omitted).

18       In the Colon case, defendant additionally argues that:

19  (1) plaintiffs did not specifically identify any relevant product

20  market; and (2) plaintiff improperly included coaching positions

21  _____

22  defendants' conduct already clearly proves."  Roberts, The NCAA,
Antitrust, and Consumer Welfare, supra, at 2639.

23       [8]   Such a distinction is logical given the variation in
professional opportunities, revenue, competition, and types of

24  duties between the divisions in college sports, high school
sports, and professional sports.  Cf. Newcal Indus., Inc. v. Ikon

25  Office Sols., 513 F.3d 1038, 1046 (9th Cir. 2008) ("The outer
boundaries of a product market are determined by the reasonable

26  interchangeability of use or the cross-elasticity of demand
between the product itself and substitutes for it.") (quoting

27  Brown Shoe v. United States, 370 U.S. 294, 325 (1962) (quotations

28  omitted).

1  in all sports, even though a coaching position in one sport is

2  not a substitute for a coaching position in a different sport.

3  (Colon Mot. Dismiss at 12, 14-16.)  The court rejects both

4  arguments.  First, plaintiffs did specify a relevant product

5  market -- the market for Division I coaches.  Second, the court

6  does not read the Colon Complaint to suggest that plaintiffs

7  believe coaches in one sport are substitutes for coaches in any

8  other sport.  To the contrary, plaintiffs sufficiently alleged

9  that defendant determines the number of paid coaches per sport

10  and plaintiffs were each seeking to be paid for the coaching

11  position in their particular sport.

12       For the reasons stated above, plaintiffs have alleged

13  facts sufficient to show a violation of § 1 of the Sherman Act.

14  Accordingly, defendant's motions to dismiss the Sherman Act claim

15  in both <u>Smart</u> and <u>Colon</u> will be denied.[9]

16       C.   <u>Quantum Meruit and Unjust Enrichment</u> (Claims 2 and 3)[10]

17       Smart Plaintiffs assert claims for quantum meruit and

18  unjust enrichment under various state laws.[11]  (Smart Compl. ¶¶

19  86-93.)  Because the named plaintiffs are from California

20  _____

21       [9]   As discussed above, Colon Plaintiffs' § 1 Sherman Act
    claim is their sole claim.

22

23       [10]  The claims for quantum meruit and unjust enrichment are
    only asserted by Smart Plaintiffs.

24       [11]  "[Q]uantum meruit . . . rests upon the equitable theory
25  that a contract to pay for services rendered is implied by law
    for reasons of justice."  <u>Hedging Concepts, Inc. v. First All.</u>
26  <u>Mortg. Co.</u>, 41 Cal. App. 4th 1410, 1149 (2nd Dist. 1996).  <u>See</u>
    <u>also</u> <u>Servewell Plumbing, LLC v. Summit Contractors, Inc.</u>, 362
27  Ark. 598, 612 (2005) ("Unjust enrichment is an equitable
    doctrine" which represents "the principle that one person should
28  not be permitted unjustly to enrich himself at the expense of
    another.").

1   (Plaintiff Hacker) and Arkansas (Plaintiff Smart), the court

2   considers both California and Arkansas law, and because the

3   claims for quantum meruit and unjust enrichment are similar the

4   court will address them together.  See McBride v. Boughton, 123

5   Cal. App. 4th 379, 387 (1st Dist. 2004) (unjust enrichment is

6   "synonymous with restitution"); City of Oakland v. Oakland

7   Raiders, 83 Cal. App. 5th 458, 477-78 (2nd Dist. 2022) ("Whether

8   termed unjust enrichment, quasi-contract, or quantum meruit, the

9   equitable remedy of restitution when unjust enrichment has

10  occurred 'is an obligation . . . created by the law without

11  regard to the intention of the parties . . . .'") (citations

12  omitted); KBX, Inc. v. Zero Grade Farms, 2022 Ark. 42, at *20

13  (2022) ("Quantum meruit is a claim for unjust enrichment that

14  does not involve the enforcement of a contract.") (citation

15  omitted).

16          Under both California and Arkansas law, a plaintiff

17  cannot sustain a claim under either theory, quantum meruit or

18  unjust enrichment, where there is an enforceable contract.  See

19  Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 94

20  Cal. App. 4th 151, 172 (4th Dist. 2001) ("[A] quasi-contract does

21  not lie where . . . express binding agreements exist and define

22  the parties' rights."); Servewell, 362 Ark. at 612 ("[T]he

23  concept of unjust enrichment has no application when an express

24  written contract exists.").  See also Hedging Concepts, 41 Cal.

25  App. 4th at 1149 ("[I]t is well settled that there is no

26  equitable basis for an implied-in-law promise to pay reasonable

27  value when the parties have an actual agreement covering

28  compensation."); Paracor Fin., Inc. v. Gen. Elec. Cap. Corp., 96

1    F.3d 1151, 1167 (9th Cir. 1996) (under California law, unjust

2    enrichment "does not lie when an enforceable, binding agreement

3    exists defining the rights of the parties") (citation omitted);

4    Deutsche Bank Nat'l Tr. Co. v. Austin, 2011 Ark. App. 531, at *7

5    (2011) ("Courts will only imply a promise to pay for services

6    where they were rendered in such circumstances as authorized the

7    party performing them to entertain a reasonable expectation of

8    their payment by the party beneficiary.") (citation omitted).

9          Here, it is alleged that Smart Plaintiffs agreed to

10   work for their respective NCAA member baseball teams as volunteer

11   coaches.[12]  Smart Plaintiffs do not allege, even in the

12   alternative, that they worked as volunteer coaches without a

13   contract.  Thus, assuming they had contracts with their

14   respective schools, the existence of these contracts makes their

15   restitution claims unavailable.[13]  See Cal. Med. Ass'n, 94 Cal.

---

16   [12]   Smart Plaintiffs make no allegations that they believed
17   they would be paid coaches or that they were unaware of the
     restrictions on non-salary benefits.

18
19   [13]   Plaintiff Hacker argues, for the first time in the
     Opposition, that he was coerced into taking the position as a
20   volunteer coach.[13]  (Smart Opp'n Mot. Dismiss at 29, 31 (Docket
     No. 18).)  Plaintiff Hacker is correct that, under California
21   law, coercion can provide the basis for their restitution claims.
     See Cal. Lab. Code § 1720.4(a) ("An individual shall be
22   considered a volunteer only when his or her services are offered
     freely and without pressure and coercion, direct or implied, from
23   an employer."); Carlin v. DairyAmerica, Inc., 978 F. Supp. 2d
     1103, 1118 (E.D. Cal. 2013) (Ishii, J.) ("[R]estitution may be
24   awarded where the defendant obtained a benefit from the plaintiff
     by fraud, duress, conversion, or similar conduct.") (citation
25   omitted).  Nevertheless, the court must reject the coercion
     argument for two reasons.  First, Plaintiff Hacker never
26   expressly asserted a theory of coercion in the Complaint.
     Second, the allegations in the Complaint, even indirectly, do not
27   support a theory of coercion.

28
                                  22

1   App. 4th at 172; <u>Servewell</u>, 362 Ark. at 612.

2   For the reasons stated above, the court finds that

3   Smart Plaintiffs have failed to allege facts sufficient to

4   support their claims for quantum meruit and unjust enrichment.[14]

5   D.   <u>UCL</u> (Claim 4)[15]

6   Smart Plaintiffs assert a claim under California's UCL

7   alleging that defendant's conduct violated both antitrust and

8   wage-and-hour laws.  (Smart Compl. ¶ 94-98.)  As an initial

9   matter, Plaintiff Smart did not allege any facts suggesting that

10  he worked as a volunteer baseball coach in California or that he

11  has any other connections to the state.  Thus, Plaintiff Smart

12  has no claim under California's UCL.  See <u>Sullivan v. Oracle</u>

13  <u>Corp.</u>, 51 Cal. 4th 1191, 1207 (2011) ("Neither the language of

14  the UCL nor its legislative history provides any basis for

15  concluding the Legislature intended the UCL to operate

16  extraterritorially.").  Smart Plaintiffs contend that discovery

17  will ultimately show that Plaintiff Smart worked in California

18  during away games.  While that may be so, the Complaint itself

19  contains no allegation that Plaintiff Smart performed any work as

20  a baseball coach for the University of Arkansas in California.

21  Accordingly, the court will evaluate plaintiffs' UCL claim as to

22  only Plaintiff Hacker.

23  "California's UCL[] prohibits 'any unlawful, unfair, or

24  _____

25  [14]   Both Smart Plaintiffs and defendant advance arguments
    about choice of law issues as this is a putative nationwide class

26  action.  However, because this order dismisses the two claims
    arising out of both California and Arkansas law, the court need

27  not address these choice of law concerns.

28  [15]   The UCL claim is asserted only by Smart Plaintiffs.

1   fraudulent business act or practice.'"). <u>Castaneda v. Saxon</u>

2   <u>Mortg. Servs., Inc.</u>, 687 F. Supp. 2d 1191, 1202 (E.D. Cal. 2009)

3   (Shubb, J.) (quoting <u>Cel-Tech Commc'ns, Inc. v. L.A. Cellular</u>

4   <u>Tel. Co.</u>, 20 Cal. 4th 163, 187 (1999)).   The UCL "establishes

5   three varieties of unfair competition -- acts or practices that

6   are (1) unlawful, (2) unfair, or (3) fraudulent." <u>Cel-Tech</u>

7   <u>Commc'ns</u>, 20 Cal. 4th at 180.   "Each prong of the UCL is a

8   separate and distinct theory of liability." <u>Perea v. Walgreen</u>

9   <u>Co.</u>, 939 F. Supp. 2d 1026, 1040 (C.D. Cal. 2013).   "A plaintiff

10   must state with reasonable particularity the facts supporting the

11   statutory elements of the violation." <u>Khoury v. Maly's of Cal.,</u>

12   <u>Inc.</u>, 14 Cal. App. 5th 612, 619 (2nd Dist. 1993).   Here,

13   Plaintiff Hacker brings claims under the unlawful and unfair

14   prongs of the UCL.

15         1. <u>Unlawful Prong</u>

16        "To state a claim under the unlawful prong of the UCL,

17   a plaintiff must plead: (1) a predicate violation, and (2) an

18   accompanying economic injury caused by the violation." <u>Roper v.</u>

19   <u>Big Heart Pet Brands, Inc.</u>, 510 F. Supp. 3d 903, 921 (E.D. Cal.

20   2020) (Drozd, J.) (citation and quotations omitted).   "By

21   proscribing 'any unlawful' business practice, section 17200

22   borrows violations of other laws and treats them as unlawful

23   practices that the unfair competition law makes independently

24   actionable." <u>Cel-Tech Commc'ns, Inc.</u>, 20 Cal. 4th at 180

25   (internal quotations omitted).

26        Plaintiff Hacker asserts two predicates for his claim

27   under the UCL's unlawful prong: antitrust laws and wage-and-hour

28   laws.   (Smart Compl. ¶ 96.)   Because Smart Plaintiffs have

1  adequately pled their Sherman Act claim, Plaintiff Hacker has

2  also adequately pled his unfair competition claim as premised on

3  the antitrust violations.  See Name.Space, Inc. v. Internet Corp.

4  for Assigned Names & Numbers, 795 F.3d 1124, 1134 (9th Cir. 2015)

5  ("Statutory liability can be premised on antitrust or trademark

6  violations.").  And because the antitrust theory is clearly

7  sufficient, the court need not address the wage-and-hour theory.

8              2.   Unfair Prong

9         Plaintiff Hacker asserts the same antitrust and wage-

10  and-hour predicates for his claim under the UCL's unfair prong.

11  (Smart Compl. ¶ 96.)  Plaintiff Hacker also asserts a restitution

12  claim under the "unfair" prong of the UCL for depriving

13  plaintiffs of "the right to earn a bargained-for wage in exchange

14  for work performed . . . ."  (Id. ¶ 97.)

15              a.   Statutory Violations

16         "To show a business practice is unfair, the plaintiff

17  must show the conduct 'threatens an incipient violation of an

18  antitrust law, or violates the policy or spirit of one of those

19  laws because its effects are comparable to or the same as the

20  violation or the law, or otherwise significantly threatens or

21  harms competition.'"  Byars v. SCME Mortg. Bankers, Inc., 109

22  Cal. App. 4th 1134, 1147 (4th Dist. 2003) (quoting Cel-Tech

23  Commc'ns, Inc., 20 Cal. 4th at 186).  Here, as discussed above,

24  the court already found that Plaintiff Hacker has adequately pled

25  his UCL claim under the unlawful prong as premised on alleged

26  antitrust violations.  Thus, Plaintiff Hacker has also adequately

27  pled his UCL claim under the unfair prong as to the same alleged

28  antitrust violations.  See Cel-Tech Commc'ns, Inc., 20 Cal. 4th

1    at 186 (conduct is "unfair" where it "threatens an incipient

2    violation of an antitrust law").

3          b.    <u>Restitution</u>

4        "California Business and Professions Code § 17203

5    provides that restitution is an available remedy under the UCL

6    'to restore any person in interest any money or property, real or

7    personal, which may have been acquired by means of such unfair

8    competition.'"   <u>Linde, LLC v. Valley Protein, LLC</u>, No. 1:16-cv-

9    00527 DAD, 2019 WL 3035551, at *20 (E.D. Cal. July 11, 2019)

10    (quoting Cal. Bus. & Prof. Cod § 17203).   However, a plaintiff

11    "must establish that she lacks an adequate remedy at law before

12    securing equitable restitution for past harm under the UCL . . .

13    ."   <u>Sonner v. Premier Nutrition Corp.</u>, 971 F.3d 834, 844 (9th

14    Cir. 2020) (citations omitted) (dismissing plaintiff's claims for

15    equitable restitution under California's UCL because the

16    operative complaint did not allege that the plaintiff lacked an

17    adequate legal remedy, and the plaintiff sought the same amount

18    in both equitable restitution and damages for the same past

19    harm); <u>see also</u> <u>Guthrie v. Transamerica Life Ins. Co.</u>, 561 F.

20    Supp. 3d 869, 875 (N.D. Cal. 2021) ("[A] plaintiff must, at a

21    minimum, plead that she lacks adequate remedies at law if she

22    seeks equitable relief.") (collecting cases).

23        Here, Plaintiff Hacker acknowledges that he cannot seek

24    restitution under the UCL for the same money he would receive for

25    his claims at law. (Smart Opp'n Mot. Dismiss at 45 (Docket No.

26    18).)   Nevertheless, he contends that his restitution claim

27    should be allowed to proceed because, "if, for some reason, [his]

28    claims at law fail[,] . . . . [he] would lack an adequate legal

1   remedy . . . ."  (Id.)  In support of this proposition, Plaintiff

2   Hacker relies on Coleman v. Mondelez International Inc., 554 F.

3   Supp. 3d 1055, 1065 (C.D. Cal. 2021).  In Coleman, the district

4   court denied a motion to dismiss the plaintiff's UCL claim,

5   finding that the plaintiff had adequately plead that she lacked

6   an adequate remedy at law because she "may ultimately not attain"

7   the monetary damages sought at law.  Id. at 1065.

8          However, as recognized by multiple district courts,

9   Coleman was decided before Guzman v. Polaris Industries Inc., 49

10  F.4th 1308 (9th Cir. 2022).  In Guzman, the Ninth Circuit held

11  that a plaintiff has an adequate remedy at law even where those

12  claims can no longer be pursued because they are time barred by

13  the statute of limitations.  Id. at 1312.  Thus, the court

14  concluded that the plaintiff "could not bring his equitable UCL

15  claim in federal court because he had an adequate legal remedy in

16  his time-barred [underlying] claim."  Id. at 1311.

17         Since Guzman, multiple district courts have declined to

18  follow Coleman.  See, e.g., Clevenger v. Welch Foods Inc., No.

19  20-cv-01859 CJC, 2022 WL 18228288, at *6 (S.D. Cal. Dec. 14,

20  2022) ("Plaintiffs cannot allege that they have an inadequate

21  remedy at law where their claim for monetary damages . . . seeks

22  redress for the exact same harm, in the exact same amount, as

23  their claims for restitution."); Stafford v. Rite Aid Corp., No.

24  17-cv-1340 TWR, 2012 WL 2876109, at *5 (S.D. Cal. Apr. 10, 2023)

25  (dismissing claims for equitable relief where plaintiff failed to

26  plausibly allege that he lacks an adequate remedy at law).  This

27  court also finds the reasoning in Coleman unpersuasive in the

28  light of the Ninth Circuit's binding decision in Guzman.

1  Plaintiff Hacker cannot plead that he lacks an adequate remedy at
2  law because he may lose on his legal claims.

3          Plaintiff Hacker also argues that his injunctive relief
4  claims under the UCL should proceed even though defendant amended
5  the Bylaw after Smart Plaintiffs filed their complaint.  (Smart
6  Opp'n Mot. to Dismiss at 14, 44.)  Effective July 2023, the
7  volunteer coach position in NCAA Division I will be eliminated,
8  and member teams will be permitted an additional paid coach.
9  (Id.)  While Smart Plaintiffs seek a permanent injunction to
10 enjoin defendant from implementing a rule similar to the Bylaw,
11 they have not pled any facts to suggest that they are likely to
12 be harmed in the future.  See Lujan v. Defenders of Wildlife, 504
13 U.S. 555, 564 ("Past exposure to illegal conduct does not in
14 itself show a present case or controversy regarding injunctive
15 relief if unaccompanied by any continuing, present adverse
16 effects.") (citing City of L.A. v. Lyons, 461 U.S. 95, 102
17 (1983)) (additional citation, internal quotations, and
18 punctuation omitted); see also Kurshan v. Safeco Ins. Co. of Am.,
19 --- F. Supp. 3d ---, 2023 WL 1070614, at *4 (E.D. Cal. Jan. 27,
20 2023) (Drozd, J.) (finding plaintiff lacked standing to seek
21 injunctive relief where he "ha[d] pled no facts alleging a
22 likelihood of future harm").[16]

23         Notably, neither Plaintiff Hacker nor Plaintiff Smart
24 has alleged any facts indicating that he is seeking another
25 position as a Division I baseball coach.  Moreover, even if

---

26         [16]   Nothing in Judge Drozd's decision in Roper v. Big Heart
27 Pet Brands, Inc., 510 F. Supp. 3d 903 (E.D. Cal. 2020) (holding
   that after Sonner a plaintiff may request injunctive relief in
   addition to claims for legal remedies), leads to a contrary
28 result.

1    either plaintiff had expressed an interest in coaching Division I

2    college baseball again in the future, such allegations would be

3    insufficient.  See Lujan, 504 U.S. at 564 ("'[S]ome day'

4    intentions -- without any description of concrete plans . . . do

5    not support a finding of the 'actual or imminent' injury that our

6    cases require.").  Because Smart Plaintiffs fail to allege facts

7    sufficient to show a likelihood of future harm, their claim for

8    injunctive relief under the UCL must be dismissed.  Cf. Roper v.

9    Big Heart Pet Brands, Inc., 510 F. Supp. 3d 903, 918 (E.D. Cal.

10   2020) (Drozd, J.) ("[T]he allegations of the complaint are

11   'sufficient to suggest a likelihood of future harm amenable to

12   injunctive relief.'") (citations omitted).

13       For the foregoing reasons, defendant's motion to

14   dismiss Plaintiff Hacker's UCL claim under both the unlawful and

15   unfair prongs as premised on antitrust law violations will be

16   denied.  However, the court will grant the motion as to (1) the

17   UCL claim brought by Plaintiff Smart and (2) the UCL claim for

18   restitution and injunctive relief.

19       E.    Declaratory Judgment (Claim 5)[17]

20       Smart Plaintiffs seek declaratory relief under the

21   Declaratory Judgment Act, 28 U.S.C. § 2201.  (Smart Compl. ¶¶ 99-

22   101.)  Under the Federal Declaratory Judgment Act, "[i]n a case

23   of actual controversy . . . any court of the United States . . .

24   may declare the rights and other legal relations of any

25   interested party seeking such declaration, whether or not further

26   relief is or could be sought."  28 U.S.C. § 2201(a).

27   _____

28       [17]    The declaratory judgment claim is only asserted by
     Smart Plaintiffs.

1          To determine whether a declaratory judgment is

2    appropriate, the court must (1) "inquire whether there is an

3    actual case or controversy within its jurisdiction" and (2)

4    "decide whether to exercise its jurisdiction by analyzing the

5    factors set out in Brillhart v. Excess Insurance Co., 316 U.S.

6    491 (1942), and its progeny." Principal Life Ins. Co. v.

7    Robinson, 394 F.3d 665, 669 (9th Cir. 2005).  Under Brillhart,

8    potentially relevant factors include avoiding duplicative

9    litigation, avoiding needless determination of state law issues,

10   and considering whether the declaratory action will serve a

11   useful purpose in clarifying the legal relations at issue.  Id.

12   at 672.  The court's decision of whether to exercise jurisdiction

13   "is discretionary, for the Declaratory Judgment Act is

14   'deliberately cast in terms of permissive, rather than mandatory,

15   authority.'"  Gov't Emps. Ins. Co. v. Dizol, 133 F.3d 1220, 1223

16   (9th Cir. 1998) (citation omitted).

17          "A case or controversy exists justifying declaratory

18   relief only when 'the challenged ... activity ... is not

19   contingent, has not evaporated or disappeared, and, by its

20   continuing and brooding presence, casts what may well be a

21   substantial adverse effect on the interests of the ... parties.'"

22   Bayer v. Neiman Marcus Grp., Inc., 861 F.3d 853, 867 (9th Cir.

23   2017) (citations omitted).  Thus, "[t]he difference between an

24   abstract question and a 'controversy' contemplated by the

25   Declaratory Judgment Act . . . . is whether the facts alleged,

26   under all the circumstances, show that there is a substantial

27   controversy, between parties having adverse legal interests, of

28   sufficient immediacy and reality to warrant the issuance of a

30

1  declaratory judgment." Md. Cas. Co. v. Pac. Coal & Oil Co., 312

2  U.S. 270, 273 (1941) (citation omitted). "[A] declaratory

3  judgment merely adjudicating past violations of federal law -- as

4  opposed to continuing or future violations of federal law -- is

5  not an appropriate exercise of federal jurisdiction." Bayer, 861

6  F.3d at 868 (citing Green v. Mansour, 474 U.S. 64, 74 (1985)).

7         Here, the Bylaw was repealed in January 2023. (See

8  Smart Mot. Dismiss at 14.) The Complaint includes no allegation

9  that either named plaintiff is coaching or has imminent plans to

10 coach for any NCAA member school. Therefore, Smart Plaintiffs

11 have not alleged any facts showing that "the parties have [a]

12 relationship beyond this litigation." Bayer, 861 F.3d at 868

13 (finding claim for declaratory relief moot where plaintiff "has

14 produced no evidence to show the conduct complained of in this

15 action presently affects him or can reasonably be expected to

16 affect him in the future") (citations omitted).

17        Smart Plaintiffs contend that defendant's conduct is

18 continuing to cause harm since they "have been unable to

19 negotiate for compensation." (Smart Opp'n Mot. Dismiss at 46;

20 Smart Compl. ¶¶ 79, 98.) However, these conclusory allegations

21 speak only to the failure to negotiate compensation for past

22 harms. They do not sufficiently allege any ongoing harm,

23 particularly where plaintiffs have alleged no facts showing that

24 plaintiffs and defendant have any form of ongoing relationship.

25 See Bayer, 861 F.3d at 868. Accordingly, Smart Plaintiffs have

26 failed to allege facts sufficient to support a claim under the

27 Declaratory Judgment Act.

28 ///

IT IS THEREFORE ORDERED that defendant's motions to transfer venue (Smart Docket No. 6; Colon Docket No. 26) be, and the same hereby are, DENIED.

IT IS FURTHER ORDERED that defendant's motion to dismiss the <u>Colon</u> Complaint (Colon Docket No. 27) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that defendant's motion to dismiss the <u>Smart</u> Complaint (Smart Docket No. 7) be, and the same hereby is, DENIED IN PART and GRANTED in PART.  Defendant's motion to dismiss is DENIED as to Smart Plaintiffs' claim for violations of the Sherman Act § 1 (Claim 1) and California's UCL as brought by Plaintiff Hacker under the unfair and unlawful prongs (Claim 4).  Defendant's motion to dismiss is GRANTED as to all other claims in the <u>Smart</u> Complaint.

Smart Plaintiffs are granted 14 days from the date of this Order to file an Amended Complaint if they can do so consistent with this Order.

Dated:  July 27, 2023

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE