1    Michael Lieberman, DC Bar No. 1033827
     *(pro hac vice)*
2    **FAIRMARK PARTNERS, LLP**
     1825 7th Street, NW, #821
3    Washington, DC 20001
     Telephone: (818) 585-2903
4    michael@fairmarklaw.com

5    *Attorney for Plaintiffs Joseph Colon, Shannon Ray,*
     *Khala Taylor, Peter Robinson, Katherine Sebbane,*
6    *and Patrick Mehlert, Individually and on Behalf of*
     *All Those Similarly Situated*

7

8                    **UNITED STATES DISTRICT COURT**
9                    **EASTERN DISTRICT OF CALIFORNIA**

10   TAYLOR SMART AND MICHAEL HACKER,          No. 2:22-cv-02125 WBS KJN
     Individually and on Behalf of All Those Similarly
11   Situated,                                 Hon. William B. Shubb
                                               (assigned to Chief Magistrate Judge
12            Plaintiffs,                       Kendall J. Newman for discovery matters)
              v.
13   NATIONAL COLLEGIATE ATHLETIC              **DECLARATION OF MICHAEL**
     ASSOCIATION, an unincorporated association, **LIEBERMAN IN SUPPORT OF**
14            Defendant.                        **PLAINTIFFS' MOTION TO COMPEL**

15   JOSEPH COLON, SHANNON RAY, KHALA          No. 1:23-cv-00425 WBS KJN
     TAYLOR, PETER ROBINSON, KATHERINE
16   SEBBANE, and PATRICK MEHLERT,
     individually and on behalf of all those similarly
17   situated,
              Plaintiffs,
18            v.
     NATIONAL COLLEGIATE ATHLETIC
19   ASSOCIATION, an unincorporated association,
              Defendant.

20

21

22

23

24

25

26

27

28

1       I, Michael Lieberman, declare as follows:

2       1.     I am one of the attorneys principally responsible for the handling of this matter.  I

3 submit this declaration in support of Plaintiffs' motion to compel in the above-captioned cases.  I

4 am personally familiar with the facts set forth in this declaration.  If called as a witness, I could

5 and would competently testify to the matters stated in this declaration.

6       2.     Attached as Exhibit A to this declaration is a true and accurate copy of the *Smart*

7 Plaintiffs' First Requests For Production to Defendant NCAA, dated August 16, 2023.

8       3.     Attached as Exhibit B to this declaration is a true and accurate copy of the *Smart*

9 Plaintiffs' First Set of Interrogatories to Defendant NCAA, dated September 11, 2023.

10       4.     Attached as Exhibit C to this declaration is a true and accurate copy of the *Colon*

11 Plaintiffs' First Set of Requests For Production to Defendant NCAA, dated August 23, 2023.

12       5.     Attached as Exhibit D to this declaration is a true and accurate copy of the *Colon*

13 Plaintiffs' First Set of Interrogatories to Defendant NCAA, dated September 12, 2023.

14       6.     Attached as Exhibit E to this declaration is a true and accurate copy of excerpts

15 from the 2022-23 NCAA Division I Manual downloaded on October 16, 2023 from the NCAA's

16 website at https://www.ncaapublications.com/productdownloads/D123.pdf.

17       7.     Attached as Exhibit F to this declaration is a true and accurate copy of a page from

18 the NCAA's website.  It was accessed on October 16, 2023 at

19 https://www.ncaa.org/sports/2021/2/9/governance.aspx.

20       8.     Attached as Exhibit G to this declaration is a true and accurate copy of a page from

21 the NCAA's website.  It was accessed on October 16, 2023 at

22 https://www.ncaa.org/sports/2021/5/11/division-i-governance.aspx.

23       9.     Attached as Exhibit H to this declaration is a true and accurate copy of a report

24 issued by the NCAA Division I Transformation Committee, dated January 3, 2023.  It was

25 downloaded on October 16, 2023 from the NCAA's website at

26 https://ncaaorg.s3.amazonaws.com/committees/d1/transform/Jan2023D1TC_FinalReport.pdf.

27       10.     Attached as Exhibit I to this declaration is a true and accurate copy of a document

28 produced by the NCAA in the *Smart* case in response to document requests.  It is entitled "Report

**DECLARATION OF MICHAEL LIEBERMAN**

1   of the NCAA Division I Council, October 27, 2022, Video Conference," and is stamped

2   "NCAA_SMART_0000017."

3   11. Attached as Exhibit J to this declaration is a true and accurate copy of Defendant

4   NCAA's Response to the *Smart* Plaintiffs' First Requests For Production of Documents, dated

5   September 15, 2023.

6   12. Attached as Exhibit K to this declaration is a true and accurate copy of Defendant

7   NCAA's Response to the *Colon* Plaintiffs' First Set of Requests For Production, dated September

8   22, 2023.

9

10   I declare under penalty of perjury that the foregoing is true and correct.

   Executed on October 17, 2023 in Washington, D.C.

11

12             /s/ *Michael Lieberman*
             Michael Lieberman

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF MICHAEL LIEBERMAN**

# EXHIBIT A

to the Declaration of Michael Lieberman

STEPHEN M. TILLERY *(pro hac vice)*
  stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
  sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and
Michael Hacker, Individually and on Behalf
of All Those Similarly Situated

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association;<br><br>          Defendant. | CASE NO. 2:22-cv-02125-WBS-KJN<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT NCAA**<br><br>**JURY TRIAL DEMANDED** |

Pursuant to Fed. R. Civ. P. 34, Plaintiffs Taylor Smart and Michael Hacker (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, propound their First Set of Requests for Production of Documents (the "Requests") to Defendant National Collegiate Athletic Association ("NCAA" or "Defendant") and request that NCAA produce the following documents in its possession, custody, or control within thirty (30) days:

**DEFINITIONS**

1. The term "Communication" (or any variant thereof) means any contact between or among two or more Persons, including written contact by means such as letters, memoranda, telegrams, telecopies, telexes, e-mail, instant or text message, or any other Document; the transmittal of information by any means; any oral contact such as face-to-face meetings or telephone conversations; and any writings memorializing such oral contact.

2. The term "Document" or "Documents" means "any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs,  images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form."  Fed. R. Civ. P. 34(a)(1)(A).

3. The term "Head or Assistant Coach" is the same as defined in NCAA Bylaw 11.01.2 in the 2022-23 Division I Manual (effective August 1, 2022).

4. The term "Person" means natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal or governmental entity or association, including any directors, officers, employees, agents, successors, predecessors, assignees, or representatives thereof.

5. The terms "relate" and "relating" as used herein shall mean all documents as defined above, which explicitly or implicitly, in whole or in part, were received in  conjunction with, or were generated as a result of the subject matter of the Request, including, but not limited to, all documents which reflect, record, memorialize, mention, discuss, describe, consider, constitute, embody, establish,

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

1  evidence, explain, identify, evaluate, analyze, review, report on, comment on, quantify, impinge upon,

2  or impact the subject matter of the Request.

3      6.      The term "Volunteer Coach" is the same as defined in NCAA Bylaw 11.01.6 in the

4  2022-23 Division I Manual (effective August 1, 2022).

5      7.      As used herein "You" or "Your" means Defendant National Collegiate Athletic

6  Association and its agents (including members of its governing/advisory boards and committees),

7  subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors,

8  partners, employees, or representatives (in their individual or representative capacities).

9                              **INSTRUCTIONS**

10     1.      Unless otherwise noted, all requests include the time period from May 29, 2018 to the

11 present, and that time period is the "relevant period." For purposes of compliance with Rule 34 of the

12 Federal Rules of Civil Procedure, NCAA's duty to supplement its responses shall continue through

13 the date of hearing or trial.

14     2.      Unless otherwise indicated, the documents that shall be produced pursuant to these

15 Requests include all documents prepared, sent, dated or received, or those in effect, or those which

16 otherwise came into existence, at any time during the Relevant Period.

17     3.      All documents shall be produced that respond to any part or clause of any paragraph

18 of these Requests. You are required to make a diligent search of all archives, books, records, papers,

19 and computers of NCAA, including its members, and a diligent inquiry of all officers, directors, agents

20 (including members of its governing/advisory boards and committees), servants, and employees of

21 NCAA, wherever located (*e.g.*, in any unit, region, division, subcommittee, board, or portion of

22 NCAA), with a view toward obtaining all information available.

23     4.      All documents produced shall be segregated according to the paragraphs and

24 subparagraphs of these Requests to which they are responsive or as they are kept in the ordinary

25 course of business. Upon production of such documents, you should indicate by appropriate

26 designation which of the following paragraphs (and parts or clauses of such paragraphs, if any) of

27 these Requests relate to each document produced. If a document relates to more than one paragraph

28

1  (or part or clause of a paragraph), you should indicate, by appropriate designation, all of the

2  paragraphs (and parts and clauses thereof) to which the document relates.

3       5.    All documents existing or maintained in electronic format should be produced in their

4  native format, or in Microsoft Excel (for numeric information) or in Microsoft Word (for text

5  information). Otherwise, all documents should be produced in paper format or, if stored on a CD-

6  ROM, thumb drive, or similar storage device, a copy of such CD-ROM, thumb drive, or similar

7  storage device may be produced instead. Directions for Plaintiff to retrieve documents from other

8  sources do not constitute production and Plaintiffs reserve the right to bring a motion to compel

9  production of such documents.

10       6.    If any document is unavailable because it was lost or destroyed by NCAA or its

11  agents, or for any other reason, after fully identifying the document, state when and where it was

12  destroyed or otherwise made unavailable, the name(s) and address(es) of the person(s) who directed,

13  approved, and/or knew of its destruction, and the name(s) and address(es) of the person(s) who

14  has/have knowledge of such document.

15       7.    If you claim that any document required to be produced by you in response to a

16  Request is privileged, then "each reason for objection shall be stated" by identifying with regard to the

17  document (i) the type of document (e.g., letter, memorandum, etc.), (ii) the author(s), (iii) the

18  recipient(s) (including all persons receiving a "cc" or "bcc"), (iv) the date, (v) a summary of the

19  contents, (vi) the privilege claimed, and (vii) the basis for claiming the privilege.

20       8.    If you cannot fully respond to a Request or produce a document for any reason,

21  respond to the extent possible, stating the reason(s) for your inability to respond in full.

22       9.    These Requests shall be deemed continuing, to the full extent required or permitted by

23  Rule 34 of the Federal Rules of Civil Procedure, so as to require supplementary production whenever

24  NCAA obtains knowledge, access, custody, possession or control of any information or document

25  not previously disclosed, which is responsive to any of these Requests.

26

27

28

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

**DOCUMENTS AND THINGS TO BE PRODUCED**

1. Documents and Communications sufficient to identify all current or former Volunteer Coaches in baseball for NCAA Division I schools during the relevant time period.

2. Documents and Communications sufficient to identify all current or former Head or Assistant Coaches in baseball for NCAA Division I schools during the relevant time period.

3. Documents and Communications sufficient to identify any NCAA liaison or representative with NCAA Division I schools regarding baseball during the relevant time period.

4. Documents and Communications sufficient to identify any NCAA Division I school liaisons or representatives with the NCAA regarding baseball during the relevant time period.

5. From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications sufficient to identify Persons who are or were involved in the following:

    a. Drafting NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

    b. The passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

    c. The drafting or consideration of any proposed amendments that would have or did modify NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

    d. Efforts to repeal NCAA Bylaw 11.01.6 (or any substantially similar predecessor); and

    e. The January 2023 revocation of the NCAA bylaw regarding the Volunteer Coach for Division I baseball.

6. From the time period of six months preceding the passage of NCAA Bylaw 11.7.6.2.3 (or any substantially similar predecessor) to the present, Documents and Communications sufficient to identify Persons who are or were involved in the following:

    a. Drafting NCAA Bylaw 11.7.6.2.3 (or any substantially similar predecessor);

    b. The passage of NCAA Bylaw 11.7.6.2.3 (or any substantially similar predecessor);

    c. The drafting or consideration of any proposed amendments that would have or did modify NCAA Bylaw 11.7.6.2.3 (or any substantially similar predecessor);

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

d.   Limiting NCAA Division I baseball to only one Volunteer Coach; and

e.   Efforts to remove the NCAA bylaw limitation of only one Volunteer Coach for Division I baseball.

7.   From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications related to:

a.   The need or non-need for NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

b.   Drafting NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

c.   The passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

d.   The drafting or consideration of any proposed amendments that would have or did modify NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

e.   Efforts to repeal NCAA Bylaw 11.01.6 (or any substantially similar predecessor); and

f.   The January 2023 revocation of the NCAA bylaw regarding the Volunteer Coach for Division I baseball.

8.   From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications discussing the reason(s) or rationale for limiting NCAA Division I schools to only one Volunteer Coach.

9.   From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications discussing the reason(s) or rationale for the Volunteer Coach position.

10.   Documents and Communications discussing the need or non-need for an additional Assistant Coach in baseball.

11.   Documents and Communications discussing the pros and/or cons of the Volunteer Coach position for NCAA Division I baseball or other NCAA Division I sports.

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

12.     Documents and Communications discussing how the Volunteer Coach position has affected parity or competitive play (whether positively, negatively, or neutrally) amongst Division I baseball teams or other Division I sports.

13.     Documents and Communications regarding how "eliminate[ing] the volunteer coach designation" was part of "an effort to create a fairer and more equitable Division I athletics competition," as stated in the NCAA's January 2023 Division I Transformation Committee Final Report.

14.     Documents and Communications regarding why the Volunteer Coach must not "receive compensation or remuneration from the institution's athletics department," as stated in NCAA Bylaw 11.01.6.

15.     Documents and Communications regarding whether the Volunteer Coach may receive health insurance, housing or a housing stipend, meals or a meal stipend, or other employment benefits from an institution's athletics department.

16.     Documents and Communications discussing the reason(s) or rationale for permitting more than one Volunteer Coach for sports like football, basketball, women's equestrian, women's rowing, swimming and diving, and women's triathlon per NCAA Bylaw 11.7.6.2.3.

17.     Documents and Communications discussing the pros and/or cons of permitting more than one Volunteer Coach for sports like football, basketball, women's equestrian, women's rowing, swimming and diving, and women's triathlon per NCAA Bylaw 11.7.6.2.3.

18.     From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications discussing the money or resources saved by NCAA Division I schools or the NCAA by not permitting a Volunteer Coach to "receive compensation or remuneration."

19.     From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications discussing the money or resources saved by NCAA Division I schools or the NCAA by not permitting a third Assistant Coach in Division I baseball.

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

20. Documents and Communications discussing the anticipated salaries and benefits NCAA Division I schools or the NCAA would have incurred or would incur moving forward if the Volunteer Coach designation were eliminated and an additional Assistant Coach position was added.

21. Documents and Communications discussing the market value of labor and/or services provided by Volunteer Coaches for baseball.

22. Documents and Communications discussing the experience level of Volunteer Coaches for baseball.

23. Documents and Communications advocating for the repeal of the Volunteer Coach designation.

24. Documents and Communications advocating for the continuation of the Volunteer Coach designation.

25. Documents and Communications sufficient to show the compensation and employment benefits of NCAA Division I Head or Assistant Coaches during the relevant period.

26. Documents and Communications sufficient to show the salaries and employment benefits of all NCAA Division II and Division III baseball coaches during the relevant period.

27. Documents and Communications sufficient to show yearly revenue attributable to baseball for each NCAA Division I school during the relevant period.

28. Documents and Communications sufficient to show yearly revenue attributable to baseball for the NCAA during the relevant period.

29. Studies or research regarding the optimum number of coaches for NCAA Division I baseball teams.

30. Studies or research regarding the optimum number of coaches for NCAA Division II and III baseball teams.

31. Studies or research regarding the benefits to NCAA Division I baseball teams of having Volunteer Coaches and/or Head or Assistant Coaches.

32. Documents and Communications regarding the job duties of Volunteer Coaches and/or Head or Assistant Coaches for NCAA Division I baseball.

33.    Documents and Communications regarding the skill sets required of Volunteer Coaches and/or Head or Assistant Coaches for NCAA Division I baseball.

34.    Documents and Communications regarding the skills possessed by NCAA Division I baseball players compared to NCAA Division II and III baseball players.

35.    Documents and Communications regarding the skills possessed by NCAA Division I baseball players compared to non-NCAA collegiate athletic association baseball players.

36.    Documents and Communications regarding the skills possessed by NCAA Division I baseball Volunteer Coaches and/or Head or Assistant Coaches compared to NCAA Division II and III baseball coaches.

37.    Documents and Communications regarding the skills possessed by NCAA Division I baseball Volunteer Coaches and/or Head or Assistant Coaches compared to non-NCAA collegiate athletic association baseball coaches.

38.    Documents and Communications regarding whether NCAA Division I baseball Volunteer Coaches served as Graduate Assistant baseball coaches before being hired as Volunteer Coaches.

39.    Documents sufficient to show all of the NCAA's governing/advisory boards and committees, including their membership, during the relevant period.

40.    From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 or 11.7.6.2.3 (or any substantially similar predecessors) to the present, any minutes, agendas, notes, or other Documents from meetings held by the NCAA's governing/advisory boards and committees regarding NCAA Bylaw 11.01.6 or 11.7.6.2.3 (or any substantially similar predecessors).

41.    Any Documents and Communications in the possession of members of governing/advisory boards or committees regarding NCAA Bylaw 11.01.6 or 11.7.6.2.3 (or any substantially similar predecessors).

42.    Any Documents relating to any actual or potential interpretation or enforcement of the Volunteer Coach position.

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

43.     Any Documents relevant to or which you claim support any relevant market you intend to assert in this case.

44.     All exhibits and any other evidence, demonstrative or otherwise, to be used in support of any motion, in opposition to any motion, or at any hearing or trial in this case.

45.     All documents, including but not limited to treatises, publications, texts, standards, regulations, etc., that you contemplate using or intend to use in support of or opposition to any motion in this case, or at the class certification hearing, any other hearing, or at trial.

46.     All documents identified in your answers to, or utilized in answering, any set of interrogatories that Plaintiffs serve on NCAA.

DATED: August 16, 2023

By: /s/ *Garrett R. Broshuis*
KOREIN TILLERY, LLC
Stephen M. Tillery (*pro hac vice*)
Steven M. Berezney
Garrett R. Broshuis

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via email attachment, this 16th day of August, 2023, to all counsel of record.

/s/ *Garrett R. Broshuis*

# EXHIBIT B

to the Declaration of Michael Lieberman

STEPHEN M. TILLERY *(pro hac vice)*
  stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
  sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and
Michael Hacker, Individually and on Behalf
of All Those Similarly Situated

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association;<br><br>                    Defendant. | CASE NO. 2:22-cv-02125-WBS-KJN<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT NCAA**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 33, Plaintiffs Taylor Smart and Michael Hacker (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, propound their First Set of Interrogatories (the "Interrogatories") to Defendant National Collegiate Athletic Association ("NCAA" or "Defendant") and request that NCAA respond within thirty (30) days:

**DEFINITIONS**

1.      The term "Communication" (or any variant thereof) means any contact between or among two or more Persons, including written contact by means such as letters, memoranda, telegrams, telecopies, telexes, e-mail, instant message, or any other Document; the transmittal of information by any means; any oral contact such as face-to-face meetings or telephone conversations; and any writings memorializing such oral contact.

2.      The term "Document" or "Documents" means "any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs,  images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form."  Fed. R. Civ. P. 34(a)(1)(A).

3.      The term "Head or Assistant Coach" is the same as defined in NCAA Bylaw 11.01.2 in the 2022-23 Division I Manual (effective August 1, 2022).

4.      The term "Person" means natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal or governmental entity or association, including any directors, officers, employees, agents, successors, predecessors, assignees, or representatives thereof.

5.      The terms "relate" and "relating" as used herein shall mean all documents as defined above, which explicitly or implicitly, in whole or in part, were received in  conjunction with, or were generated as a result of the subject matter of the Request, including, but not limited to, all documents which reflect, record, memorialize, mention, discuss, describe, consider, constitute, embody, establish, evidence, explain, identify, evaluate, analyze, review, report on, comment on, quantify, impinge upon, or impact the subject matter of the Request.

6.      The term "Volunteer Coach" is the same as defined in NCAA Bylaw 11.01.6 in the 2022-23 Division I Manual (effective August 1, 2022).

7.      As used herein "You" or "Your" means Defendant National Collegiate Athletic Association and its agents (including members of its governing/advisory boards and committees), subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, employees, or representatives (in their individual or representative capacities).

## INSTRUCTIONS

1.      Unless otherwise noted, all interrogatories include the time period from May 29, 2018 to the present, and that time period is the "relevant period." Each Interrogatory shall be deemed continuing so as to require further and supplemental responses if You receive, discover, become aware of or create additional responsive information subsequent to the date of Your response to these Interrogatories.

2.      If You object to or otherwise refuse to comply with any portion of an Interrogatory, please (i) state the objection or reason for such refusal, and (ii) provide all information called for by that portion of the Interrogatory to which You do not object or which You do not decline to answer as follows:

    a.    If You object to an Interrogatory on the ground that to respond would constitute an undue burden, then You shall respond as fully as possible without undertaking such asserted undue burden;

    b.    If You object to any portion of an Interrogatory on the ground that it is vague or indefinite, You shall set forth Your good faith understanding of the allegedly vague or indefinite term and shall then respond to the Interrogatory based upon that stated understanding;

    c.    If You refuse to answer any Interrogatory on the ground of privilege, please provide a statement of the claim of privilege and all facts relied upon in support of that claim. Fed. R. Civ. P. 26(b)(5).

**PLAINTIFFS' FIRST SET OF INTERROGATORIES**

3.     When responding to each Interrogatory, You are required to make a diligent inquiry into all archives, books, records, papers, and computers of NCAA, including its members, and a diligent inquiry of all officers, directors, agents (including members of its governing/advisory boards and committees), servants, and employees of NCAA, wherever located (*e.g.*, in any unit, region, division, subcommittee, board, or portion of NCAA), with a view toward obtaining all information available.

4.     If You choose to rely on Rule 33(d) when responding to a given Interrogatory, you must identify by Bates Number the records responsive to the Interrogatory.

5.     These Interrogatories shall be deemed continuing, to the full extent required or permitted by Rule 33 of the Federal Rules of Civil Procedure, so as to require supplementary production whenever NCAA obtains knowledge, access, custody, possession or control of any information or document not previously disclosed, which is responsive to any of these Interrogatories.

## INTERROGATORIES

1.     Identify all current or former Volunteer Coaches in baseball for NCAA Division I schools during the relevant period.

2.     Identify all compensation and employment benefits received by Volunteer Coaches for work performed in the Volunteer Coaches role in baseball at the Division I level during the relevant period.

3.     Identify all compensation and employment benefits received by Head Coaches or Assistant Baseball Coaches in baseball at the Division I level during the relevant period.

4.     Identify all current or former NCAA employees whose job duties include:

    a.   Communicating with Your Division I member schools about the Volunteer Coach position in Division I, whether for baseball or other sports;

    b.   Communicating with Your Division I member schools about the baseball Head Coach and Assistant Baseball Coach positions in Division I;

**PLAINTIFFS' FIRST SET OF INTERROGATORIES**

c.  Creating, maintaining, enforcing, or eliminating NCAA policies, rules, or bylaws regarding the Volunteer Coach position; or

d.  Creating, maintaining, enforcing, or eliminating NCAA policies, rules, or bylaws designed to support competitive play between member schools in Division I baseball.

5.      Identify any proposed or approved amendments to NCAA Bylaws that would have or did affect the Volunteer Coach position and all Persons who are or were involved in the drafting of such amendments.

6.      Identify any NCAA employee, employee of Your Division I member schools, or an employee from Division I conferences that called for the elimination of the Volunteer Coach position in Division I, whether for baseball or other sports.

7.      State the reason(s) or rationale for the Volunteer Coach position for baseball and identify the names of any individuals with knowledge of the same.

8.      State the reason(s) or rationale for eliminating the Volunteer Coach position for baseball and identify the names of any individuals with knowledge of the same.

9.      Identify any pro-competitive benefit that the Volunteer Coach position has provided for Division I baseball teams or other Division I sports and the names of any individuals with knowledge of the same.

10.     State the reason(s) for why the bylaw was passed stating that the Volunteer Coach must not "receive compensation or remuneration from the institution's athletics department," as stated in NCAA Bylaw 11.01.6.

11.     Identify any studies or discussion about the value of labor and/or services provided by Volunteer Coaches for baseball during the relevant period and the names of any individuals with knowledge of the same.

12.     Identify the revenue that You received from hosting post-season NCAA baseball events, including the College World Series, during the relevant period and including revenue from sponsorships and from broadcasting contracts.

13.     Identify any studies or discussion about the number of coaches needed in Division I baseball.

14.     For each affirmative defense You have asserted or plan to assert, identify the basis for the defense and any Documents or Communications that purportedly support the affirmative defense.

DATED: September 11, 2023

By: /s/ *Garrett R. Broshuis*
KOREIN TILLERY, LLC
Stephen M. Tillery (*pro hac vice*)
Steven M. Berezney
Garrett R. Broshuis

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via email attachment, this 11th day of September, 2023, to all counsel of record.

/s/ Garrett R. Broshuis

**PLAINTIFFS' FIRST SET OF INTERROGATORIES**

# EXHIBIT C

to the Declaration of Michael Lieberman

Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson, MN Bar No. 202241
Joshua J. Rissman, MN Bar No. 391500
Noah L. Cozad, MN Bar No. 402643
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644

Michael Lieberman, DC Bar No. 1033827
Jamie Crooks, CA Bar No. 310447
**FAIRMARK PARTNERS, LLP**
1825 7th Street, NW, #821
Washington, DC 20001
Telephone: (818) 585-2903

*Attorneys for Plaintiffs Joseph Colon, Shannon Ray,*
*Khala Taylor, Peter Robinson, Katherine Sebbane, and Patrick Mehlert*
*Individually and on Behalf of All Those Similarly Situated*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| JOSEPH COLON, SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and PATRICK MEHLERT, Individually and on Behalf of All Those Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, <br><br> Defendant. | CASE NO. 1:23-cv-00425-WBS-KJN <br><br> **PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT** <br><br> Judge: Hon. William B. Shubb |

**PROPOUNDING PARTY:**   PLAINTIFFS JOSEPH COLON, SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, AND PATRICK MEHLERT

**RESPONDING PARTY:**   DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

**SET NUMBER:**   ONE (1)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Joseph Colon, Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Patrick Mehlert (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, request that Defendant National Collegiate Athletic Association ("NCAA") respond to the following document requests in writing and under oath, within thirty (30) days from the date of service.

**I.    DEFINITIONS**

1.    The term "Communications" means the transmittal of any information by any means, including written contact by means such as letters, memoranda, faxes, e-mails, instant messages, text messages, WhatsApp messages, or any other type of communication, in the form of facts, ideas, opinions, thoughts, inquiries or otherwise, and includes communications internal within the NCAA and with or among any third parties including among athletes, schools, committees, conferences, and media.

2.    The term "Division I Member" refers to any school which competed in NCAA Division I during any portion of the Relevant Period (as defined herein) in any of the Relevant Sports (as defined herein), as well as its employees, agents, coaches, student-athletes, members of its governing/advisory boards, councils, and committees, subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, or representatives (in their individual or representative capacities).

3.    The term "Division I Conference" or "conference" refers to any conference whose member schools competed in NCAA Division I during any portion of the Relevant Period in any of the Relevant Sports, as well as its employees, agents, members of its governing/advisory boards,

councils, and committees, subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, or representatives (in their individual or representative capacities).

4.      The term "Document" or "Documents" means "any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A).

5.      The term "Employ" or "Employed" when used with respect to coaches means that the person provided coaching services whether or not for pay and specifically includes having provided services as a "volunteer" coach.

6.      Except as otherwise indicated, the term "Identify" with respect to a person includes that person's name, last known address, employer, and in the case of requests seeking the identity of coaches, the school at which the coach provided services whether for pay or not.

7.      The term "NCAA" refers to the National Collegiate Athletic Association, which is the defendant in this case, as well as its employees, agents, attorneys, subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, or representatives (in their individual or representative capacities) and those acting on its behalf or under its authority with respect to the matters at issue in this case, including but not limited to, members of its governing/advisory boards, councils, and committees.

8.      The term "Volunteer Coach Rule" ("VCR") means the entire series of rules currently in section 11 of the NCAA Manual which pertain to the position described therein as "Volunteer Coach," and all substantially similar predecessor rules.

9.      The term "Relevant Sports" means all Division I sports except baseball to which the VCR has applied during the relevant period.

10.     The term "relate to" or "relating to" means consisting of, referring to, describing, discussing, constituting, evidencing, containing, reflecting, mentioning, concerning, pertaining to,

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

citing, summarizing, analyzing, or bearing any logical or factual connection with the matter discussed.

11.     The term "Volunteer Coach" means any individual who worked in the position described in the VCR as "Volunteer Coach" as well as any person who rendered coaching services in a relevant sport during the relevant period without pay whether designated by the institution as a "volunteer" coach under the VCR or not.

## II.     INSTRUCTIONS

1.     Unless otherwise noted as "without reference to time", all requests include the time period from January 1, 2017, to the present, and that time period is the "relevant period." For all other requests, the time period of the Request is comprised of the entire time relevant to the subject matter of the request which will be designated as "without reference to time". For purposes of compliance with Rule 34 of the Federal Rules of Civil Procedure, NCAA's duty to supplement its responses shall continue through the date of hearing or trial.

2.     Unless otherwise indicated, the documents that shall be produced pursuant to these Requests include all documents prepared, sent, dated or received, or those in effect, or those which otherwise came into existence, at any time during the Relevant Period.

3.     All documents shall be produced that respond to any part or clause of any paragraph of these Requests. You are required to make a diligent search of all archives, books, records, papers, and computers of NCAA, and a diligent inquiry of all officers, directors, agents (including members of its governing/advisory boards, councils, and committees), servants, and employees of NCAA, wherever located (e.g., in any unit, region, division, subcommittee, board, or portion of NCAA), with a view toward obtaining all information available.

4.     All documents produced shall be segregated according to the paragraphs and subparagraphs of these Requests to which they are responsive or as they are kept in the ordinary course of business. Upon production of such documents, you should indicate by appropriate designation which of the following paragraphs (and parts or clauses of such paragraphs, if any) of these Requests relate to each document produced. If a document relates to more than one paragraph

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

(or part or clause of a paragraph), you should indicate, by appropriate designation, all of the paragraphs (and parts and clauses thereof) to which the document relates.

5.      All documents existing or maintained in electronic format should be produced in their native format, or in Microsoft Excel (for numeric information) or in Microsoft Word (for text information). Otherwise, all documents should be produced in paper format or, if stored on a CD-ROM, thumb drive, or similar storage device, a copy of such CD-ROM, thumb drive, or similar storage device may be produced instead. Directions for Plaintiff to retrieve documents from other sources do not constitute production and Plaintiffs reserve the right to bring a motion to compel production of such documents.

6.      If any document is unavailable because it was lost or destroyed, after fully identifying the document, state when and where it was destroyed or otherwise made unavailable, the name(s) and address(es) of the person(s) who directed, approved, and/or knew of its destruction, and the name(s) and address(es) of the person(s) who has/have knowledge of such document.

7.      If you claim that any document required to be produced by you in response to a Request is privileged, then "each reason for objection shall be stated" by identifying with regard to the document (i) the type of document (e.g., letter, memorandum, etc.), (ii) the author(s), (iii) the recipient(s) (including all persons receiving a "cc" or "bcc"), (iv) the date, (v) a summary of the contents, (vi) the privilege claimed, and (vii) the factual basis for claiming the privilege.

8.      If you cannot fully respond to a Request or produce a document for any reason, respond to the extent possible, stating the reason(s) for your inability to respond in full.

9.      These Requests shall be deemed continuing, to the full extent required or permitted by Rule 34 of the Federal Rules of Civil Procedure, so as to require supplementary production whenever NCAA obtains knowledge, access, custody, possession or control of any information or document not previously disclosed, which is responsive to any of these Requests.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

## III.    REQUESTS FOR PRODUCTION

1.    Without reference to time, all documents and communications relating to the enactment of the VCR, including but not limited to:

   a.    Prior unenacted drafts of the VCR;

   b.    Documents commenting upon, considering, analyzing or discussing the rule in any way including stating any reasons for the rule, or its actual, anticipated or intended effects;

   c.    Communications within the NCAA and between the NCAA and Division I Members and among its members relating to the enactment of the VCR; and

   d.    Objections to or concerns relating to the Rule or its enactment.

2.    Without reference to time, all documents and communications relating to, produced by, or relied on by the Cost Reduction Committee (as described in Law v. National Collegiate Athletic Ass'n, 902 F. Supp. 1394 (D. Kan. 1995)), including but not limited to the 1986 Raiborn Report (as described in the same opinion).

3.    Without reference to time, all versions of the VCR and all documents and communications relating to any proposed, potential or actual amendment of the VCR.

4.    All documents and communications relating to the abrogation or withdrawal of the VCR.

5.    All documents and communications relating to plans, proposals, or actions of any member school or conference, generally or with respect to any given coach or coaching position, related to the abrogation of the VCR.

6.    Without reference to time, all documents and communications relating to any actual or potential application of the VCR generally, to a particular sport, in a conference, at a school or with respect to a specific coach.

7.    Without reference to time, all documents and communications relating to complaints or inquires by or among Division I Members or Division I Conferences relating to the VCR or its enforcement by NCAA, any Division I Conference, or any Division I Member.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

8.      Without reference to time, all documents and communications relating to any actual or potential interpretation of the VCR generally or in a specific case.

9.      All documents and communications relating to any actual or potential enforcement of the VCR generally or in a specific case.

10.     Without reference to time, all documents and communications relating to any analysis or consideration of the actual or anticipated consequences or effects of the VCR or its withdrawal.

11.     Without reference to time, all documents and communications relating to any meetings attended or arranged by NCAA staff, NCAA committees, NCAA governing/advisory boards, the Division I Council, the Division I Board of Directors, any other similar NCAA sponsored bodies, or Division I Members which related in whole or in part to the VCR, its drafting and enactment, its amendment, or its withdrawal.

12.     Without reference to time, all documents and communications relating to any asserted pro-competitive benefits of the VCR.

13.     Without reference to time, documents sufficient to identify all NCAA employees or agents, Division I Member employees or agents, and Division I Conference employees or agents who participated in the enactment, proposed, potential or actual amendment, abrogation, withdrawal, interpretation or enforcement of the VCR.

14.     Without reference to time, documents sufficient to identify all NCAA employees, Division I Member employees, and Division I Conference employees who communicated about the enactment, proposed, potential or actual amendment, abrogation, withdrawal, interpretation or enforcement of the VCR.

15.     Documents sufficient to identify all persons who worked as a volunteer coach at any Division I Member school in any of the relevant sports during the relevant period, and the sport, school, and period of employment for each such volunteer coach.

16.     All documents produced to NCAA by Division I Members including those provided pursuant to Division I Bylaw 20.2.4.17 and its predecessors, Division I Bylaw 11.7.1 and its

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

predecessors, or any other Division I Bylaw relating to athletic department personnel budgets and expenditures for athletic department employees and coaches' salaries and benefits at Division I schools.

17.     Documents sufficient to show all compensation (including wages, salaries, and all forms of benefits), ages, and years of coaching experience of each head and assistant coach (including volunteer coaches) employed in each relevant sport at each Division I Member which employed a volunteer coach during the relevant period.

18.     Documents relating to the job duties of any specific volunteer coach and volunteer coaches in general.

19.     Without reference to time, all documents relevant to, or which you claim support, any relevant product or geographic market you intend to assert in this case.

20.     All documents identified in your Answer or designated in response to any Interrogatories in this case or in Smart v. NCAA.

21.     All documents relevant to, or which you contend support, any of your affirmative defenses.

22.     Without reference to time, all documents and communications relating to the potential application or non-application of federal or state wage and hour laws to the Volunteer Coach position, including but not limited to any communications within NCAA, communications among NCAA and any Division I Members and/or Division I Conferences or involving any third party, or communications among or internal to Division I Members and/or Division I Conferences relating to the applicability of such laws to volunteer coaches.

23.     Documents sufficient to identify each college or university which participated in any of the relevant sports at the Division I level, all sports in which each college or university participated at the Division I level during each year, and in which Division I Conference each sport participated, for each of the academic years starting with the academic year beginning in Fall 2016 through the present.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

24.     All documents received by NCAA pursuant to a discovery request or subpoena in this lawsuit or *Smart v. NCAA*.

25.     All non-privileged documents and communications relating to this case, *Smart v. NCAA*, or any litigation or potential litigation involving claims similar to the claims in this case.

26.     All documents and communications relating to compliance with the Division I bylaws with respect to current volunteer coaches or coaches formerly designated as volunteer coaches, including but not limited to communications relating to the effect of the VCR's withdrawal.

27.     All documents and communications by, with, or among any Division I members or Division I Conferences relating to the payment, non-payment, employment, or non-employment of volunteer coaches or coaches formerly designated as volunteer coaches.

28.     All documents relating to the named Plaintiffs in this case.

Dated:  August 23, 2023                    **GUSTAFSON GLUEK PLLC**

By:  */s/ Dennis Stewart*
Dennis Stewart, CA Bar No. 99152
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Daniel E. Gustafson, MN Bar No. 202241
(*pro hac vice*)
Joshua J. Rissman, MN Bar No. 391500
(*pro hac vice*)
Noah L. Cozad, MN Bar No. 402643
(*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
jrissman@gustafsongluek.com
ncozad@gustafsongluek.com

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820
dhorowitt@ch-law.com

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

Michael Lieberman, DC Bar No. 1033827
(*pro hac vice*)
Jamie Crooks, CA Bar No. 310447
(*pro hac vice*)
**FAIRMARK PARTNERS, LLP**
1825 7th Street, NW, #821
Washington, DC 20001
Telephone: (818) 585-2903
michael@fairmarklaw.com
jamie@fairmarklaw.com

*Attorneys for Plaintiffs and the Class*

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT

## **DECLARATION OF SERVICE BY E-MAIL**

I, the undersigned, declare:

That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Hennepin, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 120 South 6th Street, Suite 2600, Minneapolis, Minnesota 55402.

That on August 23, 2023, declarant served by e-mail (as agreed to by the parties) a true and correct copy thereof of the following document:

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT**

to the parties listed below:

Carolyn Luedtke
Munger Tolles & Olson LLP
560 Mission St., 27th Floor
San Francisco, CA 94105
carolyn.luedtke@mto.com

Christopher Brian Cruz
Munger, Tolles & Olson LLP
350 South Grand Avenue, Ste 50th Floor
Los Angeles, CA 90071
christopher.cruz@mto.com

Hussin Javier Kordi
Munger Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
javier.kordi@mto.com

Justin Paul Raphael
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
justin.raphael@mto.com

I declare under penalty of perjury under the laws of the State of Minnesota that the foregoing is true and correct.

*/s/ Melanie Morgan*

# EXHIBIT D

to the Declaration of Michael Lieberman

Dennis Stewart (Bar No. 99152)
dstewart@gustafsongluek.com
**GUSTAFSON GLUEK PLLC**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (612) 333-8844

Daniel E. Gustafson, MN Bar No. 202241
Joshua J. Rissman, MN Bar No. 391500
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B.
SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644

Michael D. Lieberman, DC Bar No. 1033827
Jamie Crooks, CA Bar No. 310447
**FAIRMARK PARTNERS, LLP**
1825 7th Street, NW, #821
Washington, DC 20001
Telephone: (818) 585-2903

Attorneys for Plaintiffs Joseph Colon, Shannon Ray,
Khala Taylor, Peter Robinson, Katherine Sebbane, and Patrick Mehlert, individually and on Behalf
of All Those Similarly Situated

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

JOSEPH COLON, SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBAME, AND PATRICK MEHLERT, individually and on Behalf of All Those Similarly Situated,

        Plaintiffs,

    vs.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,

        Defendant.

CASE NO. 1:23-cv-00425 WBS KJN

**PLAINTIFFS' FIRST SET OF
INTERROGATORIES TO DEFENDANT**

**Judge: Hon. William B. Schubb**

Pursuant to Fed. R. Civ. P. 33, Plaintiffs Joseph Colon, Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbame, and Patrick Mehlert, (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, propound their First Set of Interrogatories (the "Interrogatories") to Defendant National Collegiate Athletic Association ("NCAA" or "Defendant") and request that NCAA respond within thirty (30) days:

## DEFINITIONS

1.    The term "Head or Assistant Coach" is the same as defined in NCAA Bylaw 11.01.2 in the 2022-23 Division I Manual (effective August 1, 2022).

2.    The term "NCAA" refers to the National Collegiate Athletic Association, which is the defendant in this case, as well as its employees, agents, attorneys, subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, or representatives (in their individual or representative capacities) and those acting on its behalf or under its authority with respect to the matters at issue in this case, including but not limited to, members of its governing/advisory boards, councils, and committees.

3.    The term "Volunteer Coach" is the same as defined in NCAA Bylaw 11.01.6 in the 2022-23 Division I Manual (effective August 1, 2022).

4.    As used herein "You" or "Your" means to Defendant National Collegiate Athletic Association and its agents (including members of its governing/advisory boards and committees), subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, employees, or representatives (in their individual or representative capacities).

5.    The term "Volunteer Coach Rule" ("VCR") means the entire series of rules currently in section 11 of the NCAA Manual which pertain to the position described therein as "Volunteer Coach," and all substantially similar predecessor rules.

6.    The term "Relevant Sport" means all Division I sports except baseball to which the VCR has applied during the relevant period.

7.    The term "Unpaid Coach" means any individual employed in a Relevant Sport that did not receive compensation or benefits, (excluding Graduate Assistant coaches and Student-

PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

1  Athletes who served as coaches, as those terms are defined in NCAA's Bylaws) whether or not

2  identified as a Volunteer Coach.

3  **INSTRUCTIONS**

4      1.    Unless otherwise noted as "without reference to time", all interrogatories include

5  the time period from January 1, 2017, to the present, and that time period is the "Relevant Period."

6  For all other interrogatories, the time period of the Interrogatory is comprised of the entire time

7  relevant to the subject matter of the Interrogatory which will be designated as "without reference

8  to time". For purposes of compliance with Rule 34 of the Federal Rules of Civil Procedure,

9  NCAA's duty to supplement its responses shall continue through the date of hearing or trial.

10      2.    If You object to or otherwise refuse to comply with any portion of an Interrogatory,

11  please (i) state the objection or reason for such refusal, and (ii) provide all information called for

12  by that portion of the Interrogatory to which You do not object or which You do not decline to

13  answer as follows:

14          a.  If You object to an Interrogatory on the ground that to respond would constitute

15              an undue burden, then You shall respond as fully as possible without

16              undertaking such asserted undue burden;

17          b.  If You object to any portion of an Interrogatory on the ground that it is vague or

18              indefinite, You shall set forth Your good faith understanding of the allegedly

19              vague or indefinite term and shall then respond to the Interrogatory based upon

20              that stated understanding;

21          c.  If You refuse to answer any Interrogatory on the ground of privilege, please

22              provide a statement of the claim of privilege and all facts relied upon in support

23              of that claim. Fed. R. Civ. P. 26(b)(5).

24      3.    When responding to each Interrogatory, You are required to make a diligent inquiry

25  into all archives, books, records, papers, and computers of NCAA, including its members, and a

26  diligent inquiry of all officers, directors, agents (including members of its governing/advisory

27  boards and committees), servants, and employees of NCAA, wherever located (*e.g.*, in any unit,

28

PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

1  region, division, subcommittee, board, or portion of NCAA), with a view toward obtaining all

2  information available.

3       4.      If You choose to rely on Rule 33(d) when responding to a given Interrogatory, you

4  must identify by Bates Number the records responsive to the Interrogatory.

5       5.      These Interrogatories shall be deemed continuing, to the full extent required or

6  permitted by Rule 33 of the Federal Rules of Civil Procedure, so as to require supplementary

7  production whenever NCAA obtains knowledge, access, custody, possession or control of any

8  information or document not previously disclosed, which is responsive to any of these

9  Interrogatories.

10

11                               **INTERROGATORIES**

12       1.      Identify all persons who worked in the position of Volunteer Coach or as an

13  Unpaid Coach in each of the Relevant Sports at each Division I school during the Relevant Period.

14       2.      As to each Division I school and in each Relevant Sport in which a Volunteer

15  Coach or Unpaid Coach was employed during the Relevant Period, identify all persons who

16  worked as the Head or an Assistant Coach and identify all compensation and employment benefits

17  received by each Head and Assistant Coach during that time.

18

19

20

21  DATED: September 12, 2023              **GUSTAFSON GLUEK PLLC**

22                                        By: */s/ Dennis Stewart*
                                          Dennis Stewart, CA Bar No. 99152
23                                        600 W. Broadway, Suite 3300
                                          San Diego, CA 92101
24                                        Telephone: (619) 595-3299
                                          dstewart@gustafsongluek.com
25

26                                        Daniel E. Gustafson, MN Bar No. 202241
                                          (*pro hac vice*)
27                                        Joshua J. Rissman, MN Bar No. 391500
                                          (*pro hac vice*)
28
                                        3
             PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
jrissman@gustafsongluek.com

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820
dhorowitt@ch-law.com

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

Michael Lieberman, DC Bar No. 1033827
(*pro hac vice*)
Jamie Crooks, CA Bar No. 310447
(*pro hac vice*)
**FAIRMARK PARTNERS, LLP**
1825 7th Street, NW, #821
Washington, DC 20001
Telephone: (818) 585-2903
michael@fairmarklaw.com
jamie@fairmarklaw.com

*Attorneys for Plaintiffs and the Class*

---

4

PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

1

2

3

## <u>CERTIFICATE OF SERVICE</u>

4

     I hereby certify that a copy of the foregoing was sent via email attachment, this 12th day of September, 2023, to all counsel of record.

5

6

                               /s/ Dennis Stewart

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

# EXHIBIT E

to the Declaration of Michael Lieberman

# Institutional Control

## 8.01 General Principle.

**8.01.1 Institutional Control.** The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and by the conference(s), if any, of which it is a member. Administrative control or faculty control, or a combination of the two, shall constitute institutional control. *(Revised: 1/20/22)*

**8.01.2 Responsibility for Control.** It is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. The institution's president or chancellor is responsible for the administration of all aspects of the athletics program. *(Adopted: 8/1/22)*

**8.01.3 Responsibility to Monitor and Report.** An institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs. It shall monitor its programs to ensure compliance and to identify and report instances in which compliance has not been achieved. An institution shall cooperate fully with any enforcement efforts and shall take appropriate corrective actions, as necessary. Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, including rules requiring cooperation with enforcement efforts, and the member institution shall be responsible for such compliance. *(Adopted: 8/1/22)*

## 8.1 Institutional Governance.

**8.1.1 President or Chancellor.** A member institution's president or chancellor has ultimate responsibility and final authority for the conduct of the intercollegiate athletics program and the actions of any board in control of that program. The term "president or chancellor" refers to the individual with primary executive authority for an institution and does not include an individual who has executive responsibility over a system of institutions. *(Revised: 3/8/06, 5/22/13, 1/20/22)*

**8.1.2 Athletics Board.** A board in control of athletics or an athletics advisory board, which has responsibility for advising or establishing athletics policies and making policy decisions, is not required. However, if such a board exists, it must conform to the following provisions. *(Revised: 1/20/22)*

    **8.1.2.1 Composition.** Administration and/or faculty staff members shall constitute at least a majority of the board in control of athletics or an athletics advisory board, irrespective of the president or chancellor's responsibility and authority or whether the athletics department is financed in whole or in part by student fees. If the board has a parliamentary requirement necessitating more than a simple majority in order to transact some or all of its business, then the administrative and faculty members shall be of sufficient number to constitute at least that majority. *(Revised: 3/8/06, 1/20/22)*

        **8.1.2.1.1 Administrator Defined.** An administrator (for purposes of this legislation) is an individual employed by the institution as a full-time administrative staff member who holds an academic appointment, is directly responsible to the institution's president or chancellor or serves as a chief administrative official (e.g., admissions director, finance officer, department head, or athletics department head). Other nonacademic staff members and individuals who are members of an institution's board of trustees or similar governing body would not be considered to be administrators for purposes of this regulation. *(Revised: 3/8/06, 1/20/22)*

        **8.1.2.1.2 Board Subcommittee.** If a board subcommittee is appointed, it is not necessary for the subcommittee to have majority control by administration and/or faculty members (see Bylaw 8.1.2.1), provided all actions of the subcommittee are approved by the entire board before becoming effective. However, if the subcommittee's actions are effective permanently or become effective immediately and remain in effect until reviewed by the entire board at a later date, the subcommittee's membership must satisfy the majority-control requirement. *(Revised: 1/20/22)*

        **8.1.2.1.3 Attendance.** A parliamentary majority of administrators and faculty members of a board in control of athletics is not required to be present at any single meeting in order to conduct business. *(Revised: 1/20/22)*

    **8.1.2.2 Chair or Voting Delegate.** Only an administrator or faculty member (as opposed to a student, alumnus or governing board member) may serve as chair of a member institution's board in control of intercollegiate athletics or represent the board as the institution's voting delegate at Conventions. Institutional representatives in these positions have responsibility for advising or establishing athletics policies and making policy decisions that require administrative and/or faculty control. *(Revised: 1/20/22)*

# Conduct and Employment of Athletics Personnel

## 11.01 Definitions and Applications.

**11.01.1 Bonus.** A bonus is a direct cash payment over and above an athletics department staff member's institutional salary in recognition of a specific and extraordinary achievement (see Bylaw 11.3.2.3).

**11.01.2 Coach, Head or Assistant. [A]** A head or assistant coach is any coach who is designated by the institution's athletics department to perform coaching duties and who serves in that capacity on a volunteer or paid basis. *(Revised: 1/10/91 effective 8/1/92, 8/7/14)*

**11.01.3 Coach, Graduate Assistant -- Football. [FBS/FCS]** In football, a graduate assistant coach is any coach who has received a baccalaureate degree and has either received the individual's first baccalaureate degree or has exhausted athletics eligibility in football (whichever occurs later) within the previous seven years and qualifies for appointment as a graduate assistant under the policies of the institution. For an individual who did not participate in football, exhaustion of eligibility occurs at the expiration of the individual's five-year period of eligibility. The individual is not required to be enrolled in a specific graduate degree program unless required by institutional policy. The following provisions shall apply: *(Revised: 1/11/89, 1/10/91, 1/10/92, 1/16/93, 1/9/96 effective 8/1/96, 11/1/01 effective 8/1/02, 5/25/06, 12/15/06, 1/8/07 effective 8/1/07, 11/1/07 effective 8/1/08, 1/16/10 effective 8/1/10, 4/29/10 for new appointments, 1/15/11 effective 8/1/11, 4/26/12, 8/21/12, 1/19/13 effective 8/1/13, 10/21/13, 4/25/18, 5/1/19, 1/22/20, 9/27/21, 7/20/22 effective 8/1/22)*

(a) The individual shall be enrolled in at least 50 percent of the institution's minimum regular graduate program of studies, except that during the individual's final semester or quarter of the degree program, the individual may be enrolled in less than 50 percent of the institution's minimum regular program, provided the individual is carrying (for credit) the courses necessary to complete the degree requirements. If the individual fails to complete all degree requirements during the term in which the individual is enrolled in less than 50 percent of the institution's minimum regular program, the result shall be an institutional violation per Bylaw 8.01.3. An institution may appoint a midyear replacement graduate assistant coach who is enrolled in less than 50 percent of the institution's minimum regular graduate program of studies (or is not yet enrolled), provided the graduate assistant coach has been accepted for enrollment in a graduate program beginning with the next regular academic term;

(b) The individual may not receive compensation or remuneration in excess of the value of a full grant-in-aid for a full-time student, based on the resident status of that individual, and the receipt of four complimentary tickets to all the institution's intercollegiate athletics events;

(c) The individual may receive training table meals as provided to the institution's student-athletes without the value of the meals being included in the individual's limit on remuneration;

(d) Graduate and postgraduate financial assistance administered outside the institution (e.g., NCAA postgraduate scholarship) shall be excluded from the individual's limit on remuneration, provided such assistance is awarded through an established and continuing program to aid graduate students and the donor of the assistance does not restrict the recipient's choice of institutions;

(e) The individual may not serve as a graduate assistant coach for a period of more than two years except that if the individual successfully completes 24-semester or 36-quarter hours during the initial two-year period, the individual may serve as a graduate assistant coach for a third year;

(f) Compensation for employment from a source outside the institution during the academic year shall be excluded from the individual's limit on remuneration, provided the institution does not arrange such employment and the compensation is for work actually performed. The member institution may not arrange on- or off-campus employment opportunities except for summer employment, which is permissible regardless of whether the student remains enrolled in the graduate program during the summer;

(g) A graduate student coach may accept employment benefits available to all institutional employees (e.g., life insurance, health insurance, disability insurance), as well as expenses to attend the convention of the national coaches association in the coach's sport, without the value of those benefits being included in the individual's limit on remuneration;

(h) The individual may receive cash to cover unitemized incidental expenses during travel and practice for NCAA championship events or postseason bowl contests in accordance with the parameters by which student-athletes may receive such expenses pursuant to Bylaw 16.8.1.1;

(i) The institution may provide actual and necessary expenses for the individual's significant other and children to attend a postseason football bowl game or an NCAA championship; and

(j) The individual may not evaluate or contact prospective student-athletes off campus, regardless of whether compensation is received for such activities. The individual may not perform recruiting coordination functions (see Bylaw 11.7.2); however, it is permissible for a graduate assistant coach to make telephone calls to prospective student-athletes, provided the coach has successfully completed the rules education requirement per Bylaw 11.5.1.

**11.01.3.1 Exception -- Professional Football Player. [FBS]** Time spent under contract as a professional football player is excepted from the application of the requirement that a graduate assistant coach must either have received the individual's first baccalaureate degree or have exhausted athletics eligibility within the previous seven years. *(Adopted: 10/27/21 Immediate; applicable to an individual appointed as a graduate assistant for fall 2022 and beyond.)*

**11.01.3.2 Replacement of Graduate Assistant Coach. [FBS/FCS]** The compensation or remuneration set forth in Bylaw 11.01.3 shall be charged against an academic year. Once the amount set forth in Bylaw 11.01.3-(b) is paid to a graduate assistant coach for that academic year, additional funds may not be spent on a replacement until the start of the next academic year, even though the graduate assistant coach leaves the institution's athletics program during the academic year. *(Adopted: 1/11/94, Revised: 1/9/06 effective 8/1/06, 12/15/06, 1/8/07 effective 8/1/07, 5/1/19)*

**11.01.4 Coach, Graduate Assistant -- Women's Rowing and Swimming and Diving.** In women's rowing and swimming and diving (see Bylaw 11.7.6.2.8), a graduate assistant coach is any coach who has received a baccalaureate degree and qualifies for appointment as a graduate assistant under the policies of the institution. The individual is not required to be enrolled in a specific graduate degree program unless required by institutional policy. The following provisions shall apply: *(Adopted: 1/9/06 effective 8/1/06, Revised: 5/25/06, 1/8/07 effective 8/1/07, 11/1/07 effective 8/1/08, 1/16/10 effective 8/1/10, 1/15/11 effective 8/1/11, 4/26/12, 8/21/12, 1/19/13 effective 8/1/13, 10/21/13, 8/7/14, 1/19/18, 1/16/19 effective 8/1/19, 1/15/20, 12/15/21 effective 8/1/22)*

(a) The individual shall be enrolled in at least 50 percent of the institution's minimum regular graduate program of studies, except that during the individual's final semester or quarter of the degree program, the individual may be enrolled in less than 50 percent of the institution's minimum regular program, provided the individual is carrying (for credit) the courses necessary to complete the degree requirements. If the individual fails to complete all degree requirements during the term in which the individual is enrolled in less than 50 percent of the institution's minimum regular program, the result shall be an institutional violation per Bylaw 8.01.3. An institution may appoint a midyear replacement graduate assistant coach who is enrolled in less than 50 percent of the institution's minimum regular graduate program of studies (or is not yet enrolled), provided the graduate assistant coach has been accepted for enrollment in a graduate program beginning with the next regular academic term;

(b) The individual may not receive compensation or remuneration in excess of the value of a full grant-in-aid for a full-time student, based on the resident status of that individual, and the receipt of four complimentary tickets to all the institution's intercollegiate athletics events;

(c) The individual may receive meals incidental to organized team activities (e.g., pregame or postgame meals, occasional meals) without the value of the meals being included in the individual's limit on remuneration;

(d) Graduate and postgraduate financial assistance administered outside the institution (e.g., NCAA postgraduate scholarship) shall be excluded from the individual's limit on remuneration, provided such assistance is awarded through an established and continuing program to aid graduate students and the donor of the assistance does not restrict the recipient's choice of institutions;

(e) The individual may not serve as a graduate assistant coach for a period of more than two years except that if the individual successfully completes 24-semester or 36-quarter hours during the initial two-year period, the individual may serve as a graduate assistant coach for a third year;

(f) Compensation for employment from a source outside the institution during the academic year shall be excluded from the individual's limit on remuneration, provided institution does not arrange such employment and the compensation is for work actually performed. The member institution may not arrange on- or off-campus employment opportunities except for summer employment, which is permissible regardless of whether the student remains enrolled in the graduate program during the summer;

(g) A graduate student coach may accept employment benefits available to all institutional employees (e.g., life insurance, health insurance, disability insurance), as well as expenses to attend the convention of the national coaches association in the coach's sport, without the value of those benefits being included;

(h) The individual may receive cash to cover unitemized incidental expenses during travel and practice for NCAA championship events in accordance with the parameters by which student-athletes may receive such expenses pursuant to Bylaw 16.8.1.1;

(i) The institution may provide actual and necessary expenses for the individual's significant other and children to attend the season-ending tournament(s) specified in Bylaw 17.16.5.3-(b); and

(j) The individual may not evaluate or contact prospective student-athletes off campus, regardless of whether compensation is received for such activities. The individual may not perform recruiting coordination functions (see Bylaw 11.7.2); however, it is permissible for a graduate assistant coach to make telephone calls to prospective student-athletes, provided the coach has successfully completed the rules education requirement per Bylaw 11.5.1.

**11.01.4.1 Replacement of Graduate Assistant Coach. [A]** The compensation or remuneration set forth in Bylaw 11.01.4 shall be charged against an academic year. Once the amount set forth in Bylaw 11.01.4-(b) is paid to a graduate assistant coach for that academic year, additional funds may not be spent on a replacement until the start of the next academic year, even though the graduate assistant coach leaves the institution's athletics program during the academic year. *(Adopted: 1/9/06 effective 8/1/06, Revised: 1/8/07 effective 8/1/07)*

**11.01.5 Coach, Student Assistant. [A]** A student assistant coach is any coach who is a student-athlete who has exhausted eligibility in the sport or has become injured to the point that the individual is unable to practice or compete ever again, and who meets the following additional criteria: *(Revised: 1/9/96, 1/12/04 effective 8/1/04, 3/10/04, 5/26/06, 8/11/09, 4/29/10 effective 8/1/10, 8/7/14, 1/15/16 effective 8/1/16, 2/7/20)*

(a) Is enrolled at the institution where the individual most recently participated in intercollegiate athletics;

(b) Is enrolled as a full-time graduate student within the individual's five-year period of eligibility (see Bylaw 12.8) or is enrolled as a full-time undergraduate student in the individual's first baccalaureate degree program, except that during the individual's final semester or quarter of the degree program, the individual may be enrolled in less than a full-time degree program of studies, provided the individual is carrying (for credit) the courses necessary to complete the degree requirements;

(c) Is receiving no compensation or remuneration for coaching duties from the institution other than the financial aid that could be received as a student-athlete and expenses incurred on road trips that are received by individual team members; and

(d) Is not involved in contacting and evaluating prospective student-athletes off campus and does not perform recruiting coordination functions (see Bylaw 11.7.2).

**11.01.6 Coach, Volunteer. [A]** In sports other than bowl subdivision football and basketball, a volunteer coach is any coach who does not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association). The following provisions shall apply: *(Revised: 1/10/92 effective 8/1/92, 1/16/93, 1/11/94, 4/26/01 effective 8/1/01, 4/29/04 effective 8/1/04, 1/10/05 effective 8/1/05, 5/26/06, 8/7/14, 1/19/18 effective 8/1/18, 5/1/19, 2/7/20)*

(a) The individual is prohibited from contacting and evaluating prospective student-athletes off campus and may not perform recruiting coordination functions (see Bylaw 11.7.2).

(b) The individual may receive a maximum of two complimentary tickets to home athletics contests in the coach's sport.

(c) The individual may receive complimentary admission to a home athletics event in conjunction with a prospective student-athlete's official or unofficial visit.

(d) The individual may receive complimentary meals incidental to organized team activities (e.g., pre- or postgame meals, occasional meals, but not training table meals) or meals provided during a prospective student-athlete's official or unofficial visit, provided the individual dines with the prospective student-athlete.

(e) The individual may receive reasonable entertainment (but may not receive cash for such entertainment) in conjunction with entertainment provided to student-athletes per Bylaw 16.7.

**11.01.7 Manager. [A]** A manager is an individual who performs traditional managerial duties (e.g., equipment, laundry, hydration) and meets the following additional criteria: *(Adopted: 1/16/10 effective 8/1/10, Revised: 4/29/10 effective 8/1/10, 8/7/14, 6/12/19)*

(a) The individual shall be a full-time undergraduate or graduate student (see Bylaws 14.2.2 and 14.2.2.1.5) at the institution for which the individual serves as a manager, except that during the individual's final semester or quarter of a degree program, the individual may be enrolled in less than a full-time program of studies, provided the individual is carrying (for credit) the courses necessary to complete the degree requirements;

(b) The individual may participate in limited on-court or on-field activities during practice (e.g., assist with drills, throw batting practice) or competition (e.g., assist with warm-up activities) involving student-athletes on a regular basis;

(c) The individual shall not provide instruction to student-athletes;

(d) The individual shall not participate in countable athletically related activities (e.g., practice player) except as permitted in Bylaw 11.01.7-(b); and

(e) In baseball, the individual shall forfeit any remaining eligibility in the sport at the institution where the individual serves as a manager.

**11.01.8 Significant Other.** A significant other is a spouse, fiancé or fiancée, domestic partner, or any individual whose relationship to an identified individual (e.g., prospective student-athlete, coach, student-athlete) is the practical equivalent of a spouse. *(Adopted: 1/19/18)*

# 11.1 Conduct of Athletics Personnel.

**11.1.1 Responsibility for Violations of NCAA Regulations.** Institutional staff members found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in Bylaw 19.9, whether such violations occurred at the certifying institution or during the individual's previous employment at another member institution. *(Revised: 7/31/14)*

**11.1.1.1 Responsibility of Head Coach.** An institution's head coach is presumed to be responsible for the actions of all institutional staff members who report, directly or indirectly, to the head coach. An institution's head coach shall promote an atmosphere of compliance within the program and shall monitor the activities of all institutional staff members involved with the program who report, directly or indirectly, to the coach. *(Adopted: 4/28/05, Revised: 10/30/12, 7/16/14)*

**11.1.2 Use of Association Name or Affiliation.** Staff members of member institutions and others serving on the Association's committees or acting as consultants shall not use, directly or by implication, the Association's name or their affiliation with the Association in the endorsement of products or services.

**11.1.3 Representing Individuals in Marketing Athletics Ability/Reputation.** Staff members of the athletics department of a member institution shall not represent, directly or indirectly, any individual in the marketing of athletics ability or reputation to an agent, a professional sports team or a professional sports organization, including receiving compensation for arranging commercial endorsements or personal appearances for former student-athletes, except as specified in Bylaw 11.1.3.1, and shall not receive compensation or gratuities of any kind, directly or indirectly, for such services. *(Revised: 1/10/92, 1/11/94)*

**11.1.3.1 Exception -- Professional Sports Counseling Panel and Head Coach.** An institution's professional sports counseling panel or a head coach in a sport may contact agents, professional sports teams or professional sports organizations on behalf of a student-athlete, provided no compensation is received for such services. The head coach shall consult with and report the coach's activities on behalf of the student-athlete to the institution's professional sports counseling panel. If the institution has no such panel, the head coach shall consult with and report the coach's activities to the president or chancellor [or an individual or group (e.g., athletics advisory board) designated by the president or chancellor]. *(Revised: 11/1/01 effective 8/1/02, 3/8/06)*

**11.1.4 Strength and Conditioning Coach Certification.** A strength and conditioning coach shall be certified and maintain current certification through a nationally accredited strength and conditioning certification program. *(Adopted: 4/24/14 effective 8/1/15)*

# 11.2 Contractual Agreements.

**11.2.1 Stipulation That NCAA Enforcement Provisions Apply.** Contractual agreements or appointments between a president or chancellor, director of athletics or any contracted or appointed athletics department staff member and an institution shall include the stipulation that: *(Revised: 3/10/04, 7/31/14, 8/8/18 for contracts or appointments executed on or after 8/8/18)*

(a) The individual has an affirmative obligation to cooperate fully in the infractions process, including the investigation and adjudication of a case (see Bylaw 19.2.3); and

(b) An individual who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA infractions process (see Bylaw 19), including suspension without pay or termination of employment.

**11.2.2 Athletically Related Income and Benefits.** Contractual agreements, including letters of appointment, between a full-time or part-time athletics department staff member and an institution shall include the stipulation that an athletics department staff member who receives athletically related income or benefits from a source outside the institution (e.g., income from endorsement or consultation contracts with apparel companies, equipment manufacturers, television and radio programs; income from ownership, control or management of a foundation, organization or other entities; etc.) must report such earnings [other than cash or cash equivalent (as opposed to tangible items) if the total amount received is $600 or less] to the president or chancellor on an annual basis. (See Bylaw 11.3.2.1.1.) *(Adopted: 8/8/18)*

## 11.3 Compensation and Remuneration.

**11.3.1 Control of Employment and Salaries.** The institution, as opposed to any outside source, shall remain in control of determining who is to be its employee and the amount of salary the employee is to receive within the restrictions specified by NCAA legislation.

### 11.3.2 Income in Addition to Institutional Salary.

**11.3.2.1 Bona Fide Outside Employment.** A staff member may earn income and receive benefits in addition to the institutional salary by performing services for outside groups consistent with the institution's policy related to outside income and benefits applicable to all full-time or part-time employees. The approval of such income and benefits shall be consistent with the institution's policy. *(Revised: 1/10/92, 4/26/01 effective 8/1/01, 4/28/16 effective 8/1/16, 8/8/18)*

**11.3.2.1.1 Noninstitutional Income and Benefits Disclosure.** A full-time or part-time athletics department staff member who receives athletically related income or benefits from a source outside the institution (e.g., income from endorsement or consultation contracts with apparel companies, equipment manufacturers, television and radio programs; income from ownership, control or management of a foundation, organization or other entities; etc.) must report such earnings to the president or chancellor on an annual basis; however, the athletics staff member is not required to report any cash or cash equivalent (as opposed to tangible items) if the total amount received is $600 or less. (See Bylaw 11.2.2.) *(Adopted: 8/8/18)*

**11.3.2.2 Supplemental Pay.** An outside source is prohibited from paying or regularly supplementing an athletics department staff member's annual salary and from arranging to supplement that salary for an unspecified achievement. This includes the donation of cash from outside sources to the institution earmarked for the staff member's salary or supplemental income. It would be permissible for an outside source to donate funds to the institution to be used as determined by the institution, and it would be permissible for the institution, at its sole discretion, to use such funds to pay or supplement a staff member's salary.

**11.3.2.3 Bonuses for Specific and Extraordinary Achievement.** An institution may permit an outside individual, group or agency to supplement an athletics department staff member's salary with a direct cash payment in recognition of a specific and extraordinary achievement (e.g., contribution during career to the athletics department of the institution, winning a conference or national championship, number of games or meets won during career/season), provided such a cash supplement is in recognition of a specific achievement and is in conformance with institutional policy.

**11.3.2.4 Recruiting Service Consultants.** Institutional athletics department staff members may not serve as consultants or participate on advisory panels for any recruiting or scouting service involving prospective student-athletes. *(Adopted: 1/16/93, Revised: 11/17/21)*

**11.3.2.5 Consultant for Noninstitutional Athletics Events Involving Prospective Student-Athletes.** An athletics department staff member may not serve as a consultant for a noninstitutional athletics event that primarily involves prospective student-athletes. *(Adopted: 1/15/11, Revised: 11/17/21)*

## 11.4 Employment of High School, Preparatory School or Two-Year College Coaches, or Other Individuals Associated With Prospective Student-Athletes.

**11.4.1 High School, Preparatory School or Two-Year College Coach.** An institution may not employ a high school, preparatory school or two-year college coach who remains a coach in the same sport at the high school, preparatory school or two-year college. This provision does not preclude employment of a high school, preparatory school or two-year college coach in a different sport. Men's and women's teams in the same sport are considered different sports for purposes of this legislation. Men's and women's teams in the same sport are considered different sports even if an athlete from the opposite gender is playing on a high school, preparatory school or two-year college men's or women's team, provided the team is classified as a separate team (as opposed to a "mixed" team) by the appropriate institution or the state high school, preparatory school or two-year college governing body. (See Bylaw 13.12.2.2 for regulations relating to the employment of high school, preparatory school or two-year college coaches in institutional camps or clinics.) *(Revised: 1/10/91, 3/16/07, 1/16/10)*

**11.4.1.1 Contract for Future Employment.** An institution is permitted to enter into a contractual agreement with a high school, preparatory school or two-year college coach for an employment opportunity that begins with the next academic year, provided the employment contract with the member institution is not contingent upon the enrollment of a prospective student-athlete and the coach does not begin any coaching duties (e.g., recruiting, selection of coaching staff) for the member institution while remaining associated with the high school, preparatory school or two-year college.

**11.4.2 Individual Associated with a Prospective Student-Athlete -- Men's Basketball.** In men's basketball, during a two-year period before a prospective student-athlete's anticipated enrollment and a two-year period after the prospective student-athlete's actual enrollment, an institution shall not employ (either on a salaried or a volunteer basis) or enter into a contract for future employment with an individual associated with the prospective student-athlete in any athletics department noncoaching staff position or in a strength and conditioning staff position. *(Adopted: 1/16/10 a contract signed before 10/29/09 may be honored, Revised: 6/17/11)*

**11.4.2.1 Application.** A violation of Bylaw 11.4.2 occurs if an individual associated with a prospective student-athlete (see Bylaw 13.02.19) is employed by the institution and, at the time of employment, a student-athlete who enrolled at the institution in the previous two years (and remains enrolled at the institution) was a prospective student-athlete by which the individual meets the definition of an individual associated with a prospective student-athlete. A violation of Bylaw 11.4.2 also occurs if an individual associated with a prospective student-athlete is employed and, within two years after such employment, a prospective student-athlete by which the individual meets the definition of an individual associated with a prospective student-athlete enrolls as a full-time student in a regular academic term at the institution. In either case, the student-athlete becomes ineligible for intercollegiate competition unless eligibility is restored by the Committee on Student-Athlete Reinstatement. *(Adopted: 6/20/13)*

**11.4.2.2 Exception -- Reassignment.** An institution may reassign an individual associated with a prospective student-athlete from a countable coaching staff position to a noncoaching staff position or strength and conditioning staff position, provided the individual has been a countable coach at the institution for at least one full season. A season is defined as the time between the institution's start of on-court preseason practice and the institution's last regular-season contest. *(Adopted: 4/28/16, Revised: 4/13/17, 3/3/21)*

**11.4.3 Individual Associated with a Recruited Prospective Student-Athlete -- Women's Basketball.** In women's basketball, during a two-year period before a recruited prospective student-athlete's anticipated enrollment and a two-year period after the recruited prospective student-athlete's actual enrollment, an institution shall not employ (either on a salaried or volunteer basis) or enter into a contract for future employment with an individual associated with the recruited prospective student-athlete in any athletics department noncoaching staff position or in a strength and conditioning staff position. *(Adopted: 4/26/17 effective 8/1/17 a contract signed before 1/18/17 may be honored)*

**11.4.3.1 Application.** A violation of Bylaw 11.4.3 occurs if an individual associated with a recruited prospective student-athlete (see Bylaws 13.02.14.1 and 13.02.18) is employed by the institution and, at the time of employment, a student-athlete who enrolled at the institution in the previous two years (and remains enrolled at the institution) was a recruited prospective student-athlete by which the individual meets the definition of an individual associated with a recruited prospective student-athlete. A violation of Bylaw 11.4.3 also occurs if an individual associated with a recruited prospective student-athlete is employed and, within two years after such employment, a recruited prospective student-athlete by which the individual meets the definition of an individual associated with a recruited prospective student-athlete enrolls as a full-time student in a regular academic term at the institution. In either case, the student-athlete becomes ineligible for intercollegiate competition unless eligibility is restored by the Committee on Student-Athlete Reinstatement. *(Adopted: 4/26/17 effective 8/1/17)*

**11.4.3.2 Exception -- Reassignment.** An institution may reassign an individual associated with a recruited prospective student-athlete from a countable coaching staff position to a noncoaching staff position or strength and conditioning staff position, provided the individual has been a countable coach at the institution for at least one full season. A season is defined as the time between the institution's start of on-court preseason practice and the end of institution's last regular-season contest. *(Adopted: 4/26/17 effective 8/1/17, Revised: 3/3/21)*

**11.4.4 Individual Associated with a Prospective Student-Athlete -- Bowl Subdivision Football. [FBS]** In bowl subdivision football, during a two-year period before a prospective student-athlete's anticipated enrollment and a two-year period after the prospective student-athlete's actual enrollment, an institution shall not employ (either on a salaried or volunteer basis) or enter into a contract for future employment with an individual associated with the prospective student-athlete in any athletics department noncoaching staff position or in a strength and conditioning staff position. *(Adopted: 4/26/17 a contract signed before 1/18/17 may be honored.)*

**11.4.4.1 Application. [FBS]** A violation of Bylaw 11.4.4 occurs if an individual associated with a prospective student-athlete (see Bylaw 13.02.20) is employed by the institution and, at the time of employment, a student-athlete who enrolled

at the institution in the previous two years (and remains enrolled at the institution) was a prospective student-athlete by which the individual meets the definition of an individual associated with a prospective student-athlete. A violation of Bylaw 11.4.4 also occurs if an individual associated with a prospective student-athlete is employed and, within two years after such employment, a prospective student-athlete by which the individual meets the definition of an individual associated with a prospective student-athlete enrolls as a full-time student in a regular academic term at the institution. In either case, the student-athlete becomes ineligible for intercollegiate competition unless eligibility is restored by the Committee on Student-Athlete Reinstatement. *(Adopted: 4/26/17)*

**11.4.4.2 Exception -- Reassignment.** An institution may reassign an individual associated with a prospective student-athlete from a countable coaching staff position to a noncoaching staff position or strength and conditioning staff position, provided the individual has been a countable coach at the institution the previous academic year. *(Adopted: 4/26/17, Revised: 3/3/21)*

## 11.5 Requirements to Recruit Off Campus.

**11.5.1 Annual Rules Education Requirement.** A coach shall not engage in off-campus recruiting activities until the coach has received, from the coach's institution, rules education covering NCAA legislation, including Bylaw 13 and other bylaws [e.g., Bylaw 15.3 (institutional financial aid award) and 14.3 (freshman academic requirements)] that relates to the recruitment of prospective student-athletes. Continuing rules education must occur, at a minimum, on an annual basis. *(Adopted: 1/10/91 effective 8/1/92, Revised: 12/15/21 effective 8/1/22)*

## 11.6 Scouting of Opponents.

**11.6.1 Off-Campus, In-Person Scouting Prohibition.** Off-campus, in-person scouting of future opponents (in the same season) is prohibited, except as provided in Bylaws 11.6.1.1 and 11.6.1.2. *(Adopted: 1/11/94 effective 8/1/94, Revised: 1/14/97 effective 8/1/97, 1/19/13 effective 8/1/13, 1/15/14)*

**11.6.1.1 Exception -- Same Event at the Same Site.** An institutional staff member may scout future opponents also participating in the same event at the same site. *(Revised: 1/11/94 effective 8/1/94, 10/28/97 effective 8/1/98, 1/19/13 effective 8/1/13, 9/19/13, 2/7/20, 6/30/21 effective 8/1/21)*

**11.6.1.2 Exception -- Conference or NCAA Championships.** An institutional staff member may attend a contest in the institution's conference championship or an NCAA championship contest in which a future opponent participates (e.g., an opponent on the institution's spring nonchampionship-segment schedule participates in a fall conference or NCAA championship). *(Adopted: 1/15/14, Revised: 2/7/20, 6/30/21 effective 8/1/21)*

## 11.7 Limitations on the Number and Duties of Coaches and Noncoaching Staff Members.

**11.7.1 Designation of Coaching Category. [A]** An individual who coaches and either is uncompensated or receives compensation or remuneration of any sort from the institution, even if such compensation or remuneration is not designated for coaching, shall be designated as a head coach, assistant coach, volunteer coach, graduate assistant coach or student assistant coach by certification of the institution. *(Revised: 1/10/91 effective 8/1/92, 1/12/04 effective 8/1/04, 1/18/14 effective 8/1/14)*

**11.7.1.1 Countable Coach.** An institutional staff member or any other individual outside the institution (e.g., consultant, professional instructor) with whom the institution has made arrangements must count against coaching limits in the applicable sport as soon as the individual participates (in any manner) in any of the following: *(Revised: 1/18/14 effective 8/1/14)*

(a) Provides technical or tactical instruction related to the sport to a student-athlete at any time;

(b) Makes or assists in making tactical decisions related to the sport during on-court or on-field practice or competition; or

(c) Engages in any off-campus recruiting activities.

**11.7.1.1.1 Exception -- Postseason Practice Session -- Football. [FBS/FCS]** In football, an employee of a professional sports organization or team who conducts a postseason practice session per Bylaw 17.11.7.4 is not considered a countable coach. *(Adopted: 4/25/18 effective 8/1/18)*

**11.7.1.1.2 Replacement Due to Extenuating Circumstances. [A]** An institution may replace temporarily or on a limited basis one of its countable coaches if the coach is unable to perform any or all duties because of extenuating circumstances (e.g., suspension, prolonged serious illness, pregnancy). The replacement coach may perform only those coaching, administrative or recruiting duties, including the telephoning of prospective student-athletes, that the replaced coach is unable to perform. *(Revised: 1/11/94, 4/25/02 effective 8/1/02)*

**11.7.1.1.3 Replacement for National, Olympic or Paralympic Team Coaches. [A]** An institution may replace a coach temporarily or on a limited basis when that coach takes a leave of absence to participate on or to coach a national team, Olympic or Paralympic team, provided the replacement is limited to a one-year period and the coach who is replaced performs no recruiting or other duties on behalf of the institution. *(Adopted: 1/14/97 effective 8/1/97, Revised: 4/25/02 effective 8/1/02, 1/14/08, 1/15/20)*

**11.7.1.2 Placement Within Categories. [A]** If an institution has not reached its limit on the number of coaches in any category, any type of coach may be counted in that category. *(Revised: 1/10/91 effective 8/1/92, 1/12/04 effective 8/1/04)*

**11.7.2 Recruiting Coordination Functions. [A]** The following recruiting coordination functions (except related routine clerical tasks) must be performed by the head coach or one or more of the assistant coaches who count toward the numerical limitations in Bylaw 11.7.6: *(Revised: 1/12/06, 4/27/06 effective 8/1/06, 4/24/08 effective 8/1/08, 4/26/12, 8/7/14, 1/19/18, 1/16/19)*

(a) Activities involving athletics evaluations and/or selection of prospective student-athletes other than on-campus evaluations of video and on-campus activities involving the selection of prospective student-athletes; and

(b) Making telephone calls to prospective student-athletes (or prospective student-athletes' family members or coaches).

**11.7.2.1 Exception -- Graduate Assistant Coach -- Football.** In football, a graduate assistant coach may perform the functions set forth in Bylaw 11.7.2-(a) (on campus only) and 11.7.2-(b) if the coach has successfully completed the rules education requirement per Bylaw 11.5.1. [See Bylaw 11.01.3-(j).] *(Revised: 4/27/06 effective 8/1/06, 12/15/06, 5/1/19, 12/15/21 effective 8/1/22)*

**11.7.2.2 Exception -- Graduate Assistant Coach -- Women's Rowing and Swimming and Diving.** In women's rowing and swimming and diving, a graduate assistant coach may perform the functions set forth in Bylaw 11.7.2-(a) (on campus only) and 11.7.2-(b) if the coach has successfully completed the rules education requirement per Bylaw 11.5.1. [See Bylaw 11.01.4-(j).] *(Adopted: 1/9/06 effective 8/1/06, Revised: 4/27/06 effective 8/1/06, 8/7/14, 1/19/18, 12/15/21 effective 8/1/22)*

**11.7.2.3 Exceptions -- Noncoaching Staff Members and Noncountable Coaches. [A]** *(Adopted: 1/14/08 effective 8/1/08, Revised: 8/8/08, 9/24/09, 1/16/10 effective 8/1/10, 4/13/10, 1/15/11 effective 8/1/11, 4/26/12, 11/7/13, 4/26/17 effective 8/1/17)*

(a) **After National Letter of Intent Signing or Other Written Commitment.** A noncoaching staff member or a coach who does not count toward the numerical limitations on head and assistant coaches in Bylaw 11.7.6 may perform the functions set forth in Bylaw 11.7.2-(b) after the prospective student-athlete signs a National Letter of Intent or the institution's written offer of admission and/or financial aid.

(b) **After Receipt of Financial Deposit.** A noncoaching institutional staff member or a coach who does not count toward the numerical limitations on head and assistant coaches in Bylaw 11.7.6 may perform the functions set forth in Bylaw 11.7.2-(b) after the institution receives a financial deposit in response to the institution's offer of admission.

(c) **Telephone Calls in Conjunction With Official Visit.** A noncoaching staff member or coach who does not count toward the numerical limitations on head and assistant coaches in Bylaw 11.7.6 may initiate telephone calls to a prospective student-athlete or those individuals accompanying the prospective student-athlete during the five days immediately preceding the official visit and during the official visit.

(d) **Telephone Calls in Conjunction With an Unofficial Visit.** A noncoaching staff member or a coach who does not count toward the numerical limitations on head and assistant coaches in Bylaw 11.7.6 may initiate telephone calls to a prospective student-athlete (or those individuals accompanying the prospective student-athlete) beginning the day immediately preceding the unofficial visit until the conclusion of the visit.

(e) **Telephone Calls Regarding Institutional Camp or Clinic Logistical Issues.** A noncoaching staff member or coach who does not count toward the numerical limitations on head and assistant coaches in Bylaw 11.7.6 may initiate telephone calls to a prospective student-athlete (or a prospective student-athlete's family member or coach) that relate solely to institutional camp or clinic logistical issues (e.g., missing registration information), provided no recruiting conversation or solicitation of particular individuals to attend a camp or clinic occurs during such calls.

**11.7.3 Noncoaching Staff Member with Sport-Specific Responsibilities. [A]** A noncoaching staff member with sport-specific responsibilities (e.g., director of operations, administrative assistant) is prohibited from participating in on-court or on-field activities (e.g., assist with drills, throw batting practice, signal plays) and is prohibited from participating with or observing student-athletes in the staff member's sport who are engaged in nonorganized voluntary athletically related activities (e.g., pick-up games). *(Adopted: 1/16/10, Revised: 1/18/14 effective 8/1/14)*

**11.7.4 Bowl Subdivision Football. [FBS]** There shall be a limit of one head coach, 10 assistant coaches and four graduate assistant coaches who may be employed by an institution in bowl subdivision football. *(Revised: 4/28/11 effective 8/1/12, 4/26/17 effective 1/9/18)*

**11.7.4.1 Exceptions to Number Limits. [FBS]** No individual other than coaches designated to fill the coaching categories set forth in Bylaw 11.7.4 may participate in any manner in the coaching of the intercollegiate team of a member institution during any football game, practice or other organized activity, with the following exceptions:

**11.7.4.1.1 Weight or Strength Coach. [FBS]** A weight (strength and conditioning) coach may conduct flexibility, warm-up and physical conditioning activities prior to any game and prior to or during any practice or other organized activities without being included in the limitations on number of coaches. Not more than five weight or strength coaches are permitted to work with a football program in any capacity, including all workouts (required and voluntary), practices and game-related activities. *(Revised: 1/15/11 effective 8/1/12)*

**11.7.4.1.2 Student Assistant Coach. [FBS]** The limits on the number of coaches in this section do not apply to student assistant coaches (see Bylaw 11.01.5). *(Revised: 1/10/91 effective 8/1/92, 1/15/16 effective 8/1/16)*

**11.7.4.1.3 Sprint Football. [FBS]** The limits on the number of coaches in this section do not apply to sprint football programs. Sprint football coaches are prohibited from off-campus recruiting.

**11.7.4.1.4 Additional Coaches -- National Service Academies. [FBS]** National service academies may employ four additional coaches. *(Revised: 1/10/91 effective 8/1/92, 1/12/04 effective 8/1/04, 8/23/05)*

**11.7.4.1.5 Special Attrition Provision. [FBS]** The institution is permitted to meet these limitations through normal attrition only if the institution had in effect prior to September 15, 1990, a written obligation to the assistant coach through academic tenure, an enforceable contract or a formal security-of-employment commitment. *(Revised: 1/10/91 effective 8/1/92)*

**11.7.4.2 Contact and Evaluation of Prospective Student-Athletes. [FBS]** Only those coaches who are counted by the institution within the numerical limitations on head and assistant coaches may contact or evaluate prospective student-athletes off campus. *(Revised: 4/28/05 effective 8/1/05, 1/19/13 effective 8/1/13)*

**11.7.5 Championship Subdivision Football. [FCS]** In championship subdivision football, there shall be a limit of 11 head or assistant coaches and two coaches who may serve as either graduate assistant coaches or volunteer coaches. *(Revised: 1/10/91 effective 8/1/92, 1/16/93, 1/9/96, 1/12/04 effective 8/1/04, 12/15/06, 5/1/19)*

**11.7.5.1 Exceptions to Number Limits. [FCS]** No individual other than coaches designated to fill the coaching limit set forth in Bylaw 11.7.5 may participate in any manner in the coaching of the intercollegiate team of a member institution during any football game, practice or other organized activity, with the following exceptions:

**11.7.5.1.1 Weight or Strength Coach. [FCS]** A weight (strength and conditioning) coach may conduct flexibility, warm-up and physical conditioning activities prior to any game and prior to or during any practice or other organized activities without being included in the limitations on number of coaches.

**11.7.5.1.2 Student Assistant Coach. [FCS]** The limits on the number of coaches in this section do not apply to student assistant coaches (see Bylaw 11.01.5). *(Revised: 1/10/91 effective 8/1/92, 1/15/16 effective 8/1/16)*

**11.7.5.1.3 Varsity/Freshman Team Football Program. [FCS]** An institution that conducts a championship subdivision football program that includes a varsity team and a freshman team may employ two additional coaches. Freshman eligibility for varsity team participation must be prohibited by the institution and the freshman team must participate in five or more intercollegiate contests in order for the two additional coaches to be employed. Such additional coaches may perform football-related duties only during the permissible playing and practice season in football. *(Revised: 1/10/91 effective 8/1/92, 1/12/04 effective 8/1/04, 12/15/06)*

**11.7.5.1.4 Varsity/Junior Varsity/Freshman Team Football Program. [FCS]** An institution that conducts a championship subdivision football program that includes a varsity team, a junior varsity team and a freshman team may employ four additional coaches. Freshman eligibility for varsity or junior varsity team participation must be prohibited by the institution, the junior varsity team must participate in at least four intercollegiate contests and the freshman team must participate in at least five intercollegiate contests in order for the four additional coaches to be employed. Such additional coaches may perform football-related duties only during the permissible playing and practice season in football. *(Revised: 1/10/91 effective 8/1/92, 1/12/04 effective 8/1/04, 12/15/06)*

**11.7.5.1.5 Varsity/Junior Varsity Football Program. [FCS]** An institution that conducts a championship subdivision football program that includes a varsity team and a junior varsity team may employ two additional coaches. The institution's junior varsity team must participate in at least four intercollegiate contests in order for the two

additional coaches to be employed. Such additional coaches may perform football-related duties only during the permissible playing and practice season in football. *(Revised: 1/10/92 effective 8/1/92, 1/12/04 effective 8/1/04, 12/15/06)*

**11.7.5.1.6 Sprint Football. [FCS]** The limits on the number of coaches in this section do not apply to sprint football programs. Sprint football coaches are prohibited from off-campus recruiting.

**11.7.5.1.7 Special Attrition Provision. [FCS]** The institution is permitted to meet these limitations through normal attrition only if the institution had in effect prior to September 15, 1990, a written obligation to the assistant coach through academic tenure, an enforceable contract or a formal security-of-employment commitment. *(Revised: 1/10/91 effective 8/1/92)*

**11.7.5.2 Off-Campus Contact and Evaluation of Prospective Student-Athletes. [FCS]** Only those coaches who are counted by the institution within the numerical limitations on head and assistant coaches may contact or evaluate prospective student-athletes off campus. *(Revised: 4/28/05 effective 8/1/05, 1/19/13 effective 8/1/13)*

**11.7.6 Limitations on Number of Coaches and Off-Campus Recruiters.** There shall be a limit on the number of coaches (other than graduate assistant coaches per Bylaw 11.01.3 and 11.01.4, student assistant coaches per Bylaw 11.01.5 and volunteer coaches per Bylaw 11.01.6) who may be employed by an institution and who may contact or evaluate prospective student-athletes off campus in each sport as follows: *(Revised: 1/10/91 effective 8/1/92, 1/10/92 effective 8/1/92, 1/9/96 effective 8/1/96, 1/14/97, 4/25/02 effective 8/1/02, 1/12/04 effective 8/1/04, 4/29/04 effective 8/1/04, 4/28/05, 2/3/06, 12/15/06, 4/26/07 effective 8/1/07, 1/17/09 effective 8/1/09, 1/15/11 effective 8/1/11, 4/28/11 effective 8/1/12, 8/11/11, 1/19/13 effective 8/1/13, 1/18/14 effective 8/1/14, 7/31/15, 1/15/16 effective 8/1/16, 4/26/17 effective 8/1/17, 6/23/20 effective 8/1/20)*

| Sport | Limit | Sport | Limit |
|---|---|---|---|
| Women's Acrobatics and Tumbling | 3 | Men's Skiing | 2 |
| Baseball | 3 | Women's Skiing | 2 |
| Men's Basketball | 4 | Men's Soccer | 3 |
| Women's Basketball | 4 | Women's Soccer | 3 |
| Women's Beach Volleyball | 2 | Softball | 3 |
| Women's Bowling | 2 | Men's Swimming | 2 |
| Women's Equestrian | 3 | Men's Swimming and Diving | 3 |
| Men's Fencing | 2 | Women's Swimming | 2 |
| Women's Fencing | 2 | Women's Swimming and Diving | 3 |
| Football, Bowl Subdivision (See Bylaw 11.7.4) | 11 | Men's Tennis | 2 |
| Football, Championship Subdivision (See Bylaw 11.7.5) | 11 | Women's Tennis | 2 |
| Field Hockey | 3 | Men's Cross Country (No Track and Field) | 2 |
| Men's Golf | 2 | Men's Track and Field | 3 |
| Women's Golf | 2 | Men's Cross Country/Track and Field | 3 |
| Men's Gymnastics | 3 | Women's Cross Country (No Track and Field) | 2 |
| Women's Gymnastics | 3 | Women's Track and Field | 3 |
| Men's Ice Hockey | 3 | Women's Cross Country/Track and Field | 3 |
| Women's Ice Hockey | 3 | Women's Triathlon | 2 |
| Men's Lacrosse | 3 | Men's Volleyball | 3 |
| Women's Lacrosse | 3 | Women's Volleyball | 3 |
| Men's Rifle | 2 | Men's Water Polo | 3 |
| Women's Rifle | 2 | Women's Water Polo | 3 |
| Women's Rowing | 4 | Men's Wrestling | 3 |
| Women's Rugby | 3 | Women's Wrestling | 3 |

**11.7.6.1 Combined Sports Program. [A]** An institution that conducts a combined program in a sport (one in which all coaching staff members in the same sport are involved in practice activities or competition with both the men's and women's teams on a daily basis) may employ the total number of coaches specified separately for men and for women in that sport. *(Adopted: 1/16/93)*

**11.7.6.2 Exceptions to Number Limits. [A]** No individual other than coaches designated to fill the coaching limits set forth in Bylaw 11.7.6 may participate in any manner in the coaching of the intercollegiate team of a member institution during any game, practice or other organized activity, with the following exceptions: *(Revised: 1/10/91 effective 8/1/92)*

**11.7.6.2.1 Weight or Strength Coach. [A]** A weight (strength and conditioning) coach may conduct flexibility, warm-up and physical conditioning activities prior to any game and prior to or during any practice or other organized activities without being included in the limitations on number of coaches. *(Revised: 1/10/91 effective 8/1/92)*

**11.7.6.2.2 Student Assistant Coach. [A]** An institution may employ student assistant coaches (see Bylaw 11.01.5). The limit on the number of student assistant coaches in each sport shall be the same as the limit on the number of coaches in the sport per Bylaw 11.7.6. *(Revised: 1/10/91 effective 8/1/92, 8/23/05, 4/29/10 effective 8/1/10, 1/15/16 effective 8/1/16)*

**11.7.6.2.3 Volunteer Coach. [A]** In sports other than football, basketball, women's equestrian, women's rowing, swimming and diving and women's triathlon, an institution may use the services of one volunteer coach (per Bylaw 11.01.6). Indoor track and field, outdoor track and field, and cross country are separate sports for purposes of this provision. In sports in which the NCAA conducts separate men's and women's championships, a combined men's and women's program may use two volunteer coaches. *(Adopted: 1/19/92 effective 8/1/92, Revised: 4/26/01 effective 8/1/01, 1/8/07 effective 8/1/07, 1/18/14 effective 8/1/14, 1/15/16 effective 8/1/16)*

**11.7.6.2.3.1 Volunteer Coach -- Women's Rowing. [A]** In women's rowing, an institution may use the services of four volunteer coaches. *(Adopted: 4/25/01 effective 8/1/01)*

**11.7.6.2.3.2 Volunteer Coach -- Swimming and Diving. [A]** An institution that conducts separate men's and women's swimming programs with a combined men's and women's diving program may employ three volunteer coaches, one for men's swimming, one for women's swimming and one for diving. An institution that only sponsors either men's swimming and diving or women's swimming and diving may use the services of two volunteer coaches, one for swimming and one for diving. *(Adopted: 1/10/95 effective 8/1/95, Revised: 1/15/16 effective 8/1/16)*

**11.7.6.2.3.3 Volunteer Coach -- Cross Country/Track and Field. [A]** An institution that sponsors cross country, indoor track and field, or outdoor track and field as separate sports may use the services of one volunteer coach for each of the sports that it sponsors. Each volunteer coach may coach student-athletes in any of the three sports throughout the academic year. *(Adopted: 4/27/00 effective 8/1/00)*

**11.7.6.2.3.4 Volunteer Coach -- Track and Field -- Pole Vault. [A]** An institution that competes in pole vault may use the services of one additional volunteer coach (to coach both genders), limited to coaching pole vault. *(Adopted: 1/12/04)*

**11.7.6.2.3.5 Volunteer Coach -- Women's Equestrian. [A]** In women's equestrian, an institution may use the services of one volunteer coach for the hunt seat riding discipline and one volunteer coach for the western riding discipline. *(Adopted: 1/8/07 effective 8/1/07)*

**11.7.6.2.3.6 Volunteer Coach -- Women's Triathlon. [A]** In women's triathlon, an institution may use the services of one volunteer coach for the swimming element, one volunteer coach for the cycling element and one volunteer coach for the running element. *(Adopted: 1/18/14 effective 8/1/14)*

**11.7.6.2.3.7 Volunteer Coach -- Women's Acrobatics and Tumbling.** In women's acrobatics and tumbling, an institution may use the services of two volunteer coaches. *(Adopted: 6/23/20 effective 8/1/20)*

**11.7.6.2.3.8 Volunteer Coach -- Championship Subdivision Football. [FCS]** In championship subdivision football, an institution may use the services of up to two volunteer coaches, dependent on the number of graduate assistant coaches employed by the institution (see Bylaw 11.7.5). *(Adopted: 5/1/19)*

**11.7.6.2.4 Special Attrition Provision.** The institution is permitted to meet these limitations through normal attrition only if the institution had in effect prior to September 15, 1990, a written obligation to the assistant coach through academic tenure, an enforceable contract or formal security-of-employment commitment. *(Revised: 1/10/91 effective 8/1/92)*

**11.7.6.2.5 Additional Coaches -- National Service Academies.** A national service academy may employ two additional coaches in basketball. *(Revised: 1/10/91 effective 8/1/92, 1/12/04 effective 8/1/04)*

**11.7.6.2.6 Exception for Lightweight Rowing. [A]** An institution that conducts a rowing program that includes heavyweight rowing and lightweight rowing may employ two additional coaches. Each of the institution's rowing teams must have at least one "eight" or two "fours" that compete in at least four spring events. *(Adopted: 1/9/96 effective 8/1/96)*

**11.7.6.2.7 Graduate Assistant Coach -- Women's Rowing. [A]** In women's rowing, an institution may employ one graduate assistant coach (see Bylaw 11.01.4). *(Adopted: 1/9/06 effective 8/1/06)*

**11.7.6.2.8 Graduate Assistant Coach -- Swimming and Diving. [A]** In swimming and diving, an institution may employ one graduate assistant coach (see Bylaw 11.01.4) for diving (regardless of whether its diving programs are separate or combined). *(Adopted: 1/19/18)*

(h) A team is privately or commercially sponsored; or

(i) The competition is either directly or indirectly sponsored, promoted or administered by an individual, an organization or any other agency.

**12.02.10 Pay.** Pay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics.

**12.02.11 Professional Athlete.** A professional athlete is one who receives any kind of payment, directly or indirectly, for athletics participation except as permitted by the governing legislation of the Association.

**12.02.12 Professional Athletics Team.** A professional team is any organized team that: *(Revised: 4/25/02 effective 8/1/02, 8/8/02, 4/23/03, 4/24/04, 10/28/04)*

(a) Provides any of its players more than actual and necessary expenses for participation on the team, except as otherwise permitted by NCAA legislation. Actual and necessary expenses are limited to the items listed in Bylaw 12.02.2, provided the value of these items is commensurate with the fair market value in the locality of the player(s) and is not excessive in nature; or

(b) Declares itself to be professional.

**12.02.13 Religious Mission, Official.** An official religious mission is one that is established by the religious organization of which the individual is a member and that results in the individual being unable to attend a collegiate institution during the period of the mission. *(Revised: 1/9/06, 4/2/10)*

**12.02.14 Student-Athlete.** A student-athlete is a student whose enrollment was solicited by a member of the athletics staff or other representative of athletics interests with a view toward the student's ultimate participation in the intercollegiate athletics program. Any other student becomes a student-athlete only when the student reports for an intercollegiate squad that is under the jurisdiction of the athletics department, as specified in Bylaw 20.2.4.6. A student is not deemed a student-athlete solely on the basis of prior high school athletics participation.

**12.02.15 Triathlon and Cross Country, Track and Field and Swimming.** Triathlon and cross country are considered the same sport, triathlon and track and field are considered the same sport, and triathlon and swimming are considered the same sport for purposes of Bylaw 12.1, 12.2, 12.3 and 12.8.3.2. *(Adopted: 1/18/14 effective 8/1/14)*

**12.02.16 Volleyball and Beach Volleyball.** Volleyball and beach volleyball are considered the same sport for the purposes of Bylaws 12.1, 12.2, 12.3 and 12.8.3.2. *(Adopted: 8/26/10, Revised: 7/31/14)*

# 12.1 General Regulations. An individual must comply with the following to retain amateur status. (See Bylaw 12.12 regarding the eligibility restoration process.)

**12.1.1 Validity of Amateur Status.** As a condition and obligation of membership, it is the responsibility of an institution to determine the validity of the information on which the amateur status of a prospective student-athlete (including two-year and four-year college transfers initially enrolling at an NCAA Division I institution) and student-athlete is based. (See Bylaw 14.01.3.) *(Adopted: 1/9/06 effective 8/1/06 for all final certifications for student-athletes initially enrolling at a Division I or Division II institution on or after 8/1/07, Revised: 1/8/07, 4/30/07)*

**12.1.1.1 Amateurism Certification Process.** An institution shall use an initial eligibility center approved by the Board of Governors to determine the validity of the information on which the amateur status of a student-athlete is based. *(Adopted: 1/9/06 effective 8/1/06 for final certifications for student-athletes initially enrolling at a Division I or Division II institution on or after 8/1/07, Revised: 4/30/07, 10/30/14)*

**12.1.1.1.1 Scope.** The certification of amateur status issued by the NCAA Eligibility Center is limited to activities that occur prior to the prospective student-athlete's request for final amateurism certification or the prospective student-athlete's initial full-time enrollment at an NCAA Division I or II institution, whichever occurs earlier. *(Adopted: 4/30/07)*

**12.1.1.1.2 Institutional Responsibilities.**

**12.1.1.1.2.1 Amateur Status After Certification.** An institution is responsible for certifying the amateur status of a prospective student-athlete (including two-year and four-year college transfers initially enrolling at an NCAA Division I institution) from the time the prospective student-athlete requests that a final certification be issued by the NCAA Eligibility Center or from the time the prospective student-athlete initially enrolls as a full-time student at an NCAA Division I or II institution (whichever occurs earlier). *(Adopted: 4/30/07)*

**12.1.1.1.2.2 Sharing Information and Reporting Discrepancies.** If an institution receives additional information or otherwise has cause to believe that a prospective student-athlete's amateur status has been jeopardized, the institution is responsible for promptly notifying the NCAA Eligibility Center of such

information. Further, an institution is responsible for promptly reporting to the NCAA Eligibility Center all discrepancies in information related to a student-athlete's amateurism certification. *(Adopted: 4/30/07)*

**12.1.1.1.3 Eligibility for Practice or Competition.** Prior to engaging in practice or competition, a student-athlete shall receive a final certification of amateur status based on activities that occur prior to the student-athlete's request for final certification or initial full-time enrollment at an NCAA Division I or II institution (whichever occurs earlier). *(Adopted: 4/30/07)*

**12.1.1.1.3.1 Temporary Certification.** If a prospective student-athlete reports for athletics participation before the student's amateur status has been certified, the student may practice, but not compete, for a maximum period of 45 days. After this period, the student's amateur status must be certified in order to continue to practice or to compete. *(Adopted: 1/9/06 effective 8/1/06 for all final certifications for student-athletes initially enrolling at a Division I or Division II institution on or after 8/1/07, Revised: 11/29/09)*

**12.1.1.1.3.2 Effect of Violations.** A violation of Bylaw 12.1.1.1.3 or Bylaw 12.1.1.1.3.1 in which the student-athlete is subsequently certified without conditions shall be considered an institutional violation per Bylaw 8.01.3 but shall not affect the student-athlete's eligibility. *(Adopted: 10/29/15)*

**12.1.1.1.4 Eligibility for Practice After a Final Not-Certified Certification.** After a final not-certified certification is rendered, a student-athlete may continue to engage in practice activities, provided the institution has submitted a notice of appeal. At the point in which all appeal opportunities have been exhausted and no eligibility has been granted, the student-athlete may no longer participate in practice activities. *(Adopted: 3/21/07)*

**12.1.2 Amateur Status.** An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: *(Revised: 4/25/02 effective 8/1/02, 4/23/03 effective 8/1/03, 4/29/10 effective 8/1/10)*

(a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;

(b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;

(c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;

(d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;

(e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

(f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or

(g) Enters into an agreement with an agent.

**12.1.2.1 Prohibited Forms of Pay.** "Pay," as used in Bylaw 12.1.2 above, includes, but is not limited to, the following:

**12.1.2.1.1 Salary, Gratuity or Compensation.** Any direct or indirect salary, gratuity or comparable compensation.

**12.1.2.1.2 Division or Split of Surplus.** Any division or split of surplus (bonuses, game receipts, etc.).

**12.1.2.1.3 Educational Expenses.** Educational expenses not permitted by the governing legislation of this Association (see Bylaw 15 regarding permissible financial aid to enrolled student-athletes).

**12.1.2.1.3.1 Educational Expenses or Services -- Prior to Collegiate Enrollment.** A prospective student-athlete may receive educational expenses or services (e.g., tuition, fees, room and board, books, tutoring, standardized test preparatory classes) prior to collegiate enrollment from any individual or entity other than an agent, professional sports team/organization, member institution or a representative of an institution's athletics interests, provided the payment for such expenses or services is disbursed directly to the individual, organization or educational institution (e.g., high school, preparatory school) providing the educational expenses or services. *(Adopted: 4/25/02 effective 8/1/02, Revised: 1/14/08, 5/1/19)*

**12.1.2.1.3.1.1 Professional Sports Team/Organization -- Sports Other Than Men's Ice Hockey and Skiing.** In sports other than men's ice hockey and skiing, prior to collegiate enrollment, a professional sports team/organization may provide payment for educational expenses or services (e.g., tuition, fees, room and board, books, tutoring, standardized test preparatory classes) provided to a prospective student-athlete, provided such payment is disbursed directly to the individual, organization or educational institution (e.g., high school, preparatory school) providing the educational expenses or services. *(Adopted: 5/1/19)*

extensive impermissible benefit. Among other examples, the following, in appropriate circumstances, may constitute a severe breach of conduct: *(Adopted: 10/30/12 effective 8/1/13, Revised: 7/31/14, 1/23/19 effective 8/1/19, 8/1/22)*

(a) Lack of institutional control;

(b) Academic misconduct;

(c) Failure to cooperate in an NCAA enforcement or Complex Case Unit investigation;

(d) Individual unethical or dishonest conduct, regardless of whether the underlying institutional violations are considered Level I;

(e) A violation of Bylaw 11.1.1.1 (Responsibility of Head Coach) by a head coach resulting from an underlying Level I violation by an individual within the sport program;

(f) Cash payment or other benefits provided by a coach, administrator or representative of the institution's athletics interests intended to secure, or which resulted in, enrollment of a prospective student-athlete;

(g) Third-party involvement in recruiting violations in which institutional officials knew or should have known about the involvement;

(h) Intentional violations or reckless indifference to the NCAA bylaws; or

(i) Collective Level II and/or Level III violations.

**19.1.2 Significant Breach of Conduct (Level II Violation).** A significant breach of conduct is one or more violations that provide or are intended to provide more than a minimal but less than a substantial or extensive recruiting, competitive or other advantage; include more than a minimal but less than a substantial or extensive impermissible benefit; or involve conduct that may compromise the integrity of the NCAA Collegiate Model as set forth in the bylaws. Among other examples, the following may constitute a significant breach of conduct: *(Adopted: 10/30/12 effective 8/1/13, Revised: 8/8/18 effective 10/15/18, 8/1/22)*

(a) Violations that do not rise to the level of Level I violations and are more serious than Level III violations;

(b) Failure to monitor (such violations will be presumed Level II but may be deemed to be of a Level I nature if the failure is substantial or egregious);

(c) Systemic violations that do not amount to a lack of institutional control;

(d) Multiple recruiting, financial aid, or eligibility violations that do not amount to a lack of institutional control;

(e) A violation of Bylaw 11.1.1.1 (Responsibility of Head Coach) by a head coach resulting from an underlying Level II violation by an individual within the sport program;

(f) A violation of Bylaw 13.1.1.3 (Four-Year College Prospective Student-Athletes) as it relates to contact with a student-athlete; or

(g) Collective Level III violations.

**19.1.3 Breach of Conduct (Level III Violation).** A breach of conduct is one or more violations that are isolated or limited in nature; provide no more than a minimal recruiting, competitive or other advantage; and provide no more than a minimal impermissible benefit. Among other examples, the following may constitute a breach of conduct: *(Adopted: 10/30/12 effective 8/1/13)*

(a) Inadvertent violations that are isolated or limited in nature; or

(b) Extra-benefit, financial aid, academic eligibility and recruiting violations, provided they do not create more than minimal advantages.

## 19.2 Expectations and Shared Responsibility.

**19.2.1 Member Responsibility for Compliance.** Each institution has an affirmative obligation to monitor and control its athletics programs, its representatives and its student-athletes to ensure compliance with the bylaws of the Association. *(Adopted: 10/30/12 effective 8/1/13, Revised: 8/1/22)*

**19.2.2 Member Responsibility to Report Noncompliance.** Each institution has an affirmative obligation to report all instances of noncompliance to the Association in a timely manner. *(Adopted: 10/30/12 effective 8/1/13)*

**19.2.3 Responsibility to Cooperate.** Institutions, current and former institutional staff members, and prospective and enrolled student-athletes of member institutions have an affirmative obligation to cooperate fully with and assist the NCAA enforcement staff, the Complex Case Unit, the Committee on Infractions, the Independent Resolution Panel and the Infractions Appeals Committee to further the objectives of the Association and its infractions program, including the

independent accountability resolution process. Full cooperation includes, but is not limited to: *(Adopted: 11/1/07 effective 8/1/08, Revised: 10/30/12 effective 8/1/13, 7/31/14, 8/8/18 effective 8/1/19, 8/8/18, 12/20/18, 1/23/19)*

(a) Affirmatively reporting instances of noncompliance to the Association in a timely manner and assisting in developing full information to determine whether a possible violation has occurred and the details thereof;

(b) Timely participation in interviews and providing complete and truthful responses;

(c) Making a full and complete disclosure of relevant information, including timely production of materials or information requested, and in the format requested;

(d) Disclosing and providing access to all electronic devices used in any way for business purposes;

(e) Providing access to all social media, messaging and other applications that are or may be relevant to the investigation;

(f) Preserving the integrity of an investigation and abiding by all applicable confidentiality rules and instructions; and

(g) Instructing legal counsel and/or other representatives to also cooperate fully.

**19.2.3.1 Exemplary Cooperation.** Exemplary cooperation by an institution or involved individual may constitute a mitigating factor for purposes of determining a penalty for a violation. Institutions or involved individuals may demonstrate exemplary cooperation while denying some or all of the alleged violations and otherwise acting in furtherance of their independent interests. *(Adopted: 10/30/12 effective 8/1/13)*

**19.2.3.2 Failure to Cooperate.** Failing to satisfy the responsibility to cooperate may result in an independent allegation and/or be considered an aggravating factor for purposes of determining a penalty. Institutional representatives and the involved individual may be requested to appear before a hearing panel of the Committee on Infractions or the Independent Resolution Panel at the time the allegation is considered. *(Adopted: 10/30/12 effective 8/1/13, Revised: 8/8/18 effective 8/1/19, 12/20/18)*

**19.2.3.2.1 Failure or Refusal to Produce Materials.** If an institution or individual fails or refuses to produce materials requested by the enforcement staff during an investigation, the hearing panel may infer that the requested materials would support an alleged violation for which the party may be subject to penalty pursuant to Bylaw 19.9 (see Bylaws 19.7.8.3.2 and 19.11.5.8.3.2). *(Adopted: 8/8/18, Revised: 8/8/18 effective 8/1/19)*

**19.2.3.2.2 Failure or Refusal to Participate in Interview.** If an individual fails or refuses to participate in an interview requested by the enforcement staff, and is later deemed to be an involved individual, the hearing panel may view the failure or refusal as an admission that an alleged violation, for which the individual may be subject to penalty pursuant to Bylaw 19.9, occurred (see Bylaws 19.7.8.3.3 and 19.11.5.8.3.3). *(Adopted: 8/8/18, Revised: 8/8/18 effective 8/1/19)*

**19.2.3.2.3 Immediate Penalties for Failure to Cooperate.** The Committee on Infractions and Independent Resolution Panel may prescribe immediate penalties during the investigation if an institution or individual fails to satisfy the responsibility to cooperate. In cases before the Committee on Infractions, the chair of the Committee on Infractions; a hearing panel generated at the request of the chair to review whether an institution or individual failed to satisfy the responsibility to cooperate; the chief hearing officer of a hearing panel assigned to review the case, if appointed by the chair; or the hearing panel, if requested by the chief hearing officer, may prescribe penalties. In cases before the Independent Resolution Panel, the chief panel member or hearing panel, if requested by the chief panel member, may prescribe penalties. The Committee on Infractions or Independent Resolution Panel may prescribe any penalty available under Bylaw 19.9, including when appropriate, loss of the right to participate in postseason competition and other NCAA events and loss of associated revenues. *(Adopted: 8/8/18 effective 2/1/19, Revised: 1/23/19)*

**19.2.3.2.3.1 Finality of Immediate Penalties.** The prescribed penalties are final and not subject to appeal. *(Adopted: 1/23/19 effective 2/1/19)*

**19.2.3.2.3.2 Committee on Infractions Hearing Panel Generated for Review.** When practicable, members of a Committee on Infractions hearing panel generated at the request of the Committee on Infractions chair to review whether an institution or individual failed to satisfy the responsibility to cooperate will serve on the panel that reviews the case. *(Adopted: 1/23/19 effective 2/1/19)*

**19.2.3.2.3.3 Considerations in Review of Case.** In its review of the case, the Committee on Infractions or Independent Resolution Panel hearing panel may consider any conclusion that an institution or individual failed to satisfy the responsibility to cooperate in accordance with Bylaw 19.2.3.2.3 in concluding whether a failure to cooperate violation pursuant to Bylaw 19.2.3 occurred. The panel may also consider any penalties prescribed in accordance with this bylaw in prescribing penalties pursuant to Bylaw 19.9 in its review of the case. *(Adopted: 1/23/19 effective 2/1/19)*

**19.2.3.2.3.4 Immediate Penalties Prescribed Before Referral.** Any penalties prescribed by the Committee on Infractions in accordance with Bylaw 19.2.3.2.3 prior to referral of a case to the independent accountability resolution structure shall continue to apply after referral. *(Adopted: 1/23/19 effective 2/1/19)*

**19.2.3.3 Protection for Cooperation.** An institution shall not retaliate against a current or former institutional staff member or prospective student-athlete or student-athlete who voluntarily reports information about potential violations to the individual's conference, member institution and/or the Association. *(Adopted: 8/8/18)*

# 19.3 Committee on Infractions.

**19.3.1 Composition of Committee.** The Board of Directors shall appoint a Committee on Infractions comprised of not more than 24 members to act as hearing officers in infractions proceedings of the Association. The Board of Directors shall also appoint one member of the committee to serve as chair and another member to serve as vice chair. If at any time the chair is unavailable to act as such, the vice chair is empowered to exercise the functions of the chair. There shall be no subdivision restrictions except that all nonpublic members may not be from the same subdivision. The committee shall reflect the Association's commitment to diversity. To the extent reasonably possible, the committee shall include members from each of the following categories: *(Revised: 1/16/93, 10/27/98, 10/28/99, 1/11/00, 11/1/01, 10/31/02, 10/30/12 effective 8/1/13, 1/19/13 effective 8/1/13, 4/18/18)*

(a) Current or former college or university presidents, chancellors or other senior institutional administrators (no more than three years removed from employment by a member institution or similar service at the time of the individual's initial appointment);

(b) Current or former directors of athletics (no more than three years removed from employment by a member institution or similar service at the time of the individual's initial appointment);

(c) Former NCAA coaches (no more than 10 years removed from employment by a member institution or similar service at the time of the individual's initial appointment);

(d) Representatives from conference offices;

(e) Institutional staff or faculty, including but not limited to faculty athletics representatives [such a member who does not meet the definition of "on the staff" due to a change in employment status during a term of office may complete the individual's term (subject to discretion of the committee chair) and be eligible for reappointment];

(f) Athletics administrators with compliance experience; and

(g) Members of the general public with formal legal training who are not associated with a collegiate institution, conference, or professional or similar sports organization and who do not represent coaches or athletes in any capacity.

**19.3.2 Temporary Substitutes.** If it appears that one or more members of the committee will be unable to participate in the disposition of a case, the chair may designate a current or former member or members of the committee to participate for purposes of consideration and disposition of that case. *(Revised: 11/1/07 effective 8/1/08, 10/30/12 effective 8/1/13)*

**19.3.3 Hearing Panels of the Committee.** Unless ordered otherwise by the committee chair or to review an agreement of negotiated resolution pursuant to Bylaw 19.5.12, cases involving Level I or Level II violations will be presented to and decided by hearing panels consisting of not less than five and not more than seven members of the full Committee on Infractions. When submitting the case for the committee's consideration, the parties may identify their belief that the case is suitable to be decided by a three-member panel. When appropriate based on the number and nature of allegations, the chair or vice chair may order that a panel of three members be generated. Upon notification, parties may submit their position when they believe that a three-member panel is not appropriate to review the case. The final decision of whether to consider a case with a three-member panel rests with the chair or vice chair. Decisions issued by hearing panels are made on behalf of the Committee on Infractions. *(Adopted: 10/30/12 effective 8/1/13, Revised: 10/5/16, 10/31/18)*

**19.3.4 Conflict of Interest.** No member of a hearing panel shall participate in a case if the member is directly connected with an institution under investigation or if the member has a personal, professional or institutional affiliation that may create the appearance of partiality. It is the responsibility of the panel member to determine if a conflict exists. Objections to the participation of a panel member in a particular case should be raised as soon as recognized but will not be considered unless raised at least one week in advance of the panel's review of the case. Objections will be decided by the committee chair. *(Adopted: 10/30/12 effective 8/1/13)*

**19.3.5 Term of Office.** A member shall be appointed to serve a three-year term, which shall commence on the first day of August following the member's appointment. A member may be reappointed for additional three-year terms but shall not serve more than nine years on the committee. *(Adopted: 1/11/00, Revised: 10/30/12 effective 8/1/13)*

(b) A prospective student-athlete participating in a covered event who has graduated from high school and signed a National Letter of Intent or an institution's written offer of admission and/or financial aid to participate in an intercollegiate sport at a participating institution.

**20.2.4.9.1 Amount of Coverage Insurance.** Such insurance coverage must be of equal or greater value than the deductible of the NCAA Catastrophic Injury Insurance Program and may be provided through the following sources: *(Adopted: 4/28/05 effective 8/1/05, Revised: 1/20/22)*

(a) Parents or guardians' insurance coverage;

(b) Participant's personal insurance coverage; or

(c) Institution's insurance program.

**20.2.4.9.2 Athletically Related Injuries.** For purposes of this provision, athletically related injuries are injuries that are a direct result of participation in a covered event. *(Adopted: 4/28/05 effective 8/1/05, Revised: 1/20/22)*

**20.2.4.9.3 Covered Event.** A covered event includes the following: *(Adopted: 4/28/05 effective 8/1/05, Revised: 1/20/22)*

(a) Any intercollegiate sports activity, including team travel, competition, practices and conditioning sessions during the playing season (as defined in Bylaw 17.1.1);

(b) An NCAA-sanctioned competition in which the insured person is an official competitor; or

(c) Practice and conditioning sessions that are authorized, organized or directly supervised by athletics department personnel at the member institution other than during the playing season. Such sessions must occur on campus or at approved off-campus facilities as part of an intercollegiate athletics activity. For insured student-athletes or prospective student-athletes who compete in individual sports, off-campus intercollegiate athletics activities must be authorized by athletics department personnel at the participating school and take place at approved locations.

**20.2.4.10 Student-Athlete Health Insurance Portability and Accountability Act (HIPAA) Authorization/ Buckley Amendment Consent Form -- Disclosure of Protected Health Information.** An active member institution shall administer annually a statement for each student-athlete to voluntarily sign that provides information prescribed in Bylaw 12.7.4. *(Adopted: 4/23/03 effective 8/1/03, Revised: 8/7/03 effective 8/1/04, 11/1/07 effective 8/1/08, 1/20/22)*

**20.2.4.11 Discipline of Members.** Pursuant to directions of the Board of Directors or the annual Convention, an active member institution shall refrain from athletics competition with designated institutions as required under the provisions of the Association's infractions process (see Bylaw 19). *(Revised: 11/1/07 effective 8/1/08, 7/31/14, 1/20/22)*

**20.2.4.12 Standards.** An active member institution agrees to establish and maintain high standards of personal honor, eligibility and fair play. *(Revised: 1/20/22)*

**20.2.4.13 Publication of Progress-Toward-Degree Requirements.** An active member institution is obligated to publish its progress-toward-degree requirements for student-athletes (see Bylaw 14.4.1). *(Revised: 1/20/22)*

**20.2.4.14 Missed Class-Time Policies.** An active member institution is obligated to establish policies in all sports concerning student-athletes' missed class time due to participation in intercollegiate athletics and in athletics competition scheduled during final examination periods. *(Adopted: 4/29/10 effective 8/1/10, Revised: 4/25/15 effective 8/1/18, 1/20/22)*

**20.2.4.15 President or Chancellor Attestation of Compliance Obligations.** An active member institution shall not be eligible to enter a team or individual competitors in an NCAA championship and shall be subject to removal from and/or ineligibility of individuals to serve on an NCAA board, council or committee unless its president or chancellor attests, annually by October 15, to an understanding of the institutional obligations and personal responsibilities imposed by the constitution (Principle of Institutional Control; Rules, Compliance and Accountability). [See Bylaw 18.4.2.1-(d).] *(Adopted: 4/19/19 effective 8/1/19, Revised: 1/20/22)*

**20.2.4.16 Compliance-Related Certification.** A member institution shall not be eligible to enter a team or individual competitors in an NCAA championship and shall be subject to removal from and/or ineligibility of individuals to serve on an NCAA board, council or committee unless it certifies [see Bylaw 18.4.2.1-(e)] that the conditions of Bylaw 18.4.2.1.1 have been satisfied. *(Adopted: 1/10/95, Revised: 3/8/06, 8/8/18 effective 8/1/19, 1/20/22)*

**20.2.4.17 Operating and Capital Financial Data Report.** An institution shall submit financial data detailing operating revenues, expenses and capital related to its intercollegiate athletics program to the NCAA on an annual basis in accordance with the financial reporting policies and procedures. The required data shall include, but is not limited to, the following: *(Adopted: 1/17/09 effective 8/1/09, Revised: 1/20/22)*

(a) All expenses and revenues for or on behalf of an institution's intercollegiate athletics program, including those by any affiliated or outside organization, agency or group of individuals;

(b) Salary and benefits data for all athletics positions. The data shall include base salary, bonuses, endorsements, media fees, camp or clinic income, deferred income and other income contractually guaranteed by the institution;

(c) Capital expenditures (to be reported in aggregate for athletics facilities), including capitalized additions and deletions to facilities during the reporting period, total estimated book value of athletically related plant and equipment net of depreciation, total annual debt service on athletics and university facilities and total debt outstanding on athletics and university facilities;

(d) Value of endowments at fiscal year-end that are dedicated to the sole support of athletics;

(e) Value of all pledges at fiscal year-end that support athletics; and

(f) The athletics department fiscal year-end fund balance.

**20.2.4.17.1 Verification and Certification.** The report shall be subject to annual agreed-on verification procedures approved by the membership (in addition to any regular financial reporting policies and procedures of the institution) and conducted by a qualified independent accountant who is not a staff member of the institution and who is selected by the institution's chancellor or president or by an institutional administrator from outside the athletics department designated by the chancellor or president. The independent accountant shall verify the accuracy and completeness of the data prior to submission to the institution's chancellor or president and the NCAA. The institution's chancellor or president shall certify the financial report prior to submission to the NCAA. *(Adopted: 1/17/09 effective 8/1/09, Revised: 1/20/22)*

**20.2.4.18 Designation of Team Physician. [A]** An active member institution shall designate a team physician for all or each of its intercollegiate teams. The team physician shall be a doctor of medicine (MD) or doctor of osteopathic medicine (DO) with a current license in good standing to practice medicine in the state in which the institution is located. The team physician shall be authorized to oversee the medical services for injuries and illnesses incidental to a student-athlete's participation in intercollegiate athletics. *(Revised: 1/18/14 effective 8/1/14, 1/20/22)*

**20.2.4.19 Independent Medical Care. [A]** An active member institution shall establish an administrative structure that provides independent medical care and affirms the unchallengeable autonomous authority of primary athletics health care providers (team physicians and athletic trainers) to determine medical management and return-to-play decisions related to student-athletes. An active institution shall designate an athletics health care administrator to oversee the institution's athletic health care administration and delivery. *(Adopted: 1/15/16 effective 8/1/16, Revised: 10/7/16, 1/20/22)*

**20.2.4.19.1 Application to Nonautonomy Conferences. [A]** A member institution of a conference other than the five conferences named in Bylaw 9.2.2.1.1 shall apply the provisions of Bylaw 20.2.4.19. *(Adopted: 10/30/19 effective 8/1/20, Revised: 1/20/22)*

**20.2.4.20 Concussion Management Plan. [A]** An active member institution shall have a concussion management plan for its student-athletes. The plan shall include, but is not limited to, the following: *(Adopted: 8/12/10, Revised: 1/20/22)*

(a) An annual process that ensures student-athletes are educated about the signs and symptoms of concussions. Student-athletes must acknowledge that they have received information about the signs and symptoms of concussions and that they have a responsibility to report concussion-related injuries and illnesses to a medical staff member;

(b) A process that ensures a student-athlete who exhibits signs, symptoms or behaviors consistent with a concussion shall be removed from athletics activities (e.g., competition, practice, conditioning sessions) and evaluated by a medical staff member (e.g., sports medicine staff, team physician) with experience in the evaluation and management of concussions;

(c) A policy that precludes a student-athlete diagnosed with a concussion from returning to athletics activity (e.g., competition, practice, conditioning sessions) for at least the remainder of that calendar day; and

(d) A policy that requires medical clearance for a student-athlete diagnosed with a concussion to return to the athletics activity (e.g., competition, practice, conditioning sessions) as determined by a physician (e.g., team physician) or the physician's designee.

**20.2.4.20.1 Concussion Safety Protocol. [A]** An institution shall submit its Concussion Safety Protocol to the Concussion Safety Protocol Committee by May 1 of each year. The protocol shall be consistent with the NCAA Concussion Safety Protocol Checklist and shall include: **[D]** *(Revised: 2/23/17, Adopted: 1/17/19, 2/13/20, 1/20/22)*

(a) Policies and procedures that meet the requirements of Bylaw 20.2.4.20;

(b) Procedures for preparticipation baseline testing of each student athlete;

(c) Procedures for reducing exposure to head injuries;

**20.8.1.1.1 Football Championship Subdivision Member Electing Football Bowl Subdivision Legislation.** A Football Championship Subdivision member institution may elect to be governed by the legislation pertaining to the Football Bowl Subdivision, as follows: *(Revised: 12/15/06)*

(a) The institution shall file a declaration of intent with the NCAA president. The declaration shall be received in the national office (by mail or electronic transmission) not later than June 1 preceding the applicable academic year. Any declaration received after that date shall be postmarked not later than May 25.

(b) Once receipt of the declaration has been confirmed, the institution shall not be eligible for inclusion in championship subdivision football rankings or for consideration for the Division I Football Championship.

**20.8.1.2 Division III Application.** A Division III member institution that has a sport classified in Division I may apply Division I rules in that sport except the institution must apply the Division III financial aid regulations of Bylaw 15 in the Division I sport. *(Revised: 1/11/94, 2/7/20)*

**20.8.1.2.1 Waivers.** If a member institution conducts a men's or women's sport that was classified in Division I during the 1982-83 academic year, the Strategic Vision and Planning Committee, by a two-thirds majority of its members present and voting, may approve waivers of the application of the Division III regulations to such a sport. *(Revised: 11/1/07 effective 8/1/08, 1/15/11 effective 8/1/11, 8/7/14, 10/4/17)*

# 20.9 Eligibility for National Collegiate and Division Championships.

**20.9.1 Eligibility for National Collegiate Championships.** [#] Separate championships in each division are not sponsored in the following sports: *(Adopted: 4/24/03 effective 8/1/03, Revised: 1/15/11 effective 8/1/11, 10/30/14 effective 8/1/15, 7/31/15)*

| | | |
|---|---|---|
| Women's beach volleyball | Women's gymnastics | Men's volleyball (Divisions I a |
| Women's bowling | Women's ice hockey (Divisions I and II) | Men's water polo |
| Men's and women's fencing | Men's and women's rifle | Women's water polo |
| Men's gymnastics | Men's and women's skiing | |

An active member institution in good standing, regardless of division, is eligible for the National Collegiate Championships if a division championship in the respective sport is not offered in its division. Such an institution is required to meet only the institutional and individual eligibility requirements of its division that govern the sport in question.

**20.9.2 Division II Options When No Division II Championship Is Conducted.** An active member institution that holds membership in Division II is eligible to compete in the Division I championship in those sports for which no championship is conducted in Division II. The Division II institution shall declare its intention to compete by June 1. This declaration of intent shall be effective for a minimum of three years. *(Revised: 1/10/91 effective 9/1/92)*

**20.9.2.1 Participation in Division I Championship.** To be eligible for the Division I championship in such a sport, the Division II member institution is required to meet all Division I institutional and individual eligibility requirements and may use Division I financial aid limitations in that sport as permitted under Bylaw 20.10.1.1. *(Revised: 1/10/91 effective 9/1/92)*

**20.9.2.2 Exception for Maximum Number of Contests or Dates of Competition.** A Division II member institution that is eligible for a championship in another division because there is no championship in that sport in its membership division shall apply the maximum number of contests or dates of competition in the sport involved that applies to the division in which it declares its intention to compete.

# 20.10 Division I Membership.

**20.10.1 Commitments to the Division I Collegiate Model.** In addition to the purposes and fundamental policy of the National Collegiate Athletic Association, as set forth in the NCAA constitution, members of Division I support the following commitments in the belief that these commitments assist in defining the nature and purposes of the division. These commitments are not binding on member institutions, but serve as a guide for the preparation of legislation by the division and for planning and implementation of programs by institutions and conferences. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.1 The Commitment to Value-Based Legislation.** Bylaws proposed and enacted by member institutions governing the conduct of intercollegiate athletics shall be designed to foster competition in amateur athletics, promote the Association's enduring values and advance the Collegiate Model as set forth in the NCAA constitution. In some instances, a careful balancing of these values may be necessary to help achieve the purposes of the Association. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.2 The Commitment to Amateurism.** Member institutions shall conduct their athletics programs for students who choose to participate in intercollegiate athletics as a part of their educational experience and in accordance with NCAA bylaws, thus maintaining a line of demarcation between student-athletes who participate in the Collegiate Model and athletes competing in the professional model. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.3 The Commitment to Fair Competition.** Bylaws shall be designed to promote the opportunity for institutions and eligible student-athletes to engage in fair competition. This commitment requires that all member institutions compete within the framework of the Collegiate Model of athletics in which athletics competition is an integral part of the student-athlete's effort to acquire a degree in higher education. The commitment to fair competition acknowledges that variability will exist among members, including facilities, geographic locations and resources, and that such variability should not be justification for future legislation. Areas affecting fair competition include, but are not limited to, personnel, eligibility and amateurism, recruiting, financial aid, the length of playing and practice seasons, and the number of institutional competitions per sport. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.4 The Commitment to Integrity and Sportsmanship.** It is the responsibility of each member institution to conduct its athletics programs and manage its staff members, representatives and student-athletes in a manner that promotes the ideals of higher education and the integrity of intercollegiate athletics. Member institutions are committed to encouraging behavior that advances the interests of the Association, its membership and the Collegiate Model of athletics. All individuals associated with intercollegiate athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty, responsibility, academic integrity and ethical conduct. These values should be manifest not only in athletics participation, but also in the broad spectrum of activities affecting the athletics programs. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.5 The Commitment to Institutional Control and Compliance.** It is the responsibility of each member institution to monitor and control its athletics programs, staff members, representatives and student-athletes to ensure compliance with the constitution and bylaws of the Association. Responsibility for maintaining institutional control ultimately rests with the institution's campus president or chancellor. It is also the responsibility of each member institution to report all breaches of conduct established by these bylaws to the Association in a timely manner and cooperate with the Association's infractions process. Upon a conclusion that one or more violations occurred, an institution shall be subject to such disciplinary and corrective actions as may be prescribed by the Association on behalf of the entire membership. *(Adopted: 1/19/13 effective 8/1/13, Revised: 7/31/14)*

**20.10.1.6 The Commitment to Student-Athlete Well-Being.** Intercollegiate athletics programs shall be conducted in a manner designed to enhance the well-being of student-athletes who choose to participate and to prevent undue commercial or other influences that may interfere with their scholastic, athletics or related interests. The time required of student-athletes for participation in intercollegiate athletics shall be regulated to minimize interference with their academic pursuits. It is the responsibility of each member institution to establish and maintain an environment in which student-athletes' activities, in all sports, are conducted to encourage academic success and individual development and as an integral part of the educational experience. Each member institution should also provide an environment that fosters fairness, sportsmanship, safety, honesty and positive relationships between student-athletes and representatives of the institution. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.7 The Commitment to Sound Academic Standards.** Standards of the Association governing participation in intercollegiate athletics, including postseason competition, shall be designed to ensure proper emphasis on educational objectives and the opportunity for academic success, including graduation, of student-athletes who choose to participate at a member institution. Intercollegiate athletics programs shall be maintained as an important component of the educational program, and student-athletes shall be an integral part of the student body. Each member institution's admission and academic standards for student-athletes shall be designed to promote academic progress and graduation and shall be consistent with the standards adopted by the institution for the student body in general. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.8 The Commitment to Responsible Recruiting Standards.** Recruiting bylaws shall be designed to promote informed decisions and balance the interests of prospective student-athletes, their educational institutions, the Association's member institutions and intercollegiate athletics as a whole. This commitment includes minimizing the role of external influences on prospective student-athletes and their families and preventing excessive contact or pressure in the recruitment process. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.1.9 The Commitment to Diversity and Inclusion.** The Division I membership believes in and is committed to the core values of diversity, inclusion and equity, because realization of those values improves the learning environment for all student-athletes and enhances excellence within the membership and in all aspects of intercollegiate athletics. The membership shall create diverse and inclusive environments, promote an atmosphere of respect for and sensitivity to the dignity of every person, and include diverse perspectives in the pursuit of academic and athletic excellence. Member

institutions, with assistance from the national office, are expected to develop inclusive practices that foster positive learning and competitive environments for student-athletes, as well as professional development and opportunities for athletics administrators, coaches and staff from diverse backgrounds. *(Adopted: 1/19/13 effective 8/1/13)*

**20.10.2 Division I Philosophy.** Members of Division I support the following principles in the belief that the following statements provide further definition of the nature and purposes of the division. These statements are not binding on member institutions, but serve as additional guidance for the preparation of legislation by the division and for planning and implementation of programs by institutions and conferences. A member of Division I: *(Revised: 1/19/13 effective 8/1/13)*

(a) Subscribes to high standards of academic quality, as well as breadth of academic opportunity;

(b) Strives in its athletics program for regional and national excellence and prominence. Accordingly, its recruitment of student-athletes and its emphasis on and support of its athletics program are, in most cases, regional and national in scope;

(c) Recognizes the dual objective in its athletics program of serving both the university or college community (participants, student body, faculty-staff, alumni) and the general public (community, area, state, nation);

(d) Believes in offering extensive opportunities for participation in varsity intercollegiate athletics for both men and women;

(e) Sponsors at the highest feasible level of intercollegiate competition one or both of the traditional spectator-oriented, income-producing sports of football and basketball. In doing so, members of Division I recognize the differences in institutional objectives in support of football; therefore, the division provides competition in that sport in the Bowl Subdivision and the Championship Subdivision;

(f) Believes in scheduling its athletics contests primarily with other members of Division I, especially in the emphasized, spectator-oriented sports, as a reflection of its goal of maintaining an appropriate competitive level in its sports program;

(g) Maintains institutional control over all funds supporting athletics; and

(h) Understands, respects and supports the programs and philosophies of other divisions. Occasionally, institutions from other divisions or athletics associations will seek membership in Division I. In such cases, the applicants should be required to meet, over a period of time, prescribed criteria for Division I membership in order to ensure that such institutions agree and comply with the principles and program objectives embodied in this statement.

**20.10.3 Financial Aid Requirements.**

**20.10.3.1 Maximum Limitations.** A member of Division I shall not make an award of financial aid (for which the recipient's athletics ability is considered in any degree) in excess of the number permitted by the provisions of the bylaws governing Division I financial aid awards limitations (see Bylaw 15.5). *(Revised: 1/10/91 effective 9/1/94)*

**20.10.3.2 Minimum Awards.** A member of Division I shall provide institutional financial assistance that equals one of the following: *(Revised: 1/10/91 effective 9/1/94, 1/10/95, 1/9/96, 1/14/97 effective 9/1/97, 4/15/97 effective 8/1/98, 10/27/98 effective 8/1/99, 4/13/99, 4/11/00, 4/10/01, 8/14/02, 4/28/05, 4/27/06, 6/11/07, 11/1/07 effective 8/1/08, 8/7/14, 10/4/17)*

(a) A minimum of 50 percent of the maximum allowable grants in 14 sports, at least seven of which must be women's sports. If an institution uses indoor track and field, outdoor track and field and cross country to meet the financial aid criterion, it must award the equivalent of at least 80 percent of the full grants for men and 80 percent of the full grants for women in those sports. If the institution counts two of those three sports to meet the financial aid criterion, it must award the equivalent of at least 70 percent of the full grants for men and 70 percent of the full grants for women. If the institution counts indoor and outdoor track and field as one sport, it must award the equivalent of at least 50 percent of the full grants for men and 50 percent of the full grants for women;

(b) Financial aid representing a minimum aggregate expenditure of $1,799,140 in 2022-23 (with at least $899,571 in women's sports) and $1,835,123 (with at least $917,562 in women's sports) exclusive of grants in football and men's and women's basketball, provided the aggregate grant value is not less than the equivalent of 38 full grants, with at least 19 full grants for women. The Strategic Vision and Planning Committee shall adjust the minimum aggregate figure annually to reflect inflation, based on changes in average national tuition charges for regionally accredited institutions. The committee shall announce the revised figure in the fall each year for the following academic year. If the institution does not sponsor men's or women's basketball, the minimum aggregate expenditure must be $1,187,801 in 2022-23 and $1,211,557 in 2023-24 for the gender without the basketball program, but in no case fewer than the equivalent of 29 full grants for that gender;

(c) A minimum of the equivalent of 50 full grants (at least 25 full grants in women's sports), exclusive of grants awarded in football and men's and women's basketball. If the member institution does not provide men's or women's basketball, it shall sponsor a minimum of 35 full grants in the sports program for the gender without the basketball program; or

# EXHIBIT F

to the Declaration of Michael Lieberman

Case 1:23-cv-00425-WBS-CSK    Document 58-2    Filed 10/17/23    Page 66 of 264



**GOVERNANCE**

# Governance

The NCAA governance structure consists of legislative bodies made up of volunteers from member schools. These legislative bodies, as well as a group of committees, govern each division and set Association-wide policy. Committees manage topics affecting sports rules, championships, health and safety, matters impacting women in athletics and opportunities for minorities.

The Board of Governors, the NCAA's highest governing body, consists primarily of presidents and chancellors from each division, as well as two independent members. The board provides strategic planning for the Association as a whole, such as adopting and implementing policies to resolve core issues and other Association-wide matters. The board also initiates and settles litigation, provides final approval and oversight of the NCAA's budget and employs the NCAA president — the only national office staff member who plays an active role in the governance system as an ex officio member of the Board of Governors. The NCAA president gets one vote on the committee, and only for the purpose of breaking a tie.

All Association-wide governing bodies are charged with upholding and advancing the Association's core values of fairness, safety and equal opportunity for all student-athletes. Neither the Association-wide committees nor the Board of Governors has authority to enact legislation directly, but they can influence and provide guidance by recommending legislation to each division, where it can be reviewed through the divisions' legislative processes.

## Governance Links

- Division I
- Division II
- Division III

## How the NCAA Works

- Association-Wide: PDF
- Division I: PDF
- Division II: PDF
- Division III: PDF
- Feature Story



   

POWERED BY ◢ LEARFIELD

Terms of Service

Privacy Policy

© 2023 NCAA All Rights Reserved

NCAA Terms of Service | Privacy Policy

# EXHIBIT G

to the Declaration of Michael Lieberman

Case 1:23-cv-00425-WBS-CSK   Document 58-2   Filed 10/17/23   Page 69 of 264



**DIVISION I**                                         Additional Links +

# Division I Governance

In 2014, Division I redesigned its governing system to create a structure that is more nimble, streamlined and responsive to membership needs.



Members adopt bylaws governing Division I through two legislative processes. These two systems are referred to as autonomy and Council governance.

Both processes include input from presidents and chancellors, directors of athletics, other athletics administrators, coaches, faculty representatives, conference personnel and student-athletes from Division I schools and conferences. NCAA committees populated by membership personnel conduct the division's day-to-day business and establish strategic direction for the future.

Division I's committee structure oversees everything from championships administration and sport oversight to strategic planning and the overall health of Division I.

The student-athlete voice is an important component of the Division I governance structure. Two members of the Division I Student-Athlete Advisory Committee participate and vote in meetings of the Division I Council, the division's primary policymaking body. The Student-Athlete Advisory Committee also has a voting student-athlete on each of the seven standing committees of the Council. Students also participate actively in the autonomy governance structure. Conferences choose 15 student-athletes to be part of the 80 votes cast on autonomy legislation.

Many of these potential regulations — as well as proposals to change existing policies — develop within the committee governance structure throughout the year, while other legislative measures are submitted by member conferences.



   



POWERED BY LEARFIELD

Terms of Service

Privacy Policy

© 2023 NCAA All Rights Reserved
NCAA Terms of Service | Privacy Policy

# EXHIBIT H

to the Declaration of Michael Lieberman



# NCAA Division I Transformation Committee

Final Report

January 3, 2023

*FOR THE DIVISION I BOARD OF DIRECTORS:* **For a full list of recommended actions, please see the addendum at the end of this document.**

**Reintroducing the Transformation Committee**

Jere Morehead, chair of the NCAA Division I Board of Directors and president of the University of Georgia

*The NCAA exists to provide student-athletes with a fair, inclusive and fulfilling environment in which to study, practice and compete. That mission has remained steady for more than a century, but over the last decade, it has become vastly more complicated. College sports are undergoing a significant transformation.*

*Those of us involved in college athletics are stewards of something that is powerful and beloved. Each year, college sports provide hundreds of thousands of student-athletes an opportunity to pursue their dreams while gaining an education and preparing themselves for a lifetime of success. College sports inject vitality and passion into our campuses in a way that is irreplaceable. And they bring families and communities around the country together, providing entertainment that captures our hearts and imaginations. Few moments as president of the University of Georgia bring a smile to my face like memories of our Bulldogs triumphs.*

*In recent years, court challenges and state legislatures have dramatically changed the landscape for college sports. Suddenly, the NCAA's authority to apply consistent rules to schools across the country has been thoroughly strained. Issues that are common to student-athletes and athletics departments across the country are being regulated by vastly different state laws. We're already seeing that with name, image and likeness compensation, which has inspired 30-plus individual state laws. In short time, this patchwork of state laws will cripple the notion of integrity of athletics competitions, diminishing the number of teams in a position to fairly compete for national championships.*

*For the aspects we love about college sports to exist for future generations, it must continue to transform. Leaders across college sports and higher education recognize that, and we're taking action to put that transformation in motion. Last year, we ratified a new NCAA constitution that drove added responsibility down to our three divisions, dozens of athletics conferences and individual institutions. We also initiated a Division I Transformation Committee to address issues specific to student-athletes and athletics departments at that level.*

*For the last year, that committee, whose work is encapsulated in this report, has examined issues pertaining to Division I from every angle and put forward a sweeping series of recommendations for modernization. Our goal has been to ensure that our Division I systems fundamentally support the needs of current and future student-athletes.*

*The recommendations and proposals you'll see here will be closely scrutinized, as they should be. Student-athletes pour their hearts and souls into their studies and athletic pursuits and contribute to their universities in immeasurable ways. They deserve an experience worthy of their effort.*

*As you read the recommendations, I hope you'll realize they were developed by people who are deeply steeped in college sports. These are complex issues that lack easy or clear solutions. However, I am confident that as these recommendations are further refined, adopted and implemented, they will have terrific real-world impacts. I am proud of the work this committee did and thank all its members for their effort.*

**In pursuit of transformative change**

Julie Cromer, director of athletics at Ohio University, and Greg Sankey, commissioner of the Southeastern Conference — co-chairs of the Division I Transformation Committee

*Over the past several years, changes in the environment surrounding college sports have outpaced Division I's ability to respond. While the needs and expectations of student-athletes have evolved significantly over time, our approach has remained largely the same.*

*In October 2021, the Division I Board of Directors appointed our 21-member Division I Transformation Committee to not only rapidly remake Division I to serve the needs of today's student-athletes, but also to give Division I the speed and flexibility it needs to meet its most significant challenges going forward. Consisting of leaders from across Division I — including university presidents, athletics directors, student-athlete representatives and more — the committee has embraced the opportunity to reimagine Division I for the future and worked diligently over the course of the past year to live up to our charge.*

*As our work took form, our recommendations coalesced in three areas of priority, which are reflected within this report. Across each of these areas, we sought to fundamentally improve the student-athlete experience.*

1. *Elevating support for student-athletes' mental, physical and academic well-being.*
2. *Enhancing the Division I championships experience for student-athletes.*
3. *Building a faster, fairer and more equitable Division I.*

*From the beginning, the Division I Board of Directors made clear: Leave no stone unturned. Over the course of this committee's work together, we have wrestled with big, complex questions that have necessitated hard conversations. These include:*

- *How can we provide additional support to student-athletes, and what other resources are needed to improve their experience?*
- *How can we make that experience more equitable?*
- *What should be expected of all Division I member institutions?*
- *Are the range of schools in Division I too broad? Are the differences between our athletics departments irreconcilably large?*
- *How should revenue and resources be distributed across Division I?*
- *How do we address the budgetary needs of Division I schools with clear resource limitations?*

3

- *How do we balance fairness and autonomy?*
- *What are the emerging legal issues that impact our rule-making?*

*As we considered these questions and worked to refine and finalize our recommendations, we grounded our approach in listening. Over the course of the last year, we've received consistent input from student-athletes, membership, NCAA leadership and key voices from inside and outside college sports. The priorities we heard reflected in those conversations — such as student-athletes' desire for heightened support for their mental health, the need for universities to have greater latitude in investing in student-athletes' academic and professional training programs, concerns for athletics departments with structural budget challenges, and opportunities to enhance the experience in a Division I championship — are reflected in this report in different ways.*

*We also made a critical choice early on to maintain a "big tent" approach for Division I. While the breadth and diversity of Division I presents challenges, it's also a fundamental part of the magic that is college sports. In the committee's view — and in the view of most outside voices who joined us — breaking Division I apart would damage what is vital and essential about college sports. So long as their universities can meet minimum expectations in terms of the support they provide, ultimately, we want as many student-athletes as possible to start each season with Division I national championship dreams.*

*We view this report and actions presented by the Division I Transformation Committee as a meaningful step to both begin and accelerate the process of change. The process of transforming the NCAA cannot be limited to a committee or a 12-month timeline. The commitment to transformation must be accepted by all in Division I, particularly for those in key leadership positions. Reluctance to change the status quo must be overcome through a continuing commitment to both the discomfort and opportunity created through an ongoing transformation effort.*

*This report and the committee's work is just the first step. Throughout this report, we'll discuss several areas where we know that more transformation is required, yet additional time and consideration are needed to align membership support with proposed solutions that will further modernize Division I.*

*Thank you to all involved with Division I athletics — in any capacity — for their invaluable inputs, perspectives and support.*

***Fundamentally Transforming the Division I Student-Athlete Experience***

When the Transformation Committee was formed, its members agreed that success would be measured by two factors: **whether its recommendations modernize the experience of today's student-athletes and whether they ensure the continued integrity of intercollegiate athletics**.

Throughout the past year, the Transformation Committee's commitment to the Division I student-athlete experience has been unwavering. Student-athletes have remained at the center of all our conversations, and we've evaluated all recommendations based on their fundamental impact on student-athlete success and development. Further, all recommendations were developed with a lens of ensuring gender equity and principles of diversity and inclusion. In consultation with a wide range of affiliate organizations, student-athletes, commissioners, athletics directors, presidents, faculty members, senior woman administrators, coaches and other sports communities, the Transformation Committee helped enact or recommended changes across a variety of areas.

**I. Elevating Support for Student-Athletes' Mental, Physical and Academic Well-Being**

**In support of student-athletes, today and in the future**

Kendall Spencer, attorney, member of the Division I Transformation Committee and former track and field athlete at the University of New Mexico

*Student-athletes have been at the center of the Transformation Committee's process from beginning to end. We've worked diligently to ensure that our voice as student-athletes is inextricably woven into the fabric of college sports in ways that transcend the student-athlete experience. The themes heard were consistent, and we spoke with great conviction alongside other prominent leaders in college sports to facilitate transformational improvements in ways that will resonate with every student-athlete who dreamed of participating in Division I.*

*More than anything, what we heard is that student-athletes want to enjoy their college experiences with a sense of safety and know that their short- and long-term well-being are protected. If they encounter mental health struggles — which are all too prevalent right now — they want to know they have access to care and treatment. If they have academic or professional aspirations that require financial investments, they want to know their universities will help them outside of athletics. This committee's first order of business was understanding the modern student-athlete and the montage of challenges that find their way into their lives. As such, our committee has a responsibility to find ways to ensure that every Division I athlete — regardless of sport, conference or major — can study, practice and compete with confidence.*

*As a former student-athlete and a passionate advocate for student-athletes, I am proud of the work we've done to elevate support for all Division I student-athletes' physical, mental and academic well-being. Taken together, I believe the recommendations and actions detailed below will prove transformative for the next generation of college athletes.*

*I am especially proud to have helped advance what we've referred to as the "holistic model" for modern student-athlete support. Traditionally, regulation of Division I has revolved around caps on permissible benefits intended to achieve fairness and maintain a level play field. We've undoubtedly raised the ceiling, adopting a slew of new permissible benefits. Much of our focus to raise Division I standards, however, was narrowly tailored to comprehensively promote student-athlete well-being.*

*The holistic model raises the standards for Division I membership in transformative ways. In our vision for the future Division I, all student-athletes will be able to pursue their academic and athletic ambitions knowing that they'll have access to:*

- *At least two years of medical coverage after college or the completion of their athletic career if they sustain an athletically related injury.*

- *Mental health treatment and services in accordance with recognized best practices.*

- *Degree completion funds for 10 years, should they choose to step away from their studies before reaching graduation, before eventually deciding to return.*

- *Academic, career and life skills counseling so that they are given every resource needed to make informed decisions about their minds, bodies, careers and finances.*

*If you're reading this as a current, former or future student-athlete, I hope you can hear the echoes of our voices in these changes. These are your school's changes, your conference's changes and your sport's changes. But more importantly, these are your changes. If we want to continue making progress in these endeavors, we have a responsibility to work collaboratively to continue addressing core issues directly. While I take great pride in seeing these recommendations — so earnestly fought for — meet the light of day, the needs of student-athletes will continue to evolve with time. As such, it is the responsibility of each of us to meet that need, embracing whatever challenges come our way face to face. I look forward to seeing this new Division I come to life. All of us should want the absolute best for our student-athletes because our society depends on it!*

*We serve, we lead!*

Today's student-athletes face new challenges and realities that warrant enhanced and holistic support by member schools. In conversations with members of the Division I Student-Athlete Advisory Committee, the mental health of student-athletes is frequently cited as their utmost priority. Challenges presented in the past few years, including COVID-19's impact on student-athletes' academic success and social relationships, have placed new strains on student-athletes, requiring a renewed focus on mental health. At the same time, the Transformation Committee acknowledges the need for expanded support by the NCAA and member schools in areas related to a student-athlete's physical, mental and academic well-being. The Transformation Committee encourages the NCAA and its member schools to continue efforts to provide additional support to student-athletes beyond what has been accomplished to date.

*Transformative Changes Made to Date*

**Newly Permissible Benefits for Student-Athletes**

In the past few months, the Transformation Committee made a number of recommendations that were adopted by the Division I Board of Directors. These actions represent significant, widespread changes to how student-athletes are supported by their schools, their teams and the NCAA. Building on previous changes and newly adopted recommendations, effective immediately, member schools have been empowered to provide additional support to student-athletes in the following ways:

- **Health and safety** — Division I schools are now permitted to purchase insurance for student-athletes. This includes student-athletes who may face severe or critical injuries, get sick, lose their ability to play and more.

- **Financial support and expenses** — Division I schools are now permitted to do the following:

  ○ Provide benefits that are incidental to their academic success. This includes expenses like parking, cap and gown, transportation to campus and more.

  ○ Provide student-athletes with travel expenses related to institutional athletics competition, regardless of whether the student-athlete is eligible to compete.

  ○ Provide expenses for student-athletes to participate in elite-level training, tryouts and competition, including regional, national and world championships, and other events used for consideration for selection to a national team.

- **Complimentary admissions** — Division I schools are now permitted to provide complimentary admissions for student-athletes' friends and family with fewer restrictions. Additionally, schools can arrange for student-athletes to purchase tickets at face value.

- **Entertainment, housing and meals** — Division I schools are permitted to do the following:

  ○ Provide reasonable entertainment to student-athletes at any time.

  ○ Provide student-athletes meals and snacks at any time.

  ○ Use discretion in providing vacation expenses.

  ○ Allow student-athletes to rent dormitory space during the summer.

  ○ Provide preseason practice expenses for specific circumstances, like international travel.

*A New Model for 2023 and Beyond*

The significant changes the Transformation Committee has accomplished to date represent a strong step forward for the larger transformation of Division I athletics. Still, the committee has advanced more

aggressive recommendations to fundamentally transform and improve the student-athlete experience, but more must be done.

**Enhancing Division I Membership Expectations**

The Transformation Committee spent several months evaluating membership expectations for all Division I schools, teams and conferences. As members of the committee pointed out, standards for Division I membership have not changed substantively in decades, and expectations for membership must evolve to better suit the unique needs of student-athletes. Given the broad range of Division I schools, the committee's intent is to provide a baseline experience for all student-athletes regardless of size, geography and more.

The Transformation Committee endorses the following recommendations related to Division I membership expectations:

- **Enhanced mental health support** — The Transformation Committee recommends the establishment of a requirement that Division I schools must provide a direct pathway for full-time clinical services of a licensed mental health professional exclusively dedicated to serving student-athletes.

- **Greater student-athlete representation in decision-making processes** — The Transformation Committee has worked closely with the Division I SAAC to identify ways to meaningfully enhance the voice of student-athletes in the decision-making process. SAAC has developed a series of recommendations that the Transformation Committee supports and recommends the Division I Board of Directors approve. These include:

  - Requiring institutional and conference student-athlete advisory committees to be directly overseen by a senior staff member.

  - Requiring institutions and conferences to establish a student-athlete advisory committee executive team.

  - Requiring student-athlete representation and/or participation in institutional and conference ad hoc or special issues committees.

  - Recommending that conferences establish sport-specific student-athlete engagement groups, as applicable.

The Transformation Committee also supports further discussion regarding concepts requiring student-athlete involvement and engagement on conference sport committees, at institutional coaches meetings and on conference/institutional operational-level committees.

- **Increased career preparation and support** — The Transformation Committee recommends the establishment of an annual attestation requirement for schools regarding career services availability for current and former student-athletes.

8

- **Ongoing education and programming** — In addition to providing student-athletes with access to educational programming that will be outlined later in the report, the Transformation Committee recommends that each Division I member school be required to annually attest that its coaches have completed required education in the following areas:

  ○ Mental health.

  ○ Diversity, equity, inclusion and belonging.

  ○ Campus sexual violence prevention.

  ○ Transfer requirements.

  ○ Strength and conditioning.

  ○ Nutrition.

  ○ Financial literacy.

  ○ Career preparation.

  ○ Name, image and likeness.

- **Additional student-athlete health and safety measures**.

  ○ **Review of physical and mental health, safety and performance support services.** The Transformation Committee recommends requiring schools to complete a regular review of physical and mental health, safety and performance support services, which may be overseen or facilitated by a conference office.

  ○ **Coverage of athletics activity.** The Transformation Committee recommends establishing a requirement that Division I institutions comply with the following:

    > Medical personnel with training in the diagnosis, treatment and initial management of acute concussion and other injuries must be present at all NCAA practices and competitions in the following contact/collision sports: acrobatics and tumbling, baseball, basketball, beach volleyball, diving, equestrian, field hockey, football, gymnastics, ice hockey, lacrosse, pole vault, rugby, skiing, soccer, softball, volleyball, water polo and wrestling. To be present means to be on site at the campus or arena of the competition. Medical personnel may be from either team or may be independently contracted for the event.

    > Medical personnel with training in the diagnosis, treatment and initial management of acute concussion and other injuries must be "available" at all NCAA practices and competitions in all sports not listed above. To be available means that, at a minimum, medical personnel can be contacted at any time during the practice via telephone,

9

messaging, email, beeper or other immediate communication means. Further, the case can be discussed through such communication, and immediate arrangements can be made for the athlete to be evaluated.

- ○ **Empowerment of athletics health care administrator.** The Transformation Committee recommends empowering the athletics health care administrator to effectuate Association physical and mental health, safety and performance guidance, policy, legislation and other requirements.

  - > The athletics health care administrator is a legislated designation that is part of a broader obligation to establish a structure that supports the delivery of independent medical care. The athletics health care administrator serves as primary point of contact on health, safety and performance issues and oversees a school's athletics health care administration and delivery.

  - > The Transformation Committee recommends the guidance in the Athletics Health Care Administrator Handbook be formalized to further empower the AHCA and establish clearer expectations for member schools.

    - ◊ Changes to the handbook may include setting consistent or standardized divisional expectations and/or requirements, developing training and education, designating specific responsibilities (see above), and mandating appropriate staffing and reporting structures. In addition, the committee recommends promoting the importance of or seeking partnership for the creation of an AHCA professional organization to build culture and resources and legitimize the responsibilities of the designation.

- ● **Reconsider and update Football Bowl Subdivision membership requirements** to determine the appropriateness of maintaining the current attendance standard while focusing on other elements that more directly link the student-athlete experience to expectations for FBS membership criteria. This review should be established by the Division I Board of Directors, involve experts and key leaders from the FBS membership and focus on establishing more effective distinctions between the football subdivision.

- ● **Potential changes related to compliance**. The Transformation Committee recommends establishing a periodic compliance audit requirement (e.g., once every three to four years) for institutional compliance operations to confirm that compliance programs are appropriately serving and supporting student-athletes.

  - ○ In addition, the committee recommends establishing education requirements for individuals who support athletics compliance, but are housed outside of athletics (registrar, admissions, financial aid, etc.) due to the important role they play in a shared responsibility model. Lastly, the committee recommends these critical staff members be required to attest on a periodic basis that they are adhering to established best practices related to their compliance duties.

- **Diversity, equity, inclusion and belonging.** The Transformation Committee recommends establishing a membership expectation that an institution's athletics department must employ at least one full-time staff member, with appropriate training, whose primary focus is on diversity, equity, inclusion and belonging. The committee also supports further discussion about establishing additional membership requirements in this area.

- **Surveying student-athletes.** The Transformation Committee recommends establishing a requirement that schools administer an NCAA-managed survey about the student-athlete experience and that schools regularly examine the results for areas of improvement when the school is not meeting recommended benchmarks. Schools would be required to seek student-athlete feedback and then conduct a self-study in areas where the institution is an outlier or falls below benchmarks. The current NCAA Division I Institutional Performance Program database could be used to house the student-athlete survey data.

  - The IPP system would allow for benchmarking against conference institutions and other self-selected peer groups.

  - Institutional-level data would only be available to select individuals at the institution and at the conference office and could not be viewed by other institutions.

  - The data would be intended for institutional self-study and would allow NCAA research staff to examine aggregate trends to support membership decision-making bodies.

The Transformation Committee noted the following considerations regarding its recommendations related to membership expectations:

- **Role of mission-based exceptions and subsidization.**

  - The Transformation Committee noted that the NCAA should continue seeking new revenue streams, which may be used to assist member schools and conferences in meeting enhanced membership expectations.

  - Exploration of a need-based model or mission-based filters for subsidization may be a helpful and/or necessary tool for assisting existing members in Division I while still providing enhanced support for Division I student-athletes.

  - The committee noted the importance of maintaining the integrity of membership expectations by pairing any subsidy with an expectation that membership standards will be met to maintain access to membership benefits.

  - A strategic approach to membership growth in Division I must also be considered if a subsidization model is deployed.

- **Access to membership benefits.**

11

- ○ The Transformation Committee noted that membership expectations should be satisfied for schools and conferences to access the benefits of Division I membership: championships participation, governance representation and revenue distribution.

- **Effective dates.**

  - ○ The committee discussed an appropriate runway for the effective date of enhanced expectations to provide an opportunity for schools to budget and plan for meeting new requirements.

  - ○ A runway of approximately two years is generally supported by the committee. It was suggested that immediate action could be taken to permit the provision of benefits outlined in the new membership expectations along with an expectation that those benefits and expectations will become required in two years.

**A New Holistic Model for Student-Athletes**

In the fall of 2022, the Transformation Committee deliberated on a new model with suggested recommendations to usher in added support for the 21st century student-athlete. The Transformation Committee recommends that the Division I Board of Directors endorse the key commitments identified below to enhance the student-athlete experience and that it direct legislation be drafted consistent with these commitments and informed by the work of the Board of Governors Subcommittee on Congressional Engagement.

This new holistic model would go above and beyond current standards and do the following:

- **Require all Division I schools to provide medical coverage** for athletically related injuries for a minimum of two years following graduation or completion of athletics experience. This would also include assistance for out-of-pocket medical expenses during a student-athlete's playing career (of note, a national coverage model may need to be created to assist schools with costs).

- **Require all schools to provide current scholarship protections** that are required of autonomy schools (e.g., four-year aid agreements) to further benefit student-athletes, like protection against reduction or cancellation of aid based on injury, illness, physical or mental medical condition or any athletics reasons.

- **Require all schools to offer degree completion funds** within 10 years of separation to any student-athlete who was on full scholarship.

- **Create an updated Division I governance structure that will include increased participation by student-athletes** at the campus, conference and national levels. In collaboration with SAAC, there will be an emphasis on including voices from student-athletes in all sports, with attention toward ensuring engagement of those from highly visible, revenue-producing sports.

- **Track and report on schools' commitments related to mental health services and resources directly provided to student-athletes** consistent with the [Inter-Association Consensus Document: Mental Health Best Practices](#).

- **Require schools to attest that they provide academic support services to current student-athletes** consistent with current NCAA legislation, like academic counseling and tutoring services.

- **Require schools to attest that they provide career counseling and life skills programming to student-athletes** that include, at minimum, the following:

  ○ Mental health.

  ○ Diversity, equity, inclusion and belonging.

  ○ Campus sexual violence prevention.

  ○ Transfer requirements.

  ○ Strength and conditioning.

  ○ Nutrition.

  ○ Financial literacy.

  ○ Career preparation.

  ○ Name, image, and likeness.

- **Require schools to attest that they follow concussion management protocols** consistent with the [NCAA Concussion Safety Protocol Checklist](#).

- **Require schools to complete a post-incident review** of circumstances surrounding any athletically related catastrophic injury or death.

By requiring schools to fulfill these expectations, Transformation Committee members believe these recommendations will help hold schools accountable to the needs of their student-athletes. These actions will offer meaningfully enhanced support so student-athletes have the best academic and college athletics experience.

Importantly, the NCAA Board of Governors Subcommittee on Congressional Engagement and Action will work with members of Congress to determine whether there is mutual agreement on a federal approach to some of the challenges in college sports.

**Additional Recommendations for Consideration**

In addition, the Transformation Committee recommends that the following concepts be further studied and considered by the appropriate governance entities. The committee spent the past year reviewing all possible options to transform, and sees the following as viable, impactful avenues the NCAA should

continue to evaluate. As such, the Transformation Committee recommends that the Division I Board of Directors:

- Refer to the NCAA Division I Committee on Academics a recommendation to create an NCAA Division I Academic Progress Rate score that could be used as a benchmark for meeting membership expectations in the areas of academic support.

- Direct appropriate governance entities to review sports-sponsorship minimums, including consideration of a model in which schools are not permitted to count a sport toward meeting minimum sports-sponsorship requirements unless it demonstrates a certain level of financial commitment to student-athlete scholarships in that sport.

- Direct appropriate governance entities to review overall financial aid minimums once the impact of changes in other areas of the Transformation Committee's review become known, with a focus on prioritizing the provision of financial support to student-athletes.

**II. Enhancing the Division I Championships Experience for Student-Athletes**

**Celebrating what brings student-athletes, schools and fans together**

Lynda Tealer, member of the Division I Transformation Committee and executive associate athletics director at the University of Florida

*NCAA tournaments are where dreams are fulfilled, lifelong memories are made and communities come together under a shared love for the game. Seeing student-athletes, both in victory and defeat, competing with passion and conviction wins our hearts long after the clock hits zero. Simply put, championships represent the very best of college athletics.*

*This deserves to be felt at every juncture. Transformation Committee members evaluated differences that exist across sports to find ways to improve equity and bring these experiences closer together. We recognized that championships are the pinnacle of a student-athlete's Division I experience and sought to grant greater access to championships for well-qualified teams while honoring the existing structure for entry. For travel to championships, our goal was to create new, elevated recommendations so teams and student-athletes would have a comparable experience when traveling, regardless of sport or gender.*

*Below you'll see recommendations we've made to create broader, fairer, more consistent access to championship tournaments. You'll see heightened standards for travel to and from championships, and you'll see aggressive measures to create more consistent experiences.*

*We also believe it's important that as part of transformation, the NCAA give critical and creative thought to enhancing the financial value of championship tournaments, particularly women's basketball and other sports. While not all sports share the same levels of relative popularity, I can attest that every national championship chase is thrilling and worth spotlighting. As the NCAA embarks on establishing a slew of new programs to enhance student-athletes' experiences, finding ways to increase fan following*

14

*of various NCAA tournaments, while generating new sources of media and sponsorship revenue, will be an immediate and long-term priority.*

A defining characteristic of Division I is its championships: those passionate events that unify and rally teams, fans and conferences behind a shared love for the game. The Transformation Committee agrees that changes should be made to expand access to championships, ensure the highest level of bracket composition, and improve equity for all student-athletes, which includes creating a comparable experience for men's and women's teams. Championships are a pinnacle of Division I student-athletes' college experience and an area that should continue to be prioritized through an increase in the allocation of Association resources in the years ahead.

After months of discussions by the Transformation Committee's Championship Subgroup, informed by input from the Division I Council and the Division I Competition Oversight Committee, the Transformation Committee urges the Division I Board of Directors to thoroughly review, fully consider and, where appropriate, swiftly act on the following:

- **Accommodate access for 25% of active Division I members in good standing in team sports sponsored by more than 200 schools.**

- **Compose all Division I championships in a manner that reflects the highest level of bracket composition and quality of competition, including seeding at least 50% of teams.**

- Travel to Division I and National Collegiate championships directly affect the student-athlete experience. **As such, the focal point of championships travel policies must shift to prioritize the elevated travel experience for participants.**

- **Evaluate each sport for potential growth in visibility, digital engagement and revenue generation**, including additional sport-specific sponsorship and partnership opportunities to further modernize, elevate and, in some cases, finance the enhanced Division I championship experience.

- **Refine the Division I revenue-distribution program to reflect contemporary Division I values** and account for athletic performance in more sports than men's basketball. When redesigning the program, consider: (a) gender equity; (b) implementation timeline; and (c) commitment to broad-based sports sponsorship.

- **Increase the championship budget** to accommodate recommendations to expand championship access, ensure the highest level of bracket composition and elevate the travel experience for student-athletes.

The Transformation Committee recommends the Division I Board of Directors endorse these recommendations and refer them to championships and oversight committees and the Division I Board of Directors Finance Committee to review the financial support required to implement changes.

**III. Building a faster, fairer, and more equitable Division I**

**Unlocking new opportunities for improved agility and equity**

Pat Chun, member of the Division I Transformation Committee and director of athletics at Washington State University

*The NCAA's mission is to provide student-athletes with a fair, inclusive and fulfilling environment. Ensuring adequate rules are in place and enforced to protect the health, safety and well-being of student-athletes, as well as their broad interests, is a key element of satisfying the mission, and it's a core reason for the NCAA's existence.*

*Within Division I, there exists a wide array of athletics programs, each with its own unique opportunities and challenges, as well as competing interests and priorities. In the past, creating and enforcing rules that consider the diversity of competing interests and priorities has evolved into slow, cumbersome and complex processes. As a Division I athletics director, I've heard the frustration voiced to the Transformation Committee firsthand.*

*In speaking with membership, we consistently heard the refrain that the NCAA needs to deconstruct and rebuild many of its core governance, rule-making and infractions processes to generate faster, fairer and more equitable outcomes.*

*Over the past year, we've challenged Division I governance from every conceivable angle to increase speed and efficiency and generally ensure that student-athletes' needs exist at the center of all structures and processes. This has included rigorous looks at how we approach the allocation of resources and investments; diversity, equity and inclusion; gender-specific issues; and elevating the student-athlete voice in institutional groups, among many other points of consideration.*

*As a result, we've made a number of significant changes. While they are wide-ranging, I think you'll see that they work to a few common ends. For instance, we've tried to inject flexibility and autonomy into Division I governance, most critically through decentralization of responsibility. An example will be the introduction of sport-specific management committees. These decentralized management committees allow each sport greater powers of self-governance, resulting in a student-athlete experience more bespoke to their specific needs.*

*Similarly, we have tried to make recommendations to amend processes so that when infractions occur, outcomes are aimed more squarely at perpetrators. Programs existing in perpetual limbo only for coaches and student-athletes far removed from violations suffering consequences is unjust and ineffective. It hurts our credibility as an institution. We know a fix is needed, and we believe this gets us closer to the right outcome.*

*Finally, it has been a guiding principle of the Transformation Committee that rules should exist more for purposes of protection than punishment. This was the rationale that drove our recommendation to codify protections for transferring student-athletes, so they are guaranteed scholarship maintenance if and when they choose to exercise their ability to move between institutions.*

16

*Student-athletes show incredible dedication to their academic and athletic pursuits. They deserve fast, fair and equitable oversight. As someone who has spent decades living and breathing college sports, I am confident the Transformation Committee's work will help us reach decisions faster. I know the NCAA will continue to build on the Transformation Committee's work in this area, continually revisiting and revising processes regularly to serve student-athletes' evolving needs.*

Over several months of conversation, the Transformation Committee agreed that college athletics cannot continue to follow the status quo model. A number of changes must be made to the rulebook and governance processes to enable a more agile and equitable Division I. As part of the Transformation Committee's work, committee members consulted with membership to help shape recommendations that will ultimately lead to a timelier and more efficient infractions process, provide added protections for student-athletes who transfer, result in a stronger, more responsive decision-making process inclusive of student-athlete voices, and more.

*Transformative Changes Made to Date*

**Introducing Added Protections for Transfers**

The Transformation Committee previously recommended the establishment of notification of transfer windows in addition to guaranteeing a student-athlete's financial aid at the individual's next school through graduation. To ensure student-athletes feel secure and supported, these transfer changes will immediately and consistently be reviewed and adjusted as needed, based on factors like academic impact, graduation success outcomes, and more. The actions that were adopted by the Division I Board of Directors include:

- **Establishment of new notification of transfer windows:** Four-year college undergraduate transfer student-athletes may provide notification of transfer during applicable periods for their sports. If a student-athlete does not provide notification of transfer during the applicable windows below, the student-athlete must serve an academic year of residence at the new school. These new transfer windows provide some certainty in an evolving transfer environment. The certainty helps many key stakeholders, including student-athletes who remain on rosters.

  - **Fall sports:** A 45-day window beginning the day after championships selections are made in their sport, or May 1-15 (April 15-30 in football).

  - **Winter sports:** A 60-day window beginning the day after championships selections are made in the sport.

  - **Spring sports:** Dec. 1-15, or a 45-day window beginning the day after championship selections are made in the sport.

- **Schools accepting undergraduate four-year college transfer student-athletes are required to provide financial aid to the student-athlete** through completion of the student-athlete's five-year period of eligibility or until undergraduate graduation, whichever comes first, unless the student-

17

athlete departs the school and enrolls at another school or engages in a professional athletics opportunity.

○ Schools are required to count the student-athlete and the aid against applicable team financial aid limitations unless the student-athlete is medically disqualified, exhausts eligibility, departs to engage in a professional athletics opportunity or transfers to another school.

**Improving Efficiency and Timeliness in the Infractions Process**

Division I membership entrusts the NCAA with oversight and enforcement of infractions cases. Yet all too often, the outcomes decided and the time it takes to reach such decisions leave many feeling confused and/or frustrated. Earlier this year, and in direct response to these challenges, the Division I Board of Directors adopted recommendations from the Transformation Committee related to the NCAA's infractions process. These changes promote timely outcomes, focus the time and resources of all involved on a modernized set of shared principles and rules, and hold accountable those who are directly involved in rule-breaking while minimizing impact on student-athletes who were not involved.

- **Reserve full Committee on Infractions adjudication for only the most significant behaviors and allowing all other cases to be processed through more expedited and flexible means.**

- **Ensure the scope of the enforcement staff's investigation prioritizes timeliness and most significant behaviors.** Additionally, the enforcement staff's approach and responsibilities will be proactively communicated.

- **Create a more precise and concrete charging standard as to when enforcement staff should bring allegations.** This includes legislating automatic accountability for head coach responsibility violations.

- **Expand the use of a public dashboard for all infractions cases.**

- **Enhance the responsibility to cooperate.** This includes clarifying parties' obligations to retain and provide information about potential violations. It also includes legislating appropriate incentives for cooperation and disincentives for refusal to cooperate that impact allegations and penalties.

- **Expand legislation related to mitigating factors and institutional leadership involvement.** This includes legislation noting the importance of active involvement and cooperative efforts by key institutional leadership; the expansion of legislation to include clear expectations for positive leadership involvement in infractions matters; and the drafting of additional mitigating factors or clarification of the application of current mitigating factors related to self-detection, reporting and exemplary cooperation.

- **A number of changes to the infractions appeals process**, including:

  ○ Remove automatic stay of appealed penalties.

- ○ When the Infractions Appeals Committee affirms a Committee on Infractions decision on appeal, it may issue a summary decision stating its conclusion without further discussion.

- ○ Resolve all matters on the written record unless the Infractions Appeals Committee determines an oral argument is necessary in extenuating circumstances.

- ○ Expressly prohibit extensions except in a showing of good cause for extenuating circumstances.

- ○ Committee on Infractions decisions shall not be disturbed unless the appealing party demonstrates that no reasonable person could have made the decision after considering the record.

- ○ Limit appeals to only those penalties outside of the penalty guideline range that corresponds with the case classification.

- ○ Case classification may only be changed and remanded to the Committee on Infractions for a new penalty assessment if the appealing party demonstrates that the committee's determination regarding one or more aggravating and mitigating factors should be set aside.

- ○ Aggravating and mitigating factors determinations may only be set aside if the appealing party demonstrates that no reasonable person could have made the determination after considering the record.

_On the Horizon in 2023 and Beyond_

**Implementing a New Approach to Governance and Decision-Making**

The Transformation Committee's Decision-Making Subgroup was created to improve decision-making processes by promoting sport-specific gender equity and elevating the voice of student-athletes on institutional committees and in institutional processes. In addition, the Subgroup strove to identify a set of principles and eventual recommendations that create a system with necessary balances and important checks while not being overly bureaucratic. As a result of its thorough review, the Transformation Committee noted the following regarding the decision-making and governance structure of Division I:

- The Transformation Committee reaffirms that presidents and chancellors should continue to provide the strategic direction for the Association and Division I. As the embodiment of presidential oversight, the Board of Directors must function at the highest level of effectiveness in a new governance structure.

- To achieve the stated goals of effectiveness and agility, members of the presidential subgroup of the Transformation Committee do not support expanding the number of members who should sit on the board, and they recommend that the Board of Directors consider revising the composition.

- After evaluating the effectiveness of the current structure, members of the presidential subgroup of the Transformation Committee recommend the elimination of the Presidential Forum. In making its

19

recommendation, they noted the need to remove redundancy in the structure and the need to engage the leadership and expertise of presidents more effectively, beyond a single president serving on an advisory group.

● The committee recommends the establishment of a new model for decision-making in Division I, including the following elements:

  ○ To successfully manage its responsibilities, the Oversight Council shall establish subcommittees. Initial subcommittees will include membership, nominating, nonacademic eligibility and legislation/interpretation. The structure should be committed to continual transformation and implement a system for reviewing legislation, policies and procedures to ensure all are having the intended effect.

  ○ Decisions should be pushed as far down in the structure as is possible and to responsible committees that are composed of engaged and experienced representatives with knowledge of the sport.

  ○ A decision-making system should appropriately balance necessary and important checks in the system without being overly bureaucratic. This will be accomplished by the sequence and frequency of meetings. A goal is to avoid too much of a lag in time before actions are taken, legislation is implemented and/or decisions are made.

  ○ Potential amended composition requirements for championships committees should be referred to the appropriate governance entities for review.

● All sports for which there is a Division I or National Collegiate championship shall have a Sport Management Committee to oversee sport-specific rules and policies in assigned areas, prioritizing equitable policies that improve the student-athlete experience regardless of gender. The Sport Management Committees will include representation from student-athletes and will also oversee the work of championships selection and rules committees. The appropriate governance entity should consider whether sports that have both genders (e.g., men's and women's soccer, men's and women's basketball) should operate with a single management committee and whether some sports can have a combined sport management and championship committee.

**Decentralization of Rules**

In an effort to create fairer and more equitable Division I athletics competition, the Transformation Committee charged the NCAA Division I Legislative Committee Modernization of the Rules Subcommittee to review existing rules to determine whether modification is necessary and whether NCAA rules are regulated at the appropriate level (national, division, subdivision, conference or campus). The Modernization of the Rules Subcommittee developed and the NCAA Division I Council introduced proposals into the legislative process, which will be considered in January, to:

● Eliminate the volunteer coach designation, increase the number of countable coaches permitted in applicable sports and eliminate the recruiting coordination functions legislation.

- Adjust the definition of a countable coach to remove "makes or assists in making tactical decisions related to the sport during on-court or on-field practice or competition" as an element.

- In bowl subdivision football, amend the graduate assistant coach designation.

- In championship subdivision football, women's rowing, and swimming and diving, eliminate the graduate assistant coach designation.

- Amend the official and unofficial visits legislation.

In addition, the Transformation Committee recommends the following related to future areas to be considered for decentralization:

- The Division I Board of Directors should direct appropriate governance entities to review restrictions related to:

  - The use of agents by student-athletes and prospective student-athletes.

  - Professional tryouts, practice and competition.

  - Professional drafts.

- In addition, the Division I Board of Directors should:

  - Direct appropriate governance entities to further review other athletics eligibility rules, such as delayed enrollment; and direct appropriate governance entities to further review playing and practice seasons (summer athletic activities, time demands, outside competition).

  - Direct appropriate governance entities to explore the possibility of eliminating or replacing the maximum institutional grant-in-aid limitations by sport and allowing national rules in this area to focus on the number of student-athletes participating in countable athletically related activities during the institution's playing season.

The Modernization of the Rules Subcommittee will continue to review Division I legislation to determine whether modification is necessary and whether the rules are regulated at the appropriate level.

**The path ahead for continued transformation**

Julie Cromer, director of athletics at Ohio University and Greg Sankey, commissioner of the Southeastern Conference — co-chairs of the Division I Transformation Committee

*As the Transformation Committee's co-chairs, we would like to extend a sincere thank you to the Division I Board of Directors for the opportunity to help shape and guide such critical and consequential work. We'd especially like to thank the Transformation Committee's members, who gave generously and tirelessly to this process for the past year. Each week, they spent hours reviewing materials, participating in small group conversations, and attending and contributing to full group dialogues. Many times, they came together for in-depth, multiday working sessions where many of the proposals detailed in this*

*document were introduced, considered and refined. We're proud to have worked with them in this capacity and glad that each and every one of them will have a thumbprint on the future of Division I athletics.*

*The contents of this report represent the deliberations, evaluations and actions on some of the biggest challenges facing Division I athletics. In our time, we have made great strides in achieving that charge. However, many issues remain unaddressed.*

*In the vast majority of those cases — as it pertains to issues such as name, image and likeness standards, the employment status of student-athletes, and the unique interests of student-athletes in the highest revenue-generating athletic programs — this stems from legal and other uncertainties. The NCAA is prepared and eager to engage on these issues. There's no question that finding fair, sustainable and equitable resolutions to each issue will be essential to Division I's future. We simply need a clear, stable framework under which to address them.*

*Congress is the only entity that can grant that stability. Since the next phase of NCAA transformation will hinge on these issues, the NCAA has initiated and established a Board of Governors Subcommittee on Congressional Engagement. The subcommittee will now take responsibility for the advancement of the unfinished pieces of the Transformation Committee's work where the NCAA currently lacks the ability to self-impose changes on its own. The subcommittee will also lead the NCAA's strategy for engaging, motivating and collaborating with Congress over the coming year.*

*For the recommendations outlined in this report, we encourage Division I membership to join us by simultaneously supporting them and pursuing action. This includes student-athletes, who will continue to be vital in transforming Division I under this new proposed structure.*

*College sports are a truly unique community. We each joined this effort because we believe that for all of its challenges, college sports are worth fighting for. We've each seen the power of college sports to transform people, campuses and communities. It's been a privilege to have played a role in that.*

*We look forward to seeing these recommendations continue to take hold, as we know they will meaningfully support the Division I student-athletes of today and tomorrow.*

Members of the Division I Transformation Committee include:

- Javaune Adams-Gaston, president, Norfolk State University — Mid-Eastern Athletic Conference

- Jeri Beggs, faculty athletics representative, Illinois State University — Missouri Valley Conference

- Janna Blais, senior woman administrator, Northwestern University — Big Ten Conference

- Dean Bresciani, president, North Dakota State University — Summit League

- Greg Christopher, director of athletics, Xavier University — Big East Conference

- Patrick Chun, director of athletics, Washington State University — Pac-12 Conference

- Julie Cromer, co-chair, director of athletics, Ohio University — Mid-American Conference

- Troy Dannen, director of athletics, Tulane University — American Athletic Conference

- Jack DeGioia, president, Georgetown University — Big East Conference

- Damon Evans, director of athletics, University of Maryland, College Park — Big Ten Conference

- Robin Harris, executive director, The Ivy League

- Bob Jacobsen, faculty athletics representative, University of California, Berkeley — Pac-12 Conference

- Linda A. Livingstone, president, Baylor University — Big 12 Conference

- Shane Lyons, former director of athletics, West Virginia University — Big 12 Conference

- Jere Morehead, president, University of Georgia — Southeastern Conference

- Gloria Nevarez, commissioner, West Coast Conference

- James Phillips, commissioner, Atlantic Coast Conference

- Gregory Sankey, co-chair, commissioner, Southeastern Conference

- Kendall Spencer, former track and field athlete, University of New Mexico

- Lynda Tealer, senior woman administrator, University of Florida — Southeastern Conference

- Randy Woodson, chancellor, North Carolina State University — Atlantic Coast Conference

**ADDENDUM: Division I Transformation Committee for the Division I Board of Directors**

| Category | Review Area | Transformation Committee Recommendation | Timeline |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Student-Athlete Benefits | **Holistic Student-Athlete Benefits Model**<br><br>1. Require all Division I schools to provide medical coverage for athletically related injuries for a minimum of two years following graduation or completion of athletics experience. This would also include assistance for out-of-pocket medical expenses during a student-athlete's playing career. Of note, a national coverage model may need to be created to assist schools with defraying costs.<br><br>2. Require all Division I schools to commit to a consensus-based care, education and services model. Each school's athletics health care administrator would be required to attest to the institution's compliance with:<br>Cardiac Care Best Practices.<br>Interassociation Mental Health Best Practices.<br>NCAA Concussion Safety Protocol.<br>Independent Medical Care Best Practices.<br>Standards for Preventing Catastrophic Injury and Illness in the Collegiate Athlete.<br><br>3. Require schools to complete a post-incident review of circumstances surrounding any catastrophic injury or death occurring within its athletics program. The review must occur within one year of the incident.<br><br>4. Require schools to offer degree completion funds within 10 years of separation to any student-athlete who was on full scholarship.<br><br>5. Require schools to attest that they provide academic support services to current student-athletes consistent with current NCAA legislation.<br><br>6.  Require all schools to provide current scholarship protections mandated for autonomy schools. | Endorse the key commitments in the holistic benefits model and direct that legislation be drafted consistent with these commitments.<br><br>Legislation will be acted on either as it appears in the commitments or modified as needed by the work of the Board of Governors Subcommittee on Congressional Engagement.<br><br>Additional commitments could be adopted based on the work of the subcommittee. | Dependent upon work of the Board of Governors Subcommittee on Congressional Engagement. |

2

|  | 7.  Require schools to attest that they provide career counseling and life skills programming to student-athletes that include, at minimum, the following modules: mental health; strength and conditioning; nutrition; NIL; financial literacy; transfer requirements; career preparation; diversity, equity, inclusion, and belonging; and campus sexual violence prevention.<br><br>8. Create a new Division I governance structure that will include increased participation by student-athletes at the campus, conference and national levels. In collaboration with SAAC, there will be an emphasis on including voices from student-athletes in revenue-producing sports. |  |  |
|---|---|---|---|

3

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Voice | **Membership Expectations — Student-Athlete Voice in Decision-Making**<br><br>*The Transformation Committee recommends approval of the following institutional and conference requirements to enhance the student-athlete voice in decision-making:*<br><br>**Conference**<br>1.  Require Student-Athlete Advisory Committee oversight by a senior staff member.<br>2.  Require establishment of a SAAC executive team.<br>3. Require conferences to have at least one student-athlete serving on any ad hoc or conference committee established to address issues directly impacting student-athletes.<br>4. Recommend that conferences establish sport-specific student-athlete engagement and advocacy groups in, at a minimum, football (where applicable) and men's and women's basketball.<br><br>**Institutional**<br>1. Require SAAC oversight by a senior staff member.<br>2. Require establishment of a SAAC executive team.<br>3. Require institutions to have at least one student-athlete serving on any ad hoc or athletics department committee established to address issues directly impacting student-athletes.<br>_____<br><br>*The Transformation Committee supports further discussion on the following concepts related to student-athlete voice in the decision making process:*<br><br>**Conference**<br>   1. Student-athlete involvement and engagement on conference sport | Approve identified formal recommendations in concept. Direct staff to draft legislative proposals.<br>_____<br><br>Support further discussion on identified concepts.<br><br>Refer to the Student-Athlete Advisory Committee and Division I Council for development of concepts. | Legislative action to be finalized on formal recommendations by April 2023.<br>_____<br><br>Response to concepts identified for further discussion by August 2023. |

4

| | committees. | | |
|---|---|---|---|
| | 2. Student-athlete involvement and engagement with the primary operational-level committee(s) at the conference level.<br><br>**Institutional**<br>1. Student-athlete involvement and engagement on the primary athletics department operational-level committee(s).<br>2. Student-athlete involvement and engagement at coaches meetings. | | |

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Health and Safety — Empowerment of Athletics Health Care Administrator**<br><br>The Transformation Committee recommends empowering the athletics health care administrator to effectuate Association physical and mental health, safety and performance guidance, policy, legislation and other requirements.<br><br>The athletics health care administrator is a legislated designation that is part of a broader obligation to establish a structure that supports the delivery of independent medical care. The athletics health care administrator serves as primary point of contact on health, safety and performance issues and oversees a school's athletics health care administration and delivery.<br><br>Consider ways to formalize guidance in the Athletics Health Care Administrator Handbook to further empower the AHCA, which may include setting consistent or standardized divisional expectations and/or requirements, developing training and education, designating specific responsibilities (see above), and mandating appropriate staffing and reporting structures.<br><br>Promote the importance of or seek partnership for the creation of an AHCA professional organization to build culture and resources and legitimize the responsibilities of the designation. | Approve in concept.<br><br>Refer to the Committee on Competitive Safeguards and Medical Aspects of Sports and the Strategic Vision and Planning Committee to develop legislative recommendations. | Legislative action to be finalized by June 2023. |
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Academic Support**<br><br>The Transformation Committee recommends that the Board of Directors refer to the NCAA Division I Committee on Academics consideration of an NCAA Division I Academic Progress Rate score that could be used as a benchmark for meeting membership expectations in the areas of academic support. | Approve in concept.<br><br>Refer to the Committee on Academics for the identification of | May 2023. |

| | | the APR score that meets membership expectation. | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Mental Health**<br><br>The Transformation Committee recommends the establishment of a membership expectation that Division I institutions must provide a pathway for full-time clinical services of a licensed mental health professional exclusively dedicated to serving student-athletes to meeting the mental health services membership expectation. | Approve in concept.<br><br>Refer to the Committee on Competitive Safeguards and Medical Aspects of Sports and the Strategic Vision and Planning Committee to develop legislative recommendations. | Legislative action to be finalized by June 2023. |

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Review of Physical and Mental Health, Safety and Performance Support Services**<br><br>The Transformation Committee recommends requiring schools to complete a regular review of physical and mental health, safety and performance support services, which may be overseen or facilitated by a conference office.<br><br>An active member institution shall complete a comprehensive review/audit of its health and safety support services (e.g., legislative and policy requirements, best practice considerations) at least once every four years and provide written confirmation of completion to its conference office. Review must consider if the institution is meeting NCAA-established guidance for health, safety and performance (e.g., concussion safety checklist) and should be a primary responsibility of the designated athletics health care administrator. Failure to complete a health and safety review/audit consistent with an established timeline shall subject an institution to a penalty pursuant to a penalty structure and timeline maintained by the relevant governance body. | Approve in concept.<br><br>Refer to the Committee on Competitive Safeguards and Medical Aspects of Sports and the Strategic Vision and Planning Committee to develop legislative recommendations. | Legislative action to be finalized by June 2023. |

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Health and Safety — Coverage of Athletic Activity**<br><br>The Transformation Committee recommends establishing a requirement that Division I institutions comply with the following:<br><br>Medical personnel with training in the diagnosis, treatment and initial management of acute concussion and other injuries must be "present" at all NCAA practices and competitions in the following contact/collision sports: acrobatics and tumbling; Alpine skiing; baseball; basketball; beach volleyball; diving; equestrian; field hockey; football; gymnastics; ice hockey; lacrosse; pole vault; rugby; soccer; softball; volleyball; water polo; and wrestling. To be present means to be on-site at the campus or arena of the competition. Medical personnel may be from either team or may be independently contracted for the event.<br><br>Medical personnel with training in the diagnosis, treatment and initial management of acute concussion and other injuries must be "available" at all NCAA practices and competitions in all sports not listed above. To be available means that, at a minimum, medical personnel can be contacted at any time during the practice via telephone, messaging, email, beeper or other immediate communication means. Further, the case can be discussed through such communication, and immediate arrangements can be made for the athlete to be evaluated. | Approve in concept.<br><br>Refer to the Committee on Competitive Safeguards and Medical Aspects of Sports and the Strategic Vision and Planning Committee to develop legislative recommendations. | Legislative action to be finalized by June 2023. |

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Compliance**<br><br>The Transformation Committee recommends establishing a periodic audit requirement (perhaps once every three to four years) for institutional compliance operations to confirm that compliance programs are appropriately serving and supporting student-athletes.<br><br>In addition, the committee recommends establishing education requirements for individuals that support the athletic compliance program, but are housed outside of athletics (e.g., registrar, admissions, financial aid) due to the important role they play in a shared responsibility model. Lastly, the committee also recommends that these critical staff members be required to attest on a periodic basis that they are adhering to established best practices related to their compliance duties. | Approve in concept.<br><br>Refer to the Legislative Committee to develop legislative recommendations. | Legislative action to be finalized by June 2023. |
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Career Preparation**<br><br>The Transformation Committee recommends the establishment of an annual attestation requirement for institutions regarding career services availability for current and former student-athletes. | Approve in concept.<br><br>Refer to the Strategic Vision and Planning Committee or Student-Athlete Experience Committee to develop legislative recommendations. | Legislative action to be finalized by June 2023. |

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Diversity, Equity, Inclusion and Belonging**<br><br>The Transformation Committee recommends establishing a membership expectation that an institution's athletics department must employ at least one full-time staff member, with appropriate training, whose primary focus is on diversity, equity, inclusion and belonging. The committee also supports further discussion about establishing additional membership requirements in this area. | Approve in concept.<br><br>Refer to the Strategic Vision and Planning Committee to develop legislative recommendations in consultation with the NCAA Diversity, Equity and Inclusion Committees. | Legislative action to be finalized by August 2023. |
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Student-Athlete Survey**<br><br>The Transformation Committee recommends requiring institutions to administer an NCAA-managed survey about their experience in the categories outlined and regularly examine for areas of improvement when the institution is not meeting recommended benchmarks. | Approve in concept.<br><br>Refer to the Strategic Vision and Planning Committee to develop legislative recommendations. | Legislative action to be finalized by August 2023. |

| | | | |
|---|---|---|---|
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Education and Programming**<br><br>The Transformation Committee recommends that a Division I member institution be required to annually attest that it provides student-athletes with access to education and programming in the following areas:<br><br>Mental health.<br>Strength and conditioning.<br>Nutrition.<br>Name, image and likeness.<br>Financial literacy.<br>Transfer requirements.<br>Career preparation.<br>Diversity, equity, inclusion and belonging.<br>Campus sexual violence prevention. | Approve in concept.<br><br>Refer to the Strategic Vision and Planning Committee to develop legislative recommendations.<br><br>Direct NCAA staff to explore the development of national office resources to assist institutions. | Legislative action to be finalized by June 2023. |
| Membership Expectations Student-Athlete Experience/Outcomes Current Student-Athletes | **Membership Expectations — Education and Programming**<br><br>The Transformation Committee recommends that a Division I member institution be required to annually attest that its coaches have completed required education in each of the areas outlined above. | Approve in concept.<br><br>Refer to the Strategic Vision and Planning Committee to develop legislative recommendations.<br><br>Direct NCAA staff to explore the development of | Legislative action to be finalized by June 2023. |

| | | national office resources to assist institutions. | |
|---|---|---|---|
| Membership Expectations General | **Membership Expectations — Football Attendance Requirements**<br><br>The Transformation Committee recommends a reconsideration and update of FBS membership requirements to determine appropriateness of maintaining the current attendance standard while focusing on other elements that more directly link the student-athlete experience to expectations for FBS membership criteria. This review should be established by the Division I Board of Directors, involve experts and key leaders from the FBS membership and focus on establishing more effective distinctions between the football subdivision. | Approve in concept.<br><br>Refer to the Division I Council and Football Oversight Committee the exploration of any new subdivisional commitment expectations. | Legislative action to be finalized by June 2023. |

| | | | |
|---|---|---|---|
| Membership Expectations General | **Membership Expectations — Sports-Sponsorship Minimums**<br><br>The committee recommends that the Board of Directors direct appropriate governance entities to review sports-sponsorship minimums in the future, including consideration of a model in which institutions are not permitted to count a sport toward meeting minimum sports-sponsorship requirements unless it demonstrates a certain level of financial commitment to student-athlete scholarships in that sport. | No action.<br><br>In light of other recommended commitments, it is unnecessary to amend the current minimums. | |
| Membership Expectations General | **Membership Expectations — Minimum Scheduling Requirements**<br><br>The Transformation Committee is not recommending changes to the minimum scheduling requirements in its January report to the Board of Directors. | No action.<br><br>In light of other recommended commitments, it is unnecessary to amend the scheduling requirements. | |
| Membership Expectations General | **Membership Expectations — Financial Aid Minimums**<br><br>The Transformation Committee recommends that the Board of Directors direct appropriate governance entities to review financial aid minimums once the impact of changes in other areas of the Transformation Committee's review become known. | Support further discussion.<br><br>Refer to the Division I Council for consideration and potential development of legislation. | Proposal or rationale for no change by October 2023 Board of Directors meeting. |

14

| | | | |
|---|---|---|---|
| Decision-Making and Governance | **Decision-Making and Governance — Eliminate the NCAA Division I Presidential Forum**<br><br>The presidential subgroup of the Transformation Committee recommends the elimination of the Presidential Forum. | Adopt emergency legislation. | Immediate. |
| Decision-Making and Governance | **Decision-Making and Governance — Amend the composition of the Division I Board of Directors**<br><br>The presidential subgroup of the Transformation Committee recommends amending the composition of the Division I Board of Directors. | Approve in concept.<br><br>Board to finalize composition recommendation for action by April 2023. | Legislative action to be finalized by April 2023. |

| | | | |
|---|---|---|---|
| Decision-Making and Governance | **Decision-Making Structure and Governance — Sport Oversight Model**<br><br>The Transformation Committee recommends the following related to the establishment of a new sport oversight model for decision-making:<br><br>To successfully manage its responsibilities, the Oversight Council shall establish subcommittees. Initial subcommittees will include membership, nominating, nonacademic eligibility and legislation/interpretation. The structure should be committed to continual transformation and implement a system for reviewing legislation, policies and procedures to ensure all are having the intended effect.<br><br>All sports for which there is a Division I or National Collegiate championship shall have a Sport Management Committee.  The appropriate governance entity should consider whether sports that have both genders (e.g., men's and women's soccer, men's and women's basketball) should operate with a single management committee or prescribe required coordination and collaboration. In addition, it should be determined whether some sports can have a combined sport management and championship committee<br><br>Decisions should be pushed as far down in the structure as is possible and to responsible committees that are composed of engaged and experienced representatives with knowledge of the sport.<br><br>A decision-making system should appropriately balance necessary and important checks in the system without being overly bureaucratic. This will be accomplished by the sequence and frequency of meetings. A goal is to avoid too much of a lag in time before actions are taken, legislation is implemented and/or decisions are made. | Approve in concept.<br><br>Refer to the Council Coordination Committee to gather feedback, develop legislative recommendations and manage the committee appointments. | Additions, modifications and legislative actions to be finalized by June 2023. |

| | Potential amended composition requirements for championships committees to be referred to the championships committees for feedback. | | |
|---|---|---|---|
| Decentralization | **Recruiting Legislation**<br><br>The Transformation Committee recommends revising legislation governing visits to campus. | Proposal to be considered by the Division I Council in January.<br><br>If not acted on in | Proposal to be considered by the Council in January. |

| | | January, refer to the Council for additional consideration. | |
|---|---|---|---|
| Decentralization | **Playing and Practice Seasons (summer athletic activities, time demands, outside competition)**<br><br>The Transformation Committee recommends that the Board of Directors direct appropriate governance entities to review playing and practice seasons legislation. | Support further discussion.<br><br>Refer to the Council for consideration and potential development of legislation. | Proposal or rationale for no change by October 2023 Board of Directors meeting. |
| Decentralization | **Institutional Personnel**<br><br>The Transformation Committee recommends amending legislation regarding coaching limits, designations and permissible recruiters. | Proposal to be considered by the Council in January.<br><br>If not acted on in January, refer to the Council for additional consideration. | Proposal to be considered by the Council in January. |
| Decentralization | **Amateurism and Athletics Eligibility — Agents**<br><br>The Transformation Committee recommends that the Board of Directors direct appropriate governance entities to review the use of agents by student-athletes | Support further discussion.<br><br>Refer to the | Proposal or rationale for no change by October 2023 |

| | | | |
|---|---|---|---|
| | and prospective student-athletes in pursuing professional and intercollegiate athletics opportunities. | Council for consideration and potential development of legislation. | Board of Directors meeting. |
| Decentralization | **Amateurism and Athletics Eligibility — Professional opportunities — tryouts, practice and competition — pre-enrollment and post-enrollment**<br><br>The Transformation Committee recommends that the Board of Directors direct appropriate governance entities to review legislation regarding professional opportunities for student-athletes — tryouts, practice and competition — pre-enrollment and post-enrollment. | Support further discussion.<br><br>Refer to the Council for consideration and potential development of legislation. | Proposal or rationale for no change by October 2023 Board of Directors meeting. |
| Decentralization | **Amateurism and Athletics Eligibility — Professional drafts**<br><br>The Transformation Committee recommends that the Board of Directors direct appropriate governance entities to review legislation regarding professional drafts. | Support further discussion.<br><br>Refer to the Council for consideration and potential development of legislation. | Proposal or rationale for no change by October 2023 Board of Directors meeting. |
| Decentralization | **Athletics Eligibility — Athletics eligibility, such as delayed enrollment**<br><br>The Transformation Committee recommends that the Board of Directors direct | Support further discussion.<br><br>Refer to the Council for | Proposal or rationale for no change by October 2023 |

| | | | |
|---|---|---|---|
| | appropriate governance entities to review other athletics eligibility rules, such as delayed enrollment. | consideration and potential development of legislation. | Board of Directors meeting. |
| Decentralization | **Transition From Team Financial Aid Limits to Roster Size Limits**<br><br>The Transformation Committee recommends further review of the concept of eliminating the maximum institutional grant-in-aid limitations by sport and allowing national rules in this area to focus on the number of student-athletes participating in countable athletically related activities during an institution's playing season. | Support further discussion.<br><br>Refer to the Council for consideration and potential development of legislative recommendations. | Proposal or rationale for no change by October 2023 Board of Directors meeting. |
| Championships | **Championships — Bracket Composition**<br><br>In acknowledgment and support of the NCAA Division I Competition Oversight Committee's ongoing work and pilot program, the Transformation Committee recommends that Division I championships should be composed in a manner that reflects the highest level of bracket composition and quality of competition, including seeding at least 50% of teams. | Support in concept.<br><br>Refer to the Board Finance Committee to review budget implications.<br><br>Refer to championships and oversight committees to | Initial review by championship and oversight committees by June 2023 for possible implementation for 2023-24 championships. |

| | | review operational considerations. | |
|---|---|---|---|
| Championships | **Championships — Access Ratio of 25%**<br><br>To ensure that NCAA Division I championships provide national-level competition among the best eligible student-athletes and teams, the Transformation Committee recommends that the governing sport and oversight committees for Division I championship team sports sponsored by more than 200 institutions should fully consider how to accommodate access for 25% of active member institutions in good standing with Division I membership requirements. Their considerations should account for impacts on the timing of the postseason, the total length of the postseason, necessary format changes, broadcast and other partners, budget resources and host entity event management. | Support in concept.<br><br>Refer to championships committees, oversight committees and the Board Finance Committee to review budget implications. | Initial review by committees by June 2023.<br><br>Final recommendations by January 2024 for implementation in the 2024-25 championship. |
| Championships | **Championships — Enhanced Focus on Revenue Generation**<br><br>To further modernize, elevate and, in some cases, finance the enhanced Division I championship experience, the Transformation Committee recommends that each sport should be evaluated for revenue generation potential, including additional sport-specific sponsorship and partnership opportunities. | Support in concept.<br><br>Refer to NCAA executive staff. Consider the recommendation as part of upcoming/future | Ongoing.<br>To align with future contract negotiations. |

21

| | | | |
|---|---|---|---|
| | | contract negotiations. | |
| Championships | **Championships — Elevated Championships Travel Experience**<br><br>The Transformation Committee recommends that travel policies for Division I and National Collegiate championships be reviewed to identify ways to elevate the travel experience for participants while maintaining operational controls, which allow for consistent implementation across sports and genders, within budget parameters.<br><br>The Transformation Committee identified the following areas for potential immediate action by the Board of Directors:<br><br>• Increase all Division I and National Collegiate per diem rates to be equal with Division I basketball preliminary rounds.<br><br>• Reimburse for local ground transportation when a team travels by air.<br><br>• Standardize the process and fee structure for upgrading to charter air travel.<br><br>• Guarantee outbound charter air travel for teams advancing to the finals round, for teams that otherwise qualify for air travel. (Note: This would not apply to sports that conduct the entirety of the championship at one site or bring more than eight teams to the final site.) | Support in concept.<br><br>Refer to the board Finance Committee to review budget implications. | Board Finance Committee to make a report to the Board of Directors by June 2023. |

- For outbound travel to competition site, do not split NCAA-financed travel party. Additional variations could be set for outbound flights vs. return flights.

- Modify travel policies for team sports to only apply the hub rule on departure or arrival but not both.

Once a reimagined decision-making structure is operational, the Board of Directors or the appropriate entity should review and consider the following:

- Guaranteeing charter air travel for teams traveling over 2,000 miles and no direct flight options.

- Reducing hub mileage to 150 (or some other mile radius and consider time in transit).

- Redefining reasonable flight options in conjunction with hub rule to only allow an early departure (6 a.m.) or late arrival from a local/regional airport. Further, establish a new time parameter for acceptable departure for a hub airport.

- In conjunction with the review of championship postseason travel policies, the benefits, risks, and challenges of using logistics services (i.e., current partners: Short's Travel, Anthony Travel, STM Driven, On Location) organized by the NCAA for the championship postseason should be reviewed.

Any changes should account for risk mitigation and limited availability of commercial and charter flights given quick turnaround between selections and

23

| | | | |
|---|---|---|---|
| | travel. The review should also consider the benefits and challenges of using logistics services (i.e., Short's Travel, Anthony Travel, STM Driven, On Location) organized by the NCAA. | | |
| Championships | **Championships — Increased Championships Budget**<br><br>The Transformation Committee recommends that the Division I Board of Directors and Division I Board of Directors Finance Committee fully consider an increase to the championships budget that accommodates these recommendations to expand championships access, ensure the highest level of bracket composition and elevate the travel experience for student-athletes. | Support in concept.<br><br>Refer to the Board of Directors Finance Committee and Board of Governors Finance and Audit Committee. | Response from the Finance Committee and Board of Governors Finance and Audit Committee by June 2023. |
| Championships | **Championships — Modify Revenue Distribution Program**<br><br>The Transformation Committee recommends that the Division I revenue distribution program be evaluated to consider models that reflect contemporary Division I values and account for athletic performance in more sports than men's basketball. When developing modifications, consideration should be given to the following: (a) implementation timeline; (b) gender equity; and (c) commitment to broad-based sports sponsorship. | Support in concept.<br><br>Refer to the Division I Board of Directors Finance Committee. | Recommendations for legislative change to be developed by August 2023.<br><br>Will require a vote of the full Division I membership to change legislation |

| | | | related to revenue distribution. |
|---|---|---|---|

# EXHIBIT I

to the Declaration of Michael Lieberman



**REPORT OF THE**
**NCAA DIVISION I COUNCIL**
**OCTOBER 27, 2022, VIDEOCONFERENCE**

*In an effort to connect NCAA Division I Council items to the NCAA pillars of academics, fairness and well-being, items included in this report have an identifying pillar. There is an additional pillar, operational, that is used to denote items that relate to maintaining a stable and efficient Division I.*

<u>KEY ITEMS.</u>

1.      **Legislative Actions.** The Division I Council took the legislative actions listed below. (See Attachment for voting results.)

       a.      **Softball Midyear Transfer Eligibility.** (Operational) The Division I Council <u>introduced</u> legislation into the 2022-23 legislative cycle to specify that in softball, a student-athlete who initially enrolls at the certifying institution as a full-time student after the conclusion of the first term of the academic year and satisfies the 2-4 or 4-2-4 transfer requirements or qualifies for an exception to the 4-4 transfer residence requirement shall not be eligible for competition until the ensuing academic year. The effective date of the proposal is August 1, 2023.

           <u>Rationale.</u> This proposal decreases disruption to team cohesion and promotes stability in the championship season. Prohibiting midyear transfers will help provide clarity to championship-season rosters. Additionally, midyear transfers negatively impact the student-athlete experience for those student-athletes who remain at the transferring student-athlete's previous institution.

       b.      **Personnel and Recruiting Proposals.** (Well-Being/Operational) The Council acted on the following four proposals developed by the NCAA Division I Legislative Committee Modernization of the Rules Subcommittee and recommended by the NCAA Division I Legislative Committee. The NCAA Division I Transformation Committee charged the Modernization of the Rules Subcommittee with effectuating transformational change in modernizing the division's rules. In reviewing existing rules, the subcommittee was instructed to assess whether regulation is necessary on the national level and, if so, it should prioritize the needs of the modern student-athlete.

           1)      **Athletics Personnel – Coaching Limits and Off-Campus Recruiters.** The Council <u>introduced</u> legislation into the 2022-23 Council-governance legislative cycle to:

               a)      Eliminate the volunteer coach designation, increase the number of countable coaches permitted in applicable sports;

               b)      Remove "makes or assists in making tactical decisions related to the sport during on-court or on-field practice or competition" as an element of the definition of a countable coach;

NCAA_SMART_0000017

Case 1:23-cv-00425-WBS-CSK   Document 58-2   Filed 10/17/23   Page 122 of 264
Report of the NCAA Division I Council
October 27, 2022, Videoconference
Page No. 2

_____

c)  Eliminate the recruiting coordination functions legislation;

d)  In bowl subdivision football, amend the graduate assistant coach designation, as specified; and

e)  In championship subdivision football, women's rowing, and swimming and diving, eliminate the graduate assistant coach designation.

The effective date of the proposal is July 1, 2023.

Rationale. Current legislation permits most sports to maintain a specified number of volunteer coaches or graduate assistant coaches in addition to the number of countable coaches who may be employed. Eliminating the volunteer coach designation and significant revisions to the graduate assistant coach position will help better support student-athletes and simplify the personnel legislation. This proposal offsets the proposed elimination of the volunteer coach designation in all sports and graduate assistant coach designation in women's rowing and swimming and diving by increasing the number of individuals who may serve as countable coaches. Removing the element of making or assisting in making tactical decisions related to a sport during practice or competition significantly simplifies the legislation and relieves monitoring burdens. Maintaining the other elements of the countable coach definition preserves an integral component of coaching – providing technical or tactical instruction – and ensures the individuals who engage in off-campus recruiting activities are the same individuals who will provide on-campus coaching, which helps facilitate integrity and informed decision-making in the recruiting process. Lastly, in bowl subdivision football, the proposed amendments to the graduate assistant coach designation maintain and provide developmental positions to the coaching profession that are directly tied to the pursuit of graduate-level education.

To provide the membership with adequate time to implement the proposed changes, the Legislative Committee recommended – and the Council approved – that the proposal be considered during the Council's January 2023 meeting. Per Council policy, for a proposal to be considered in January, it must (1) be introduced by the Council, (2) be time sensitive, and (3) impact student-athlete well-being.

2)  **Athletics Personnel – Coaching Limits – Baseball, Ice Hockey and Softball.** (Well-Being/Operational) The Council introduced legislation into the 2022-23 Council-governance legislative cycle to increase, from three to

five, the number of countable coaches permitted in baseball, ice hockey and softball. The effective date of the proposal is July 1, 2023.

Rationale. This proposal reflects coaches association input to further increase the number of countable coaches permitted beyond the number currently occupied in baseball, softball and ice hockey by a volunteer coach. The recommended additional coaches are motivated by a desire to enhance student-athlete health, safety and well-being based on the student-athlete-to-coach ratio that currently exists in those sports. These increases would provide opportunities for additional coaching and overall support to student-athletes.

The Council approved a recommendation that the proposal be considered during the Council's January 2023 meeting.

3)      **Athletics Personnel – Coaching Limits – Basketball.** (Well-Being/ Operational) The Council introduced legislation into the 2022-23 Council-governance legislative cycle that in basketball permits an institution to employ up to two additional coaches who may provide technical or tactical instruction to a student-athlete but may not engage in off-campus recruiting activities. The effective date of the proposal is July 1, 2023.

Rationale. During its review of existing athletics personnel limits, the Modernization of the Rules Subcommittee sought feedback from Division I coaches associations and sport oversight committees on the proper number of coaching staff required to support the needs of their respective Division I programs. This proposal incorporates feedback provided and would allow institutions to permit the same number of individuals who are currently permitted to provide technical and tactical instruction to student-athletes via a blanket waiver to continue to do so. Blanket waivers were approved for the 2021-22 and the 2022-23 playing seasons to permit two noncoaching staff members to engage in instructional duties. The individuals hired into these two positions would be subject to legislation related to hiring an individual associated with a prospective student-athlete (IAWP). This proposal provides additional support to basketball student-athletes and ensures staff members are available to assist and develop current student-athletes when the other countable coaches are recruiting off campus. Further, this proposal helps develop coaches by allowing the staff members to provide instruction to student-athletes without the pressure of engaging in off-campus recruiting activities.

The Council approved a recommendation that the proposal be considered during the Council's January 2023 meeting. It was noted that the effective date of this proposal (July 1, 2023) may need to be amended during the

January Council meeting to avoid a legislative gap that would occur if the proposal were approved, as the blanket waiver is set to expire May 31, 2023.

4)   **Recruiting – Official and Unofficial Visits.** (Fairness/Well-Being/Operational) The Council introduced legislation into the 2022-23 Council-governance legislative cycle to amend the official and unofficial campus visits legislation to:

   a)   Remove official limit on number of official visits a prospective student-athlete (PSA) may take;

   b)   Remove institutional official visit limitations in baseball, basketball and football;

   c)   Permit actual and necessary expenses to be covered for the PSA and up to four individuals, in all sports, during an official visit; and

   d)   Permit a PSA and up to four other individuals (e.g., family members, PSA's coach) to receive one meal, complimentary admissions to home athletics events and parking expenses during unofficial visits.

The effective date of the proposal is July 1, 2023.

Rationale. Campus visits are an integral part of the decision-making process for PSAs and those who assist them in their decisions. This proposal provides additional flexibility and support to PSAs and those accompanying prospects on visits to an institution's campus to promote informed decision-making in the recruiting process. Retaining provisions around certain expenses that occur during campus visits helps to ensure that visits remain part of the college evaluation process but do not serve as a recruiting inducement or a celebration of a prospect's presence on campus.

The Council approved a recommendation that the proposal be considered during the Council's January 2023 meeting.

2.   **Noncontroversial Legislation – Recruiting Calendars – Football.** (Fairness/Well-Being/Operational) The Council adopted NCAA Division I Proposal No. 2022-27 (Recruiting – Recruiting Calendars – Football – November Dead Period and January Quiet Period) as noncontroversial legislation, effective immediately, to amend the football recruiting calendars, as follows:

   a.   The Sunday immediately following Thanksgiving Day (e.g., November 27, 2022; November 26, 2023; December 1, 2024; November 30, 2025) shall be an evaluation period.

_____

b.  A four calendar-day dead period beginning the Monday immediately following Thanksgiving Day (e.g., November 28-December 1, 2022; November 27-30, 2023; December 2-5, 2024; December 1-4, 2025).

c.  A five calendar-day quiet period beginning the Wednesday immediately before the first Saturday in January (e.g., January 4-8, 2023; January 3-7, 2024; January 1-5, 2025; December 31, 2025-January 4, 2026) for transfer prospective student-athletes who intend to enroll midyear.

d.  Eliminate the seven-day quiet period immediately before the first day of classes of the institution's second academic term that is not part of the contact period (applicable only to prospective student-athletes who intend to enroll midyear).

The recent adoption of the notification of transfer windows warrants changes to the recruiting calendar to provide an opportunity for student-athletes and coaches to engage in conversations about future participation opportunities. The adoption of a dead period allows coaching staff members to prioritize in-person conversations with current student-athletes following the conclusion of the season before the December contact period and the opening of the Football Bowl Subdivision notification-of-transfer window. The dead period in championship subdivision football maintains alignment in fall and winter recruiting opportunities and dead periods across subdivisions.

## *ACTION ITEMS.*

- **None.**

## *INFORMATIONAL ITEMS.*

1.  **Reports from Council Committees.**

    a.  **NCAA Division I Football Oversight Committee.** The Council received the following as information:

        - **Recruiting Review.** (Well-Being/Operational) The Football Oversight Committee will continue to discuss recruiting person days, recruiting during the spring (contact period, evaluation period), official visits and on-campus evaluations. Representatives from the 365-day college football calendar working group have participated in recent Comprehensive Recruiting Review Subgroup meetings. There will be additional opportunities to solicit membership feedback on the football recruiting model.

    b.  **NCAA Division I Student-Athlete Advisory Committee.** The Council received the following as information:

Report of the NCAA Division I Council
October 27, 2022, Videoconference
Page No. 6

_____

- **Athletics Eligibility Model.** (Fairness/Well-Being/Operational) The Student-Athlete Advisory Committee reported that it has put its discussion regarding the athletics eligibility concept that would allow student-athletes to participate in five seasons of competition during a student-athlete's five-year period of eligibility on hold given the ongoing work of the Transformation Committee. Accordingly, the Student-Athlete Advisory Committee recommends that no other proposals regarding athletics eligibility models be introduced in this period.

2. **Report of the October 4-5 Council Meeting.** The Council approved the report of its October 4-5 in-person meeting.

*Council Chair:*     Shane Lyons, West Virginia University; Big 12 Conference.
*Council Liaisons:*   Amanda Conklin, Governance, Policy and Human Resources
      Jennifer Fraser, Governance, Policy and Human Resources
      Kevin Lennon, Governance, Policy and Human Resources
      Leeland Zeller, Governance, Policy and Human Resources

| NCAA Division I Council Videoconference October 27, 2022 |
|---|
| **Attendees:** |
| Nicole Kendall Arrighi, Tennessee State University; Ohio Valley Conference. |
| Brian Barrio, University of Maryland, Baltimore County; America East Conference. |
| Kelly Barsky, University of California, Santa Barbara; Big West Conference. |
| Renee Baumgartner, Santa Clara University; West Coast Conference. |
| Jackie Blackett, Columbia University-Barnard College; The Ivy League. |
| Jamie Boggs; Grand Canyon University; Western Athletic Conference. |
| Don Bruce, The University of Tennessee, Knoxville; 1A Faculty Athletics Representative. |
| Dan Butterly, Big West Conference (Division I conference commissioner). |
| Brynn Carlson, University of Missouri; Division I Student-Athlete Advisory Committee (alternate). |
| Charles Cobb, Georgia State University; Sun Belt Conference. |
| Tim Coffey, Longwood University; Big South Conference. |
| Tim Day, Iowa State University; FARA (alternate). |
| Jean Gee, University of Montana; Big Sky Conference. |
| David Harris, University of Northern Iowa; Missouri Valley Conference. |
| Chad Hawley, Big Ten Conference (alternate). |
| Jennifer Heppel, Patriot League. |
| Angie Jabir, Siena College; Metro Atlantic Athletic Conference. |
| Michael Kelly, University of South Florida; American Athletic Conference. |
| Debbie Kirch, Northern Kentucky University; Horizon League. |
| Heather Lyke, University of Pittsburgh; Atlantic Coast Conference. |

Case 1:23-cv-00425-WBS-CSK   Document 58-2   Filed 10/17/23   Page 127 of 264
Report of the NCAA Division I Council
October 27, 2022, Videoconference
Page No. 7

| **NCAA Division I Council Videoconference**<br>**October 27, 2022** |
|---|
| Shane Lyons, West Virginia University; Big 12 Conference. |
| Judy MacLeod, Conference USA (FBS nonautonomy conference commissioner). |
| Brandon Martin, University of Missouri, Kansas City; The Summit League. |
| Chris May, Saint Louis University; Atlantic 10 Conference. |
| Noreen Morris, Northeast Conference. |
| Eddie Nunez, University of New Mexico; Mountain West Conference. |
| Adeanah Pooler; Southwestern Athletic Conference (alternate). |
| Erik Price, Pac-12 Conference (alternate). |
| Elizabeth Rabb, Wofford College, Southern Conference. |
| Chrissi Rawak, University of Delaware; Colonial Athletic Association. |
| Alex Ricker-Gilbert, Jacksonville University; ASUN Conference. |
| Thomas Samuel, Southland Conference. |
| Greg Sankey, Southeastern Conference (FBS autonomy conference commissioner). |
| Alecia Shields-Gadson, Delaware State University; Mid-Eastern Athletic Conference. |
| Jon Steinbrecher, Mid-American Conference. |
| Lynda Tealer, University of Florida; Southeastern Conference. |
| Isaac Vance, Kent State University; Division I Student-Athlete Advisory Committee (alternate). |
| Billy Walker, American University; Patriot League. |
| Katie Willett, Big East Conference (alternate). |
| Eric Wood, Louisiana Tech University; Conference USA. |
| **Absentees:** |
| Jason Cable, Alabama State University; Southwestern Athletic Conference. |
| Patrick Chun, Washington State University; Pac-12 Conference. |
| Turner Dirrigl, Canisius College; Division I Student-Athlete Advisory Committee. |
| Ami Gianchandani, Yale University; Division I Student-Athlete Advisory Committee. |
| Mark Jackson, Villanova University; Big East Conference. |
| Patty Viverito, Missouri Valley Football Conference (FCS conference commissioner). |
| **NCAA Staff Liaisons in Attendance:** |
| Amanda Conklin, Jenn Fraser and Kevin Lennon. |
| **Other NCAA Staff Members in Attendance for Portions of the Meeting:** |
| Scott Bearby, Lydia Bell, DJ Brown, Gary Brown, Emily Capehart, Meredith Cleaver, Joni Comstock, Derrick Crawford, Jon Duncan, Michele Forte-Osborne, Dan Gavitt, Ty Halpin, Brandy Hataway, Jennifer Henderson, Lynn Holzman, Brittney Jackson, Charnele Kemper, Felicia Martin, Ty Medd, Karen Metzger, Mario Morris, Binh Nguyen, Kris Richardson, Bridget Rigney, Jenn Samble, Dave Schnase, Geoff Silver, Stan Wilcox and Quintin Wright. |

NCAA_SMART_0000023

| Conference -- Voting Delegate | Conference Type | Voting Weight | October 4-5 Report | Introduce Softball Midyear Transfers | Introduce Coaching Limits | Introduce Coaching Limits -- Baseball, Ice Hockey and Softball | Introduce Coaching Limits -- Basketball | Introduce Official and Unofficial Visits | 2022-27 as Noncontroversial -- FBS | 2022-27 FBS | 2022-27 as Noncontroversial -- FCS | 2022-27 FCS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| America East Conference -- B. Barrio | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| American Athletic Conference -- M. Kelly | NA | 2 | | Y | Y | Y | Y | Y | Y | Y | | |
| Atlantic 10 Conference -- C. May | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| Atlantic Coast Conference -- H. Lyke | A | 4 | | Y | N | N | N | Y | | | | |
| ASUN Conference -- A. Ricker-Gilbert | FCS | 1 | | Y | Y | Y | Y | Y | | | Y | Y |
| Big 12 Conference -- S. Lyons | A | 4 | | Y | Y | Y | Y | Y | Y | Y | | |
| Big East Conference -- K. Willett (alternate) | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| Big Sky Conference -- J. Gee | FCS | 1 | | Y | Y | Y | N | Y | | | Y | Y |
| Big South Conference -- T. Coffey | FCS | 1 | A p p r o v e d | Y | Y | Y | Y | Y | | | Y | Y |
| Big Ten Conference -- C. Hawley (alternate) | A | 4 | | Y | N | N | N | Y | Y | Y | | |
| Big West Conference -- K. Barsky | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| Colonial Athletic Association -- C. Rawak | FCS | 1 | | | Y | Y | Y | Y | | | Y | Y |
| Conference USA -- E. Wood | NA | 2 | | Y | Y | Y | Y | Y | | | | |
| Horizon League -- D. Kirch | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| Ivy League -- J. Blackett | FCS | 1 | | Y | Y | Y | Y | Y | | | Y | Y |
| Metro Atlantic Athletic Conference -- A. Jabir | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| Mid-American Conference -- J. Steinbrecher | NA | 2 | | Y | Y | Y | Y | Y | Y | Y | | |
| Mid-Eastern Athletic Conference -- A. Shields-Gadson | FCS | 1 | | Y | Y | N | Y | Y | | | Y | Y |
| Missouri Valley Conference -- D. Harris (MVFC for FCS) | DI | 1 | | Y | Y | Y | Y | Y | | | Y | Y |
| Mountain West Conference -- E. Nunez | NA | 2 | | Y | Y | Y | Y | N | Y | Y | | |
| Northeast Conference -- N. Morris | FCS | 1 | | Y | Y | Y | N | Y | | | Y | Y |
| Ohio Valley Conference -- N. Arrighi | FCS | 1 | | Y | Y | Y | Y | Y | | | Y | Y |
| Pac-12 Conference -- E. Price (alternate) | A | 4 | | Y | Y | A | Y | Y | | | | |
| Patriot League -- B. Walker | FCS | 1 | | Y | Y | Y | Y | N | | | Y | Y |
| Southeastern Conference -- L. Tealer | A | 4 | | Y | Y | Y | Y | Y | | | | |
| Southern Conference -- E. Rabb | FCS | 1 | | Y | Y | Y | Y | Y | | | Y | Y |
| Southland Conference -- T. Samuel | FCS | 1 | | Y | Y | Y | Y | Y | | | Y | Y |
| Southwestern Athletic Conference -- A. Pooler (alternate) | FCS | 1 | | | | | | | | | Y | Y |
| Summit League -- B. Martin | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| Sun Belt Conference -- C. Cobb | NA | 2 | | Y | Y | Y | Y | Y | Y | Y | | |
| West Coast Conference -- R. Baumgartner | DI | 1 | | Y | A | A | Y | Y | | | | |
| Western Athletic Conference -- J. Boggs | DI | 1 | | Y | Y | Y | Y | Y | | | | |
| IA FAR -- D. Bruce | | 1 | | Y | N | Y | Y | Y | | | | |
| Division I Conference Commissioner -- D. Butterly | | 1 | | Y | Y | Y | Y | Y | | | | |
| FARA -- T. Day (alternate) | | 1 | | Y | N | Y | Y | N | | | | |
| FBS Autonomy Commissioner -- G. Sankey | | 4 | | | | | | | | | | |
| FBS Nonautonomy Commissioner -- J. MacLeod | | 2 | | | | | | | | | | |
| FCS Conference Commissioner -- J. Heppel (alternate) | | 1 | | | | | | | | | Y | Y |
| SAAC -- B. Carlson (alternate) | | 1 | | | | | | | | | | |
| SAAC -- I. Vance (alternate) | | 1 | | A | Y | Y | Y | Y | | | | |
| **Yes/Adopt (Y)** | | | | 60 | 46 | 53 | 53 | 58 | 15 | 15 | 14 | 14 |
| **No/Defeat (N)** | | | | 0 | 11 | 8 | 10 | 5 | 0 | 0 | 0 | 0 |
| **Abstain (A)** | | | | 1 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **No Vote Cast (Blank)** | | | | 3 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 |
| **Total** | | | | 64 | 64 | 64 | 64 | 64 | 15 | 15 | 14 | 14 |
| **Y Percent** | | | | 100.0% | 80.7% | 86.9% | 84.1% | 92.1% | 100.0% | 100.0% | 100.0% | 100.0% |

A = Autonomy; NA = FBS Nonautonomy

# EXHIBIT J

to the Declaration of Michael Lieberman

1   CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
    carolyn.luedtke@mto.com
2   JUSTIN P. RAPHAEL (State Bar No. 292380)
    Justin.Raphael@mto.com
3   CHRISTOPHER CRUZ (State Bar No. 346128)
    Christopher.Cruz@mto.com
4   JAVIER KORDI (State Bar No. 348358)
    Javier.Kordi@mto.com
5   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, Twenty-Seventh Floor
6   San Francisco, California 94105-2907
    Telephone:     (415) 512-4000
7   Facsimile:     (415) 512-4077

8   *Attorneys for Defendant National*
    *Collegiate Athletic Association*

9                   UNITED STATES DISTRICT COURT

10                  EASTERN DISTRICT OF CALIFORNIA

11

12
    TAYLOR SMART AND MICHAEL         Case No. 2:22-cv-02125
13  HACKER, individually and on
    behalf of all those similarly    Hon. William B. Shubb
14  situated,                        Assigned to Hon. Judge Kendall
                                     J. Newman for Non-Dispositive
15           Plaintiffs,             Issues

16      vs.                          **DEFENDANT'S RESPONSE TO
                                     PLAINTIFFS' FIRST
17  NATIONAL COLLEGIATE ATHLETIC     REQUESTS FOR PRODUCTION OF
    ASSOCIATION, an unincorporated   DOCUMENTS TO DEFENDANT NCAA**
18  association,

19           Defendants.

20

21

22

23

24

25

26

27

28

1
2

## <u>DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST</u>
## <u>REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT NCAA</u>

3      Pursuant to Rule 34 of the Federal Rules of Civil Procedure,

4  Defendant the National Collegiate Athletic Association ("NCAA")

5  by and through undersigned counsel, submits the following

6  responses and objections to Plaintiffs' First Requests for

7  Production of Documents to Defendant NCAA.  The NCAA responds to

8  these Requests to the best of its knowledge at the present time

9  and reserves the right at any time to supplement, amend, correct,

10  or clarify its responses and objections, but undertakes no

11  obligation to do so beyond the obligations imposed by the Federal

12  Rules of Civil Procedure, the Local Rules of this Court, and

13  other applicable orders or rules.  That the NCAA has objected or

14  responded to a Request for Production ("Request") is not and

15  should not be taken as an admission that the NCAA accepts or

16  admits the existence of any fact set forth in or assumed by the

17  Request, or as indication that the NCAA agrees with or adopts any

18  characterization or statement within such Request.

19

20      **<u>OBJECTIONS TO PLAINTIFFS' DEFINITIONS AND INSTRUCTIONS</u>**

21      1.   The NCAA objects to the definition of "Communication"

22  or any variant thereof on the grounds that it is overbroad,

23  unduly burdensome, and not proportional to the needs of the case.

24  As defined, the definition calls for the production of

25  communications not kept by the NCAA in the ordinary course of

26  business, including "oral contact such as face-to-face meetings

27  or telephone conversations".  The NCAA further objects to this

28  definition to the extent that it imposes obligations beyond those

2

1  required by the Federal Rules of Civil Procedure or any orders of

2  this Court.  The NCAA will construe "Communication" to refer to

3  records of correspondence kept in the ordinary course of business

4  that can be located after a reasonable search.

5      2.   The NCAA objects to the definition of "Document" or

6  "Documents" on the grounds that it is overbroad, unduly

7  burdensome, and not proportional to the needs of the case.  The

8  definition, as drafted, encompasses (1) every physical document

9  and every piece of data ever created or maintained; (2) all

10 documents and data when a subset of documents or data will

11 suffice to respond to the scope of the request for production at

12 issue; (3) documents and data sources that are not reasonably

13 accessible because of undue burden or cost.  The NCAA further

14 objects to this definition to the extent that it demands the

15 creation of documents not currently in existence rather than the

16 production of presently existing documents, or demands the

17 production of documents not in the NCAA's possession, custody, or

18 control.  The NCAA further objects to this definition as vague

19 and ambiguous.  Pursuant to Rule 34(2)(D) of the Federal Rules of

20 Civil Procedure, the NCAA further objects to this definition to

21 the extent that it calls for the production of Electronically

22 Stored Information ("ESI") in any particular format; the NCAA

23 will produce in reasonably useable format which will be

24 memorialized in a stipulated order establishing a protocol for

25 the production of documents and ESI.  The NCAA will construe

26 "documents" consistently with the definition of the term provided

27 in Rule 34(a)(1)(A) and with the parties' forthcoming ESI

28 Protocol.

3.    The NCAA objects to the definition of "Person" on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case. The NCAA also objects to the extent that the definition, as drafted, encompasses institutions and entities that are not involved in this case or within the NCAA's possession, custody and control.  The NCAA further objects to this definition as vague and ambiguous.

4.    The NCAA objects to the definition of "relate" and "relating to" as vague and ambiguous.  The NCAA also objects to the definition to the extent that it calls for and would require the NCAA to speculate.  The NCAA also objects to the definition on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it calls for the production of documents only tangentially related to the subject matter of the request (for instance, the request would call for the production of documents that only "mention" the subject matter).  The NCAA will construe "relate" and "relating to," as "directly referencing."

5.    The NCAA objects to the definition of "You," and "Your," on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it would require the NCAA to respond on behalf of persons or entities other than the NCAA itself or its employees.  The NCAA further objects to the extent it seeks information outside the NCAA's possession, custody, and control.  For example, as explained by the NCAA to counsel, for the most part individuals employed by member institutions who sit on NCAA boards and committees do not have documents within the possession, custody,

and control of the NCAA.  If those individuals employed by member institutions do not have NCAA email addresses, which is rare, the NCAA will not be collecting or reviewing documents for them as it does not have access to or possession of those documents.  The NCAA will construe "You" and "Your" to be referring to the NCAA and its employees.

6.    The NCAA objects to Instruction No. 1 to the extent that it seeks to impose obligations inconsistent with the Federal Rules of Civil Procedure and any orders of this Court, including the request that the NCAA supplement its responses through the date of hearing or trial.

7.    The NCAA objects to Instruction No. 2 on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it calls for the production of all documents without limiting the scope of custodians.  The NCAA further objects to this definition as vague and ambiguous to the extent that "or those in effect, or those which otherwise came into existence" are unclear terms to describe the documents requested.

8.    The NCAA objects to Instruction No. 3 on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it would require the NCAA to respond on behalf of persons or entities other than the NCAA itself or its employees.  The NCAA further objects to the extent it seeks information outside the NCAA's possession, custody, and control from NCAA member institutions.  For example, as explained by the NCAA to counsel, for the most part individuals employed by member institutions who sit on NCAA

1  boards and committees do not have documents within the
2  possession, custody, and control of the NCAA.  If those
3  individuals employed by member institutions do not have NCAA
4  email addresses, which is rare, the NCAA will not be collecting
5  or reviewing documents for them as it does not have access to or
6  possession of those documents.  The NCAA will respond only on
7  behalf of the NCAA and its employees.  The NCAA also objects that
8  the request is overbroad, unduly burdensome, and not proportional
9  to the needs of the case to the extent that it would require the
10 NCAA to search the archives, books, records, papers, and
11 computers of persons or entities other than the NCAA itself or
12 its employees.

13      9.   The NCAA objects to Instruction No. 4 on the grounds
14 that it is overbroad, unduly burdensome, and not proportional to
15 the needs of the case to the extent that it demands the creation
16 of documents not currently in existence rather than the
17 production of presently existing documents.  The NCAA further
18 objects to this instruction to the extent that it imposes
19 obligations not consistent with the Federal Rules of Civil
20 Procedure or any orders of this Court.

21      10.  The NCAA objects to Instruction No. 5 it imposes
22 obligations not consistent with the Federal Rules of Civil
23 Procedure or any orders of this Court and because it unilaterally
24 dictates how the parties will handle the production of ESI and
25 demands that all documents will be produced in native format.
26 The NCAA will produce ESI in the format specified in the parties'
27 forthcoming ESI Protocol.

28

1     11.   The NCAA objects to Instruction No. 6 on the grounds
2 that it is overbroad, unduly burdensome, and not proportional to
3 the needs of the case to the extent that it would require the
4 NCAA to respond on behalf of persons or entities other than the
5 NCAA itself or its employees, such as persons or entities outside
6 the NCAA's possession, custody, and control, and to detail the
7 actions of those persons or entities.  The NCAA further objects
8 to these instructions to the extent that they impose obligations
9 not consistent with the Federal Rules of Civil Procedure or any
10 orders of this Court.

11     12.   The NCAA objects to Instruction No. 7 to the extent
12 that it imposes obligations not consistent with the Federal Rules
13 of Civil Procedure or any orders of this Court. The parties will
14 work together to agree upon a protocol for privilege logs.

15     13.   The NCAA objects to Instruction No. 8 to the extent
16 that it imposes obligations not consistent with the Federal Rules
17 of Civil Procedure or any orders of this Court.

18     14.   The NCAA objects to Instruction No. 9 to the extent
19 that it imposes obligations not consistent with the Federal Rules
20 of Civil Procedure or any orders of this Court.

21 **OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**
22 **REQUEST FOR PRODUCTION NO. 1:**

23     Documents and Communications sufficient to identify all
24 current or former Volunteer Coaches in baseball for NCAA Division
25 I schools during the relevant time period.

26 **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

27     The NCAA incorporates its Objections to Plaintiffs'
28 Definitions and Instructions as if fully set forth herein.  The

1  NCAA further objects to this Request on the grounds that it is

2  overbroad, unduly burdensome, and not proportional to the needs

3  of the case, in that the requested information does not exist

4  anywhere at the NCAA in any centralized repository or source.

5  The NCAA further objects to this Request to the extent it calls

6  for the NCAA to seek documents outside of its possession,

7  custody, and control from member institutions or member

8  conferences.  Member institutions and conferences are independent

9  entities and not within the control of the NCAA and the NCAA does

10  not have possession of or access to their documents.  NCAA board

11  and committee members do not have NCAA email addresses for

12  documents that would be responsive to this Request.  The NCAA

13  will not be collecting and producing documents from outside the

14  NCAA that are in the possession of persons working for member

15  institutions, conferences, or other outside organizations who

16  serve on NCAA boards or committees.  As set forth in Plaintiff's

17  Instruction No. 1, the NCAA understands the time period for this

18  Request is May 29, 2018 to the present and interprets that as the

19  governing time period for the NCAA's response.

20      The NCAA has done a reasonable search and inquiry and is not

21  aware of any documents or communications that exist sufficient to

22  identify all current or former Volunteer Coaches in baseball for

23  NCAA Division I schools during the time period.

24  **REQUEST FOR PRODUCTION NO. 2:**

25      Documents and Communications sufficient to identify all

26  current or former Head or Assistant Coaches in baseball for NCAA

27  Division I schools during the relevant time period.

28

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2**:

2       The NCAA incorporates its Objections to Plaintiffs'

3  Definitions and Instructions as if fully set forth herein.  The

4  NCAA further objects to this Request on the grounds that it is

5  overbroad, unduly burdensome, and not proportional to the needs

6  of the case, in that it seeks the names of head and assistant

7  coaches, which have no connection to the allegations that the

8  NCAA failed to allow schools to pay volunteer coaches, and in

9  that it seeks information about assistant coaches that does not

10 exist in any centralized repository or source.  The NCAA further

11 objects to this Request to the extent it calls for the NCAA to

12 seek documents outside of its possession, custody, and control

13 from member institutions or member conferences.  Member

14 institutions and conferences are independent entities and not

15 within the control of the NCAA and the NCAA does not have

16 possession of or access to their documents.  NCAA board and

17 committee members do not have NCAA email addresses for documents

18 that would be responsive to this Request.  The NCAA will not be

19 collecting and producing documents from outside the NCAA that are

20 in the possession of persons working for member institutions,

21 conferences, or other outside organizations who serve on NCAA

22 boards or committees.

23      In response to this Request, the scope of the NCAA's

24 production will be as follows: the NCAA will produce

25 nonprivileged documents and communications, subject to the

26 application of agreed-upon search terms and custodians, if any

27 exist sufficient to show the names of all current Division I head

28 coaches for all sports except FBS football and men's and women's

1 basketball during the time period that are located through a

2 reasonable search and diligent inquiry from sources in the NCAA's

3 custody, possession, and control.  As set forth in Plaintiff's

4 Instruction No. 1, the NCAA understands the time period for this

5 Request is May 29, 2018 to the present and interprets that as the

6 governing time period for the NCAA's response.  The NCAA has done

7 a reasonable search and inquiry and is not aware of any documents

8 or communications that exist sufficient to identify all current

9 or former NCAA Division I assistant coaches during that same time

10 period.

11 **REQUEST FOR PRODUCTION NO. 3:**

12      Documents and Communications sufficient to identify any NCAA

13 liaison or representative with NCAA Division I schools regarding

14 baseball during the relevant time period.

15 **RESPONSE TO REQUEST FOR PRODUCTION No. 3:**

16      The NCAA incorporates its Objections to Plaintiffs'

17 Definitions and Instructions as if fully set forth herein. The

18 NCAA objects to this Request as vague and ambiguous.  The NCAA

19 does not understand what information Plaintiffs seek or what it

20 means by "any NCAA liaison or representative with NCAA Division I

21 schools regarding baseball." The NCAA is open to meeting and

22 conferring with Plaintiffs to better understand what this Request

23 seeks, but as drafted, the NCAA does not understand it sufficient

24 to respond more specifically.  The NCAA reserves all other

25 objections until it understands what the Request seeks.  To the

26 extent the NCAA understands it (which it does not), the NCAA

27 further objects to this Request to the extent that it seeks

28 documents that are not relevant to any claims or defenses. It is

not clear who Plaintiffs are referring to as "liaisons" or what their role is related to the allegations in this case.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences.  Member institutions and conferences are independent entities and not within the control of the NCAA and the NCAA does not have possession of or access to their documents.  NCAA board and committee members do not have NCAA email addresses for documents that would be responsive to this Request.  The NCAA will not be collecting and producing documents from outside the NCAA that are in the possession of persons working for member institutions, conferences, or other outside organizations who serve on NCAA boards or committees.

The NCAA will not produce documents in response to this Request because it does not understand it.  The NCAA is willing to meet and confer to better understand what information Plaintiffs are seeking and how it relates to the allegations in the case.

**REQUEST FOR PRODUCTION NO. 4**:

Documents and Communications sufficient to identify any NCAA Division I school liaisons or representatives with the NCAA regarding baseball during the relevant time period.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4**:

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA objects to this request as vague and ambiguous in the use of the phrase "Division I school liaisons or representatives with

1  the NCAA regarding baseball."  The NCAA does not understand what
2  this Request is seeking.  The NCAA is open to meeting and
3  conferring with Plaintiffs to better understand what this Request
4  seeks, but as drafted, the NCAA does not understand it sufficient
5  to respond more specifically.  The NCAA reserves all other
6  objections until it understands what the Request seeks.  To the
7  extent the NCAA understands it (which it does not), the NCAA
8  further objects to this Request to the extent that it seeks
9  documents that are not relevant to any claims or defenses.  It is
10 not clear who Plaintiffs are referring to as "liaisons" or what
11 their role is related to the allegations in this case.  The NCAA
12 further objects to this Request to the extent it calls for the
13 NCAA to seek documents outside of its possession, custody, and
14 control from member institutions or member conferences.  Member
15 institutions and conferences are independent entities and not
16 within the control of the NCAA and the NCAA does not have
17 possession of or access to their documents.  NCAA board and
18 committee members do not have NCAA email addresses for documents
19 that would be responsive to this Request.  The NCAA will not be
20 collecting and producing documents from outside the NCAA that are
21 in the possession of persons working for member institutions,
22 conferences, or other outside organizations who serve on NCAA
23 boards or committees.

24     The NCAA will not produce documents in response to this
25 Request because it does not understand it.  The NCAA is willing
26 to meet and confer to better understand what information
27 Plaintiffs are seeking and how it relates to the allegations in
28 the case.

1  **REQUEST FOR PRODUCTION NO. 5:**

2      From the time period of six months preceding the passage of

3  NCAA Bylaw 11.01.6(or any substantially similar predecessor) to

4  the present, Documents and Communications sufficient to identify

5  Persons who are or were involved in the following:

6      a. Drafting NCAA Bylaw 11.01.6 (or any substantially similar

7  predecessor);

8      b. The passage of NCAA Bylaw 11.01.6 (or any substantially

9  similar predecessor);

10     c. The drafting or consideration of any proposed amendments

11 that would have or did modify NCAA Bylaw 11.01.6 (or any

12 substantially similar predecessor);

13     d. Efforts to repeal NCAA Bylaw 11.01.6 (or any

14 substantially similar predecessor);and

15     e. The January 2023 revocation of the NCAA bylaw regarding

16 the Volunteer Coach for Division I baseball.

17 **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

18     The NCAA incorporates its Objections to Plaintiffs'

19 Definitions and Instructions as if fully set forth herein.  The

20 NCAA objects to the phrase "any substantially similar

21 predecessor" as vague and ambiguous.  The NCAA further objects to

22 the phrase "involved" as vague and ambiguous in its scope and

23 definition, and potentially overbroad in its definition.  The

24 NCAA will interpret "involved" to mean having an active,

25 leadership role in proposing or discussing language for or

26 revocation of the Bylaw at issue.  The NCAA does not interpret

27 "involved" as merely voting for or against a Bylaw change or

28 being a minor participant in any discussion of such a change.  The

1   NCAA further objects to the phrase "passage of," "drafting of,"

2   and "consideration of" as vague, ambiguous and overbroad.  The

3   NCAA further objects to the use of "related to" as vague,

4   ambiguous, and overbroad.  That language could refer to a

5   sweeping array of conduct that is undefined and unrelated to this

6   case.  The NCAA will interpret "related to" as referring to or

7   about the defined topics.  The NCAA further objects to this

8   Request to the extent that it seeks documents that are not

9   relevant to any claims or defenses.  The NCAA further objects to

10  this Request on the grounds that it is overbroad, unduly

11  burdensome, and not proportional to the needs of the case, to the

12  extent it seeks information on people "involved" under an

13  overbroad definition of the term. The NCAA further objects to

14  this Request on the grounds that it is overbroad, unduly

15  burdensome, and not proportional to the needs of the case, to the

16  extent it seeks information "related to" unnamed person's

17  "consideration" or "passage" of the named Bylaw.  The NCAA

18  further objects to this Request on the grounds that it is

19  overbroad, unduly burdensome, and not proportional to the needs

20  of the case, because it seeks documents from a time period that

21  exceeds thirty years.  It is not reasonable for the NCAA to

22  search for documents for such a broad time period.  The NCAA will

23  interpret the time period for this request to be the six months

24  before through the six months after (a) the enactment of the

25  bylaw and (b) each subsequent effort to amend or repeal the

26  bylaw.  The NCAA further objects to this Request to the extent it

27  calls for the NCAA to seek documents outside of its possession,

28  custody, and control from member institutions or member

14

1    conferences.  Member institutions and conferences are independent

2    entities and not within the control of the NCAA and the NCAA does

3    not have possession of or access to their documents.  NCAA board

4    and committee members do not have NCAA email addresses for

5    documents that would be responsive to this Request.  The NCAA

6    will not be collecting and producing documents from outside the

7    NCAA that are in the possession of persons working for member

8    institutions, conferences, or other outside organizations who

9    serve on NCAA boards or committees.

10       In response to this Request, the scope of the NCAA's

11   production will be as follows: the NCAA will produce

12   nonprivileged documents and communications, subject to the

13   application of agreed-upon search terms and custodians, if any

14   exist, (a) referencing or discussing the drafting and enactment

15   of 11.01.6; (b) referencing or discussing any efforts to amend,

16   modify, or repeal 11.01.6; and/or (c) that are drafts or versions

17   of 11.01.6 that are located through a reasonable search and

18   diligent inquiry from sources in the NCAA's custody, possession,

19   and control.

20   **REQUEST FOR PRODUCTION NO. 6**:

21       From the time period of six months preceding the passage of

22   NCAA Bylaw 11.7.6.2.3(or any substantially similar predecessor)

23   to the present, Documents and Communications sufficient to

24   identify Persons who are or were involved in the following:

25       a. Drafting NCAA Bylaw 11.7.6.2.3 (or any substantially

26   similar predecessor);

27       b. The passage of NCAA Bylaw 11.7.6.2.3 (or any

28   substantially similar predecessor);

1    c. The drafting or consideration of any proposed amendments

2  that would have or did modify NCAA Bylaw 11.7.6.2.3 (or any

3  substantially similar predecessor);

4    d. Limiting NCAA Division I baseball to only one Volunteer

5  Coach; and

6    e. Efforts to remove the NCAA bylaw limitation of only one

7  Volunteer Coach for Division I baseball.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

9    The NCAA incorporates its Objections to Plaintiffs'

10 Definitions and Instructions as if fully set forth herein.  The

11 NCAA objects to the phrase "any substantially similar

12 predecessor" as vague and ambiguous.  The NCAA further objects to

13 the phrase "involved" as vague and ambiguous in its scope and

14 definition, and potentially overbroad in its definition.  The

15 NCAA will interpret "involved" to mean having an active,

16 leadership role in proposing or discussing language for or

17 revocation of the Bylaw at issue.  The NCAA does not interpret

18 "involved" as merely voting for or against a Bylaw change or

19 being a minor participant in any discussion of such a change. The

20 NCAA further objects to the phrase "passage of," "drafting of,"

21 and "consideration of" as vague, ambiguous and overbroad.  The

22 NCAA further objects to the use of "related to" as vague,

23 ambiguous, and overbroad.  That language could refer to a

24 sweeping array of conduct that is undefined and unrelated to this

25 case.  The NCAA will interpret "related to" as referring to or

26 about the defined topics.  The NCAA further objects to this

27 Request to the extent that it seeks documents that are not

28 relevant to any claims or defenses.  The NCAA further objects to

16

this Request on the grounds that it is overbroad, unduly
burdensome, and not proportional to the needs of the case, to the
extent it seeks information on people "involved" under an
overbroad definition of the term. The NCAA further objects to
this Request on the grounds that it is overbroad, unduly
burdensome, and not proportional to the needs of the case, to the
extent it seeks information "related to" unnamed person's
"consideration" or "passage" of the named Bylaw.  The NCAA
further objects to this Request on the grounds that it is
overbroad, unduly burdensome, and not proportional to the needs
of the case, because it seeks documents from a time period that
exceeds thirty years.  It is not reasonable for the NCAA to
search for documents for such a broad time period.  The NCAA will
interpret the time period for this request to be the six months
before through the six months after (a) the enactment of the
bylaw and (b) each subsequent effort to amend or repeal the
bylaw.  The NCAA further objects to this Request to the extent it
calls for the NCAA to seek documents outside of its possession,
custody, and control from member institutions or member
conferences.  Member institutions and conferences are independent
entities and not within the control of the NCAA and the NCAA does
not have possession of or access to their documents.  NCAA board
and committee members do not have NCAA email addresses for
documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the
NCAA that are in the possession of persons working for member
institutions, conferences, or other outside organizations who
serve on NCAA boards or committees.

17

In response to this Request, the scope of the NCAA's production will be as follows: the NCAA will produce nonprivileged documents and communications, subject to the application of agreed-upon search terms and custodians, if any exist, (a) referencing or discussing the drafting and enactment of 11.7.6.2.3; (b) referencing or discussing any efforts to amend, modify, or repeal 11.7.6.2.3; and/or (c) that are drafts or versions of 11.7.6.2.3 that are located through a reasonable search and diligent inquiry from sources in the NCAA's custody, possession, and control.

**REQUEST FOR PRODUCTION NO. 7:**

From the time period of six months preceding the passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to the present, Documents and Communications related to:

a. The need or non-need for NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

b. Drafting NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

c. The passage of NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

d. The drafting or consideration of any proposed amendments that would have or did modify NCAA Bylaw 11.01.6 (or any substantially similar predecessor);

e. Efforts to repeal NCAA Bylaw 11.01.6 (or any substantially similar predecessor);and

f. The January 2023 revocation of the NCAA bylaw regarding the Volunteer Coach for Division I baseball.

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

2       The NCAA incorporates its Objections to Plaintiffs'

3  Definitions and Instructions as if fully set forth herein.  The

4  NCAA objects to this Request to the extent that it seeks

5  documents that are protected from disclosure by the attorney-

6  client privilege, the attorney work product doctrine, or any

7  other applicable privilege.  The NCAA objects to the phrase "any

8  substantially similar predecessor" as vague and ambiguous.  The

9  NCAA further objects to the phrase "need or non-need" as vague

10  and ambiguous.  The NCAA will interpret that as discussions about

11  the benefits, drawbacks, or reasons for the named Bylaw.  The

12  NCAA further objects to the phrase "passage of," "drafting of,"

13  and "consideration of" as vague, ambiguous and overbroad.  Those

14  phrases could encompass discussions that are non-substantive and

15  unrelated to the benefits, drawbacks, or reasons for the named

16  Bylaw.  The NCAA further objects to the use of "related to" as

17  vague, ambiguous, and overbroad.  That language could refer to a

18  sweeping array of conduct that is undefined and unrelated to this

19  case.  The NCAA will interpret "related to" as referring to or

20  about the defined topics.  The NCAA further objects to this

21  Request to the extent that it seeks documents that are not

22  relevant to any claims or defenses.  The NCAA further objects to

23  this Request on the grounds that it is overbroad, unduly

24  burdensome, and not proportional to the needs of the case, to the

25  extent it seeks information "related to" unnamed person's

26  "consideration" or "passage" of the named Bylaw.  The NCAA

27  further objects to this Request on the grounds that it is

28  overbroad, unduly burdensome, and not proportional to the needs

of the case, because it seeks documents from a time period that exceeds thirty years.  It is not reasonable for the NCAA to search for documents for such a broad time period.  The NCAA will interpret the time period for this request to be the six months before through the six months after (a) the enactment of the bylaw and (b) each subsequent effort to amend or repeal the bylaw.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences.  Member institutions and conferences are independent entities and not within the control of the NCAA and the NCAA does not have possession of or access to their documents.  NCAA board and committee members do not have NCAA email addresses for documents that would be responsive to this Request.  The NCAA will not be collecting and producing documents from outside the NCAA that are in the possession of persons working for member institutions, conferences, or other outside organizations who serve on NCAA boards or committees.

     In response to this Request, the scope of the NCAA's production will be as follows: the NCAA will produce nonprivileged documents and communications, subject to the application of agreed-upon search terms and custodians, if any exist, (a) referencing or discussing the drafting and enactment of 11.01.6; (b) referencing or discussing any efforts to amend, modify, or repeal 11.01.6; and/or (c) that are drafts or versions of 11.01.6 that are located through a reasonable search and diligent inquiry from sources in the NCAA's custody, possession, and control.

**REQUEST FOR PRODUCTION NO. 8:**

From the time period of six months preceding the passage of NCAA Bylaw 11.01.6(or any substantially similar predecessor) to the present, Documents and Communications discussing the reason(s) or rationale for limiting NCAA Division I schools to only one Volunteer Coach.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.  The NCAA further objects to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents from a time period that exceeds thirty years.  It is not reasonable for the NCAA to search for documents for such a broad time period.  The NCAA will interpret the time period for this request to be the six months before through the six months after (a) the enactment of the bylaw and (b) each subsequent effort to amend or repeal the bylaw.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences.  Member institutions and conferences are independent entities and not within the control of the NCAA and the NCAA does not have possession of or access to their documents.  NCAA board and committee members do not have NCAA email addresses for documents that would be

1   responsive to this Request.  The NCAA will not be collecting and

2   producing documents from outside the NCAA that are in the

3   possession of persons working for member institutions,

4   conferences, or other outside organizations who serve on NCAA

5   boards or committees.

6        In response to this Request, the scope of the NCAA's

7   production will be as follows: the NCAA will produce

8   nonprivileged documents and communications, subject to the

9   application of agreed-upon search terms and custodians,

10  discussing (a) the reason(s) or rationale for limiting NCAA

11  Division I schools to only one volunteer coach for certain

12  sports, (b) the reason(s) or rationale for the voluntary coach

13  bylaw, and/or (c) the pros and/or cons of the volunteer coach

14  position for NCAA Division I sports, if any exist, for the six

15  months before through the six months after (a) the enactment of

16  the bylaw and (b) each subsequent effort to amend or repeal the

17  bylaw that are located through a reasonable search and diligent

18  inquiry from sources in the NCAA's custody, possession, and

19  control.

20  **REQUEST FOR PRODUCTION NO. 9**:

21       From the time period of six months preceding the passage of

22  NCAA Bylaw 11.01.6 (or any substantially similar predecessor) to

23  the present, Documents and Communications discussing the

24  reason(s) or rationale for the Volunteer Coach position.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9**:

26       The NCAA incorporates its Objections to Plaintiffs'

27  Definitions and Instructions as if fully set forth herein.  The

28  NCAA objects to this Request to the extent that it seeks

1  documents that are protected from disclosure by the attorney-

2  client privilege, the attorney work product doctrine, or any

3  other applicable privilege.  The NCAA further objects to this

4  Request on the grounds that it is overbroad, unduly burdensome,

5  and not proportional to the needs of the case, because it seeks

6  documents from a time period that exceeds thirty years.  It is

7  not reasonable for the NCAA to search for documents for such a

8  broad time period.  The NCAA will interpret the time period for

9  this request to be the six months before through the six months

10  after (a) the enactment of the bylaw and (b) each subsequent

11  effort to amend or repeal the bylaw.  The NCAA further objects to

12  this Request to the extent it calls for the NCAA to seek

13  documents outside of its possession, custody, and control from

14  member institutions or member conferences.  Member institutions

15  and conferences are independent entities and not within the

16  control of the NCAA and the NCAA does not have possession of or

17  access to their documents.  NCAA board and committee members do

18  not have NCAA email addresses for documents that would be

19  responsive to this Request.  The NCAA will not be collecting and

20  producing documents from outside the NCAA that are in the

21  possession of persons working for member institutions,

22  conferences, or other outside organizations who serve on NCAA

23  boards or committees.

24        In response to this Request, the scope of the NCAA's

25  production will be as follows: the NCAA will produce

26  nonprivileged documents and communications, subject to the

27  application of agreed-upon search terms and custodians,

28  discussing (a) the reason(s) or rationale for limiting NCAA

1 Division I schools to only one volunteer coach for certain

2 sports, (b) the reason(s) or rationale for the voluntary coach

3 bylaw, and/or (c) the pros and/or cons of the volunteer coach

4 position for NCAA Division I sports, if any exist, for the six

5 months before through the six months after (a) the enactment of

6 the bylaw and (b) each subsequent effort to amend or repeal the

7 bylaw that are located through a reasonable search and diligent

8 inquiry from sources in the NCAA's custody, possession, and

9 control.

10 **REQUEST FOR PRODUCTION NO. 10:**

11     Documents and Communications discussing the need or non-need

12 for an additional Assistant Coach in baseball.

13 **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

14     The NCAA incorporates its Objections to Plaintiffs'

15 Definitions and Instructions as if fully set forth herein.  The

16 NCAA objects to this Request to the extent that it seeks

17 documents that are protected from disclosure by the attorney-

18 client privilege, the attorney work product doctrine, or any

19 other applicable privilege.  The NCAA objects to the phrase "need

20 or non-need" as vague and ambiguous.  The NCAA objects to this

21 request as seeking documents not relevant to Plaintiffs' claims

22 or the NCAA's defenses.  This litigation concerns the former

23 bylaws regarding volunteer coaches specifically.  The reasons for

24 an additional Assistant Coach are not relevant to the claims and

25 defenses in this litigation.  The NCAA further objects to this

26 Request to the extent it calls for the NCAA to seek documents

27 outside of its possession, custody, and control from member

28 institutions or member conferences.  Member institutions and

24

1   conferences are independent entities and not within the control
2   of the NCAA and the NCAA does not have possession of or access to
3   their documents.  NCAA board and committee members do not have
4   NCAA email addresses for documents that would be responsive to
5   this Request.  The NCAA will not be collecting and producing
6   documents from outside the NCAA that are in the possession of
7   persons working for member institutions, conferences, or other
8   outside organizations who serve on NCAA boards or committees.
9   Further, the NCAA understands this Request to only be seeking
10  documents after May 29, 2018 pursuant to Plaintiffs' Instruction
11  No. 1.

12      In response to this Request, the scope of the NCAA's
13  production will be as follows: the NCAA will produce
14  nonprivileged documents and communications, subject to the
15  application of agreed-upon search terms and custodians,
16  discussing (a) the reason(s) or rationale for limiting NCAA
17  Division I schools to only one volunteer coach for certain
18  sports, (b) the reason(s) or rationale for the voluntary coach
19  bylaw, and/or (c) the pros and/or cons of the volunteer coach
20  position for NCAA Division I sports, if any exist, for the six
21  months before through the six months after (a) the enactment of
22  the bylaw limiting the number of assistant coaches and (b) each
23  subsequent effort to amend or repeal that bylaw that are located
24  through a reasonable search and diligent inquiry from sources in
25  the NCAA's custody, possession, and control.

26
27
28

1 **REQUEST FOR PRODUCTION NO. 11:**

2    Documents and Communications discussing the pros and/or cons

3 of the Volunteer Coach position for NCAA Division I baseball or

4 other NCAA Division I sports.

5 **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

6    The NCAA incorporates its Objections to Plaintiffs'

7 Definitions and Instructions as if fully set forth herein.  The

8 NCAA objects to this Request to the extent that it seeks

9 documents that are protected from disclosure by the attorney-

10 client privilege, the attorney work product doctrine, or any

11 other applicable privilege.  The NCAA objects to the phrase "pros

12 and cons" as vague and ambiguous.  The NCAA further objects to

13 this Request to the extent it calls for the NCAA to seek

14 documents outside of its possession, custody, and control from

15 member institutions or member conferences.  Member institutions

16 and conferences are independent entities and not within the

17 control of the NCAA and the NCAA does not have possession of or

18 access to their documents.  NCAA board and committee members do

19 not have NCAA email addresses for documents that would be

20 responsive to this Request.  The NCAA will not be collecting and

21 producing documents from outside the NCAA that are in the

22 possession of persons working for member institutions,

23 conferences, or other outside organizations who serve on NCAA

24 boards or committees. Further, the NCAA understands this Request

25 to only be seeking documents after May 29, 2018 pursuant to

26 Plaintiffs' Instruction No. 1.

27    In response to this Request, the scope of the NCAA's

28 production will be as follows: the NCAA will produce

1  nonprivileged documents and communications, subject to the
2  application of agreed-upon search terms and custodians,
3  discussing (a) the reason(s) or rationale for limiting NCAA
4  Division I schools to only one volunteer coach for certain
5  sports, (b) the reason(s) or rationale for the voluntary coach
6  bylaw, and/or (c) the pros and/or cons of the volunteer coach
7  position for NCAA Division I sports, if any exist, for the six
8  months before through the six months after (a) the enactment of
9  the bylaw and (b) each subsequent effort to amend or repeal the
10 bylaw that are located through a reasonable search and diligent
11 inquiry from sources in the NCAA's custody, possession, and
12 control.

13 **REQUEST FOR PRODUCTION NO. 12:**

14      Documents and Communications discussing how the Volunteer
15 Coach position has affected parity or competitive play (whether
16 positively, negatively, or neutrally) amongst Division I
17 baseball teams or other Division I sports.

18 **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

19      The NCAA incorporates its Objections to Plaintiffs'
20 Definitions and Instructions as if fully set forth herein.  The
21 NCAA objects to this Request to the extent that it seeks
22 documents that are protected from disclosure by the attorney-
23 client privilege, the attorney work product doctrine, or any
24 other applicable privilege.  The NCAA objects to the phrase
25 "parity or competitive play" as vague and ambiguous.  The NCAA
26 further objects to this Request to the extent it calls for the
27 NCAA to seek documents outside of its possession, custody, and
28 control from member institutions or member conferences.  Member

1  institutions and conferences are independent entities and not

2  within the control of the NCAA and the NCAA does not have

3  possession of or access to their documents.  NCAA board and

4  committee members do not have NCAA email addresses for documents

5  that would be responsive to this Request.  The NCAA will not be

6  collecting and producing documents from outside the NCAA that are

7  in the possession of persons working for member institutions,

8  conferences, or other outside organizations who serve on NCAA

9  boards or committees.

10     In response to this Request, the scope of the NCAA's

11  production will be as follows: the NCAA will produce

12  nonprivileged documents and communications, subject to the

13  application of agreed-upon search terms and custodians, if any

14  exist, discussing how the Volunteer Coach position has affected

15  parity or competitive play (whether positively, negatively, or

16  neutrally) amongst Division I teams during the time period that

17  are located through a reasonable search and diligent inquiry from

18  sources in the NCAA's custody, possession, and control.  As set

19  forth in Plaintiff's Instruction No. 1, the NCAA understands the

20  time period for this Request is May 29, 2018 to the present and

21  interprets that as the governing time period for the NCAA's

22  response.

23  **REQUEST FOR PRODUCTION NO. 13:**

24     Documents and Communications regarding how "eliminate[ing]

25  the volunteer coach designation" was part of "an effort to create

26  a fairer and more equitable Division I athletics competition," as

27  stated in the NCAA's January 2023 Division I Transformation

28  Committee Final Report.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any
other applicable privilege.  The NCAA further objects to this
Request to the extent it calls for the NCAA to seek documents
outside of its possession, custody, and control from member
institutions or member conferences.  Member institutions and
conferences are independent entities and not within the control
of the NCAA and the NCAA does not have possession of or access to
their documents.  NCAA board and committee members do not have
NCAA email addresses for documents that would be responsive to
this Request.  The NCAA will not be collecting and producing
documents from outside the NCAA that are in the possession of
persons working for member institutions, conferences, or other
outside organizations who serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians,
containing analysis or consideration of the actual or anticipated
consequences or effects of 11.01.6 or 11.7.6.2.3 or the
withdrawal of the voluntary coach bylaw, if any exist, including
but not limited to any analysis of the application of the
volunteer coach bylaw to a particular sport, in a conference, at
a school or with respect to a specific coach; and if any exist,

1  discussing how the Volunteer Coach position has affected parity

2  or competitive play (whether positively, negatively, or

3  neutrally) amongst Division I teams to the extent such

4  productions include Documents and Communications regarding how

5  "eliminate[ing] the volunteer coach designation" was part of "an

6  effort to create a fairer and more equitable Division I athletics

7  competition," as stated in the NCAA's January 2023 Division I

8  Transformation Committee Final Report that are located through a

9  reasonable search and diligent inquiry from sources in the NCAA's

10 custody, possession, and control.  As set forth in Plaintiff's

11 Instruction No. 1, the NCAA understands the time period for this

12 Request is May 29, 2018 to the present and interprets that as the

13 governing time period for the NCAA's response.

14 **REQUEST FOR PRODUCTION NO. 14:**

15       Documents and Communications regarding why the Volunteer

16 Coach must not "receive compensation or remuneration from the

17 institution's athletics department," as stated in NCAA Bylaw

18 11.01.6.

19 **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

20       The NCAA incorporates its Objections to Plaintiffs'

21 Definitions and Instructions as if fully set forth herein.  The

22 NCAA objects to this Request to the extent that it seeks

23 documents that are protected from disclosure by the attorney-

24 client privilege, the attorney work product doctrine, or any

25 other applicable privilege.  The NCAA objects to this Request as

26 vague and ambiguous in its entirety.  It is not clear what the

27 Request means as written.  The NCAA will interpret it as asking

28 for documents or communications regarding the reasons for Bylaw

11.01.6 during the time period.  The NCAA further objects to this
Request to the extent it calls for the NCAA to seek documents
outside of its possession, custody, and control from member
institutions or member conferences.  Member institutions and
conferences are independent entities and not within the control
of the NCAA and the NCAA does not have possession of or access to
their documents.  NCAA board and committee members do not have
NCAA email addresses for documents that would be responsive to
this Request.  The NCAA will not be collecting and producing
documents from outside the NCAA that are in the possession of
persons working for member institutions, conferences, or other
outside organizations who serve on NCAA boards or committees.
Further, the NCAA understands this Request to only be seeking
documents after May 29, 2018 pursuant to Plaintiffs' Instruction
No. 1.

    In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians, if any
exist, (a) referencing or discussing the drafting and enactment
of 11.01.6, (b) the reason(s) or rationale for limiting NCAA
Division I schools to only one volunteer coach for certain
sports, (c) the reason(s) or rationale for the voluntary coach
bylaw, and/or (d) the pros and/or cons of the volunteer coach
position for NCAA Division I sports, if any exist, for the six
months before through the six months after (a) the enactment of
the bylaw and (b) each subsequent effort to amend or repeal the
bylaw that are located through a reasonable search and diligent

1 inquiry from sources in the NCAA's custody, possession, and

2 control.

3 **REQUEST FOR PRODUCTION NO. 15:**

4     Documents and Communications regarding whether the Volunteer

5 Coach may receive health insurance, housing or a housing stipend,

6 meals or a meal stipend, or other employment benefits from an

7 institution's athletics department.

8 **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

9     The NCAA incorporates its Objections to Plaintiffs'

10 Definitions and Instructions as if fully set forth herein.  The

11 NCAA objects to this Request to the extent that it seeks

12 documents that are protected from disclosure by the attorney-

13 client privilege, the attorney work product doctrine, or any

14 other applicable privilege.  The NCAA objects to the phrase

15 "other employment benefits" as vague and ambiguous.  The NCAA

16 further objects to this Request to the extent it calls for the

17 NCAA to seek documents outside of its possession, custody, and

18 control from member institutions or member conferences.  Member

19 institutions and conferences are independent entities and not

20 within the control of the NCAA and the NCAA does not have

21 possession of or access to their documents.  NCAA board and

22 committee members do not have NCAA email addresses for documents

23 that would be responsive to this Request.  The NCAA will not be

24 collecting and producing documents from outside the NCAA that are

25 in the possession of persons working for member institutions,

26 conferences, or other outside organizations who serve on NCAA

27 boards or committees.

28

1    In response to this Request, the scope of the NCAA's

2 production will be as follows: the NCAA will produce

3 nonprivileged documents and communications, subject to the

4 application of agreed-upon search terms and custodians, if any

5 exist, sufficient to show whether the Volunteer Coach was

6 permitted under the Bylaws to receive health insurance, housing

7 or a housing stipend, meals or a meal stipend, or other

8 employment benefits from an institution's athletics department

9 that are located through a reasonable search and diligent inquiry

10 from sources in the NCAA's custody, possession, and control.  As

11 set forth in Plaintiff's Instruction No. 1, the NCAA understands

12 the time period for this Request is May 29, 2018 to the present

13 and interprets that as the governing time period for the NCAA's

14 response.

15 **REQUEST FOR PRODUCTION NO. 16:**

16    Documents and Communications discussing the reason(s) or

17 rationale for permitting more than one Volunteer Coach for sports

18 like football, basketball, women's equestrian, women's rowing,

19 swimming and diving, and women's triathlon per NCAA Bylaw

20 11.7.6.2.3.

21 **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

22    The NCAA incorporates its Objections to Plaintiffs'

23 Definitions and Instructions as if fully set forth herein.  The

24 NCAA objects to this Request to the extent that it seeks

25 documents that are protected from disclosure by the attorney-

26 client privilege, the attorney work product doctrine, or any

27 other applicable privilege.  The NCAA further objects to this

28 Request to the extent that it seeks documents that are not

relevant to any claims or defenses.  The NCAA further objects to
this Request to the extent it calls for the NCAA to seek
documents outside of its possession, custody, and control from
member institutions or member conferences.  Member institutions
and conferences are independent entities and not within the
control of the NCAA and the NCAA does not have possession of or
access to their documents.  NCAA board and committee members do
not have NCAA email addresses for documents that would be
responsive to this Request.  The NCAA will not be collecting and
producing documents from outside the NCAA that are in the
possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.  Further, the NCAA understands this Request
to only be seeking documents after May 29, 2018 pursuant to
Plaintiffs' Instruction No. 1.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians,
discussing the reason(s) or rationale for limiting NCAA Division
I schools to only one volunteer coach for certain sports, the
reason(s) or rationale for the voluntary coach bylaw, and/or
discussing the pros and/or cons of the volunteer coach position
for NCAA Division I sports, if any exist to the extent they
include Documents and Communications discussing the reason(s) or
rationale for permitting more than one Volunteer Coach for sports
like football, basketball, women's equestrian, women's rowing,
swimming and diving, and women's triathlon per NCAA Bylaw

1  11.7.6.2.3 for the six months before through the six months after
2  (a) the enactment of the bylaw and (b) each subsequent effort to
3  amend or repeal the bylaw that are located through a reasonable
4  search and diligent inquiry from sources in the NCAA's custody,
5  possession, and control.

6  **REQUEST FOR PRODUCTION NO. 17:**

7       Documents and Communications discussing the pros and/or cons
8  of permitting more than one Volunteer Coach for sports like
9  football, basketball, women's equestrian, women's rowing,
10 swimming and diving, and women's triathlon per NCAA Bylaw
11 11.7.6.2.3.

12 **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

13      The NCAA incorporates its Objections to Plaintiffs'
14 Definitions and Instructions as if fully set forth herein.  The
15 NCAA objects to this Request to the extent that it seeks
16 documents that are protected from disclosure by the attorney-
17 client privilege, the attorney work product doctrine, or any
18 other applicable privilege.  The NCAA objects to the phrase "pros
19 and cons" as vague and ambiguous.  The NCAA further objects to
20 this Request to the extent that it seeks documents that are not
21 relevant to any claims or defenses.  The NCAA further objects to
22 this Request to the extent it calls for the NCAA to seek
23 documents outside of its possession, custody, and control from
24 member institutions or member conferences.  Member institutions
25 and conferences are independent entities and not within the
26 control of the NCAA and the NCAA does not have possession of or
27 access to their documents.  NCAA board and committee members do
28 not have NCAA email addresses for documents that would be

1  responsive to this Request.  The NCAA will not be collecting and

2  producing documents from outside the NCAA that are in the

3  possession of persons working for member institutions,

4  conferences, or other outside organizations who serve on NCAA

5  boards or committees.  Further, the NCAA understands this Request

6  to only be seeking documents after May 29, 2018 pursuant to

7  Plaintiffs' Instruction No. 1.

8       In response to this Request, the scope of the NCAA's

9  production will be as follows: the NCAA will produce

10  nonprivileged documents and communications, subject to the

11  application of agreed-upon search terms and custodians,

12  discussing the reason(s) or rationale for limiting NCAA Division

13  I schools to only one volunteer coach for certain sports, the

14  reason(s) or rationale for the voluntary coach bylaw, and/or

15  discussing the pros and/or cons of the volunteer coach position

16  for NCAA Division I sports, if any exist to the extent they

17  include Documents and Communications discussing the pros and/or

18  cons of permitting more than one Volunteer Coach for sports like

19  football, basketball, women's equestrian, women's rowing,

20  swimming and diving, and women's triathlon per NCAA Bylaw

21  11.7.6.2.3 for the six months before through the six months after

22  (a) the enactment of the bylaw and (b) each subsequent effort to

23  amend or repeal the bylaw that are located through a reasonable

24  search and diligent inquiry from sources in the NCAA's custody,

25  possession, and control.

26  **REQUEST FOR PRODUCTION NO. 18:**

27       From the time period of six months preceding the passage of

28  NCAA Bylaw 11.01.6(or any substantially similar predecessor) to

1   the present, Documents and Communications discussing

2   the money or resources saved by NCAA Division I schools or the

3   NCAA by not permitting a Volunteer Coach to "receive compensation

4   or remuneration."

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

6        The NCAA incorporates its Objections to Plaintiffs'

7   Definitions and Instructions as if fully set forth herein.  The

8   NCAA objects to this Request to the extent that it seeks

9   documents that are protected from disclosure by the attorney-

10  client privilege, the attorney work product doctrine, or any

11  other applicable privilege.  The NCAA objects to the phrase

12  "money or resources saved" and "substantially similar

13  predecessor" as vague and ambiguous.  The NCAA further objects to

14  this Request to the extent that it seeks documents that are not

15  relevant to any claims or defenses.  The NCAA further objects to

16  this Request on the grounds that it is overbroad, unduly

17  burdensome, and not proportional to the needs of the case,

18  because it seeks documents from a time period that exceeds thirty

19  years.  It is not reasonable for the NCAA to search for documents

20  for such a broad time period.  The NCAA will interpret the time

21  period for this request to be the six months before through the

22  six months after (a) the enactment of the bylaw limiting the

23  number of assistant coaches and (b) each subsequent effort to

24  amend or repeal that bylaw.  The NCAA further objects to this

25  Request to the extent it calls for the NCAA to seek documents

26  outside of its possession, custody, and control from member

27  institutions or member conferences.  Member institutions and

28  conferences are independent entities and not within the control

1 of the NCAA and the NCAA does not have possession of or access to

2 their documents.  NCAA board and committee members do not have

3 NCAA email addresses for documents that would be responsive to

4 this Request.  The NCAA will not be collecting and producing

5 documents from outside the NCAA that are in the possession of

6 persons working for member institutions, conferences, or other

7 outside organizations who serve on NCAA boards or committees.

8      In response to this Request, the scope of the NCAA's

9 production will be as follows: the NCAA will produce

10 nonprivileged documents and communications, subject to the

11 application of agreed-upon search terms and custodians,

12 discussing any financial impact on NCAA Division I schools or the

13 NCAA by permitting a volunteer coach and not permitting another

14 paid assistant coach, if any such documents exist, for the time

15 period of the six months before through the six months after (a)

16 the enactment of the bylaw limiting the number of assistant

17 coaches and (b) each subsequent effort to amend or repeal that

18 bylaw that are located through a reasonable search and diligent

19 inquiry from sources in the NCAA's custody, possession, and

20 control.

21 **REQUEST FOR PRODUCTION NO. 19:**

22      From the time period of six months preceding the passage of

23 NCAA Bylaw 11.01.6(or any substantially similar predecessor) to

24 the present, Documents and Communications discussing the money or

25 resources saved by NCAA Division I schools or the NCAA by not

26 permitting a third Assistant Coach in Division I baseball.

27 **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

28      The NCAA incorporates its Objections to Plaintiffs'

Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any
other applicable privilege.  The NCAA objects to the phrase
"resources saved" and "substantially similar predecessor" as
vague and ambiguous.  The NCAA further objects to this Request to
the extent that it seeks documents that are not relevant to any
claims or defenses.  The NCAA further objects to this Request on
the grounds that it is overbroad, unduly burdensome, and not
proportional to the needs of the case, because it seeks documents
from a time period that exceeds thirty years.  It is not
reasonable for the NCAA to search for documents for such a broad
time period.  The NCAA will interpret the time period for this
request to be the six months before through the six months after
(a) the enactment of the bylaw limiting the number of assistant
coaches and (b) each subsequent effort to amend or repeal that
bylaw.  The NCAA further objects to this Request to the extent it
calls for the NCAA to seek documents outside of its possession,
custody, and control from member institutions or member
conferences.  Member institutions and conferences are independent
entities and not within the control of the NCAA and the NCAA does
not have possession of or access to their documents.  NCAA board
and committee members do not have NCAA email addresses for
documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the
NCAA that are in the possession of persons working for member
institutions, conferences, or other outside organizations who

1  serve on NCAA boards or committees.

2      In response to this Request, the scope of the NCAA's

3  production will be as follows: the NCAA will produce

4  nonprivileged documents and communications, subject to the

5  application of agreed-upon search terms and custodians,

6  discussing any financial impact on NCAA Division I schools or the

7  NCAA by permitting a volunteer coach and not permitting another

8  paid assistant coach, if any such documents exist, for the time

9  period of the six months before through the six months after (a)

10 the enactment of the bylaw limiting the number of assistant

11 coaches and (b) each subsequent effort to amend or repeal that

12 bylaw that are located through a reasonable search and diligent

13 inquiry from sources in the NCAA's custody, possession, and

14 control.

15 **REQUEST FOR PRODUCTION NO. 20:**

16     Documents and Communications discussing the anticipated

17 salaries and benefits NCAA Division I schools or the NCAA would

18 have incurred or would incur moving forward if the Volunteer

19 Coach designation were eliminated and an additional Assistant

20 Coach position was added.

21 **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

22     The NCAA incorporates its Objections to Plaintiffs'

23 Definitions and Instructions as if fully set forth herein.  The

24 NCAA objects to this Request to the extent that it seeks

25 documents that are protected from disclosure by the attorney-

26 client privilege, the attorney work product doctrine, or any

27 other applicable privilege.  The NCAA objects to the phrase

28 "salaries and benefits . . . the NCAA would have incurred" as

vague and ambiguous because the NCAA does not incur salaries or
expenses for assistant coaching staff at member institutions.
The NCAA further objects to this Request to the extent that it
seeks documents that are not relevant to any claims or defenses.
The NCAA further objects to this Request to the extent it calls
for the NCAA to seek documents outside of its possession,
custody, and control from member institutions or member
conferences.  Member institutions and conferences are independent
entities and not within the control of the NCAA and the NCAA does
not have possession of or access to their documents.  NCAA board
and committee members do not have NCAA email addresses for
documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the
NCAA that are in the possession of persons working for member
institutions, conferences, or other outside organizations who
serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians,
discussing the anticipated salaries and benefits NCAA Division I
schools or the NCAA would have incurred or would incur moving
forward if the Volunteer Coach designation were eliminated and an
additional Assistant Coach position was added, if any such
documents exist for the time period that are located through a
reasonable search and diligent inquiry from sources in the NCAA's
custody, possession, and control.  As set forth in Plaintiff's
Instruction No. 1, the NCAA understands the time period for this

1    Request is May 29, 2018 to the present and interprets that as the

2    governing time period for the NCAA's response.

3    **REQUEST FOR PRODUCTION NO. 21:**

4         Documents and Communications discussing the market value of

5    labor and/or services provided by Volunteer Coaches for baseball.

6    **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

7         The NCAA incorporates its Objections to Plaintiffs'

8    Definitions and Instructions as if fully set forth herein.  The

9    NCAA objects to this Request to the extent that it seeks

10   documents that are protected from disclosure by the attorney-

11   client privilege, the attorney work product doctrine, or any

12   other applicable privilege.  The NCAA objects to this Request as

13   vague and ambiguous in its use of the phrase "market value of

14   labor and/or services."  The NCAA further objects to this Request

15   to the extent that it seeks documents that are not relevant to

16   any claims or defenses.  The NCAA further objects to this Request

17   to the extent it calls for the NCAA to seek documents outside of

18   its possession, custody, and control from member institutions or

19   member conferences.  Member institutions and conferences are

20   independent entities and not within the control of the NCAA and

21   the NCAA does not have possession of or access to their

22   documents.  NCAA board and committee members do not have NCAA

23   email addresses for documents that would be responsive to this

24   Request.  The NCAA will not be collecting and producing documents

25   from outside the NCAA that are in the possession of persons

26   working for member institutions, conferences, or other outside

27   organizations who serve on NCAA boards or committees.

28

1    In response to this Request, the scope of the NCAA's

2 production will be as follows: the NCAA will produce

3 nonprivileged documents and communications, subject to the

4 application of agreed-upon search terms and custodians,(a)

5 discussing any financial impact on NCAA Division I schools or the

6 NCAA by permitting a volunteer coach and not permitting another

7 paid assistant coach, if any such documents exist and/or (b)

8 discussing the anticipated salaries and benefits NCAA Division I

9 schools or the NCAA would have incurred or would incur moving

10 forward if the Volunteer Coach designation were eliminated and an

11 additional Assistant Coach position was added, if any such

12 documents exist to the extent they include such Documents and

13 Communications discussing the market value of labor and/or

14 services provided by Volunteer Coaches for baseball during the

15 time period that are located through a reasonable search and

16 diligent inquiry from sources in the NCAA's custody, possession,

17 and control.  As set forth in Plaintiff's Instruction No. 1, the

18 NCAA understands the time period for this Request is May 29, 2018

19 to the present and interprets that as the governing time period

20 for the NCAA's response.

21 **REQUEST FOR PRODUCTION NO. 22**:

22    Documents and Communications discussing the experience level

23 of Volunteer Coaches for baseball.

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 22**:

25    The NCAA incorporates its Objections to Plaintiffs'

26 Definitions and Instructions as if fully set forth herein.  The

27 NCAA objects to this Request to the extent that it seeks

28 documents that are protected from disclosure by the attorney-

1  client privilege, the attorney work product doctrine, or any

2  other applicable privilege.  The NCAA objects to this Request as

3  vague and ambiguous in its use of the phrase "experience level."

4  The NCAA further objects to this Request to the extent that it

5  seeks documents that are not relevant to any claims or defenses.

6  Moreover, the document seeks an undefined group of documents and

7  communications discussing the "experience level" of Volunteer

8  Coaches for baseball, which could be a broad set of conversations

9  with a broad set of custodians that has nothing to do with the

10 Bylaws at issue or the claims and defenses in this case.  The

11 NCAA will interpret this Request as seeking documents discussing

12 the experience level of Volunteer Coaches in the context of

13 discussions about enacting, amending, or repealing the volunteer

14 coach bylaw.  The NCAA further objects to this Request to the

15 extent it calls for the NCAA to seek documents outside of its

16 possession, custody, and control from member institutions or

17 member conferences.  Member institutions and conferences are

18 independent entities and not within the control of the NCAA and

19 the NCAA does not have possession of or access to their

20 documents.  NCAA board and committee members do not have NCAA

21 email addresses for documents that would be responsive to this

22 Request.  The NCAA will not be collecting and producing documents

23 from outside the NCAA that are in the possession of persons

24 working for member institutions, conferences, or other outside

25 organizations who serve on NCAA boards or committees.

26      In response to this Request, the scope of the NCAA's

27 production will be as follows: the NCAA will produce

28 nonprivileged documents and communications, subject to the

1 application of agreed-upon search terms and custodians,

2 referencing or describing the job duties of any specific

3 volunteer coach and volunteer coaches in Division I during the

4 time period in the context of discussions about adopting,

5 amending or repealing the volunteer coach bylaw, if any such

6 documents exist that are located through a reasonable search and

7 diligent inquiry from sources in the NCAA's custody, possession,

8 and control.  As set forth in Plaintiff's Instruction No. 1, the

9 NCAA understands the time period for this Request is May 29, 2018

10 to the present and interprets that as the governing time period

11 for the NCAA's response.

12 **REQUEST FOR PRODUCTION NO. 23:**

13      Documents and Communications advocating for the repeal of

14 the Volunteer Coach designation.

15 **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

16      The NCAA incorporates its Objections to Plaintiffs'

17 Definitions and Instructions as if fully set forth herein.  The

18 NCAA objects to this Request to the extent that it seeks

19 documents that are protected from disclosure by the attorney-

20 client privilege, the attorney work product doctrine, or any

21 other applicable privilege.  The NCAA objects to this Request as

22 vague and ambiguous in its use of the phrase "the Volunteer Coach

23 designation."  The NCAA will interpret this Request as seeking

24 documents and communications advocating for the repeal of the

25 volunteer coach bylaw.  The NCAA further objects to this Request

26 to the extent it calls for the NCAA to seek documents outside of

27 its possession, custody, and control from member institutions or

28 member conferences.  Member institutions and conferences are

1   independent entities and not within the control of the NCAA and

2   the NCAA does not have possession of or access to their

3   documents.  NCAA board and committee members do not have NCAA

4   email addresses for documents that would be responsive to this

5   Request.  The NCAA will not be collecting and producing documents

6   from outside the NCAA that are in the possession of persons

7   working for member institutions, conferences, or other outside

8   organizations who serve on NCAA boards or committees.

9       In response to this Request, the scope of the NCAA's

10  production will be as follows: the NCAA will produce

11  nonprivileged documents and communications, subject to the

12  application of agreed-upon search terms and custodians,

13  referencing or discussing any efforts to amend, modify, or repeal

14  11.01.6 or 11.7.6.2.3, during the time period that are located

15  through a reasonable search and diligent inquiry from sources in

16  the NCAA's custody, possession, and control.  As set forth in

17  Plaintiff's Instruction No. 1, the NCAA understands the time

18  period for this Request is May 29, 2018 to the present and

19  interprets that as the governing time period for the NCAA's

20  response.

21  **REQUEST FOR PRODUCTION NO. 24**:

22      Documents and Communications advocating for the continuation

23  of the Volunteer Coach designation.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 24**:

25      The NCAA incorporates its Objections to Plaintiffs'

26  Definitions and Instructions as if fully set forth herein. The

27  NCAA objects to this Request to the extent that it seeks

28  documents that are protected from disclosure by the attorney-

1  client privilege, the attorney work product doctrine, or any

2  other applicable privilege.  The NCAA objects to this Request as

3  vague and ambiguous in its use of the phrase "the Volunteer Coach

4  designation."  The NCAA will interpret this Request as seeking

5  documents and communications advocating against the repeal of the

6  volunteer coach bylaw.  The NCAA further objects to this Request

7  to the extent it calls for the NCAA to seek documents outside of

8  its possession, custody, and control from member institutions or

9  member conferences.  Member institutions and conferences are

10  independent entities and not within the control of the NCAA and

11  the NCAA does not have possession of or access to their

12  documents.  NCAA board and committee members do not have NCAA

13  email addresses for documents that would be responsive to this

14  Request.  The NCAA will not be collecting and producing documents

15  from outside the NCAA that are in the possession of persons

16  working for member institutions, conferences, or other outside

17  organizations who serve on NCAA boards or committees.

18      In response to this Request, the scope of the NCAA's

19  production will be as follows: the NCAA will produce

20  nonprivileged documents and communications, subject to the

21  application of agreed-upon search terms and custodians,

22  referencing or discussing any efforts to amend, modify, or repeal

23  11.01.6 or 11.7.6.2.3 during the time period that are located

24  through a reasonable search and diligent inquiry from sources in

25  the NCAA's custody, possession, and control.  As set forth in

26  Plaintiff's Instruction No. 1, the NCAA understands the time

27  period for this Request is May 29, 2018 to the present and

28

1 interprets that as the governing time period for the NCAA's

2 response.

3 **REQUEST FOR PRODUCTION NO. 25:**

4      Documents and Communications sufficient to show the

5 compensation and employment benefits of NCAA Division I Head or

6 Assistant Coaches during the relevant period.

7 **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

8      The NCAA incorporates its Objections to Plaintiffs'

9 Definitions and Instructions as if fully set forth herein.  The

10 NCAA objects to this Request on the grounds that it is overbroad,

11 unduly burdensome, and not proportional to the needs of the case.

12 The NCAA further objects to this Request to the extent it calls

13 for the NCAA to seek documents outside of its possession,

14 custody, and control from member institutions or member

15 conferences.  Member institutions and conferences are independent

16 entities and not within the control of the NCAA and the NCAA does

17 not have possession of or access to their documents.  NCAA board

18 and committee members do not have NCAA email addresses for

19 documents that would be responsive to this Request.  The NCAA

20 will not be collecting and producing documents from outside the

21 NCAA that are in the possession of persons working for member

22 institutions, conferences, or other outside organizations who

23 serve on NCAA boards or committees.

24      In response to this Request, the scope of the NCAA's

25 production will be as follows: the NCAA will produce

26 nonprivileged documents and communications, subject to the

27 application of agreed-upon search terms and custodians,

28 sufficient to show the compensation and benefits of head coaches

and aggregate compensation and benefits of assistant coaches for
each Division I member institution during the time period that
are located through a reasonable search and diligent inquiry from
sources in the NCAA's custody, possession, and control.  As set
forth in Plaintiff's Instruction No. 1, the NCAA understands the
time period for this Request is May 29, 2018 to the present and
interprets that as the governing time period for the NCAA's
response.  The NCAA has done a reasonable search and inquiry and
cannot produce data with regards to this request with any greater
level of specificity.

**REQUEST FOR PRODUCTION NO. 26:**

     Documents and Communications sufficient to show the salaries
and employment benefits of all NCAA Division II and Division III
baseball coaches during the relevant period.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

     The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request on the grounds that it is overbroad,
unduly burdensome, and not proportional to the needs of the case.
The NCAA further objects to this Request to the extent it calls
for the NCAA to seek documents outside of its possession,
custody, and control from member institutions or member
conferences.  Member institutions and conferences are independent
entities and not within the control of the NCAA and the NCAA does
not have possession of or access to their documents.  NCAA board
and committee members do not have NCAA email addresses for
documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the

1  NCAA that are in the possession of persons working for member

2  institutions, conferences, or other outside organizations who

3  serve on NCAA boards or committees.

4      In response to this Request, the scope of the NCAA's

5  production will be as follows: the NCAA will produce

6  nonprivileged documents and communications, subject to the

7  application of agreed-upon search terms and custodians,

8  sufficient to show the compensation and benefits of head coaches

9  and aggregate compensation and benefits of assistant coaches for

10 each Division II and Division III member institution during the

11 time period, if such documents exist, that are located through a

12 reasonable search and diligent inquiry from sources in the NCAA's

13 custody, possession, and control.  As set forth in Plaintiff's

14 Instruction No. 1, the NCAA understands the time period for this

15 Request is May 29, 2018 to the present and interprets that as the

16 governing time period for the NCAA's response.

17 **REQUEST FOR PRODUCTION NO. 27:**

18     Documents and Communications sufficient to show yearly

19 revenue attributable to baseball for each NCAA Division I school

20 during the relevant period.

21 **RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

22     The NCAA incorporates its Objections to Plaintiffs'

23 Definitions and Instructions as if fully set forth herein. The

24 NCAA objects to this Request to the extent that it seeks

25 documents that are not relevant to any claims or defenses.  The

26 NCAA further objects to this Request on the grounds that it is

27 overbroad, unduly burdensome, and not proportional to the needs

28 of the case.  It is not clear how yearly revenue attributable to

1  baseball for each NCAA Division I school is relevant to the case.

2  The NCAA further objects to this Request to the extent it calls

3  for the NCAA to seek documents outside of its possession,

4  custody, and control from member institutions or member

5  conferences.  Member institutions and conferences are independent

6  entities and not within the control of the NCAA and the NCAA does

7  not have possession of or access to their documents.  NCAA board

8  and committee members do not have NCAA email addresses for

9  documents that would be responsive to this Request.  The NCAA

10 will not be collecting and producing documents from outside the

11 NCAA that are in the possession of persons working for member

12 institutions, conferences, or other outside organizations who

13 serve on NCAA boards or committees.

14      In response to this Request, the scope of the NCAA's

15 production will be as follows: the NCAA will produce

16 nonprivileged documents and communications, subject to the

17 application of agreed-upon search terms and custodians,

18 sufficient to show the athletics department revenue and expenses

19 for each Division I member institution during the time period,

20 and to the extent possible this data broken down by sport that

21 are located through a reasonable search and diligent inquiry from

22 sources in the NCAA's custody, possession, and control.  As set

23 forth in Plaintiff's Instruction No. 1, the NCAA understands the

24 time period for this Request is May 29, 2018 to the present and

25 interprets that as the governing time period for the NCAA's

26 response.

27 **REQUEST FOR PRODUCTION NO. 28**:

28      Documents and Communications sufficient to show yearly

1 revenue attributable to baseball for the NCAA during the relevant

2 period.

3 **RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

4     The NCAA incorporates its Objections to Plaintiffs'

5 Definitions and Instructions as if fully set forth herein.  The

6 NCAA objects to the phrase "attributable to baseball for the

7 NCAA" as vague and ambiguous.  The NCAA further objects to this

8 Request to the extent that it seeks documents that are not

9 relevant to any claims or defenses.  It is not clear how the

10 NCAA's revenue from baseball has any bearing on the claims and

11 allegations in this case.  The NCAA further objects to this

12 Request on the grounds that it is overbroad, unduly burdensome,

13 and not proportional to the needs of the case.  It is not clear

14 how yearly revenue attributable to baseball for the NCAA is

15 relevant to the case.  The NCAA further objects to this Request

16 to the extent it calls for the NCAA to seek documents outside of

17 its possession, custody, and control from member institutions or

18 member conferences.  Member institutions and conferences are

19 independent entities and not within the control of the NCAA and

20 the NCAA does not have possession of or access to their

21 documents.  NCAA board and committee members do not have NCAA

22 email addresses for documents that would be responsive to this

23 Request.  The NCAA will not be collecting and producing documents

24 from outside the NCAA that are in the possession of persons

25 working for member institutions, conferences, or other outside

26 organizations who serve on NCAA boards or committees.

27     In response to this Request, the scope of the NCAA's

28 production will be as follows: the NCAA will produce

1  nonprivileged documents and communications, subject to the

2  application of agreed-upon search terms and custodians,

3  sufficient to show the athletics department revenue and expenses

4  for each Division I member institution during the time period

5  and, to the extent possible, this data broken down by sport that

6  are located through a reasonable search and diligent inquiry from

7  sources in the NCAA's custody, possession, and control.  As set

8  forth in Plaintiff's Instruction No. 1, the NCAA understands the

9  time period for this Request is May 29, 2018 to the present and

10  interprets that as the governing time period for the NCAA's

11  response.

12  **REQUEST FOR PRODUCTION NO. 29:**

13      Studies or research regarding the optimum number of coaches

14  for NCAA Division I baseball teams.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

16      The NCAA incorporates its Objections to Plaintiffs'

17  Definitions and Instructions as if fully set forth herein.  The

18  NCAA objects to this Request to the extent that it seeks

19  documents that are protected from disclosure by the attorney-

20  client privilege, the attorney work product doctrine, or any

21  other applicable privilege.  The NCAA further objects to this

22  Request to the extent that it seeks documents that are not

23  relevant to any claims or defenses.  The NCAA further objects to

24  this Request to the extent it calls for the NCAA to seek

25  documents outside of its possession, custody, and control from

26  member institutions or member conferences.  Member institutions

27  and conferences are independent entities and not within the

28  control of the NCAA and the NCAA does not have possession of or

access to their documents.  NCAA board and committee members do
not have NCAA email addresses for documents that would be
responsive to this Request.  The NCAA will not be collecting and
producing documents from outside the NCAA that are in the
possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians, that are
studies or research, if any exist, regarding the optimum number
of coaches for NCAA Division I teams that are located through a
reasonable search and diligent inquiry from sources in the NCAA's
custody, possession, and control.  As set forth in Plaintiff's
Instruction No. 1, the NCAA understands the time period for this
Request is May 29, 2018 to the present and interprets that as the
governing time period for the NCAA's response.

**REQUEST FOR PRODUCTION NO. 30:**

Studies or research regarding the optimum number of coaches
for NCAA Division II and III baseball teams.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any
other applicable privilege.  The NCAA further objects to this

1  Request to the extent that it seeks documents that are not

2  relevant to any claims or defenses.   This case involves the

3  former bylaws regarding volunteer coaches for NCAA Division I

4  sports and not coaches for NCAA Division II and Division II

5  teams.  The NCAA further objects to this Request to the extent it

6  calls for the NCAA to seek documents outside of its possession,

7  custody, and control from member institutions or member

8  conferences.  Member institutions and conferences are independent

9  entities and not within the control of the NCAA and the NCAA does

10 not have possession of or access to their documents.  NCAA board

11 and committee members do not have NCAA email addresses for

12 documents that would be responsive to this Request.  The NCAA

13 will not be collecting and producing documents from outside the

14 NCAA that are in the possession of persons working for member

15 institutions, conferences, or other outside organizations who

16 serve on NCAA boards or committees.

17     On the basis of the foregoing objections, the NCAA will not

18 search for or produce any documents in response to this Request,

19 but is willing to meet and confer with Plaintiffs regarding the

20 scope of this Request and whether it can be narrowed to documents

21 reasonably related to the allegations in the complaint.  The NCAA

22 did agree to produce studies, if any exist, for Division I

23 baseball which is the subject of Plaintiffs' allegations.  As set

24 forth in Plaintiff's Instruction No. 1, the NCAA understands the

25 time period for this Request is May 29, 2018 to the present and

26 interprets that as the governing time period for the NCAA's

27 response

28

1 **REQUEST FOR PRODUCTION NO. 31:**

2       Studies or research regarding the benefits to NCAA Division

3 I baseball teams of having Volunteer Coaches and/or Head or

4 Assistant Coaches.

5 **RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

6       The NCAA incorporates its Objections to Plaintiffs'

7 Definitions and Instructions as if fully set forth herein.  The

8 NCAA objects to this Request to the extent that it seeks

9 documents that are protected from disclosure by the attorney-

10 client privilege, the attorney work product doctrine, or any

11 other applicable privilege.  The NCAA further objects to this

12 Request to the extent it calls for the NCAA to seek documents

13 outside of its possession, custody, and control from member

14 institutions or member conferences.  Member institutions and

15 conferences are independent entities and not within the control

16 of the NCAA and the NCAA does not have possession of or access to

17 their documents.  NCAA board and committee members do not have

18 NCAA email addresses for documents that would be responsive to

19 this Request.  The NCAA will not be collecting and producing

20 documents from outside the NCAA that are in the possession of

21 persons working for member institutions, conferences, or other

22 outside organizations who serve on NCAA boards or committees.

23       In response to this Request, the scope of the NCAA's

24 production will be as follows: the NCAA will produce

25 nonprivileged documents and communications, subject to the

26 application of agreed-upon search terms and custodians, that are

27 studies or research, if any exist, regarding the optimum number

28 of coaches for NCAA Division I teams, to the extent such studies

or research regard the benefits to NCAA Division I baseball teams
of having Volunteer Coaches and/or Head or Assistant Coaches that
are located through a reasonable search and diligent inquiry from
sources in the NCAA's custody, possession, and control.  As set
forth in Plaintiff's Instruction No. 1, the NCAA understands the
time period for this Request is May 29, 2018 to the present and
interprets that as the governing time period for the NCAA's
response.

**REQUEST FOR PRODUCTION NO. 32**:

      Documents and Communications regarding the job duties of
Volunteer Coaches and/or Head or Assistant Coaches for NCAA
Division I baseball.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32**:

      The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein. The
NCAA objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any
other applicable privilege.  The NCAA objects to this Request to
the extent that it seeks documents that are not relevant to any
claims or defenses.  This case concerns the former bylaws
regarding volunteer coaches in NCAA Division I sports and not
Head or Assistant Coaches for NCAA Division I baseball.  It is
unclear how any such information about the job duties of head or
assistant coaches would be relevant to the claims and defenses in
this case.  The NCAA further objects to this Request on the
grounds that it is overbroad, unduly burdensome, and not
proportional to the needs of the case.  It is not clear how the

1  job duties of all head and assistant coaches for 300 plus

2  Division I baseball teams is relevant to the case and to try to

3  identify all such communications would be unduly burdensome and

4  disproportionate to the needs of the case.  The NCAA further

5  objects to this Request to the extent it calls for the NCAA to

6  seek documents outside of its possession, custody, and control

7  from member institutions or member conferences.  Member

8  institutions and conferences are independent entities and not

9  within the control of the NCAA and the NCAA does not have

10  possession of or access to their documents.  NCAA board and

11  committee members do not have NCAA email addresses for documents

12  that would be responsive to this Request.  The NCAA will not be

13  collecting and producing documents from outside the NCAA that are

14  in the possession of persons working for member institutions,

15  conferences, or other outside organizations who serve on NCAA

16  boards or committees.

17      In response to this Request, the scope of the NCAA's

18  production will be as follows: the NCAA will produce

19  nonprivileged documents and communications, subject to the

20  application of agreed-upon search terms and custodians,

21  referencing or describing the job duties of any specific

22  volunteer coach and volunteer coaches in Division I in general in

23  baseball, if any such documents exist, from the time period that

24  are located through a reasonable search and diligent inquiry from

25  sources in the NCAA's custody, possession, and control.  As set

26  forth in Plaintiff's Instruction No. 1, the NCAA understands the

27  time period for this Request is May 29, 2018 to the present and

28

1 | interprets that as the governing time period for the NCAA's

2 | response.

3 | **REQUEST FOR PRODUCTION NO. 33:**

4 |     Documents and Communications regarding the skill sets

5 | required of Volunteer Coaches and/or Head or Assistant Coaches

6 | for NCAA Division I baseball.

7 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

8 |     The NCAA incorporates its Objections to Plaintiffs'

9 | Definitions and Instructions as if fully set forth herein. The

10 | NCAA objects to this Request as vague and ambiguous as to the

11 | phrase "skill sets required."  The NCAA interprets that phrase to

12 | mean the job duties required.  The NCAA objects to this Request

13 | to the extent that it seeks documents that are protected from

14 | disclosure by the attorney-client privilege, the attorney work

15 | product doctrine, or any other applicable privilege.  The NCAA

16 | further objects to this Request to the extent that it seeks

17 | documents that are not relevant to any claims or defenses.  This

18 | case concerns the former bylaws regarding volunteer coaches in

19 | NCAA Division I sports and not Head or Assistant Coaches for NCAA

20 | Division I baseball.  It is unclear how any such information

21 | about the "skill sets required" of head or assistant coaches

22 | would be relevant to the claims and defenses in this case.  The

23 | NCAA further objects to this Request on the grounds that it is

24 | overbroad, unduly burdensome, and not proportional to the needs

25 | of the case.  It is not clear how the "skill sets required" of

26 | all head and assistant coaches for 300 plus Division I baseball

27 | teams is relevant to the case and to try to identify all such

28 | communications would be unduly burdensome and disproportionate to

the needs of the case.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences.  Member institutions and conferences are independent entities and not within the control of the NCAA and the NCAA does not have possession of or access to their documents.  NCAA board and committee members do not have NCAA email addresses for documents that would be responsive to this Request.  The NCAA will not be collecting and producing documents from outside the NCAA that are in the possession of persons working for member institutions, conferences, or other outside organizations who serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's production will be as follows: the NCAA will produce nonprivileged documents and communications, subject to the application of agreed-upon search terms and custodians, referencing or describing the job duties of any specific volunteer coach and volunteer coaches in Division I in general in baseball, if any such documents exist, from the time period that are located through a reasonable search and diligent inquiry from sources in the NCAA's custody, possession, and control.  As set forth in Plaintiff's Instruction No. 1, the NCAA understands the time period for this Request is May 29, 2018 to the present and interprets that as the governing time period for the NCAA's response.

**REQUEST FOR PRODUCTION NO. 34**:

Documents and Communications regarding the skills possessed by NCAA Division I baseball players compared to NCAA Division II and III baseball players.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34**:

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein. The NCAA objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege. The NCAA objects to this Request to the extent that it seeks documents that are not relevant to any claims or defenses. This case concerns the former bylaws regarding volunteer coaches in NCAA Division I sports and not players in NCAA Division I sports. The request is thus overbroad in seeking player-level information for Division I compared to Division II and III that is not relevant to the claims and defenses in this case. The NCAA further objects to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case. It is not clear how the "skills possessed" by NCAA Division I baseball players for all time would be relevant, much less how those players' skills compared to Division II and Division III players; indeed, such a broad request would be unduly burdensome and disproportionate to the needs of the case. The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences. Member institutions and conferences are

1  independent entities and not within the control of the NCAA and

2  the NCAA does not have possession of or access to their

3  documents.  NCAA board and committee members do not have NCAA

4  email addresses for documents that would be responsive to this

5  Request.  The NCAA will not be collecting and producing documents

6  from outside the NCAA that are in the possession of persons

7  working for member institutions, conferences, or other outside

8  organizations who serve on NCAA boards or committees.

9       On the basis of the foregoing objections, the NCAA will not

10  search for or produce any documents in response to this Request,

11  but is willing to meet and confer with Plaintiffs regarding the

12  scope of this Request and whether it can be narrowed to documents

13  reasonably related to the allegations in the complaint.  As set

14  forth in Plaintiff's Instruction No. 1, the NCAA understands the

15  time period for this Request is May 29, 2018 to the present and

16  interprets that as the governing time period for the NCAA's

17  response.

18  **REQUEST FOR PRODUCTION NO. 35:**

19       Documents and Communications regarding the skills possessed

20  by NCAA Division I baseball players compared to non-NCAA

21  collegiate athletic association baseball players.

22  **RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

23       The NCAA incorporates its Objections to Plaintiffs'

24  Definitions and Instructions as if fully set forth herein.  The

25  NCAA objects to this Request to the extent that it seeks

26  documents that are protected from disclosure by the attorney-

27  client privilege, the attorney work product doctrine, or any

28  other applicable privilege.  The NCAA further objects to this

1   Request to the extent that it seeks documents that are not
2   relevant to any claims or defenses.  This case concerns the
3   former bylaws regarding volunteer coaches in NCAA Division I
4   sports and not players in NCAA Division I sports. The request is
5   thus overbroad in seeking player-level information for Division I
6   compared to other non-NCAA baseball players that is not relevant
7   to the claims and defenses in this case.  The NCAA further
8   objects to this Request on the grounds that it is overbroad,
9   unduly burdensome, and not proportional to the needs of the case.
10  It is not clear how the "skills possessed" by NCAA Division I
11  baseball players for all time would be relevant, much less how
12  those players' skills compared to non-collegiate players; indeed,
13  such a broad request would be unduly burdensome and
14  disproportionate to the needs of the case.  The NCAA further
15  objects to this Request to the extent it calls for the NCAA to
16  seek documents outside of its possession, custody, and control
17  from member institutions or member conferences.  Member
18  institutions and conferences are independent entities and not
19  within the control of the NCAA and the NCAA does not have
20  possession of or access to their documents.  NCAA board and
21  committee members do not have NCAA email addresses for documents
22  that would be responsive to this Request.  The NCAA will not be
23  collecting and producing documents from outside the NCAA that are
24  in the possession of persons working for member institutions,
25  conferences, or other outside organizations who serve on NCAA
26  boards or committees.
27       On the basis of the foregoing objections, the NCAA will not
28  search for or produce any documents in response to this Request,

1   but is willing to meet and confer with Plaintiffs regarding the

2   scope of this Request and whether it can be narrowed to documents

3   reasonably related to the allegations in the complaint.  As set

4   forth in Plaintiff's Instruction No. 1, the NCAA understands the

5   time period for this Request is May 29, 2018 to the present and

6   interprets that as the governing time period for the NCAA's

7   response.

8   **REQUEST FOR PRODUCTION NO. 36:**

9        Documents and Communications regarding the skills possessed

10  by NCAA Division I baseball Volunteer Coaches and/or Head or

11  Assistant Coaches compared to NCAA Division II and

12  III baseball coaches.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

14       The NCAA incorporates its Objections to Plaintiffs'

15  Definitions and Instructions as if fully set forth herein.  The

16  NCAA objects to this Request to the extent that it seeks

17  documents that are protected from disclosure by the attorney-

18  client privilege, the attorney work product doctrine, or any

19  other applicable privilege.  The NCAA objects to this Request to

20  the extent that it seeks documents that are not relevant to any

21  claims or defenses.  This case concerns the former bylaws

22  regarding volunteer coaches in NCAA Division I sports and not

23  Division II and III.  The request is thus overbroad in seeking

24  coach-level information for Division I compared to other

25  divisions that is not relevant to the claims and defenses in this

26  case.  The NCAA further objects to this Request on the grounds

27  that it is overbroad, unduly burdensome, and not proportional to

28  the needs of the case.  It is not clear how the "skills

possessed" by NCAA Division I baseball volunteer, head, and
assistant coaches for all time would be relevant, much less how
those coaches' skills compared to Division II and III coaches;
indeed, such a broad request would be unduly burdensome and
disproportionate to the needs of the case.  The NCAA further
objects to this Request to the extent it calls for the NCAA to
seek documents outside of its possession, custody, and control
from member institutions or member conferences.  Member
institutions and conferences are independent entities and not
within the control of the NCAA and the NCAA does not have
possession of or access to their documents.  NCAA board and
committee members do not have NCAA email addresses for documents
that would be responsive to this Request.  The NCAA will not be
collecting and producing documents from outside the NCAA that are
in the possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

On the basis of the foregoing objections, the NCAA will not
search for or produce any documents in response to this Request,
but is willing to meet and confer with Plaintiffs regarding the
scope of this Request and whether it can be narrowed to documents
reasonably related to the allegations in the complaint.  The NCAA
notes that it is producing all documents referencing or
describing the job duties of any specific Division I volunteer
coach and volunteer coaches in general in baseball, if any such
documents exist, from the time period.  As set forth in
Plaintiff's Instruction No. 1, the NCAA understands the time
period for this Request is May 29, 2018 to the present and

1  interprets that as the governing time period for the NCAA's

2  response.

3  **REQUEST FOR PRODUCTION NO. 37:**

4       Documents and Communications regarding the skills possessed

5  by NCAA Division I baseball Volunteer Coaches and/or Head or

6  Assistant Coaches compared to non-NCAA collegiate

7  athletic association baseball coaches.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

9       The NCAA incorporates its Objections to Plaintiffs'

10  Definitions and Instructions as if fully set forth herein.  The

11  NCAA objects to this Request to the extent that it seeks

12  documents that are protected from disclosure by the attorney-

13  client privilege, the attorney work product doctrine, or any

14  other applicable privilege.   The NCAA further objects to this

15  Request to the extent that it seeks documents that are not

16  relevant to any claims or defenses.  This case concerns the

17  former bylaws regarding volunteer coaches in NCAA Division I

18  sports and not non-NCAA collegiate coaches. The request is thus

19  overbroad in seeking coach-level information for Division I

20  compared to other non-NCAA schools that is not relevant to the

21  claims and defenses in this case.  The NCAA further objects to

22  this Request on the grounds that it is overbroad, unduly

23  burdensome, and not proportional to the needs of the case.  It is

24  not clear how the "skills possessed" by NCAA Division I baseball

25  volunteer, head, and assistant coaches for all time would be

26  relevant, much less how those coaches' skills compared to non-

27  NCAA coaches; indeed, such a broad request would be unduly

28  burdensome and disproportionate to the needs of the case.  The

1   NCAA further objects to this Request to the extent it calls for

2   the NCAA to seek documents outside of its possession, custody,

3   and control from member institutions or member conferences.

4   Member institutions and conferences are independent entities and

5   not within the control of the NCAA and the NCAA does not have

6   possession of or access to their documents.  NCAA board and

7   committee members do not have NCAA email addresses for documents

8   that would be responsive to this Request.  The NCAA will not be

9   collecting and producing documents from outside the NCAA that are

10  in the possession of persons working for member institutions,

11  conferences, or other outside organizations who serve on NCAA

12  boards or committees.

13       On the basis of the foregoing objections, the NCAA will not

14  search for or produce any documents in response to this Request,

15  but is willing to meet and confer with Plaintiffs regarding the

16  scope of this Request and whether it can be narrowed to documents

17  reasonably related to the allegations in the complaint. The NCAA

18  notes that it is producing all documents referencing or

19  describing the job duties of any specific Division I volunteer

20  coach and volunteer coaches in general in baseball, if any such

21  documents exist, from the time period.  As set forth in

22  Plaintiff's Instruction No. 1, the NCAA understands the time

23  period for this Request is May 29, 2018 to the present and

24  interprets that as the governing time period for the NCAA's

25  response.

26  **REQUEST FOR PRODUCTION NO. 38:**

27       Documents and Communications regarding whether NCAA

28  Division I baseball Volunteer Coaches served as Graduate

1  Assistant baseball coaches before being hired as Volunteer

2  Coaches.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

4        The NCAA incorporates its Objections to Plaintiffs'

5  Definitions and Instructions as if fully set forth herein.  The

6  NCAA further objects to this Request to the extent that it seeks

7  documents that are not relevant to any claims or defenses.  This

8  case concerns the former bylaws regarding volunteer coaches in

9  NCAA Division I sports and not graduate assistant coach bylaws.

10  The request is thus overbroad in seeking information about

11  graduate assistant baseball coaches not relevant to the claims

12  and defenses in this case.  The NCAA further objects to this

13  Request on the grounds that it is overbroad, unduly burdensome,

14  and not proportional to the needs of the case.  Moreover, it is

15  not clear how the role of any volunteer coaches as prior graduate

16  assistant baseball coaches has no connection to the case; indeed,

17  such a broad request would be unduly burdensome and

18  disproportionate to the needs of the case.  The NCAA further

19  objects to this Request to the extent it calls for the NCAA to

20  seek documents outside of its possession, custody, and control

21  from member institutions or member conferences.  Member

22  institutions and conferences are independent entities and not

23  within the control of the NCAA and the NCAA does not have

24  possession of or access to their documents.  NCAA board and

25  committee members do not have NCAA email addresses for documents

26  that would be responsive to this Request.  The NCAA will not be

27  collecting and producing documents from outside the NCAA that are

28  in the possession of persons working for member institutions,

1  conferences, or other outside organizations who serve on NCAA

2  boards or committees.

3       The NCAA has done a reasonable search and inquiry and is not

4  aware of any documents or communications that exist sufficient to

5  identify all current or former Volunteer Coaches in baseball for

6  NCAA Division I schools for the time period May 29, 2018 to the

7  present, let alone Documents and Communications regarding whether

8  NCAA Division I baseball Volunteer Coaches served as Graduate

9  Assistant baseball coaches before being hired as Volunteer

10 Coaches.  As set forth in Plaintiff's Instruction No. 1, the NCAA

11 understands the time period for this Request is May 29, 2018 to

12 the present and interprets that as the governing time period for

13 the NCAA's response.

14 **REQUEST FOR PRODUCTION NO. 39:**

15      Documents sufficient to show all of the NCAA's

16 governing/advisory boards and committees, including their

17 membership, during the relevant period.

18 **RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

19      The NCAA incorporates its Objections to Plaintiffs'

20 Definitions and Instructions as if fully set forth herein. The

21 NCAA further objects to this Request to the extent that it seeks

22 documents that are not relevant to any claims or defenses.  The

23 NCAA has many committees covering many topics that are unrelated

24 to volunteer coaches in baseball and the lists of those committee

25 members would have no connection to or bearing on this

26 litigation.  Relatedly, the NCAA further objects to this Request

27 on the grounds that it is overbroad, unduly burdensome, and not

28 proportional to the needs of the case.  The NCAA will narrow this

69

1  request to the committees related to the ByLaw and its repeal,

2  its Board, and the Division I Council.  These were the same

3  groups for which the NCAA produced documents in venue-related

4  discovery in the Eastern District of California case (Case No.

5  2:22-cv-02125).

6      In response to this Request, the scope of the NCAA's

7  production will be as follows: the NCAA will produce

8  nonprivileged documents and communications, subject to the

9  application of agreed-upon search terms and custodians,

10 sufficient to identify the members of certain NCAA committees

11 (the Transformation Committee, the Modernization Committee, and

12 the Legislative Committee), the NCAA Board, and the NCAA Division

13 I Council from May 29, 2018 to the present.  As set forth in

14 Plaintiff's Instruction No. 1, the NCAA understands the time

15 period for this Request is May 29, 2018 to the present and

16 interprets that as the governing time period for the NCAA's

17 response.

18 **REQUEST FOR PRODUCTION NO. 40:**

19     From the time period of six months preceding the passage of

20 NCAA Bylaw 11.01.6 or 11.7.6.2.3 (or any substantially similar

21 predecessors) to the present, any minutes, agendas, notes, or

22 other Documents from meetings held by the NCAA's

23 governing/advisory boards and committees regarding NCAA Bylaw

24 11.01.6 or 11.7.6.2.3 (or any substantially similar

25 predecessors).

26 **RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

27     The NCAA incorporates its Objections to Plaintiffs'

28 Definitions and Instructions as if fully set forth herein.  The

NCAA objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any
other applicable privilege.  The NCAA objects to the phrase
"substantially similar predecessors" as vague and ambiguous.  The
NCAA further objects to this Request to the extent that it seeks
documents that are not relevant to any claims or defenses.  The
NCAA further objects to this Request to the extent it calls for
the NCAA to seek documents outside of its possession, custody,
and control from member institutions or member conferences.
Member institutions and conferences are independent entities and
not within the control of the NCAA and the NCAA does not have
possession of or access to their documents.  NCAA board and
committee members do not have NCAA email addresses for documents
that would be responsive to this Request.  The NCAA will not be
collecting and producing documents from outside the NCAA that are
in the possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

     In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians, if any
exist, (a) referencing or discussing the drafting and enactment
of 11.01.6 and 11.7.6.2.3; (b) referencing or discussing any
efforts to amend, modify, or repeal 11.01.6 and 11.7.6.2.3;
and/or (c) that are drafts or versions of 11.01.6 and 11.7.6.2.3
that are located through a reasonable search and diligent inquiry

1  from sources in the NCAA's custody for the time period of the six

2  months before through the six months after (a) the enactment of

3  the bylaw limiting the number of assistant coaches and (b) each

4  subsequent effort to amend or repeal that bylaw.

5  **REQUEST FOR PRODUCTION NO. 41:**

6      Any Documents and Communications in the possession of

7  members of governing/advisory boards or committees regarding NCAA

8  Bylaw 11.01.6 or 11.7.6.2.3 (or any substantially similar

9  predecessors).

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

11      The NCAA incorporates its Objections to Plaintiffs'

12  Definitions and Instructions as if fully set forth herein. The

13  NCAA objects to this Request to the extent that it seeks

14  documents that are protected from disclosure by the attorney-

15  client privilege, the attorney work product doctrine, or any

16  other applicable privilege.  The NCAA objects to the phrase

17  "substantially similar predecessors" as vague and ambiguous.  The

18  NCAA further objects to this Request to the extent that it seeks

19  documents that are not relevant to any claims or defenses. The

20  NCAA further objects to this Request as overbroad and unduly

21  burdensome in that it seeks documents related to all NCAA boards

22  and committees, most of which would have no connection to the

23  issues in this case.  The NCAA further objects to this Request to

24  the extent it calls for the NCAA to seek documents outside of its

25  possession, custody, and control from member institutions or

26  member conferences.  Member institutions and conferences are

27  independent entities and not within the control of the NCAA and

28  the NCAA does not have possession of or access to their

documents.  NCAA board and committee members do not have NCAA
email addresses for documents that would be responsive to this
Request.  The NCAA will not be collecting and producing documents
from outside the NCAA that are in the possession of persons
working for member institutions, conferences, or other outside
organizations who serve on NCAA boards or committees.  The NCAA
will not produce documents in the possession of members of boards
or committees who are not NCAA employees and whose documents are
outside of the possession, custody, and control of the NCAA.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce
nonprivileged documents and communications, subject to the
application of agreed-upon search terms and custodians, if any
exist, (a) referencing or discussing the drafting and enactment
of 11.01.6 and 11.7.6.2.3; (b) referencing or discussing any
efforts to amend, modify, or repeal 11.01.6 and 11.7.6.2.3;
and/or (c) that are drafts or versions of 11.01.6 and 11.7.6.2.3.
As set forth in Plaintiff's Instruction No. 1, the NCAA
understands the time period for this Request is May 29, 2018 to
the present and interprets that as the governing time period for
the NCAA's response.

**REQUEST FOR PRODUCTION NO. 42:**

Any Documents relating to any actual or potential
interpretation or enforcement of the Volunteer Coach position.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request to the extent that it seeks

1   documents that are protected from disclosure by the attorney-
2   client privilege, the attorney work product doctrine, or any
3   other applicable privilege.  The NCAA objects to the phrase
4   "potential interpretation or enforcement" as vague and ambiguous.
5   The NCAA further objects to the use of "relating to" as vague,
6   ambiguous, and overbroad.  That language could refer to a
7   sweeping array of conduct that is undefined and unrelated to this
8   case.  The NCAA will interpret "related to" as referring to or
9   about the defined topics.  The NCAA further objects to this
10  Request to the extent that it seeks documents that are not
11  relevant to any claims or defenses.  The NCAA further objects to
12  this Request on the grounds that it is overbroad, unduly
13  burdensome, and not proportional to the needs of the case.
14  Moreover, it is not clear how the interpretation or enforcement
15  of the volunteer coach position has any connection to the case;
16  indeed, such a broad request would be unduly burdensome and
17  disproportionate to the needs of the case.  The NCAA further
18  objects to this Request to the extent it calls for the NCAA to
19  seek documents outside of its possession, custody, and control
20  from member institutions or member conferences.  Member
21  institutions and conferences are independent entities and not
22  within the control of the NCAA and the NCAA does not have
23  possession of or access to their documents.  NCAA board and
24  committee members do not have NCAA email addresses for documents
25  that would be responsive to this Request.  The NCAA will not be
26  collecting and producing documents from outside the NCAA that are
27  in the possession of persons working for member institutions,
28

1  conferences, or other outside organizations who serve on NCAA

2  boards or committees.

3      In response to this Request, the scope of the NCAA's

4  production will be as follows: the NCAA will produce

5  nonprivileged documents and communications, subject to the

6  application of agreed-upon search terms and custodians, if any

7  exist, (a) relating to any actual or potential interpretation or

8  enforcement of 11.01.6 or 11.7.6.2.3 generally or in a specific

9  case from May 29, 2018 to the present or (b) relating to

10  compliance with 11.01.6 or 11.7.6.2.3 (and the repeal) with

11  respect to current volunteer coaches or coaches formerly

12  designated as volunteer coaches, if any exist, including but not

13  limited to communications relating to the effect of the voluntary

14  coach bylaws that are located through a reasonable search and

15  diligent inquiry from sources in the NCAA's custody.   As set

16  forth in Plaintiff's Instruction No. 1, the NCAA understands the

17  time period for this Request is May 29, 2018 to the present and

18  interprets that as the governing time period for the NCAA's

19  response.

20  **REQUEST FOR PRODUCTION NO. 43:**

21      Any Documents relevant to or which you claim support any

22  relevant market you intend to assert in this case.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

24      The NCAA incorporates its Objections to Plaintiffs'

25  Definitions and Instructions as if fully set forth herein.   The

26  NCAA objects to this Request to the extent that it seeks

27  documents that are protected from disclosure by the attorney-

28  client privilege, the attorney work product doctrine, or any

1  other applicable privilege.  The NCAA objects to this Request as

2  calling for a legal conclusion.  The NCAA further objects to this

3  Request because it is vague and ambiguous as to what Documents

4  the Plaintiffs believe the NCAA is "claim[ing] support" a

5  relevant market.  The NCAA further objects to this Request to the

6  extent it calls for the NCAA to seek documents outside of its

7  possession, custody, and control from member institutions or

8  member conferences.  Member institutions and conferences are

9  independent entities and not within the control of the NCAA and

10 the NCAA does not have possession of or access to their

11 documents.  NCAA board and committee members do not have NCAA

12 email addresses for documents that would be responsive to this

13 Request.  The NCAA will not be collecting and producing documents

14 from outside the NCAA that are in the possession of persons

15 working for member institutions, conferences, or other outside

16 organizations who serve on NCAA boards or committees.

17      On the basis of the foregoing objections, the NCAA will not

18 search for or produce any documents in response to this Request,

19 but is willing to meet and confer with Plaintiffs regarding the

20 scope of this Request and whether it can be narrowed to documents

21 reasonably related to the allegations in the complaint.  As set

22 forth in Plaintiff's Instruction No. 1, the NCAA understands the

23 time period for this Request is May 29, 2018 to the present and

24 interprets that as the governing time period for the NCAA's

25 response.

26

27

28

1   **REQUEST FOR PRODUCTION NO. 44**:

2      All exhibits and any other evidence, demonstrative or

3   otherwise, to be used in support of any motion, in opposition to

4   any motion, or at any hearing or trial in this case.

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 44**:

6      The NCAA incorporates its Objections to Plaintiffs'

7   Definitions and Instructions as if fully set forth herein.  The

8   NCAA objects to this Request to the extent that it seeks

9   documents that are protected from disclosure by the attorney-

10   client privilege, the attorney work product doctrine, or any

11   other applicable privilege.  The NCAA further objects to this

12   Request as premature and at this point, calling for attorney work

13   product about documents that may or may not be used in support of

14   a motion, an opposition brief, or at a hearing or at trial.  The

15   NCAA objects to this Request to the extent it seeks the exchange

16   of information otherwise governed by the Court's standing order,

17   local rules, and/or the Federal Rules of Civil Procedure.  The

18   NCAA further objects to this Request to the extent it calls for

19   the NCAA to seek documents outside of its possession, custody,

20   and control from member institutions or member conferences.

21   Member institutions and conferences are independent entities and

22   not within the control of the NCAA and the NCAA does not have

23   possession of or access to their documents.  NCAA board and

24   committee members do not have NCAA email addresses for documents

25   that would be responsive to this Request.  The NCAA will not be

26   collecting and producing documents from outside the NCAA that are

27   in the possession of persons working for member institutions,

28

1  conferences, or other outside organizations who serve on NCAA

2  boards or committees.

3      In response to this Request, the scope of the NCAA's

4  production will be as follows: the NCAA will produce

5  nonprivileged documents and communications, subject to the

6  application of agreed-upon search terms and custodians, of any

7  final exhibits and any other evidence, final demonstrative or

8  otherwise, to be used in support of any motion, in opposition to

9  any motion, or at any hearing or trial in this case that are

10  located through a reasonable search and diligent inquiry from

11  sources in the NCAA's custody. These items, if not otherwise

12  covered by the many categories the NCAA is agreeing to produce in

13  response to other Requests, will be produced when the motions are

14  submitted and/or according to pre-hearing and pre-trial

15  disclosure requirements for demonstratives and otherwise.  As set

16  forth in Plaintiff's Instruction No. 1, the NCAA understands the

17  time period for this Request is May 29, 2018 to the present and

18  interprets that as the governing time period for the NCAA's

19  response.

20  **REQUEST FOR PRODUCTION NO. 45:**

21      All documents, including but not limited to treatises,

22  publications, texts, standards, regulations, etc., that you

23  contemplate using or intend to use in support of or opposition to

24  any motion in this case, or at the class certification hearing,

25  any other hearing, or at trial.

26  **RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

27      The NCAA incorporates its Objections to Plaintiffs'

28  Definitions and Instructions as if fully set forth herein.  The

NCAA objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any
other applicable privilege.  The Request appears to seek
information that counsel is "contemplating" using to support any
opposition to a motion in this case.  Such a request is plainly
improper and calls for attorney work product.  The NCAA will not
produce privileged or work product information.  The NCAA objects
to this Request as premature.  The NCAA further objects to this
Request to the extent it calls for the NCAA to seek documents
outside of its possession, custody, and control from member
institutions or member conferences.  Member institutions and
conferences are independent entities and not within the control
of the NCAA and the NCAA does not have possession of or access to
their documents.  NCAA board and committee members do not have
NCAA email addresses for documents that would be responsive to
this Request.  The NCAA will not be collecting and producing
documents from outside the NCAA that are in the possession of
persons working for member institutions, conferences, or other
outside organizations who serve on NCAA boards or committees.

On the basis of the foregoing objections, the NCAA will not
search for or produce any documents in response to this Request,
including but not limited to treatises, publications, texts,
standards, regulations, etc., that it contemplates using or
intends to use in support of or opposition to any future
undefined motion in this case, or at the future class
certification hearing, any other hearing, or at trial.  As set
forth in Plaintiff's Instruction No. 1, the NCAA understands the

1  time period for this Request is May 29, 2018 to the present and

2  interprets that as the governing time period for the NCAA's

3  response.

4  **REQUEST FOR PRODUCTION NO. 46:**

5      All documents identified in your answers to, or utilized in

6  answering, any set of interrogatories that Plaintiffs serve on

7  NCAA.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

9      The NCAA incorporates its Objections to Plaintiffs'

10 Definitions and Instructions as if fully set forth herein.  The

11 NCAA objects to this Request to the extent that it seeks

12 documents that are protected from disclosure by the attorney-

13 client privilege, the attorney work product doctrine, or any

14 other applicable privilege. The Request seeks information

15 "utilized in" answering any set of future interrogatories.  To

16 the extent the documents utilized are utilized by counsel, this

17 Request seeks attorney work product which the NCAA will not

18 disclose.  The NCAA objects to this Request as premature.  The

19 NCAA further objects to this Request to the extent it calls for

20 the NCAA to seek documents outside of its possession, custody,

21 and control from member institutions or member conferences.

22 Member institutions and conferences are independent entities and

23 not within the control of the NCAA and the NCAA does not have

24 possession of or access to their documents.  NCAA board and

25 committee members do not have NCAA email addresses for documents

26 that would be responsive to this Request.  The NCAA will not be

27 collecting and producing documents from outside the NCAA that are

28 in the possession of persons working for member institutions,

1  conferences, or other outside organizations who serve on NCAA

2  boards or committees.

3      Subject to the foregoing objections, the NCAA will produce

4  nonprivileged documents, if any exist, identified in the NCAA's

5  answers to interrogatories that Plaintiffs serve on NCAA. As set

6  forth in Plaintiff's Instruction No. 1, the NCAA understands the

7  time period for this Request is May 29, 2018 to the present and

8  interprets that as the governing time period for the NCAA's

9  response.

10  DATED:  September 15, 2023   MUNGER, TOLLES & OLSON LLP

11

12                              By:   /s/CAROLYN HOECKER LUEDTKE

13                                    CAROLYN HOECKER LUEDTKE
                                      Attorney for Defendant
14                                    NCAA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

**Smart v. NCAA**
**Case No. 2:22-cv-02125 WBS KJN**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action.**  I am employed in the County of Los Angeles, State of California.  My business address is 350 South Grand Avenue 50th Floor, Los Angeles, CA 90071-3426.

On September 15, 2023, I served true copies of the following DOCUMENT(s) described as **DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT NCAA** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address Denise.Olguin@mto.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 15, 2023, at Los Angeles, California.


*/s/Denise Olguin*
Denise Olguin

82

**SERVICE LIST**

**Smart v. NCAA**
**Case No. 2:22-cv-02125 WBS KJN**

STEPHEN M. TILLERY                    *Attorneys for Plaintiffs Taylor*
*(pro hac vice)*                       *Smart and Michael Hacker,*
stillery@koreintillery.com            *Individually and on Behalf of*
STEVEN M. BEREZNEY                    *All Those Similarly Situated*
(Bar No. 329923)
sberezney@koreintillery.com
GARRETT R. BROSHUIS
(Bar No. 329924)
gbroshuis@koreintillery.com
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525


CAROLYN H. LUEDTKE                    *Attorneys for Defendant NCAA*
(State Bar No. 207976)
carolyn.luedtke@mto.com
JUSTIN P. RAPHAEL
(State Bar No. 292380)
Justin.Raphael@mto.com
CHRISTOPHER CRUZ
(State Bar No. 346128)
Christopher.Cruz@mto.com
JAVIER KORDI
(State Bar No. 348358)
Javier.Kordi@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

# EXHIBIT K

to the Declaration of Michael Lieberman

1   CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
    Carolyn.Luedtke@mto.com
2   JUSTIN P. RAPHAEL (State Bar No. 292380)
    Justin.Raphael@mto.com
3   CHRISTOPHER CRUZ (State Bar No. 346128)
    Christopher.Cruz@mto.com
4   JAVIER KORDI (State Bar No. 348358)
    Javier.Kordi@mto.com
5   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, Twenty-Seventh Floor
6   San Francisco, California 94105-2907
    Telephone:(415) 512-4000
7   Facsimile:(415) 512-4077

8   Attorneys for *Defendant National*
    *Collegiate Athletic Association*

9

10                UNITED STATES DISTRICT COURT

11              EASTERN DISTRICT OF CALIFORNIA

12

13   JOSEPH COLON, SHANNON RAY,      Case No. 1:23-cv-00425-WBS-KJN
    KHALA TAYLOR, PETER ROBINSON,
14   KATHERINE SEBBANE, and PATRICK    Hon. William B. Shubb
    MEHLERT, Individually and on      Assigned to Hon. Judge Kendall
15   Behalf of All Those Similarly     J. Newman for Non-Dispositive
    Situated,                      Issues
16
           Plaintiffs,           **DEFENDANT'S RESPONSE TO**
17                        **PLAINTIFFS' FIRST SET OF**
        vs.                      **REQUESTS FOR PRODUCTION TO**
18                        **DEFENDANT**
    NATIONAL COLLEGIATE ATHLETIC
19   ASSOCIATION, an unincorporated
    association,
20
           Defendants.
21

22

23

24

25

26

27

28

1
2

**DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST
SET OF REQUESTS FOR PRODUCTION TO DEFENDANT**

3      Pursuant to Rule 34 of the Federal Rules of Civil Procedure,
4   Defendant the National Collegiate Athletic Association ("NCAA") by
5   and through undersigned counsel, submits the following responses
6   and objections to Plaintiffs' First Requests for Production of
7   Documents to Defendant NCAA.  The NCAA responds to these Requests
8   to the best of its knowledge at the present time and reserves the
9   right at any time to supplement, amend, correct, or clarify its
10  responses and objections, but undertakes no obligation to do so
11  beyond the obligations imposed by the Federal Rules of Civil
12  Procedure, the Local Rules of this Court, and other applicable
13  orders or rules.  That the NCAA has objected or responded to a
14  Request for Production ("Request") is not and should not be taken
15  as an admission that the NCAA accepts or admits the existence of
16  any fact set forth in or assumed by the Request, or as indication
17  that the NCAA agrees with or adopts any characterization or
18  statement within such Request.

19      **OBJECTIONS TO PLAINTIFFS' DEFINITIONS AND INSTRUCTIONS**

20      1.   The NCAA objects to the definition of "Communications"
21  on the grounds that it is overbroad, unduly burdensome, and not
22  proportional to the needs of the case.  As defined, the definition
23  potentially calls for the production of communications not kept by
24  the NCAA in the ordinary course of business, by requesting "any
25  other type of communication".  The NCAA further objects to the
26  definition as overbroad, unduly burdensome, and not proportional
27  to the needs of the case insofar as it asks for communications "in
28  the form of facts, ideas, opinions, thoughts, inquiries or

otherwise".  The NCAA further objects to this definition to the
extent that it imposes obligations beyond those required by the
Federal Rules of Civil Procedure or any orders of this Court.  The
NCAA will construe "Communications" to refer to records of
correspondence kept in the ordinary course of business that can be
located after a reasonable search.

2.   The NCAA objects to the definition of "Division I
Member" insofar as the definition incorporates the Plaintiffs'
proposed definition of "Relevant Period" and "Relevant Sports",
which the NCAA objects to below.  The NCAA further objects that
the definition is overbroad, unduly burdensome, and not
proportional to the needs of the case to the extent that it would
require the NCAA to respond on behalf of persons or entities other
than the NCAA itself or its employees.  The NCAA further objects
to the extent it seeks information outside the NCAA's possession,
custody, and control.  For example, as explained by the NCAA to
counsel, for the most part individuals employed by member
institutions who sit on NCAA boards and committees do not have
documents within the possession, custody, and control of the NCAA.
If those individuals employed by member institutions do not have
NCAA email addresses, which is rare, the NCAA will not be
collecting or reviewing documents for them as it does not have
access to or possession of those documents.

3.   The NCAA objects to the definition of "Division I
Conference" and "conference" insofar as the definition
incorporates the Plaintiffs' proposed definition of "Relevant
Period" and "Relevant Sports", which the NCAA objects to below.
The NCAA further objects that the definition is overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent that it would require the NCAA to respond on behalf of persons or entities other than the NCAA itself or its employees. The NCAA further objects to the extent it seeks information outside the NCAA's possession, custody, and control. For example, as explained by the NCAA to counsel, for the most part individuals employed by member institutions who sit on NCAA boards and committees do not have documents within the possession, custody, and control of the NCAA. If those individuals employed by member institutions do not have NCAA email addresses, which is rare, the NCAA will not be collecting or reviewing documents for them as it does not have access to or possession of those documents.

4.    The NCAA objects to the definition of "Document" and "Documents" on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case. The definition, as drafted, encompasses (1) every physical document and every piece of data ever created or maintained; (2) all documents and data when a subset of documents or data will suffice to respond to the scope of the request for production at issue; (3) documents and data sources that are not reasonably accessible because of undue burden or cost. The NCAA further objects to this definition to the extent that it demands the creation of documents not currently in existence rather than the production of presently existing documents, or demands the production of documents not in the NCAA's possession, custody, or control. The NCAA further objects to this definition as vague and ambiguous. Pursuant to Rule 34(2)(D) of the Federal Rules of Civil Procedure, the NCAA further objects to this definition to the extent that it calls for

the production of Electronically Stored Information ("ESI") in any particular format; the NCAA will produce in reasonably useable format which will be memorialized in a stipulated order establishing a protocol for the production of documents and ESI. The NCAA will construe "document" and "documents" consistently with the definition of the term provided in Rule 34(a)(1)(A) and with the parties' forthcoming ESI Protocol.

5.   The NCAA objects to the definition of "Employ" or "Employed" as overbroad, unduly burdensome, and not proportional to the needs of the case. The NCAA further objects to the definition of "Employ" or "Employed" as vague and ambiguous and to the extent "provided coaching services" is an unclear term. The NCAA further objects to the definition to the extent Plaintiffs fail to define the term "volunteer".

6.   The NCAA objects to the definition of "Identify" on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case.

7.   The NCAA objects to the definition of "NCAA" on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it would require the NCAA to respond on behalf of persons or entities other than the NCAA itself or its employees.  The NCAA further objects to the extent it seeks information outside the NCAA's possession, custody, and control.  For example, as explained by the NCAA to counsel, for the most part individuals employed by member institutions who sit on NCAA boards and committees do not have documents within the possession, custody, and control of the NCAA. If those individuals employed by member institutions do not have

1  NCAA email addresses, which is rare, the NCAA will not be

2  collecting or reviewing documents for them as it does not have

3  access to or possession of those documents.  The NCAA will

4  construe "NCAA" to be referring to the NCAA and its employees.

5      8.   The NCAA objects to the definition of "Volunteer Coach

6  Rule" ("the VCR") on the grounds that it is overbroad, unduly

7  burdensome, and not proportional to the needs of the case.  The

8  NCAA will interpret "the NCAA Manual" to refer to the 2022-2023

9  NCAA Division I Manual.  The NCAA will interpret the "Volunteer

10 Coach Rule" to refer to 11.01.6 and 11.7.6.2.3.

11     9.   The NCAA objects to the definition of "Relevant Sports"

12 insofar as the definition seeks to incorporate the Plaintiffs'

13 proposed definition of "the VCR" and "the relevant period". As

14 noted above and below, the NCAA objects to the Plaintiff's

15 proposed definitions.

16     10.  The NCAA objects to the definition of "relate to" and

17 "relating to" as vague and ambiguous.  The NCAA also objects to

18 the definition to the extent that it calls for and would require

19 the NCAA to speculate or draw a legal conclusion.  The NCAA also

20 objects to the definition on the grounds that it is overbroad,

21 unduly burdensome, and not proportional to the needs of the case

22 to the extent that it calls for the production of documents only

23 tangentially related to the subject matter of the request (for

24 instance, the request would call for the production of documents

25 that only "mention[]" the subject matter).  The NCAA will construe

26 "relate" and "relating to," as "directly referencing".

27     11.  The NCAA objects to the definition of "Volunteer Coach"

28 as vague and ambiguous to the extent "rendered coaching services"

is an unclear term. The NCAA further objects to the definition
insofar as it seeks to incorporate the Plaintiffs' proposed
definitions for "relevant sport" and "relevant period". As noted
above and below, the NCAA objects to Plaintiffs' proposed
definitions.

12.   The NCAA objects to Instruction No. 1 on the grounds
that that is overbroad, unduly burdensome, and not proportional to
the needs of the case when it defines the "relevant period" as
January 1, 2017 to the present without any explanation or basis.
In alignment with its productions in the related case of *Smart v.
NCAA* (Case No. 2:22-cv-02125) and the *Smart* plaintiffs' definition
of the relevant period, the NCAA will interpret the relevant
period to be May 29, 2018 to the present unless otherwise noted.
The NCAA further objects to Instruction No. 1 on the grounds that
it requests information "without reference to time".  The NCAA
further objects to the Request because it is overbroad, unduly
burdensome, and not proportional to the needs of the case in
seeking information "without reference to time" since this seeks
documents from a time period that exceeds thirty years.  It is not
reasonable for the NCAA to search for documents for such a broad
time period.  The NCAA will note its interpretation of the
appropriate time period in its response to each request.  The NCAA
further objects to the extent that it seeks to impose obligations
inconsistent with the Federal Rules of Civil Procedure and any
orders of this Court, including the request that the NCAA
supplement its responses through the date of hearing or trial.

13.   The NCAA objects to Instruction No. 2 on the grounds
that it is overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent it calls for the production of all documents without limiting the scope of custodians.  The NCAA further objects to this definition as vague and ambiguous to the extent that "or those in effect, or those which otherwise came into existence" are unclear terms to describe the documents requested.

14.  The NCAA objects to Instruction No. 3 on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it would require the NCAA to respond on behalf of persons or entities other than the NCAA itself or its employees.  The NCAA further objects to the extent it seeks information outside the NCAA's possession, custody, and control from NCAA member institutions.  For example, as explained by the NCAA to counsel, for the most part individuals employed by member institutions who sit on NCAA boards and committees do not have documents within the possession, custody, and control of the NCAA.  If those individuals employed by member institutions do not have NCAA email addresses, which is rare, the NCAA will not be collecting or reviewing documents for them as it does not have access to or possession of those documents.  The NCAA will respond only on behalf of the NCAA and its employees.  The NCAA also objects that the request is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it would require the NCAA to search the archives, books, records, papers, and computers of persons or entities other than the NCAA itself or its employees.

15.  The NCAA objects to Instruction No. 4 on the grounds that it is overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent that it demands the creation of documents not currently in existence rather than the production of presently existing documents.  The NCAA further objects to this instruction to the extent that it imposes obligations not consistent with the Federal Rules of Civil Procedure or any orders of this Court.

16.  The NCAA objects to Instruction No. 5 it imposes obligations not consistent with the Federal Rules of Civil Procedure or any orders of this Court and because it unilaterally dictates how the parties will handle the production of ESI and demands that all documents will be produced in native format.  The NCAA will produce ESI in the format specified in the parties' forthcoming ESI Protocol.

17.  The NCAA objects to Instruction No. 6 on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it would require the NCAA to respond on behalf of persons or entities other than the NCAA itself or its employees, such as persons or entities outside the NCAA's possession, custody, and control, and to detail the actions of those persons or entities.  The NCAA further objects to these instructions to the extent that they impose obligations not consistent with the Federal Rules of Civil Procedure or any orders of this Court.

18.  The NCAA objects to Instruction No. 7 to the extent that it imposes obligations not consistent with the Federal Rules of Civil Procedure or any orders of this Court. The parties will work together to agree upon a protocol for privilege logs.

1   19.   The NCAA objects to Instruction No. 8 to the extent that

2  it imposes obligations not consistent with the Federal Rules of

3  Civil Procedure or any orders of this Court.

4   20.   The NCAA objects to Instruction No. 9 to the extent that

5  it imposes obligations not consistent with the Federal Rules of

6  Civil Procedure or any orders of this Court.

7   **OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

8  **REQUEST FOR PRODUCTION NO. 1:**

9   Without reference to time, all documents and communications

10  relating to the enactment of the VCR, including but not limited

11  to:

12   a. Prior unenacted drafts of the VCR;

13   b. Documents commenting upon, considering, analyzing or

14  discussing the rule in any way including stating any reasons for

15  the rule, or its actual, anticipated or intended effects;

16   c. Communications within the NCAA and between the NCAA and

17  Division I Members and among its members relating to the enactment

18  of the VCR; and

19   d. Objections to or concerns relating to the Rule or its

20  enactment.

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

22   The NCAA incorporates its Objections to Plaintiffs'

23  Definitions and Instructions as if fully set forth herein.  The

24  NCAA further objects to this Request to the extent that it seeks

25  documents that are protected from disclosure by the attorney-

26  client privilege, the attorney work product doctrine, or any other

27  applicable privilege.  The NCAA objects to the phrase "commenting

28  upon, considering, analyzing or discussing" as vague and ambiguous

in its scope and definition, and potentially overbroad in its
definition.  The NCAA further objects to the phrase "objections to
or concerns" as vague and ambiguous in its scope and definition,
and potentially overbroad in its definition.  The NCAA further
objects to this Request to the extent that it seeks documents that
are not relevant to any claims or defenses.  The NCAA further
objects to this Request on the grounds that it is overbroad,
unduly burdensome, and not proportional to the needs of the case,
to the extent it seeks information concerning unnamed person's
"objections to or concerns" of the named rules.  The NCAA further
objects to this Request to the extent it calls for the NCAA to
seek documents outside of its possession, custody, and control
from member institutions or member conferences.  Member
institutions and conferences are independent entities and not
within the control of the NCAA and the NCAA does not have
possession of or access to their documents.  NCAA board and
committee members do not have NCAA email addresses for documents
that would be responsive to this Request.  The NCAA will not be
collecting and producing documents from outside the NCAA that are
in the possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, if any exist, (a)
referencing or discussing the drafting and enactment of 11.01.6
and 11.7.6.2.3; (b) referencing or discussing any efforts to

amend, modify, or repeal 11.01.6 and 11.7.6.2.3; (c) that are
drafts or versions of 11.01.6 and 11.7.6.2.3; and/or (d)
objections to 11.01.6 and 11.7.6.2.3 or their enactment, if any
exist for the time period of the six months before through the six
months after (a) the enactment of the bylaw limiting the number of
assistant coaches and (b) each subsequent effort to amend or
repeal that bylaw that are located through a reasonable search and
diligent inquiry from sources in the NCAA's custody.

**REQUEST FOR PRODUCTION NO. 2:**

Without reference to time, all documents and communications
relating to, produced by, or relied on by the Cost Reduction
Committee (as described in Law v. National Collegiate Athletic
Ass'n, 902 F. Supp. 1394 (D. Kan. 1995)), including but not
limited to the 1986 Raiborn Report (as described in the same
opinion).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request to the extent that it seeks documents
that are protected from disclosure by the attorney-client
privilege, the attorney work product doctrine, or any other
applicable privilege.  The NCAA objects to the phrase "produced
by, or relied on by" as vague and ambiguous.  The NCAA further
objects to this Request to the extent that it seeks documents that
are not relevant to any claims or defenses.  The NCAA further
objects to this Request on the grounds that it is overbroad,
unduly burdensome, and not proportional to the needs of the case,
because it seeks all documents "related to, produced by, or relied

on by the Cost Reduction Committee" without connection to the
volunteer coach bylaw or issues alleged in the case.  That
Committee addressed a number of issues unrelated to this
litigation.  The NCAA further objects to this Request to the
extent it calls for the NCAA to seek documents outside of its
possession, custody, and control from member institutions or
member conferences.  Member institutions and conferences are
independent entities and not within the control of the NCAA and
the NCAA does not have possession of or access to their documents.
NCAA board and committee members do not have NCAA email addresses
for documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the
NCAA that are in the possession of persons working for member
institutions, conferences, or other outside organizations who
serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, documents and
communications related to the enactment of 11.01.6 and 11.7.6.2.3
and a copy of the 1986 Raiborn Report that are located through a
reasonable search and diligent inquiry from sources in the NCAA's
custody.  If there are other materials from the *Law* litigation
that Plaintiffs would like cross produced, the NCAA is available
to meet and confer in good faith with respect to a more targeted
request for documents.

1    **REQUEST FOR PRODUCTION NO. 3:**

2      Without reference to time, all versions of the VCR and all

3 documents and communications relating to any proposed, potential

4 or actual amendment of the VCR.

5    **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

6      The NCAA incorporates its Objections to Plaintiffs'

7 Definitions and Instructions as if fully set forth herein.  The

8 NCAA further objects to this Request to the extent that it seeks

9 documents that are protected from disclosure by the attorney-

10 client privilege, the attorney work product doctrine, or any other

11 applicable privilege.  The NCAA further objects to the request as

12 vague and ambiguous.  The NCAA will interpret the request as

13 seeking documents referencing any proposal to amend the volunteer

14 coach bylaw and engaging in substantive discussion about an

15 amendment to the volunteer coach bylaw, not just referencing the

16 fact of an amendment.  The NCAA further objects to this Request on

17 the grounds that it is overbroad, unduly burdensome, and not

18 proportional to the needs of the case, because it seeks documents

19 from a time period that exceeds thirty years.  It is not

20 reasonable for the NCAA to search for documents for such a broad

21 time period.  The NCAA further objects to this Request to the

22 extent it calls for the NCAA to seek documents outside of its

23 possession, custody, and control from member institutions or

24 member conferences.  Member institutions and conferences are

25 independent entities and not within the control of the NCAA and

26 the NCAA does not have possession of or access to their documents.

27 NCAA board and committee members do not have NCAA email addresses

28 for documents that would be responsive to this Request.  The NCAA

1  will not be collecting and producing documents from outside the

2  NCAA that are in the possession of persons working for member

3  institutions, conferences, or other outside organizations who

4  serve on NCAA boards or committees.

5      In response to this Request, the scope of the NCAA's

6  production will be as follows: the NCAA will produce nonprivileged

7  documents and communications, subject to the application of

8  agreed-upon search terms and custodians, referencing or discussing

9  any efforts to amend, modify, or repeal 11.01.6 or 11.7.6.2.3 for

10 the time period of the six months before through the six months

11 after (a) the enactment of the bylaw limiting the number of

12 assistant coaches and (b) each subsequent effort to amend or

13 repeal that bylaw, that are located through a reasonable search

14 and diligent inquiry from sources in the NCAA's custody.

15 **REQUEST FOR PRODUCTION NO. 4:**

16     All documents and communications relating to the abrogation

17 or withdrawal of the VCR.

18 **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

19     The NCAA incorporates its Objections to Plaintiffs'

20 Definitions and Instructions as if fully set forth herein.  The

21 NCAA further objects to this Request to the extent that it seeks

22 documents that are protected from disclosure by the attorney-

23 client privilege, the attorney work product doctrine, or any other

24 applicable privilege.  The NCAA objects to the request as vague

25 and ambiguous particularly in its use of "relating to."  The NCAA

26 interprets the request to be seeking documents and communications

27 referencing the repeal in 2023 of the volunteer coach bylaw and

28 engaging in substantive discussion about that repeal, not just the

fact of the repeal.  The NCAA further objects to this Request to the extent that it seeks documents that are not relevant to any claims or defenses.  To keep the production focused on the issues in this case, the NCAA will interpret this as seeking documents and communications referencing the repeal in 2023 of the volunteer coach bylaw and engaging in substantive discussion of it, not just the fact of the repeal.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences.  Member institutions and conferences are independent entities and not within the control of the NCAA and the NCAA does not have possession of or access to their documents. NCAA board and committee members do not have NCAA email addresses for documents that would be responsive to this Request.  The NCAA will not be collecting and producing documents from outside the NCAA that are in the possession of persons working for member institutions, conferences, or other outside organizations who serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's production will be as follows: the NCAA will produce nonprivileged documents and communications, subject to the application of agreed-upon search terms and custodians, discussing the 2023 repeal of the volunteer coach bylaw that are located through a reasonable search and diligent inquiry from sources in the NCAA's custody.

**REQUEST FOR PRODUCTION NO. 5:**

All documents and communications relating to plans, proposals, or actions of any member school or conference,

1  generally or with respect to any given coach or coaching position,

2  related to the abrogation of the VCR.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

4      The NCAA incorporates its Objections to Plaintiffs'

5  Definitions and Instructions as if fully set forth herein.  The

6  NCAA further objects to this Request to the extent that it seeks

7  documents that are protected from disclosure by the attorney-

8  client privilege, the attorney work product doctrine, or any other

9  applicable privilege.  The NCAA objects to the phrase "generally

10  or with respect to any given coach or coaching position" as vague

11  and ambiguous.  The NCAA further objects to the use of "relating

12  to the abrogation of the VCR" in this Request as rendering it

13  vague, ambiguous, and overbroad.  The NCAA will interpret it as

14  seeking documents and communications with the NCAA that reference

15  the 2023 repeal of the volunteer coach rule and its impact on the

16  plans of member schools or conferences.  The NCAA further objects

17  to this Request to the extent it calls for the NCAA to seek

18  documents outside of its possession, custody, and control from

19  member institutions or member conferences.  Member institutions

20  and conferences are independent entities and not within the

21  control of the NCAA and the NCAA does not have possession of or

22  access to their documents.  NCAA board and committee members do

23  not have NCAA email addresses for documents that would be

24  responsive to this Request.  The NCAA will not be collecting and

25  producing documents from outside the NCAA that are in the

26  possession of persons working for member institutions,

27  conferences, or other outside organizations who serve on NCAA

28  boards or committees.

1    In response to this Request, the scope of the NCAA's

2 production will be as follows: the NCAA will produce nonprivileged

3 documents and communications, subject to the application of

4 agreed-upon search terms and custodians, documents and

5 communications with the NCAA that reference the 2023 repeal of the

6 volunteer coach rule and its impact on the plans of member schools

7 or conferences, that are located through a reasonable search and

8 diligent inquiry from sources in the NCAA's custody.

9 **REQUEST FOR PRODUCTION NO. 6:**

10    Without reference to time, all documents and communications

11 relating to any actual or potential application of the VCR

12 generally, to a particular sport, in a conference, at a school or

13 with respect to a specific coach.

14 **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

15    The NCAA incorporates its Objections to Plaintiffs'

16 Definitions and Instructions as if fully set forth herein.  The

17 NCAA further objects to this Request to the extent that it seeks

18 documents that are protected from disclosure by the attorney-

19 client privilege, the attorney work product doctrine, or any other

20 applicable privilege.  The NCAA objects to this request as vague

21 and ambiguous as written.  The NCAA further objects to this

22 Request on the grounds that it is overbroad, unduly burdensome,

23 and not proportional to the needs of the case, because it seeks

24 documents from a time period that exceeds thirty years.  It is not

25 reasonable for the NCAA to search for documents for such a broad

26 time period.  The NCAA will limit its response to May 29, 2018 to

27 the present.  The NCAA further objects to this Request to the

28 extent it calls for the NCAA to seek documents outside of its

1  possession, custody, and control from member institutions or

2  member conferences.  Member institutions and conferences are

3  independent entities and not within the control of the NCAA and

4  the NCAA does not have possession of or access to their documents.

5  NCAA board and committee members do not have NCAA email addresses

6  for documents that would be responsive to this Request.  The NCAA

7  will not be collecting and producing documents from outside the

8  NCAA that are in the possession of persons working for member

9  institutions, conferences, or other outside organizations who

10  serve on NCAA boards or committees.

11      In response to this Request, the scope of the NCAA's

12  production will be as follows: the NCAA will produce nonprivileged

13  documents and communications, subject to the application of

14  agreed-upon search terms and custodians, containing analysis or

15  consideration of the actual or anticipated consequences or effects

16  of 11.01.6 or 11.7.6.2.3 or the withdrawal of the voluntary coach

17  bylaw, if any exist, including but not limited to any analysis of

18  the application of the volunteer coach bylaw to a particular

19  sport, in a conference, at a school or with respect to a specific

20  coach that are located through a reasonable search and diligent

21  inquiry from sources in the NCAA's custody. The NCAA will limit

22  its response to May 29, 2018 to the present.

23  **REQUEST FOR PRODUCTION NO. 7:**

24      Without reference to time, all documents and communications

25  relating to complaints or inquires by or among Division I Members

26  or Division I Conferences relating to the VCR or its enforcement

27  by NCAA, any Division I Conference, or any Division I Member.

28

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA further objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.  The NCAA objects to the phrase "complaints or inquires" as vague and ambiguous.  The NCAA assumes Plaintiffs' mean "inquiries" instead of "inquires."  The NCAA objects to the use of the word "inquiries" in the Request because it makes the request vague, ambiguous, overbroad, and unduly burdensome given the issues in the case.  The NCAA objects to this request as seeking documents not relevant to the litigation.  It is not clear how documents related to complaints or inquiries about the volunteer coach rule as applied at any conference or school is relevant to this case.  Those inquiries could be about rule infractions related to compensation or recruiting. The NCAA further objects to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents from a time period that exceeds thirty years.  It is not reasonable for the NCAA to search for documents for such a broad time period.  The NCAA will limit its response to May 29, 2018 to the present.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and control from member institutions or member conferences.  Member institutions and conferences are independent entities and not within the control of the NCAA and the NCAA does not have

possession of or access to their documents.  NCAA board and committee members do not have NCAA email addresses for documents that would be responsive to this Request.  The NCAA will not be collecting and producing documents from outside the NCAA that are in the possession of persons working for member institutions, conferences, or other outside organizations who serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's production will be as follows: the NCAA will produce nonprivileged documents and communications, subject to the application of agreed-upon search terms and custodians, relating to complaints by or among Division I Members or Division I Conferences relating to 11.01.6 or 11.7.6.2.3 or their enforcement by the NCAA, any Division I Conference, or any Division I Member, if any exist that are located through a reasonable search and diligent inquiry from sources in the NCAA's custody.

**REQUEST FOR PRODUCTION NO. 8:**

Without reference to time, all documents and communications relating to any actual or potential interpretation of the VCR generally or in a specific case.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA further objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.  The NCAA objects to the phrase "in a specific case" as vague and ambiguous.  The NCAA objects to this

request as seeking documents not relevant to the litigation.  It
is not clear how documents related to actual or potential
interpretations of the volunteer coach rule generally or applied
to a specific coach is relevant to this case.  Those
interpretations could be about rule infractions related to
compensation or recruiting.  The NCAA further objects to this
Request on the grounds that it is overbroad, unduly burdensome,
and not proportional to the needs of the case, because it seeks
documents from a time period that exceeds thirty years.  It is not
reasonable for the NCAA to search for documents for such a broad
time period.  The NCAA will limit its response to May 29, 2018 to
the present.  The NCAA further objects to this Request to the
extent it calls for the NCAA to seek documents outside of its
possession, custody, and control from member institutions or
member conferences.  Member institutions and conferences are
independent entities and not within the control of the NCAA and
the NCAA does not have possession of or access to their documents.
NCAA board and committee members do not have NCAA email addresses
for documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the
NCAA that are in the possession of persons working for member
institutions, conferences, or other outside organizations who
serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, if any exist, relating to
any actual or potential interpretation of 11.01.6 or 11.7.6.2.3

generally or in a specific case from May 29, 2018 to the present
that are located through a reasonable search and diligent inquiry
from sources in the NCAA's custody.

**REQUEST FOR PRODUCTION NO. 9:**

All documents and communications relating to any actual or
potential enforcement of the VCR generally or in a specific case.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA further objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any other
applicable privilege.  The NCAA objects to the phrase "in a
specific case" as vague and ambiguous.  The NCAA objects to this
request as seeking documents not relevant to the litigation.  It
is not clear how documents related to actual or potential
enforcement of the volunteer coach rule generally or in a specific
case is relevant to this case.  Those enforcement actions could be
about rule infractions related to compensation or recruiting.  The
NCAA further objects to this Request on the grounds that it is
overbroad, unduly burdensome, and not proportional to the needs of
the case, because it seeks documents from a time period that
exceeds thirty years.  It is not reasonable for the NCAA to search
for documents for such a broad time period.  The NCAA will limit
its response to May 29, 2018 to the present.  The NCAA further
objects to this Request to the extent it calls for the NCAA to
seek documents outside of its possession, custody, and control
from member institutions or member conferences.  Member

1  institutions and conferences are independent entities and not

2  within the control of the NCAA and the NCAA does not have

3  possession of or access to their documents.  NCAA board and

4  committee members do not have NCAA email addresses for documents

5  that would be responsive to this Request.  The NCAA will not be

6  collecting and producing documents from outside the NCAA that are

7  in the possession of persons working for member institutions,

8  conferences, or other outside organizations who serve on NCAA

9  boards or committees.

10       In response to this Request, the scope of the NCAA's

11  production will be as follows: the NCAA will produce nonprivileged

12  documents and communications, subject to the application of

13  agreed-upon search terms and custodians, if any exist, relating to

14  any actual or potential enforcement of 11.01.6 or 11.7.6.2.3

15  generally or in a specific case from May 29, 2018 to the present,

16  that are located through a reasonable search and diligent inquiry

17  from sources in the NCAA's custody.

18  **REQUEST FOR PRODUCTION NO. 10:**

19       Without reference to time, all documents and communications

20  relating to any analysis or consideration of the actual or

21  anticipated consequences or effects of the VCR or it withdrawal.

22  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

23       The NCAA incorporates its Objections to Plaintiffs'

24  Definitions and Instructions as if fully set forth herein.  The

25  NCAA further objects to this Request to the extent that it seeks

26  documents that are protected from disclosure by the attorney-

27  client privilege, the attorney work product doctrine, or any other

28  applicable privilege.  The NCAA objects to the phrase "actual or

anticipated consequences or effects" as vague and ambiguous.  The

NCAA further objects to this Request on the grounds that it is

overbroad, unduly burdensome, and not proportional to the needs of

the case, because it seeks documents from a time period that

exceeds thirty years.  It is not reasonable for the NCAA to search

for documents for such a broad time period.  The NCAA will limit

its response to May 29, 2018 to the present.  The NCAA further

objects to this Request to the extent it calls for the NCAA to

seek documents outside of its possession, custody, and control

from member institutions or member conferences.  Member

institutions and conferences are independent entities and not

within the control of the NCAA and the NCAA does not have

possession of or access to their documents.  NCAA board and

committee members do not have NCAA email addresses for documents

that would be responsive to this Request.  The NCAA will not be

collecting and producing documents from outside the NCAA that are

in the possession of persons working for member institutions,

conferences, or other outside organizations who serve on NCAA

boards or committees.

    In response to this Request, the scope of the NCAA's

production will be as follows: the NCAA will produce nonprivileged

documents and communications, subject to the application of

agreed-upon search terms and custodians, containing analysis or

consideration of the actual or anticipated consequences or effects

of 11.01.6 or 11.7.6.2.3 or the withdrawal of the voluntary coach

bylaw, if any exist.

**REQUEST FOR PRODUCTION NO. 11:**

Without reference to time, all documents and communications relating to any meetings attended or arranged by NCAA staff, NCAA committees, NCAA governing/advisory boards, the Division I Council, the Division I Board of Directors, any other similar NCAA sponsored bodies, or Division I Members which related in whole or in part to the VCR, its drafting and enactment, its amendment, or its withdrawal.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA further objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.  The NCAA objects to the phrase "attended or arranged by" as vague and ambiguous. The Request is also vague and ambiguous in its use of "relating to any meetings."  The NCAA objects to this Request in that it seeks documents from meetings that were only "in part" related to the volunteer coach rule, and the Request seeks documents that broadly "relate" to meetings on those partial topics, which would mean the request seeks a broad swath of irrelevant documents and the request is overbroad and unduly burdensome.  The NCAA further objects to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents from a time period that exceeds thirty years.  It is not reasonable for the NCAA to search for documents for such a broad time period.  The NCAA will limit its response to May 29, 2018 to

the present.  The NCAA further objects to this Request to the
extent it calls for the NCAA to seek documents outside of its
possession, custody, and control from member institutions or
member conferences.  Member institutions and conferences are
independent entities and not within the control of the NCAA and
the NCAA does not have possession of or access to their documents.
NCAA board and committee members do not have NCAA email addresses
for documents that would be responsive to this Request.  The NCAA
will not be collecting and producing documents from outside the
NCAA that are in the possession of persons working for member
institutions, conferences, or other outside organizations who
serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, (a) referencing or
discussing the drafting and enactment of 11.01.6 and 11.7.6.2.3;
(b) referencing or discussing any efforts to amend, modify, or
repeal 11.01.6 and 11.7.6.2.3; and/or (c) that are drafts or
versions of 11.01.6 and 11.7.6.2.3 for the time period of the six
months before through the six months after (a) the enactment of
the bylaw limiting the number of assistant coaches and (b) each
subsequent effort to amend or repeal that bylaw that are located
through a reasonable search and diligent inquiry from sources in
the NCAA's custody.

**REQUEST FOR PRODUCTION NO. 12:**

Without reference to time, all documents and communications
relating to any asserted pro-competitive benefits of the VCR.

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

2      The NCAA incorporates its Objections to Plaintiffs'

3  Definitions and Instructions as if fully set forth herein.  The

4  NCAA further objects to this Request to the extent that it seeks

5  documents that are protected from disclosure by the attorney-

6  client privilege, the attorney work product doctrine, or any other

7  applicable privilege.  The NCAA objects to the phrase "pro-

8  competitive benefits" as vague and ambiguous and calling for a

9  legal conclusion.  The NCAA further objects to this Request on the

10  grounds that it is overbroad, unduly burdensome, and not

11  proportional to the needs of the case, because it seeks documents

12  from a time period that exceeds thirty years. It is not reasonable

13  for the NCAA to search for documents for such a broad time period.

14  The NCAA will limit its response to May 29, 2018 to the present.

15  The NCAA further objects to this Request to the extent it calls

16  for the NCAA to seek documents outside of its possession, custody,

17  and control from member institutions or member conferences.

18  Member institutions and conferences are independent entities and

19  not within the control of the NCAA and the NCAA does not have

20  possession of or access to their documents. NCAA board and

21  committee members do not have NCAA email addresses for documents

22  that would be responsive to this Request.  The NCAA will not be

23  collecting and producing documents from outside the NCAA that are

24  in the possession of persons working for member institutions,

25  conferences, or other outside organizations who serve on NCAA

26  boards or committees.

27      In response to this Request, the scope of the NCAA's

28  production will be as follows: the NCAA will produce nonprivileged

1  documents and communications, subject to the application of

2  agreed-upon search terms and custodians, discussing the pros

3  and/or cons of the volunteer coach position for NCAA Division I

4  sports, if any exist, from May 29, 2018 to the present, and, if

5  any exist, discussing how the Volunteer Coach position has

6  affected parity or competitive play (whether positively,

7  negatively, or neutrally) amongst Division I teams from May 29,

8  2018 to the present, that are located through a reasonable search

9  and diligent inquiry from sources in the NCAA's custody.

10 **REQUEST FOR PRODUCTION NO. 13:**

11      Without reference to time, documents sufficient to identify

12 all NCAA employees or agents, Division I Member employees or

13 agents, and Division I Conference employees or agents who

14 participated in the enactment, proposed, potential or actual

15 amendment, abrogation, withdrawal, interpretation or enforcement

16 of the VCR.

17 **RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

18      The NCAA incorporates its Objections to Plaintiffs'

19 Definitions and Instructions as if fully set forth herein.  The

20 NCAA objects to the phrase "participated" as vague and ambiguous.

21 The NCAA will interpret "participated" to mean having an active,

22 leadership role in proposing or discussing language for or

23 revocation of the Bylaw at issue.  The NCAA does not interpret

24 "participated" as merely voting for or against a Bylaw change or

25 being a minor participant in any discussion of such a change.  The

26 NCAA further objects to this Request to the extent that it seeks

27 documents that are not relevant to any claims or defenses and is

28 overbroad when it seeks documents sufficient to identify persons

for a period of more than three decades that "participated" in the
"interpretation or enforcement of the VCR."  It would be massively
burdensome to compile this and it does not appear to seek anything
relevant to the claims to seek the names of persons involved in
interpretation and enforcement of aspects of the VCR.  The NCAA
further objects to this Request to the extent it calls for the
NCAA to seek documents outside of its possession, custody, and
control from member institutions or member conferences.  Member
institutions and conferences are independent entities and not
within the control of the NCAA and the NCAA does not have
possession of or access to their documents.  NCAA board and
committee members do not have NCAA email addresses for documents
that would be responsive to this Request.  The NCAA will not be
collecting and producing documents from outside the NCAA that are
in the possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, sufficient to identify
the members of certain NCAA committees (the Transformation
Committee, the Modernization Committee, and the Legislative
Committee), the NCAA Board, and the NCAA Division I Council from
May 29, 2018 to the present that are located through a reasonable
search and diligent inquiry from sources in the NCAA's custody.
In addition, the NCAA will produce documents (a) referencing or
discussing the drafting and enactment of 11.01.6 and 11.7.6.2.3;

(b) referencing or discussing any efforts to amend, modify, or repeal 11.01.6 and 11.7.6.2.3, and those documents will identify individuals involved in those communications.

**REQUEST FOR PRODUCTION NO. 14:**

Without reference to time, documents sufficient to identify all NCAA employees, Division I Member employees, and Division I Conference employees who communicated about the enactment, proposed, potential or actual amendment, abrogation, withdrawal, interpretation or enforcement of the VCR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA objects to the phrase "communicated" as vague and ambiguous. The NCAA will interpret "communicated" to mean having an active, leadership role in proposing or discussing language for or revocation of the Bylaw at issue.  The NCAA does not interpret "participated" as merely voting for or against a Bylaw change or being a minor participant in any discussion of such a change.  The NCAA further objects to this Request to the extent that it seeks documents that are not relevant to any claims or defenses and is overbroad when it seeks documents sufficient to identify persons for a period of more than three decades that "participated" in the "interpretation or enforcement of the VCR."  It would be massively burdensome to compile this and it does not appear to seek anything relevant to the claims to seek the names of persons involved in interpretation and enforcement of aspects of the VCR.  The NCAA further objects to this Request to the extent it calls for the NCAA to seek documents outside of its possession, custody, and

control from member institutions or member conferences.  Member
institutions and conferences are independent entities and not
within the control of the NCAA and the NCAA does not have
possession of or access to their documents.  NCAA board and
committee members do not have NCAA email addresses for documents
that would be responsive to this Request.  The NCAA will not be
collecting and producing documents from outside the NCAA that are
in the possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

     In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, sufficient to identify
the members of certain NCAA committees (the Transformation
Committee, the Modernization Committee, and the Legislative
Committee), the NCAA Board, and the NCAA Division I Council from
May 29, 2018 to the present, that are located through a reasonable
search and diligent inquiry from sources in the NCAA's custody.
In addition, the NCAA will produce documents (a) referencing or
discussing the drafting and enactment of 11.01.6 and 11.7.6.2.3;
(b) referencing or discussing any efforts to amend, modify, or
repeal 11.01.6 and 11.7.6.2.3, and those documents will identify
individuals involved in those communications.

**REQUEST FOR PRODUCTION NO. 15:**

     Documents sufficient to identify all persons who worked as a
volunteer coach at any Division I Member school in any of the

1  relevant sports during the relevant period, and the sport, school,

2  and period of employment for each such volunteer coach.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

4       The NCAA incorporates its Objections to Plaintiffs'

5  Definitions and Instructions as if fully set forth herein.  The

6  NCAA further objects to this Request on the grounds that it is

7  overbroad, unduly burdensome, and not proportional to the needs of

8  the case, in that the requested information does not exist

9  anywhere at the NCAA in any centralized repository or source.  The

10  NCAA further objects to this Request to the extent it calls for

11  the NCAA to seek documents outside of its possession, custody, and

12  control from member institutions or member conferences.  Member

13  institutions and conferences are independent entities and not

14  within the control of the NCAA and the NCAA does not have

15  possession of or access to their documents.  NCAA board and

16  committee members do not have NCAA email addresses for documents

17  that would be responsive to this Request.  The NCAA will not be

18  collecting and producing documents from outside the NCAA that are

19  in the possession of persons working for member institutions,

20  conferences, or other outside organizations who serve on NCAA

21  boards or committees.

22       The NCAA has done a reasonable search and inquiry and is not

23  aware of any documents or communications that exist sufficient to

24  identify all current or former Volunteer Coaches in the relevant

25  sports for NCAA Division I schools during the time period May 29,

26  2018 to the present.

27

28

1  **REQUEST FOR PRODUCTION NO. 16:**

2      All documents produced to NCAA by Division I Members

3  including those provided pursuant to Division I Bylaw 20.2.4.17

4  and its predecessors, Division I Bylaw 11.7.1 and its

5  predecessors, or any other Division I Bylaw relating to athletic

6  department personnel budgets and expenditures for athletic

7  department employees and coaches' salaries and benefits at

8  Division I schools.

9  **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

10     The NCAA incorporates its Objections to Plaintiffs'

11 Definitions and Instructions as if fully set forth herein.  The

12 NCAA objects to the request as vague and ambiguous in its use of

13 the phrase "provided" and its use of the phrase "relating to"

14 followed by a list of items.  The NCAA also objects to the

15 reference to "predecessors" as vague and ambiguous.  The NCAA

16 further objects to this Request to the extent that it seeks

17 documents that are not relevant to any claims or defenses.  The

18 NCAA further objects to this Request on the grounds that it is

19 overbroad, unduly burdensome, and not proportional to the needs of

20 the case, in that it requests "all documents" provided to the NCAA

21 when the NCAA instead could generate a report with the requested

22 information that would be sufficient to show the information.

23     In response to this Request, the scope of the NCAA's

24 production will be as follows: the NCAA will produce nonprivileged

25 documents and communications, subject to the application of

26 agreed-upon search terms and custodians, sufficient to show the

27 athletics department revenue and expenses for each Division I

28 member institution from May 29, 2018 to the present, and

1  sufficient to show the compensation and benefits of head coaches

2  and aggregate compensation and benefits of assistant coaches for

3  each Division I member institution from May 29, 2018 to the

4  present, that are located through a reasonable search and diligent

5  inquiry from sources in the NCAA's custody.

6  **REQUEST FOR PRODUCTION NO. 17:**

7       Documents sufficient to show all compensation (including

8  wages, salaries, and all forms of benefits), ages, and years of

9  coaching experience of each head and assistant coach (including

10  volunteer coaches) employed in each relevant sport at each

11  Division I Member which employed a volunteer coach during the

12  relevant period.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

14       The NCAA incorporates its Objections to Plaintiffs'

15  Definitions and Instructions as if fully set forth herein.  The

16  NCAA objects to this request as vague and ambiguous.  The NCAA

17  further objects to the request as information about all head and

18  assistant coaches' ages and years of experience is not relevant to

19  the claims in the litigation.  The NCAA further objects to this

20  Request on the grounds that it is overbroad, unduly burdensome,

21  and not proportional to the needs of the case, in that the

22  requested information does not exist anywhere at the NCAA in any

23  centralized repository or source.  The NCAA further objects to

24  this Request to the extent it calls for the NCAA to seek documents

25  outside of its possession, custody, and control from member

26  institutions or member conferences.  Member institutions and

27  conferences are independent entities and not within the control of

28  the NCAA and the NCAA does not have possession of or access to

their documents.  NCAA board and committee members do not have
NCAA email addresses for documents that would be responsive to
this Request.  The NCAA will not be collecting and producing
documents from outside the NCAA that are in the possession of
persons working for member institutions, conferences, or other
outside organizations who serve on NCAA boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, sufficient to show the
athletics department revenue and expenses for each Division I
member institution from May 29, 2018 to the present, and
sufficient to show the compensation and benefits of head coaches
and aggregate compensation and benefits of assistant coaches for
each Division I member institution from May 29, 2018 to the
present, that are located through a reasonable search and diligent
inquiry from sources in the NCAA's custody.

**REQUEST FOR PRODUCTION NO. 18:**

Documents relating to the job duties of any specific
volunteer coach and volunteer coaches in general.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.  The
NCAA objects to this Request to the extent that it seeks documents
that are not relevant to any claims or defenses as it is not clear
how documents "relating" to "job duties" of volunteer coaches are
all relevant to this case.  The NCAA further objects to this
Request on the grounds that it is overbroad, unduly burdensome,

1    and not proportional to the needs of the case.  It seeks documents

2    related to the job duties of all volunteer coaches at all D1, D2,

3    and D3 institutions, which is overbroad and highly burdensome.

4    Further, even if just at the D1 level, to try to identify all

5    documents related to the job duties (if any even exist) of all

6    volunteer coaches at potentially 300 plus Division I institutions

7    and their various sports teams would be unduly burdensome and

8    disproportionate to the needs of the case.  The NCAA further

9    objects to this Request to the extent it calls for the NCAA to

10   seek documents outside of its possession, custody, and control

11   from member institutions or member conferences.  Member

12   institutions and conferences are independent entities and not

13   within the control of the NCAA and the NCAA does not have

14   possession of or access to their documents.  NCAA board and

15   committee members do not have NCAA email addresses for documents

16   that would be responsive to this Request.  The NCAA will not be

17   collecting and producing documents from outside the NCAA that are

18   in the possession of persons working for member institutions,

19   conferences, or other outside organizations who serve on NCAA

20   boards or committees.

21        In response to this Request, the scope of the NCAA's

22   production will be as follows: the NCAA will produce nonprivileged

23   documents and communications, subject to the application of

24   agreed-upon search terms and custodians, referencing or describing

25   the job duties of any specific volunteer coach and volunteer

26   coaches in Division I, if any such documents exist, from the time

27   period May 29, 2018 to the present, that are located through a

28

37

1  reasonable search and diligent inquiry from sources in the NCAA's

2  custody.

3  **REQUEST FOR PRODUCTION NO. 19:**

4      Without reference to time, all documents relevant to, or

5  which you claim support, any relevant product or geographic market

6  you intend to assert in this case.

7  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

8      The NCAA incorporates its Objections to Plaintiffs'

9  Definitions and Instructions as if fully set forth herein.  The

10  NCAA objects to this Request to the extent that it seeks documents

11  that are protected from disclosure by the attorney-client

12  privilege, the attorney work product doctrine, or any other

13  applicable privilege.  The NCAA further objects to this Request as

14  calling for a legal conclusion.  The NCAA further objects to this

15  Request because it is vague and ambiguous as to what documents the

16  Plaintiffs believe the NCAA is "claim[ing] support" a relevant

17  product or geographic market.

18      On the basis of the foregoing objections, the NCAA will not

19  search for or produce any documents in response to this Request,

20  but is willing to meet and confer with Plaintiffs regarding the

21  scope of this Request and whether it can be narrowed to documents

22  reasonably related to the allegations in the complaint that are

23  not already provided in response to the other requests in this set

24  of requests for production and the requests for production in the

25  *Smart* litigation.

26  **REQUEST FOR PRODUCTION NO. 20:**

27      All documents identified in your Answer or designated in

28  response to any Interrogatories in this case or in Smart v. NCAA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.  The Request seeks information "identified in" or "designated in" response to any set of future interrogatories.  To the extent the documents identified or designated are utilized by counsel, this Request seeks attorney work product which the NCAA will not disclose.  The NCAA objects to this Request as premature with respect to interrogatory responses, which are not yet due.

Subject to the foregoing objections, the NCAA will produce nonprivileged documents, if any exist, identified or designated in the NCAA's answers to interrogatories that are served on the NCAA in this case or in *Smart v. NCAA*.

**REQUEST FOR PRODUCTION NO. 21:**

All documents relevant to, or which you contend support, any of your affirmative defenses.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

The NCAA incorporates its Objections to Plaintiffs' Definitions and Instructions as if fully set forth herein.  The NCAA objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.  The Request seeks documents "relevant to" or which the NCAA "contend[s] support" for any affirmative

defenses.   To the extent the documents identified are utilized by
counsel, this Request seeks attorney work product which the NCAA
will not disclose.   The NCAA objects to the phrase "relevant to,
or which you contend support" as vague and ambiguous.   The NCAA
objects to this Request as premature.

     Subject to the foregoing objections, the NCAA will produce
nonprivileged documents, if any exist, relevant to, or which the
NCAA contends support, any of its affirmative defenses.

**REQUEST FOR PRODUCTION NO. 22:**

     Without reference to time, all documents and communications
relating to the potential application or non-application of
federal or state wage and hour laws to the Volunteer Coach
position, including but not limited to any communications within
NCAA, communications among NCAA and any Division I Members and/or
Division I Conferences or involving any third party, or
communications among or internal to Division I Members and/or
Division I Conferences relating to the applicability of such laws
to volunteer coaches.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

     The NCAA incorporates its Objections to Plaintiffs'
Definitions and Instructions as if fully set forth herein.   The
NCAA further objects to this Request to the extent that it seeks
documents that are protected from disclosure by the attorney-
client privilege, the attorney work product doctrine, or any other
applicable privilege.   The NCAA objects to the phrases "potential
application or non-application", "involving any third party",
"among or internal to Division I Members and/or Division I
Conferences" and "relating to the applicability of such laws to

volunteer coaches" as vague and ambiguous.  The NCAA further
objects to this Request to the extent that it seeks documents that
are not relevant to any claims or defenses.  The NCAA further
objects to this Request on the grounds that it is overbroad,
unduly burdensome, and not proportional to the needs of the case,
because it seeks documents from a time period that exceeds thirty
years.  It is not reasonable for the NCAA to search for documents
for such a broad time period.  The NCAA further objects to this
Request to the extent it calls for the NCAA to seek documents
outside of its possession, custody, and control from member
institutions or member conferences.  Member institutions and
conferences are independent entities and not within the control of
the NCAA and the NCAA does not have possession of or access to
their documents. NCAA board and committee members do not have NCAA
email addresses for documents that would be responsive to this
Request.  The NCAA will not be collecting and producing documents
from outside the NCAA that are in the possession of persons
working for member institutions, conferences, or other outside
organizations who serve on NCAA boards or committees.

On the basis of the foregoing objections, the NCAA will not
search for or produce any documents in response to this Request,
but is willing to meet and confer with Plaintiffs regarding the
scope of this Request and whether it can be narrowed to documents
reasonably related to the allegations in the complaint.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to identify each college or university
which participated in any of the relevant sports at the Division I
level, all sports in which each college or university participated

1  at the Division I level during each year, and in which Division I

2  Conference each sport participated, for each of the academic years

3  starting with the academic year beginning in Fall 2016 through the

4  present.

5  **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

6      The NCAA incorporates its Objections to Plaintiffs'

7  Definitions and Instructions as if fully set forth herein.

8      In response to this Request, the scope of the NCAA's

9  production will be as follows: the NCAA will produce nonprivileged

10  documents and communications, subject to the application of

11  agreed-upon search terms and custodians, sufficient to identify

12  each college or university that participated in any of the

13  relevant sports at the Division I level, all sports in which each

14  college or university participated at the Division I level during

15  each year (excluding FBS football and basketball), and in which

16  Division I Conference each sport participated, for each of the

17  academic years starting with the academic year beginning in Fall

18  2016 through the present, that are located through a reasonable

19  search and diligent inquiry from sources in the NCAA's custody.

20  **REQUEST FOR PRODUCTION NO. 24:**

21      All documents received by NCAA pursuant to a discovery

22  request or subpoena in this lawsuit or *Smart v. NCAA*.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

24      The NCAA incorporates its Objections to Plaintiffs'

25  Definitions and Instructions as if fully set forth herein.  The

26  NCAA objects to this Request as premature.

27      In response to this Request, the scope of the NCAA's

28  production will be as follows: the NCAA will cross-produce all

1  documents from the *Smart* litigation to Plaintiffs in the *Colon*

2  litigation, that are located through a reasonable search and

3  diligent inquiry from sources in the NCAA's custody.

4  **REQUEST FOR PRODUCTION NO. 25:**

5      All non-privileged documents and communications relating to

6  this case, *Smart v. NCAA*, or any litigation or potential

7  litigation involving claims similar to the claims in this case.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

9      The NCAA incorporates its Objections to Plaintiffs'

10  Definitions and Instructions as if fully set forth herein.  The

11  NCAA objects to this Request to the extent that it seeks documents

12  that are protected from disclosure by the attorney-client

13  privilege, the attorney work product doctrine, or any other

14  applicable privilege.  The NCAA further objects to this Request

15  because it is vague and ambiguous as to what is meant by "relating

16  to this case" or "any litigation or potential litigation involving

17  claims similar to the claims in this case".  The NCAA further

18  objects to this Request on the grounds that it is overbroad,

19  unduly burdensome, and not proportional to the needs of the case,

20  to the extent it seeks all "non-privileged documents and

21  communications related to this case, *Smart v. NCAA*, or any

22  litigation or potential litigation involving claims similar to the

23  claims in this case."

24      On the basis of the foregoing objections, the NCAA will not

25  search for or produce any documents in response to this Request.

26  **REQUEST FOR PRODUCTION NO. 26:**

27      All documents and communications relating to compliance with

28  the Division I bylaws with respect to current volunteer coaches or

1  coaches formerly designated as volunteer coaches, including but

2  not limited to communications relating to the effect of the VCR's

3  withdrawal.

4  **RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

5      The NCAA incorporates its Objections to Plaintiffs'

6  Definitions and Instructions as if fully set forth herein.  The

7  NCAA objects to this Request to the extent that it seeks documents

8  that are protected from disclosure by the attorney-client

9  privilege, the attorney work product doctrine, or any other

10 applicable privilege.  The NCAA objects to this request as vague

11 and ambiguous including with respect to its use of "relating to".

12 The Request is also vague and ambiguous in that it appears to

13 merge two different RFPs to make the meaning unclear, and it is

14 unclear why earlier Requests are duplicated here but in a way that

15 combines them.  The NCAA objects to this Request as seeking

16 information not relevant to the litigation to the extent it is

17 asking for documents related to volunteer coach's compliance with

18 other Division I bylaws not related to the bylaws at issue in this

19 litigation.  The NCAA further objects to this Request to the

20 extent it calls for the NCAA to seek documents outside of its

21 possession, custody, and control from member institutions or

22 member conferences.  Member institutions and conferences are

23 independent entities and not within the control of the NCAA and

24 the NCAA does not have possession of or access to their documents.

25 NCAA board and committee members do not have NCAA email addresses

26 for documents that would be responsive to this Request. The NCAA

27 will not be collecting and producing documents from outside the

28 NCAA that are in the possession of persons working for member

1  institutions, conferences, or other outside organizations who

2  serve on NCAA boards or committees.

3       In response to this Request, the scope of the NCAA's

4  production will be as follows: the NCAA will produce nonprivileged

5  documents and communications, subject to the application of

6  agreed-upon search terms and custodians, relating to compliance

7  with 11.01.6 or 11.7.6.2.3 (and the repeal) with respect to

8  current volunteer coaches or coaches formerly designated as

9  volunteer coaches, if any exist, including but not limited to

10 communications relating to the effect of the voluntary coach

11 bylaws from May 29, 2018 to the present that are located through a

12 reasonable search and diligent inquiry from sources in the NCAA's

13 custody.

14 **REQUEST FOR PRODUCTION NO. 27:**

15      All documents and communications by, with, or among any

16 Division I members or Division I Conferences relating to the

17 payment, non-payment, employment, or non-employment of volunteer

18 coaches or coaches formerly designated as volunteer coaches.

19 **RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

20      The NCAA incorporates its Objections to Plaintiffs'

21 Definitions and Instructions as if fully set forth herein.  The

22 NCAA objects to this Request to the extent that it seeks documents

23 that are protected from disclosure by the attorney-client

24 privilege, the attorney work product doctrine, or any other

25 applicable privilege.  The NCAA further objects to this Request

26 because it is vague and ambiguous as to what is meant by "the

27 payment", "non-payment", "employment" or "non-employment".  The

28 NCAA further objects to this Request on the grounds that it is

overbroad, unduly burdensome, and not proportional to the needs of
the case, in that it has no time limitation and its use of
"relating to" renders it overbroad.  The NCAA will interpret the
time period to by May 29, 2018 to the present.  The NCAA further
objects to this Request to the extent it calls for the NCAA to
seek documents outside of its possession, custody, and control
from member institutions or member conferences.  Member
institutions and conferences are independent entities and not
within the control of the NCAA and the NCAA does not have
possession of or access to their documents.  NCAA board and
committee members do not have NCAA email addresses for documents
that would be responsive to this Request.  The NCAA will not be
collecting and producing documents from outside the NCAA that are
in the possession of persons working for member institutions,
conferences, or other outside organizations who serve on NCAA
boards or committees.

In response to this Request, the scope of the NCAA's
production will be as follows: the NCAA will produce nonprivileged
documents and communications, subject to the application of
agreed-upon search terms and custodians, relating to compliance
with 11.01.6 or 11.7.6.2.3 (and the repeal) with respect to
current volunteer coaches or coaches formerly designated as
volunteer coaches, if any exist, including but not limited to
communications relating to the effect of the voluntary coach
bylaws from May 29, 2018 to the present that are located through a
reasonable search and diligent inquiry from sources in the NCAA's
custody.

1   **REQUEST FOR PRODUCTION NO. 28:**

2       All documents relating to the named Plaintiffs in this case.

3   **RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

4       The NCAA incorporates its Objections to Plaintiffs'

5   Definitions and Instructions as if fully set forth herein.  The

6   NCAA objects to this Request to the extent that it seeks documents

7   that are protected from disclosure by the attorney-client

8   privilege, the attorney work product doctrine, or any other

9   applicable privilege.  The NCAA further objects to this Request to

10  the extent that it seeks documents that are not relevant to any

11  claims or defenses.  For example, if a named plaintiff

12  communicated with the NCAA about a question on recruiting bylaw

13  compliance, or about a sports rule change, that communication

14  would have no connection to the issues in this litigation and it

15  would be burdensome to identify all such communications.  The NCAA

16  further objects to this Request to the extent it calls for the

17  NCAA to seek documents outside of its possession, custody, and

18  control from member institutions or member conferences.  Member

19  institutions and conferences are independent entities and not

20  within the control of the NCAA and the NCAA does not have

21  possession of or access to their documents.  NCAA board and

22  committee members do not have NCAA email addresses for documents

23  that would be responsive to this Request.  The NCAA will not be

24  collecting and producing documents from outside the NCAA that are

25  in the possession of persons working for member institutions,

26  conferences, or other outside organizations who serve on NCAA

27  boards or committees.

28

1    In response to this Request, the scope of the NCAA's

2  production will be as follows: the NCAA will produce nonprivileged

3  documents and communications, subject to the application of

4  agreed-upon search terms and custodians, relating to the named

5  Plaintiffs from May 29, 2018 to the present that refer to their

6  status as a volunteer or non-volunteer coach at a Division I

7  member institution and excluding all privileged communications

8  related to the filed litigation, if any such documents exist, that

9  are located through a reasonable search and diligent inquiry from

10 sources in the NCAA's custody.

11

12 DATED:  September 22, 2023   MUNGER, TOLLES & OLSON LLP

13

14                            By: _____/s/Carolyn Hoecker Luedtke____

15                               CAROLYN HOECKER LUEDTKE
                                Attorney for Defendant
16                              NCAA

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>PROOF OF SERVICE</u>

2

**Colon v. NCAA**
**Case No. 1:23-cv-00425-WBS-KJN**

3

4

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

5        At the time of service, I was over 18 years of age and **not a**
**party to this action.**  I am employed in the County of Los Angeles,
6   State of California.  My business address is 350 South Grand
Avenue 50th Floor, Los Angeles, CA 90071-3426.

7

8        On September 22, 2023, I served true copies of the
following DOCUMENT(s) described as **DEFENDANT'S RESPONSE TO**
**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT** on
9   the interested parties in this action as follows:

10                    **SEE ATTACHED SERVICE LIST**

11       **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order
or an agreement of the parties to accept service by e-mail or
12   electronic transmission, I caused the document(s) to be sent from
e-mail address Sydney.Etter@mto.com to the persons at the e-mail
13   addresses listed in the Service List.  I did not receive, within a
reasonable time after the transmission, any electronic message or
14   other indication that the transmission was unsuccessful.

15       I declare under penalty of perjury under the laws of the
United States of America that the foregoing is true and correct
16   and that I am employed in the office of a member of the bar of
this Court at whose direction the service was made.

17

        Executed on September 22, 2023, at Los Angeles, California.
18

19

                                    _/s/Sydney Etter_
20                                    Sydney Etter

21

22

23

24

25

26

27

28

**SERVICE LIST**

**Colon v. NCAA**
**Case No. 1:23-cv-00425-WBS-KJN**

| | |
|---|---|
| DENNIS STEWART | *Attorneys for Plaintiffs Joseph* |
| (MN State Bar No. 99152) | *Colon, Shannon Ray, Khala* |
| (*pro hac vice*) | *Taylor, Peter Robinson,* |
| dstewart@gustafsongluek.com | *Katherine Sebbane, and Patrick* |
| DANIEL E. GUSTAFSON | *Mehlert Individually and on* |
| (MN State Bar No. #202241) | *Behalf of All Those Similarly* |
| (*pro hac vice*) | *Situated* |

DENNIS STEWART
(MN State Bar No. 99152)
(*pro hac vice*)
dstewart@gustafsongluek.com
DANIEL E. GUSTAFSON
(MN State Bar No. #202241)
(*pro hac vice*)
dgustafson@gustafsongluek.com
JOSHUA J. RISSMAN
(MN State Bar No. #391500)
(*pro hac vice*)
jrissman@gustafsongluek.com
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

DARRYL J. HOROWITT
(CA State Bar No. 100898)
COLEMAN & HOROWITT, LLP
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820
dhorowitt@ch-law.com

ROBERT J. GRALEWSKI, JR.
(CA State Bar No. 196410)
MARKO RADISAVLJEVIC
(CA State Bar No. 306552)
KIRBY McINERNEY LLP
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

LEONARD B. SIMON
(CA State Bar No. 58310)
THE LAW OFFICES OF LEONARD B.
SIMON P.C.
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

1 | MICHAEL LIEBERMAN
(DC Bar No. 1033827)
2 | (*pro hac vice*)
Jamie Crooks, CA Bar No. 310447
3 | (pro hac vice)
FAIRMARK PARTNERS, LLP
4 | 1825 7th Street, NW, #821
Washington, DC 20001
5 | Telephone: (818) 585-2903
michael@fairmarklaw.com
6 | jamie@fairmarklaw.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28