UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR SMART, et al., | No. 2:22–cv–2125–WBS–KJN |
| Plaintiffs, | (ECF Nos 49, 50.) |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |
| JOSEPH COLON, et al., | No. 1:23–cv–425–WBS–KJN |
| Plaintiffs, | (ECF Nos. 58, 59.) |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ORDER |
| Defendant. | |

On November 7, 2023, the court held a hearing on plaintiffs' motion to compel and the parties' motion to resolve discovery issues and process. For the reasons discussed at the hearing: (I) the court declines to set limits on the Rule 30(b)(6) topics at this time; (II) plaintiffs are limited to 10 depositions for each case; (III) plaintiff's class certification expert report is due alongside their briefing, with defendant's rebuttal due alongside their opposition; and (IV) plaintiffs' motion to compel member schools' communications, volunteer coach names, and pay data is denied.

1

**Background**

Plaintiffs in these related cases were "volunteer coaches" for NCAA Division 1 schools who allege antitrust claims as class representatives (a class of baseball coaches in Smart; a class of coaches across many other sports in Colon). (ECF No. 1.) The assigned district judge related the cases and denied defendant's motion to dismiss in part, finding plaintiffs' Sherman Act and UCL claims stated a claim (that the NCAA's bylaw requiring member schools to retain volunteer coaches alleges a restraint of trade). Relevant here, the district judge applied a "quick look" framework to plaintiffs' anticompetitive claims, noting that the Supreme Court does not allow a per se anticompetitive framework against the NCAA, but finding "no elaborate industry analysis is required" to show that paying coaches $0 is less beneficial to plaintiffs. (ECF No. 29.)

After the pleadings were settled, the district judge entered a scheduling order. Relevant here, the schedule requires plaintiffs to move for class certification by August 2, 2024. The parties had requested differing schedules about expert deadlines for the class certification motion, but the district judge declined to order this. Under the schedule, the parties' expert disclosures are due by January of 2025, rebuttals by February, and fact discovery is to close by March of 2025. The district judge informed the parties to notice any remaining discovery or scheduling matters before the assigned magistrate judge. (ECF No. 38.)

Plaintiffs propounded discovery on the NCAA, including requests for production of documents and interrogatories seeking (as is relevant here): the names of Division 1 schools' volunteer coaches, individualized pay data for these schools' assistant coaches, and NCAA board members' communications regarding a recent change in the 'volunteer coach' bylaw. (See ECF 49.) Defendant objected to these requests, asserting that while the information appeared relevant to plaintiffs' claims, the NCAA does not possess or regularly collect this information, nor does it have any authority over its member schools to require them to produce the information. (Id.) Plaintiffs disagreed, noting various provisions of the NCAA's bylaws that they argue give the unincorporated association control. (Id.) The parties submitted this dispute to the undersigned for resolution. (Id.) The parties also requested the undersigned resolve certain scheduling and discovery matters. (ECF No. 50.)

**Discussion**

Alongside the parties' disputes raised here, the parties submit to the court a number of modifications to the standard discovery rules. These include the number of interrogatories and requests for admissions the parties may serve, procedures for expert and authentication depositions, the time limits and time divisions for each deposition, and the number of depositions allowed defendant. (ECF No. 50 at 3-4.) The parties have stipulated to these modifications. To the extent the parties seek the court's blessing for their stipulation, it is so ordered.

### I. Limitations on Topics for Rule 30(b)(6) Depositions

Fed. R. Civ. P. 30(b)(6) grants a party the power to depose "one or more officers, directors, or managing agents" of an organization "[or] other persons who consent to testify on its behalf," as designated by the organization. The Rule requires the organization "set out the matters on which each person designated will testify," and also <u>requires the parties to confer about the matters for examination</u>. Defendants request plaintiffs be required to coordinate on one 30(b)(6) deposition limited to 8 topics; plaintiffs contend this request is premature. The court agrees with plaintiffs, and so no limits (beyond what the Rules require) will be set <u>at this time</u>.

### II. Number of Depositions for Plaintiffs

Fed. R. Civ. P. 30 states that "[a] party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2)." However, Rule 30(a)(2) states that a party must obtain leave of court if a deposition "would result in more than 10 depositions being taken." Defendant contends that because these cases were related and involve a similar set of facts, plaintiffs should be limited to 8 additional depositions beyond the one, coordinated Rule 30(b)(6) deposition. Plaintiffs contend the facts differ for their two cases, as the proposed classes are different, and note that the district judge declined to consolidate the cases; thus, plaintiffs argue they should be allowed the standard 10 depositions in each case.

Given the operation of the Federal Rules and the fact that these cases have been related only, plaintiffs in each case are allowed the standard 10 depositions without needing leave of court. Plaintiffs are cautioned that this should not be read as a license to take 20 depositions just because the rules allow. The parties should continue to work together to resolve any disputes,

and eliminate or minimize any redundancy.

### III. Expert Report Deadlines for Class Certification Motion/Opposition

In the parties' joint statement submitted to the district judge, defendant requested a bifurcated schedule to accommodate plaintiffs' forthcoming motions for class certification. Defendant argued that because Sherman Act claims often require a detailed examination of market power, typically supported by expert testimony, the parties should be required to submit their expert reports, rebuttals, and replies prior to the start of class certification briefing. Plaintiffs contend the district judge rejected this request, and so plaintiffs' expert reports should be due alongside their motions. Plaintiffs note the district judge found that a "quick look" approach was appropriate for this case, so a less-extensive analysis is required for their Sherman Act claims at class certification. Plaintiffs also cite to the district judge's approval of the parties' agreement to allow for an extended briefing schedule for the motion (that defendant be allowed six weeks to depose plaintiffs' experts, generate its own expert report, and file its points and authorities in opposition of class certification).

On this point, the undersigned agrees with plaintiffs. The district judge declined to enter a bifurcated schedule, and given the parties' cooperation so far, defendant could request (and should receive) the amount of time necessary to complete its expert discovery on class certification prior to submitting its opposition. The undersigned encourages the parties to submit stipulations to the district judge regarding their briefing schedule and reaffirms the district judge's note on this matter. (See ECF No. 38 at 5, fn.1.)

### IV. Plaintiffs' Motion to Compel

Plaintiffs seek a court order compelling the NCAA to produce: (a) the names of member schools' volunteer coaches; (b) individualized pay data for member schools' assistant coaches; and (c) NCAA governance board members' communications regarding a recent change in the 'volunteer coach' bylaw at issue in this case. The parties do not dispute the relevance of this information, nor do they dispute that the NCAA does not possess or have custody over this information. Rather, the parties dispute whether the NCAA has "control" over the information for Rule 34 purposes, or that the information is otherwise "available to" it for Rule 33 purposes,

4

such that the court could compel the NCAA to collect and produce the information.

**Legal Standards**

Under Federal Rule of Civil Procedure 34, a party's obligation to produce documents extends to relevant non-privileged documents in its "possession, custody, or control." "Control is defined as the legal right to obtain documents upon demand." In re Citric Acid Lit., 191 F.3d 1090, 1107 (9th Cir. 1999) (quoting United States v. Int'l Union of Petroleum & Indus. Workers, 870 F.2d 1450, 1452 (9th Cir. 1989)). The Ninth Circuit has emphasized that proof of "theoretical control is insufficient; a showing of actual control is required." Int'l Union, 870 F.2d at 1453–54; see also Citric Acid, 191 F.3d at 1107 (rejecting the "practical ability" test because the non-party entity "could legally—and without breaching any contract—continue to refuse to turn over such documents"). "The party seeking production of the documents . . . bears the burden of proving that the opposing party has such control." Int'l Union, 870 F.2d at 1452.

Under Rule 33(b)(1)(B), an interrogatory addressed to a party must be answered by an officer or agent, "who must furnish the information available to the party." For Rule 33 purposes, courts have held that information "readily obtainable" from a third-party is discoverable through an interrogatory. See In re NCAA Student-Athlete Name & Likeness Litigation ("O'Bannon"), 2012 WL 161240 *5 (N.D. Cal. Jan 17, 2012) (citing Hitachi, Ltd. v. AmTran Tech. Co., Ltd., 2006 WL 2038248 at *2 (N.D. Cal. July 18, 2006). "Rule 33 requires that a corporation furnish such information as is available from the corporation itself or from sources under its control." In re ATM Fee Antitrust Lit., 233 F.R.D. 542, 545 (N.D. Cal. 2005) (quoting Brunswick Corp. v. Suzuki Motor Co., Ltd., 96 F.R.D. 684, 686 (D. Wis. 1983). Thus, courts have found a parent corporation must respond to an interrogatory with information from a subsidiary, or where the subsidiary is participating in the litigation. Id. However, other courts have found control lacking where: (i) no evidence supports an agency-principal relationship, particularly where the 'parent' organization is an unincorporated association; (ii) individual institutions have not "actively participated" in the litigation; or (iii) member institutions have done nothing more than "voluntarily cooperate in response to the discovery demands." O'Bannon, 2012 WL 161240, at *4.

**Analysis**

    a. **Volunteer Coach IDs**

To demonstrate control, plaintiffs point to a number of the NCAA's Bylaws that, they argue, give defendant the legal right to obtain the names of the volunteer coaches who worked for each of the Division 1 schools (in the relevant sports and times). Primarily, plaintiffs cite to Bylaw 11.7.1, which reads: "An individual who coaches and either is uncompensated or receives compensation or remuneration of any sort from the institution … shall be designated as a head coach, assistant coach, volunteer coach, graduate assistant coach or student assistant coach by certification of the institution." (See ECF No. 49-2 at Ex. E (the "Bylaws") at 49.) Plaintiff argues that because this Bylaw requires each school to certify the position of each coach, including the volunteer coaches, it gives the NCAA the right to obtain from the schools the names of these coaches. Defendant disagrees, noting this Bylaw only requires the schools to designate and certify the information to itself, not to the NCAA. Defendant notes other provisions in the Bylaws with similar self-reporting procedures, contrasting these with other Bylaws that explicitly require the school "notify" or "report to" the NCAA. Defendant supports this argument not only by a plain read of the text but through the declaration of Kevin Lennon, the Senior VP of Policy and Governance for the NCAA. (See ECF No. 49-3 at ¶¶ 1; 19-22.)

On the whole, defendant has the better read of the Bylaws. The undersigned notes the difference between Bylaw 11.7.1 and, for example, 12.1.1.1.2.2: the former merely requires certification by the institution (as if to say "Mrs. X, we designate you as Assistant Coach"), while the latter expressly requires reporting of information to the NCAA on certain conditions. (Cf. Bylaws at 49, with Bylaws at 55-56.) Plaintiffs argue this interpretation is absurd, as there would be no way for the NCAA to obtain this information if a school failed to follow Bylaw 11.7.1. However, the court notes there are other provisions of the Bylaws that allow the NCAA to open an investigation during an enforcement action, during an infractions proceeding, or other inquiries—thus leaving the NCAA with options to investigate certifications if the NCAA believed a school was out of compliance. (See Bylaws 8.01.3, 19.2.3, 20.10.1.5.)

Regarding the NCAA power to investigate, plaintiffs argue these give the NCAA the legal

6

right to the information so it should open an investigation. However, these investigatory Bylaws are not meant to provide a discovery mechanism for plaintiffs to utilize; rather, they allow for the NCAA to investigate if a Bylaw has not been adhered to. No one has asserted schools failed to follow the volunteer coach Bylaw—to the contrary, plaintiffs' case is founded on the premise that member schools did follow the Bylaw in hiring coaches on a $0 salary. What's more, other courts dealing with similar issues have found unpersuasive the argument that an organization's bylaws can be cobbled together to provide for express legal control over the sought-after information. See O'Bannon, 2012 WL 161240 at *3 ("Furthermore, the fact that the NCAA can take enforcement action against member institutions that violate NCAA rules does not mean that the NCAA has power to compel members to produce the documents sought in this litigation.") (citing Int'l Union, 870 F.2d at 1452 (finding that International Union did not have "control" over local union documents even though International had power to dissolve local union, revoke charter, and remove recalcitrant leaders under certain circumstances)).

Plaintiffs also contend that the names of the volunteer coaches should be "readily obtainable" and "available" to the NCAA for purposes of a Rule 33 interrogatory. However, plaintiffs' argument here falls short for the same reasons as with its Rule 34 argument: they have not shown the NCAA has the legal right to obtain this information. Similar to O'Bannon, this case differs from, for example, Hitachi, Ltd. v. AmTran Tech. Co., Ltd., 2006 WL 2038248 at *2 (N.D. Cal. July 18, 2006). There, the court relied on the agent-principle relationship between the parties; here, no such relationship is apparent. See O'Bannon, 2012 WL 161240 at *3-5.

Beyond this fact, plaintiffs generally cite to Rule 1 (for the "just, speedy, and inexpensive determination of every action"), note the incredible burden placed on them in having to issue over 300 subpoenas to member schools, and cite as persuasive a 10th Circuit case where, when the "rubber met the road," the NCAA successfully obtained and produced the information sought in discovery. See Law v. National Collegiate Athletic Ass'n, 167 F.R.D. 464 (D. Kan. 1996). However, as defendant correctly notes, the 10th Circuit expressly overruled a portion of the district court's order in Law (that the member schools were the "real parties in interest"), thus calling into question its central holding. Further, as noted in Int'l Union, the Ninth Circuit has

7

1  rejected a more flexible "practical ability" test used in Law.  870 F.2d at 1454.  Bigger picture,
2  plaintiffs have not indicated what action the court might take if it were to issue an order
3  compelling member schools to produce the information but the member schools refuse.[1]  See
4  O'Bannon, 2012 WL 161240 at *5 ("And the Court is not convinced that if it were to order the
5  NCAA to survey its members for more information that there would be any remedy if the
6  member institutions refused to comply.").  For these reasons, the court denies plaintiffs' motion to
7  compel defendant to obtain and produce the names of each schools' volunteer coaches.

### b. Individualized Data on Assistant Coach Pay

Much for the same reason, plaintiffs' argument fails in its request for an order compelling the NCAA to produce individualized salary data for each member schools' assistant coaches. Plaintiffs' strongest argument is its reliance on Bylaw 20.2.4.17, which states that member schools must "submit financial data … to the NCAA on an annual basis in accordance with the financial reporting policies and procedures, [including] [s]alary and benefits data for all athletics positions." (See Bylaws at 60-61.)  Defendant states that, pursuant to this Bylaw, it regularly collects the aggregate salaries for all assistant coach positions (e.g. "We, X School employ two assistant coaches with a salary of $200,000 in total.").  Defendant has offered to produce this information in the form it receives it.  Plaintiffs argue this text plainly gives the NCAA control over the individualized salary data, and so the NCAA should obtain it from each school.  Despite plaintiffs' arguments, the Bylaw makes this reporting duty subject to certain "financial reporting policies and procedures."  These procedures define the salaries category as "[i]nput compensation, bonuses and benefits paid to all coaches . . . ." (ECF No. 49-3 at 7 (emphasis added).)  The courts read here aligns with defendant's read of the Bylaw and attached procedures.

---

[1] The court discussed at length the parties' options regarding plaintiffs' ability to obtain the sought-after information.  One option could be for the NCAA to voluntarily solicit this information from its member schools and produce to plaintiffs whatever it obtains.  Coupled with an agreement that the parties might rely on a random sample of evidence to support their class certification/opposition motions, this might reduce the costs—and attorneys' fees—that the NCAA may be liable for in any settlement or loss at trial.  However, the court's "mediator's suggestions" herein are different from its power to compel member schools to produce the information.

In re Citric Acid Litig., 191 F.3d at 1107.

The remainder of plaintiffs' arguments on this point (NCAA's general investigatory powers, Rule 33 availability, Rule 1 efficiencies, citation to Law, reliance on a "practical ability" test, and the court's ability to enforce any order against nonparties) are similar to those with the volunteer coaches, and so are rejected for the same reasons as above.  Thus, plaintiffs' motion to compel individualized salary data for the assistant coaches is denied.  Defendant shall produce the information as it has in its possession, and if plaintiffs wish to obtain more granularized data, they may subpoena the member schools.

### c. Division 1 School Communications re: Bylaw Changes

Finally, plaintiffs seek an order compelling production of communications from members of the NCAA Governance Board as related to changes made to the 'Volunteer Coaches' Bylaw over the last few years.  Defendant has offered to produce communications on this topic to the extent that its employees participated in these conversations and have copies of them.  However, defendant notes that almost all individuals on this board are employees of the member schools, including university presidents, conference commissioners, and other high-ranking officials at those schools.  These individuals use their own communications portals (email accounts and the like) which are not under the NCAA's control.  (ECF No. 49-3 at ¶¶ 35-42.)  Plaintiffs counter that these individuals do business on behalf of the NCAA and so are, in effect, defendant's agents; thus, the court can find defendant has control over these individuals' communications.  See S. California Edison Co., et al. v. Greenwich Ins. Co., 2023 WL 5506018, at *6 (C.D. Cal. July 17, 2023) ("[A] party responding to a Rule 34 production request is under an affirmative duty to seek that information reasonably available to it from its employees, agents, or others subject to its control.").

Again, plaintiffs' arguments are unpersuasive.  The court notes plaintiffs' citation to cases where courts have found such control between an association and its members.  However, these cases present situations where, for one reason or another, there was some explicit authority granting this control.  Miniace v. Pac. Martime Ass'n, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006) (compelling production of documents from association board members' accounts where a

state statute gave the power to remove the current, non-employee board members); Adidas Am., Inc. v. TRB Acquisitions LLC, 2019 WL 7630793, at *3 (D. Or. Aug. 2, 2019) (compelling search and production of documents of company board members where control might be established through "a term of sale or . . . some other mechanism"); Royal Park Invs. SA/NV v. Deutsche Bank, 2016 WL 5408171, at *1 (S.D.N.Y. Sept. 27, 2016) (same, using a "practically available" test that the 9th Circuit rejects).  At the hearing, plaintiffs argued defendant's failure to cite to any supporting cases should render this argument in their favor.  While true, defendant's briefing in this section of the joint statement did not cite persuasive cases contrary to plaintiffs', the court reads defendant's argument as part and parcel with its argument regarding the volunteer coach identities and individualized pay data.  That is:  no Bylaw exists giving control to the NCAA over the email accounts of university presidents, conference commissioners, and the like.  Thus, for the same reasons as above, plaintiffs' motion to compel communications from the NCAA Governance Board Members is denied.

**ORDER**

Accordingly, it is hereby ORDERED that:

1. The parties' agreed upon procedures for discovery, as outlined above and at ECF No. 50-1, 3-4, is ADOPTED;

2. Defendant's request to limit the topics of a Rule 30(b)(6) deposition is DENIED;

3. No limits on the number of depositions allowed plaintiffs are ordered aside from those outlined in Fed. R. Civ. P. 30;

4. Plaintiff's timeline for the deadline to submit expert reports related to their class certification motion is ADOPTED.  Plaintiffs shall submit their expert report alongside their class certification motion, currently due by August 2, 2024.  Defendant's rebuttal expert report is due alongside its opposition to the class certification motion;

////

////

////

////

5. Plaintiff's motion to compel (ECF No. 49) is DENIED IN FULL.  Defendant shall produce the information in its possession.  Plaintiffs may subpoena the member schools for additional information as needed, and the parties are counseled to continue working toward a just, speedy, and inexpensive resolution to these cases.

Dated:  November 9, 2023

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

smar.2125 and colo.425