1  CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
   Carolyn.Luedtke@mto.com
2  JUSTIN P. RAPHAEL (State Bar No. 292380)
   Justin.Raphael@mto.com
3  MEGAN McCREADIE (State Bar No. 330704)
   Megan.McCreadie@mto.com
4  CHRISTOPHER CRUZ (State Bar No. 346128)
   Christopher.Cruz@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
6  San Francisco, California 94105-2907
   Telephone:(415) 512-4000
7  Facsimile:(415) 512-4077

8  *Attorneys for Defendant National
   Collegiate Athletic Association*

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11

12
   TAYLOR SMART and MICHAEL          Case No. 2:22-cv-02125-WBS-CSK
13 HACKER, individually and on
   behalf of all those similarly    **DEFENDANT NCAA'S NOTICE OF**
14 situated,                        **MOTION AND MOTION TO EXCLUDE**
                                    **EXPERT TESTIMONY OF DR. ORLEY**
15         Plaintiffs,              **ASHENFELTER AND DR. DANIEL**
                                    **RASCHER ON CLASS CERTIFICATION;**
16     v.                          **MEMORANDUM OF POINTS AND**
                                    **AUTHORITIES IN SUPPORT THEREOF**
17 NATIONAL COLLEGIATE ATHLETIC
   ASSOCIATION                      Judge:    Hon. William B. Shubb
18                                  Courtroom: 5
           Defendant.              Date:      March 3, 2025
19                                  Time:      1:30 p.m.

20 SHANNON RAY, KHALA TAYLOR,        Case No. 1:23-cv-00425-WBS-CSK
   PETER ROBINSON, KATHERINE
21 SEBBANE, and RUDY BARAJAS,
   individually and on behalf of
22 all those similarly situated,

23         Plaintiffs,

24     v.

25 NATIONAL COLLEGIATE ATHLETIC
   ASSOCIATION, an unincorporated
26 association,

27         Defendants.

28

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that, on March 3, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, California, Defendant National Collegiate Athletic Association ("NCAA") will, and hereby does, move this Court pursuant to Federal Rule of Civil Procedure 702 for an order excluding the testimony of Dr. Orley Ashenfelter and Dr. Daniel Rascher in connection with Plaintiffs' Motions for Class Certification in the above-captioned actions.

This Motion is based upon the following Memorandum of Points and Authorities, the Declaration of Megan McCreadie, all other materials supporting this Motion, all pleadings on file, including Defendant's concurrently filed Opposition to Plaintiffs' Motions for Class Certification and supporting documents, and any other matter submitted before or at the hearing on the Motion.

DATED:  December 20, 2024     MUNGER, TOLLES & OLSON LLP


By:     /s/ Justin P. Raphael
            JUSTIN P. RAPHAEL

        *Attorneys for Defendant National Collegiate Athletic Association*

1

**TABLE OF CONTENTS**

**Page**

2

3  MEMORANDUM OF POINTS AND AUTHORITIES..............................1

4  I.   INTRODUCTION................................................1

5  II.  RELEVANT BACKGROUND.........................................4

6  A.   The Coaching Landscape and Data Available To
        Experts.................................................4

7

   B.   Dr. Ashenfelter's Model................................6

8

   C.   Dr. Rascher's Model....................................9

9

   III. LEGAL STANDARDS............................................10

10

   IV.  ARGUMENT...................................................11

11

   A.   Both Experts Fail to Address Standard Economic
        Factors in Determining Earnings.......................11

12

13  B.   Neither Expert Addresses Sample Selection Bias........17

14  C.   Dr. Ashenfelter's Model Relies on Arbitrary Groups
        of Different Sports...................................26

15  V.   CONCLUSION.................................................30

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Allgood v. Gen. Motors Corp.*,
    No. 102CV1077DFHTAB, 2006 WL 2669337 (S.D. Ind. Sept.
    18, 2006) ..........................................................25

*Bickerstaff v. Vassar Coll.*,
    196 F.3d 435 (2d Cir. 1999), as amended on denial of
    reh'g (Dec. 22, 1999) ........................................16

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013) ........................25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ...................................1, 4, 11

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .................................10

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ................................11

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ..........................................11

*In re Google Play Store Antitrust Litigation*,
    No. 20-CV-05761-JD, 2023 WL 5532128 (N.D. Cal. Aug.
    28, 2023) ................................................26, 27

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
    254 F.3d 825 (9th Cir. 2001) .................................11

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..........................................11

*Law v. NCAA*,
    1996 WL 34400119 (D. Kan. 1996) ...................2, 14, 15, 29

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ................11, 12, 16

*Moussouris v. Microsoft Corp.*,
    311 F. Supp. 3d 1223 (W.D. Wash. 2018) .......................18

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000) .................................16

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016) ............................2, 14

*Orthoflex, Inc. v. ThermoTek, Inc.*,
   986 F. Supp. 2d 776 (N.D. Tex. 2013) ........................18

*In re: Pella Corp. Architect & Designer Series Windows*
   *Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   214 F. Supp. 3d 478 (D.S.C. 2016) ................2, 17, 18, 25

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands*
   *Corp.*,
   100 F. App'x 296 (5th Cir. 2004) ............................4

*Reed v. Advoc. Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009) ............................16

*Werede v. Allright Holdings, Inc.*,
   No. CIV.A03CV01167WDMCBS, 2005 WL 2124553 (D. Colo.
   Sept. 2, 2005) .............................................16

**FEDERAL RULES**

Fed. R. Evid. 702.....................................10, 16, 25

**OTHER AUTHORITIES**

Elka Torpey, *Same Occupation, Different Pay: How Wages*
   *Vary*, U.S. BUREAU OF LAB. STAT. (May 2015),
   https://www.bls.gov /careeroutlook/2015/article/wage-
   differences.htm .............................................13

Federal Judicial Center, Reference Manual on Sci. Evid.
   § 211 (3d ed.) .............................................25

1                **MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

In support of their motions for class certification, the Plaintiffs in both the *Colon* case and the *Smart* case have proffered expert models for predicting what volunteer coaches would have earned.  These models violate basic economic principles.  In order to estimate earnings, an economist should account for the fact that workers with more experience, tenure and skill earn more.  But Plaintiffs' experts did not do that.  An economist should not assume that different jobs are subject to the same supply and demand conditions.  But that is not what the *Colon* Plaintiffs' expert did.  All of this contradicted economic principles that Plaintiffs' experts agreed are standard in the field.  Accordingly, the testimony of Dr. Orley Ashenfelter in the *Colon* case and Dr. Daniel Rascher in the *Smart* case regarding earnings models is unreliable, inadmissible and should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*First*, both experts admittedly failed to control for the textbook economic principle that skill and experience affect earnings.  As Dr. Ashenfelter himself has explained in earlier work, "[s]tandard human capital theory links an individual's earnings to his or her level of education, job experience, industry and industry experience, and an individual's job title in a particular industry."  Declaration of Megan McCreadie ("McCreadie Decl.") Ex. 1 ¶ 96.  Both experts agreed that this human capital theory is fundamental to labor economics.  In his prior work, including in antitrust cases, Dr. Ashenfelter

controlled for "employee-specific variables" in estimating

earnings.  *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D.

270, 305 (N.D. Cal. 2016).  So did the expert in *Law v. NCAA*,

which is Plaintiffs' template for this case.  *See* Aff. of Robert

D. Tollison, *Law v. NCAA*, 1996 WL 34400119 (D. Kan. 1996)

("Tollison *Law* Aff.").  But here, Dr. Ashenfelter and Dr. Rascher

did not even try to account for skills and experience that affect

earnings but vary from coach to coach.  Thus, their earnings

models are unreliable and inadmissible.

Second, both experts failed to address sample selection bias,

which they agreed is a well-recognized problem in economic

analysis of data.  The basic concept is that "when an expert

attempts to draw conclusions about an entire population from a

sample-based analysis, the sample[ ] must be chosen using some

method that assures the sample[ ] [is] appropriately

representative of the larger entity or population being measured."

*In re: Pella Corp. Architect & Designer Series Windows Mktg.,*

*Sales Pracs. & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 493

(D.S.C. 2016) (quotations and citation omitted).  Otherwise, "a

study of that sample will tend to produce inaccurate results."

*Id.* at 492.

Here, both experts estimated earnings for the entire

population of volunteers using a sample of salaries for coaches

who were hired for positions created after the bylaws were

amended.  Those coaches were not representative of all volunteer

coaches for reasons related to both supply and demand.  On the

supply side, the fact that the coaches in the sample were hired

for paid positions suggests that they were more experienced and

skilled than the volunteers, who were not hired for paid positions.  Because more experienced and skilled coaches generally earn more, using salaries of coaches who were hired for paid positions would tend to overestimate what volunteer coaches would have earned.  On the demand side, schools that hired paid coaches after the bylaws were amended likely had higher demand for coaching than schools who did not, which means that they would have been willing to pay more.  Neither expert addressed either of these potential problems with their sample.  That departure from standard economic practice makes both experts' earnings models unreliable.

*Third*, Dr. Ashenfelter's earnings model in the *Colon* case improperly assumes that the same supply and demand conditions apply to jobs coaching different sports.  Dr. Ashenfelter conceded that ██████████████████████████████████████████ McCreadie Decl. Ex. 2, Ashenfelter Dep., at 183:16-18, and that to calculate a market wage, ████████████████████████████ ████████████████████████ *Id.* at 186:12-15.  But Dr. Ashenfelter used jobs coaching many different sports without analyzing whether salaries for those jobs are the function of the same supply and demand conditions.  Dr. Ashenfelter did not analyze whether jobs coaching indoor volleyball, field hockey, gymnastics, ice hockey, lacrosse, rugby, soccer, softball, track and field, water polo and wrestling are in the same market, but his model grouped together salaries in those sports.  Dr. Ashenfelter admitted that this approach ██████████████████ ██████ sports.  *Id.* at 50:11-14.  It is not reliable to model

1  market wages using salaries that are generated by different supply
2  and demand conditions.

3      This is not a "battle of the experts" about the minutiae of
4  statistical models.  Plaintiffs' experts agreed that the economic
5  principles that form the basis for this motion are standard in the
6  field.  Plaintiffs' failure to apply those principles cannot be
7  excused because they use terms like "t-statistics."  "[R]egression
8  analysis is not a magic formula."  *Piggly Wiggly Clarksville, Inc.*
9  *v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004).
10 Plaintiffs' experts' earnings models do not even try to address
11 differences that standard economic principles say matter.
12 Accordingly, the models are unreliable and inadmissible under
13 *Daubert*.

14 **II.   RELEVANT BACKGROUND**

15      **A.   The Coaching Landscape and Data Available To Experts**

16      The NCAA has bylaws governing collegiate sports in
17 Division I, the Division at issue in this lawsuit.  The bylaws are
18 adopted by the membership of the NCAA, comprised of colleges and
19 universities across the country of varying sizes and with varying
20 priorities for their sports programs.  McCreadie Decl. Ex. 5,
21 Fraser Dep., at 51:13-54:9.  The coaching bylaws set forth the
22 maximum number of coaches that a Division I member school can pay
23 in each sport that the school sponsors.  *Id.* at 128:17-129:14.
24 Each member school chooses how many sports to sponsor and, in each
25 sport, how many coaches to hire and whether or not to pay them.
26 Each school may structure their coaching staff differently.  Most
27 schools will have a head coach and then several assistant coaches
28 for each sport.

Some schools choose to hire and pay assistant coaches up to the maximum number allowed in each sport, and others do not. There is variation across schools and across sports. *See* Defendant's Opposition to Plaintiffs' Motions for Class Certification ("Opp") at 23-26, 35-36, 93. Some schools choose to pay some of their assistant coaches significantly more than other assistant coaches in the same sport. *See id.* at 93. Some schools choose to pay assistant coaches in one sport more than assistant coaches in other sports. *See id.* And some choose not to pay some of their assistant coaches at all even though the bylaws would permit doing so. *See id.* at 23-26, 35-36.

Until 2023, in most sports, NCAA bylaws allowed member schools to hire an *additional* volunteer coach in addition to the maximum number of paid coaches in that sport. As the name implies, the bylaws prohibited the school from paying the volunteer coach. *See* McCreadie Decl. Ex. 5, Fraser Dep., at 129:22-132:12. Thus, for example, before July 1, 2023, baseball programs could hire up to three paid coaches as well as a volunteer coach for a total of four coaches.

In early 2023, the NCAA membership amended the bylaws, eliminated the formal position of volunteer coach and, in most sports where volunteers had been permitted, increased the number of paid coaches that each team could hire if they chose. Under the amended bylaws, programs are not required to pay any of their coaches and can choose not to pay one or more coaches on each team. Thus, for example, under the amended bylaws, baseball programs can now hire up to four paid coaches, but they are not

1  required to do so.  Baseball programs, as well as programs in

2  other sports, may choose not to pay one or more of their coaches.

3       **B.    Dr. Ashenfelter's Model**

4       The putative *Colon* class consists of coaches in 44 different

5  NCAA sports, such as softball, rowing, gymnastics, golf, lacrosse,

6  ice hockey and many more.  Their expert is Dr. Ashenfelter.  His

7  model is based on a sample of salaries earned by coaches at 85 of

8  the more than 300 Division I schools.  Report of Orley Ashenfelter

9  in Support of *Colon* Plaintiffs' Motion for Class Certification, as

10  Corrected November 26, 2024 ("Ashenfelter Report") ¶ 61.[1]  Those

11  85 schools added at least one paid position in 2023 in at least

12  one sport other than baseball beyond the maximum number of paid

13  coaches permitted in that sport during the proposed Class period.

14  *Id.*

15       For each sport in which these schools hired an additional

16  paid coach, Dr. Ashenfelter "rank[ed]" the paid coaches from

17  highest to lowest salary.  *Id.* ¶ 67.  Dr. Ashenfelter then

18  "categorize[d]" each program depending on how many unpaid coaches

19  the amended NCAA bylaws permit each program to hire as of July 1,

20  2023.  *Id.* ¶ 66.  The categories are as follows:

21

22

23

24

25

26

27  [1] The Ashenfelter Report was lodged with the Court on December 13,
2024, along with *Colon* Plaintiffs' Notice of Request to Seal

28  Documents and Amend Filings.

| Paid Coaches Permitted | Sports |
|---|---|
| 3 | women's bowling, women's beach volleyball, men's or women's cross country, men's or women's fencing, men's or women's golf, rifle, men's or women's skiing, men's or women's swimming, men's or women's tennis, women's triathlon |
| 4 | women's field hockey; men's or women's gymnastics; men's or women's ice hockey; men's or women's lacrosse; women's rugby; men's or women's soccer; women's softball; men's or women's track and field; men's or women's volleyball; men's or women's water polo; men's or women's wrestling |
| 5 | women's acrobatics and tumbling; combined cross country; women's equestrian; men's or women's swimming and diving |
| 6 | combined fencing; combined golf; combined skiing; combined swimming; combined tennis; men's or women's track and field/cross country |
| 8 | combined swimming & diving; combined track and field; combined water polo |
| 9 | women's rowing |
| 12 | combined track and field/cross country |
| 13 | Football Championship Subdivision ("FCS") football[2] |

*Id.* Pooling together the salaries for all coaches and all sports in each category, Dr. Ashenfelter calculates the average ratio between the salary of the second-lowest paid coach and the salary of the lowest paid coach to estimate the percentage "stepdown" from the second-lowest salary to the lowest salary. *Id.* ¶¶ 67-68 & Table 5.

To illustrate, take sports in which the NCAA bylaws now permit four paid coaches, such as men's lacrosse and women's softball. *Id.* ¶ 66. Dr. Ashenfelter found that across those

---

[2] Division I football is divided into two subdivisions: FBS football, in which teams are eligible to participate in postseason bowl games such as the Rose Bowl, and the Football Championship Subdivision, where teams are not.

sports, at schools that hired four coaches after the bylaws were amended, the lowest paid coaches on average made 50.5% of what the second-lowest paid coach made.  *See id* ¶ 68 & Table 5.

To calculate damages, Dr. Ashenfelter assumed that all Division I programs for all sports in each category would have paid all volunteers the salary of the lowest paid coach in the actual world adjusted by the same calculated "stepdown" percentage.  *See id.* ¶ 71.  Thus, Dr. Ashenfelter assumed that *all* men's lacrosse programs would have hired the coaches who volunteered at a salary equal to 50.5% of the salary of their lowest paid assistant men's lacrosse coach—even if those programs did not hire an additional paid coach after the bylaws permitted them to do so.  *See id.* ¶ 71.  Dr. Ashenfelter did not take into account whether that calculated "stepdown" percentage makes sense for men's lacrosse as compared to women's softball.  He just assumed one uniform stepdown number calculated for all sports that were allowed under the rules to pay four coaches.  *See id.* ¶¶ 65-71.

As explained below, Dr. Ashenfelter did not do anything to account for the possibility that the coaches in his sample who were hired for new paid positions were different from the coaches who worked as volunteers in ways that would affect their earnings.  McCreadie Decl. Ex. 2, Ashenfelter Dep., at 240:23-241:3.  He did not do anything to determine whether the coaches hired for new positions were more experienced, tenured or skilled than the volunteers, and did not account for that possibility.  And he did not do anything to account for differences in qualifications or resulting pay across sports.

1

### C.    Dr. Rascher's Model

2      The putative class in the *Smart* case consists of volunteer

3  baseball coaches.   Their expert is Dr. Rascher.   To estimate

4  damages for coaches who volunteered at programs during the class

5  period that did *not* hire an additional paid baseball coach after

6  the bylaws permitted them to do so in 2023, Dr. Rascher used

7  salaries earned by coaches at 105 Division I schools that did hire

8  a third paid assistant baseball coach after the bylaws were

9  amended.   Amended Expert Declaration of Daniel A. Rascher in

10 Support of Motion for Class Certification, dated Nov. 7, 2024, ECF

11 64-02 ("Rascher Report") ¶ 182 & n.198; McCreadie Decl. Ex. 3,

12 Rascher Dep., at 222:2-7.   Dr. Rascher divided the Division I

13 baseball programs into deciles based on their expenditures on

14 baseball.   Rascher Report ¶ 184 & n.198.   He then compared the

15 salaries that schools that did not hire additional paid coaches

16 paid to the average salaries paid by schools in the same decile.

17 Specifically, he divided (1) the salaries that schools that did

18 not hire additional paid coaches paid their assistant baseball

19 coaches in the actual world by (2) the average salaries that

20 baseball programs in each decile paid to their two highest paid

21 assistant coaches.   McCreadie Decl. Ex. 3, Rascher Dep., at

22 220:25-222:7; Rascher Report ¶ 184.

23      To calculate damages, Dr. Rascher assumed that this same

24 ratio of salaries for the two highest paid assistant coaches in

25 each decile in the actual world would have held for salaries paid

26 to the lowest-paid coaches in the but-for world.   *See* Rascher

27 Report ¶¶ 184-85.   Thus, if in the 2023-2024 season Program A—

28 which did *not* hire an additional paid coach—paid its assistant

coaches 75% of what schools in its decile paid, then Dr. Rascher assumed that Program A would have paid its volunteers 75% of what coaches who were hired for new positions at programs in that decile were paid in the 2023-2024 season, adjusted for inflation in coaching salaries.[3]

As explained below, Dr. Rascher did not do anything to account for the possibility that the coaches in his sample who were hired for new paid positions were different from the coaches who worked as volunteers in ways that would affect their earnings. *See* McCreadie Decl. Ex. 3, Rascher Dep., at 249:7-24.  He did not do anything to determine whether the coaches hired for new positions were more experienced, tenured or skilled than the volunteers, and did not account for that possibility.

## III. LEGAL STANDARDS

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that" (among other things) "the testimony is the product of reliable principles and methods" and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

---

[3] To estimate what volunteers at baseball programs who hired a third paid assistant coach in 2023-2024 would have earned, Dr. Rascher simply assumed that those volunteers would have earned the same amount as the coaches who were actually hired for the newly created positions (adjusted for inflation in coaching salaries).  McCreadie Decl. Ex. 3, Deposition of Daniel Rascher, at 220:14-24, 249:7-250:11; Rascher Report ¶¶ 184-85.

Under Rule of Evidence 702, this court acts as a "gatekeeper" to ensure that expert testimony is reliable. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The purpose of judicial gatekeeping under Rule 702 is "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

"To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citation omitted). Courts exclude expert testimony based on assumptions that are "not sufficiently founded on facts." *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831–32 (9th Cir. 2001). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV.   ARGUMENT

### A.   Both Experts Fail to Address Standard Economic Factors in Determining Earnings

Plaintiffs' experts' models of what volunteer coaches supposedly would have earned if NCAA Division I bylaws had permitted teams to pay additional coaches are unreliable because they fail to control for factors that standard economics finds have a significant effect on earnings. The "key question

regarding the admissibility of" expert "statistical analyses is whether they account for the 'major factors.'"  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012).  "The importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation."  *Id.* at 973.  Both Dr. Ashenfelter and Dr. Rascher testified that workers' experience, tenure and skill are major factors in their earnings.  *See* McCreadie Decl. Ex. 2, Ashenfelter Dep., at 71:18-72:4; *id.* Ex. 3, Rascher Dep., at 230:1-10.  But neither accounted for these factors.

**Ashenfelter.**  Dr. Ashenfelter characterized this principle, known as "human capital theory," as ███████████████████████ *id.* Ex. 2, Ashenfelter Dep., 74:20-23; *see also id.* at 41:5-12, and the ██████ in the ████████████████████████ ██████  *Id.* at 72:5-12.  Indeed, nearly fifty years ago, Dr. Ashenfelter wrote in a published academic paper that "any theory of the determination of earnings will imply that current earnings are the result of a variety of historical factors," including experience, and that "good summary measures" of a worker's cumulative experience are "age and previous earnings."  McCreadie Decl. Ex. 9.  He also provided sworn testimony in a prior antitrust case that "[s]tandard human capital theory links an individual's earnings to his or her level of education, job experience, industry and industry experience, and an individual's job title in a particular industry."  McCreadie Decl. Ex. 1 ¶ 96.

**Rascher.**  Dr. Rascher agrees that, according to ████████ ████████████████ workers' skills will affect their wages.  *Id.* Ex. 3, Rascher Dep., at 96:10-97:18.  He testified that, according

-12-

to standard human capital theory, workers' pay is a function of their value and ███████████████████████████████████████████████ ███████████ *Id.* at 230:24-231:9.  Dr. Rascher acknowledged that this principle would be found in a ████████████████████████████ *Id.* at 231:17-23.  Indeed, Dr. Rascher's own source from the Bureau of Labor Statistics (which he testified is ████████████ ███████████ *id.* at 239:2-8) states:  "Everyone brings unique skills and abilities to a job.  And no two jobs are exactly alike. Variations affect pay for jobs within the same occupation.  Often, the more pronounced these variations are, the bigger the wage difference."[4]  *See* Rascher Report ¶ 74 n.87 (citing the source).

Thus, there is no dispute that "experienced workers usually earn more than beginners.  Workers who have in-demand skills also may earn more."[5]  *See also* McCreadie Decl. Ex. 4, Report of Jee-Yeon K. Lehmann (hereinafter "Lehmann Report"), ¶¶ 126-36 (discussing Dr. Ashenfelter's failure to account for various factors impacting human capital, including the impact on his results).

There also is no dispute that experience and skills vary from worker to worker:  in Dr. Rascher's words, ████████████████ ███████████████  McCreadie Decl. Ex. 3, Rascher Dep., at 97:20-23, 240:2-6, 247:22-248:13, 251:25-252:2.  In fact, Dr. Rascher testified that it is ███████████ economics that ████████████████ ████████████████████████████████████████████████ *Id.* at

---

[4] Elka Torpey, *Same Occupation, Different Pay: How Wages Vary*, U.S. BUREAU OF LAB. STAT. (May 2015), https://www.bls.gov /careeroutlook/2015/article/wage-differences.htm.

[5] *Id.*

242:5-24.  That is why economists typically control for these
employee-specific factors when trying to isolate the effect of a
defendant's conduct or an external event on earnings.  *See* Lehmann
Report ¶ 132 (noting that "Dr. Ashenfelter's own previous expert
work and academic work underscores the importance of controlling
for variations in the levels and types of human capital in
determining compensation").

For example, Dr. Ashenfelter controlled for employee-specific
factors in estimating earnings in an antitrust case where the
plaintiffs alleged that animation studios agreed not to recruit or
hire each other's employees.  He used compensation data "to
estimate the standard human capital earnings model" for the
defendants.  *Nitsch*, 315 F.R.D. at 299.  His model used "age as a
proxy for an individual's total job market experience" and "tenure
with the current employer to account for the fact that earnings
increase as the total job market experience and tenure with the
employer increase."  McCreadie Decl. Ex. 1 ¶¶ 98, 113-114.  In the
animation studio case, Dr. Ashenfelter included variables for
those factors in his regression to control for their effect on
earnings.  *See id.*; *see also Nitsch*, 315 F.R.D. at 305 (noting
that "Dr. Ashenfelter's regression model controls for . . .
employee-specific variables, such as age and tenure with the
Defendant"); McCreadie Decl. Ex. 2, Ashenfelter Dep., at 244:3-7.
Dr. Ashenfelter also has controlled for how workers' experience
affects their earnings as an expert in discrimination cases.  *Id.*
at 78:22-79:5.

The plaintiffs' expert in *Law v. NCAA*, which Plaintiffs
herald as the proper comparator for this case, also used age to

control for experience in modeling what Division I coaches would have earned if NCAA bylaws had not been in effect.  In that case, Dr. Robert Tollison stated in his expert report that it "is well known among economists [that] age has an independent effect upon worker earnings, due, for example, to the accumulation of experience and human capital over time."  Tollison *Law* Aff., 1996 WL 34400119.  According to Dr. Tollison's report in the *Law* case, "it is appropriate to account for the effect of age on earnings in the basic damage model."  *Id.*  In fact, he stated that this was the "first order of business" in order to "to allow for the control of other factors that affect coaches' earnings and hence the estimation of damages."  *Id.*  Dr. Tollison accordingly used a regression "to estimate the impact of age on coaches' earnings."  *Id.*

Unlike Dr. Ashenfelter in prior cases and unlike the plaintiffs' expert in the *Law* case, here neither Dr. Ashenfelter nor Dr. Rascher controlled for experience, skill, tenure, age or other factors that standard economics finds affect earnings.  *See* McCreadie Decl. Ex. 2, Ashenfelter Dep., at 242:7-243:4, 250:20-22 ██████████████████████████████████████████ ████████  ██████████████████████; *id.* Ex. 3, Rascher Dep., at 257:22-258:3.

In short, both Dr. Ashenfelter and Dr. Rascher (1) agreed that it is standard economics that workers' earnings depend on (among other things) their skills and experience, (2) agreed that experience and skills vary from worker to worker, but (3) did not make any attempt to control for differences in workers' experience and skills in estimating earnings.  This could be why

Dr. Ashenfelter's model makes significant errors in predicting actual coach salaries, estimating that coaches would have made several times more than, or only a fraction of, what they actually made after the bylaws were amended.  *See* Lehmann Report ¶ 124 & Exhibit 10.  To take just one example, Dr. Ashenfelter's model predicted that the lowest-paid Women's Volleyball coach at the University of Utah would receive around $36,000, yet they actually received around ▮▮▮▮.  *Id.* ¶ 125.

Dr. Ashenfelter and Dr. Rascher failed to account for a textbook principle of labor economics and, frankly common sense, that more skilled, experienced workers are paid more.  *See Reed v. Advoc. Health Care*, 268 F.R.D. 573, 594-95 (N.D. Ill. 2009) (economist's testimony was "essentially inadmissible" where his earnings model "fails to account" for factors such as "nurse performance and merit . . . that may play into an individual nurse's" wage); *Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 975 (excluding expert analysis that "fails to account for differences in artist quality/popularity" where "[c]ommon sense dictates that a more popular music artist typically will command higher ticket prices than a less popular artist").

Accordingly, their earnings models are unreliable and inadmissible under Rule 702.  *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (court properly excluded testimony of expert who "admitted to failing to consider other variables such as education and experience as explanations for any observed discrepancy between promotion rates"); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) (same where expert did "not even purport to account for two

1   of the[] major variables" in salaries: "merit and seniority");

2   *Werede v. Allright Holdings, Inc.*, No. CIV.A03CV01167WDMCBS, 2005

3   WL 2124553, at *5 (D. Colo. Sept. 2, 2005) (same where expert

4   incorporated "no consideration of variables of education,

5   experience and so forth").

6        **B.   Neither Expert Addresses Sample Selection Bias**

7        Both experts' earnings models are unreliable and should be

8   excluded for the related but independent reason that they do not

9   address sample selection bias, which is a fundamental problem with

10  statistical analysis in economics.  In a nutshell, the issue is

11  that both experts' models use a sample of salaries of coaches who

12  *were* hired as paid assistant coaches in the real world to predict

13  salaries of volunteer coaches who were not.  *See* Lehmann Report

14  ¶¶ 137-42, 166-67.  As compared to volunteers who were not hired

15  for paid positions, the coaches who were hired as paid assistant

16  coaches in the sample were likely (1) more skilled and

17  experienced, and (2) hired by schools that had greater demand for

18  coaches.  Together, those factors would have increased the

19  salaries of coaches in the sample compared to many volunteers.

20  But neither expert tried to account for that risk of error from

21  the sample.

22       The sample selection problem arises "where experts have

23  attempted to draw generalizable conclusions from limited data."

24  *Pella Corp.*, 214 F. Supp. 3d at 492.  "[W]hen an expert attempts

25  to draw conclusions about an entire population from a sample-based

26  analysis, the sample[ ] must be chosen using some method that

27  assures the sample[ ] [is] appropriately representative of the

28  larger entity or population being measured."  *Id.* at 493 (citation

-17-

omitted).  If "a sample is drawn from a subsection of the overall population that possesses some trait not shared by the remainder of the population, a study of that sample will tend to produce inaccurate results if this subsection-specific trait affects or correlates with the dependent variable" that the expert is trying to study.  *Id.* at 492.

"This type of systematic difference between the observations included in the study versus those that are not renders expert testimony based on these data unreliable."  *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 805 (N.D. Tex. 2013); *see also Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018) ("Representativeness is essential to the reliability of a study because to the extent that a sample systematically differs from the population, inferences about the population from the sample are misleading.") (quotations omitted).

Thus, according to Dr. James Heckman (who won the Nobel Prize in Economics in part for his work on the sample selection bias problem, which is "very famous . . . in labor economics," *see* McCreadie Decl. Ex. 2 at 63:14-21, 64:8-11), the "essence of the selection problem" is the use of data regarding a sample that is a "distorted representation" of the population the researcher is trying to study so that the sample "does not accurately describe the true population."  *Id.* Ex. 6; *see also* Lehmann Report ¶ 138 ("Selection bias occurs when the sample used for analysis is not randomly selected from the population, leading to systematic differences between those included in the sample and those excluded.").  Both of Plaintiffs' experts agreed.

1    **Ashenfelter.**  Dr. Ashenfelter testified that ██████████

2    ████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████

4    ██████████████████████████████████████████  McCreadie

5    Decl. Ex. 2, Ashenfelter Dep., at 62:25-63:7.  According to Dr.

6    Ashenfelter, it is ████████████████████████████████████

7    █████████████████████  *Id.* at 64:12-14.  He testified that it is

8    a ████████████████████████  to address sample selection

9    bias by using a random sample.  *Id.* at 142:24-143:15.  But Dr.

10   Ashenfelter did not use a random sample.  *Id.* at 143:16-23.

11   Instead, he based his damages model on a hand-picked sample of

12   coaches who were hired for paid positions created after the bylaws

13   were amended.  *Id.* at 207:15-19, 210:5-18.

14       Dr. Ashenfelter did not study how the qualifications of any

15   coach who was hired as an additional paid coach after the bylaws

16   were amended (and in the sample) compared to the qualifications of

17   any coach who volunteered in the same sport in the same school

18   during the class period.  *Id.* at 239:12-17.  In fact, Dr.

19   Ashenfelter did not investigate the qualifications of any

20   Division I coach compared to any other Division I coach.  *Id.* at

21   173:9-12.  Accordingly, Dr. Ashenfelter could not rule out that

22   coaches who were hired for additional paid coaching positions were

23   more skilled or experienced than the coaches who volunteered

24   during the class period.  *Id.* at 238:5-11.

25       Record evidence suggests that was the case.  Named Plaintiffs

26   Khala Taylor and Rudy Barajas were not hired as paid assistant

27   coaches after the NCAA bylaws were changed.  McCreadie Decl.

28   Ex. 7, Taylor Dep., at 241:10-242:1; *id.* Ex. 8, Barajas Dep., at

1  148:14-149:3.  San Jose State's softball program and Fresno

2  State's women's volleyball program hired other coaches (not their

3  volunteer coaches) as paid assistants.  *Id.* Ex. 7, Taylor Dep., at

4  204:1-205:5; *id.* Ex. 8., Barajas Dep., at 133:19-134:25.  Indeed,

5  San Jose State would not even agree to allow Ms. Taylor to

6  continue coaching in an *unpaid* capacity following the bylaw

7  change.  *Id.* Ex. 7, Taylor Dep., at 200:13-201:5, 206:6-15.  As

8  Dr. Ashenfelter admitted, according to standard economics, schools

9  would hire the coach with the skills and experience that will

10  provide ███████████████  *Id.* Ex. 2, Ashenfelter Dep., at 157:9-

11  22, 158:6-17.  Indeed, the NCAA's expert found evidence that

12  schools have done exactly that since the bylaw repeal.  *See*

13  Lehmann Report ¶ 80 (giving specific examples).

14      Differences in skill and experience between coaches in the

15  sample and volunteers are important because Dr. Ashenfelter

16  admitted that ████████████████████████████████████

17  ██████████████████████████████████████████████████

18  ███████████  McCreadie Decl. Ex. 2, Ashenfelter Dep., at 74:20-

19  23.  Dr. Ashenfelter, however, did not do anything to address the

20  possibility that coaches hired for newly created paid positions

21  would have been paid more than volunteers applying for those

22  positions because they had more valuable skills and experience.

23  *Id.* at 240:23-241:3 ("Q.  Did you do anything to try to account

24  for or address the possibility that the coaches who were hired as

25  additional paid coaches after the bylaws were amended had more

26  skills or experience than the coaches who were volunteers?  A.

27  No."); *see also* Lehmann Report ¶ 141 (NCAA expert explaining that

28  failure to account for coach-specific skills and experience "will

-20-

likely overestimate salaries" because coaches hired for new paid
positions are likely to be "more experienced and better qualified
than at least some volunteer coaches").

In addition to ignoring differences in coaches' skills,
Dr. Ashenfelter also failed to address differences in schools'
demand, which he agreed affects market wages.  McCreadie Decl.
Ex. 2, Ashenfelter Dep., at 42:18-21, 183:5-18.  Dr. Ashenfelter
agreed that schools in the sample that added paid coaching
positions could have had "higher demand for coaching services than
the schools who did not."  *Id.* at 241:4-9.  But Dr. Ashenfelter
did not "do anything to control for that."  *Id.* at 241:10-11; *see
also* Lehmann Report ¶ 139 (NCAA expert explaining that failure to
control for difference between schools that hired additional paid
coaches and those that did not will bias results because schools
that hired additional paid coaches likely had greater demand and
would have paid more).

In fact, Dr. Ashenfelter deliberately excluded evidence from
schools that did not add paid coaching positions after the bylaws
were amended.  McCreadie Decl. Ex. 2, Ashenfelter Dep., at 210:5-
18.  For example, Plaintiff Rudy Barajas was hired to coach
women's volleyball at Fresno State after the bylaws were amended,
but was not paid.  *Id.* Ex. 8, Barajas Dep., at 132:23-134:6.
Dr. Ashenfelter acknowledged that Mr. Barajas's rate was not
dictated by the NCAA rules and that Mr. Barajas's salary would
affect supply and demand for volleyball coaching.  *Id.* Ex. 2,
Ashenfelter Dep., at 214:16-215:1, 216:12-19.  But Dr. Ashenfelter
did not include Mr. Barajas's salary of zero in his damages model.
*Id.* at 217:9-13.  Nor did he do any analysis to identify how many

1  schools had chosen to keep on their volunteer coach at a salary of

2  zero after the bylaw change, as Fresno State did with Mr.

3  Barajas.[6]

4      Because Dr. Ashenfelter has failed to correct for selection

5  bias in any way, his damages model is unreliable.

6      **Rascher.**  Dr. Rascher described sample selection bias in

7  terms of the following question:  when ██████████████████████████

8  a given █████████████████████████████████████████████████████

9  ████████████████████████████████████████?  McCreadie Decl.

10  Ex. 3, Rascher Dep., at 127:25-128:8.  Dr. Rascher agreed that it

11  can be ████████████████████████████████████████████████

12  ████████  *Id.* at 128:9-12.  He also acknowledged that economists

13  have developed tools to address sample selection problems, and

14  that Dr. Heckman, for example, won the Nobel Prize for developing

15  some of those methods.  *Id.* at 128:22-129:4.

16      Dr. Rascher used salaries of coaches who were hired for

17  newly-created paid positions to predict what volunteers would have

18  earned.  *Id.* at 222:2-7.  He acknowledged that different coaches

19  could provide different value, which might affect their earnings.

20  *Id.* at 242:19-24, 247:22-248:13.  But Dr. Rascher did nothing to

21  compare the skills and experience of coaches hired for newly-

22  created positions and the coaches who volunteered.  He testified

23  that he is not offering any opinion regarding whether the coaches

24  ────────────────────

[6] Mr. Barajas was not an anomaly.  Other schools—including Arizona
25  State University, the University of Arkansas, and UC Davis—have
continued to hire volunteers in multiple sports.  *See* Opp. at 23-
26  26; *see also* Lehmann Report ¶¶ 71-75 & Exhibits 8-9 (giving
further examples in the Atlantic Coast Conference, Mountain West
27  Conference, PAC-12 Conference, Big West Conference, and Big South
Conference).

28

1   hired for newly created paid positions after the bylaws were

2   amended were more qualified or skilled than the coaches who

3   volunteered during the class period.  *Id.* at 180:1-8.

4        Thus, the only evidence in the record on this issue suggests

5   that at least some volunteer baseball coaches were not as

6   qualified as the coaches who were hired instead.  *See, e.g.*,

7   Lehmann Report ¶ 80 (providing examples).  Dr. Rascher's own

8   analysis shows that almost half of the volunteer baseball coaches

9   in the 2022-2023 year were not hired for newly-created paid

10  positions after the bylaws were amended.  McCreadie Decl. Ex. 3,

11  Rascher Dep., at 174:3-14; Rascher Report ¶ 78 & Exhibit 1.

12  Similarly, testimony from the University of Arkansas suggests that

13  Plaintiff Taylor Smart, who was a volunteer baseball coach there,

14  was not considered as qualified as Bobby Wernes, who was hired for

15  a newly created paid assistant baseball coach position there after

16  the bylaws were amended.  Declaration of Clayton Hamilton in

17  Support of NCAA's Opposition to Plaintiffs' Motions for Class

18  Certification ¶ 12.

19       Dr. Rascher himself testified that the volunteer position was

20  a ███████████████████████████ in coaching, *i.e.*,

21  volunteers were still gaining experience so that they could be

22  hired for a paid coaching position.  McCreadie Decl. Ex. 3,

23  Rascher Dep., at 140:6-10; *see also* Opp. at 21-22 (citing

24  examples). Indeed, this is still happening even after the bylaw

25  repeal.  One of Fresno State's baseball coaches is a volunteer who

26  lives with his parents and is gaining valuable experience coaching

27  as an unpaid coach while looking for a paid coaching job.  *See*

28

1  Declaration of Rob Acunto in Support of NCAA's Opposition to

2  Plaintiffs' Motions for Class Certification ¶ 8.

3      Dr. Rascher, however, did not do anything to "control for the

4  possibility" that coaches hired for additional paid positions

5  created after the bylaws were amended were more skilled and

6  experienced than the volunteers who were still trying to gain

7  experience.  McCreadie Decl. Ex. 3, Rascher Dep., at 249:7-24.

8  Nor could he now claim to have tried to address potential sample

9  bias because he testified that he ██████████████████████████

10 ████████  in the first place.  *Id.* at 129:25-131:25.

11     On the demand side, Dr. Rascher agreed that schools' demand

12 would affect market earnings.  *Id.* at 97:2-18, 230:1-10, 244:5-10.

13 He admitted that, generally, ████████████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████████████████████████████████

16 ████████████████████████████████████  *Id.* at

17 222:16-23.  But Dr. Rascher did not address the fact that schools

18 that hired paid coaches after the bylaws were amended had greater

19 demand for coaching services.  This, too, results in selection

20 bias and "will tend to overestimate salaries" for third paid

21 assistant baseball coaches in the but-for world.  Lehmann Report

22 ¶ 166.

23              *         *         *         *

24     In short, both Dr. Ashenfelter and Dr. Rascher agreed that

25 sample selection problems are well-known in economics and arise

26 when a sample is not representative of the population being

27 studied.  Evidence suggests that both experts' sample of coaches

28 who were hired for newly created positions after the bylaw change

1  were not representative because they were more skilled and

2  experienced and were hired by schools with greater demand.  But

3  neither expert even tried to address that issue.

4       Courts exclude testimony from experts who fail to ensure that

5  their samples do not bias their results.  *See Pella Corp.*, 214 F.

6  Supp. 3d at 492-93 (excluding expert's testimony where "focusing

7  on these allegedly defective Windows would seemingly tend to

8  overstate the incidence of Window problems in the overall

9  population"); *Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB,

10 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) (same where

11 plaintiff's expert "failed to offer any scientific justification

12 for his sample selection choices"); *In re Countrywide Fin. Corp.*

13 *Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1039 (C.D. Cal.

14 2013) (same due to selection bias in plaintiff's expert's model

15 that used a "nonrandom selection of subjects for study").

16      Even if, "as a practical matter, it may be impossible to

17 conduct a rigorous statistical analysis" of the issue the expert

18 has examined," the courts conclude that "convenience is not a

19 substitute for reliability under Daubert."  *Pella Corp.*, 214 F.

20 Supp. 3d at 493; *see also Countrywide*, 984 F. Supp. 2d at 1040

21 ("The Court cannot countenance the use of this type of convenience

22 sample that is 'easy to take but may suffer from serious bias.'")

23 (quoting Federal Judicial Center, Reference Manual on Sci. Evid.

24 § 211 (3d ed.), 2011 WL 7724256, at *46).

25      Plaintiffs' experts' unexplained failure to account for the

26 standard economic problem of selection bias renders both models

27 unreliable and inadmissible under Rule 702.

28

**C.    Dr. Ashenfelter's Model Relies on Arbitrary Groups of Different Sports**

Dr. Ashenfelter's earnings model also is unreliable because he tries to estimate earnings using averages of salaries of coaches in different sports with different supply and demand conditions.   That is, Dr. Ashenfelter tried to estimate a market wage by lumping together salaries of coaches in different markets. *See* Lehmann Report ¶ 127.

The court's decision in *In re Google Play Store Antitrust Litigation*, No. 20-CV-05761-JD, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023), is instructive as to how an expert cannot construct a damages model that relies on grouping together products that are not generated by the same supply and demand conditions.   In the *Google Play* case, the plaintiff's expert built a damages model to predict the prices of smartphone apps and transactions in those apps.   The model assumed that smartphone apps "in each category" in the app store were "substitutes for one another."   *Id.* at *8.   For example, the model assumed that an app for identifying plants and an app for learning languages were substitutes.

However, this was an "unproven assumption" that "flies in the face of the huge diversity of apps" in the store's "categories." *Id.*   The court found it "obvious that users looking for an app to learn Italian will not try to avoid a price hike by switching to an app that identifies the type of geranium in their kitchen." *Id.* at *7.   Because the plaintiff's expert did "not provide usable guidance on what to do with the myriad of differences and distinctions between apps" and did "not provide any boundaries on

substitution in broad app categories that contain many unlike products," it was unreliable to build a damages model based on those categories.  *Id.*  Because the damages model was "based on assumptions" that were "not supported by the evidence," the Court found that it would "not give the jury a sound basis on which to make a reasoned and reasonable judgment about antitrust impact and damages," and thus was inadmissible.  *Id.* at *9.

The same is true here.  Dr. Ashenfelter's model relies on salaries in categories of sports based not on supply and demand, but on how many paid coaches the amended NCAA bylaws permit a program to hire in each sport.  *See* Lehmann Report ¶¶ 127-28.  In order for that approach to be meaningful, there must be some relationship between salaries for coaching the sports in each group.  As Dr. Ashenfelter testified, ████████████████████ ████████████████████████████████████████████████ McCreadie Decl. Ex. 2, Ashenfelter Dep., at 183:16-18, and ███ ████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* at 186:12-15.  Thus, Dr. Ashenfelter admitted, ███ ████████████████████████████████████████ then an analysis ███████████████████████████████████████ would result in some estimates of earnings that ███████████████ ██████████████████████████ *Id.* at 191:2-9.  Such an approach ████ ████████████████████████████ *Id.* at 50:11-14.

Dr. Ashenfelter did not do any analysis to determine whether supply and demand for coaching in one sport affects supply and demand or salaries for coaching in any other sport, and he formed no opinion on that issue: ████ ████████████████████████████

1 ██████████████████████████████████████████████████

2 ████████████  ██  ██████████████████████████████

3 █████████████████████████████████         *Id.* at 189:7-17.

4 Dr. Ashenfelter did not analyze whether ████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 *Id.* at 163:12-164:2.  Indeed, Dr. Ashenfelter did not define any

8 labor market at all.  *Id.* at 192:15-20.  He therefore reached no

9 opinion on whether, for example, ██████████████████████████

10 ████████████████████████████████████████████████████

11 *Id.* at 192:22-193:5.

12      It is obvious that, in general, most people who coach one

13 sport have different skills than most people who coach other

14 sports, and that people qualified to coach one sport generally are

15 not qualified to coach other sports.  Dr. Ashenfelter himself

16 testified that workers with ████████████████████ should be

17 in separate markets.  *Id.* at 14:9-25.  Even Dr. Rascher in his

18 report agreed that "*coaches in each sport*[] provide their labor

19 services in a distinct market formed around a distinct reference

20 labor product."  Rascher Report ¶¶ 73-74 (emphasis added); *see*

21 *also* McCreadie Decl. Ex. 3, Rascher Dep., at 134:20-135:6.  That

22 is because ██████████████████████████████████████

23 ████████████████████████████████████████████████████

24 McCreadie Decl. Ex. 3, Rascher Dep., at 134:20-135:11.[7]

25 _____

26 [7] Indeed, Dr. Ashenfelter's own regression model shows that for
several groups of sports, the number of permitted coaches is not a

27 statistically significant variable for predicting how salaries of
additional paid coaches compare to other coaches' salaries.

28 Ashenfelter Report ¶ 68 & Table 5.

1   Perhaps that is why the plaintiffs' expert in the *Law v. NCAA*

2   case used a different approach in an antitrust case challenging a

3   different NCAA bylaw related to coach wages.  The plaintiffs'

4   expert in that case (Dr. Tollison) conducted regressions that were

5   "sport-specific" to model damages "for each sport separately."

6   Tollison *Law* Aff., 1996 WL 34400119.

7   That is not what Dr. Ashenfelter did here.  Dr. Ashenfelter

8   tries to estimate market rates of pay for coaches in one sport by

9   using salaries for coaching in other sports that are determined by

10  different supply and demand conditions.  *See* Ashenfelter Report

11  ¶¶ 66-68, 71.  That violates basic economic principles that Dr.

12  Ashenfelter himself acknowledged.

13  Even worse, Dr. Ashenfelter's approach separates salaries of

14  coaches who have similar skills.  Plaintiff Rudy Barajas, who was

15  a volunteer coach in both indoor and beach volleyball, testified

16  that indoor volleyball coaches are qualified to coach beach

17  volleyball and vice versa.  McCreadie Decl. Ex. 8, Barajas Dep.,

18  at 66:18-20, 67:13-16, 69:14-70:2.  Since the pool of potential

19  coaches in both sports overlap, the salaries of coaches in those

20  sports should be related.  But Dr. Ashenfelter's model puts indoor

21  volleyball coach salaries and beach volleyball coach salaries in

22  different categories based on the mere fact that the bylaws permit

23  three paid coaches in one sport and four paid coaches in the

24  other.  *See* Ashenfelter Report ¶ 66.  Dr. Ashenfelter did not

25  explain why this distinction makes sense or contend with Mr.

26  Barajas's testimony.

27  Instead, Dr. Ashenfelter averaged salaries for coaches in

28  indoor volleyball along with salaries for coaches in field hockey,

gymnastics, ice hockey, lacrosse, rugby, soccer, softball, track and field, water polo and wrestling, and averaged salaries for coaches in beach volleyball with salaries for coaches in bowling, cross country, fencing, golf, rifle, skiing, swimming, tennis and triathlon.  *See id*. ¶¶ 66-68, 71.  This makes no economic sense. Indeed, applying Dr. Ashenfelter's model to each sport separately dramatically changes Dr. Ashenfelter's predictions of what coaches in each sport would have earned, which suggests that salaries in each sport are based on different supply and demand conditions. Lehmann Report ¶¶ 127-28 & Exhibit 11.  Dr. Ashenfelter has not analyzed those conditions for any sport, let alone all of them.

Accordingly, in addition to failing to control for factors that affect earnings and to address selection bias, Dr. Ashenfelter's model assumes without any basis that salaries for coaching dozens of different sports are subject to the same supply and demand conditions.  That is an additional reason why his model is unreliable and inadmissible.

**V.  CONCLUSION**

For the reasons set forth above, the NCAA respectfully requests that the Court exclude Dr. Ashenfelter's and Dr. Rascher's earnings models in connection with ruling on Plaintiffs' motions for class certification.

Respectfully submitted,

DATED:   December 20, 2024      MUNGER, TOLLES & OLSON LLP


                                By:      /s/ Justin P. Raphael
                                       JUSTIN P. RAPHAEL

                                     *Attorneys for Defendant National*
                                     *Collegiate Athletic Association*

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY