D Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson, MN Bar No. 202241
Amanda M. Williams, MN Bar No. 0341691
Matthew Jacobs, MN Bar No. 403465
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644

Michael Lieberman, DC Bar No. 1033827
Jamie Crooks, CA Bar No. 310447
Yinka Onayemi, NY Bar No. 5940614
**FAIRMARK PARTNERS, LLP**
1001 G Street NW, Suite 400E
Washington, DC 20001
Telephone: (818) 585-2903

*Attorneys for Plaintiffs Shannon Ray, Khala Taylor,
Peter Robinson, Katherine Sebbane, and Rudy Barajas
Individually and on Behalf of All Those Similarly Situated*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and RUDY BARAJAS Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>Defendant. | Case No. 1:23-cv-00425<br><br>**PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. William B. Shubb<br>Courtroom: 5<br>Date: March 3, 2025<br>Time: 1:30 PM |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 3, 2025, before the Honorable William B. Shubb, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, CA 95814, the Class Plaintiffs will and hereby do move the Court pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure for an order certifying the following class:

> All persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of "volunteer coach," as designated by NCAA Bylaws.

This motion is based on this Amended Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the accompanying Corrected Expert Report of Professor Orley Ashenfelter, the accompanying Declarations of Michael Lieberman, Dennis Stewart, Robert Gralewski, Peter Robinson, Katherine Sebbane, Khala Taylor, Shannon Ray, and Rudy Barajas, all exhibits and appendices to such documents, any papers filed in reply, any argument as may be presented at the hearing, and all other papers and records on file in this matter. Plaintiffs will also move the Court for the appointment of Gustafson Gluek PLLC, Kirby McInerney LLP, and Fairmark Partners, LLP as Co-Lead Class Counsel for the Class pursuant to Federal Rule of Civil Procedure 23(g) and for the appointment of Mr. Robinson, Ms. Sebbane, Ms. Taylor, Ms. Ray, and Mr. Barajas as Class Representatives.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................... i

TABLE OF AUTHORITIES ............................................................................... iv

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.    INTRODUCTION ............................................................................... 1

II.   FACTUAL BACKGROUND ............................................................... 4

      A.   The NCAA and College Sports ................................................ 4

      B.   The NCAA and its Member Schools Enter into a Horizontal Wage-
           Fixing Conspiracy to Restrict Compensation for Coaches. ........... 6

      C.   In *Law v. NCAA*, Classes Are Certified and the Restricted Earnings
           Coach Rule Is Invalidated. ....................................................... 7

      D.   The NCAA Continues to Enforce the Volunteer Coach Rule, Fixing
           Class Members' Compensation at $0. ........................................ 8

      E.   Plaintiffs Worked in the "Volunteer Coach" Position and Were Not Paid.
           ...................................................................................... 11

      F.   The NCAA Repeals the Volunteer Coach Rule. ......................... 12

III.  PROCEDURAL BACKGROUND ....................................................... 13

IV.   ARGUMENT ................................................................................. 14

      A.   Standard for Class Certification ............................................. 15

      B.   Plaintiffs Satisfy the Elements of Rule 23(a) ............................. 16

           1.   Numerosity: The Proposed Class is Numerous ................... 16

           2.   Commonality: A Question of Law or Fact is Common .......... 16

           3.   Typicality: The Proposed Representatives' Claims are Typical .... 17

           4.   Adequacy: Plaintiffs Will Fairly and Adequately Represent the
                Class ..................................................................... 18

      C.   Plaintiffs Satisfy the Elements of Rule 23(b)(3) ......................... 20

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

1.    Common Issues of Law and Fact Predominate..........................................20

    a.    Common Evidence is Capable of Establishing an Unlawful Horizontal Wage-Fixing Conspiracy............................21

    b.    Common Evidence is Capable of Proving Classwide Impact. ......................................................................26

    c.    Classwide Evidence is Capable of Proving Damages..................34

    d.    NCAA's Main Criticisms of Plaintiffs' Analysis Are Wrong............................................................................36

2.    A Class Action is Superior to Individual Actions ......................................40

V.    THE COURT SHOULD APPOINT GUSTAFSON GLUEK, KIRBY MCINERNEY, AND FAIRMARK PARTNERS AS CLASS COUNSEL. ......................41

VI.    CONCLUSION.........................................................................42

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abboud v. I.N.S.*,
  140 F.3d 843 (9th Cir. 1998) ................................................................... 40

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................... 2, 37

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..................................................................... 20, 21

*Beltran v. InterExchange, Inc.*,
  2018 WL 1948687 (D. Colo. Feb. 2, 2018) ............................................. 27, 28

*In re Broiler Chicken Grower Antitrust Litig. No. II*,
  2024 WL 2117359 (E.D. Okla. May 8, 2024) .............................................. 2

*Brown v. Pro Football, Inc.*,
  1992 WL 88039 (D.D.C. Mar. 10, 1992) ................................................... 24

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ......................................................................... 23

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) .......................................................... 13, 23

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ......................................... 20, 26

*Casen-Merenda v. Detroit Medical Center*,
  2013 WL 1721651 (E.D. Mich. Apr. 22, 2013) .......................................... 33

*Cason-Merenda v. VHS of Mich., Inc.*,
  296 F.R.D. 528 (E.D. Mich. 2013) ....................................................... 33

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 6246736 (N.D. Cal. Oct. 26, 2016) ............................................ 35

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 721680 (N.D. Cal. Jan. 28, 2016) .............................................. 25

*In re Coll. Athlete NIL Litig.*,
  2023 WL 8372787 (N.D. Cal. 2023) ................................................ *passim*

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ...................................................... 41

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003) ................................................................... 19

*DZ Rsrv. v. Meta Platforms, Inc.*,
  96 F.4th 1223 (9th Cir. 2024) .................................................................. 17

*Edwards v. Nat'l Milk Producers Fed'n*,
  2014 WL 4643639 (N.D. Cal. Sept. 16, 2014) ......................................... 34

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ........................................... 38

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ................................................................. 38

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ................................................................................. 21

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) .............................................. *passim*

*House v. NCAA*,
  2023 U.S. Dist. LEXIS 216532 (N.D. Cal. Nov. 3, 2023) .................. 34, 35

*House v. NCAA*,
  2023 WL 7106483 (N.D. Cal. Sept. 22, 2023) ................................... 24, 25

*House v. NCAA*,
  545 F. Supp. 3d 804 (N.D. Cal. 2021) ..................................................... 40

*Johnson v. City of Grants Pass*,
  50 F.4th 787 (9th Cir. 2022) .................................................................... 16

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015) ............................................................. 26

*Kleen Prods. LLC v. Int'l Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015) ................................................................. 2

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ................................................................... 26

*Knutson v. Daily Review, Inc.*,
  548 F.2d 795 (9th Cir. 1976) ................................................................... 34

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ...................................................................... *passim*

*Law v. NCAA*,
    167 F.R.D. 178 (D. Kan. 1996) ........................................................... 2, 41

*Law v. NCAA*,
    185 F.R.D. 324 (D. Kan. 1999) ........................................................ 8, 18, 37

*Law v. NCAA*,
    1998 U.S. Dist. LEXIS 6608 (D. Kan. Apr. 17, 1998) ......................... 8, 14, 28, 33

*Law v. NCAA*,
    1998 U.S. Dist. LEXIS 6640 (D. Kan. Apr. 23, 1998) .............................. 33

*Law v. NCAA*,
    5 F. Supp. 2d 921 (D. Kan. 1998) ........................................................ 27

*Law v. NCAA*,
    902 F. Supp. 1394 (D. Kan. 1995) ..................................................... 8, 25

*Leyva v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................. 35

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) .......................................................... 32

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ........................................................... 40

*Lytle v. Nutramax Labs., Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ........................................................... 15

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................. 16

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ............................................................. 39

*In re Nassau Cty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) .............................................................. 22

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ..................................................................... 22, 23

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
    311 F.R.D. 532 (N.D. Cal. 2015) .................................................... 2, 14, 17

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ........................................................ 17, 18

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) ............................................................. 5

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ........................................................... *passim*

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ................................................... 22, 25, 32

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ............................................................ 23, 24

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) ............................................................ 13, 23

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................... 23

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ..................................................... 21, 35

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) .......................................................... *passim*

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ............................................................ 21, 22

*Solano Garbage Co. v. Cheney*,
    779 F. Supp. 477 (E.D. Cal. 1991) ............................................................ 3

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009) ............................................................ 21

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) .......................................................................... 35, 37

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ...................................................... 38

*In re TFT-LCD Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) ............................................................ 40

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
    209 F.R.D. 159 (C.D. Cal. 2002) ..................................................... 25, 26

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ........................................................................ 20, 26, 34

*United States v. E. I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961) .................................................................................. 39

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) .................................................................................. 25

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ............................................................................... 7, 38

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ............................................................... 3, 27

*Van v. LLR, Inc.*,
   962 F.3d 1160 (9th Cir. 2020) ..................................................................... 27

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002) ................................................................... 15

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ........................................................... 16, 17, 40

**Statutes**

15 U.S.C. § 1 ............................................................................................ 1

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................ 16

Fed. R. Civ. P. 23(b)(3) .................................................................. 16, 20, 40

Fed. R. Civ. P. 23(c)(1)(B) ........................................................................ 41

Fed. R. Civ. P. 23(g)(1)(1) ........................................................................ 41

**Other Authorities**

6 Newberg and Rubenstein on Class Actions § 20:54 (6th ed. 2024) .......................... 40

6 Newberg and Rubenstein on Class Actions § 20:62 (6th ed. 2024) ...................... 34, 35

6 Newberg on Class Actions § 20:23 (6th ed. 2024) ..................................... 14, 37

6 Newberg on Class Actions § 20:51 (6th ed. 2024) ..................................... 22, 23

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1781 (3d ed.) ................................................................................ 21, 25

13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed.) ................................................................................................. 39

Report of Robert D. Tollison, *Law v. NCAA*, No. 94-cv-2053, 1996 WL 34400119 (D. Kan. 1996) ................................................................................................. 33

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Plaintiffs worked as college sports coaches at schools that compete in Division I of the

4 National Collegiate Athletic Association ("NCAA"). They brought this class-action lawsuit

5 because they and the members of the class they seek to represent are all victims of the same illegal

6 wage-fixing scheme. Through a rule that operated uniformly in every sport to which it applied,

7 NCAA and its member schools agreed not to compete on salary and benefits for an entire category

8 of coaches—designated by rule as "volunteer coaches"—and to instead cap their compensation at

9 $0. This unlawful scheme had one purpose: to secure valuable labor for free in what would have

10 otherwise been a competitive market for NCAA Division I coaching services. As a member of the

11 NCAA's Presidents Committee put it shortly after the wage-fixing conspiracy began:

12

13

14

> The volunteer coaching concept provides us with more hands-on coaching, more counseling, more support, more mentorship, and more of the educational benefits that we claim to provide to our students, but at very little cost. This is one of the most cost-effective things that we do.

15 Exh. 27 at _0146466.[1] Plaintiffs and proposed class members were hired into and worked in the

16 wage-fixed coaching position for NCAA Division I schools, and all of them were unable to seek

17 or receive any compensation for the work they performed in that role. This wage-fixing conspiracy

18 among NCAA and its member schools violated Section 1 of the Sherman Act, 15 U.S.C. § 1, just

19 as the Tenth Circuit held in a prior challenge to a functionally identical NCAA scheme to suppress

20 coach compensation. *See Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998).

21

The question on this class certification motion is whether the legality of this wage-fixing

22 scheme would best be decided in one case for the thousands of coaches whose compensation was

23 fixed at $0 (*i.e.*, as a class action), or whether those coaches should instead be required to file

24

25

26

---

[1] Unless otherwise indicated, all internal quotations and citations are omitted and all "Exh." citations refer to the exhibits to the Amended Declaration of Michael Lieberman ("Lieberman Decl."), filed contemporaneously herewith.

27

28

Exhibits 45 and 46 to the Lieberman Declaration and associated citations and text in this Memorandum have been removed pursuant to contested clawback demands received from third parties after the original filing of this Memorandum. Plaintiffs reserve the right to re-file the original version of this Memorandum if the disputed privilege issues are resolved in their favor.

1

thousands of identical, individual lawsuits challenging the exact same wage-fixing conspiracy under the exact same legal theories. That is not a close question. Horizontal wage-fixing conspiracies make for "prototypical" class-action cases, "because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015). Accordingly, "defendants seeking to defeat class certification in a case alleging a horizontal price-fixing conspiracy face an uphill battle." *In re Broiler Chicken Grower Antitrust Litig. No. II*, 2024 WL 2117359, at *12 (E.D. Okla. May 8, 2024); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging … violations of the antitrust laws.").

Class certification is routinely granted in price- and wage-fixing cases, including in many cases challenging other NCAA-imposed restraints on compensation. *See*, *e.g.*, *In re Coll. Athlete NIL Litig.*, 2023 WL 8372787 (N.D. Cal. 2023) ("*House v. NCAA*"); *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532 (N.D. Cal. 2015) ("*Alston v. NCAA*"); *Law v. NCAA*, 167 F.R.D. 178 (D. Kan. 1996). The *Law* case in particular is virtually identical to this one; it challenged an NCAA bylaw restricting coach compensation that closely resembles the one at issue here. The *Law* litigation involved three related cases—*Law v. NCAA*, *Schreiber v. NCAA*, and *Hall v. NCAA*—and three certified classes of coaches (a men's basketball class, a baseball class, and an all-other-sports class). The cases were successfully and efficiently litigated through trial and appeal as coordinated class actions. The court recognized that not certifying the classes would lead to inefficiency, risk of inconsistent results, needless burden on the judicial system, and/or unvindicated, unlitigated alleged wrongs suffered by thousands of coaches—*i.e.*, precisely the results Rule 23 was enacted to avoid. *See id.* at 181.

This case is no different. There was only one "Volunteer Coach Rule," and it applied exactly the same way to every class member at every school in every sport, capping each one's compensation at $0.[2] NCAA's purported justifications for the restraint apply equally to all sports

---

[2] NCAA bylaws used the word "volunteer" as a euphemism to obscure the true purpose and effect of the conspiracy—namely, for schools to save money by eliminating salary competition for an entire class of coaches. The term attempts to shift the "blame" for free labor from the wage-

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

and all members of the class, as do the reasons why those justifications fail. Accordingly, whether the wage-fixing conspiracy is legal or illegal will have the same answer for all class members, based on the same evidence. That is enough to satisfy the predominance requirement of Rule 23(b)(3). On top of that, the issues of impact and damages can also be resolved with common evidence. Classwide impact is *presumed* in wage-fixing cases, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014), and there is no reason to displace that presumption given that every class member worked as a coach and was subject to the classwide wage-fixed salary of $0. Meanwhile, the unrestricted coaches whom class members worked alongside, coaching the same athletes on the same teams, were almost universally paid and paid well, making, on average, about $78,000 per year.

In addition, the expert report of Dr. Orley Ashenfelter—a widely-recognized expert in the field of labor economics—uses common evidence and a common methodology to demonstrate widespread harm to the class and describes methods capable of calculating damages on a classwide basis. Dr. Ashenfelter uses a methodology similar to that used in the *Law* case, calculating the but-for competitive wages for each class member by reference to 1) the real-world compensation paid to coaches who coached in the same sport, at the same school, and at the same time as class members but were not subject to the restraint, and 2) the real-world compensation the evidence to date shows is being paid to coaches in the post-conspiracy period. Applying well-accepted economic principles and methodologies to the common evidence, Dr. Ashenfelter concludes that all or nearly all class members were harmed and would have been paid more than $0 in a coaching market free from the collusive bylaw. Dr. Ashenfelter also identifies and applies a common, sensible, rigorous, and conservative methodology to estimate the aggregate damages suffered by the class. Plaintiffs moving for class certification need do no more. The ultimate persuasiveness of their proof is a matter for the jury.

fixing conspirators to the victims. In reality, proposed class members were unpaid not because they were clamoring to provide free labor, but because NCAA and its member schools imposed and enforced a decades-long wage-fixing scheme that denied them all opportunity to seek or obtain compensation. Needless to say, the conspiracy's legality turns on its substance, not the euphemism used by the defendant. *See*, *e.g.*, *Solano Garbage Co. v. Cheney*, 779 F. Supp. 477, 481 (E.D. Cal. 1991) (Shubb, J.).

The remaining Rule 23 requirements are easily satisfied. The NCAA concedes numerosity and commonality. Plaintiffs will also be adequate and typical class representatives: they are committed standard bearers for the class, and they share common interests and claims and challenge the same wage-fixing conspiracy as all other members of the class they seek to represent. Finally, this action presents the quintessential claim for which class treatment is superior to individual actions. Thousands of individual class members have damages claims that, while substantial, pale in comparison to the cost of antitrust litigation requiring expert testimony against a well-resourced defendant like the NCAA, making this precisely the type of judicially efficient and manageable case for which Rule 23 was designed.

## II.    FACTUAL BACKGROUND

Plaintiffs Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Rudolph Barajas (collectively, "Plaintiffs") are former coaches for NCAA Division I athletic teams. They and the members of the class they seek to represent are all victims of the same wage-fixing scheme, through which the NCAA and its member schools agreed to eliminate salary competition by jointly agreeing to pay them $0. NCAA and its member schools euphemistically called this wage-fixed position "volunteer coach," but these were integral members of coaching staffs at the highest level of college sports, in a multi-billion-dollar industry, working alongside well-compensated coaches whose pay and benefits were unrestrained by NCAA rules. Plaintiffs succeeded in obtaining a job in this market, but instead of being paid the market rate for their labor (or even minimum wage), they were subjected to the wage-fixing restraint and were paid nothing.

NCAA repealed the offending rule effective July 2023. With the repeal of the rule, schools are permitted to keep the same number of coaches as before, but all restrictions on compensation and the minor limitation on tasks the coach was permitted to perform were eliminated.[3]

### A.    The NCAA and College Sports

NCAA is an unincorporated association whose members are colleges and universities that compete in intercollegiate athletics. *See* Exh. 7. NCAA's members have organized themselves into

---

[3] Under the former rule, coaches designated as "volunteer coaches" could recruit only while on campus.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

three Divisions—Divisions I, II, and III—based on the strength of competition chosen by the school. *Id.*; *see also* Exh. 8 at _0001412 ("Each division shall have independent authority to organize itself."). This case involves Division I schools, which provide the highest quality of competition because they expend greater resources to support their teams than schools in Divisions II and III—and, as a result, attract the highest quality players. *See O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 987 (N.D. Cal. 2014) ("Non–Division I schools typically offer a lower level of athletic competition, inferior training facilities, lower-paid coaches, and fewer opportunities to play in front of large crowds and on television."). Division I is thus the only place where coaches can provide their services at the elite, collegiate level. As NCAA's Vice President of Division I Governance put it, "there is no other entity in the world like Division I." Exh. 28, Deposition of Jennifer Fraser, at 102:21-22. More than 390 schools compete in Division I, and they compete in 45 sports (though not every school competes in every sport). *See* Exh. 9 at Bylaw 11.7.6 (listing 19 men's sports and 26 women's sports). Through their membership in NCAA Division I, each institution agrees with NCAA and every other institution to uphold and enforce NCAA Division I bylaws, including the bylaws at issue in this case. *See* Exh. 9 at Constitution Articles 3.2.1.2, 3.3.4.1; *id.* at Bylaw 19.01.2; Exh. 47, Deposition of Lynda Tealer, at 69:6-21.

College sports are big business. NCAA itself earned $1.28 billion in revenue in 2023, an increase from its 2022 revenue of $1.14 billion. *See* Exh. 10. Its member schools made even more: in 2023 alone, the athletic programs at Division I schools brought in a combined $19 billion in revenue, or more than $54 million per school. *See* Exh. 1, Corrected Expert Report of Dr. Orley Ashenfelter ("Ashenfelter Report"), ¶ 17.[4] Coaches are major beneficiaries of NCAA's revenue boom—at least the coaches whose wages are not fixed at $0 by an antitrust conspiracy. In the 2022-23 academic year alone, Division I schools spent over ***$3.5 billion*** on their coaches, with the average Division I head coach making more than $170,000 and the average Division I assistant coach making $85,000. *Id.* ¶¶ 19-21. This healthy compensation for coaches, which has steadily increased over time, *id.* ¶ 20-21, is the product of intense competition among Division I schools.

---

[4] The operative version of Exhibit 1 is the Corrected Expert Report of Dr. Orley Ashenfelter, which was served on Defendant on November 26, 2024, and which corrected certain errors in the prior version of the report, as described in the accompanying Errata Table.

Schools compete to hire coaches who will help improve the performance of their teams, teach valuable skills to players, foster a culture conducive to competitive success, recruit the best players, earn revenue through ticket sales and television contracts, and attract donations from alumni—all with the goal of elevating the overall profile of the school. *See*, *e.g.*, Exh. 11, Deposition of Matthew Boyer ("Boyer Dep."), at 221:8-24. Coaches hired into the "volunteer coach" position, however, have for decades been prohibited from benefiting from this competition and being paid their fair share—or, indeed, anything at all.

**B.      The NCAA and its Member Schools Enter into a Horizontal Wage-Fixing Conspiracy to Restrict Compensation for Coaches.**

The wage-fixing conspiracy at issue here emerged from a series of cost-cutting recommendations by the NCAA's aptly-named "Cost Reduction Committee." In 1989, "the NCAA established a Cost Reduction Committee … to consider means and strategies for reducing the costs of intercollegiate athletics." *Law v. NCAA*, 134 F.3d at 1013. The Cost Reduction Committee identified unrestrained competition for coaches as a major driver of overall spending. Its final report advised that "[t]he largest expense item in the athletics budget is personnel" and urged schools that they could "reduce costs" by agreeing not to compete so vigorously for coaches. *Id.* at 1013-15; *see* Exh. 29 at _0141893-94. A "collaborative effort" was necessary because, in the NCAA's view, schools would not "make unilateral spending cuts in sports programs for fear that doing so would unduly hamstring that school's ability to compete against other institutions that spent more money on athletics." *Law*, 134 F.3d at 1013. In other words, the Cost Reduction Committee advised that restricting coach compensation would help save money by artificially restraining competition for coaches.

The NCAA turned this advice into several new rules, binding on all NCAA Division I schools, that took effect in the 1992-93 season. Three of those rules are relevant here. First, at the 1991 NCAA Convention, the NCAA's member schools voted to limit the number of coaches that each school could hire in each sport. *See* Exh. 29 at _0141893. Second, at the same convention, they voted to cap the compensation for the lowest-ranked coach within those coaching limits at $12,000 for the academic year and $4,000 for the summer months. *See* Exh. 30 at _0143196-97.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

This rule was known as the "Restricted Earnings Coach Rule," and was summarily adjudicated to be in violation of Section 1 of the Sherman Act in *Law v. NCAA*, as described in more detail below.

NCAA's member schools soon realized that they had set the cap on the number of coaches too low, *see* Exh. 31 at _143420, but cognizant of the Cost Reduction Committee's findings, needed a way to add more coaches without increasing spending. Accordingly, at the 1992 NCAA Convention, NCAA's member schools agreed to increase the number of permitted coaches in each sport by one, but agreed to not pay this additional coach any "compensation or remuneration … except for a maximum of two complimentary tickets to home athletics contests." *Id.* at _0143510. The enactment euphemistically referred to this unpaid position as the "volunteer coach" position, to indicate that NCAA member schools were not permitted to pay the coach hired into that slot.

The restriction on compensation was all about cost-cutting: the official rationale for the enactment was that it would allow schools to hire coaches to "provide assistance to student-athletes" without "any significant additional costs to the institution." *Id.* at _0143420. One administrator who spoke in favor of the enactment emphasized that it was a way to "enhanc[e] the student-athlete experience" at "no cost" to schools. *Id.* That rationale echoed throughout subsequent years. For example, when schools voted down a proposal in 2000 to eliminate the wage cap, one school explained: "removal of the compensation restrictions will include escalating costs for every institution." Exh. 32 at _0179923. Needless to say, however, a desire to save money by avoiding so-called "ruinous competition" has never been an acceptable excuse under the antitrust laws. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940). While the antitrust laws encourage cutting costs through innovation and efficiency, they flatly prohibit cutting costs by conspiring with competitors to shift all labor costs to the workers themselves—*i.e.*, to make them work for below-market wages or, even worse, for no wages at all.

## C.    In *Law v. NCAA*, Classes Are Certified and the Restricted Earnings Coach Rule Is Invalidated.

A prime example is *Law v. NCAA*. In *Law*, three classes of coaches challenged the Restricted Earnings Coach Rule—which capped certain coaches' academic-year salaries at $12,000—as an illegal wage-fixing conspiracy. The district court addressed liability first, ruling

7

that the "quick look" standard applied and that the wage cap was so plainly unlawful that "plaintiffs are entitled to judgment as a matter of law on the issue of liability." *Law v. NCAA*, 902 F. Supp. 1394, 1410 (D. Kan. 1995). The Tenth Circuit unanimously affirmed the liability decision, agreeing that "quick look" review was appropriate, holding that the Restricted Earnings Coach Rule was "nothing more than a cost-cutting measure" with no procompetitive benefits, and declaring that the plaintiffs were entitled to "summary judgment … on the issue of antitrust liability." *Law v. NCAA*, 134 F.3d at 1024.

On remand, the district court certified three damages classes: one class of men's basketball coaches, one class of baseball coaches, and one class of coaches in all other sports. *See Law v. NCAA*, 1998 U.S. Dist. LEXIS 6608, at *3 (D. Kan. Apr. 17, 1998) (included as Exh. 24) (noting that "actions involving price-fixing schemes are particularly susceptible to class certification under Rule 23(b)(3), because such schemes presumptively damage all purchasers of a price-fixed product in an affected market."); *see Law v. NCAA*, 185 F.R.D. 324, 336 n.19 (D. Kan. 1999) (describing classes). The three cases were tried together to a jury on the question of damages, and the jury returned multi-million-dollar verdicts for all three classes. *See id.* at 331 n.7.

### D. The NCAA Continues to Enforce the Volunteer Coach Rule, Fixing Class Members' Compensation at $0.

Despite the unqualified rebuke in *Law* and the obvious similarities between the Restricted Earnings Coach Rule and the Volunteer Coach Rule, the NCAA and its member schools continued to enforce the Volunteer Coach Rule.[5]

The Volunteer Coach Rule is functionally identical to the Restricted Earnings Coach Rule. The only difference is that it is an even more aggressive wage fix: compensation is capped not at $12,000 but at $0.

---

[5] This motion uses the term "Volunteer Coach Rule" to refer to the NCAA Division I bylaws through which the NCAA and its member schools agreed to withhold all "compensation or remuneration" from any coach they designated as a "volunteer coach." *See* Exh. 9 at Bylaw 11.01.6; *id.* at Bylaw 11.7.6; *id.* at Figure 11-1. As noted above, however, the term "volunteer" is a misnomer and euphemism that obscures the true purpose and effect of the conspiracy—namely, to save money by eliminating competition and banning compensation.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

Before its repeal, the Volunteer Coach Rule was codified in the NCAA Division I Bylaws ("Bylaws"). These Bylaws are voted and agreed upon by all Division I member institutions, and compliance with the Bylaws is a condition of participation in Division I. *See* Exh. 9 at Bylaw 3.2.1.2; *id.* at Bylaw 3.2.4.1. The Bylaws authorized schools to fill a specific number of coaching positions in each sport but then designated one or more of those positions as a "volunteer coach" position and prohibited compensation to anyone working in the "volunteer coach" position. *See id.* at Bylaw 11.7.6 (setting forth number of unrestricted coaches in each sport with no reference to their salaries); *id.* at Bylaw 11.7.6.2.3 (setting forth number of "volunteer" coaches in each sport); *id.* at Bylaw 11.01.6 (fixing the salaries of "volunteer" coaches at $0).

Those prohibitions applied uniformly to every Division I school and sport within the Proposed Class. There is not a different Volunteer Coach Rule for different schools or sports, but rather one uniform rule that applies to all schools and sports that use the "volunteer coach" designation. Absent this restraint, the NCAA's member schools would have competed on salary and benefits for coaches to fill all coaching positions. Instead, this artificial restraint prevented a subset of coaches from being paid fair market value (or, indeed, anything at all).

The members of the proposed class were coaches, just like the paid coaches they worked alongside. Notwithstanding the wage cap, the Bylaws explicitly grouped "volunteer coaches" and unrestricted coaches together, contrasting them with non-coaching members of the athletics staff. Specifically, the Bylaws defined the term "Coach" as follows: "A head or assistant coach is ***any coach*** who is designated by the institution's athletics department to perform coaching duties and who serves in that capacity ***on a volunteer or paid basis***." *Id.* at Bylaw 11.01.2 (emphasis added). By definition, NCAA rules recognize that so-called volunteer coaches "perform coaching duties" and are qualified to do so. *Id.* Coaches, including those designated as "volunteer coaches," were the only staff members permitted to "provide[] technical or tactical instruction related to the sport to a student-athlete at any time" or to "make[] or assist[] in making tactical decisions related to the sport during on-court or on-field practice or competition." *Id.* at Bylaw 11.7.1.1.[6] Coaches hired

---

[6] In contrast, non-coaches affiliated with a team or athletics program are prohibited from engaging in those activities. *Id.* at Bylaw 11.7.3, 11.7.1.1.

into the "volunteer coach" designation were not permitted to engage in off-campus recruiting, but were permitted to and "frequently" did "engag[e] in on-campus recruiting." Exh. 11, Boyer Dep., at 72:2-6; *see* Exh. 12 ("A volunteer coach assists in many aspects of his or her sport, including on-campus recruiting.").

More broadly, numerous NCAA documents establish that these coaches were essential members of the coaching staffs on which they worked and provided immense value to the schools and the student-athletes. For example, when NCAA members approved a rule change allowing schools to provide coaches in the "volunteer coach" position with complimentary post-game meals, the official rationale emphasized that "[v]olunteer coaches are involved in the day-to-day coaching of student-athletes, and are an integral part of the sport program." Exh. 13. Similarly, when NCAA members approved a rule change allowing coaches in the "volunteer coach" position to accompany recruits to on-campus athletic events, the official rationale stated that "[a] volunteer coach assists in many aspects of his or her sport, including on-campus recruiting … as he or she is considered an integral part of the coaching staff." Exh. 12. And when NCAA employees discussed a proposal that would have eliminated the "volunteer" coaching slot at some schools but not others, the NCAA's Director of Division I criticized the idea because of the "obvious[] … disadvantage in not having the services of a volunteer coach while [other] schools could have them." Exh. 33.[7]

---

[7] Countless other documents produced in the case demonstrate the value that coaches in the "volunteer coach" position provided to their schools and sports. *See*, *e.g.*, Exh. 27 at _0146466 (volunteer coaches provide schools "with more hands-on coaching, more counseling, more support, more mentorship, and more of the educational benefits that we claim to provide to our students, but at very little cost"); Exh. 14 ("volunteer coaches are involved in the day-to-day coaching of student-athletes"); Exh. 15 (NCAA rejecting request for additional unrestricted coach in rowing because "the concerns expressed about safety, adequate training and supervision may be accommodated by the employment of additional volunteer coaches"); Exh. 34 (Columbia University stating that "[i]t's imperative that sport programs do not have fewer coaches available to them than they did when they were utilizing volunteers"); Exh. 35 (Big Ten conference stating that "the volunteer coach is an integral part of the coaching staff"); Exh. 36 (University of Oregon stating that "[v]olunteer coaches are integral and valued members of a coaching staff"); Exh. 37 (University of California-Los Angeles stating that "[v]olunteer coaches work directly with student-athletes on a daily basis"); Exh. 16 (NCAA stating that volunteer coaches in diving "enhance the safety and well-being of diving student-athletes"); Exh. 17 (NCAA stating that volunteer coaches in rowing "enhance [student-athletes'] overall quality of varsity intercollegiate experience"); Exh. 18 (NCAA stating that volunteer coaches in equestrian "enable student-athletes to receive adequate instruction, supervision and preparation time for competition"); Exh. 19 (NCAA stating that volunteer coaches in track & field "help student-athletes receive proper instruction and address

10

The NCAA strictly enforced the Volunteer Coach Rule throughout the class period. Documents produced in this case demonstrate to the point of tedium that the NCAA and its member schools imposed discipline for even the slightest deviations from the Volunteer Coach Rule and denied requests for even the slightest exceptions. *See*, *e.g.*, Exh. 38 (discipline imposed on head softball coach and Plaintiff Sebbane because head coach gave a free football ticket to Sebbane's guest); Exh. 39 (discipline imposed on coach who received a complimentary $10 ticket for his wife); Exh. 40 (discipline imposed on coach who received a complimentary ticket to attend the school's basketball game with a paid coach); Exh. 41 (discipline imposed on coach because a head coach bought him lunch); Exh. 42 (discipline imposed on coach because the school paid for her $12 breakfast); Exh. 43 (school may not reimburse coach for picking up a recruit from the airport); Exh. 44 (school may not pay for coach to attend a coaching convention).

### E.    Plaintiffs Worked in the "Volunteer Coach" Position and Were Not Paid.

Plaintiffs all worked as coaches for NCAA Division I sports teams, adding immense value to the teams and student-athletes they coached and mentored. Plaintiff Shannon Ray, herself a four-time All-American sprinter, coached Track & Field at Arizona State University, where she worked with athletes on the track, in the weight room, in meeting rooms, and informally. *See* Exh. 2, Ray Decl., ¶¶ 1, 5. Plaintiff Khala Taylor, also an All-American in her playing days, coached Softball at San Jose State University, where she coached outfielders, taught slapping (a form of hitting unique to women's softball), and was the first base coach during games. *See* Exh. 3, Taylor Decl., ¶ 4. Plaintiff Peter Robinson coached Swimming at the University of Virginia, where he instructed multiple athletes who won medals at the 2020 Summer Olympics. *See* Exh. 4, Robinson Decl., ¶ 7. Plaintiff Katherine Sebbane, who helped her team to three national championships appearances as a player and had several years of prior coaching experience, coached Softball at the University of Pittsburgh, where her responsibilities included overseeing infield work, scouting opposing teams, and revamping the program's recruiting system. *See* Exh. 5, Sebbane Decl., ¶¶ 8-13. Plaintiff Rudy Barajas brought 18 years of coaching experience to the Women's Volleyball team at Fresno State,

concerns that coaches are not able to provide adequate supervision for the safety of the student-athletes").

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

where he spent 6 or 7 days per week coaching student-athletes, building match strategies, and skills training. *See* Exh. 6, Barajas Decl., ¶ 12. Plaintiffs' declarations describe their experiences as NCAA coaches and the valuable work they performed for their respective teams.

Plaintiffs were all designated by NCAA member schools as "volunteer coaches." As a result, they did not receive, and were prohibited by NCAA bylaws from receiving, any compensation for their work as coaches. Meanwhile, the coaches they worked alongside— coaching the same student-athletes at the same schools at the same time—were very well compensated. Shannon Ray's co-assistant-coaches made over $60,000 annually; Khala Taylor's co-assistant-coaches made over $60,000 annually; Peter Robinson's co-assistant-coaches made over $45,000 annually; Katherine Sebbane's co-assistant-coaches made over $65,000 annually; and Rudy Barajas's co-assistant-coaches made over $55,000 annually. Plaintiffs, in contrast—like all members of the class—were subject to the wage-fixing conspiracy and were paid $0.

Throughout the class period, many class members needed to work second or third jobs to make ends meet while their NCAA jobs paid them nothing. Plaintiff Katherine Sebbane, for example, worked night jobs at local bars and at Domino's Pizza "so that [she] could afford to continue [her] work with Pitt Softball." Exh. 5, Sebbane Decl., ¶ 13. Plaintiff Shannon Ray worked night shifts as a hostess and babysitter "to pay [her] bills." Exh. 2, Ray Decl., ¶ 7. In addition, many class members worked as instructors at sports camps or clinics for local high school and youth athletes. Plaintiff Khala Taylor, for example, coached instructional softball camps for groups of young athletes. *See* Exh. 48, Deposition of Khala Taylor (Rough), at 137:2-138:6. Some of these camps and clinics were affiliated with the head coaches or universities for which Plaintiffs and class members worked as coaches, but any work that a coach performed in a camp or clinic was, by NCAA rule, "separate and apart from any duties and responsibilities they may have as a[n] on-field coach." Exh. 11, Boyer Dep., at 242:14-19; *see also* Exh. 9 at Figure 11-1; Exh. 20.

**F.    The NCAA Repeals the Volunteer Coach Rule.**

After three decades of strict enforcement, NCAA and its member schools voted to end the wage-fixing scheme, effective July 1, 2023 (*i.e.*, just after this litigation commenced). *See* Exh. 21. NCAA and its member schools recognized that they still needed the valuable coaching services

that class members provided, so instead of reducing the number of allowable coaches, they simply eliminated the restrictions on compensation. *Id*. This rule change applied uniformly to all Division I sports and schools. *See id*.; Exh. 11, Boyer Dep., at 148:5-14 ("[Y]es, in all sports in which that volunteer coach position existed, it was then transitioned to the countable coach position.").

## III.    PROCEDURAL BACKGROUND

Plaintiffs filed their original complaint in March 2023 and the operative Second Amended Complaint in October 2024. NCAA moved to dismiss Plaintiffs' claims in May 2023. In a Memorandum and Order issued in July 2023, this Court denied NCAA's motion to dismiss, ruling that "plaintiffs have alleged facts sufficient to show a violation of § 1 of the Sherman Act." Mem. and Order re: Def.'s Mot. to Transfer and Mot. to Dismiss ("MTD Order") at 20, ECF No. 38. In reaching that conclusion, the Court decided two legal issues that bear on the present motion. First, the Court ruled that this case, like the *Law* case, will be decided under the quick-look framework. *Id*. at 17 ("[A] quick-look analysis is appropriate here."). NCAA's motion for reconsideration of this ruling was denied. See Order Re: Def.'s Motion for Clarification at 2, ECF No. 50. Under the quick-look framework, the NCAA's wage-fixing conspiracy "is presumed unlawful," *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36 (D.C. Cir. 2005), and "[n]o elaborate industry analysis, market definitions, or complicated testimony of high-priced expert economists will be required." MTD Order at 17 & 18 n.7. Instead, the burden shifts immediately to the NCAA "to produce evidence of procompetitive justification or effects." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011).

Second, the Court rejected NCAA's effort to impose an improper evidentiary burden on Plaintiffs and the class. Plaintiffs allege that if their wages were not illegally capped, they would have been paid more than $0 for the labor they provided. NCAA argued that Plaintiffs were also required to allege (and ultimately prove) that in the but-for world without the wage-fixing scheme, their schools would have *hired* them rather than hiring a different person or leaving the position vacant. The Court expressly rejected that argument, explaining that Plaintiffs did not need to prove that they "would have been hired" in some hypothetical world because they were, in the real world, "all hired as volunteer coaches." MTD Order at 13 n.5; *see also House v. NCAA*, 2023 WL

8372787, at *27 ("[T]he identity of the class members does not change between the real world and the but-for world.").

In discovery, Plaintiffs obtained comprehensive data about NCAA Division I member schools' usage of the "volunteer coach" designation and the compensation they paid to coaches who were not subject to the wage-fixing restraint. Plaintiffs issued subpoenas to 395 NCAA schools that competed in Division I during the relevant period.[8] Through these subpoenas, Plaintiffs collected data about (1) all coaches whom schools employed in every sport and year during the class period, and (2) the compensation schools paid to coaches who were not subject to the wage-fixing restraint. Plaintiffs also obtained several years of data from the NCAA's Membership Financial Reporting System ("MFRS"), which contains audited financial data about athletic expenses (including coach compensation) for every school that competes in Division I. As described in more detail below, Dr. Ashenfelter used these datasets—which contain information submitted, compiled, and maintained by the NCAA and its member schools—to model a pay structure that will allow him to estimate what class members' competitive salaries and benefits would have been absent the wage-fixing restraint.

## IV.    ARGUMENT

"Price fixing cases are generally well-suited for class action adjudication." 6 Newberg on Class Actions § 20:23 (6th ed. 2024). Class certification is thus routinely granted in price- and wage-fixing cases, including many involving other NCAA restraints on compensation. *See, e.g.*, *House v. NCAA*, 2023 WL 8372787, at *27 (restraint on student-athlete compensation); *Alston v. NCAA*, 311 F.R.D. at 536 (restraint on student-athlete compensation); *Law v. NCAA*, 1998 U.S.

---

[8] Plaintiffs issued 364 subpoenas to schools that primarily compete in Division I, along with 31 subpoenas to schools that compete in Division I only for certain sports. Before subpoenaing all these schools, which was a massive undertaking, Plaintiffs sought the necessary information from the NCAA and then sought the NCAA's assistance in obtaining the information from its member schools. The NCAA denied having any relevant information and declined to assist in obtaining it from the schools. At the suggestion of the Magistrate Judge, Plaintiffs also attempted to negotiate an agreed-upon sampling method so that some of this massive task could be avoided. The NCAA again declined. Plaintiffs were thus required to subpoena all schools that compete in Division I for this information. The NCAA did not itself engage in any third-party discovery of its member schools (other than narrow requests about the class representatives) and provided no input into the information requested from schools in the subpoenas served by the Plaintiffs. *See* Lieberman Decl. ¶¶ 9-15.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

Dist. LEXIS 6608, at *14-15 (restraint on coach compensation). That is because the key issues in any price- or wage-fixing case are inherently common to the class and predominate, including whether the restraint exists, the anticompetitive nature of the restraint, the validity of any procompetitive justifications for the restraint, and whether any valid procompetitive justifications could be achieved with less restrictive alternatives. *See*, *e.g.*, *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002).

This case is no exception. The same wage-fixing restraint, enshrined in the same NCAA bylaws, applied the same way to each class member, uniformly capping each one's compensation at $0. NCAA's purported justifications for the restraint apply equally to all sports and all members of the class, as do the reasons why those justifications fail. Accordingly, the wage-fixing restraint is either legal or illegal for all class members, making class resolution appropriate. Common impact, or fact of injury to the class, is presumptively recognized as an inevitable incident of wage-fixing, and it will be established easily here where every class member was hired by and provided labor to an NCAA Division I school for the wage-fixed price of $0 while those same schools paid their unrestricted assistant coaches approximately $78,000 per year during the class period. Indeed, the very fact that the proposed class members were hired as coaches is powerful evidence that their services were worth more than the $0 they were paid, as employers do not hire workers they think will make them worse off. As in *Law*, *House*, *Alston*, and countless other wage- and price-fixing cases, the class in this case should be certified and the legality of the NCAA's wage-fixing conspiracy determined in one action.

A.     **Standard for Class Certification**

Rule 23 provides "a procedural mechanism for a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). The Court's task at the class-certification stage is a modest one—it is "merely to decide whether a class action is a suitable method of adjudicating the case." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (alterations omitted). Applied here, the question for the Court is whether the legality of the NCAA's wage-fixing scheme should be decided for all class members together in one case, or

whether the thousands of coaches whose wages were suppressed by the scheme should be required to litigate the same question separately in thousands of individual lawsuits.

Rule 23 provides the framework for the Court's analysis of that question. Rule 23(a) provides that class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Where, as here, the named plaintiffs seek to certify a damages class, they must also satisfy Rule 23(b)(3), which permits class certification if common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The plaintiffs bear the burden of establishing that these prerequisites are satisfied "by a preponderance of the evidence." *Olean*, 31 F.4th at 665.

### B.    Plaintiffs Satisfy the Elements of Rule 23(a)

#### 1.    Numerosity: The Proposed Class is Numerous

Classes are generally sufficiently numerous when they comprise 60 or more members. *Johnson v. City of Grants Pass*, 50 F.4th 787, 803 (9th Cir. 2022). Here, Dr. Ashenfelter estimates that the proposed class has thousands of members. Exh. 1, Ashenfelter Report, ¶ 63. NCAA admits that the proposed class is "numerous within the meaning of Fed. R. Civ. P. 23(a)(1)." Exh. 22, Def.'s Resp. & Obj. to Pltfs.' First Set of RFAs Third Set of Interrogs., at 3.

#### 2.    Commonality: A Question of Law or Fact is Common

"The commonality requirement of Rule 23(a)(2) requires that class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Commonality requires only a single significant issue of law or fact common to a class. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). In antitrust cases, courts routinely hold that "antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in

one stroke." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013). The same is true here: whether the NCAA's wage-fixing scheme violates the antitrust laws is a question common to all class members and susceptible to resolution by common proof. *See*, *e.g.*, *House v. NCAA*, 2023 WL 8372787, at *5-6; *see also infra* part IV.C.1 (explaining that the many common issues in the case predominate over any individualized issues).

### 3.    Typicality: The Proposed Representatives' Claims are Typical

The purpose of Rule 23's typicality requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Wolin*, 617 F.3d at 1175. Under the "permissive standards" of Rule 23(a)(3), proposed class representatives' claims "are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024). "In the antitrust context, generally, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by defendants." *Alston v. NCAA*, 311 F.R.D. at 539.

That is precisely the case here. Each class representative, like all members of the proposed class, was hired by and worked for an NCAA Division I school in the role of "volunteer coach" and was therefore restrained from seeking or receiving compensation. Each class representative, like all members of the proposed class, alleges that this restraint on wages was anticompetitive and violated Section 1 of the Sherman Act. And each class representative, like all members of the proposed class, alleges that he or she was injured by this wage-fixing conspiracy. Accordingly, the proposed class representatives' claims are typical of the claims of the members of the classes they seek to represent. *See Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284 (N.D. Cal. 2016) ("In this case, all class members, regardless of their individual employers, allege the same injuries arising from common conduct: suppression of compensation … caused by Defendants' single antitrust conspiracy. This is all that is required to show typicality.").

Contrary to NCAA's position,[9] the fact that members of the proposed class worked in different sports and at different schools does not make their claims atypical. No matter which sport

---

[9] *See* Exh. 22, Def.'s Resp. and Obj. to Pltfs.' First Set of RFAs and Third Set of Interrogs., at 6 ("This variety among Division I institutions means that the issues in this case will be highly particular to individual coaches depending on what sport they coached at what institution at what

they coached or where they coached, the class representatives all were "Division I [coaches] and allege the same antitrust violations as the members of the proposed damages class[], namely that the challenged restrictions are anticompetitive and caused them cognizable antitrust injury by depriving them of [] compensation they would have received if the rules had not been in place." *House v. NCAA*, 2023 WL 8372787, at *3-4. That is all that matters; "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1142 (9th Cir. 2016).

Courts thus routinely find typicality satisfied even when class members worked different jobs for different employers, including in cases against the NCAA involving the same variety of sports and schools as in this case. In *Law*, for example, the court certified three classes of restricted-earnings coaches, including one class of coaches encompassing every Division I school and every sport other than baseball and basketball—a class nearly identical to the class Plaintiffs seek to certify here. *See Law v. NCAA*, 185 F.R.D. at 336 n.19. Similarly, in *House*, the court certified three classes of student-athletes, including one class of athletes encompassing every Division I school and every sport other than football and basketball. *House v. NCAA*, 2023 WL 8372787, at *4. Similar classes in other contexts are routinely certified. In *Nitsch*, the court certified a class of workers with 2,117 different job titles across eight different employers, 315 F.R.D. at 317, and in *High-Tech*, the court certified a class of workers in thirteen job categories across seven different employers, 985 F. Supp. 2d at 1177. In those cases, as here, the class representatives satisfied typicality because, "regardless of their individual employers, [they] allege the same injuries arising from … Defendants' single antitrust conspiracy." *Nitsch*, 315 F.R.D. at 284.

### 4. Adequacy: Plaintiffs Will Fairly and Adequately Represent the Class

Plaintiffs and their counsel will adequately represent the proposed class. The test for adequacy turns on two questions: "(1) whether named plaintiffs and their counsel have 'any conflicts of interest with other class members,' and (2) whether named plaintiffs and their counsel will 'prosecute the action vigorously on behalf of the class.'" *High-Tech*, 985 F. Supp. 2d at 1181.

---

time, which means that the REPRESENTATIVE PLAINTIFFS are not typical of the members of the proposed class.").

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

1    "This circuit does not favor denial of class certification on the basis of speculative conflicts."

2    *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003).

3         Here, the interests of the proposed class representatives are fully aligned with those of

4    absent class members in proving that NCAA and its member institutions violated the antitrust laws

5    and thereby artificially undercompensated them. As the court in *House* found with respect to

6    undercompensated student-athletes, the class representatives are adequate "because their interests

7    are aligned with members of those classes in challenging the lawfulness of the challenged rules

8    and in proving that those rules damaged class members." *House v. NCAA.*, 2023 WL 8372787, at

9    *6; *see also High-Tech*, 985 F. Supp. 2d at 1181 (finding adequacy where "named Plaintiffs and

10   [absent] Class members share an interest in proving that Defendants' conduct violated the antitrust

11   laws and suppressed their compensation"). The proposed class representatives have also

12   "significantly aided the prosecution of this litigation to date, which demonstrates that they will

13   prosecute the action vigorously on behalf of the proposed classes." *House v. NCAA*, 2023 WL

14   8372787, at *6; *see also* Lieberman Decl. ¶ 8 (explaining that each class representative has

15   responded to interrogatories, searched for responsive documents, sat for depositions, and consulted

16   with counsel about case strategy and discovery).

17        In addition, Plaintiffs' proposed class counsel satisfy the adequacy requirement. In

18   retaining Gustafson Gluek, Kirby McInerney, and Fairmark Partners, Plaintiffs have employed

19   firms and attorneys with long track records of vigorously prosecuting complex antitrust actions

20   like this one. *See infra* Part V. That includes experience with antitrust litigation against the NCAA:

21   Dennis Stewart of Gustafson Gluek and Robert Gralewski of Kirby McInerney were both among

22   the attorneys in the *Law v. NCAA* matter, which as discussed presented nearly identical legal issues

23   to the ones in this case and resulted in a finding of liability and substantial damages to the class.

24   *See* Stewart Decl. ¶ 3; Gralewski Decl. ¶ 5. The proposed class counsel have collectively devoted

25   thousands of hours and very considerable resources to the prosecution of this matter, demonstrating

26   both their commitment and ability to diligently pursue this case on behalf of the proposed class.

27   Proposed class counsel have capably pursued the interests of the proposed class to date and will

28   continue to do so.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

1    **C.      Plaintiffs Satisfy the Elements of Rule 23(b)(3)**

2          Plaintiffs also satisfy Rule 23(b)(3)'s predominance and superiority requirements. To

3    certify a class under Rule 23(b)(3), a court must find that (1) "the questions of law or fact common

4    to class members predominate over any questions affecting only individual members," and (2) "a

5    class action is superior to other available methods for fairly and efficiently adjudicating the

6    controversy." Fed. R. Civ. P. 23(b)(3).

7          "The office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is

8    to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen*

9    *Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (alterations omitted). Here, it is

10   self-evident that the best method for adjudicating the claims of thousands of coaches challenging

11   the same restraint is through a single class action case, not thousands of individual ones. That is

12   why "many courts have noted [that] the claim of a conspiracy to fix prices inherently lends itself

13   to a finding of … predominance." *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at

14   *5 (N.D. Cal. Nov. 14, 2018); *see also infra* Part IV.C.1. As to superiority, one need look no further

15   than what has already happened in this case. Important issues of substantive law common to the

16   claims of each and every class member were raised and decided on the motion to dismiss.

17   Extensive merits discovery into data and facts relevant to establishing liability and damages has

18   taken place efficiently in this action, obviating the need for duplication in thousands of similar

19   cases. What has already occurred in the case is powerful experiential evidence of the superiority

20   of the class action device.

21         **1.      Common Issues of Law and Fact Predominate**

22         The predominance inquiry asks whether the "common, aggregation-enabling, issues in the

23   case are more prevalent or important than [any] non-common, aggregation-defeating, individual

24   issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).[10] Common questions need

25   not predominate on every issue; rather, where "one or more of the central issues in the action are

26   _____

27         [10] A common question is one "where the same evidence will suffice for each member to make

     a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Torres*, 835

28   F.3d at 1134. In contrast, an individual question is one "where members of a proposed class will

     need to present evidence that varies from member to member." *Id.*

     _____
20

common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Id.* at 453-54. Predominance is lacking only when individualized questions will "overwhelm" common questions. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). Moreover, Plaintiffs need not prove that the common "questions will be answered, on the merits, in favor of the class," *Amgen*, 568 U.S. at 459, but simply that the common questions are "*capable* of class-wide resolution," *Olean*, 31 F.4th at 666-67 (9th Cir. 2022).

Here, every major issue to be litigated can be resolved with common evidence, including (1) whether NCAA and its member schools agreed to fix wages for proposed class members; (2) whether the wage-fixing agreement caused anticompetitive harms; (3) whether any procompetitive justifications outweigh those anticompetitive harms; (4) whether the wage-fixing scheme caused antitrust injury to class members; and (5) the amount of aggregate class-wide damages. None of these issues will require *any* evidence that "varies from member to member" of the class; they can all be resolved with classwide proof. *Torres*, 835 F.3d at 1134. And any individualized questions that arise could not possibly "overwhelm" the common ones. *Erica P. John Fund, Inc.*, 573 U.S. at 268.

### a. Common Evidence is Capable of Establishing an Unlawful Horizontal Wage-Fixing Conspiracy.

Plaintiffs will use common evidence to establish the existence of an antitrust violation. This alone satisfies the predominance requirement: "proof of the conspiracy is a common question that is thought to predominate over the other issues of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (emphasis omitted); *see also*, *e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present."); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) ("As a rule, the allegation of price-fixing conspiracy is sufficient to establish predominance of common questions."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1781 (3d ed.)

("Whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case."). In short, "the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure." *In re Scrap Metal*, 527 F.3d at 535.

Plaintiffs will use common evidence to prove exactly that—*i.e.*, that NCAA and its member schools interfered with the free-market pricing structure by enacting and enforcing a horizontal wage-fixing conspiracy. *See generally NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99-100 (1984) (describing "horizontal price fixing" as "the paradigm of an unreasonable restraint of trade"). To prove an antitrust violation under Section 1 of the Sherman Act, a plaintiff must show: (1) a contract, combination, or conspiracy; (2) that unreasonably restrained trade; and (3) that the restraint affected interstate commerce. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021).

Plaintiffs will use common evidence to prove all three elements.

*First*, common evidence will demonstrate the existence of "a contract, combination, or conspiracy." *Id.* The wage-fixing conspiracy was enshrined in NCAA Bylaws that applied uniformly to every Division I school and sport in which class members worked as coaches. *See* Exh. 9 at Bylaw 11.01.6 (coach designated as "volunteer" may "not receive compensation or remuneration"). The evidence of the wage-fixing scheme's existence is thus the same for all members of the proposed class—namely, the Bylaws themselves, as well as testimony from witnesses confirming that the prohibition on compensation applied uniformly to all sports and schools. *See*, *e.g.*, Exh. 11, Boyer Dep., at 246:24-247:13 (restraint applied to "all … Division I member institutions" and "all sports … where a volunteer coach existed"). Notably, the fact that the NCAA put its wage-fixing agreement in writing does not make the issue any less important to the predominance analysis: "Just as much as do contested issues, resolved issues bear on the key question that the analysis seeks to answer: whether the class is a legally coherent unit of representation by which absent class members may fairly be bound." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006); *see also* 6 Newberg on Class Actions § 20:51 (6th ed.

2024) ("The predominance test does not involve a comparison of court time needed to adjudicate common issues weighed against time needed to dispose of individual issues.").

*Second*, common evidence will demonstrate that the NCAA's wage-fixing scheme unreasonably restrained trade—*i.e.*, that its anticompetitive effects outweighed any procompetitive justifications. This Court already ruled that "a quick-look analysis is appropriate" for evaluating the reasonableness of the NCAA's wage-fixing restraint. MTD Order at 17. As the Court explained, a horizontal price-fixing agreement like the one at issue here would typically "be a per se violation of § 1," but "in the context of the NCAA, courts typically apply a quick-look analysis." *Id.* at 16-17; *see also* Pltfs.' Opposition to Mot. to Dismiss at 14-18, ECF No. 32; *Law v. NCAA*, 134 F.3d at 1020 (adopting quick-look approach in case challenging restriction on assistant coaches' salaries); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (endorsing *Law*'s application of "quick look" analysis); *NCAA v. Bd. of Regents*, 468 U.S. at 109 (applying quick look to NCAA's restraint on televising college football games).

Under the quick-look framework, once the plaintiff demonstrates the existence of an "inherently suspect" restraint—here, the horizontal wage-fixing agreement between NCAA and its member schools—anticompetitive effects are presumed and "the burden shifts to the [defendant] to produce evidence of procompetitive justification or effects." *Harris*, 651 F.3d at 1138 (9th Cir. 2011); *see also Polygram Holding, Inc.*, 416 F.3d at 36 ("[T]he restraint is presumed unlawful and, in order to avoid liability, the defendant must either identify some reason the restraint is unlikely to harm consumers or identify some competitive benefit that plausibly offsets the apparent or anticipated harm."). Accordingly, the same common evidence that proves the existence of the NCAA's restraint, *see supra*, will also presumptively establish its anticompetitive effects, thereby shifting the burden to the NCAA to show that its blanket wage cap of $0 on an entire class of Division I coaches somehow *enhanced* competition in that labor market.[11]

---

[11] Plaintiffs could also demonstrate anticompetitive effects with common evidence under a full-blown rule-of-reason analysis, even though doing so is plainly unnecessary here. *See Law v. NCAA*, 134 F.3d at 1020. Under the full rule of reason, a plaintiff may show anticompetitive effects directly through "proof of actual detrimental effects on competition," such as decreased wages. *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022). When a plaintiff makes that showing, no "inquir[y] into market definition and market power" is required. *Id.*; *see also, e.g., Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the plaintiff puts forth

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

Whether the NCAA can satisfy that burden will also be determined through evidence and argument common to the class. In its interrogatory responses, the NCAA identified three supposedly procompetitive benefits of the wage-fixing scheme, claiming that the scheme "enhanced equitable competition between NCAA Division I member institutions, increased resources available to student-athletes, and expanded opportunities for individuals interested in gaining experience and pursuing careers in coaching sports." Exh. 23, Def.'s Resps. & Objs. to Pls.' Second Set of Interrogs., at 7. Critically here, all three of those supposed benefits apply uniformly to all schools and sports in the class. NCAA did not articulate any school- or sport-specific benefit from the wage-fixing conspiracy, and it has not argued that the conspiracy is justified for different reasons in different contexts. These supposed procompetitive benefits accordingly present a classwide issue.

Another common issue is whether these supposedly procompetitive benefits are legally valid. *See House v. NCAA*, 2023 WL 7106483, at *4 (N.D. Cal. Sept. 22, 2023) ("whether Defendants' procompetitive justifications for the challenged NCAA rules are valid" can "be resolved via common proof"). Plaintiffs will demonstrate at summary judgment that each of the NCAA's three purported benefits is invalid as a matter of law for reasons that apply uniformly across the class; Defendant will argue that each benefit is legally valid for the entire class. For example, Plaintiffs will show that "expanded opportunities" for coaches and "increased resources available to student-athletes" are benefits of increasing the number of permissible coaching slots, not benefits of capping the last coach's wages at $0, and therefore cannot justify the wage cap. *See Brown v. Pro Football, Inc.*, 1992 WL 88039, at *9 (D.D.C. Mar. 10, 1992) ("The fact that an employer creates jobs does not allow that employer to violate the Sherman Act by fixing salaries."). Along the same lines, Plaintiffs will show that the supposed benefit of "enhanced

evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."). Here, the wage-fixing conspiracy had "detrimental effects on competition" because it successfully fixed the price for labor at $0, thereby precluding competition among schools and depressing wages across the class. *PLS.COM*, 32 F.4th at 834. Accordingly, common evidence will show anticompetitive effects regardless of whether they are presumed under quick-look review or proven under the full-blown rule of reason.

equitable competition between NCAA Division I member institutions" is invalid because it improperly attempts to justify a restraint in the labor market for coaches by pointing to a supposed benefit in the product market for NCAA sports. *See Law*, 902 F. Supp. at 1406 ("The market for coaching services is different from the market for intercollegiate sports."). That is not permissible: "anticompetitive effects in one market [cannot] be justified by procompetitive consequences in another." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963). To be clear, the Court need not decide today whether NCAA's justifications are valid; the point is simply that whether they are valid or invalid, as well as whether they are supported by evidence, will have a common answer across the class.

Finally on this point, even if the NCAA could identify and empirically prove a valid procompetitive benefit, Plaintiffs would use common evidence to demonstrate that the anticompetitive effects of prohibiting *all* compensation to volunteer coaches outweighed any valid procompetitive benefits, as well as to show that any valid procompetitive benefit could be obtained through less restrictive means. *See House v. NCAA*, 2023 WL 7106483, at *4 (ruling that "whether any procompetitive justifications for the challenged NCAA rules can be achieved via less restrictive alternatives" can "be resolved via common proof").

*Third*, common evidence will satisfy the third element of a Section 1 claim—that "the restraint affected interstate commerce." *Optronic*, 20 F.4th at 479. A simple list of Division I schools will demonstrate that the wage-fixing restraint regulates transactions between Plaintiffs and their schools in multiple states.

In sum, Plaintiffs will use common evidence to establish every element of NCAA's antitrust violation. This alone is enough to satisfy the predominance requirement: "In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 721680, at *15 (N.D. Cal. Jan. 28, 2016) (same); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1781 (3d ed.) ("Whether a conspiracy exists is a common question that is thought

1   to predominate over the other issues in the case."). Because "the question of whether Defendants

2   engaged in an antitrust violation" will be "central to this litigation" and can be resolved with

3   classwide proof, predominance is satisfied. *High-Tech*, 985 F. Supp. 2d at 1227.

### b. Common Evidence is Capable of Proving Classwide Impact.

5   The Court need not go any further to rule that predominance is satisfied. *See Thomas &*

6   *Thomas*, 209 F.R.D. at 167. But common evidence will also establish the element of classwide

7   impact. The term "impact" refers simply to an antitrust injury—*i.e.*, an injury-in-fact that is "of the

8   type the antitrust laws were intended to prevent and that flows from that which makes defendants'

9   acts unlawful." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 190 (N.D. Cal. 2015).

10  An "artificially depressed rate of compensation, caused by a purported conspiracy to limit

11  compensation," is a prototypical form of impact in an antitrust case. *Id.* (citing *Knevelbaard*

12  *Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000)). The term "classwide impact" refers

13  to an antitrust injury that is widespread among class members. *Torres*, 835 F.3d at 1136, 1138; *see*

14  *also High-Tech*, 985 F. Supp. 2d at 1192 ("widespread" harm to class suffices); *Olean*, 31 F.4th at

15  669 ("We reject the … argument that Rule 23 does not permit the certification of a class that

16  potentially includes more than a de minimis number of uninjured class members.").

17  Common evidence establishes classwide impact if it is capable of showing that the

18  defendant's conduct caused injury that is widespread across class members. At this stage, Plaintiffs

19  are not required to convince the Court that the wage-fixing scheme did, in fact, cause widespread

20  harm. *See In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *7 ("Rule 23 does not

21  require proof of impact on each purchaser before a class can be certified."). Instead, Plaintiffs need

22  only demonstrate that classwide evidence is *capable* of showing classwide impact—*i.e.*, that

23  evidence common to the class, if credited, could support their claim that the wage-fixing

24  conspiracy inflicted widespread harm on class members. *Tyson Foods*, 577 U.S. at 459-60; *see*

25  *also Olean*, 31 F.4th at 681 ("The … class did not have to first establish that it will win the fray in

26  order to gain certification under Rule 23(b)(3)."). Generally speaking, classwide impact is a

27  common issue so long as the proposed class does not contain "large numbers of class members

28  who were never *exposed* to the challenged conduct to begin with," and therefore could not possibly

have been injured. *Torres*, 835 F.3d at 1136 (emphasis in original). Here, of course, all members of the proposed class were "exposed" to the challenged conduct: they all worked as Division I coaches and had their compensation capped at $0 by the wage-fixing conspiracy.

Three types of common evidence are independently capable of showing that the NCAA's wage-fixing scheme widely suppressed class members' pay:[12] (1) the existence of the scheme itself, which under long-established precedent creates a presumption of classwide impact, (2) common documentary expert evidence demonstrating the value of coaches generally and class members specifically, and/or (3) the expert testimony of Dr. Orley Ashenfelter, who uses regression analysis and a well-accepted methodology to demonstrate classwide impact.

***Presumption of Classwide Impact.*** The conspiracy's existence alone gives rise to a presumption of classwide impact. "Under the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact." *In re Urethane Antitrust Litig.*, 768 F.3d at 1254. This makes good sense: the wage-fixing conspiracy applied to all members of the proposed class and capped all of their wages at $0, so it is "logical and plausible" that all class members were harmed. *Olean*, 31 F.4th at 678. As the *Law* court put it, "proof of an effective conspiracy to fix prices will include facts which tend to establish … that each class member was injured." *Law v. NCAA*, 5 F. Supp. 2d 921, 927 (D. Kan. 1998); *see also Olean*, 31 F.4th at 678 (9th Cir. 2022) ("[A] district court could reasonably conclude that price-fixing would have affected the entire market."); *Beltran v. InterExchange, Inc.*, 2018 WL 1948687, at *9 (D. Colo. Feb. 2, 2018) ("If Plaintiffs' antitrust allegations are true, it logically follows that Plaintiffs were injured from the artificially-suppressed wages.").

The inference of classwide impact is especially strong here. Courts have uniformly held that an inference of classwide impact is appropriate when a wage-fixing conspiracy "artificially deflated the baseline for ... wages," *Beltran*, 2018 WL 1948687, at *8, or, in a price-fixing case, "artificially inflated the baseline for price negotiations," *Olean*, 31 F.4th at 678. Here, the NCAA's

---

[12] For purposes of monetary impact, even a single dollar of harm will do: "Any monetary loss suffered by the plaintiff satisfies the injury in fact element; even a small financial loss suffices." *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020). Accordingly, the Court need only find that classwide evidence is capable of showing that all or nearly all class members would have been compensated in any amount for their valuable work absent the wage-fixing restraint.

wage-fixing scheme not only "artificially deflated the baseline for ... wages," *Beltran*, 2018 WL 1948687, at *8, but also prohibited any individual negotiation up from that baseline, because compensation was fixed at $0, full stop. Given that classwide impact can be inferred from an artificial baseline "even when prices are individually negotiated" and thus might deviate from the artificial baseline in practice, *Olean*, 31 F.4th at 671, it follows *a fortiori* that classwide impact can be inferred when the victims of the scheme had no leeway for negotiation at all. In short, the existence of the wage-fixing conspiracy itself, which capped all class members' wages at $0, gives rise to an inference that all members of the proposed class were impacted.

   ***Documentary Evidence.*** Documentary evidence about the value of coaches generally and class members specifically supports the conclusion that the nationwide wage cap of $0 inflicted widespread harm across the class. Data produced by the NCAA and its members demonstrates that schools placed a high value on coaching services across all sports within the proposed class: nearly 100% of unrestricted coaches were paid, with the average head coach during the class period making approximately $159,000 and the average assistant coach making approximately $78,000. *See* Exh. 1, Ashenfelter Report, ¶¶ 20-21. That evidence supports the conclusion that class members working in the same market and doing the same jobs were worth more than $0, especially in light of the extensive evidence detailed above about the value that proposed class members brought to the teams and athletes they coached. *See supra* Part II.D-E. This Court already recognized as much, noting that "the large salaries received" by unrestricted assistant coaches and "the overall increase in coach salaries" over time "creates a strong inference that the Bylaw was effective" at suppressing compensation. MTD Order at 18. Furthermore, the very fact that the proposed class members were hired as coaches is powerful evidence that their services were worth more than $0: employers do not hire workers they think will make them *worse* off, so the very fact that each class member was hired shows that their respective schools believed they added value. *See* Exh. 1, Ashenfelter Report, ¶ 58. Thus, basic "economic theory and common sense" support the conclusion that all or nearly all class members suffered antitrust injury. *Law*, 1998 U.S. Dist. LEXIS 6608, at *13.

Again, Plaintiffs at this stage do not need to convince the Court that the wage-fixing scheme actually caused widespread harm; they merely need to show that there is common evidence that would support a finding of widespread harm. *Olean*, 31 F.4th at 681. Here, the common evidence that schools highly value their coaches, handsomely compensated their unrestricted coaches, and saw value in hiring class members as coaches amply support the conclusion that the "hands-on coaching," "counseling," "support," "mentorship," and "educational benefits" that class members provided, Exh. 27 at _0146466, were worth more than *nothing* to the schools that hired and employed them, and thus that the wage-fixing conspiracy inflicted widespread harm across the class.

***Expert Testimony.*** Dr. Ashenfelter's report and testimony will provide additional common evidence that the wage-fixing scheme inflicted widespread harm on the class. With respect to impact, Dr. Ashenfelter concludes that "[a]bsent a conspiracy to suppress the compensation of these workers to $0, the market rate would be greater than zero," and therefore that the wage-fixing conspiracy "affected all or nearly all members of the class." Exh. 1, Ashenfelter Report, ¶¶ 54, 73. Dr. Ashenfelter reaches that conclusion by applying economic theory to several pieces of evidence in this case, and also describes a common damages methodology that, as applied to currently available data, finds widespread monetary harm to class members.

First, Dr. Ashenfelter observes that during the class period, NCAA Division I schools compensated nearly all their unrestricted coaches, indicating that "absent a rule preventing schools from paying coaches, they *do* pay their coaches," *i.e.*, that the market rate for assistant coaches is greater than the $0 that class members were paid. *Id.* ¶ 55.

Second, Dr. Ashenfelter observes that the restraint itself indicates that the market rate was greater than $0: "If the schools believed that the number of people who wanted to provide coaching services for free was so high that these schools could recruit and retain these workers without payment, then they need not have made an agreement to pay these workers $0." *Id.* ¶ 56. "By pushing for, agreeing to, and monitoring and punishing violations of the Volunteer Coach Rule, the NCAA and its Division I member schools revealed that they do not believe that they could recruit high-quality coaches to work for free absent such an agreement." *Id.*

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

Third, Dr. Ashenfelter notes that NCAA also restricts the *number* of coaches that each team may hire. While the restraint on the number of coaches is not being challenged in this case, Dr. Ashenfelter observes that the numerical cap indicates that "demand for coaching staff is high," and that if "NCAA member institutions did not value a marginal coach," *i.e.*, if hiring additional coaches did not provide value to the institutions, "there would be no need to place limits on the number of coaches each program is allowed to employ." *Id.* ¶ 57.

Fourth, Dr. Ashenfelter explains that "the very fact that NCAA Division I schools hired the class members as coaches—even at $0—indicates that they valued class members' labor at more than $0 and would have been willing to pay more than $0 for their services were it not for the wage-fixing restraint." *Id.* ¶ 58. Rational employers do not hire workers who do not provide value; accordingly, "when an employer *does* hire a worker, that indicates that the employer views the worker as adding positive value and would be willing to compensate that worker up to the value the worker provides to the employer." *Id.* Thus, the very fact that each class member was hired is powerful evidence that "absent a rule preventing schools from paying class members, they would have done so." *Id.*

Fifth, Dr. Ashenfelter relies on the economic concepts of "internal pay equity" and "external pay equity." Internal pay equity refers to the idea, widely accepted in economic literature, that similar workers who perform similar work for the same employer receive similar pay. *Id.* ¶ 59. External pay equity refers to the idea, equally accepted in the literature, that employers offer similar compensation as other employers for similar work. *Id.* ¶ 60. Dr. Ashenfelter identifies record evidence indicating that NCAA member schools were concerned with both internal and external equity, and concludes that absent a rule preventing some assistant coaches from being paid, "all or nearly all members of the class would have received compensation" to ensure equity among coaches on the same team and coaches across comparable Division I schools. *Id.* ¶ 59.

Based on this analysis, Dr. Ashenfelter concludes that "[a]bsent a conspiracy to suppress the compensation of these workers to $0, the market rate would be greater than zero," and therefore that "the alleged conspiracy affected all or nearly all members of the class." *Id.* ¶¶ 54, 72.

Dr. Ashenfelter has also designed a methodology to measure the amount of damages caused by the NCAA's wage-fixing conspiracy. He uses regression analysis to do so, which is commonly used in antitrust cases. *See Olean*, 31 F.4th at 677 (stating that "regression models have been widely accepted" in antitrust cases). Dr. Ashenfelter's methodology relies on data produced by the NCAA's member schools in response to subpoenas issued in this case.[13] This data includes information about coach compensation during the conspiracy period—*i.e.*, the amounts schools paid to the coaches who were *not* subject to the wage-fixing restraint—as well as information about coach compensation to coaches in the post-conspiracy period (*i.e.*, the 2023-24 academic year).

Dr. Ashenfelter's methodology follows a three-step process. At Step One, Dr. Ashenfelter looks at conspiracy-period data to determine how much compensation was paid to the lowest-ranked *unrestricted* coach in each school, sport, and year—*i.e.* how much schools paid the coach directly above each class member in their respective coaching hierarchies. He uses that amount as a benchmark for the but-for compensation of the "volunteer" coach who worked in the same school, sport, and year. Exh. 1, Ashenfelter Report, ¶ 71.

Because the "volunteer" coaches were lower-ranked in their respective coaching hierarchies than these benchmark coaches, Dr. Ashenfelter's Step Two is to calculate an appropriate "step-down" adjustment from the benchmark compensation. Dr. Ashenfelter calculates this "step-down" by using data from the post-conspiracy period. Using the post-conspiracy data, Dr. Ashenfelter builds a regression model of the standard relationship between the salaries of the two lowest-paid coaches on a coaching staff—*i.e.*, how much less the lowest-paid coach makes than the second-lowest-paid coach. Dr. Ashenfelter's usage of data from the first (and so far only) year of the post-conspiracy period is conservative, Dr. Ashenfelter explains, because wage-fixing schemes—especially decades-long wage-fixing schemes—continue to have residual effects for

---

[13] Plaintiffs issued subpoenas to 395 schools that competed in Division I during the relevant period. At this point, not all schools have finished producing the requested data. As additional schools provide their responses, Dr. Ashenfelter will add them to his model. In the event that Plaintiffs are unable to obtain the requested data from one or more schools, Dr. Ashenfelter states that he can apply a modified form of his methodology to those schools and associated class members by using compensation data from the NCAA's Membership Financial Reporting System, which was produced by the NCAA in this case. Exh. 1, Ashenfelter Report, ¶ 69 n.107.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

many years, *i.e.*, "a continuation of below-competitive wages for a period of time after the dissolution of a wage-fixing conspiracy." *Id.* ¶ 50. Indeed, "it may take several years for universities and athletic departments to provide sufficient funding to hire and pay workers in the newly-compensable, formerly-volunteer coaching positions." *Id.* ¶ 51; *see also*, *e.g.*, *Optronic*, 20 F.4th at 488 (recognizing that effects of a conspiracy last after the conspiracy ends). Nevertheless, Dr. Ashenfelter concludes that using post-conspiracy data for the limited purpose of calculating the "step-down" is a reasonable, conservative, and widely-accepted way to estimate but-for compensation during the conspiracy period. Exh. 1, Ashenfelter Report, ¶¶ 52, 69; *see In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145 (C.D. Cal. 2007) (stating that the "before-and-after methodology has been accepted by numerous courts" and collecting cases). Dr. Ashenfelter will continue to incorporate additional post-conspiracy data as it becomes available. Exh. 1, Ashenfelter Report, ¶ 69.

Finally, at Step Three, Dr. Ashenfelter describes a method by which he will reduce the benchmark compensation from Step One for each class member by the applicable "step-down" percentage determined in Step Two. This calculation will result in an estimated damages amount for each class member that is based on the compensation paid to other assistant coaches in the same school, sport, and year—*i.e.*, other coaches doing the same work for the same employer at the same time—with a downward adjustment to reflect the class member's place in the coaching hierarchy. Based on his analysis of the currently available data, Dr. Ashenfelter concludes that the wage-fixing scheme inflicted widespread harm on class members. *Id.* ¶ 72.

Courts routinely approve similar analyses in horizontal wage-fixing cases. The most obvious example is *Law*. In *Law*, the plaintiffs' expert, like Dr. Ashenfelter here, used the compensation of the lowest-paid unrestricted coach during the class period as the starting point for estimating damages for the restricted-earnings coach in the same year, school, and sport. Like Dr. Ashenfelter, the plaintiffs' expert then applied a step-down factor based on the observed relationship between the two lowest-ranked coaches on a coaching staff during a "clean" period without any wage cap on the lowest-ranked coach. As Dr. Tollison explained, "[t]he estimated wage of the restricted coach in the damage period … is then simply the wage that would place him

or her at the predicted percentage of the pay of the next coach up the coaching ladder, as derived from the clean period." Report of Robert D. Tollison, *Law v. NCAA*, No. 94-cv-2053, 1996 WL 34400119 (D. Kan. 1996). Like Dr. Ashenfelter, Dr. Tollison "appl[ied] this procedure school-by-school, coach-by-coach(es), and year-by-year," to produce damages estimates for each class member and an aggregate damages estimate for the class. *Id.* The court rejected a *Daubert* challenge to his methodology, *Law v. NCAA*, 1998 U.S. Dist. LEXIS 6640 (D. Kan. Apr. 23, 1998) (included as Exh. 25), and certified the classes, *see Law v. NCAA*, 1998 U.S. Dist. LEXIS 6608.[14]

Similarly, in *Casen-Merenda v. Detroit Medical Center*, Dr. Ashenfelter performed a benchmark analysis to determine whether a class of registered nurses (RNs) was harmed by a wage-suppression scheme among eight hospitals. As a benchmark, Dr. Ashenfelter used the amounts those hospitals paid temp agencies for part-time nurses performing work similar to the class members' work. He used this agency nurse benchmark, after adjusting for various differences between RNs and agency nurses, "to calculate what each member of the class would have earned in the absence of the alleged conspiracy." 2013 WL 1721651, at *2-3 (E.D. Mich. Apr. 22, 2013). The analysis showed, as it does here, that "almost all of the members of the class actually earned less than they would have in the 'but-for' world" without the wage-suppression scheme. *Id.* The district court rejected a *Daubert* challenge to Dr. Ashenfelter's methodology, *id.* at *12, and granted class certification. *See Cason-Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 542-44 (E.D. Mich. 2013) ("The benchmark approach of Plaintiffs' expert, Dr. Ashenfelter, provides a basis for Plaintiffs to show antitrust impact through common evidence." (capitalization altered)).

In sum, "a common body of evidence, applicable to the whole class," *Olean*, 31 F.4th at 666, is capable of showing that the NCAA's wage-fixing scheme caused widespread harm. The

---

[14] Dr. Ashenfelter's methodology is considerably more conservative than Dr. Tollison's was, as Dr. Tollison used compensation information from *before* the conspiracy to calculate damages. Because the wage-fixing conspiracy in this case has been in place for so long, there is no data for a clean "before" period, necessitating the use of data from the "after" period. As noted, data from the "after" period underestimates damages because labor markets that have been infested with a wage-fixing conspiracy for over 30 years do not snap back to perfect competitive conditions right away. Exh. 1, Ashenfelter Report, ¶¶ 50-51. Thus, the compensation paid in 2023-24 to the coaches Dr. Ashenfelter used as a benchmark is likely meaningfully lower than what that compensation would be if the restraint never existed.

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

NCAA may make the wholly illogical argument that members of the class were uninjured—*i.e.*, that their market value was exactly zero so they would not have been paid anything in the but-for world—but that is an argument for the jury.[15] At this stage, all that matters is that evidence common to the class is *capable* of showing classwide impact. As detailed above, it plainly is: the existence of the scheme itself, common evidence about the value of Division I coaching services, and Dr. Ashenfelter's testimony all support a finding that fixing wages at $0 caused widespread harm to the class. Thus, the "common, aggregation-enabling, issues in the case," *Tyson Foods*, 577 U.S. at 453, include not just whether NCAA and its member schools agreed to fix wages for proposed class members; not just whether the wage-fixing agreement caused anticompetitive harms; not just whether any procompetitive justifications outweigh those anticompetitive harms; but also whether the wage-fixing scheme harmed class members. It is not even necessary that common questions predominate across *all* these liability issues—just "one or more" of them," *id.*—but here, common questions "are more prevalent" than individual ones across the board. *Id.*

### c.    Classwide Evidence is Capable of Proving Damages.

Plaintiffs will also rely on common evidence and a common methodology to prove both aggregate damages and individual damages.[16]

As to aggregate damages, courts apply "a relaxed standard for proving the amount of damages in an antitrust case." *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976); *House v. NCAA*, 2023 U.S. Dist. LEXIS 216532, at *15 (N.D. Cal. Nov. 3, 2023) (included as Exh. 26). This relaxed standard reflects that "antitrust damage calculations necessarily require a determination of what would have been in a 'but for' world," creating "an inescapable element of uncertainty." *House v. NCAA*, 2023 WL 8372787, at *9; *accord Edwards v. Nat'l Milk Producers Fed'n*, 2014 WL 4643639, at *6 (N.D. Cal. Sept. 16, 2014) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the

---

[15] Among other reasons why such an argument has no force, if the market price for coaches were $0 the NCAA would have had no need to enact and enforce for three decades a rule prohibiting payment to those coaches. *See* Exh. 1, Ashenfelter Report, ¶ 56; *see id.* ¶ 55-60.

[16] The term "aggregate damages" refers to the defendant's total liability to the class, while the term "individual damages" refers to each individual class member's harm. *See generally* 6 Newberg and Rubenstein on Class Actions § 20:62 (6th ed. 2024).

defendant's antitrust violation."). While "such calculations may be inherently imprecise, they are not impermissibly speculative," *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6246736, at *6 n.9 (N.D. Cal. Oct. 26, 2016), and "[j]ustice and sound public policy alike require that [the defendant] should bear the risk of the uncertainty," *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931).

Once aggregate damages are shown under this "relaxed standard," *House v. NCAA*, 2023 U.S. Dist. LEXIS 216532, at *15, any individualized calculations to allocate damages among individual class members are not relevant to the predominance inquiry: "it is black-letter class action law that such damage calculations do not render the common liability issue non-predominant." 6 Newberg and Rubenstein on Class Actions § 20:62 (6th ed. 2024); *see also Torres*, 835 F.3d at 1136 (9th Cir. 2016) ("The presence of individualized damages calculations, however, does not defeat predominance."); *Leyva v. Medline Indus.*, 716 F.3d 510, 513 (9th Cir. 2013) ("[D]amage calculations alone cannot defeat certification."). While plaintiffs must propose *some* method of allocating aggregate damages, their burden is light—they have to show only that their methodology is not "so insubstantial as to amount to no method at all." *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. at 354.

Dr. Ashenfelter's methodology easily passes this test. As described above, Dr. Ashenfelter designed a methodology that calculates damages for each individual class member by applying a "step down" from the observed compensation of the lowest-ranking paid coach in the same school, sport, and year as that class member. This method applies the same way to the entire class, and Dr. Ashenfelter can easily apply the appropriate step down to the compensation data provided by the NCAA and its member schools to generate individualized damages estimates, without any need for additional evidence or testimony about individual class members. Given that at the class certification stage "the court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all," *id.*, Dr. Ashenfelter's methodology is a reasonable and reliable enough means for using common evidence to estimate aggregate and individualized damages.

#### d.    NCAA's Main Criticisms of Plaintiffs' Analysis Are Wrong

In its discovery responses and its prior filings, the NCAA has previewed two arguments that it will likely make in opposition to class certification. The first is based on the "substitution theory" this Court already rejected at the motion to dismiss stage, and the second is based on a dubious claim that schools did not have enough money to pay class members what they were worth. Neither argument is legally valid.

First, NCAA has invoked the discredited "substitution theory" to argue that Plaintiffs cannot prove that each class member was harmed. The argument is that if schools had not fixed wages for their entry-level coaching slot at $0, some schools might have filled that slot with a different coach or decided to leave the slot unfilled. Accordingly, the argument goes, each class member must prove that the school at which she worked would have hired her even if the wage-fixing scheme did not exist, and that proving as much would require individualized proof.[17]

The Court already rejected this specious argument in its Motion to Dismiss decision, correctly explaining that Plaintiffs do not have to show that they "would have been hired" in the but-for world because they "were all hired as volunteer coaches" in the real world. MTD Order at 13 n.5. Like the named Plaintiffs, all class members worked as coaches in the real world, and NCAA's member schools received the benefits of their uncompensated labor in the real world. The NCAA cannot erase the resulting harm to class members, or retain the benefits its members received, simply by claiming that NCAA's members would have made different hiring decisions in the but-for world. Simply, put, "the identity of the class members does not change between the real world and the but-for world." *House v. NCAA*, 2023 WL 8372787, at *27.

Other courts have rejected the same argument, including in cases involving the NCAA. Most recently, in *House*, Judge Wilken expressly rejected the NCAA's argument that "substitution effects would change the identities of class members in the but-for world and would make it

---

[17] *See* Exh. 22, Def.'s Resp. and Obj. to Pltfs.' First Set of RFAs and Third Set of Interrogs., at 10 ("[W]hether each class member was injured will depend on (1) whether the college or university where each class member coached would have hired an additional paid coach in the sport that the class member coached if the bylaws permitted doing so, and (2) whether the college or university have hired the class member—and not some other candidate—as the additional paid coach.").

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

impossible to determine which class members were injured." *House v. NCAA*, 2023 WL 8372787, at *27. She explained, in language equally applicable here:

> In antitrust cases such as this one, injury and damages are determined by comparing, on the one hand, the payments that each class member who falls within the class definition received in the real world with, on the other hand, the payments that *that same class member* would have received in the but-for world…. For the purpose of this comparison, ***the identity of the class members does not change between the real world and the but-for world***. Accordingly, the so-called substitutions or displacements that may or may not take place in a hypothetical but-for world are irrelevant to the determination of whether members of the proposed classes suffered antitrust injury.

*Id.* (emphasis added).

The same argument also failed when the NCAA tried it in *Law*. Judge Vratil noted that the "substitution theory" was "not anchored in established case law" and held that regardless of "why the [class members] got their jobs or … why the jobs were created, … [the class members] were entitled to work in a market that was not infested with a conspiracy to violate the federal antitrust laws." *Law*, 185 F.R.D. at 330 n.6.

More broadly, the NCAA's "substitution theory" cannot be accepted because it would preclude class certification in *every* wage-fixing and price-fixing case, contrary to the Supreme Court's guidance that "[p]redominance is a test readily met" in antitrust cases. *Amchem*, 521 U.S. at 625; *see also, e.g.*, 6 Newberg on Class Actions § 20:23 (6th ed. 2024) ("Price fixing cases are generally well-suited for class action adjudication."). In every wage-fixing case, a defendant could say that it would have hired fewer or different people if it had to pay market rates. But that neither exonerates the defendant for its illegal conduct nor eliminates the fact that every class member was harmed every day they were forced to work in a market that was "infested with a conspiracy to violate the federal antitrust laws." *Law*, 185 F.R.D. at 330 n.6. Likewise, in every price-fixing case, any seller could argue that lower prices would have changed the dynamics of the market, leading to displacement of real-world buyers by hypothetical buyers in the but-for world. But again, the real-world buyers paid more than they should have had to pay, and so they are entitled to relief under the antitrust laws. *See*, *e.g.*, *Story Parchment Co.*, 282 U.S. at 564 ("To deny the injured party the right to recover any actual damages in such cases … would be to enable parties to profit

by … their own wrongs, encourage violence and invite depredation. Such is not, and cannot be the law.").

Second, the NCAA has argued that Plaintiffs cannot show classwide impact because "member institutions have limited budgets" and so some may not have wanted to pay every class member whose labor they exploited.[18] This antitrust defense is as old as time, and it loses every time. *See*, *e.g.*, *Socony-Vacuum Oil Co.*, 310 U.S. at 221-22 (1940). It simply is not a defense for a wage-fixing employer to argue that it would have been too expensive to pay the market rate to the employee whose labor it exploited, just as it is not a defense for a price-fixing seller to argue that it would have lost money if it had to charge the competitive price: "If there is any argument the Sherman Act indisputably forecloses, it is that price fixing is necessary to save companies from losses they would suffer in a competitive market." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1152 n.24 (9th Cir. 2003); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 870 (N.D. Ill. 2010) ("While Defendants frequently refer to their financial constraints as an element in their defense, an unforgiving market offers no excuse for violating antitrust laws."). NCAA's member schools needed labor and used labor; antitrust law does not allow them to escape paying for that labor with pleas of poverty. "[Congress] has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies." *Socony-Vacuum*, 310 U.S. at 221-22.

NCAA's member schools sought out and received the benefits of free labor. The antitrust laws do not allow them to keep those benefits of that labor simply by claiming they would have exited the market if they were not able to fix wages. For example, in a price-fixing case involving e-books, Apple argued that one of its co-conspirators (Barnes & Noble) would have left the e-book market if it had not been able to fix prices, so any class members who purchased from Barnes & Noble were uninjured. *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *21 (S.D.N.Y. Mar. 28, 2014). The court rejected the argument as a matter of law, explaining that a price-fixing

---

[18] Exh. 22, Def.'s Resp. and Obj. to Pltfs.' First Set of RFAs and Third Set of Interrogs., at 6 ("Even highly resourced member institutions have limited budgets and often only hire paid coaches in some sports. Class members who volunteered in each sport will want to prove the college or university where they coached would have spent their resources on the sports they coached rather than on sports that other class members coached.").

conspirator "may not escape its obligation to compensate [] customers whom it overcharged" by claiming that it would not have participated in the market absent the price-fix. *Id.* at *20. Likewise here, the NCAA and its member schools "may not escape [their] obligation" to compensate coaches whose wages their conspiracy suppressed. *Id.* They received the benefit of the transaction and cannot avoid paying the value of the benefits they received. *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 366 n.12 (1961) ("[T]he object of the remedies under the anti-trust laws is to … deprive the wrongdoers of the fruits of their unlawful conduct.").

Even if such a defense were not categorically invalid, it would be a merits defense, not a defense to class certification. As discussed, Plaintiffs need only show that common evidence is *capable* of showing classwide impact, not that the jury will ultimately accept that evidence. *Olean*, 31 F.4th at 681 (9th Cir. 2022). Any attempt by the NCAA to *disprove* Plaintiffs' methodology—*i.e.*, to argue that the wage-fixing scheme was superfluous and that schools would not have paid more than $0 anyway—is a jury argument about the persuasiveness of Plaintiffs' methodology; it would not suggest that Plaintiffs' methodology is *incapable* of showing classwide harm. *See id.* at 666-67 ("[A] district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."). Indeed, even if a jury concludes that the class "consists largely (or entirely, for that matter) of members who … have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012); *accord Olean*, 31 F.4th at 669 n.14 (9th Cir. 2022). As long as the class does not include "large numbers of class members who were never *exposed* to the challenged condut to begin with" and therefore could not possibly have been harmed, *Torres*, 835 F.3d at 1136 (9th Cir. 2016), arguments about *how much* harm any class member suffered is a merits question, not a class question.[19]

---

[19] The fact that every class member was "exposed to" the wage-fixing scheme is itself enough to show classwide impact, even apart from any consideration of monetary damages. For purposes of antitrust injury and impact, "loss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded." 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed.). Accordingly, in *House*, student-athletes pleaded antitrust injury by alleging that the NCAA's ban on compensation "deprived [them] of the opportunity to receive [] compensation." *House v. NCAA*,

## 2.     A Class Action is Superior to Individual Actions

Rule 23(b)(3)'s final requirement is superiority—*i.e.*, that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Given "the breadth of most antitrust classes" and "the significant cost" of litigating antitrust cases, the "superiority requirement is easily met in most antitrust cases." 6 Newberg and Rubenstein on Class Actions § 20:54 (6th ed. 2024); *see also In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 314 (N.D. Cal. 2010) ("[I]f common questions are found to predominate in an antitrust action, . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied."). Non-exclusive superiority factors to consider are: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Generally speaking, a class action is superior to other methods of litigation when it "will reduce litigation costs and promote greater efficiency." *Wolin*, 617 F.3d at 1176.

Adjudicating this case as a class action is superior to individual actions. The damages sustained by each class member are not insignificant, but they are still far too low to make individual antitrust litigation economical. *See Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (first Rule 23 superiority factor supports class treatment when there are class members for whom it would be "uneconomical to litigate individually"). This is especially true given how expensive it is to litigate antitrust cases

---

545 F. Supp. 3d 804, 816 (N.D. Cal. 2021); *see also Abboud v. I.N.S.*, 140 F.3d 843, 847 (9th Cir. 1998) ("This lost opportunity represents a concrete injury."). When common evidence is capable of showing that the whole class was deprived of an opportunity to receive compensation, predominance is satisfied. In *Torres*, for example, predominance was satisfied because each class member was "denied the opportunity to apply for a job" by the defendant's conduct, establishing classwide impact regardless of whether any class member would have been actually been hired and paid in the but-for world. 835 F.3d at 1136-37. Likewise here, every class member was "exposed to" the wage-fixing scheme, which applied uniformly to the entire class, capping their wages at $0 and denying them the opportunity to seek more. *Id.*; *see* Exh. 9, Division I Bylaw 11.02.6 (coach may "not receive compensation or remuneration"). Nothing more is required to show classwide impact, though here, of course, Plaintiffs also show classwide impact in the form of widespread monetary harm. *See supra* Part IV.C.1.b.

against well-funded, sophisticated defendants like the NCAA. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1033 (C.D. Cal. 2015). Moreover, requiring thousands of individual plaintiffs to pursue their claims in individual cases would needlessly burden courts around the country and waste resources with hundreds or thousands of decisions on questions that are more efficiently decided at once. There are no manageability concerns because "managing this case as a class action would not be difficult given that the issues central to Plaintiffs' Section 1 claims are capable of resolution on a classwide basis with common proof," *House v. NCAA*, 2023 WL 2372787, at *27, and because Dr. Ashenfelter's model is capable of generating an aggregate damages estimate that will not require the presentation of individualized testimony or evidence. Again, *Law v. NCAA* provides an apt example. There the virtually identical wage-fixing claims of substantially identical classes of assistant coaches were efficiently and manageably litigated through trial and appeal. *See Law v. NCAA*, 167 F.R.D. 178. Finally, Plaintiffs are not aware of any other litigation, other than the *Smart* matter also pending in this Court, that involves similar antitrust claims challenging this restraint. This case will proceed best on a class basis.

## V.    THE COURT SHOULD APPOINT GUSTAFSON GLUEK, KIRBY MCINERNEY, AND FAIRMARK PARTNERS AS CLASS COUNSEL.

"An order that certifies a class action … must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). In appointing class counsel, "the court … must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(1). Gustafson Gluek, Kirby McInerney, and Fairmark Partners seek to be appointed as co-lead class counsel. All three firms have vigorously litigated this case from the outset and have extensive experience in handling complex class actions, including antitrust cases, and have demonstrated their knowledge of the law and willingness to dedicate substantial resources to this matter. *See* Stewart Decl. ¶¶ 3-4; Gralewski Decl. ¶¶ 2-10; Lieberman Decl. ¶¶ 3-7.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed class under Rule 23(b)(3); appoint Gustafson Gluek, Kirby McInerney, and Fairmark Partners as class counsel; and appoint Plaintiffs as class representatives.

DATED: December 13, 2024                     Respectfully submitted,

**GUSTAFSON GLUEK PLLC**

By: */s/ Dennis Stewart*
Dennis Stewart, CA Bar No. 99152
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Daniel E. Gustafson, MN Bar No. 202241
(*pro hac vice*)
Amanda M. Williams, MN Bar No. 0341691
(*pro hac vice*)
Matthew Jacobs, MN Bar No. 403465
(*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com
mjacobs@gustafsongluek.com

**FAIRMARK PARTNERS, LLP**

By: */s/ Michael Lieberman*
Michael Lieberman, DC Bar No. 1033827
(*pro hac vice*)
Jamie Crooks, CA Bar No. 310447
(*pro hac vice*)
Yinka Onayemi, NY Bar No. 5940614
(*pro hac vice*)
**FAIRMARK PARTNERS, LLP**
1001 G Street NW, Suite 400 East
Washington, DC 20001
Telephone: (818) 585-2903
michael@fairmarklaw.com

jamie@fairmarklaw.com
yinka@fairmarklaw.com

**KIRBY McINERNEY LLP**

By: */s/ Robert J. Gralewski*
Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone:    (559) 248-4820
dhorowitt@ch-law.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

*Attorneys for Plaintiffs and the Class*

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION