# EXHIBIT 1

**REPORT OF ORLEY ASHENFELTER**

**IN CONNECTION WITH**

**COLON et al.**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**

**CASE NO. 1:23-cv-00425-WBS**

**November 1, 2024**

**Corrected: November 26, 2024**

ATTORNEYS' EYES ONLY

## Table of Contents

*I.*   *Introduction* ........................................................................................................ *1*

    **A.**   **Qualifications** ................................................................................................ 1

    **B.**   **Assignment** .................................................................................................... 2

    **C.**   **Summary of Opinions** .................................................................................. 2

*II.*   *Case and Background* .......................................................................................... *4*

    **A.**   **Plaintiffs** ........................................................................................................ 4

    **B.**   **Defendant** ...................................................................................................... 5

    **C.**   **The NCAA's Coaching Caps and the "Volunteer Coach" Rule** ............ 11

    **D.**   **Class Definition** .......................................................................................... 16

*III.*   *The NCAA and its Member Schools Exercised Monopsony Power* ............... *16*

    **A.**   **The Economics of a wage-fixing conspiracy** .......................................... 16

        1.   Selecting and coordinating the behavior of all cartel participants .......... 16

        2.   Monitoring cartel participants and deterring defections ........................... 17

        3.   Preventing entry or expansion by non-cartel firms ................................... 20

    **B.**   **Direct Evidence of Monopsony Power in the Market for NCAA Division I Assistant Coaches** ... 21

    **C.**   **Effect of Ending Volunteer Coach Rule Will Not Be Immediate** ........... 23

        1.   Wages do not adjust immediately ............................................................... 23

        2.   Adjusting university budgets takes time ..................................................... 24

        3.   Lingering Effects of Cartels ......................................................................... 27

*IV.*   *All or Nearly All Class Members Were Harmed by the Volunteer Coach Rule* ............. *28*

*V.*   *Data* ...................................................................................................................... *34*

    **A.**   **Data from Colleges** ..................................................................................... 34

    **B.**   **NCAA MFRS Data** ........................................................................................ 37

*VI.*   *Methods* ............................................................................................................... *37*

    **A.**   **Calculating "Stepdown"** ............................................................................ 38

    **B.**   **A Process for Estimating Volunteer Coach But-For Pay** ....................... 43

*VI.*   *Conclusions* ........................................................................................................ *44*

## I.  Introduction

A.        <u>Qualifications</u>

1.        I am the Joseph Douglas Green 1895 Professor of Economics Emeritus at Princeton University. I am the former President of the American Economic Association and the former President of the American Law and Economics Association. I am a recipient of the IZA Prize in Labor Economics and the Mincer Award for Lifetime Achievement of the Society of Labor Economists. I am a Fellow of the Econometric Society, a Fellow of the American Academy of Arts and Sciences, a Fellow of the Society of Labor Economics, a Corresponding Fellow of the Royal Society of Edinburgh, and a Distinguished Fellow of the American Economic Association. My areas of specialization include labor economics, industrial organization, econometrics, and law and economics. I was previously the Director of the Industrial Relations Section at Princeton University, and I have been Director of the Office of Evaluation of the U.S. Department of Labor, a Guggenheim Fellow, and the Benjamin Meeker Visiting Professor at the University of Bristol. I edited the *Handbook of Labor Economics* and I was a previous editor of the *American Economic Review* and a previous co-editor of the *American Law and Economics Review*. My curriculum vitae and a list of my testimony in the last four years are attached to my report as Appendix A.

2.        My time is being billed at the rate of $950 per hour for my work in this matter. This is my normal hourly rate for this type of work. Payment to me is not contingent on my opinions in this matter. I reserve the right to supplement this report if and when additional, relevant material becomes known to me.

B.        Assignment

3.        I have been retained by counsel for a proposed class of coaches of sports other than baseball, basketball, and FBS football at National Collegiate Athletic Association ("NCAA") Division I schools. The members of the class were all designated by NCAA Division I schools as "volunteer coaches," a designation that, under NCAA bylaws, meant that schools could not provide them with any compensation. The plaintiffs allege the NCAA and its member schools have engaged in an illegal wage-fixing conspiracy to suppress the wages of thousands of NCAA Division I coaches to zero dollars.[1]

4.        The plaintiffs' counsel have asked me to give my opinion on the two questions relevant for class certification.

- Whether common evidence exists that all or nearly all members of the proposed class have been harmed as a result of the alleged conspiracy.

- Whether one or more accepted and feasible methods exist for estimating monetary damages incurred by the proposed class members as a result, over the period of March 17, 2019 through June 30, 2023, when the NCAA bylaw was abandoned, on a class-wide basis and whether sufficient data are available to implement these methods.

C.        Summary of Opinions

5.        In forming my conclusions, described at length in this report, I have reviewed extensive documentary and empirical evidence in this matter. To the extent that new evidence

---

[1] *Colon v. NCAA, No.* 1:23-cv-00425-WBS-KJ Second Amended Class Action Complaint ("Second Amended Class Complaint").

becomes available (including, but not limited to, testimonial evidence) I reserve the right to update and supplement my opinions.

6.        Compensation (or lack thereof) of "volunteer" coaches as well as the number of "volunteer" coaches a team could have was governed by NCAA's Division I bylaws Article 11, in particular 11.01.6, 11.7.6 and 11.7.6.2.3, and Figure 11-1. All Division I schools are subject to the bylaws established by NCAA, and as a result all "volunteer" coaches used by schools' sports teams were all subject to the same regulations.[2] These coaches could not be compensated by the schools.[3]. In contrast, the NCAA Division I bylaws do not include any restriction on the amounts that schools may pay their other coaches. Throughout this report, I refer to coaches whose pay was not restricted by these bylaws as "unrestricted" coaches. I refer to the coaches subject to the wage restriction as "volunteer coaches" because that is how the NCAA bylaws refer to them. I refer to the bylaws preventing payment to volunteer coaches as the "Volunteer Coach Rule."

7.        I make use of the change in the NCAA Division I bylaws in 2023, which eliminated the Volunteer Coach Rule and expanded the number of unrestricted coaching slots for each sport, to estimate the relationship between the lowest-paid coach and the pay of other coaches in each program. I then use this relationship to estimate how much the class members would have earned in the absence of the Volunteer Coach Rule, based on the compensation of unrestricted coaches for each program during the class period . I also describe how it is possible to use this relationship to estimate the "but-for" earnings of the members.

---

[2] NCAA_SMART-COLON_0000001 at Constitution Articles 3.2.1.2, 3.3.4.1; Bylaw 19.01.2.

[3] *See* NCAA_SMART-COLON_0000001 at Bylaw 11.01.06 ("In sports other than bowl subdivision football and basketball, a volunteer coach is any coach who does not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association), and Figure 11-1 ("compensation or remuneration from Athletics Department prohibited").

8.      I conclude based on this analysis that there exists evidence common to the class that the alleged conspiracy suppressed class members' compensation generally, namely at zero. I also find that the alleged conspiracy affected all or nearly all members of the class.

9.      I also conclude that the NCAA Division I member schools had sufficient market power to suppress the compensation of the coaches that were subject to the Volunteer Coach Rule. I base this on my conclusion that the compensation of class members was suppressed below the competitive level, namely to $0.

10.      I also conclude that there exists a reasonable methodology by which to estimate damages using data and methods that are common to the class.

## II.  Case and Background

A.      <u>Plaintiffs</u>

11.      Shannon Ray coached track and field at Arizona State University in Tempe, Arizona from 2019 to 2020, and was designated as a "volunteer coach."[4]

12.      Khala Taylor coached softball at San Jose State University in San Jose, California from 2022 to 2023, and was designated as a "volunteer coach."[5]

13.      Peter Robinson coached swimming and diving at the University of Virginia in Charlottesville, Virginia from 2019 to 2021, and was designated as a "volunteer coach."[6]

14.      Katherine Sebbane coached softball at the University of Pittsburgh in Pittsburgh, Pennsylvania from 2019 to 2021, and was designated as a "volunteer coach."[7]

---

[4] Second Amended Complaint at ¶ 7.

[5] Second Amended Complaint at ¶ 8.

[6] Second Amended Complaint at ¶ 9.

[7] Second Amended Complaint at ¶ 10.

15.      Rudy Barajas coached women's volleyball at Fresno State University from 2018 to 2023, and was designated as a "volunteer coach."[8]

B.      Defendant

16.      The NCAA is headquartered in Indianapolis, Indiana.[9] The NCAA governs student athletic competition at approximately 1,100 colleges and universities in the United States and Canada. [10] Colleges and universities are divided into three largely autonomously governed divisions, Division I, Division II, and Division III.[11] The proposed class in this case consists of coaches in NCAA Division I sports programs other than baseball, basketball, and FBS football.[12] The NCAA describes Division I schools as "generally hav[ing] the biggest student bodies, manag[ing] the largest athletics budgets, and offer[ing] the highest number of athletics scholarships."[13] There are 353 NCAA Division I schools, which collectively field over 4300 Division I sports programs.[14]

17.      NCAA Division I athletics are big business. Table 1 presents the total athletics revenue for all NCAA Division I institutions, as well as the average athletics revenue per NCAA Division I institution. In 2022-23, the most recent year for which the NCAA Membership Financial Reporting System ("MFRS") database has been published, the average Division I

---

[8] Second Amended Complaint at ¶ 11.

[9] Overview, NCAA https://www.ncaa.org/sports/2021/2/16/overview.aspx.

[10] Overview, NCAA https://www.ncaa.org/sports/2021/2/16/overview.aspx.

[11] See NCAA_SMART-COLON_0001396 at _0001412; see also Overview, NCAA, https://www.ncaa.org/sports/2021/2/16/overview.aspx.

[12] Baseball volunteer coaches are the proposed class in the case Smart v. NCAA, No. 2:22-cv-02125 (E.D. Cal.). Basketball and FBS football did not have restrictions on how much they could pay their coaches.

[13] Overview, https://www.ncaa.org/sports/2021/2/16/overview.aspx.

[14] See my workpapers. There are a total of 398 schools that sponsor at least one Division I athletics program. These schools collectively field over 4500 programs.

institution earned over $54 million in athletics revenue. Across all NCAA Division I institutions, athletics revenue totaled over $19 billion.

Table 1: Total Athletics Revenue for NCAA Division I Institutions

| Year | Total athletics revenues for all NCAA DI Institutions | Average athletics revenue per NCAA DI Institution |
|---|---|---|
| 2015-2016 | $ 13,506,412,772 | $ 39,035,875 |
| 2016-2017 | $ 14,397,168,770 | $ 41,610,314 |
| 2017-2018 | $ 15,239,103,776 | $ 43,416,250 |
| 2018-2019 | $ 15,805,254,035 | $ 45,029,214 |
| 2019-2020 | $ 15,700,612,737 | $ 44,731,090 |
| 2020-2021 | $ 13,320,789,180 | $ 38,059,398 |
| 2021-2022 | $ 17,457,866,212 | $ 49,879,618 |
| 2022-2023 | $ 19,040,414,454 | $ 54,246,195 |

Source: NCAA MFRS Data

18.     NCAA Division I schools tend to be large: an analysis performed by the NCAA reports that the mean undergraduate enrollment of an NCAA Division I school is nearly 12,000 students, and only 10% of NCAA Division I schools are "small" schools with undergraduate enrollment of 2,999 or fewer students.[15] Furthermore, a majority (63%) of NCAA Division I schools are classified as "Research Universities," defined as schools that grant at least 20 doctoral degrees per year.[16] Two-thirds (67%) of NCAA Division I schools are public institutions.[17]

---

[15] "Institutional Characteristics of NCAA Member Schools" at p. 2.
https://ncaaorg.s3.amazonaws.com/research/demographics/2017RES_institutionalcharacteristics.pdf

[16] "Institutional Characteristics of NCAA Member Schools" at p. 2.
https://ncaaorg.s3.amazonaws.com/research/demographics/2017RES_institutionalcharacteristics.pdf

[17] "Institutional Characteristics of NCAA Member Schools" at p. 5.
https://ncaaorg.s3.amazonaws.com/research/demographics/2017RES_institutionalcharacteristics.pdf

19.      Coach compensation is the largest expense item for NCAA Division I schools, and the second-largest expense item (behind student athletics aid) at non-FBS Division I schools.[18] Table 2 presents total annual spending on coaching staff by all Division I schools for each year since 2015-2016. In the 2022-2023 academic year, NCAA Division I schools spent over $3.5 billion on salaries and benefits for their coaching staffs.

Table 2: Total Coaching Expenses for NCAA Division I Institutions

| Year | Total coaching staff expenses for all NCAA DI Institutions | |
|------|---|---|
| 2015-2016 | $ | 2,403,336,066 |
| 2016-2017 | $ | 2,537,693,682 |
| 2017-2018 | $ | 2,730,333,903 |
| 2018-2019 | $ | 2,916,193,677 |
| 2019-2020 | $ | 3,009,201,781 |
| 2020-2021 | $ | 2,987,070,366 |
| 2021-2022 | $ | 3,290,836,811 |
| 2022-2023 | $ | 3,563,960,182 |

Source: NCAA MFRS Data. Coaching staff expenses include salary, bonuses, and benefits, including allowances, speaking fees, retirement, stipends, memberships, media income, tuition reimbursement/exemptions (for self or a dependent) and earned deferred compensation, including those funded by the state.

20.      NCAA Coaches can be quite well paid, and their pay is increasing over time. Figure 1 presents the average compensation for head coaches in class-relevant Division I sports since 2015-2016.[19] Other than a small dip during 2020-2021 (the first year of the Covid-19 pandemic, which interrupted many athletic seasons), the average compensation of head coaches

---

[18] National Collegiate Athletic Association. (2023). *NCAA Financial Database* [Data visualization dashboard]. Retrieved from https://www.ncaa.org/sports/2019/11/12/finances-of-intercollegiate-athletics-database.aspx at "Intercollegiate Athletics Expense Items."

[19] "Class-relevant" Division I sports are all Division I sports excluding FBS football, basketball, and baseball.

increased each year during this period. In the 2022-2023 academic year, the average pay of an

NCAA Division I head coach was more than $170,000 per year. The average head coach

compensation during academic years 2019-2020 through 2022-2023 is approximately

$159,000.[20]

Figure 1: Head Coach Compensation

Source: NCAA MFRS Data. Excludes FBS Football, Basketball, and Baseball

21.     Figure 2 presents the average pay for assistant coaches (that is, non-head coaches)

not subject to the restraint at issue in this case for all Division I sports since 2015-2016. As with

head coaches, with the exception of a small decrease in pay during the first year of the Covid-19

pandemic, the pay of unrestricted assistant coaches increased each year during this period. In the

2022-2023 academic year, the average pay of an NCAA Division I unrestricted assistant coach

---

[20] This compensation includes salary, bonuses, and benefits, including allowances, speaking fees,
retirement, stipends, memberships, media income, tuition reimbursement/exemptions (for self or a
dependent) and earned deferred compensation, including those funded by the state.

was more than $85,000. The average assistant coach compensation during academic years 2019-2020 through 2022-2023 is approximately $78,000.

Figure 2: Unrestricted Assistant Coach Compensation

Source: NCAA MFRS Data Excludes FBS Football, Basketball, and Baseball

22.     Table 3 presents, for each of the sports at issue in this case, the average compensation during the 2022-23 academic year for those assistant coaches whose compensation was not restricted by the rule at issue in this case.

Table 3: Average Compensation by Sport for NCAA Division I Institutions (2022-23)

| Sport Name | Average Compensation |
|---|---|
| M. Fencing | $ 73,098.41 |
| M. Football (FCS) | $ 96,451.20 |
| M. Golf | $ 75,679.52 |
| M. Gymnastics | $ 98,261.95 |
| M. Ice Hockey | $ 169,502.97 |
| M. Lacrosse | $ 104,237.09 |
| M. Rifle | $ 52,472.21 |
| M. Skiing | $ 69,666.63 |
| M. Soccer | $ 76,479.70 |
| M. Swimming & Diving | $ 79,401.69 |
| M. Tennis | $ 77,093.12 |
| M. Track (Indoor & Outdoor) & Cross Country | $ 79,597.39 |
| M. Volleyball | $ 88,632.40 |
| M. Water Polo | $ 85,275.96 |
| M. Wrestling | $ 107,930.19 |
| W. Acrobatics and Tumbling | $ 50,940.47 |
| W. Beach Volleyball | $ 62,692.44 |
| W. Bowling | $ 47,531.00 |
| W. Equestrian | $ 91,424.29 |
| W. Fencing | $ 71,106.66 |
| W. Field Hockey | $ 74,190.25 |
| W. Golf | $ 72,870.04 |
| W. Gymnastics | $ 119,139.30 |
| W. Ice Hockey | $ 103,755.93 |
| W. Lacrosse | $ 78,655.41 |
| W. Rifle | $ 60,174.05 |
| W. Rowing | $ 73,615.07 |
| W. Rugby | $ 61,594.05 |
| W. Skiing | $ 70,021.13 |
| W. Soccer | $ 77,583.55 |
| W. Softball | $ 85,607.23 |
| W. Stunt | $ 78,747.50 |
| W. Swimming & Diving | $ 77,172.76 |
| W. Tennis | $ 72,474.20 |
| W. Track (Indoor & Outdoor) & Cross Country | $ 78,363.32 |
| W. Triathlon | $ 51,221.99 |
| W. Volleyball | $ 85,171.73 |
| W. Water Polo | $ 77,344.87 |
| W. Wrestling | $ 66,934.22 |
| Total | $ 85,043.09 |

Source: NCAA MFRS data, 2022-2023

23.      During each year presented in the above charts, class members, i.e. coaches designated by their schools as "Volunteer Coaches," received $0 compensation for their work as coaches for NCAA Division I teams as required by the NCAA Bylaws cited above.

C.    The NCAA's Coaching Caps and the "Volunteer Coach" Rule

24.      In the late 1980s, the NCAA established a "Cost Reduction Committee" aimed at reducing the cost of intercollegiate sports. The Cost Reduction Committee's final report, issued in 1990, recommended "a number of changes designed to reduce costs," the first of which was to establish a limit on the number of coaches associated with each sport, and to "establish a 'restricted earnings' category that will encourage the development of new coaches while more effectively limiting compensation to such coaches."[21] These rules (establishing limits on the number of coaches, and limiting the payment of the lowest-earning coach for each sport) were voted on at the 1991 NCAA Convention, and went into effect in the 1992-1993 season. The following year, at the 1992 NCAA Convention, in response to the coaching caps, many NCAA member institutions "expressed concern that a group of unpaid volunteers…would be precluded from coaching and providing assistance to student-athletes. This proposal would permit each sport other than football and basketball the use of one volunteer coach….[t]he establishment of a volunteer coach also would not result in any significant additional costs to the institution."[22]

25.      The NCAA faced antitrust lawsuits in the late 1990s related to "restricted earnings" coaches.[23] In those cases, individuals designated as "restricted earnings" coaches could earn no more than $12,000 during the academic year and $4,000 during the summer. There were

---

[21] NCAA_SMART-COLON_0141887 at 93-94.

[22] NCAA_SMART-COLON_0143283 at -510.

[23] *Law v. NCAA*, 134 F. 3d 1010 (10th Cir. 1998). This case was coordinated with *Schreiber v. NCAA* and *Hall v. NCAA*.

three classes certified by the Court: one for men's basketball, one for baseball, and one for all other sports. The court granted summary judgment on liability to the Plaintiffs, which was upheld on appeal. The case went to trial and the three classes were awarded damages.[24]

26.    Until its policy change in January 2023, which went into effect July 2023, the NCAA allowed for certain classes of coaches in most sports: among them, head coaches, assistant coaches as to whom there were no restrictions on "compensation or remuneration," and assistant coaches designated as "volunteer coaches" for whom no "compensation or remuneration" was permitted.[25] Within each category a certain number of such coaches are permitted. NCAA Rules define a "coach" as any person who "is designated by the institution's athletics department to perform[s] coaching duties and who serves in that capacity on a volunteer or paid basis".[26] Any staff member who meets the definition of "coaching" must be "counted" against those limits. Bylaw 11.7.1.1 states that "[a]n institutional staff member or any other individual outside the institution (e.g. consultant, professional instructor) with whom the institution has made arrangements must count against coaching limits in the applicable sport as soon as the individual participates (in any manner) in any of the following:

- Provides technical or tactical instruction related to the sport to a student-athlete at any time; or

- Makes or assists in making tactical decisions related to the sport during on-court or on-field practice or competition; or

---

[24] *Law v. NCAA*, 185 F.R.D. 324 (D. Kan. 1999).

[25] In addition to unrestricted coaches and coaches subject to the Volunteer Coach Rule, there was also an allowed category of "graduate assistant coaches" and "student assistant" coaches (NCAA_SMART-COLON_0000001 at Bylaw 11.01.3, 11.01.4, and 11.01.5). It is my understanding that the "graduate assistant" and "student assistant" coaches are not at issue in this case.

[26] NCAA_SMART-COLON_0000001 at Bylaw 11.01.2.

- Engages in any off-campus recruiting activities."[27]

27.     The NCAA limits the number of coaches in each coaching category for each sport. Prior to the NCAA's rule change in 2023, most sports had limits of two or three coaches (e.g. a head coach and one or two assistant coaches) who had no restrictions on "compensation or remuneration."[28,29] A small number of sports allowed for more unrestricted coaches (e.g. women's rowing, which allowed four unrestricted coaches, or championship subdivision football, which allowed eleven unrestricted coaches).[30] In the event that a school offers a combined men's and women's program, the unrestricted coach cap is the sum of the individual teams' coaching caps.[31] For instance, a men's swimming and diving team may have three unrestricted coaches; a women's swimming and diving team may have three unrestricted coaches; a combined men and women's swimming and diving team may have six unrestricted coaches.[32]

28.     In addition to unrestricted coaches, the NCAA also allowed, prior to the rule change in 2023, one or more "volunteer" coaches for sports other than bowl subdivision football

---

[27] NCAA Bylaws at 11.7.1.1.

[28] See NCAA Manual Figure 11-1.

[29] The numbers of such unrestricted coaches, among other things, are set out for the respective sports in Bylaw 11.7.6.

[30] NCAA Bylaw 11.7.6. 2020-21 NCAA Division I Manual Division I football programs are divided into two categories: Bowl Subdivision (FBS) and Championship Subdivision (FCS). FBS schools can compete in bowl games. FBS teams did not have restrictions on pay to coaches. Additionally, both women's and men's basketball allow for four coaches without restrictions on pay. Other than FBS football and basketball, all other Division I sports were allocated at least one coaching position that was subject to the restrictions on compensation at issue in this case.

[31] NCAA_SMART-COLON_0000001 at Bylaw 11.7.6.1.

[32] NCAA_SMART-COLON_0000001 at Bylaw 11.01.2.

("FBS football") and basketball.[33] The NCAA defines "volunteer coach" as "any coach who does not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association)."[34] The only restriction on coaching duties for a coach designated as the "volunteer coach" that does not apply to unrestricted coaches is that volunteer coaches are prohibited from "contacting and evaluating prospective student-athletes off campus and may not perform recruiting coordination functions."[35] Coaches designated as the "volunteer coach" may not receive any compensation from the university including salaries, wages, tuition waivers or reimbursement, and health or other forms of insurance.[36] Volunteer coaches may receive tickets to home games in their sport, or in conjunction with a prospective student athlete's visit, and may receive occasional meals and entertainment as part of team activities.[37]

---

[33] NCAA_SMART-COLON_0000001 at Bylaw 11.7.6.2.3. Most sports were permitted to fill one "volunteer coach" slot. Exceptions to this were: women's rowing (four volunteer coaches); swimming and diving (three volunteer coaches for combined male and female programs, or two volunteer coaches for single-gender programs); cross country and track and field (up to three volunteer coaches, one each for indoor track and field; outdoor track and field; and cross country; additionally, if the track and field program competes in pole vault, the institution may add a pole-vault specific volunteer coach); women's equestrian (two volunteer coaches, one each for hunt seat riding and western riding); women's triathlon (three volunteer coaches, one for each element of swimming/bicycling/running); women's acrobatics and tumbling (two volunteer coaches, as of August 1, 2020); FCS football (two volunteer coaches).

[34] NCAA_SMART-COLON_0000001 at NCAA Bylaw 11.01.6.

[35] NCAA_SMART-COLON_0000001 at NCAA Bylaw 11.01.6(a).

[36] NCAA_SMART-COLON_0000001 at NCAA Bylaw 11.01.6 and Figure 11-1 "Coaches' Compensation and Benefits".

[37] NCAA_SMART-COLON_0000001 at NCAA Bylaw 11.01.6.

29.    In 2023, the NCAA's member schools voted to eliminate the volunteer coach designation.[38] They also increased the number of allowed unrestricted coaches, typically by the number of "volunteer coaches" allowed under the prior rules.[39] For instance, lacrosse teams were allowed three unrestricted coaches and one "volunteer coach" under the prior rules, and four unrestricted coaches under the rules adopted in 2023. Likewise, women's acrobatics and tumbling was allowed three unrestricted coaches and two volunteer coaches in 2020-21, and five unrestricted coaches under the rules adopted in 2023.[40] Thus under the rule change in 2023, the number of allowed coaching positions was, by and large, unchanged, but the restriction on paying one or more of the allowed coach positions was eliminated.

30.    The Plaintiffs in this case have alleged that the NCAA's bylaws creating the volunteer coach position and then forbidding "compensation or remuneration"[41] to volunteer coaches "make[s] the member schools a buyer-side cartel: a group of competitors agreeing to abide by naked horizontal pricing restraints to purposefully restrict competition in the labor market for valuable college coaching services so they can collectively reduce their costs. The very purpose and effect of this horizontal agreement was to fix and suppress salaries so as to

---

[38] In the 2020-21 NCAA Division I Manual (NCAA_SMART-COLON_0000001), volunteer coaches were defined in Section 11.7.6.2.3 "Volunteer Coach", which falls under Section 11.7.6.2 "Exceptions to Number Limits." In the 2023-24 NCAA Division I Manual (NCAA_SMART-COLON_0001396), there is no longer a Volunteer Coach exception (see NCAA_SMART-COLON_0001396at 11.7.5.2 "Exceptions to Number Limits").

[39] Compare Bylaw 11.7.5 in the 2020-21 NCAA Division I Manual (NCAA_SMART-COLON_0000001) with Bylaw 11.7.5 in the 2023-24 NCAA Division I Manual (NCAA_SMART-COLON_0001396).

[40] There are exceptions to this: basketball allowed four unrestricted coaches and had zero coaches subject to the Volunteer Coach Rule under the earlier rules. It now allows six coaches (though only four may participate in off-campus recruiting) under the rules adopted in 2023. Likewise, women's triathlon allowed for two unrestricted coaches and three coaches subject to the Volunteer Coach Rule under the earlier rules, and allows for three coaches under the rules adopted in 2023.

[41] See NCAA_SMART-COLON_0000001 at Figure 11-1.

make them unresponsive to a competitive marketplace or even one in which basic wage-and-hour laws are respected."[42]

D.    Class Definition

31.    The proposed class is "[a]ll persons who, from March 17, 2019 to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of 'volunteer coach,' as designated by NCAA Bylaws."[43]

## III. The NCAA and its Member Schools Exercised Monopsony Power

A.    The Economics of a wage-fixing conspiracy

32.    In order to successfully collude, cartels need to solve three challenges. As summarized by Levenstein and Suslow (2006), these are: "first, selecting and coordinating the behavior of all cartel participants on mutually consistent, collusive strategies; second, monitoring the behavior of cartel participants to detect and deter defections from these collusive strategies; and third, preventing entry (or expansion) by noncartel firms."[44] The NCAA and its member schools achieved these three goals.

   *1.  Selecting and coordinating the behavior of all cartel participants*

33.    The NCAA and its Division I member schools, upon adoption of the Volunteer Coach Rule, selected and coordinated the behavior of all Division I schools: to fix the compensation of a class of coaches at $0. While typically such coordination is performed in secret and typically not formalized in contracts, bylaws, or other writings, in this case the

---

[42] Second Amended Complaint at ¶ 4.

[43] Second Amended Complaint at ¶ 19.

[44] Levenstein, Margaret C., and Valerie Y. Suslow. "Cartel Bargaining and Monitoring: The Role of Information Sharing." The Pros and Cons of Information Sharing, 2006.

coordination was performed in public and memorialized in the NCAA Bylaws.[45] This was also true in several other antitrust cases in which the NCAA was the defendant.[46] Such collusive agreements were similarly formalized in the "franchise no-poach" agreements that were common in the United States prior to enforcement actions by the Washington State Attorney General.[47]

### 2. Monitoring cartel participants and deterring defections

34.     The NCAA monitors its member schools for compliance. The bylaws state that "[e]ach institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs. It shall monitor its programs to ensure compliance and to identify and report to the Association instances in which compliance has not been achieved."[48] In addition to self-monitoring, the NCAA required schools to report data on the number of and compensation to coaches, including information about volunteer coaches, to the NCAA's Membership Financial Reporting System (MFRS).[49]

35.     The NCAA punishes schools for noncompliance with bylaws. The bylaws state that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association."[50] These punishments include possible fines, vacation of records and scholarship reductions, and recruiting restrictions, among other potential penalties.[51] The NCAA bylaws describe "[t]he

---

[45] E.g. NCAA Bylaw 11.01.6, NCAA_SMART-COLON_0000001.

[46] These include *House v. NCAA*, No. 20-cv-03919 (N.D. Cal.), *Alston v. NCAA*, No. 14-md-02541 (N.D. Cal.), and *Law v. NCAA*, Nos. 94-cv-2053, 94-cv-2392, and 95-cv-2026 (D. Kan.)

[47] https://www.atg.wa.gov/news/news-releases/ag-report-ferguson-s-initiative-ends-no-poach-practices-nationally-237-corporate

[48] NCAA_SMART-COLON_0000001 at Bylaw 2.8.1.

[49] I discuss the MFRS in more detail in Section V.B below.

[50] NCAA_SMART-COLON_0000001 at Bylaw 2.8.3.

[51] https://www.ncaa.org/sports/2013/11/27/enforcement-process-penalties.aspx at F.A.Q.

ability to investigate allegations and penalize infractions" as "critical to the common interests of the Association's membership and the preservation of its enduring values."[52]

36.     I have reviewed documents summarizing punishments from the NCAA for violating the Volunteer Coach rule. These violations and punishments include:

- A volunteer gymnastics coach at the University of Nebraska - Lincoln received "impermissible" payments related to floor exercise choreography and music. The NCAA described the violation as "exceed[ing] the permissible number of countable [unrestricted] coaches when the former head coach and members of the program arranged for a former volunteer coach to receive impermissible compensation." The program received a two year penalty and was fined $5,000 plus 1% of the women's gymnastics budget. Both the head coach and volunteer coach were also punished with "show cause" orders which restricted their abilities to be employed by any NCAA member school for a period of several years.[53] The head coach resigned and eventually retired as a result of the University's investigation; the volunteer coach was "permanently disassociated" with the University as a result of the same.[54]

- The women's volleyball program at Missouri State University was punished for, among other violations, providing monthly payments and free housing to "coaches who were intended to be volunteers." These monthly payments ranged from $100 per month to $500 per month.[55] The women's volleyball team was found to have

---

[52] NCAA_SMART-COLON_0000001 at Bylaw 19.01.1.

[53] NCAA_SMART-COLON_0019078.

[54] NCAA_SMART-COLON_0019352 at -62.

[55] NCAA_SMART-COLON_0019450 at -58.

committed multiple Level I (severe breaches) and Level II (significant breaches) violations for this and other conduct.[56] Among the violations found by the NCAA, Missouri State University was found to have failed to adequately monitor the women's volleyball program for compliance with the NCAA's Division I bylaws.[57]

- There are several instances where volunteer coaches received free admission to events, either more tickets than allowed (e.g. three tickets to a home game when only allowed two under the Volunteer Coach Rule), or tickets that the volunteer coach was not eligible to receive (e.g. admission to a conference championship). In these cases, the NCAA often recommended that the institution should require the volunteer coach to make a "donation to the charity of her choice in the amount of the impermissible complementary admission."[58]

- The NCAA has punished schools for reimbursing volunteer coaches for expenses incurred to attend coaching conventions.[59]

---

[56] NCAA_SMART-COLON_0019450 at -72.

[57] NCAA_SMART-COLON_0019450 at -68.

[58] NCAA_SMART-COLON_0020637 (a women's volleyball coach who received three tickets to a home volleyball match); NCAA_SMART-COLON_0020323 (two volunteer track and field coaches received complementary admission to the conference championship); NCAA_SMART-COLON_0027251 (A men's volleyball coach two complementary admissions to an away-from-home contest); NCAA_SMART-COLON_0027589 (a women's softball coach received two complementary tickets to an away game).

[59] NCAA_SMART-COLON_0020925 (a softball coach was provided $1,255.10 in convention, travel, and hotel expenses to attend a convention; upon discovery of the violation, the volunteer coach repaid this money to the athletic department and two assistant coaches in her program); NCAA_SMART-COLON_0020631 (a men's wrestling team paid for the volunteer coach's flights and meals when attending a coaching convention. The NCAA recommended that the institution should require the volunteer coach to make a repayment of these impermissible expenses to charity).

- The NCAA has punished schools for providing food to volunteer coaches.[60]

- The NCAA has punished schools for allowing a volunteer coach to receive compensation for a role other than volunteer coach.[61]

- During the COVID-19 pandemic, two volunteer lacrosse coaches were selected as recipients of $1000 donations from a GoFundMe account started by Inside Lacrosse to help raise money for assistant lacrosse coaches who were negatively impacted by the pandemic. The NCAA recommended the institution should be required to have the volunteer coaches donate this money to charity.[62]

   *3.   Preventing entry or expansion by non-cartel firms*

37.     In order for their students to play collegiate sports at the highest level, colleges must, by definition, be members of Division I of the NCAA. The NCAA offers two less-competitive Divisions (Divisions II and III). In order to compete in NCAA Division I sports, all schools must agree to the Division I bylaws, which until their change in 2023, included the restrictions at issue in this case, which prevented compensating coaches designated as "volunteer coaches." Therefore, to the extent that any colleges joined NCAA Division I, or extant Division I schools introduced new athletic teams, these programs would be bound by the alleged conspiracy at issue in this case.

38.     By setting the maximum compensation for a class of workers it deemed "volunteer coaches" at $0, the NCAA and its members agreed on compensation limits for thousands of

---

[60] NCAA_SMART-COLON_0027843 (a women's volleyball coach was provided a meal from the campus dining hall during an unofficial prospective student athlete's visit.)

[61] NCAA_SMART-COLON_0028382 (a men's wrestling volunteer coach received compensation in his capacity as a graduate assistant for the convocation center, which is operated by the athletics department. The NCAA recommended that the volunteer coach be suspended.)

[62] NCAA_SMART-COLON_0023825.

coaches, and the NCAA then enforced these limits on its member schools. Schools were required to report to the NCAA the number of coaches employed for each sport, and the NCAA monitored for compliance. By forbidding schools from providing any salary, tuition assistance, health insurance, or other benefits, this harmed workers and decreased staffing costs to NCAA member schools.

B.  Direct Evidence of Monopsony Power in the Market for NCAA Division I Assistant Coaches

39.    Monopsony power is the power to profitably suppress the price of an input below competitive levels. Monopsony power in a labor market is the power to profitably suppress compensation, working conditions, or benefits below the competitive level.[63] The labor market at issue in this case is the market for NCAA Division I assistant coaches in the United States. The exercise of defining an antitrust market is designed to infer monopsony power from market shares where direct evidence is not available. As I describe below, there is direct evidence of monopsony power in the market for NCAA Division I assistant coaches in the United States. As such, there is no need to engage in the traditional practice of measuring market share to infer the existence of market power.[64] Additionally, I note that though the caps on the number of coaches

---

[63] Carlton, Dennis W, and Jeffrey M Perloff. *Modern Industrial Organization*. 2nd ed., 1994, p. 153.

[64] *See, e.g.,* Baker, Jonathan B. and Timothy F. Bresnahan. *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power.* Handbook of Antitrust Economics ed., 2007, p. 15 ("Historically, in the antitrust world, market power has most commonly been identified through inference from a high market share. But direct evidence has increasingly become important as an alternative, in part because academic economists have developed a number of econometric approaches for measuring market power."). Baker and Bresnahan also note that "quantitative methods of measuring market power through direct evidence have parallels involving the use of qualitative evidence." Baker and Bresnahan (15). *See also* Edlin, Aaron S. and Daniel L. Rubinfeld, "Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals." Antitrust Law Journal, vol. 72, no. 1, 2004, pp. 119, 126. ("Market definition is only a traditional means to the end of determining whether power over price exists. Power over price is what matters…if power can be shown directly, there is no need for market definition: the value of market

are not at issue in this case, a mechanism by which monopsonists lower wages is by reducing hiring.[65] The NCAA's coach caps, which limit the number of coaches each team is allowed, serve to restrict compensation of coaches and are evidence of the NCAA and its member schools exerting market power.

40.     In Section VI below, I use regression analysis to estimate the relationship between the pay of unrestricted coaches and the but-for pay of the coaches subject to the restraint at issue in this case using pay structures in the post-conspiracy period as a competitive benchmark.[66] Furthermore, it is worth reiterating that under the restraint at issue here, class members earned $0 in compensation for their labor. Absent a hypothetical scenario where a firm charges employees a fee to work, the restraint at issue in this case suppressed compensation to the lowest possible value, $0.

41.     Based on my review of the evidence and the analysis described below, I conclude that the NCAA and its member schools have sufficient monopsony power over NCAA Division I assistant coaches to suppress compensation for the class members. A cartel's successful exercise of monopsony power is direct evidence that the cartel had monopsony power. Here, I find that competitive compensation for Division I coaching services is greater than $0 and was greater than $0 at all times during the class period. However, because of the Volunteer Coach Rule, class

definition is in cases where power cannot be shown directly and must be inferred from sufficiently high market share in a relevant market."). *See also* Areeda, Phillip E., et al. *Antitrust Law: An Analysis of Antitrust Principles and Their Application.* 1996. 2003. pp. 267, 325–28, ¶ 1758b.; *see also* Areeda, Phillip, et al. *Antitrust Analysis: Problems, Text and Cases.* 6th ed., 2004, ¶ 344.

[65] Posner, Eric A. How Antitrust Failed Workers. Oxford University Press. 2021 at p. 31.

[66] As I describe at further length below, the "post conspiracy" period for which I have data likely does not reflect truly competitive market dynamics. Nevertheless, the programs which have expanded their roster of paid coaches provide a reasonable benchmark for the but-for compensation of class members in the absence of the restraint on competition at issue in this case.

members were paid $0 for their labor. That the NCAA and its member schools, through the Volunteer Coach Rule, successfully suppressed compensation for volunteer coaches in all sports and at all schools below the competitive level is direct evidence that they had sufficient monopsony power to do so.

C. Effect of Ending Volunteer Coach Rule Will Not Be Immediate

42.    Once the restraint on compensation was abandoned and all limits on compensation for coaches were removed, one might expect that a sport's team would immediately start paying the team's previous volunteer coach. However, I would not expect this to happen immediately at every school, for several reasons: first, wages in general do not typically adjust immediately; second, university budgets are typically set in advance and many programs may not have had time to adjust budgets for increased paid coaching positions; third, sport programs have anchored their expectations that they are able to pay some workers a suppressed rate—$0—due to the decades-long history of the Volunteer Coach Rule.

1.  *Wages do not adjust immediately*

43.    It is a well-known phenomenon in economics that wages do not immediately adjust to market changes.[67] Wages generally exhibit "rigidity" and take some time to adjust to changes in the market, such as an increase in demand for paid coaches triggered by renewed competition among the NCAA's member schools for labor.

44.    I would not expect schools to react to the removal of the compensation restrictions by reducing compensation for incumbent unrestricted coaches and using that funding to pay a former volunteer coach or hire someone else. Labor economists have noted that, unlike product

---

[67] For a discussion of why wages do not react instantaneously to changes in market conditions, *see, for example*, Armen Alchian, "Information Costs, Pricing, and Resource Unemployment." Western Economic Journal. (1969) pp. 109-128.

markets, labor markets are often characterized by strong norms about wage setting, including the fact that employers can always raise nominal wages, but cannot easily lower them because employees tend to anchor on their current compensation and as a result morale will be deeply affected by nominal wage reductions, to the point that they are almost never implemented regardless of changes in supply and demand conditions. This phenomenon is called downward nominal wage rigidity.[68] Because of downward nominal wage rigidity, I would not expect to see schools reduce compensation of incumbent coaches in order to "free up" budget to pay for a newly created coaching position if that position was not already budgeted. It is possible that schools will increase the pay of incumbent coaches by less than they would have if the NCAA's compensation restrictions remained in place in order to allocate that spending to the newly expanded unrestricted earnings positions, but this adjustment will take some time to provide sufficient funding for one or more new unrestricted positions. Additionally, it is possible that schools may reduce pay for a coaching position when there is eventual turnover.

### 2. *Adjusting university budgets takes time*

45.       The budgeting process is slow, with university budgets being set well in advance of the beginning of each new fiscal year. I have seen evidence that, as of the eve of the end of the Volunteer Coach Rule, athletics department officials express that their budgets were yet unchanged. In an email chain among athletics directors at various universities, one wrote, "[w]e've been working with our general counsel, and true volunteer positions are no longer going to be approved at our University due to employment regulations. So basically, we are allowing programs to transition their volunteers to a paid, casual wage countable coach if they

---

[68] Lebow, David E., et al. "*Downward Nominal Wage Rigidity: Evidence from the Employment Cost Index.*" Advances in Macroeconomics, vol. 3, no. 1,2 Jan. 2003at pp. 10–13.

have the funding to do so. At this time, we're not in a position to add funds or full-time positions to support it, so some are exploring ways to use fundraised/camp income to supplement."[69] As late as June 2023, just weeks before the rule change went into effect, the Senior Associate Athletics Director and the Deputy Athletics Director for Columbia University were discussing in emails whether it would be possible, and how, to "determine [each sport's] coaching needs and identify potential funding sources," and whether they would be able to denote the move from volunteer to paid position as a "promotion," because if they opened up any full-time positions, they would "need to do a 30 day posting unless we can go the promotions route."[70]

46.    Athletics personnel appear to understand that the transition from volunteer coaches to paid positions may not be immediate. In an email among employees of the Southeastern Conference ("SEC"), discussing a 2019 proposal to end the Volunteer Coach Rule and increase the number of unrestricted coaches for baseball and softball, David Baston writes, "While most in the SEC will likely make it a full-time position, many schools may want to start with a no pay or part-time pay and continue to transition to a full-time position."[71]

47.    An Executive Associate Athletic Director at the University of Florida described it as "a shock to the system to have all those potential hires hitting the budget all at once."[72] At her deposition, she agreed that it "might be difficult for member schools to fully accommodate the Volunteer Coach Rule all at once."[73] This email, written in October 2022, also described the end of the Volunteer Coach Rule as "one of those thing that everyone knows is hanging out there but

---

[69] COLON_CONFERENCE_0000101686 at -87.

[70] COLON_CONFERENCE_0000206202.

[71] SEC_COLONSMART0010458 at -59.

[72] SEC_COLONSMART0006211.

[73] Tealer Depo. at 133:25-134:3.

not fully tracking on in terms of timing,"[74] which at her deposition she agreed meant that "not all DI schools realized the impending effective date was coming up or would be coming up on July 1, 2023."[75] She further testified that she was emailing with other individuals at her University about the end of the Volunteer Coach Rule in October, 2022: "Just something to keep on our radar for budget purposes. The volunteer coach category is going away."[76] Because her University was "attentive to the effective date"[77] of the rule change, it was able to make changes prior to the end of the University budgeting process, which ended in May 2023.[78] The University of Florida then hired on several former volunteer coaches as Assistant Coach I, at a salary of between $35,000 and $45,000 per year.[79]

48.     Because of the complexity in changing university budgets, and potentially complicated hiring rules that govern universities, many NCAA member schools may not have had time to react to the NCAA's 2023 rule change eliminating compensation restrictions in time for the 2023-24 academic year.

49.     Furthermore, the data I have received from NCAA member institutions were provided subject to subpoenas that were issued between December 2023 and September 2024, and answers were provided beginning in January 2024, a process which is ongoing. At this time, some schools have not fully responded to the subpoenas, and of the schools who have provided responses, some schools did not provide any information on coach pay for the 2023-2024 period.

---

[74] SEC_COLONSMART0006211.

[75] Tealer Depo. at 187:13-17.

[76] UF 002788.

[77] Tealer Depo. at 187:18-23.

[78] Tealer Depo. at 195:13-18.

[79] UF 004035 and UF 003863 at -64.

### 3. Lingering Effects of Cartels

50.     Even after a collusive agreement on prices (including wages) has formally ended, the effects of the conspiracy may continue. The American Bar Association's Econometrics handbook notes that "it is possible that the effects of the anticompetitive conduct at issue last beyond the time when the conduct actually ended."[80] Finkelstein and Levenbach (1983) note that though the end of a conspiracy is "usually a fairly dramatic event," in most cases "it is argued that there is a transition period in which prices are still affected by the residue of the conspiratorial activities."[81] Harrington (2023) describes the phenomenon of "residual collusion," which he defines as "the continuation of supracompetitive prices after a cartel has been shut down."[82] In a wage-fixing context, the parallel residual collusion would be a continuation of below-competitive wages for a period of time after the dissolution of a wage-fixing conspiracy. Here, there has been a nearly thirty-year history of the presence of a position deemed "volunteer coach" coupled with an outright ban on compensating these individuals at all. It is likely that the effect of this rule did not end instantaneously with a rule change.

51.     Additionally, the economics literature indicates that using a post-collusion period as a benchmark may tend to understate damages (and so is conservative): "standard methods for calculating antitrust damages in price-fixing cases may create a strategic incentive for firms to

---

[80] ABA Section of Antitrust Law, *Econometrics*, Second Edition (2014) ("ABA Econometrics Handbook") at p. 317.

[81] Finkelstein and Levenbach (1983) at p. 162. *See also* Erickson, W. Bruce. "Price Fixing Conspiracies: Their Long-Term Impact." The Journal of Industrial Economics, Mar.,1977. vol 24, no. 3 pp. 189-202 at p. 201("[P]re-conditions favorable to price leadership or similar methods of oligopolistic coordination are created by prolonged collusion.")

[82] Harrington, Joseph E., Jr. "Competitor Coupons: A Remedy for Residual Collusion." Journal of Competition Law & Economics (2023). vol. 19, pp. 610-627 at 610. Section II of this paper presents a literature review of evidence of residual collusion after the discovery and presumptive end of price-fixing cartels.

price above the non-collusive price after the cartel has been dissolved."[83] The strategic behavior described by Harrington (2004) is that firms "price above the standard non-collusive level, which results in an overestimate of the but-for price and thereby an underestimate of the overcharge and antitrust damages."[84] Translated to a wage-fixing case, the strategic behavior available to the NCAA member institutions would be to continue, post-collusion, to suppress wages below the competitive level, perhaps as low as the collusive price of $0. Doing so would have the effect of reducing estimates of competitive compensation and paid employment levels and hence would decrease measured damages. Taken together, these factors mean that it may take several years for universities and athletic departments to provide sufficient funding to hire and pay workers in the newly-compensable, formerly-volunteer coaching positions. That not all programs hired and paid volunteer coaches as soon as it was permissible under NCAA bylaws to do so is not evidence that if the Volunteer Coach Rule had never been in place that workers in these positions would not have been paid.

52.     Nevertheless, though I believe that this market is still moving towards a new competitive equilibrium, I also believe that the schools who have expanded their coaching staff and are paying these coaches are a conservative yet reasonable benchmark for estimating the compensation of class members but-for the restriction on earnings at issue in this case.

## IV. All or Nearly All Class Members Were Harmed by the Volunteer Coach Rule

53.     Each and every class member was subject to the Volunteer Coach Rule, which restricted their compensation to $0. In addition to not earning pay, they also were not provided

---

[83] ABA Econometrics Handbook at p. 317, fn 48, describing Harrington, Joseph E. (2004) "Post-Cartel Pricing During Litigation." The Journal of Industrial Economics. vol.LII, no. 4, pp. 517-533.

[84] Harrington (2004). This article is cited by the ABA Econometrics Handbook at p. 317.

benefits (e.g. health insurance or retirement benefits), housing stipends, tuition benefits, or reimbursement for meals other than in limited circumstances.[85]

54.       Absent a conspiracy to suppress the compensation of these workers to $0, the market rate would be greater than zero, the amount of compensation received by each class member. Consequently, I conclude that all or nearly all members of the class were harmed by the NCAA's rule preventing the compensation of certain coaches. I come to this conclusion through several pieces of evidence, outlined in the remainder of this section.

55.       First, NCAA Division I member schools compensate their coaches. Based on data from the NCAA's MFRS, the average compensation of an unrestricted assistant coach for the programs at issue in this case during the class period was approximately $78,000.[86] I have reviewed several documents indicating that coaches in the "volunteer coach" position were viewed as important members of the coaching staffs on which they worked and, like unrestricted coaches, provided valuable services to their schools.[87] By definition, volunteer coaches provided "coaching services" to the athletics teams for which they were hired which consisted, at a minimum, of "[p]rovid[ing]technical or tactical instruction related to the sport to a student-athlete at any time" or "[m]ak[ing] or assist[ing] in making tactical decisions related to the sport during on-court or on-field practice or competition."[88] Though the NCAA bylaws did not (and do

---

[85] See Section II.C, above

[86] See ¶ 21, above.

[87] *See* NCAA_SMART-COLON_0145784; NCAA_SMART-COLON_0145980; NCAA_SMART-COLON_0140536; NCAA_SMART-COLON_0146466; NCAA_SMART-COLON_0146006; NCAA_SMART-COLON_0146011; COLON_CONFERENCE_0000206202; NCAA_SMART-COLON_0021762; NCAA_SMART-COLON_0022783; NCAA_SMART-COLON_0021507; NCAA_SMART-COLON_0145841; NCAA_SMART-COLON_0145848; NCAA_SMART-COLON_0145857; NCAA_SMART-COLON_0146038.

[88] NCAA_SMART-COLON_0000001 at 11.01.2 and 11.7.1.1.

not) require that unrestricted coaches be compensated, over 99% of unrestricted coaches in the data I received from member schools received compensation during the class period.[89] This is evidence that absent a rule preventing schools from paying coaches, they *do* pay their coaches.

56.    Second, the adoption of the Volunteer Coach Rule was made explicitly with the understanding that the purpose of this rule was to increase the number of coaches without "result[ing] in any significant additional costs to the institution."[90] That is, the explicit purpose of this rule at its adoption was to increase the number of workers available to NCAA Division I member schools without needing to pay them. If the schools believed that the number of people who wanted to provide coaching services for free was so high that these schools could recruit and retain these workers without payment, then they need not have made an agreement to pay these workers $0. Likewise, if the agreed-upon restriction was not necessary to recruit and retain a sufficient number of individuals who wanted to provide coaching services for free, the NCAA and its Division I member schools would not have engaged in the costly exercise of monitoring for and punishing violations of this rule.[91] By pushing for, agreeing to, and monitoring and punishing violations of the Volunteer Coach Rule, the NCAA and its Division I member schools revealed that they do not believe that they could recruit high-quality coaches to work for free absent such an agreement.

---

[89] I identified uncompensated unrestricted coaches as individuals who were either explicitly described as being unpaid, or for whom all three compensation fields (namely: salary, health insurance, and total cash compensation) are missing or zero, without a narrative explanation for the reason that it is missing. This count likely overstates the number of uncompensated coaches (and hence is conservative) because it includes individuals who are denoted as being college or university faculty (e.g. a women's golf coach at Lindenwood University, who is reported as earning 0 compensation in connection with coaching, but is described as "faculty position was primary position. Course release for coaching duties."). There are several other instances of this. Additionally, some schools have may left these compensation fields blank because they are unknown, not because these unrestricted coaches actually earned zero compensation.

[90] NCAA_SMART-COLON_0143283 at -510.

[91] See discussion at Section III.A.2 above.

57.      Third, the fact that the NCAA places limitations on the number of coaches for each sport is evidence that the demand for coaching staff is high: if there was not a demand for a large number of coaches, there would be no need for coaching caps.[92] If it were the case that NCAA member institutions did not value a marginal coach, there would be no need to place limits on the number of coaches each program is allowed to employ.

58.      Fourth, the very fact that NCAA Division I schools hired the class members as coaches — even at $0—indicates that they valued class members' labor at more than $0 and would have been willing to pay more than $0 for their services were it not for the wage-fixing restraint. As a general matter, employers do not hire workers whose marginal product of labor is negative —i.e. workers who do not provide value. A rational employer would simply not hire such a worker. Accordingly, when an employer *does* hire a worker, that indicates that the employer views the worker as adding positive value and would be willing to compensate that worker up to the value the worker provides to the employer. The fact that each class member was hired by and worked for an NCAA Division I school therefore indicates that each one provided labor worth more than $0 to the school for which they worked, providing evidence that absent a rule preventing schools from paying class members, they would have done so.

59.      Fifth, the economic concept of internal pay equity is a mechanism that, absent a rule preventing some assistant coaches from being paid, all or nearly all members of the class would have received compensation. Internal equity is simply the idea that workers who perform similar work receive similar pay, and this concept plays a large role in employers' compensation

---

[92] I understand that the existence of these coaching caps is not an issue in this case.

setting decisions.[93] I have seen evidence that the NCAA and its member institutions are concerned about issues of internal pay equity. For instance, when one University hired a new assistant wrestling coach for a salary of $80,000, they adjusted the pay of an incumbent assistant wrestling coach from $44,582 to $50,000, citing internal equity concerns.[94] In reference to payments to competition officials, the NCAA Division I Men's and Women's Track and Field and Cross Country Committee proposed pay changes for their "tiers" of officials to reduce the gap between these tiers and promote pay equity. They write that "tier one officials would receive a decrease in pay, but members noted the gap between tier one and tier two has grown significantly in the last several years… The sense is this decrease would not be viewed negatively, as those dollars are being reallocated to the tiers two and three officials who have previously been underpaid."[95] In the absence of a specially-designated coaching position that is definitionally unpaid, concerns about internal equity likely would have led to non-zero pay to the lowest-paid coach.

60.     Lastly, the economic concept of external pay equity is a mechanism that, absent the Volunteer Coach Rule, would have caused all or nearly all of these workers to receive pay.

---

93 *See, e.g.*, Card, David, et al. "Inequality at Work: The Effect of Peer Salaries on Job Satisfaction." American Economics Review, vol. 102, no. 6, Oct. 2012, pp. 2981–3003, which finds that workers who learn that they earn below median pay report lower pay and job satisfaction, while workers who learn that they earn above median pay report no higher satisfaction. Likewise, below-median earners are more likely to report searching for a new job. Employers also are attentive to issues of internal equity to reduce turnover: equity theory posits that employees who perceive themselves as being in an inequitable position seek to reduce this inequity, perhaps by leaving the organization. (*See* Carrell, Michael R., and John E. Dittrich. "Equity Theory: The Recent Literature, Methodological Considerations, and New Directions." The Academy of Management Review, vol. 3, no. 2, Apr. 1978, pp. 202–210, at p. 203. *See also* Torre, Edoardo Della, et al. "Internal and External Equity in Compensation Systems, Organizational Absenteeism and the Role of Explained Inequalities." Human Relations, vol. 68, no. 3, 11 June 2014, pp. 409–440.

94 COLON_SCHLS_0000016398 at 0000016405.

95 COLON_CONFERENCE_0000003058 at _0000003430.

External pay equity is the idea that employers offer similar compensation as other employers for similar work.[96] I have seen evidence that NCAA and its Division I member schools were concerned with external equity. For instance, the NCAA encourages member schools to use its Institutional Performance Program to compare coaches' salaries at their institution to those at other schools.[97] As another example, a presentation prepared for the Mountain West conference, compares compensation paid to coaches at particular schools in the Mountain West conference as well as "Peer Institutions" for several sports.[98] In the presence of the Volunteer Coach Rule, an NCAA Division I school can get away with paying $0 to its lowest-ranked coaches because every other NCAA Division I school is doing the same. If, in the absence of the Volunteer Coach Rule, some schools began compensating these coaches, then those schools will have an easier time recruiting and retaining high-quality coaching talent, who will leave (or refuse to join) schools that do not pay. The schools that do not pay these coaches will then face pressure to compensate their workers if they wish to recruit and retain high-quality coaching talent. If the Volunteer Coach Rule never existed, there likely would have always been at least some schools compensating these workers, which would create competitive pressure for all schools to provide

---

[96] Dulebohn, James H., and Stephen E. Werling. "Compensation Research Past, Present, and Future." Human Resource Management Review. vol. 17, no. 2, June 2007, pp. 191-207 at 194. ("concerns such as competitiveness, turnover, and compliance to government regulation mandating equal pay for equal work were met with organizations comparing their wage rates for key or benchmark jobs with their competitors and the external market.").

[97] Under the Institutional Performance Program Case Studies, Case Study No. 1 walks the user through how to compare women's basketball assistant coaching salaries to the same at other schools in the rest of the conference. Likewise, Case Study No. 5 walks the user through how to analyze the cost of adding a men's ice hockey team to their athletics department, including the costs of salaries and benefits. *See* http://ncaa.s3.amazonaws.com/files/apps/ipp/resources/CaseStudies_FiscalManagement.pdf.

[98] COLON_CONFERENCE_0000209031. Pay comparisons for football are at pp. 57-58. Pay comparisons for men's basketball are at pp. 75-76. Pay comparisons for women's basketball are at pp. 90-91. Pay comparisons for women's volleyball are at pp. 107-108. *See also* Deposition of Mario Morris as 30(b)(6) Corporate Representative of NCAA at 34-36.

compensation. In fact, I expect that this competitive dynamic is currently at play. As of the time

of writing this report, not every program that previously had employed a volunteer coach is

compensating these workers yet. For reasons described in Section III.C above, I expect that this

process will take several years. That a sport program had not hired and paid a new coach in the

2023-24 academic year (the first year they were permitted to do so, and the most recent year for

which counsel for the Plaintiffs requested data from NCAA Division I colleges and universities)

does not mean that they will not do so in the coming months and years. Likewise, it does not

mean that if the Volunteer Coach Rule had never been put into effect that it is reasonable to

believe that any substantial number of the individuals who worked without pay in the real world

would have done so in the but-for world.

## V.  Data

A.        <u>Data from Colleges</u>

61.        I have received data from Division I colleges and universities, provided pursuant to

a subpoena process in connection with this litigation in which Plaintiffs' counsel subpoenaed

information from 395 NCAA institutions who fielded Division I athletics teams. These data

include, for each program (i.e. sport) for each school, information on the compensation paid to

unrestricted coaches and information to identify volunteer coaches for each year. Through this

process, to date, I have received and processed data from 243 schools, of which, to date, 175

schools provided usable data from the post-conspiracy period. Of these, I include data from 85

schools in my regression analysis. These schools must have expanded at least one program's

coaching staff beyond the caps on unrestricted coaches present during the conspiracy period.

These represent 251 sport programs and 1,522 coach-years.[99] For unrestricted coaches, I have information on their cash compensation (i.e. salary or wages), as well as the value of health insurance and other benefits.

62.      Table 4 presents summary statistics for the data provided as a part of this process. In particular, this table presents for each sport program, the number of person-years worked by unrestricted coaches, the number of person-years worked by individuals subject to the Volunteer Coach Rule, the number of school-years offering that program, the number of unique schools offering that program, and the mean compensation of head- and unrestricted assistant coaches. I present this information separately for each sport and overall across all sports.

---

[99] As I am preparing this report, these data are still arriving. Because these data require cleaning and processing, I have not been able to incorporate all data that have been provided to me. In particular, I have not included all schools in my analysis because of data issues, including but not limited to schools that report large numbers of coaches with missing pay; schools reporting a single compensation or salary number for workers spanning multiple years for all or nearly all coaches; or schools which did not identify the particular year or years associated with coaches' employment; or those that arrived after October 1, 2024.

Table 4: Summary Statistics (2019-2024)

| Sport | Countable Coach Years | Volunteer Coach Years | Program-Years | Programs | Mean Head Coach Salary | Mean Assistant Coach Salary |
|---|---|---|---|---|---|---|
| M. Cross Country | 4 | 3 | 4 | 1 | $39,500 | |
| M. Football | 3737 | 167 | 310 | 60 | $354,162 | $80,468 |
| M. Golf | 1055 | 171 | 626 | 127 | $89,689 | $44,340 |
| M. Gymnastics | 84 | 16 | 29 | 6 | $115,136 | $59,113 |
| M. Ice Hockey | 294 | 52 | 94 | 21 | $219,049 | $99,104 |
| M. Lacrosse | 632 | 124 | 198 | 38 | $141,054 | $65,118 |
| M. Skiing | 10 | 2 | 5 | 1 | $70,308 | |
| M. Soccer | 1655 | 356 | 555 | 110 | $94,880 | $40,483 |
| M. Swimming & Diving | 99 | 30 | 40 | 9 | $107,666 | $68,789 |
| M. Tennis | 862 | 212 | 478 | 98 | $89,301 | $50,564 |
| M. Track & Field | 19 | 13 | 6 | 1 | $75,420 | $45,704 |
| M. Track (Indoor & Outdoor) & Cross Country | 170 | 68 | 66 | 14 | $81,608 | $56,164 |
| M. Volleyball | 132 | 20 | 51 | 11 | $64,536 | $41,344 |
| M. Water Polo | 85 | 13 | 35 | 8 | $88,410 | $44,952 |
| M. Wrestling | 413 | 86 | 142 | 33 | $129,530 | $69,398 |
| W. Acrobatics and Tumbling | 26 | 0 | 9 | 3 | $63,230 | $23,793 |
| W. Beach Volleyball | 230 | 78 | 127 | 30 | $53,420 | $35,750 |
| W. Bowling | 126 | 23 | 85 | 16 | $50,397 | $23,859 |
| W. Cross Country | 10 | 3 | 6 | 1 | $41,173 | |
| W. Equestrian | 126 | 12 | 51 | 9 | $74,792 | $48,035 |
| W. Fencing | 5 | 0 | 1 | 1 | $62,375 | $70,433 |
| W. Field Hockey | 464 | 58 | 156 | 32 | $98,120 | $47,602 |
| W. Golf | 955 | 131 | 541 | 113 | $79,713 | $41,603 |
| W. Gymnastics | 400 | 59 | 122 | 25 | $140,178 | $73,825 |
| W. Ice Hockey | 195 | 30 | 64 | 14 | $112,360 | $59,122 |
| W. Lacrosse | 845 | 85 | 270 | 56 | $91,716 | $48,486 |
| W. Rowing | 769 | 135 | 203 | 43 | $84,952 | $43,917 |
| W. Rugby | 44 | 3 | 22 | 5 | $67,160 | $46,713 |
| W. Skiing | 10 | 3 | 5 | 1 | $85,207 | |
| W. Soccer | 2363 | 397 | 794 | 163 | $91,127 | $41,295 |
| W. Softball | 2435 | 361 | 782 | 156 | $103,217 | $51,626 |
| W. Swimming | 118 | 11 | 55 | 12 | $64,755 | $28,607 |
| W. Swimming & Diving | 414 | 72 | 141 | 29 | $88,093 | $43,308 |
| W. Tennis | 1133 | 291 | 642 | 133 | $77,778 | $43,788 |
| W. Track & Field | 77 | 53 | 21 | 4 | $60,719 | $43,396 |
| W. Track (Indoor & Outdoor) & Cross Country | 365 | 136 | 115 | 23 | $80,545 | $49,331 |
| W. Triathlon | 9 | 0 | 7 | 2 | $41,806 | $16,538 |
| W. Volleyball | 2351 | 404 | 784 | 175 | $103,747 | $48,948 |
| W. Water Polo | 134 | 19 | 58 | 13 | $69,920 | $41,583 |
| W. Wrestling | 13 | 0 | 7 | 2 | $77,074 | $76,125 |
| Rifle | 66 | 2 | 44 | 8 | $65,244 | $52,639 |
| C. Cross Country | 54 | 7 | 27 | 5 | $65,705 | $35,533 |
| C. Fencing | 97 | 26 | 45 | 9 | $58,508 | $46,584 |
| C. Golf | 117 | 6 | 57 | 11 | $56,709 | $27,119 |
| C. Skiing | 39 | 6 | 15 | 4 | $67,702 | $34,754 |
| C. Swimming | 188 | 14 | 64 | 12 | $54,408 | $33,023 |
| C. Swimming & Diving | 1148 | 220 | 230 | 46 | $96,242 | $48,772 |
| C. Tennis | 243 | 31 | 115 | 25 | $55,740 | $25,574 |
| C. Track & Field | 783 | 274 | 158 | 33 | $121,169 | $58,896 |
| C. Track (Indoor & Outdoor) & Cross Country | 2758 | 816 | 582 | 113 | $89,460 | $47,412 |
| C. Water Polo | 31 | 14 | 17 | 4 | $38,218 | $23,230 |
| ALL | 28392 | 5113 | 9061 | 1869 | $103,345 | $54,236 |

Source: College Subpoena Data

ATTORNEYS' EYES ONLY

63.        Based on my analysis of the schools from which I have received and processed data, there were approximately 4,159 individuals subject to the Volunteer Coach Rule (excluding those individuals who were exclusively engaged in coaching baseball) from March 17, 2019 through July 1, 2023. If I extrapolate this number to the remainder of the NCAA Division I schools, I estimate that there were approximately 6,613 individuals subject to the Volunteer Coach Rule during the same period.

B.        NCAA MFRS Data

64.        I additionally have data from the NCAA's Membership Financial Reporting System (MFRS) for the academic years 2015-16 through 2022-23. These data are provided by member colleges and universities to the NCAA on an annual basis. These data include information on expenses and revenues for each sport. This includes information on the compensation of the head coach of each sport, as well as the aggregate compensation for all assistant coaches and the number of coaches for each sport.[100] From these data I can infer the average compensation paid to all unrestricted assistant coaches for each sport played at each school in each year.

VI. Methods

65.        In order to estimate the pay that individuals in the "volunteer coach" position would have received during the class period but-for an agreement among the NCAA and its member institutions to not compensate them, I have utilized the fact that this restriction was

---

[100] The coaching salaries reported in the MFRS data separately identify (a) salaries, benefits, and bonuses paid by the university (including gross wages and benefits; taxable and non-taxable benefits including: allowances; speaking fees, stipends, memberships, media income; tuitions reimbursement/exemptions for self or dependent; and earned deferred compensation) and (b) coaching salaries, benefits, and bonuses paid by a third party (including car stipend; country club memberships; allowances for clothing, housing, and entertainment; speaking fees; camp compensation; media income; and shoe and apparel income).

repealed and the number of unrestricted coach slots for each sport was increased in mid-2023. For reasons described in Section III.C, above, I do not expect the effects of the conspiracy to end immediately as of the rescission of the Volunteer Coach Rule. In addition, because the data were collected while the first post-conspiracy year was still ongoing, the data I received do not always include information about the post-conspiracy period and may not reflect all coaches that received compensation in that period. Nevertheless, I do observe some schools hiring into and offering compensation for the newly created unrestricted coach positions. I use this information as the primary basis of my analysis.

A. Calculating "Stepdown"

66.     I have categorized sports programs according to how many unrestricted coaches each program is allowed in the period beginning July 1, 2023. I will call this period the "post-conspiracy period" or simply the "post period."[101] These categories are:

- Three coaches: women's bowling, women's beach volleyball, men's or women's cross country, men's or women's fencing, men's or women's golf, rifle; men's or women's skiing, men's or women's swimming, men's or women's tennis, women's triathlon

- Four coaches: women's field hockey; men's or women's gymnastics; men's or women's ice hockey; men's or women's lacrosse; women's rugby; men's or women's soccer; women's softball; men's or women's track and field; men's or women's volleyball; men's or women's water polo; men's or women's wrestling

---

[101] Correspondingly, I will refer to the period during the Volunteer Coach Rule as the "conspiracy period" or the "during" period.

- Five coaches: women's acrobatics and tumbling; combined cross country;[102] women's equestrian;[103] men's or women's swimming and diving[104]

- Six coaches: combined fencing; combined golf; combined skiing; combined swimming; combined tennis; men's or women's track and field/cross country

- Eight coaches: combined swimming & diving; combined track and field; combined water polo

---

[102] Here and elsewhere, a "combined" sports program is one in which all coaching staff members in the same sport are involved in practice activities or competition with both the men's and women's team on a daily basis. Combined teams may employ the total number of coaches specified separately for men and for women in that sport. (NCAA_SMART-COLON_0001396 at Rule 11.7.5.1). I first identify a program as potentially combined based on certain conditions (described below) and either the subpoena or MFRS data. I identify a program as being potentially combined based on the subpoena data if any of the following conditions (A) – (C) are true in any year. These are (A) The sport name or coach titles indicate the program is "Men's and Women's"; (B) The sport name or coach titles indicate neither "Men's" nor "Women's" in the school data, and both Men's and Women's sport teams are present in the MFRS data; or (C) There are Men's and Women's programs that have at least one unrestricted coach in common between the Men's and Women's team, based on the subpoena data. (Due to lack of consistency in how names are written, as well as ambiguity in exact employment dates, it is impractical to apply a stricter name-matching rule for identifying combined programs.) I additionally separately identify potentially combined programs based on three rules based on the MFRS data: (D) The MFRS data indicate that both the men and women's teams are coached by head coaches with identical names for each sport; (E) The MFRS data indicate that the aggregate payroll (summing the head coach pay and total pay for all assistant coaches) for the men and women's teams are within $2 of each other; (F) I also rule out programs as being combined if the men's or women's teams have coaches who are indicated in NCAA_SMART-COLON_0234691 as having "full time duties" for that team. If the combined status of a team is in agreement under each of these definitions (A, B, or C, plus all of D, E, and F) to the extent definable due to data availability, then I identify the program as being either combined or not combined based on these rules. For programs for which the combined status of a team is not in agreement under these definitions, a manual analysis of whether a program was combined or not combined was conducted, based on the above criteria and the teams' websites, which list coach rosters for each year.

[103] The specified cap on equestrian coaches is four, with an additional coach allowed for institutions that use both the "hunt seat riding discipline and the western riding discipline." (NCAA_SMART-COLON_0001396 at Rule 11.7.5.2.6)

[104] Men's or women's swimming and diving has a specified cap of four coaches, plus an additional coach if the school has a men's swimming and diving team or a women's swimming and diving team but not both (NCAA_SMART-COLON_0001396 at Rule 11.7.5.2.5).

- Nine coaches: women's rowing[105]

- Twelve coaches: combined track and field/cross country

- Thirteen coaches: FCS football.

67.        For the schools that have expanded their paid coaching staff in the post-conspiracy period, I have built a model explaining the "step-down" in pay from the second-lowest-paid position (which corresponds to the lowest paid position during the conspiracy period) to the lowest-paid position. I rank coaches according to their pay (within a given school, sport, and year) and I include indicator variables in the model for each rank.[106] For example, there will be a variable that equals 1 when a coach is the highest paid coach at their school, in their sport, in the given year, and 0 otherwise. Likewise for the second-highest paid coach, and so on down to the lowest-paid coach. The step-down between any two ranks is the difference in the relevant rank-indicator coefficients. In practice, I define rank such that the lowest-paid coach is the omitted, or baseline, category, so that a single coefficient (on the second-lowest-rank indicator) measures the desired step-down described above.

68.        I categorize sports into groups according to their post-conspiracy unrestricted coach limit (see above), and I interact indicators for these groups with the rank indicators in my model, which allows me to use a single regression to estimate unique rank coefficients for each group. This model also includes indicator variables for each of the two post-period years 2023 and 2024, and an indicator variable for whether or not the program is a "combined" (men's and women's) program. In this way, I allow the stepdown in pay between the second-lowest paid

---

[105] The specified cap on rowing coaches is seven, with an additional two coaches available if the institution's rowing program includes both heavyweight rowing and lightweight rowing. (NCAA_SMART-COLON_0001396 at Rule 11.7.5.2.7)

[106] The pay variable I use is coach annual salary.

position and the lowest-paid position to depend on the coach limit in each sport. The results of this analysis are presented in Table 5. Column [1] presents the number of coaches allowed after the end of the Volunteer Coach Rule in 2023; Column [2] presents the regression coefficient, expressed in natural logarithms, that is the relationship between the compensation of the coach in the expanded unrestricted slot(s) (in the post-conspiracy period) and the pay of the next-lowest paid coach that is within the unrestricted coach caps that were in place during the period of the alleged conspiracy.[107] Column [3] presents the t-statistic on this coefficient. In general, using a "one-tailed" test, a t-statistic greater than 1.645 indicates that the difference is statistically significant at the 5% level, and is unlikely to have arisen by chance.  This analysis shows that for programs with 3, 4, 5, 9, or 12 allowable coaches in the post-conspiracy period, the estimated coefficient is statistically significantly different from 0 at the 5% level.[108] Column [4] converts the coefficient in Column [2] into a percentage difference. For instance, to interpret the number in the first row, if a sport expanded from two to three slots (e.g. tennis), the average relationship between the pay of the lowest paid coach is 45% lower than the pay of the second-lowest paid coach.

---

[107] Because most sports saw their unrestricted coach cap expand by exactly one, this is usually equivalent to comparing the pay of the lowest-paid coach to that of the second-to-lowest paid coach.

[108] The remaining programs (with 6, 8, or 13 allowable coaches in the post-conspiracy period) do not have t-statistics that are statistically significantly different from zero at any conventional level. However, as I continue to receive and process data from schools, it is likely that these t-statistics will increase, as a major contributor to the statistical significance of an estimate is the sample size underlying it.

Table 5: Regression Results

| Post-Period Restriction | Regression coefficient, for sports with given restriction (in post-period) | T-Statistic | Percentage Stepdown |
|:---:|:---:|:---:|:---:|
| [1] | [2] | [3] | [4] |
| 3 | -0.597 | 4.38 | -45.0% |
| 4 | -0.703 | 8.34 | -50.5% |
| 5 | -0.946 | 3.30 | -61.2% |
| 6 | -0.654 | 1.51 | -48.0% |
| 8 | -0.373 | 1.28 | -31.1% |
| 9 | -1.454 | 2.31 | -76.6% |
| 12 | -0.768 | 2.18 | -53.6% |
| 13 | -0.580 | 1.24 | -44.0% |

Notes: Based on subpoena data. Model includes indicator variables for each year (2023 or 2024), and an indicator for whether it is a combined program. The stepdown is estimated separately for each post-period restriction size, estimated in a single model.

69.    Because I am continuing to receive and process data underlying this model, I expect that the particular stepdown estimates in the table above may change as this process continues. Though this process is ongoing, this is a reasonable approach by which to establish the relationship between the lowest-paid coach (a position which prior to the end of the Volunteer Coach Rule would have received $0), and the compensation of the lowest-paid coach above her.[109] In the remainder of this section I explain how one could use this information to estimate but-for pay (and hence damages) for class members in the absence of the conspiracy.

---

[109] Ideally I will receive data from every NCAA Division I athletics program. In the event that I do not, it would be possible to estimate a similar relationship between the compensation of the newly-compensated coach position in the post-conspiracy period and the compensation of all assistant coaches under the conspiracy-period unrestricted coach cap. This would allow me to use data from the NCAA's MFRS

B. A Process for Estimating Volunteer Coach But-For Pay

70.    In this section, I describe a process for estimating volunteer coach but-for pay during the conspiracy period. Because I am still receiving and processing data, I will describe this process, which is feasible using data and methods that are common to all class members.

71.    This method, which I will call the "stepdown method," will use data provided by the schools to establish the rank order of unrestricted coaches in each year of the class period, ranked by compensation within each sport program at each school. This is the same method I used to perform the regression analysis I used to estimate the stepdown function described in the previous subsection. Then, I will do the following:

- If the school has a "full complement" (that is, it meets the cap of allowable unrestricted coaches according to the NCAA bylaws) of coaches earning non-zero compensation (other than the volunteer coach), then I take the lowest-paid coach within that program, and apply the relevant stepdown. For instance, if a men's lacrosse team has a full complement of coaches (3 unrestricted coaches plus a volunteer coach), and the lowest-paid unrestricted coach receives $80,000, reducing this $80,000 by the relevant stepdown (50.5%) implies a but-for compensation of $39,600.[110] The difference between these estimated but-for earnings and the actual volunteer coach earnings ($0), is damages.

- If the school has less than a full complement of coaches earning non-zero compensation (other than the volunteer coach), it is possible to take the compensation of the lowest-paid coach and apply one or more stepdowns to yield

---

database to estimate the but-for compensation of volunteer coaches in a similar manner as described below.

[110] This is calculated as $80,000 x (1-0.505)

a conservative estimate of but-for pay for the volunteer coach. For instance, if a combined (men's and women's) swimming team, which has a "during" period cap of 4 and a "post" period cap of 6, had two unrestricted coaches and a volunteer coach during the conspiracy period (while the cap on unrestricted coaches was 4), the relevant stepdown is 48%, and the lowest-earnings coach I observe receives $70,000, taking a "double stepdown" would imply that the but-for pay of the volunteer coach would be about $18,900 which is a reasonable, conservative estimate of but-for pay.[111]

- If during the conduct period, a program reports an unrestricted coach who earns no compensation, then the volunteer coach is estimated to also earn no compensation. However, this case is rare: according to my analysis of the schools' data, more than 99% of unrestricted coaches are paid.

## VI.    Conclusions

72.      I conclude based on this analysis that there exists evidence common to the class that the alleged conspiracy suppressed class members' compensation generally, namely at zero. I also find that the alleged conspiracy affected all or nearly all members of the class.

73.      I also conclude that the NCAA Division I member schools had sufficient market power to suppress the compensation of the coaches that were subject to the Volunteer Coach Rule. I base this on my conclusion that the compensation of class members was suppressed below the competitive level, namely to $0.

---

[111] This is calculated as $70,000 x (1-0.48)^2.

74.     I also conclude that there exists a reasonable methodology by which to estimate damages using data and methods that are common to the class.

_____

Orley Ashenfelter

November 26, 2024

# APPENDIX A

# Curriculum Vitae 2024

NAME:                    Orley C. Ashenfelter

BUSINESS ADDRESS:        Industrial Relations Section
                         Louis A. Simpson International Bldg.
                         Princeton University
                         Princeton, New Jersey 08544

BUSINESS PHONE:          609-258-4040

FAX NUMBER:              609-258-2907

CURRENT POSITION:        Joseph Douglas Green 1895 Professor of Economics, Emeritus
                         Senior Scholar in Economics

                         And

                         American Association of Wine Economists, President
                         American Philosophical Society, Member
                         Executive Committee, Law and Public Affairs, Princeton
                         University
                         Faculty Steering Committee, Griswold Center for Economic Policy
                         Studies, Princeton University
                         Scientific Advisory Committee, Graduate School of Economics,
                         Barcelona
                         Co-editor, *Journal of Wine Economics*
                         Advisory Board, Stanford University, Institute for Economic
                         Policy Research
                         Editorial Board, *Journal of Cultural Economics*
                         International Advisory Board, the *Economic and Labour Relations
                         Review*
                         Editorial Board, Economic Sciences, PNAS

PREVIOUS POSITIONS:      Western Economic Association International, President-elect,
                         2017- 2018
                         Vice-President, 2015-16, Western Economic Association
                         International
                         President, American Economic Association, 2011
                         President, American Law and Economics Association, 2010
                         President, Society of Labor Economists, 2003
                         Editorial Board, the Australian Bulletin of Labour, 2009-2017

Section Editor, Economics, *International Encyclopedia of the Social and Behavior Sciences*

Co-Editor, *American Law and Economics Review,* 1999-2005

Director, Industrial Relations Section, Princeton University

Co-editor, *American Economic Review*, 2001-2002

Editor, *American Economic Review*, 1985-2001.

Meyer Visiting Research Professor, New York University School of Law, 1990.

Meeker Visiting Professor, University of Bristol, 1980-81. Guggenheim Fellow, 1976-77.

Director, Office of Evaluation, U.S. Department of Labor, 1972-73.

Lecturer, Assistant Professor, and Associate Professor of Economics, Princeton University, 1968-72.

EDUCATION:        Claremont McKenna College, B.A. 1964

Princeton University, Ph.D. 1970

AWARDS AND HONORS:

Doctor Honoris Causa of the University of Bordeaux, 2023

Corresponding Fellow of the British Academy, 2018

National Academy of Sciences Elect, 2018

Honorary Degree from Charles University, Czech Republic, January 15th, 2014.

Labor and Employee Relations Academic Fellow, 2010

Distinguished Fellow, American Economic Association, January, 2008.

Recipient of Karel Englis Honorary Medal, awarded by the Academy Council of the Academy of Science of the Czech Republic, May, 2007.

Society of Labor Economists' Jacob Mincer Award, June 4, 2005.

Corresponding Fellow of the Royal Society of Edinburgh, 2005.

IZA Prize in Labor Economics, 2003.

Doctor Honoris Causa, University of Brussels, November 29, 2002

Fellow, American Academy of Arts & Sciences, 1993-

Recipient of the Ragnar Frisch Prize of the Econometric Society, 1984.

Fellow, Econometric Society, 1977.

Guggenheim Fellowship, 1976-77.

BOOKS:

*Statistics and Econometrics: Methods and Applications*, (with Phillip Levine and David Zimmerman), New York: J. Wiley, 2003.

*The Collected Essays of Orley C. Ashenfelter,* Volumes I – III, (edited by Kevin Hallock), Cheltenham, England: Edward Elgar Publishing Limited, 1997.

Volume I      Employment, Labor Unions, and Wages
Volume II     Education, Training, and Discrimination
Volume III    Economic Institutions and the Demand and Supply of Labor

VIDEOS/MEDIA:

"Introduction to Wine Economics", YouTube, Harvard Data Science Initiative, July 15, 2024.

Host of podcast "The Work Goes On with Orley Ashenfelter," Industrial Relations Section, Princeton University December 2022 - present.

Profiled on video blog on site of Scott Cunningham, Professor of Economics, Baylor University, "Brittany and Michael Present 5 Pionners in Difference-in-Differences," November 2022.

Podcast on Environmental Insights, hosted by Robert Stavins, Harvard University. "The Economics of Wine: A Conversation with Orley Ashenfelter," March 2022.

Interview with Orley Ashenfelter, PhD labor economist,YouTube, Hosted by Scott Cunningham, Professor of Economics, Baylor University, March 2022.

Podcast on Harvard Data Science Review, "Big Data and Wine" December 2021

"What McDonald's Shows About The Minimum Wage," NPR's' Planet Money, February 2021.

"Economics of Wine," part of the "Economists in the Wild" series produced by Marginal Revolution University, September 2020.

Interviewed on Facebook Live, Sailing Illustrated, "Economics of Wine" January 2020.

"Panel 1: Approaching Labor Market Definition," part of the
Public Workshop on Competition in Labor Markets, United States
Department of Justice, September 2019.

"Barcelona GSE Scientific Council Roundtable: What has
changed?" Barcelona GSE, March 2019.

"Wine, Big Macs and Natural Experiments with Orley
Ashenfelter, Princeton University," Interviewed by Liyou Borga,
PhD student at the Center for Economic Research and Graduate
Education - Economics Institute, 2014.

"Labor Reform and Crisis Recovery – Barcelona GSE,"
roundtable debate as part of the biennial meeting of the Barcelona
GSE Scientific Council, September 2012.

PUBLIC LECTURES:

Introduction to Statistics and Introduction to Econometrics,
Lecture, Inaugural Justices Scalia & Ginsburg Judicial Colloquium
for State Supreme Court Justices, January 2023, The Law &
Economics Center, George Mason University, Honolulu, HI.

Seminar in Applied Economics, February 22, 2022, "Evaluating
the Economic effects of Prohibition."

Inaugural Ronald Coase Lecture, June 2021, University of Dundee,
Scotland.

Sage Lodge Colloquium, Lecture, September 2021, Law &
Economics Center, George Mason University, Pray, MT.

The Douglas H. Ginsburg Judicial Colloquium Series, December
2021, (Introduction to Statistics and Introduction to Econometrics),
Law & Economics Center, George Mason University, Palm Beach
Florida.

American Bar Association, July 2020, "Information Exchanges:
Antitrust, RICO, and Tort Theories of Liability," panel
presentation.

United States Department of Justice Public Workshop on
Competition in Labor Markets, September 2019, "Approaching
Labor Market Definition," panel presentation.

Syracuse University Whitman School of Management, June 2019,
"How Competitive are US Labor Markets." Keynote address at the
Changing Nature of Work and Workplaces Conference.

Federal Trade Commission, April 2019, "Retrospective Analyses of Mergers," presented on panel at FTC Hearing #13: Merger Retrospectives.

"Barcelona GSE Scientific Council Roundtable: What has changed?" Panel presentation at Barcelona GSE, March 2019.

Keynes Lecture at the British Royal Academy, November 2018, "The McWages Project: Real Wages Across Space and Time."

Western Economic Association International Presidential Address, June 2018, "The McWages Project: Real Wages Across Space and Time."

Kiwanis Club of San Francisco, July 2018, "The World of Wine – an Economist's Perspective."

University of Washington, Princeton Club of Western Washington, April 2018, "What Determines Vintage and Vineyard Quality?"

14th International Conference of the Western Economic Association International (WEAI), January 2018, "Roundtable Discussion on Immigration"

Humboldt State University, November 2017, "Wine Economics: the Role of Robert Hodgson."

Trento Economic Festival, June 2017, "Comparing Real Wages," Trento, Italy.

Napa Valley Grape Growers, March 2017, "Do Vineyards & Vintage Really Matter?"

The National Economist Club, February 2017, "The Economics of Czech Wine," presented at the Embassy of the Czech Republic, Washington DC.

Inness College, November 2016, Morley Gunderson Lecture in Labour Economics and Industrial Relations, "Real Wages Over Time and Space (the McWages Project)."

Gustavus College, September 2016, Nobel Conference 52, "Comparing Real Wages around the World: Inequality in Human Wealth."

University of Arizona, April 2016, Economic Seminar Series, "Real Wage Rates Around the World and Over (a Long) Time."

Vassar College, April 2016, Martin H. Crego Lecture in Economics, "Evaluating the Economic Effects of the Noble Experiment: National Prohibition, 1920-1933."

Rutgers University, March 2016, Dean's Distinguished Lectureship in Social and Behavioral Sciences, "Real Wage Rates Around the World and Over (a Long) Time."

Maitre Magisterial, Conference in Honor of Danièle Meulders, Université libre de Bruxelles, 2015

Art Investment Forum, Shanghai, China, October 2013, "Trust and Transparency in the Art Market," Keynote Speech.

Shanghai Jiao Tong University, Antai College of Economics and Management, China, October 2013, "Comparing Real Wages".

Sotheby's Institute, London, May 2013, "Trust and Transparency in the Art Market" Plenary Lecture, Conference on Art Markets.

U.S. Department of Labor, November 2012, "History of Program Evaluation," presented at the 75th Anniversary Celebration and Conference.

"Labor Reform and Crisis Recovery – Barcelona GSE," roundtable debate as part of the biennial meeting of the Barcelona GSE Scientific Council, September 2012.

Washington State University, March 2011, "McWages, Cross Country Comparison of Wages", 11th Annual Bertha C. and Roy E. Leigh Distinguished Lecture in Economics

American Bar Association, December 2010, Presentation, Conference on Labor Market Monopsony.

Yale University, November 2010, Plenary Lecture, Conference on Empirical Legal Studies.

San Francisco Federal Reserve Board, July 2010, "Expert Opinion."

Brigham Young University, April 2010, "McWages, Cross Country Comparison of Wages."

Stanford University, March, 2010, "Labor Markets and Their Recovery."

Vanderbilt University, February 2010, "McWages, Cross Country Comparison of Wages."

Law and Economics Workshop, University of California-Berkeley, Berkeley, California, November 16, 2009, "The Effect of Mergers on the Consumer Prices: Evidence from Five Mergers on the Enforcement Margin."

District of Columbia Circuit Conference of the Federal Courts, Nemacolin Woods, Pennsylvania, Conference of the Third Circuit

Judicial Court of Appeals, June 8, 2006, "How Not to Lie with Statistics."

Stanford Institute for Economic Policy Research, Stanford University, Stanford, California, May 30, 2006, "McWages: Cross-Country Comparison of Wages."

The Economics of Art and Culture in Honor of Victor Ginsburg, June 17, 2005, Brussels, Belgium, "Efficiency and Inefficiency in the Market for Bordeaux Wines."

David Hume Institute Lecture, Edinburgh, Scotland, March 24, 20005. "The Evolution of the Global Labor Market: Change vs. Continuity."

J. Denis Sargan Lecture to the Royal Econometric Society, Nottingham, England, March 23, 2005, "The Value of a Statistical Life: Problems and Prospects."

Edmund Clarke Distinguished Lecture, October 15, 2004, Queens College, Ontario, "Evolution of the Global Labor Market: Change vs Continuity."

Wei Lun Lecture, December 14, 2000, The Chinese University of Hong Kong, "How Large Is the Economic Payoff to Education?"

Paul Hartman Memorial Lecture, November 1, 1995, University of Illinois at Champaign-Urbana, "How Credible is the Evidence Linking Education and Income?"

Jerome Levy Economics Institute Lecture, November 21, 1995, Bard College, "How Credible Are Estimates of the Economic Returns to Schooling?"

Ida Cordelia Beam Lecture, November 10, 1994, University of Iowa, "Does a College Degree Pay Off? Evidence from Data on Identical Twins."

42nd Joseph Fisher Lecture, October 12, 1993, Adelaide University, Adelaide, Australia, "How Convincing is the Evidence Linking Education and Income?"

Lecture to honor Gregg Lewis, October 29, 1992, Duke University, "The Economic Returns to Schooling from a New Sample of Twins."

George Seltzer Distinguished Lecture, October 6, 1991, Industrial Relations Center, University of Minnesota, "How Convincing Is The Evidence Linking Education and Income?"

University of Bristol, Bristol, England, December 6, 1990, "The Market for Fine Wine: Is It Economically Efficient or Is There a Sucker Born Every Minute"

PUBLICATIONS:

Ashenfelter, Orley (2024) "Public Policy and labour market competition-IFS Deaton Review of Inequalities", Oxford Open Economics, **3**, i930-i932, odad028

Ashenfelter, Orley & Ruth Gilgenbach (2023) No-Poaching Agreements as Antitrust Violations: Animation Workers Antitrust Litigation In John Kwoka, Jr, Tommaso M. Valletti, and Lawrence J. White ( Eds.), *Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents*. Competition Policy International.

(with David Card, Henry Farber, and Michael Ransom) "Monopsony in the Labor Market: New Empirical results and New Public Policies," *Journal of Human Resources,* vol. 57 no. 3, 2022, p. S1-S10.

(with Alan B. Krueger) "Theory and Evidence on Employer Collusion in the Franchise Sector," *Journal of Human Resources*, vol. 57 no. 3, 2022, p. S324-S348.

(with Stepan Jurajda) "Minimum Wages, Wages, and Price PassThrough: The Case of McDonald's Restaurants", *Journal of Labor Economics*, Volume 40, Issue S1, 2022. Pp. S179-S201.

(with A. Mas) "Editorial Essay: Introduction to a Special Issue in Honor of Henry Farber", *Industrial and Labor Relations Review*, Volume 72, Issue 2, 2019.

Ashenfelter, Orley, Daniel L. McFadden, Abigail Payne, Jason Potts, Robert Gregory, Wade E. Martin, ""Roundtable Discussion on Immigration. This article is based upon presentations at the closing session of the 14th International Conference of the Western Economic Association International (WEAI), hosted by the Newcastle Business School, University of Newcastle, Australia, January 11–14, 2018, Published online November 2019.

(with A. Corsia) "Predicting Italian Wine Quality from Weather Data and Expert Ratings*," Journal of Wine Economics*, Volume 14 Number 3, 2019

Ashenfelter, Orley, Robert F. Engle, Daniel L. McFadden, and Klaus Schmidt-Hebbel. 2018. "Globalization: Contents and Discontents." *Contemporary Economic Policy* 36 (1) (01): 29-43.

(with David Card as Guest Editors), "Introduction: Essays in Honor of Robert J. LaLonde," *Journal of Labor Economics*, 35, no. 51 (July 2017): S1-S6.

(with R. Engle, D. McFadden, K. Schmidt-Hebbel), "Globalization: Contents and Discontents," *Contemporary Economic Policy,* Wiley Online Library, June 2017.

"The Hedonic Approach to Vineyard Site Selection: Adaptation to Climate Change and Grape Growing in Emerging Markets," *Journal of Wine Economics*, Vol. 12, No. 1, 2017, pp. 1-13.

(with K. Storchmann) "Wine and Climate Change" AAWE working paper No. 152, Economics, March 2014. Published as "The Economics of Wine, Weather, and Climate Change." *Review of Environmental Economics and Policy*, 10(1), January 2016, 25-46. Also published as "Climate Change and Wine: A Review of the Economic Implications." *Journal of Wine Economics*, 11(1), April 2016, 105-138.

(with D. Hosken; M. C. Weinberg) "Efficiencies Brewed: Pricing and Consolidation in the US Beer Industry." NBER Working Paper Series, 2013, *RAND Journal of Economics*, July 2015, 46(2), 328-361.

(with D. Hosken; M. C. Weinberg) "Did Robert Bork Understate the Competitive Impact of Mergers? Evidence from Consummated Mergers." August 2014, *Journal of Law and Economics,* Vol. 57, No. S3. The Contributions of Robert Bork to Antitrust Economics, pp.S67-S100, The University of Chicago Press for The Booth School of Business of the University of Chicago and The University of Chicago Law School.

"The Early History of Program Evaluation and the Department of Labor." May 2014, Special Issue: U.S. Department of Labor Centennial, *Industrial and Labor Relations Review*, 67 Supplement, 574-577.

(with Hosken, Daniel; Weinberg, Matthew) "Corrigendum: the Price Effects of a Large Merger of Manufacturers: A Case Study of Maytag Whirlpool." February 2014, *American Economic Journal: Economic Policy*, 6(1), 308-309.

(with Bloom, David E. and Dahl, Gordon B.). "Lawyers as Agents of the Devil in a Prisoner's Dilemma Game." Princeton University Industrial Relations Section Working Paper #270, NBER Working Paper No. 4447, September, 1993. September 2013, *Journal of Empirical Legal Studies* 10(3): 399-423.

(with Jones, Gregory). "The Demand for Expert Opinion: Bordeaux Wine". December 2013, *Journal of Wine Economics*, 8, pp 285-293.

(with Hosken, Daniel; Weinberg, Matthew) "The Price Effects of a Large Merger of Manufacturers: A Case Study of Maytag-Whirlpool", February 2013, *American Economics Journal: Economic Policy*, 5(1), 239-261.

"Comparing Real Wage rates: Presidential address", National Bureau of Economic Research, Inc. Working Papers: 18006. *American Economic Review*, April 2012, 102(2), 617-642.

(with Gordon Dahl) "Bargaining and the Role of Expert Agents: An Empirical Study of Final-offer Arbitration." *Review of Economics and Statistics*, February 2012, 94(1), 116-132.

(with Kathryn Graddy) *A Handbook of Cultural Economics*, Second Edition, Chapter 2 "Art Auctions", August 2011

"Foreward", *American Economic Review*, May 2011, v. 101, iss. 3, pp. x-xi

(with Kathryn Graddy) "Sale Rates and Price Movements in Art Auctions", *American Economic Review*, May 2011, v. 101, iss. 3, pp. 212-16

(with Hosken, Daniel; Vita, Michael; Weinberg, Matthew) "Retrospective Analysis of Hospital Mergers", *International Journal of the Economics of Business,* February 2011, v. 18, iss. 1, pp. 5-16

(with Kirk Doran and Bruce Schaller) "A Shred of Credible Evidence on the Long-run Elasticity of Labour Supply", *Economica*, October 2010, Vol. 77, issue 308, pages 637-650

"George E. Johnson", *Journal of Wine Economics*, vol. 5, no. 1, pg. 217, 2010

(with D. Hosken) "The Effect of Mergers on Consumer Prices: Evidence from Five Selected Case Studies", *Journal of Law and Economics,* August 2010, v. 53, iss. 3, pp. 417-66

(with K. Storchmann) "Measuring the Economic Effect of Global Warming on Viticulture Using Auction, Retail, and Wholesale Prices," *Review of Industrial Organization*, 2010, vol. 37, no. 1, 51-64

(with K. Storchmann) "Using Hedonic Models of Solar Radiation and weather to Assess the Economic Effect of Climate Change: The Case of Mosel Valley Vineyards, *" Review of Economics and Statistics,* May 2010, Vol. 92, No. 2, Pages 333-349

(with Henry Farber; Michael Ransom) "Labor Market Monopsony," *Journal of Labor Economics*, April 2010, v. 28, iss. 2, pp. 203-10

"Predicting the Quality and Prices of Bordeaux Wine," *Journal of Wine Economics,* Spring 2010, v. 5, iss. 1, pp. 40-52

(with John Pencavel) "Albert Rees and the 'Chicago School of Economics,'" in *Elgar Companion to the Chicago School of Economics*, edited by Ross B. Emmett, Edward Elgar, 2010.

(with Daniel Hosken and Matthew Weinberg) "Generating Evidence to Guide Merger Enforcement," in *Global Competition Policy,* vo. 5, no. 1, Spring 2009.

(with Richard E. Quandt and George M. Tabor) "Wine-Tasting Epiphany: An Analysis of the 1976 California vs. France Tasting," in *Wine and Philosophy*, edited by Fritz Allhoff, November 2007.

(with Stephen Ciccarella and Howard J. Schatz) "French Wine and the U.S. Boycott of 2003: Does Politics Really Affect Commerce?" July 2007, National Bureau of Economic Research Working Paper #13258. *Journal of Wine Economics*, Volume 2, No. 1, Spring 2007.

(with Kathryn Graddy) "Art Auctions" *Handbook of the Economics of Art and Culture,* edited by Victor Ginsburgh and David Throsby (Oxford, UK: Elsevier), vol. 1, 2006.

(with W. J. Collins and A.Yoon) "Evaluating the Role of Brown v. Board of Education in School Equalization, Desegregation and the

Income of African Americans," *American Law and Economics Review*, vol. 8, no. 2, Summer 2006.

(with David Ashmore, Jonathan B. Baker, Suzanne Gleason and Daniel S. Hosken) "Empirical Methods in Merger Analysis: Econometric Analysis of Pricing in FTC v. Staples," *International Journal of the Economics of Business*, vol. 13, no. 2, July 2006. Reprinted in *Recent Developments in Monopoly and Competition Policy*, edited by George Norman (Edward Elgar Publishers: Cheltenham, UK) January 2008.

"George M. Tabor, Judgment of Paris: California vs. France and the Historic 1976 Paris Tasting That Revolutionized Wine," *Journal of Wine Economics*, vol. 1. no. 1 (Spring) 2006.

"Measuring the Value of a Statistical Life: Problems", *The Economics Journal*, vol. 118 (March) 2006.

(with Alan Krueger) "Estimates of the Economic Return to Schooling from a New Sample of Twins," in *Quantitative Social Science*, edited by Jacqueline Scott and Yu Xie, volume 1, part 6, October 2005.

"Predicting the Quality and Prices of Bordeaux Wines," in *Statistics: A Guide to the Unknown*, 4th edition, edited by Roxy Peck, et al., (Stamford, CT: Thomson), March 2005. Reprinted in the *Economic Journal*, vol. 118, no. 529, June, 2008. Reprinted in the *Journal of Wine Economics*, vol. 5, no. 1, 2010.

(with Kathryn Graddy) "Anatomy of the Rise and Fall of a Price-Fixing Conspiracy: Auctions at Sotheby's and Christies'" *Journal of Competition Law & Economics*, vol. 1, no. 1, March 2005.

(with David Ashmore and Olivier Deschenes) "Do Unemployment Insurance Recipients Actively Seek Work? Evidence From Randomized Trials in Four U.S. States," *Journal of Econometrics,* vol. 125, no. 1, March 2005.

(with Junsen Zhang) "Introduction: The Chinese Labor Market: New Quantitative Studies," *Pacific Economic Review*, vol. 9, no. 3, October 2004.

(with Michael Greenstone), "Estimating the Value of a Statistical Life: The Importance of Omitted Variables and Publication Bias," *American Economic Association Papers and Proceedings*, vol. 94, no. 2, May 2004.

(with Michael Greenstone) "Using Mandated Speed Limits to Measure the Value of a Statistical Life," *Journal of Political Economy*, vol. 112, no. S1, February 2004.

(with Kathryn Graddy) "Auctions and the Price of Art," *Journal of Economic Literature*, vol. 41, no. 3, September 2003.

(with Victor Ginsburgh) "Economists Argue the Payments Are Unfair," *The Art Newspaper*, October 2003.

"Art Auctions," in *Handbook of Cultural Economics*, edited by Ruth Towse (Edward Elgar Publishers: Cheltenham, UK) May 2003.

(with David Card) "Did the Elimination of Mandatory Retirement Affect Faculty Retirement Flows?" *American Economic Review*, vol. 92, no. 4, September 2002.

"Comment on the Age Discrimination Example," *Jurimetrics Journal,* vol. 42, Spring 2002.

(with John Abowd) "Using Price Indices and Sale Rates to Assess Short Run Changes in the Market for Impressionist and Contemporary Paintings," in *The Economics of Art Auctions*, Edited by G. Mosetto and M. Vecco, (Milan: F. Angeli Press, 2002).

"Economics Overview," in *International Encyclopedia of Economics*, (Oxford, UK: Elsevier Science Ltd., December 2001).

(with Alessandro Corsi) "Predicting Italian Wines Quality From Weather Data and Expert 'Ratings'," *Cahier Scientifique de 'Observatoire des Conjonctures Vincoles Europeenenes*, no. 4, July 2001.

(with Karl Storchmann) "The Quality of Vineyard Sites in the Mosel Valley of Germany," *Cahier Scientifique de 'Observatoire des Conjonctures Vincoles Europeenenes*, no. 4, July 2001.

(with Dean Hyslop) "Measuring the Effect of Arbitration on Wage Levels: The Case of Police Officers," *Industrial and Labor Relations Review*, vol. 54, no. 2, January 2001.

(with Phillip B. Levine) "Unemployment Insurance Appeals in the State of Wisconsin: Who Fights and Who Wins?" *Research in*

*Employment Policy*, vol. 2, 2000; *Long-Term Unemployment and Reemployment Policies*, Volume 2, edited by Laurie J. Bassi and Stephen Woodbury, (Stamford, CT: JAI Press.)

"Liquid Assets," *Optimus: The Magazine for the Private Investor,* vol. 2, 2000.

(with Gregory Jones) "The Demand for Expert Opinions: Bordeaux Wine," *Cahier Scientifique de 'Observatoire des Conjonctures Vincoles Europeenenes*, no. 3, March 2000.

"Orley Ashenfelter," in *Exemplary Economists*, Volume 1, edited by Roger E. Backhouse and Roger Middleton, (Cheltenham, United Kingdom: Edward Elgar Publishing, Ltd. 2000).

(with Cecilia Rouse) "Schooling, Intelligence, and Income in America: Cracks in the Bell Curve," *Meritocracy and Inequality*, edited by Kenneth Arrow, Steven Durlauf, and Samuel Bowles, (Princeton, NJ: Princeton University Press, 2000).

(with Colm Harmon and Hessel Oosterbeek) "A Review of Estimates of the Schooling/Earnings Relationship, with Tests for Publication Bias," *Labour Economics*, vol. 6, 1999.

"Paul Samuelson Teaching Federal Judges," *Journal of Economics Education,* vol. 30, no.4, Fall 1999.

(with Richard E. Quandt) "Analyzing a Wine Tasting Statistically (Wherein we rigorously analyze the famous 1976 Paris Taste off!)," *Chance*, vol. 12, no. 3, Summer 1999.

"Arbitration," in *The New Palgrave Dictionary of Economics and the Law*, edited by Peter Newman, (London, United Kingdom: Macmillian Reference Ltd., 1998).

(with Cecilia Rouse) "Income, Schooling and Ability: Evidence From A New Sample of Identical Twins," *The Quarterly Journal of Economics,* vol. 113, no. 1, February 1998, reprinted in *Income Distribution*, edited by Michael Sattinger, (Cheltenham, England: Edward Elgar Publishing Ltd., 2001).

(with David Ashmore and Randall Filer) "Contract Form and Procurement Costs: The Impact of Compulsory Multiple Contractor Laws in Construction," *Rand Journal of Economics*, vol. 28, no. 0, 1997, S5-S16.

(with David Zimmerman) "Estimates of the Returns to Schooling From Sibling Data: Fathers, Sons, Brothers," *The Review of Economics and Statistics*, vol. 79, no. 1, February 1997.

(with Robert LaLonde) "The Economics of Training," in *The Human Resource Management Handbook,* edited by David Lewin, Daniel Mitchell, and Mahmood Zaidi, (JAI Press, 1997).

(with Kevin Hallock) "Bibliography," in *Labor Market Discrimination, Labor Mobility, and Compensating Wage Differentials: Labor Economics,* Volume IV, (Cheltenham, England: Edward Elgar Publishing Ltd., 1995).

(with David Ashmore and Robert LaLonde) "Wine Vintage Quality and the Weather: Bordeaux," *Chance,* Fall 1995.

(with Theodore Eisenberg and Stewart Schwab) "Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes," *Journal of Legal Studies*, vol. 24, no. 2, June 1995.

(with Ray Byron) "Predicting the Quality of the Unborn Grange," *The Economic Record*, Australia, vol. 71, no. 212, March 1995: 40-53.

(with Alan Krueger) "Estimates of the Economic Return to Schooling From A New Sample of Twins*," American Economic Review*, vol. 84, no. 5, December 1994. Reprinted in SAGE Benchmarks in Social Research Methods

"Have We Underinvested in Education?," *The Changing Distribution of Income in an Open U.S. Economy*, edited by Jeffrey Bergstrand, Thomas Cosimano, John Houck and Richard Sheehan, (North- Holland Publishing, 1994).

"How Convincing is the Evidence Linking Education and Income?" *Labour Economics and Productivity*, vol. 6, (1994) pp. 1-12. In Australia's Economy in its International Context, Volume 2 1950- 2001, edited by Kym Anderson, (Adelaide, Australia: Centre for International Economic Studies, 2001), 366-374.

(with Janet Currie, Henry S. Farber and Matthew Spiegel) "An Experimental Comparison of Dispute Rates in Alternative Arbitration Systems," *Econometrica*, vol. 60, no. 6, November 1992: 1407-1433.

(with David Genesove) "Testing For Price Anomalies in Real Estate Auctions," *American Economic Review*, vol. 82, no. 2, May 1992, 501-505.

(with Ronald L. Oaxaca) "Labor Market Discrimination and Economic Development," in *Unfair Advantage Labor Market Discrimination in Developing Countries*, edited by Nancy Birdsall and Richard Sabot, (Washington, DC: The World Bank, 1991): 35-53.

(with Janet Currie) "Negotiator Behavior and the Occurrence of Disputes," *American Economic Review*, vol. 80, no. 2, May 1990: 416-20.

"Albert Rees: Teacher, Scholar, Public Servant," *Journal of Labor Economics,* vol. 8, no. 2, Part 2, January 1990, S1-S3.

(with Mark W. Plant) "Non-Parametric Estimates of the Labor Supply Effects of Negative Income Tax Programs," *Journal of Labor Economics*, vol. 8, no. 1, Part 2, January 1990.

"Evidence on U.S. Experiences with Dispute Resolution Systems," in *Organized Labor at the Crossroads*, edited by Wei-Chiao Huang, (Kalamazoo, Michigan: W.E. Upjohn Institute, 1989).

"How Auctions Work for Wine and Art," *Journal of Economic Perspectives,* vol. 3, no.3, Summer 1989, 23-36.

(with Ronald Oaxaca) "The Economics of Discrimination: Economists Enter the Courtroom," *American Economic Review*, vol. 77, no. 2, May 1987, 321-25.

"The Case for Evaluating Training Programs with Randomized Trials," *Economics of Education Review*, vol. 6, no. 4, 1987, 333-338.

"Arbitration and Negotiation Process," *American Economic Review*, vol. 77, no. 2, May 1987, 342-46.

(with D. Sullivan) "Nonparametric Tests of Market Structure: An Application to the Cigarette Industry," *Journal of Industrial Economics*, vol. 35, no. 4, June 1987, 483-98.

(with T. Hannan) "Sex Discrimination and Market Concentration: The Case of the Banking Industry," *Quarterly Journal of Economics,* vol. C1, Issue 1, February 1986, 149-73.

(with J. Brown) "Testing the Efficiency of Employment Contracts," *Journal of Political Economy*, vol. 94, no. 3, 1986, S40-S87.

(with D. Card) "Why Have Unemployment Rates in Canada and the United States Diverged?" *Economica*, vol. 53, 1986, S171-S195.

(with D. Card) "Using the Longitudinal Structure of Earnings to Estimate the Effect of Training Programs," *Review of Economics and Statistics,* vol. 67, no. 4, 1985, 648-60.

"Macroeconomic Analyses and Microeconomic Analyses of Labor Supply," *Carnegie-Rochester Conference Series on Public Policy*, vol. 21, 1984, 117-56.

(with D. Bloom) "Models of Arbitrator Behavior: Theory and Evidence," *American Economic Review*, vol. 74, no. 1, March 1984, 111-24.

(with D. Bloom) "The Pitfalls in Judging Arbitrator Impartiality by Win-Loss Tallies Under Final Offer Arbitration," *Labor Law Journal,* vol. 34, no. 8, August 1983, 534-39; reprinted in Proceedings of the 1983 Spring Meeting of the Industrial Relations Research Association.

"Determining Participation in Income-Tested Social Programs," *Journal of the American Statistical Association*, vol. 78, no. 383 Evaluation Studies Review Annual, vol. 10, 1985.September 1983, 517-25, reprinted in L. Aiken and B. Kehrer,

(with J. Abowd), "Compensating Wage and Earnings Differentials for Employer Determined Hours of Work," August, 1983.

(with R. Layard) "Incomes Policy and Wage Differentials," *Economica*, vol. 50 May 1983, 127-43.

"The Withering Away of a Full Employment Goal," *Canadian Public Policy*, vol. 9, no. 1, March 1983, 114-25.

(with D. Card) "Time-Series Representation of Economic Variables and Alternative Models of the Labor Market," *Review of Economic Studies,* vol. 49, Special Issue, 1982, 761-81; reprinted in *Foundations of Probability, Econometrics and Economic Games*, edited by Omar F. Hamouda and J. C. Rowley.

(with G. Solon) "Employment Statistics: The Interaction of Economics and Policy," *The American Economic Review*, vol. 77, no. 2, May 1982, 233-236.

(with G. Solon) "Longitudinal Labor Market Data: Sources, Uses and Limitations," in *What's Happening to American Labor Force and Productivity Measurements?*, National Council on Employment Policy, 1982; revised as Industrial Relations Section Working Paper No. 155, September 1982.

"The Economic Impact of an Older Population: A Brief Survey," in *Aging: A Challenge to Science and Society, vol. 2 of Medicine and Social Science*, (Oxford: Oxford University Press, 1981): 333-40.

(with J. Abowd) "Anticipated Unemployment, Temporary Layoffs, and Compensating Wage Differentials," in *Studies in Labor Markets*, edited by Sherwin Rosen, (Chicago: University of Chicago Press for the National Bureau of Economic Research, 1981), 141-70.

(with J. Altonji) "Wage Movements and the Labour Market Equilibrium Hypothesis," *Economica*, vol. 47, no. 187, August 198:
217-45.

"Commentary on Firm Size, Market Structure and Worker Satisfaction," in *The Economics of Firm Size, Market Structure and Social Performance*, edited by J. Siegfried, 1980.

"Unemployment as Disequilibrium in a Model of Aggregate Labor Supply," *Econometrica*, vol. 48, no. 3, April 1980, 217-245.

"Estimating the Effect of Training Programs on Earnings," *Review of Economics and Statistics*, vol. 60, no. 1, February 1978, 47-57; reprinted in *Evaluating Manpower Training Programs,* edited by F.

Bloch, 1979; and in *Evaluation Studies Review Annual*. vol. 5 edited by Stromsdorfer and Farkus, 1980.

(with J. Ham) "Education, Unemployment and Earnings," *Journal of Political Economy*, vol. 87, no. 51, October 1979, S99-S116.

(with M. Abbott) "Labour Supply, Commodity Demand, and the Allocation of Time Correction," *Review of Economic Studies*, vol. 46, July 1979, 576-79.

(with R. Smith) "Compliance with the Minimum Wage Law," *Journal of Political Economy*, vol. 87, no. 21, April 1979, 330-50.

"What Do Teenage Unemployment Statistics Measure?" Supplementary Papers from the Conference on Youth Unemployment: Its Measurement and Meaning, Washington, DC: US Government Printing Office, October 1978, 37-55.

"Current European Manpower Policies, July 1978" and "Some Highlights of Papers from the Conference on European Manpower Policies," in *European Labor Market Policies*, National Commission for Manpower Policy, Special Report No. 27, September 1978, 5-26.

"What is Involuntary Unemployment?" in *Proceedings of the American Philosophical Society*, vol. 122, no. 3 June 1978, 135-38.

Union Relative Wage Effects: New Evidence and a Survey of Their Implications for Wage Inflation," in *Econometric Contributions to Public Policy,* edited by R. Stone and W. Peterson, (New York: St. Martins Press, 1978), 31-63.

"Evaluating the Effects of the Employment Tax Credit," in Conference Report on Evaluating the 1977 Economic Stimulus Package, (Washington, DC: US Government Printing Office, 1978).

"The Labor Supply Response of Wage Earners," in *Welfare in Rural Areas: North Carolina-Iowa Income Maintenance Experiment,* edited by J. Palmer and J. A. Pechman, (Washington: Brookings Institution, 1978), 109-48.

"Unemployment as a Constraint on Labor Market Behavior," in *Contemporary Economic Analysis*, edited by M. J. Artis and A. R. Nobay, (London: Croon Helm for the Association of University Teachers of Economics, 1978), 149-81.

"Demand and Supply Functions for State and Local Employment: Implications for Public Employment Programs," in Essays in Labor Market Analysis. *In Memory of Yochanan Peter Comay*, edited by O. Ashenfelter and W. Oates, (New York: John Wiley & Sons, 1978), 1- 16.

"Will the Real Conventional Theory of Income Distribution Please Stand Up?" *Social Science Quarterly*, vol. 58, no. 1, June 1977, 147-50.

"Comments on 'Black/White Male Earnings and Employment," in *The Distribution of Economic Well-Being*, edited by F. T. Juster, (Cambridge, MA: Ballinger Publishing Co. for the National Bureau of Economic Research, 1977), 296-98.

(with M. Abbott) "Labour Supply, Commodity Demand, and the Allocation of Time," *Review of Economic Studies*, vol. 43, October 1976, 389-411.

Comment on "Does the Contract Compliance Program Work?" in *Industrial and Labor Relations Review*, vol. 29, no. 4, July 1976, 577-80.

(with J. Pencavel) "A Note on Measuring the Relationship Between Changes in Earnings and Changes in Wage Rates," *British Journal of Industrial Relations*, vol. 14, no. 1, March 1976, 70-76.

"Notes on the Interpretation of Urban Density Functions," *The Journal of Urban Economics*, vol. 3, January 1976, 82-87.

(with J. Heckman), "Measuring the Effect of an Antidiscrimination Program," in *Evaluating the Labor Market Effects of Social Programs*, edited by O. Ashenfelter and J. Blum, (Princeton, NJ: Princeton University Press, 1976), 46-89.

(with J. Pencavel) "Estimating the Effects on Cost and Price of the Elimination of Sex Discrimination: The Case of Telephone Rates," in *Some New Perspectives on Equal Employment Opportunity: The A.T. & T. Case*, edited by Phyllis Wallace, (Cambridge, MA: MIT Press, 1976), 111-22.

(with S. Kelley) "Determinants of Participation in Presidential Elections," *Journal of Law and Economics*, vol.18, no. 3, December 1975, 695-733.

(with J. Pencavel) "Wage Changes and the Frequency of Wage Settlements," *Economica*, May 1975, 162-70.

"The Effect of Manpower Training on Earnings: Preliminary Results," Proceedings of the 27th Annual Meeting of the Industrial

Relations Research Association, 1974, reprinted in *Monthly Labor Review*, April 1975.

(with R. Ehrenberg) "The Demand for Labor in the Public Sector," in *Labor in the Public and Nonprofit Sectors*, edited by D. Hamermesh, (Princeton, NJ: Princeton University Press, 1975), pp. 55-84; condensed and reprinted in *Public Sector Labor Relations: Analysis and Readings,* edited by D. Lewin, et al., (Glen Ridge, NJ: Thomas Horton and Daughters. 1977), 30-36.

"Blacks and Trade Unionism," Integrateducation, May-June 1975: 53-59; from a transcript of Hearings before the New York Commission on Human Rights, May 1974.

"Comments on 'Labor Market Discrimination: Analysis, Findings, and Problems,'" in Volume 2 of *Frontiers of Quantitative Economics*, edited by M. Intriligator and D. Kendrick, (Amsterdam: North Holland Press, 1974), 556-59.

(with J. Heckman) "The Estimation of Income and Substitution Effects in a Model of Family Labor Supply," *Econometrica*, vol. 42, no. 1, January 1974, 73-85.

"Comment on 'Child Quality and the Demand for Children,'" *Journal of Political Economy*, vol. 81, no. 2, March-April 1973, pp. S96-S98; reprinted in *Economics of the Family*, edited by T. W. Schultz, 1974.

"Discrimination and Trade Unions," in *Discrimination in Labor Markets*, edited by O. Ashenfelter and A. Rees, (Princeton, NJ: Princeton University Press, 1973), 88-112; reprinted in Readings in Labor Economics and Labor Relations, edited by Reynolds, Masters and Moser, 1974, 432-443.

(with J. Heckman) "Estimating Labor Supply Functions," in *Income Maintenance and Labor Supply*, edited by G. Cain and H. Watts, (Madison, WI: University of Wisconsin Institute on Poverty Research, 1973, 265-78.

(with J. Pencavel) "American Trade Union Growth, 1900-1960: A Rejoiner," *Quarterly Journal of Economics*, vol. 86, no. 4, November 1972, 691-2.

(with G.E. Johnson) "Unionism, Relative Wages, and Labor Quality in U.S. Manufacturing Industries," *International Economic Review,* vol. 13, no.3, October 1972, 488-508.

"Racial Discrimination and Trade Unionism," *Journal of Political Economy,* vol. 8, no. 3, May-June 1972, 435-64.

(with G.E. Johnson and J. H. Pencavel) "Trade Unions and the Rate of Change of Money Wages in U.S. Manufacturing," *The Review of Economic Studies*, vol. 39, no. 1, January 1972, 27-54.

(with L. Godwin) "Some Evidence on the Effect of Unionism on the Average Wage of Black Workers Relative to White Workers, 1900- 1967," Proceedings of the 24th Annual Winter Meeting of the Industrial Relations Research Association, 1971, 217-24.

(with M.K. Taussig) "Discrimination and Income Differentials: Comment," *American Economic Review*, vol. 61, no. 4, September 1971, 746-50.

"The Effect of Unionization on Wages in the Public Sector: The Case of Fire Fighters," *Industrial and Labor Relations Review*, vol. 24, no. 2, January 1971, 191-202.

"Changes in Labor Market Discrimination Over Time," *The Journal of Human Resources,* vol. 5, no. 4, Fall 1970, 403-30.

(with J. H. Pencavel) "American Trade Union Growth," *Quarterly Journal of Economics*, vol. 83, August 1969, 434-48.

(with G.E. Johnson) "Bargaining Theory, Trade Union, and Industrial Strike Activity," *American Economic Review*, vol. 59, no. 1, March 1969, 35-49; reprinted in Bobbs-Merril Reprint Series in *Economics*.

"Some Statistical Difficulties in Using Dummy Dependent Variables," Appendix A in *The Economics of Labor Force Participation,* edited by W.G. Bowen and T.A. Finegan, (Princeton, NJ: Princeton University Press, 1969), 644-48.

(with J.D. Mooney) "Some Evidence on the Private Returns to Graduate Education," *Southern Economic Journal*, vol. 35, no. 3, January 1968, 247-56, reprinted in *Human Capital Formation and Manpower Development,* edited by R. Wykstra, 1971.

(with J.D. Mooney) "Graduate Education, Ability and Earnings," *Review of Economics and Statistics*, vol. 50, no. 1, February 1968, 78-86.

(with Wm. Pierce) "Industrial Conflict: The Power of Prediction," *Industrial and Labor Relations Review*, vol. 20, October 1966, 92-95.

BOOKS EDITED:

Ashenfelter, O., Gergaud, O., Storchmann, K. and Ziemba, W. (eds.) World Scentific *Handbook of Wine Economics*, Volumes I & II, (World Scientific Publishing Co. Pte. Ltd., 2018)

(with David Card) *Handbook of Labor Economics*, Volume IV A & B, (Elsevier Science, North Holland, 2010).

(with Radha Iyengar) "Economics of Commercial Arbitration and Dispute Resolution", 2009, pp. ix-xv, An Elgar Reference Collection. Economic Approaches to Law, vol. 21. Cheltenham, U.K. and Northampton, Mass.: Elgar

(with D. Card) *Handbook of Labor Economics*, Volumes I - III, (Elsevier Science, North Holland, 1999).

*Worth Series in Outstanding Contributions: Labor Economics*, (Worth Publishing Inc., New York, NY, 1999).

(with R. LaLonde) *The Economics of Training I and II*, (Edward Elgar Publishing Limited, Cheltenham, England, 1996).

(with Kevin Hallock) *Labor Economics, Volumes I - IV*, (Edward Elgar Publishing Limited, Cheltenham, England, 1995).
Volume I         -- Labor Supply and Demand
Volume II        -- Employment, Wages, and Education
Volume III       -- Unemployment, Trade Unions, and Dispute
                            Resolution
Volume IV       -- Labor Market Discrimination, Labor Mobility,
                       and Compensating Wage

"Discussion," in *Lessons From the Income Maintenance Experiments,* edited by A. H. Munnel, (Federal Reserve Bank of Washington and Brookings Institution, 1986).

(with L. J. Bassi) "The Effect of Direct Job Creation and Training Programs on Low Skilled Workers," in *Fighting Poverty: What Works and What Doesn't,* S. H. Danzinger and D. H. Weinberg, (Cambridge, MA: Harvard University Press, 1986), 133-51.

(with R. Layard) *Handbook of Labor Economics*, 2 Volumes, (Amsterdam: North Holland Press, 1986). Translated to Spanish.

(with W. Oates) *Essays in Labor Market Analysis. In Memory of Yochanan Peter Comay*. (New York: John Wiley & Sons for Halsted Press, 1978).

(with L. Hausman, B. Rustin, R. Schubert and D. Slaiman) *Equal Rights and Industrial Relations*. (Industrial Relations Research Association, 1977).

(with J. Blum) *Evaluating the Labor Market Effects of Social Programs*. (Princeton, NJ: Princeton University Industrial Relations Section, 1976).

(with W.G. Bowen) *Labor and the National Economy*. Revised edition, (New York: W.W. Norton, 1975).

(with A. Rees) *Discrimination in Labor Markets*. (Princeton, NJ: Princeton University Press).


BOOKS REVIEWED

Review of *The City of Vines: The History of Wine in Los Angeles* by Thomas Pinney, *Journal of Wine Economics,* Volume 15, Issue 4, November 2020, published online by Cambridge University Press January 5, 2021.

Review of *Wine Grape Varieties for New Jersey* by Lawrence Coia and Daniel Ward, *Journal of Wine Economics,* Volume 15, No 1, 2020.

"Economic history or history of economics?" *Review of Grand Pursuit: The Story of Economic Genius*, Center for Economic Policy Studies, Working Papers: 1365. Journal of Economic Literature, March 2012, 50(1), 96-102.

Review of *Last Call: The Rise and Fall of Prohibition* by Daniel Okrent, *Journal of Wine Economics*, Volume 5, Issue 2, Pages 339–347. Also Barron's October 4, 2010, 90(40), 40-40.

Review of *In Search of Bacchus* by George M. Taber, *Barron's* October 5, 2009, 89(40), 40-40.

Review of *The Billionaire's Vinegar* by Benjamin Wallace, *Barron's* July 7, 2008.

Review of *Wine into Words: A History and Bibliography of Wine Books in the English Language* by James M. Gabler, *Journal of Wine Economics,* vol. 2, no. 2, (Fall 2007), 213-225

Review of *Judgment of Paris* by George Taber, *Barron's* September 5, 2005.

Review of *Hollywood Economics* by Arthur DeVany. *Barron's* December 6, 2004.

Review of *The Far Side of Eden* by James Conaway. *Barron's* May 11, 2003.

Review of *The Future of Success* by Robert B. Reich. *Financial Times* (London), February 27, 2001.

Review of *The National Supported Work Demonstration* by R. Hollister, et al. *Journal of Economic Literature*, 24 (September 1986), 1268-70.

Review of *Dangerous Currents* by L. Thurow. *National Review* (April 6, 1984), 53-55.

Review of *Jobs for Disadvantaged Workers: The Economics of Employment Subsidies* by R. Haveman and J.L. Palmer. *Journal of Economic Literature*, 21 (September 1983), 1039-41.

Review of *Collective Bargaining and Industrial Relations* by T.A. Kochan. *Industrial Relations*, 21, (Winter 1982), 73-78.

Review of *The Regulatory Process and Labor Earnings* by R. Ehrenberg. *Journal of Political Economy*, 89, (June 1981), 601-03.

Review of *Union Growth and the Business Cycle* by G.S. Bain and F. Elsheikh. *Economica*, 45, (August 1978), 319-320.

Review of *Economic Forecasting* by H. O. Stekler. *Journal of Finance*, 26, (June 1971), 816-17.

Review of S*till a Dream: The Changing Status of Blacks Since 1960* by Sar Levitan, et al. *Monthly Labor Review*, 98 (December 1975), 66-67.

Review of *Patterns of Racial Discrimination* by G. von Furstenburg, et al. *Journal of Economic Literature* (December 1975), 1372-74.

UNPUBLISHED PAPERS:

Public policy and labour market competition, Orley Ashenfelter. Industrial Relations Section Working Paper # 656

(With K. Graddy) "Art Auctions" CEPR Discussion Paper No. DP13665, April 2019.

(with A. Krueger) "Theory and Evidence on Employer Collusion in the Franchise Sector," NBER working paper # 24831, July 2018

(with K. Graddy) "Regularities and Anomalies in Art Auctions" March 2003.

(with K. Graddy and M. Stevens) "A Study of Sale Rates and Prices in Impressionist and Contemporary Art Auctions," October, 2000.

(with S. Jurajda) "Cross-Country Comparisons of Wage Rates: The Big Mac Index," August 2000.

(with C. Rouse) "The Payoff to Education," August 1999.

(with N. Thurston) "Mink Markets: Price Determination, Pre-Sale Valuation and Seller-Specific Effects," Instituto y Universidad Torcuato Di Tella Seminar, September 1998.

(with P. B. Levine and S. Skeath) "Practicing Safe Game Theory: An Empirical Test of a Prisoners' Dilemma in Unemployment Insurance Disputes," July 1998.

(with D. Ashmore, J.B. Baker and S. M. McKernan) "Identifying The Firm-Specific Cost Pass-Through Rate," Federal Trade Commission, Bureau of Economics, Working Paper No. 217.

(with A. Papandreou and N. Papandreou) "Weather and the Quality of the Vintage for Greek Red Wines," October, 1997.

(with K. Graddy) "An Empirical Study of Sale Rates and Prices in Impressionist and Contemporary Art Auctions," August, 1997.

(with J. Dow, D. Gallagher and D. Hyslop) "Arbitrator and Negotiator Behavior Under an Appellate System," August 1997.

(with C. Rouse) "How Convincing Is The Evidence Linking Education and Income?" October, 1995.

(with J. Waldfogel) "Bargaining in the Shadow of the Judge: Empirical Tests," Prepared for the American Association of the Advancement of Science, Boston, February 11-16, 1993.

(with J. Abowd) "Art Auctions: Price Indexes and Sale Rates for Impressionist Paintings," January 1988.

(with D. Card) "Using Longitudinal Data to Estimate Reemployment Effects of the Minimum Wage," Draft, (May, 1981).

"Minority Employment Patterns" 1966, Prepared for the U.S. Equal Employment Opportunity Commission and OMPER of the Department of Labor.

TESTIMONY BEFORE CONGRESS:

Hearings before the Committee on the Budget, House of Representatives, "Outlook and Budget Levels for FY 1979-80," 96th Congress: 645-659.

OTHER ACTIVITIES:

Member, URB Institutional Review Panel for Human

Subjects Committee, July, 2007.

Selection Committee, Frisch Medal, 2004. President, Society of Labor Economists, 2003. Chairman, Frisch Medal Selection Committee, 2003

Advisory Committee of the Center for Arts and Cultural Policy Studies, Princeton University, 2002-

First Vice President, The Society of Labor Economists, 2002.

Associate Editor, *Journal of Population Economics*, 2001-

Member, Executive and Supervisory Committee, CERGE/EI, Charles University, Prague, Czech Republic, 2001- 2007.

Advisory, Job Opportunity Index National Advisory Board, 2001 – 2003.

Second Vice President, The Society of Labor Economists, 2001

Member, Editorial Board, *Contemporary Economic Policy*, 2000- 2001.

Member, Advisory Board, Stanford Institute for Economic Policy Research, 1999 -

Member, Center for Law and Public Affairs, 1999 -

Board Member, American Foundation for the Center for Graduate Education/Economics Institute of the Charles University, Prague, Czech Republic, 1999 – Chairman, 1999-2006.

Member, Board of Editors, *Australian Economic Review* 1997 -

Member, Board of Trustees, Center for Advanced Study in the Behavioral Sciences, Stanford University, 1994-2000.

Member, Committee on Fellowships and Special Projects, Center for Advanced Study in the Behavioral Sciences, Stanford University, 1994-2000.

Member, Board of Directors, American Law and Economics Association, 1994 – 1996.

Faculty Member, Law and Economics Center, George Mason University, Advanced Course for Federal Judges on Statistics, Econometrics, and Financial Data, 1979-

Faculty Member, Law and Economics Center, George Mason University, Economics Institute for Federal Judges, 1982 -

Faculty Member, "Statistics and Expert Testimony," The Federal Judicial Center, 1985.

Faculty Member, "Economics and Expert Testimony," The Federal Judicial Center, 1984.

Benjamin Meeker Visiting Professor, University of Bristol, 1981.

Visiting Scholar, Federal Reserve Bank of Philadelphia, 1979-80.

Recipient of the Ragnar Frisch Prize of the Econometric Society, 1984.

Member, Board of Editors, *Journal of Labor Economics*, 1983-2008

Member, Board of Editors, *Pakistan Development Review*, 1981-1985.

Member, Board of Editors, *Journal of Labor Research*, 1980-89.

Member, Board of Editors, *Journal of Urban Economics*, 1974-1978.

Member, Advisory Board, *Ricerche Economiche: An International Review of Economics*, 1992 – 1993.

Member, Advisory Board, Labour Economics: *An International Journal*, 1992-1997.

Member, Advisory Council of the Cornell Institute for Labor Market Policies, 1991- 2000.

Member, Advisory Board, Center for Economic Policy Research, Stanford University, 1984-1999.

Member, Executive Committee, Conference on Research in Income and Wealth, National Bureau of Economic Research, 1982-1989.

Member, Macro Advisory Panel, National Commission for Employment Policy, 1980-81.

Member, Advisory Board, Institute of Labor Management Relations, Rutgers University, 1979-2001.

Member, Advisory Panel of the American Economic Association to the National Commission on Employment and Unemployment Statistics, 1978-81.

Member, Panel of Statisticians for the National Commission on Employment and Unemployment Statistics, 1977-81.

Fellow, Econometric Society, 1977.

Guggenheim Fellowship, 1976-77.

Orley C. Ashenfelter

Sworn Testimony in the Past Four Years                    November 2024

Confidential Ad Hoc Arbitration Under JAMS Rules

Retained by: Paul Weiss

Deposition: August, 2021

FTC et al. v. Kroger and Albertsons

Testimony: Economic and statistical analysis of the impact of a proposed merger on unionized grocery store labor

Jurisdiction: District of Oregon

Caption: Case No.: 3:24-cv-00347

Retained by: Federal Trade Commission

Deposition: August 2024

Hearing: September 2024

# APPENDIX B

# Documents Relied Upon

**Legal Filings**

*Colon v. NCAA, No.* 1:23-cv-00425-WBS-KJ Second Amended Class Action Complaint

**Bates-Numbered Documents**

COLON_CONFERENCE_0000003058
COLON_CONFERENCE_0000101686
COLON_CONFERENCE_0000206202
COLON_CONFERENCE_0000209031
COLON_SCHLS_0000016398
NCAA_SMART-COLON_0000001 (2020-2021 NCAA Division I Manual)
NCAA_SMART-COLON_0001396 (2023-2024 NCAA Division I Manual)
NCAA_SMART-COLON_0019078
NCAA_SMART-COLON_0019352
NCAA_SMART-COLON_0019450
NCAA_SMART-COLON_0020323
NCAA_SMART-COLON_0020631
NCAA_SMART-COLON_0020637
NCAA_SMART-COLON_0020925
NCAA_SMART-COLON_0021507
NCAA_SMART-COLON_0021762
NCAA_SMART-COLON_0022783
NCAA_SMART-COLON_0023825
NCAA_SMART-COLON_0027251
NCAA_SMART-COLON_0027589
NCAA_SMART-COLON_0027843
NCAA_SMART-COLON_0028382
NCAA_SMART-COLON_0140536
NCAA_SMART-COLON_0141887
NCAA_SMART-COLON_0143283
NCAA_SMART-COLON_0145784
NCAA_SMART-COLON_0145841
NCAA_SMART-COLON_0145848
NCAA_SMART-COLON_0145857
NCAA_SMART-COLON_0145980
NCAA_SMART-COLON_0146006
NCAA_SMART-COLON_0146011
NCAA_SMART-COLON_0146038
NCAA_SMART-COLON_0146466
SEC_COLONSMART0006211
SEC_COLONSMART0010458
UF 002788

UF 003863
UF 004035

**Deposition Transcripts:**

Deposition of Lynda Tealer, October 10, 2024
Deposition of Mario Morris as 30(b)(6) Corporate Representative of NCAA, September 12, 2024

**Websites**

https://www.atg.wa.gov/news/news-releases/ag-report-ferguson-s-initiative-ends-no-poach-practices-nationally-237-corporate

https://www.bls.gov/news.release/pdf/ecec.pdf

https://www.ncaa.org/sports/2021/2/16/overview.aspx

https://www.ncaa.org/sports/2019/11/12/finances-of-intercollegiate-athletics-database.aspx

https://www.ncaa.org/sports/2013/11/27/enforcement-process-penalties.aspx

http://ncaa.s3.amazonaws.com/files/apps/ipp/resources/CaseStudies_FiscalManagement.pdf

https://ncaaorg.s3.amazonaws.com/research/demographics/2017RES_institutionalcharacteristics.pdf

**Academic Literature**

ABA Section of Antitrust Law, *Econometrics*, 2nd ed., 2014, p. 317

Areeda, Phillip E., et al. *Antitrust Law: An Analysis of Antitrust Principles and Their Application.* 1996. 2003. pp. 267, 325–28, ¶ 1758b

Areeda, Phillip, et al. *Antitrust Analysis: Problems, Text and Cases.* 6th ed., 2004, ¶ 344

Armen Alchian, "Information Costs, Pricing, and Resource Unemployment." Western Economic Journal. (1969) pp. 109-128.

Baker, Jonathan and Bresnahan, Timothy F., *Economic Evidence in Antitrust: Defining Markets and Measuring Market Powe*r, Handbook of Antitrust Economics, ed., 2007, p.15.

Card, David, et al. "Inequality at Work: The Effect of Peer Salaries on Job Satisfaction." American Economics Review, vol. 102, no. 6, Oct. 2012, pp. 2981–3003.

Carlton, Dennis W, and Jeffrey M Perloff. *Modern Industrial Organization*. 2nd ed., 1994, p. 153.

Carrell, Michael R., and John E. Dittrich. "Equity Theory: The Recent Literature, Methodological Considerations, and New Directions." The Academy of Management Review, vol. 3, no. 2, Apr. 1978, pp. 202–210, p. 203

Dulebohn, James H., and Stephen E. Werling. "Compensation Research Past, Present, and Future." Human Resource Management Review. vol. 17, no. 2, June 2007, pp. 191-207.

 Edlin, Aaron S. and Daniel L. Rubinfeld, "Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals." Antitrust Law Journal, vol. 72, no. 1, 2004, pp. 119, 126.

Erickson, W. Bruce. "Price Fixing Conspiracies: Their Long-Term Impact." The Journal of Industrial Economics, Mar.,1977. vol 24, no. 3 pp. 189-202, p. 201

Finkelstein, M. O. and Levenbach, H., "Regression Estimates of Damages in. Fixing Cases." Law and Contemporary Problems, no. 46, pp. 145-169

Handbook of Antitrust Economics ed., 2007, p.15

Harrington, Joseph E. (2004) "Post-Cartel Pricing During Litigation." The Journal of Industrial Economics. vol. LII, no. 4, pp. 517-533.

Harrington, Joseph E., Jr. "Competitor Coupons: A Remedy for Residual Collusion." Journal of Competition Law & Economics (2023).  vol. 19, pp. 610-627

Lebow, David E., et al. "Downward Nominal Wage Rigidity: Evidence from the Employment Cost Index." Advances in Macroeconomics, vol. 3, no. 1,2 Jan. 2003at pp. 10–13.

Levenstein, Margaret C., and Valerie Y. Suslow. "Cartel Bargaining and Monitoring: The Role of Information Sharing." The Pros and Cons of Information Sharing, 2006

Posner, Eric A. *How Antitrust Failed Workers*. Oxford University Press. 2021.

Torre, Edoardo Della, et al. "Internal and External Equity in Compensation Systems, Organizational Absenteeism and the Role of Explained Inequalities." Human Relations, vol. 68, no. 3, 11 June 2014, pp. 409–440

Since filing my corrected report on November 6, 2024, I have made corrections to my report, none of which change my conclusions.  In particular, I have made the following corrections:

1. Corrected identification of combined programs
2. Included Division I programs at non-Division I schools
3. Removed non-Division I program-years
4. Categorized "rifle" programs as co-educational
5. Corrected errors in college names
6. Corrected gender coding for track and field at University of Arkansas, Pine Bluff
7. Corrected sport names in mapping file

These errata are summarized in the following table, and a corrected report is attached.

| Location | Original Text | New Text |
|---|---|---|
| Paragraph 61 | Through this process, to date, I have received and processed data from 243 schools, schools, of which, to date, 176 schools provided usable data from the post-conspiracy period. Of these, I include data from 84 schools in my regression analysis. These schools must have expanded at least one program's coaching staff beyond the caps on unrestricted coaches present during the conspiracy period. These represent 243 sport programs and 1,506 coach-years. | Through this process, to date, I have received and processed data from 243 schools, of which, to date, 175 schools provided usable data from the post-conspiracy period. Of these, I include data from 85 schools in my regression analysis. These schools must have expanded at least one program's coaching staff beyond the caps on unrestricted coaches present during the conspiracy period. These represent 251 sport programs and 1,522 coach-years. |
| Table 4 | | Replaced entire Table |
| Paragraph 63 | Based on my analysis of the schools from which I have received and | Based on my analysis of the schools from which I have received and |

| Location | Original Text | New Text |
|---|---|---|
| | processed data, there were approximately 4,272 individuals subject to the Volunteer Coach Rule (excluding those individuals who were exclusively engaged in coaching baseball) from March 17, 2019 through July 1, 2023. If I extrapolate this number to the remainder of the NCAA Division I schools, I estimate that there were approximately 6,730 individuals subject to the Volunteer Coach Rule during the same period. | processed data, there were approximately 4,159 individuals subject to the Volunteer Coach Rule (excluding those individuals who were exclusively engaged in coaching baseball) from March 17, 2019 through July 1, 2023. If I extrapolate this number to the remainder of the NCAA Division I schools, I estimate that there were approximately 6,613 individuals subject to the Volunteer Coach Rule during the same period. |
| Paragraph 66, bullet 1 | Three coaches: women's bowling, women's beach volleyball, men's or women's cross country, men's or women's fencing, men's or women's golf, men's or women's rifle; men's or women's skiing, men's or women's swimming, men's or women's tennis, women's triathlon | Three coaches: women's bowling, women's beach volleyball, men's or women's cross country, men's or women's fencing, men's or women's golf, rifle; men's or women's skiing, men's or women's swimming, men's or women's tennis, women's triathlon |

| Location | Original Text | New Text |
|---|---|---|
| Paragraph 66, bullet 4 | Six coaches: combined fencing; combined golf; combined rifle; combined skiing; combined swimming; combined tennis; men's or women's track and field/cross country | Six coaches: combined fencing; combined golf; combined skiing; combined swimming; combined tennis; men's or women's track and field/cross country |
| Paragraph 66, bullet 5 | Eight coaches: combined gymnastics; combined ice hockey; combined lacrosse; combined soccer; combined swimming & diving; combined track and field; combined water polo; combined volleyball; combined wrestling | Eight coaches: combined swimming & diving; combined track and field; combined water polo |
| Footnote 102 | Here and elsewhere, a "combined' sports program is one in which all coaching staff members in the same sport are involved in practice activities or competition with both the men's and women's team on a daily basis. Combined teams may employ the total number of coaches specified separately for men and for women in that sport. (NCAA_SMART-COLON_0001396 at | Here and elsewhere, a "combined" sports program is one in which all coaching staff members in the same sport are involved in practice activities or competition with both the men's and women's team on a daily basis. Combined teams may employ the total number of coaches specified separately for men and for women in that sport. (NCAA_SMART- |

| Location | Original Text | New Text |
|---|---|---|
| | Rule 11.7.5.1). I identify a program as combined if any of the following three criteria are true in at least one year: (A) The sport name or coach titles indicate the program is "Men's and Women's"; (B) The sport name or coach titles indicate neither "Men's" nor "Women's" in the school data, and both Men's and Women's sport teams are present in the MFRS data; or, (C) There are Men's and Women's programs that have at least one unrestricted coach in common between the Men's and Women's team (Due to lack of consistency in how names are written, as well as ambiguity in exact employment dates, it is impractical to apply a stricter name-matching rule for identifying combined programs). | COLON_0001396 at Rule 11.7.5.1). I first identify a program as potentially combined based on certain conditions (described below) and either the subpoena or MFRS data.  I identify a program as being potentially combined based on the subpoena data if any of the following conditions (A) – (C) are true in any year.  These are (A) The sport name or coach titles indicate the program is "Men's and Women's"; (B) The sport name or coach titles indicate neither "Men's" nor "Women's" in the school data, and both Men's and Women's sport teams are present in the MFRS data; or (C) There are Men's and Women's programs that have at least one unrestricted coach in common between the Men's and Women's team, based on the subpoena data (Due to lack of consistency in how |

| Location | Original Text | New Text |
|---|---|---|
| | | names are written, as well as ambiguity in exact employment dates, it is impractical to apply a stricter name-matching rule for identifying combined programs).  I additionally separately identify potentially combined programs based on three rules based on the MFRS data: (D) The MFRS data indicate that both the men and women's teams are coached by head coaches with identical names for each sport; (E) The MFRS data indicate that the aggregate payroll (summing the head coach pay and total pay for all assistant coaches) for the men and women's teams are within $2 of each other; (F) I also rule out programs as being combined if the men's or women's teams have coaches who are indicated in NCAA_SMART-COLON_0234691 as having "full time duties" for that team.  If the |

| Location | Original Text | New Text |
|---|---|---|
| | | combined status of a team is in agreement under each of these definitions (A, B, or C, plus all of D, E, and F) to the extent definable due to data availability, then I identify the program as being either combined or not combined based on these rules.  For programs for which the combined status of a team is not in agreement under these definitions, a manual analysis of whether a program was combined or not combined was conducted, based on the above criteria and the teams' websites, which list coach rosters for each year. |
| Paragraph 68 | This analysis shows that for programs with 3, 4, 5, 8, 9, or 12 allowable coaches in the post-conspiracy period, the estimated coefficient is statistically significantly different from 0 at the 5% level.[108] Column [4] converts the coefficient in Column [2] into a | This analysis shows that for programs with 3, 4, 5, 9, or 12 allowable coaches in the post-conspiracy period, the estimated coefficient is statistically significantly different from 0 at the 5% level.[108] Column [4] converts the coefficient in Column [2] into a |

| Location | Original Text | New Text |
|---|---|---|
| | percentage difference. For instance, to interpret the number in the first row, if a sport expanded from two to three slots (e.g. tennis), the average relationship between the pay of the lowest paid coach is 47.8% lower than the pay of the second-lowest paid coach. | percentage difference. For instance, to interpret the number in the first row, if a sport expanded from two to three slots (e.g. tennis), the average relationship between the pay of the lowest paid coach is 45% lower than the pay of the second-lowest paid coach. |
| Footnote 108 | The remaining programs (with 6 or 13 allowable coaches in the post-conspiracy period) do not have t-statistics that are statistically significantly different from zero at any conventional level. However, as I continue to receive and process data from schools, it is likely that these t-statistics will increase, as a major contributor to the statistical significance of an estimate is the sample size underlying it. | The remaining programs (with 6, 8, or 13 allowable coaches in the post-conspiracy period) do not have t-statistics that are statistically significantly different from zero at any conventional level. However, as I continue to receive and process data from schools, it is likely that these t-statistics will increase, as a major contributor to the statistical significance of an estimate is the sample size underlying it. |
| Table 5 | | Replaced entire Table |

| Location | Original Text | New Text |
|---|---|---|
| Paragraph 71, bullet 1 | For instance, if a men's lacrosse team has a full complement of coaches (3 unrestricted coaches plus a volunteer coach), and the lowest-paid unrestricted coach receives $80,000, reducing this $80,000 by the relevant stepdown (50.6%) implies a but-for compensation of $39,559. | For instance, if a men's lacrosse team has a full complement of coaches (3 unrestricted coaches plus a volunteer coach), and the lowest-paid unrestricted coach receives $80,000, reducing this $80,000 by the relevant stepdown (50.5%) implies a but-for compensation of $39,600. |
| Footnote 110 | This is calculated as $80,000 x (1-0.506) | This is calculated as $80,000 x (1-0.505) |
| Paragraph 71, bullet 2 | For instance, if a combined (men's and women's) swimming team, which has a "during" period cap of 4 and a "post" period cap of 6, had two unrestricted coaches and a volunteer coach during the conspiracy period (while the cap on unrestricted coaches was 4) and the lowest-earnings coach I observe receives $70,000, taking a "double stepdown" would imply that the but-for pay of the volunteer coach would be | For instance, if a combined (men's and women's) swimming team, which has a "during" period cap of 4 and a "post" period cap of 6, had two unrestricted coaches and a volunteer coach during the conspiracy period (while the cap on unrestricted coaches was 4), the relevant stepdown is 48%, and the lowest-earnings coach I observe receives $70,000, taking a "double stepdown" would imply that the but-for pay of the volunteer coach |

| Location | Original Text | New Text |
|---|---|---|
| | $46,750 which is a reasonable, conservative estimate of but-for pay. | would be about $18,900 which is a reasonable, conservative estimate of but-for pay. |
| Footnote 111 | This is calculated as $70,000 x (1-0.183)^2. | This is calculated as $70,000 x (1-0.48)^2. |

_____
Orley Ashenfelter
November 26, 2024