# EXHIBIT 48

```
 1                UNITED STATES DISTRICT COURT
 2      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3
 4      _____
        TAYLOR SMART AND MICHAEL         )
 5      HACKER, individually and on      )
        behalf of all those similarly    )
 6      situated,                        )
                                         )
 7               Plaintiffs,             )
                                         ) Case No.
 8      vs.                              ) 22-cv-02125-WBS-CSK
                                         )
 9      NATIONAL COLLEGIATE ATHLETIC     )
        ASSOCIATION, an unincorporated   )
10      association,                     )
                                         )
11               Defendant.              )
        _____)
12                                       )
        And Related Actions.             )
13      _____)
14            PORTIONS OF THE TRANSCRIPT HAVE BEEN
15                DESIGNATED AS CONFIDENTIAL
16
17         VIDEOTAPED DEPOSITION OF KHALA TAYLOR
18                   Newark, California
19              Wednesday, October 23, 2024
20                       Volume I
21
22      Reported by:
        CATHERINE A. NOLASCO, RMR, CRR, BS
23      CSR No. 8239
24      Job No. 6932441
25      PAGES 1 - 319
```

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3
 4   _____
     TAYLOR SMART AND MICHAEL       )
 5   HACKER, individually and on    )
     behalf of all those similarly  )
 6   situated,                      )
                                    )
 7         Plaintiffs,              )
                                    ) Case No.
 8   vs.                            ) 22-cv-02125-WBS-CSK
                                    )
 9   NATIONAL COLLEGIATE ATHLETIC   )
     ASSOCIATION, an unincorporated )
10   association,                   )
                                    )
11         Defendant.               )
     _____)
12   JOSEPH COLON, SHANNON RAY,     )
     KHALA TAYLOR, PETER ROBINSON,  )
13   and KATHERINE SEBBANE,         )
     individually and on behalf of  )
14   all those similarly situated,  )
                                    )
15         Plaintiffs,              )
                                    ) Case No.
16   vs.                            ) 23-cv-00425-WBS-CSK
                                    )
17   NATIONAL COLLEGIATE ATHLETIC   )
     ASSOCIATION, an unincorporated )
18   association,                   )
                                    )
19         Defendant.               )
     _____)
20
21         Videotaped deposition of KHALA TAYLOR,
22   Volume I, taken on behalf of Defendant, with the
23   Witness appearing at Doubletree, 39900 Balentine
24   Drive, Newark, California, beginning at 2:02 p.m.
25   and ending at 9:39 p.m., on Wednesday, October 23,
```
Page 2

```
 1   2024, before CATHERINE A. NOLASCO, Certified
 2   Shorthand Reporter No. 8239.
```
Page 3

```
 1  APPEARANCES:
 2
 3  For Plaintiffs in Colon v. NCAA, Case No.
    22-cv-02125-WBS-CSK (E.D. Cal.) and the Witness:
 4
       KIRBY McINERNEY LLP
 5     BY: ROBERT J. GRALEWSKI, JR.
       Attorney at Law
 6     1420 Kettner Boulevard, Suite 100
       San Diego, California  90101
 7     858.834.2044
       858.255.7772 Fax
 8     bgralewski@kmllp.com
 9
10  For Plaintiffs in Smart v. NCAA, Case No.
    22-cv-02125-WBS-CSK (E.D. Cal.):
11
       KOREIN TILLERY, LLC
12     BY:  GARRETT R. BROSHUIS (appearing remotely)
            STEVEN M. BEREZNEY (appearing remotely)
13     Attorneys at Law
       505 North 7th Street, Suite 3600
14     St. Louis, Missouri  63101
       314.241.4844
15     gbroshuis@koreintillery.com
       sberezney@koreintillery.com
16
17  For Defendant:
18     MUNGER, TOLLES & OLSON, LLP
       BY:  MEGAN L. McCREADIE
19          CAROLYN LUEDTKE (appearing remotely)
       Attorneys at Law
20     560 Mission Street, 27th Floor
       San Francisco, California  94105-3089
21     415.512.4099
       415.512.4077 Fax
22     megan.mccreadie@mto.com
       carolyn.luedtke@mto.com
23
24  (Mr. Berezney and Ms. Luedtke were not present at
    the commencement of the deposition proceedings.)
25
```
Page 4

```
 1  APPEARANCES (Continued):
 2
 3  ALSO PRESENT:
 4  CAMERON TUTTLE, Videographer, Veritext
 5
 6  CONFIDENTIAL DESIGNATIONS:
 7  27:13-19
 8  42:6-9
 9  47:9-12
10  48:8-9
11  52:22-24
12  54:5-16
13  60:4-13
14  64:2-7
15  65:13-19
16  65:24-66:2
17  148:5-7
18  283:16-24
19  284:16-23
20  285:5-7
21  291:24-292:1
22  Exhibits 21 and 49
23
24
25
```
Page 5

2 (Pages 2 - 5)

```
 1       Could you please give me all the other
 2  documents?  Thank you.
 3  BY MS. McCREADIE:
 4       Q    This -- this looks like another text chain
 5  from your phone; is that correct?
 6       A    Yes.
 7       Q    Okay.  And who are you sending this text
 8  to?
 9       A    I don't quite recall the name.
10       Q    Okay.  I'm going to read the very
11  beginning of this text.  It's from October 17, 2022,
12  and it says:  "Hello there!  I am happy to announce
13  that I will be posting my first hitting
14  Instructional Camp this Saturday, October 22nd and
15  Sunday, October 23rd at San Jose State University."
16            Did I read that correctly?
17       A    Yes.
18       Q    So you used the softball facilities at San
19  Jose State to host this camp, correct?
20       A    Yes.
21       Q    And who was the audience for this camp?
22       A    There wasn't an audience.
23       Q    Well, who were you hoping would attend
24  this camp?
25       A    Clients.
                                                Page 134
```

```
 1       Q    And how did you advertise this camp?
 2       A    On my own through text messages, email.
 3       Q    How did you get the phone numbers and
 4  emails to which you sent these ads?
 5       A    Previous clients from extensive amount of
 6  lessons.
 7       Q    And was this also being advertised through
 8  VIA the Zone?
 9       A    No.
10       Q    So this was a camp you were offering
11  separately from your work at VIA the Zone?
12       A    Yes.
13       Q    Did you do any other advertising for this
14  camp besides the text messages and emails?
15       A    No.
16       Q    What did you teach during the camp?
17       A    The camp was instructional, whether it was
18  starting with a dynamic warmup, drills, whether it
19  was throwing or hitting.  It was a full-range camp
20  that involved mechanics, throwing mechanics,
21  defensive situations, and hitting as well.
22       Q    How many hours a day was the camp?
23       A    Roughly three hours.
24       Q    So three hours per day?
25            Was this similar to your work as a
                                                Page 135
```

```
 1  volunteer coach at San Jose State, the work you did
 2  through the camps you offered?
 3            MR. GRALEWSKI:  Vague and ambiguous.
 4  Overbroad.
 5            THE WITNESS:  My camps were more
 6  instructional, not the same.  It was more for the
 7  development of the clients.
 8  BY MS. McCREADIE:
 9       Q    When you --
10       A    For a specific camp, it was just built so
11  that they had the opportunity at this time to go to
12  a camp if they weren't already practicing.
13       Q    So when you say your camps were more
14  instructional, do you mean that they were more about
15  teaching --
16       A    They were more --
17       Q    -- younger people how to play softball?
18       A    -- more one-on-one.  So clients don't
19  necessarily have the opportunity, when they go to a
20  school camp, to have one-on-one instruction with a
21  Division I coach.  So this allowed the opportunity
22  for them to receive the same coaching that the
23  coaches are instructing to their collegiate
24  athletes, but to get one-on-one instruction at a
25  personal situation like this camp.
                                                Page 136
```

```
 1       Q    How many people would typically attend one
 2  of these camps?  How many students, that is to say?
 3       A    Sometimes it was zero, and it would range
 4  maybe four.
 5       Q    So four would be the maximum usually?
 6       A    Yes.  I never received more than that.
 7       Q    Okay.  And the camp that you're
 8  advertising in these particular text messages, that
 9  was not the only camp you offered at San Jose State
10  while you were there, correct?
11       A    Not -- not the only one.
12            MS. McCREADIE:  Okay.  I'm going to
13  introduce another exhibit, which will be Exhibit 43.
14            (Exhibit 43 was marked for
15            identification by the court reporter.)
16            MR. GRALEWSKI:  Thank you.
17  BY MS. McCREADIE:
18       Q    And this is TAYLOR_0000000246, and it's
19  marked -- marked "CONFIDENTIAL."
20            This appears to be another text chain from
21  your phone; is that correct?
22       A    Yes.
23       Q    And this one, if you look at the first
24  text, is from November 15, 2022, correct?
25       A    Yes.
                                                Page 137
```

**Page 138**

1  Q  And it says: "Hello there! I am happy to
2  announce that I will be hosting my Northern
3  California instructional Hitting Camps on Sundays
4  for 2022 and 2023 At San Jose State University."
5      Did I read that correctly?
6  A  Yes.
7  Q  So did you end up hosting hitting camps or
8  other forms of camp -- of -- sorry.
9      So did you end up hosting softball camps
10 on Sundays in 2022 and 2023 at San Jose State?
11 A  I can't recall how many, but it wasn't a
12 lot.
13 Q  So at least on several additional Sundays
14 you hosted camps at San Jose State; would that be
15 fair to say?
16 A  Hosted, but I would find out the amount
17 who were attending due to a Google sheet. So
18 sometimes on those Sundays there would be zero.
19 Q  Okay. And on Sundays when there were
20 zero, I assume you did not go to the camp?
21 A  Mm-hmm, yes.
22 Q  Do you remember roughly how -- how many
23 camps you ended up hosting at San Jose State?
24 A  I -- I don't remember.
25 Q  Do you remember the time period in which

**Page 139**

1  you hosted camps at San Jose State?
2  A  During my coaching agreement from 2022 to
3  2023.
4  Q  Did you have to get approval from folks
5  within San Jose State to use their facilities for
6  camps?
7  A  Yes, I had to run it through compliance.
8  Q  And what's "compliance," as you use it?
9  A  It's the school division of where we have
10 to get things approved as a program, meaning
11 softball for San Jose, to use the facility.
12 Q  What information did you have to provide
13 compliance about these camps?
14 A  That there was a document that I would
15 have to input and state the facilities would need to
16 be used on specific days if -- so that the lights
17 were on, but there were some days where the camps
18 didn't happen, so the facilities would be used or
19 wouldn't be used.
20 Q  Did -- did compliance ever deny permission
21 for you to have a camp at the San Jose State
22 facilities?
23 A  It was always approved.
24 Q  Did you have to clear these camps with
25 Coach Lohmann as well?

**Page 140**

1  A  No, she gave full -- full opportunity for
2  me to host these camps.
3  Q  Did you charge students for these camps?
4  A  Students of San Jose or clients?
5  Q  The -- the client. The -- the people who
6  would be attending the camps.
7  A  Yes.
8  Q  How much per person did you charge?
9  A  I don't remember.
10 Q  Would it be roughly the same for what you
11 would have charged in your one-on-one instructions
12 via VIA the Zone?
13 A  Roughly -- roughly the amount.
14 Q  Okay. And were most of these camps, as we
15 discussed before, about three hours per day?
16 A  Yes. Sometimes it would be less if it was
17 only a one-on-one.
18 Q  It would be shorter if it was just one
19 person?
20 A  Yeah, it would be shorter.
21 Q  Are the amounts you made from these camps
22 reflected in your interrogatory responses about
23 compensation from softball-related positions?
24 A  No.
25 Q  Why not?

**Page 141**

1  A  Because there wasn't a lot of clients that
2  came to the camps. There was zero to one.
3  Q  So you did not end up making a lot of
4  money from these camps; is that what you're saying?
5  A  I -- I barely made anything.
6  Q  Did you have to pay to use the San Jose
7  State facilities?
8  A  No.
9  Q  Could people who are not affiliated with
10 San Jose State use the facilities to host camps?
11 A  I wouldn't know.
12 Q  To your knowledge, would anyone hoping to
13 use the facilities have to go through compliance?
14 A  I wouldn't know.
15 Q  Have you held any camps or -- sorry.
16     Have you used the San Jose -- or -- yeah.
17 Have you used the San Jose State softball facilities
18 at all since you stopped being a volunteer coach for
19 them?
20 A  No.
21 Q  Have you ever had to pay for facilities to
22 host a camp or a training session?
23 A  No.
24 Q  Why did you want to use the San Jose State
25 facilities for these camps?