1  CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
   Carolyn.Luedtke@mto.com
2  JUSTIN P. RAPHAEL (State Bar No. 292380)
   Justin.Raphael@mto.com
3  MEGAN McCREADIE (State Bar No. 330704)
   Megan.McCreadie@mto.com
4  CHRISTOPHER CRUZ (State Bar No. 346128)
   Christopher.Cruz@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
6  San Francisco, California 94105-2907
   Telephone:(415) 512-4000
7  Facsimile:(415) 512-4077

8  *Attorneys for Defendant National
   Collegiate Athletic Association*

9

10                    UNITED STATES DISTRICT COURT

11                    EASTERN DISTRICT OF CALIFORNIA

12

13  TAYLOR SMART and MICHAEL          Case No. 2:22-cv-02125-WBS-CSK
    HACKER, individually and on
    behalf of all those similarly     **DEFENDANT NCAA'S OPPOSITION TO**
14  situated,                         ***SMART* AND *COLON* PLAINTIFFS'**
                                      **MOTIONS FOR CLASS CERTIFICATION**
15            Plaintiffs,
                                      Judge:     Hon. William B. Shubb
16       v.                           Courtroom: 5
                                      Date:      March 3, 2025
17  NATIONAL COLLEGIATE ATHLETIC      Time:      1:30 p.m.
    ASSOCIATION
18
             Defendant.
19  ─────────────────────────────     Case No. 1:23-cv-00425-WBS-CSK
    SHANNON RAY, KHALA TAYLOR,
20  PETER ROBINSON, KATHERINE
    SEBBANE, and RUDY BARAJAS,
21  individually and on behalf of
    all those similarly situated,
22
             Plaintiffs,
23
         v.
24
    NATIONAL COLLEGIATE ATHLETIC
25  ASSOCIATION, an unincorporated
    association,
26
             Defendants.
27

28

─────────────────────────────────────────────────────────────────

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND.........................................10

      A.    NCAA Division I Includes 350+ Widely Diverse
            Institutions.........................................10

      B.    The Sports at Issue Vary Widely......................16

      C.    Class Members Had Very Different Experiences in the
            Volunteer Coach Role.................................18

      D.    Following the Change in Bylaws, Most Institutions
            in Most Sports Have Not Added Paid Coaching
            Positions............................................23

      E.    Plaintiffs Have Never Worked in Paid Division I
            Coaching Positions...................................26

III.  LEGAL STANDARD............................................28

IV.   ARGUMENT..................................................29

      A.    Plaintiffs Cannot Show Predominance Because They
            Lack Class-Wide Proof Of Whether Each Class Member
            Was Injured..........................................29

            1.    Plaintiffs Need Class-Wide Proof of Whether
                  Each Class Member Was Injured..................29

            2.    In this Case, Proof of Injury Will Turn on
                  Evidence Unique to Each Class Member,
                  Requiring Mini-Trials..........................33

                  (a)   Plaintiffs Lack Common Proof to
                        Reconstruct Decisions To Add Additional
                        Positions Needed to Prove Injury.........34

                        (i)   Evidence of Actual School Behavior
                              Creates Individualized Issues......34

                        (ii)  Plaintiffs Lack Common Proof to
                              Address Those Individual Issues....36

                  (b)   Plaintiffs Lack Common Proof to
                        Reconstruct Hiring Decisions Needed to
                        Prove Injury.............................45

                        (i)   There is No Dispute that Coaches
                              Would Have Faced More Competition
                              for Paid Positions.................45

-i-

(ii) Reconstructing Hiring Decisions Depends on Individualized Proof........49

(iii) Plaintiffs' Arguments for Insulating Themselves from Competition Are Flawed.................................53

3.   Plaintiffs Cannot Take Shortcuts to Proving Impact.........................................59

(a)   The Common Issue Of Whether A Conspiracy Existed Does Not Predominate In All Price-Fixing Cases...........................60

(b)   There Is No Presumption Of Classwide Impact.......................................62

(c)   Exposure To The Challenged Conduct Is Not Proof of Impact In An Antitrust Case........66

(d)   Proof Of The Value Of Services Is Not Proof Of Impact.............................67

(e)   The *Law* Case Does Not Support Certification................................69

B.   Plaintiffs Cannot Show Predominance Because Proving Each Class Member's Damages Will Require Mini-Trials..........................................73

1.   Plaintiffs Fail to Account for Key Factors that Indisputably Affect Earnings................75

2.   Plaintiffs Do Not Have Any Method for Accounting for Undisputed Benefits to Class Members.........................................78

3.   Plaintiffs Do Not Account for Coaches' Geographic Preferences...........................81

4.   Individualized Issues Preclude Certification of the *Smart* Plaintiffs' Claims for Damages Related to Health Insurance.....................82

C.   The *Colon* Plaintiffs Cannot Satisfy Their Burden To Certify A Class of Coaches In Dozens of Different Sports..........................................85

1.   Individualized Issues Will Predominate Because Different Sports Have Different Labor Markets....85

2.   A Multi-Sport Class Would Involve Conflicts Between Class Members............................94

V.   CONCLUSION...............................................97

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1                                   **TABLE OF AUTHORITIES**

2                                                                              **Page(s)**

3    **FEDERAL CASES**

4    *Abboud v. INS*,
         140 F.3d 843 (9th Cir. 1998) ................................67
5
     *Agnew v. NCAA*,
6        683 F.3d 328 (7th Cir. 2012) ...............................92

7    *Alabama v. Blue Bird Body Co., Inc.*,
         573 F.2d 309 (5th Cir. 1978) ...............................91
8
     *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare
9        Grp. L.P.*,
         247 F.R.D. 156 (C.D. Cal. 2007) ...........................78
10
     *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
11       190 F.3d 1051 (9th Cir. 1999) ..............................61

12   *Bigelow v. RKO Radio Pictures*,
         327 U.S. 251 (1946) ........................................53
13
     *Black Lives Matter L.A. v. City of Los Angeles*,
14       113 F.4th 1249 (9th Cir. 2024) ....................2, 6, 28, 56

15   *Blades v. Monsanto Co.*,
         400 F.3d 562 (8th Cir. 2005) .........................9, 85, 91
16
     *Bowerman v. Field Asset Servs., Inc.*,
17       60 F.4th 459 (9th Cir. 2023) ...........................passim

18   *In re Capacitors Antitrust Litig. (No. III)*,
         No. 14-CV-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov.
19       14, 2018) ..................................................33

20   *Castillo v. Bank of Am., NA*,
         980 F.3d 723 (9th Cir. 2020) ...............................80
21
     *In re Coll. Athlete NIL Litig.*,
22       2023 WL 8372787 (N.D. Cal. Nov. 3, 2023)
         .....................................................56, 57, 68
23
     *Comcast Corp. v. Behrend*,
24       569 U.S. 27 (2013) ...............................2, 8, 44, 73

25   *In re Comp. of Managerial, Pro., & Tech. Emps. Antitrust
         Litig.*,
26       No. CIV. 02-2924 AET, 2003 WL 26115698 (D.N.J. May
         27, 2003) ...........................................9, 86, 87

27

28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

*Conrad v. Jimmy John's Franchise, LLC*,
    No. 18-CV-00133-NJR, 2021 WL 3268339 (S.D. Ill. July
    30, 2021) ...............................................79, 87

*De Sousa v. Dir. of U.S. Citizenship & Immigr. Servs.*,
    720 F. Supp. 3d 794 (N.D. Cal. 2024) .........................67

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
    773 F.2d 1506 (9th Cir. 1985) .........................6, 53, 54

*EEOC v. Farmer Bros. Co.*,
    31 F.3d 891 (9th Cir. 1994) ..................................82

*Fleischman v. Albany Medical Center*,
    No. 06-CV-0765, 2010 WL 681992 (N.D.N.Y. Feb. 16,
    2010) ....................................................32, 33

*Four In One Co. v. S.K. Foods, L.P.*,
    No. 2:08-CV-3017, 2014 WL 28808 (E.D. Cal. Jan. 2,
    2014) ........................................................61

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) .............................60, 91

*Galindo v. Stoody Co.*,
    793 F.2d 1502 (9th Cir. 1986) ................................82

*Garza v. City of Sacramento*,
    No. 220CV01229WBSJDP, 2022 WL 2757600 (E.D. Cal.
    July 14, 2022) ...............................................60

*In re Google Play Store Antitrust Litig.*,
    No. 20-CV-05761-JD, 2023 WL 5532128 (N.D. Cal.
    Aug. 28, 2023) ...............................................56

*In re High-Tech Emp. Antitrust Litig.*,
    289 F.R.D. 555 (N.D. Cal. 2013) ..........................2, 30

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........................92

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974) ...............................8, 60

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ...........................8, 62, 64

*Jacks v. DirectSat USA, LLC*,
    118 F.4th 888 (7th Cir. 2024) ................................84

*Johnson v. Arizona Hospital & Healthcare Association*,
    No. CV07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz.
    July 14, 200 .................................................32

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

*Lara v. First Nat'l Ins. Co. of Am.*,
    25 F.4th 1134 (9th Cir. 2022) ...........................84, 85

*Law v. NCAA*,
    1996 WL 34400119 (D. Kan. 1996) .................71, 72, 77, 90

*Law v. NCAA*,
    No. 94-2053-KHV, 1998 U.S. Dist. LEXIS 6608 (D. Kan.
    Apr. 17, 1998) ..........................................69, 70

*In re Linerboard Antitrust Litigation*,
    305 F.3d 145 (3d Cir. 2002) ..................................64

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ......................29, 44, 70

*Malchman v. Davis*,
    588 F. Supp. 1047 (S.D.N.Y. 1984) ...........................68

*Malchman v. Davis*,
    761 F.2d 893 (2d Cir. 1985) ...............................8, 68

*Miles v. Kirkland's Stores Inc.*,
    89 F.4th 1217 (9th Cir 2024) ................................52

*In re NCAA I-A Walk-On Football Players Litigation*,
    No. C04-1254C, 2006 WL 1207915 (W.D. Wash.
    May 3, 2006) ....................................10, 51, 62, 96

*In re NCAA Student-Athlete Name & Likeness Licensing
    Litigation*,
    No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal.
    Nov. 8, 2013) ...................................5, 54, 55, 58

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) .........................71, 92

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods
    LLC*,
    31 F.4th 651 (9th Cir. 2022) (en banc) ..................passim

*In re Optical Disk Drive Antitrust Litig.*,
    303 F.R.D. 311 (N.D. Cal. 2014) .............................44

*In re Processed Egg Prod. Antitrust Litig.*,
    312 F.R.D. 171 (E.D. Pa. 2015) ..............................64

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ...............................44

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) ...........................30, 61

*Reed v. Advoc. Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) ........................passim

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

*Rock v. NCAA*,
  No. 112CV01019TWPDKL, 2016 WL 1270087 (S.D. Ind. Mar.
  31, 2016) ...............................................passim

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ................................66

*Sidibe v. Sutter Health*,
  333 F.R.D. 463 (N.D. Cal. 2019) ....................29, 38, 44

*Tennessee v. NCAA*,
  718 F. Supp. 3d 756 (E.D. Tenn. 2024) ........................67

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...............................9, 86

*Toscano v. PGA Tour, Inc.*,
  201 F. Supp. 2d 1106 (E.D. Cal. 2002) ....................6, 54

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..........................................30

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  896 F.3d 923 (9th Cir. 2018) .................................34

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ..............................3, 43, 50, 96

*In re Urethane Antitrust Litigation*,
  768 F.3d 1245 (10th Cir. 2014) ...........................62, 63

*Valley Drug Co. v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ...............................78

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) ...........................passim

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ................................74

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..............................50, 51, 70

*Wynn v. Nat'l Broad. Co.*,
  234 F. Supp. 2d 1067 (C.D. Cal. 2002) ........................51

FEDERAL STATUTES

15 U.S.C. § 15...........................................66, 68

Clayton Act § 4..........................................61, 91

FEDERAL RULES

Federal Rule of Civil 23................................passim

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  TREATISES

2  13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.)..................66

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  I.   **INTRODUCTION**

2       Both the *Colon* and *Smart* Plaintiffs seek to certify claims

3  for damages by volunteer coaches at hundreds of different colleges

4  and universities that could be litigated only by reconstructing

5  thousands of budget and hiring decisions as well as assessing the

6  varying job responsibilities of thousands of coaches.  The *Colon*

7  Plaintiffs' claims would require doing so in dozens of different

8  sports, which makes certification of the *Colon* class particularly

9  improper.  Nevertheless, because there are a number of reasons why

10 neither class can be certified that are common to both cases, the

11 NCAA submits this consolidated opposition to both of Plaintiffs'

12 motions for class certification to avoid duplicative briefing that

13 would burden the Court.[1]

14      "In civil antitrust cases, the class certification often

15 turns on whether antitrust impact/injury can be established

16 through common proof or will require individualized proof."  1

17 McLaughlin on Class Actions § 5:36 (21st ed.).  To satisfy the

18 predominance requirement, Plaintiffs must show that "essential

19 elements of the cause of action, such as . . . an antitrust

20 violation or antitrust impact, are capable of being established

21 through a common body of evidence, applicable to the whole class."

22 *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31

23 F.4th 651, 666 (9th Cir. 2022) (en banc) (quotation marks and

24

25 ─────────────────────────

[1] The *Colon* Plaintiffs' counsel have lost contact with Plaintiff

26 Joseph Colon and have filed an amended complaint that does not
   name him as a plaintiff.  *See Colon* ECF 82.  The first Plaintiff

27 on the amended complaint now is Shannon Ray.  The NCAA
   nevertheless describes that case as the *Colon* case for consistency

28 with the docket.

1 citation omitted). Simply put, "for cases involving antitrust
2 violations, common issues do not predominate unless the issue of
3 impact is also susceptible to class-wide proof." *In re High-Tech*
4 *Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013)
5 (quotations omitted).

6     Plaintiffs also "cannot show Rule 23(b)(3) predominance" if
7 "[q]uestions of individual damage calculations will inevitably
8 overwhelm questions common to the class." *Comcast Corp. v.*
9 *Behrend*, 569 U.S. 27, 34 (2013). Class certification is
10 inappropriate where "individualized mini-trials" are "required to
11 establish liability and damages." *Bowerman v. Field Asset Servs.,*
12 *Inc.*, 60 F.4th 459, 469-70 (9th Cir. 2023). As Plaintiffs' own
13 authority explains, "courts must also ensure that damage issues do
14 not defeat the predominance requirement" and that "if a case
15 threatens to break down into myriad individual damage issues,
16 common issues may no longer predominate." 6 Newberg and
17 Rubenstein on Class Actions § 20:52 (6th ed.).

18     Here, class certification is improper because Plaintiffs do
19 not have a single body of evidence to prove impact as to each
20 class member. Plaintiffs' theory of impact is that they would
21 have earned compensation for their work as volunteer coaches if
22 NCAA bylaws permitted Division I schools to add an additional paid
23 coaching position in sports where the bylaws authorized volunteer
24 coaches. That theory of impact depends on two premises: (1)
25 schools would have created additional paid positions, and (2)
26 class members (and not other coaches) would have been hired for
27 those positions. Neither of these is "capable of being resolved
28 in one stroke." *Black Lives Matter L.A. v. City of Los Angeles*,

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

113 F.4th 1249, 1258 (9th Cir. 2024) (quotations and citation omitted).  Nor is calculating each coach's alleged damages (if any).  Rather, on all three questions, members of the proposed class will need to present evidence that varies from member to member."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

**Plaintiffs lack common evidence to reconstruct school by school decisions whether to create additional paid coach positions.**  To show that they would have been compensated, each volunteer coach first must make the threshold showing that the school where they volunteered would have found money in its budget and added an additional *paid* coaching position in the volunteer's particular sport if the NCAA bylaws had permitted doing so.  Or, put differently, Plaintiffs must show that the schools would *not* have kept the position as an unpaid one, which the rules did not prohibit, or simply eliminated the position.  And Plaintiffs must make this threshold showing with common evidence across hundreds of differently situated schools.

The problem for Plaintiffs is that after the bylaws were amended in 2023 to permit paying an additional assistant coach instead of a volunteer, most schools did *not* add additional paid coaching positions in most sports.  That evidence "substantiates [ ] an individualized issue" and "summon[s] the spectre of class-member-by-class-member adjudication":  would each school that did not hire an additional paid coach when the bylaws permitted doing so have made a different budget decision if the bylaws had permitted dong so during the class period?  *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023).  The answer to that question

1  depends on school-specific finances, budget constraints,

2  allocations, and priorities that differ from school to school and

3  can be determined only by taking evidence from each of the more

4  than 300 schools in Division I.  Plaintiffs therefore cannot meet

5  their burden to show that "a class-member-by-class-member

6  assessment of th[at] individualized issue will be unnecessary or

7  workable."  *Id.*

8      The *Colon* Plaintiffs' expert, Dr. Ashenfelter, admittedly has

9  not even tried to predict which schools would have added an

10  additional paid coaching position in each sport.  He testified

11  that answering that question would require taking testimony from

12  each school.  That conceded need for mini-trials alone requires

13  denial of the *Colon* Plaintiffs' motion.  The Court does not have

14  to go further in *Colon*.  *See Rock v. NCAA*, No. 112CV01019TWPDKL,

15  2016 WL 1270087, at *14 (S.D. Ind. Mar. 31, 2016) (denying

16  certification where "many member institutions" did not offer

17  compensation permitted after NCAA bylaws were amended because

18  "anti-trust injury as to each member of the class cannot be proven

19  without considering the facts surrounding each class member").

20      The *Smart* Plaintiffs' expert, Dr. Rascher, did try to build a

21  model to predict which schools would have added additional paid

22  baseball coaching positions.  The model predicts that at least 70

23  schools would *not* have done so, and the *Smart* Plaintiffs have

24  dropped volunteers at those schools from the class.  But even in

25  that narrowed class, Dr. Rascher's model admittedly gets schools'

26  predicted hiring decisions wrong more than 20% of the time as

27  compared to what happened in the real world, and Dr. Rascher

28  cannot explain why any school made a different decision than his

model predicts.  That underscores that getting to the truth of this issue requires an individualized inquiry as to each school. The Court's inquiry should stop here with the Plaintiffs' failure to show that they have common proof of whether each program at each school would have created additional paid positions.

**Plaintiffs lack common evidence to reconstruct hiring decisions in each sport at each school in each year.**  If the Court gets past the initial question of whether schools would have hired an additional paid coach in each sport (which it should not), class certification should be denied for the additional reason that there is no common proof that each class member would have been the person selected for that additional paid position at their school.  There is no dispute that, as a matter of basic economics, paid positions would attract more applicants than volunteer ones.  Thus, even if a school would have added a paid position in the sport that a volunteer coached, the volunteer must show that they would have been selected for that position over other candidates who would have been attracted to a paid position. Reconstructing each hiring decision that schools would have made in each sport in each year would require quintessential individualized inquiries into the skills and qualifications of each volunteer and competing candidates as well as each head coach's hiring criteria for the particular position.  Neither set of Plaintiffs argues that they have a single body of evidence to reconstruct these thousands of hiring decisions, and their experts did not proffer any.  That should be the end of the matter.  *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at *8-9 (N.D. Cal. Nov. 8, 2013)

1  (denying certification because plaintiffs lacked method for

2  addressing evidence that some class members "would not have

3  suffered injuries" because "they would never have been able to

4  play").

5       Plaintiffs argue that the additional competition coaches

6  would have faced for paid positions is irrelevant in an antitrust

7  case.  That is not the law.  Circuit precedent requires antitrust

8  plaintiffs to account for "competition from third parties" to

9  avoid "artificially high damage estimate[s]."  *Dolphin Tours, Inc.*

10 *v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1512 (9th Cir.

11 1985); *see also Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106,

12 1125 (E.D. Cal. 2002) (no issue of fact on damages where golfer

13 "failed to account for how his damages might change in a truly

14 competitive environment" because he did not "account[] for the

15 fact that it would be more difficult for [him] to qualify").  This

16 Court's footnote at the pleading stage did not foreclose this

17 argument on class certification, where plaintiffs "must actually

18 *prove*—not simply plead—that" Rule 23's standards are met, *Black*

19 *Lives Matter*, 113 F.4th at 1258, and this Court must "make a

20 rigorous assessment of the available evidence," *Olean*, 31 F.4th at

21 666.  The evidence shows that, as in many industries, the

22 volunteer coach position insulated at least some volunteers from

23 competition and enabled them to get their foot in the door.

24 Plaintiffs lack any method for separating those volunteers from

25 others who allegedly suffered impact.  This is an independent

26 reason why class certification must be denied.

27      **Proving damages would require mini-trials.**  A third reason

28 why class certification would be improper is that estimating each

-6-

coach's alleged damages would require mini-trials.  Plaintiffs cannot dispute the obvious fact that any class member's compensation in the but-for world would depend on their experience, tenure, and skills, which vary from class member to class member.  Plaintiffs' experts concede that this "human capital theory" is fundamental to labor economics and that "individual factors" drive what workers are paid.  Declaration of Megan McCreadie ("McCreadie Decl.") Ex. 2, Rascher Dep., at 230:24-231:9.  That is why the plaintiffs' expert in the *Law v. NCAA* case, and the *Colon* Plaintiffs' own expert in prior cases and published work, controlled for the effect of experience and other employee-specific variables on wages.  But neither expert in this case made any attempt to address the fact that coaches with more skills and experience would make more.  *E.g.*, *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009) (denying certification where "regression does not, in fact, control for all of the wide variance in RN base wages") (quotations omitted).

Moreover, Plaintiffs fail to account for the fact that each class member's responsibilities working as a volunteer coach differed.  While some worked full time, others worked part time, and still others were merely honorary members of the team.  Some volunteer coaches maintained full time paid jobs outside of volunteer coaching and did the volunteer coach job on the side, while others gained access to practice facilities and coaching for free as professional athletes while serving as volunteer coaches.  Accounting for these varying costs and benefits of the volunteer position would require individualized mini-trials regarding each

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  volunteer's position in the actual world and what a paid position

2  would have required in the but-for world.

3      Because Plaintiffs lack a single body of evidence to

4  reconstruct thousands of budget and hiring decisions at hundreds

5  of schools and (in the *Colon* case) dozens of sports, they ask the

6  Court to take shortcuts that are contrary to the law:

- Plaintiffs say the question of whether there was an allegedly unlawful agreement "inherently" predominates, but the "allegation that a conspiracy existed to violate the antitrust laws does not insure that common questions will predominate." *In re Hotel Tel. Charges*, 500 F.2d 86, 89 (9th Cir. 1974).  That is why courts regularly deny class certification in antitrust cases where plaintiffs lack common proof of impact.

- Plaintiffs say there is a "presumption" of impact in price-fixing cases, but the Ninth Circuit has explained (in a price-fixing case, no less) that the law requires a "rigorous assessment of the available evidence." *Olean*, 31 F.4th at 666. "Applying a presumption of impact" would "conflict" with the "need for a careful, fact-based approach." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 326 (3d Cir. 2008).

- Plaintiffs say that all coaches suffered impact because the services they provided were valuable, but their unjust enrichment claims have been dismissed, and "a theory of unjust enrichment is inappropriate in proving damages for an antitrust violation." *Malchman v. Davis*, 761 F.2d 893, 901 n.3 (2d Cir. 1985).

- Plaintiffs say that a class was certified in the *Law v. NCAA* case nearly three decades ago, but the District of Kansas court in that case did not apply the standards for class certification now recognized in this Circuit.  Also, the plaintiff's expert in the *Law* case used controls that Plaintiffs' experts admitted are standard in labor economics but that they did not use here.

- Plaintiffs say that their only burden is to proffer a method of estimating damages, but the Supreme Court has rejected the argument that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Behrend*, 569 U.S. at 36.

1    **The *Colon* Plaintiffs' attempt to certify a class of coaches**
2    **in 44 different sports presents additional problems.**  Even if the
3    *Colon* putative class could surmount all of the foregoing
4    obstacles, the broad array of 44 sports the five *Colon* class
5    representatives seek to represent makes it improper for them to
6    win class certification for several additional reasons.  *First*,
7    coaching jobs in each of the 44 sports involve "individualized
8    market conditions," which would have to be proven with
9    "individualized, not common, evidence."  *Blades v. Monsanto Co.*,
10   400 F.3d 562, 574 (8th Cir. 2005).  The "differences among the
11   various" jobs coaching each sport means that not all coaches would
12   have been "affected by the conspiracy in the same way——thus
13   creating potential difficulties with class certification."  *Todd*
14   *v. Exxon Corp.*, 275 F.3d 191, 202 n.5 (2d Cir. 2001) (Sotomayor,
15   J.).

16   The *Colon* Plaintiffs' expert conceded that the market wage
17   depends on supply and demand for coaching, that these conditions
18   could differ from sport to sport, and that, if so, mixing data
19   across sports would incorrectly estimate market wages.  *See In re*
20   *Comp. of Managerial, Pro., & Tech. Emps. Antitrust Litig.*,
21   No. CIV. 02-2924 AET, 2003 WL 26115698, at *3 (D.N.J. May 27,
22   2003) (denying certification of class consisting of many different
23   jobs because the way that alleged wage suppression "affects each
24   type of employee will be vastly different").  But here, he did not
25   even try to show that there is a single set of supply and demand
26   conditions for coaches in all sports.

27   *Second*, there would be conflicts between members of the
28   proposed *Colon* class who coached different sports.  Many schools

1  could not have afforded to add paid coaching positions in all
2  sports (which is why at least some of them did not do so even when
3  the bylaws allowed it).  Thus, coaches who volunteered in one
4  sport will face conflicting claims to the same limited athletic
5  department funds from coaches who volunteered in *other* sports at
6  the same school.  Plaintiffs have not proposed any method for
7  resolving that conflict.  *See In re NCAA I-A Walk-On Football*
8  *Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *9 (W.D. Wash.
9  May 3, 2006) (denying class certification where plaintiffs had "no
10 method" to address conflict between class members over limited
11 number of additional scholarships).  Indeed, the only way to do so
12 would be to take evidence from each school about how it would have
13 allocated its limited budget.  Some 350 such inquiries would
14 overwhelm any common issues.

15      Simply put, Plaintiffs lack a single body of evidence to
16 account for variations among hundreds of schools and thousands of
17 coaches, and (for the *Colon* case) among dozens of different
18 sports.  Their motions for class certification should be denied.

19 **II.  FACTUAL BACKGROUND**

20      **A.  NCAA Division I Includes 350+ Widely Diverse**
            **Institutions**
21

22      The NCAA is an unincorporated membership organization with
23 more than 1,000 member colleges and universities (sometimes
24 referred to as "membership institutions") across the country. Its
25 members have come together to create rules (some of which are
26 called "bylaws") governing various aspects of intercollegiate
27 athletics.  The *Smart* and *Colon* cases challenge bylaws adopted by
28 the more than 350 member institutions that compete in the NCAA's

1  Division I (or "DI"), which is one of the NCAA's three divisions
2  of the NCAA.

3      Each year, over 190,000 student-athletes compete on more than
4  6,000 teams in nearly 50 different Division I sports.  Division I
5  includes a wide variety of colleges and universities with
6  different missions, traditions, and resources.  *See, e.g.,*
7  McCreadie Decl. Ex. 3, Carter Dep., at 247:3-248:5.  They include
8  flagship state universities such as the University of Alabama,
9  Ohio State University, and the University of Texas-Austin; Ivy
10 League institutions such as Harvard, Princeton, and Columbia;
11 historically black colleges and universities such as Norfolk State
12 and Texas Southern; institutions with religious affiliations such
13 as Villanova University and St. Mary's College; and even the
14 United States Military, Naval and Air Force academies.  These
15 member institutions have different priorities, cultures, and
16 financial situations, all of which impact their athletics
17 programs.

18     Not all NCAA schools are similar financially.  Some Division
19 I institutions have revenues and athletic budgets in the hundreds
20 of millions of dollars while others have revenues and budgets that
21 are only a fraction of those amounts.  For example, in 2022-2023,
22 the University of Alabama's athletic department had revenue of
23 ██████████ and expenditures of ██████████, while American
24 University had revenues and expenditures of only ██████████—less
25 than ██ of Alabama's.  Declaration of Mario Morris ("Morris
26 Decl.") ¶¶ 7, 12.

27     Some member institutions are filling 100,000 person stadiums
28 for football games and have budgets that are growing, while others

face budget cuts and require loans from the university to subsidize the athletics program. *See, e.g.,* Decl. of Deborah Adishian-Astone ("Adishian-Astone Decl.") ¶¶ 11-12 (describing how Fresno State and its athletics program is "under significant financial pressure and [has] worked with constrained resources the past several years," requiring loans from the institution to balance the athletics program budget); McCreadie Decl. Ex. 4, Tealer Dep., at 167:14-168:17 (describing University of Florida's revenue as growing every year); *id.* Ex. 3, Carter Dep., at 252:7-253:9, 258:24-259:10 (describing schools such as Ohio State and Nebraska that can fill 100,000-person football stadiums and, as a result, have the highest revenue of schools in the region). Budgets in athletic departments are limited, and different institutions allocate those budgets in different ways through what the *Smart* Plaintiffs' own expert called "individual decision making." *Id.* Ex. 2, Rascher Dep., at 25:25-27:3, 29:24-30:20.

Most NCAA Division I member institutions are members of athletic conferences. The conferences consist of subsets of NCAA member institutions who organize together to create their own set of governance rules, championship competitions for the conference, television contracts to broadcast competitions, student athlete services, and more. Athletic conferences are also members of the NCAA.

Like Division I member institutions themselves, Division I athletic conferences are diverse. Consider the Southeastern

1  Conference ("SEC"), Big West Conference, and Mountain West

2  Conference, in which some of the named Plaintiffs competed[2]:

3  • Members of the SEC are located in twelve states and
      include powerhouses like the University of Alabama,

4    Texas A&M University, and Louisiana State University.[3]
      In baseball alone, SEC schools can draw hundreds of

5    thousands of attendees to home games in a season.  *See*
      McCreadie Decl. Ex. 5, Boyer Dep., at 52:16-25.

6

7  • The Mountain West consists of public universities in
      seven states, plus the Air Force Academy.[4]

8  • With the exception of one school (the public University
      of Hawaii), all schools in the Big West Conference are

9    members of the public California State University or
      University of California systems.  Unlike the SEC and

10   Mountain West, the Big West Conference does not sponsor
      football.[5]

11

12 As shown in the following chart, the average member of the SEC

13 earns nearly six times as much revenue than the average member of

14 the Big West and nearly three times as much as the average member

15 of the Mountain West.

16

|  | Average Revenue per School in 2022-2023 | Average Expenditures per School in 2022-2023 |
|---|---|---|
| **SEC** | $177,110,545 | $170,443,685 |
| **Mountain West** | $59,940,354 | $58,896,955 |

19

20 _____

[2] Plaintiff Taylor Smart coached baseball at the University of
21 Arkansas, a member of the SEC.  Plaintiff Michael Hacker coached
   baseball at University of California, Davis, a member of the Big
22 West.  Plaintiff Khala Taylor coached softball at San Jose State,
   while Plaintiff Rudy Barajas coached women's volleyball at Fresno
23 State; both schools are members of the Mountain West.

24 [3] *History – Southeastern Conference*,
   https://www.secsports.com/history (last visited Dec. 16, 2024).

25
   [4] *This is the Mountain West – Mountain West Conference*,
26 https://themw.com/this-is-the-mountain-west/ (last visited
   Dec. 16, 2024).

27
   [5] *About the Big West – The Big West*, https://bigwest.org/sports
28 /2016/12/22/GEN_1222161145.aspx (last visited Dec. 16, 2024).

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

| | Average Revenue per School in 2022-2023 | Average Expenditures per School in 2022-2023 |
|---|---|---|
| **Big West** | $30,207,377 | $30,401,151 |

*See* Morris Decl. ¶¶ 6-11.

Division I schools differ widely in how they fund their athletics programs. For example, the SEC has a media contract worth $300 million annually (more than $3 billion total) with ESPN.[6] Other conferences have much less valuable television contracts or none at all. The Mountain West Conference's current TV contract is worth only $45 million a year, roughly seven times smaller than the SEC's.[7] And the University of California, Davis ("UC Davis"), which competes in the Big West, receives no revenue at all from television contracts. *See* Declaration of Josh Flushman ("Flushman Decl.") ¶ 9. Instead, unlike other schools in the UC system and many other schools in Division I, UC Davis funds most of its athletic department spending through student fees approved by the student body. *Id.* ¶¶ 8-9;[8] *compare* Declaration of Clayton Hamilton ("Hamilton Decl.") ¶ 6 ("No student fees . . . are used to fund the athletics department at the University of Arkansas."). Some states support the athletics department of

---

[6] Kevin Draper & Alan Blinder, *SEC Reaches $3 Billion Deal With Disney, Drawing CBS Ties Toward an End*, N.Y. TIMES (Dec. 10, 2020), https://www.nytimes.com/2020/12/10/sports/ncaafootball/sec-disney-deal.html.

[7] *Mollie Cahillane, The Mountain West Pac- … 6?*, SPORTS BUSINESS JOURNAL (Sept. 16, 2024), https://www.sportsbusinessjournal.com/Articles/2024/09/16/pac-12-mountain-west-conference-media-rights#:~:text=The%20Mountain%20West's%20%2445%20million,the%20conference's%20biggest%20schools%20departing.

[8] Fresno State also funds its athletics program in part with student fees. Adishian-Astone Decl. ¶ 7.

1  their flagship public universities with state funds, *see, e.g.,*

2  Adishian-Astone Decl. ¶ 7 (Fresno State), while others do not,

3  *see, e.g.*, McCreadie Decl. Ex. 3, Carter Dep., at 253:21-255:21

4  (University of Minnesota).

5      Different institutions also use different processes to

6  determine and allocate their budgets.  *Id.* Ex. 6, Ashenfelter

7  Dep., at 101:4-12, 102:12-16.  For example, under Arkansas law,

8  the State of Arkansas determines how many paid coaches it will

9  employ at its public universities.  *See* Hamilton Decl. ¶ 10.

10  Accordingly, the University of Arkansas must request authorization

11  from the state through an annual appropriations act in order to

12  add paid personnel in the athletic department.  *See id.*  At South

13  Dakota State University, ███████████████████████████████████

14  ██████████████████████████████████████████████████████████████

15  ████████████████████████████[9]  McCreadie Decl. Ex. 7.

16      Spending varies widely both across and within sports.  For

17  example, the University of Arkansas (where Plaintiff Taylor Smart

18  coached) spent more than ████████████ on baseball in the 2022-2023

19  academic year, while Alcorn State University spent only ████████.

20

_____

[9] *See also* Declaration of Ryan Varley ("Varley Decl.") ¶ 8
(describing University of Pittsburgh's budgeting process that
involves discussions among various constituents and ultimately
rests with the Board of Trustees); *id.* ¶¶ 9-12 (explaining that
each sport gets a budget for hiring and paying coaches and can
determine sport by sport how many coaches to hire and how to
allocate the amount); Adishian-Astone Decl. ¶¶ 7-10 (describing
Fresno State's budget process for their athletics program called
the Fresno State Athletics Corporation, which is housed in a
nonprofit public benefit organization that serves as an auxiliary
organization to Fresno State and operates at a deficit, requiring
loans from the University to the Athletics Corporation and various
budget approvals from the University).

1   Morris Decl. ¶¶ 13-14.  The University of Virginia spent more than

2   ███████████ combined on men's and women's swimming in the same

3   year.  *Id.* ¶ 15.  By contrast, the University of Memphis spent

4   only ███████ on men's rifle, and Eastern Illinois University spent

5   ███████ on women's beach volleyball.  *Id.* ¶¶ 16-17.

6   **B.    The Sports at Issue Vary Widely**

7        The Division I bylaws challenged by Plaintiffs applied to all

8   Division I sports except men's and women's basketball and Football

9   Bowl Subdivision ("FBS") football.[10]  The *Smart* Plaintiffs seek to

10  represent a class of volunteer coaches in baseball.  The *Colon*

11  Plaintiffs' putative class encompasses volunteer coaches in all 44

12  other sports[11] to which the bylaws applied, which are:

13       **Men's:** cross-country, FCS football, fencing, golf,
         gymnastics, ice hockey, lacrosse, rifle, skiing, soccer,
14       swimming and diving, tennis, track (indoor), track (outdoor),
         volleyball, water polo, and wrestling.
15
         **Women's:** acrobatics and tumbling, beach volleyball, bowling,
16       cross-country, equestrian, fencing, field hockey, golf,
         gymnastics, ice hockey, lacrosse, rifle, rowing, rugby,
17       skiing, soccer, softball, swimming and diving, tennis, track
         (indoor), track (outdoor), triathlon, volleyball, water polo,
18       and wrestling.

19       Coaches in different sports have different job options

20  available to them.  Golf and tennis coaches may have the option to

21  ───────────────

22  [10] Division I football is divided into two subdivisions:  FBS
    football, in which teams are eligible to participate in postseason
23  bowl games such as the Rose Bowl, and the Football Championship
    Subdivision, where teams are not.

24  [11] *Colon* Plaintiffs have never provided a list or count of the
    sports whose volunteers they purport to represent.  They describe
25  the class as "[a]ll persons who, from March 17, 2019, to June 30,
    2023, worked for an NCAA Division I sports program other than
26  baseball3 in the position of "volunteer coach," as designated by
    NCAA Bylaws."  Second Amended Complaint, ECF 84, ¶ 19.  The NCAA's
27  count and list here is based on the sports listed in NCAA
    Division I bylaw 11.7.6, minus baseball.
28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

coach at country clubs, but field hockey coaches likely do not. Baseball and ice hockey coaches may be able to coach for the professional minor leagues, which do not exist for most other sports. *See* McCreadie Decl. Ex. 8, Smart Dep., at 148:20-149:21. And coaches in certain sports may even be able to secure roles in professional major leagues. Plaintiff Taylor Smart, for instance, applied for and received job offers to serve as a scout for several Major League Baseball teams while serving as a volunteer baseball coach at the University of Arkansas. *Id.* at 82:17-83:6, 180:16-181:2, 191:15-192:18.

Some sports, like swimming, have highly competitive club teams. Plaintiff Peter Robinson coaches at one such club and testified that he has not applied for Division I coaching positions because he expects to make more as a club coach than he would as a coach in Division I. *Id.* Ex. 9, Robinson Dep., at 209:18-211:4, 223:1-6. In some sports, like softball or volleyball, coaching at the high school level may be a viable alternative path. *Id.* Ex. 10, Barajas Dep., at 39:24-40:1, 41:8-13, 57:12-58:13; *id.* Ex. 11, Taylor Dep., at 265:6-266:2. But not many high schools have gymnastics, fencing, or triathlon programs.

In short, the universe of potential job alternatives varies significantly by sport, and assistant coach salaries thus vary widely by sport and by institution. *E.g.*, *Id.* Ex. 12, Ray Dep., at 187:13-188:17. As a senior athletics director at one Division I school has put it: "Salaries are individualized based on market considerations for each sport and based on where we want

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1    to go with each coaching position. . . . To evaluate the market, I

2    look sport by sport."  Flushman Decl. ¶ 25.[12]

3        C.   **Class Members Had Very Different Experiences in the Volunteer Coach Role**

The volunteer coach position functioned differently in

different sports.  *See e.g.*, McCreadie Decl. Ex. 4, Tealer Dep.,

at 155:15-156:2 ("So every sport that had a volunteer coach on

their staff [at the University of Florida] utilized the position

differently . . . . [T]here was a wide range of duties assigned to

that particular position based on sport."); Declaration of Rob

Acunto ("Acunto Decl.") ¶¶ 8-9 (testifying that volunteer coaches

played different roles in different sports at Fresno State

throughout the 2018-2023 time period); McCreadie Decl. Ex. 3,

Carter Dep., at 263:14-19, 264:9-270:2 (describing "very wide

variation of what a volunteer coach was involved with and how much

they worked" at the University of Minnesota); Decl. of Christina

Wombacher ("Wombacher Decl.") ¶¶ 12-14, 16 (same for Arizona

State).

---

[12] *See also* McCreadie Decl. Ex. 3, Carter Dep., at 261:22-262:15
(at the University of Minnesota, assistant coach salaries at the
school vary significantly within sports and across sports); Varley
Decl. ¶¶ 9-12 (wide variation in salaries within and across sports
at the discretion of the head coach; "[t]he payment scale [is]
individualized based on each team's head coach's recommendations,
the needs for hiring that particular assistant coach, and the
priorities each head coach set for how to allocate the team's
budget); Wombacher Decl. ¶ 24 & Exs. A, C (Arizona State has
considerable variation in salary among assistant coaches across
sports and within a sport).  At Fresno State, some assistant
coaches are employees of the Athletics Corporation (a separate
non-profit), whereas some are University faculty.  The designation
influences how they are paid and their benefit packages and varies
by sport and position.  *See* Adishian-Astone Decl. ¶ 9.

1      Not all volunteer coaches worked full-time.  For some

2  volunteers, the position was a part-time job that enabled them to

3  continue their own athletic aspirations or take on other kinds of

4  work.  For example, Shannon Ray, one of the *Colon* Plaintiffs, was

5  training as a professional sprinter while she volunteered at

6  Arizona State University.  McCreadie Decl. Ex. 12, Ray Dep., at

7  41:16-20.  She testified that she took the volunteer coaching

8  position so that she could be coached by Dion Miller, Arizona

9  State's head track and field coach.  *Id.* at 41:21-42:17, 43:1-

10  44:7, 47:9-15.  While a volunteer coach at Arizona State, she

11  received coaching and access to facilities for free, and she (and

12  other Arizona State volunteer coaches) would train alongside

13  Arizona State athletes during practices.  *Id.* at 62:19-63:21,

14  64:4-25, 65:22-66:13, 110:14-20.  Ms. Ray also continued to work

15  full time as an auditor, for which she received a full salary and

16  benefits.  *See id.* at 105:4-107:18.  Since leaving her volunteer

17  position, she has had to pay a monthly fee for coaching and access

18  to other facilities.  *Id.* at 99:5-100:14, 110:21-111:7, 113:5-15.

19  Another Arizona State volunteer coach–Eddie Lack–attended practice

20  with the hockey team twice a week, attended 10% of games, and had

21  a job as a real estate agent.  *See* Wombacher Decl. ¶ 14.

22      At the University of Minnesota, one volunteer hockey coach

23  who specialized in working with goalies worked once or twice a

24  week remotely reviewing film with the goalies, would be at

25  practice once or twice a week, and did not attend games.  *See*

26  McCreadie Decl. Ex. 3, Carter Dep., at 265:18-25, 268:4-24.  He

27  maintained a full-time job as a private goalie coach to high

28  school, club, and even professional goalies.  *See id.* at 268:25-

-19

269:13.  Similarly, the volunteer golf coach at the University of
Minnesota worked at a golf-club-fitting company and came to campus
to fit golf student-athletes with clubs.  His work with Minnesota
was "very infrequent," and he maintained his full-time job at the
golf club fitting service.  *See id.* at 266:4-19, 266:24-268:3.[13]

Volunteer coaches in baseball similarly had varying levels of
responsibility and time commitments.  At the University of
Pittsburgh, David Mesoraco is a former professional baseball
player who for a time served as a volunteer coach so that he could
spend more time with his family but remain involved with the team.
He had "significantly fewer responsibilities than full-time
assistant coaches" while volunteering, working with the team on a
"periodic basis" and traveling with the team "at his discretion."
Declaration of Ryan Varley ("Varley Decl.") ¶ 15.  At the
University of Minnesota, one volunteer baseball coach co-owned a
hitting facility, which was his "primary job" when he was a
volunteer coach.  McCreadie Decl. Ex. 3, Carter Dep., at 270:18-
23, 271:2-272:8, 282:1-8.

Some universities retained well-known professional athletes
to serve as volunteer coaches and train alongside their student-
athletes.  For example, Katie Ledecky, the nine-time Olympic gold

---

[13] Mr. Carter also testified that the volunteer pole vault coach
for track and field who did not work with the team all the time
and had outside full time jobs.  McCreadie Decl. Ex. 3, Carter
Dep., at 269:14-270:2.  Mr. Carter explained that other volunteer
coaches at the University of Minnesota coached "in name only."
*Id.* at 264:18-22; *see also* Acunto Decl. ¶ 9 (describing the
various part-time volunteer coach roles at Fresno State); Varley
Decl. ¶ 15 (noting that volunteer coaches have served different
roles on different teams at University of Pittsburgh).

medalist, took a position as a volunteer coach for the University of Florida's swimming and diving program so that she could train for the 2024 Olympics with Florida's head swim coach.[14]  Ryan Crouser, a three-time Olympic gold medalist in the shot put, was a volunteer coach at the University of Arkansas while training for the Olympics.  *See* Hamilton Decl. ¶ 18.  And Billy Horschel, a professional golfer who has eight wins on the PGA Tour, served as a volunteer golf coach at the University of Florida, though "his presence was spotty."  McCreadie Decl. Ex. 4, Tealer Dep., at 207:9-11.[15]

For others, the volunteer coach position provided a foot in the door to a potential coaching career.  As the *Smart* Plaintiffs' expert acknowledged, the volunteer position was "a way for coaches to move their way up."  *Id.* Ex. 2, Rascher Dep., at 140:6-10.  For example, Mr. Smart was a former minor league baseball player who took the volunteer position as a step on the "ladder of the [baseball] coaching ranks . . . to be[coming] a paid assistant."  *Id.* Ex. 8, Smart Dep., at 13:8-14; 88:2-89:17; *see also id.* Ex. 4, Tealer Dep., at 173:15-174:18.  Similarly, Mr. Robinson, one of the *Colon* Plaintiffs, began working as a volunteer swim coach at

---

[14] Bridgette Underwood, *Katie Ledecky Joins Gators Coaching Staff*, FLORIDA GATORS NEWS (Sept. 22, 2021), https://floridagators.com/news/2021/9/22/mens-swimming-diving-katie-ledecky-joins-gators-coaching-staff.aspx#:~:text=Seven%2Dtime%20Olympic%20gold%20medalist,as%20a%20volunteer%20swimming%20coach.

[15] Arizona State also had a retired professional golfer as a volunteer coach from 2018 to 2023.  He continues to coach there as an unpaid assistant.  He travels with the golf team once or twice a year to tournaments and attends practice two to three times a week for approximately one to two hours.  Wombacher Decl. ¶ 13.

the University of Virginia because he wanted "to learn from smart people." *Id.* Ex. 9, Robinson Dep., at 53:1-3. So, too, for the current head baseball coach at the University of Minnesota, who got his first Division I coaching job as a volunteer coach after finishing his time playing baseball at the University. He ultimately transitioned to an assistant coach position before being promoted to head coach this year. *See Id.* Ex. 3, Carter Dep., at 270:18-272:4.[16]

Other volunteer coaches were not interested in pursuing a career in coaching. UC Davis's volunteer women's water polo coach is a local doctor who "comes to practices as it fits with his schedule."[17] Flushman Decl. ¶ 12. Ms. Ray, the professional sprinter, has never applied for another coaching position at any level. McCreadie Decl. Ex. 12, Ray Dep., at 121:4-14. And Mr. Barajas started as a volunteer women's volleyball coach at Fresno State University after retiring from a decades-long career as a claims adjuster for State Farm because of his passion for the game and for working with young people. *Id.* Ex. 10, Barajas Dep., at 12:21-14:13, 91:12-16, 94:21-96:13. At Arizona State, the University did not hire all volunteer coaches as paid coaches for the sports in which it created additional paid coaching positions because, among other things, "[s]ome volunteer coaches were not

---

[16] At Fresno State, Jack Karraker was the volunteer coach for the 2022-2023 season. He has stayed an unpaid coach at Fresno State even after the volunteer coach bylaw was repealed. He is seeking a paid baseball coaching position while volunteering. *See* Acunto Decl. ¶ 8.

[17] This coach continued to coach UC Davis's women's water polo team on an unpaid basis following the bylaw change in July 2023. Flushman Decl. ¶ 12.

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  offered or did not want paid assistant coach positions due to the
2  lack of flexibility in being a paid coach."  Wombacher Decl. ¶ 19.

3      **D.**    **Following the Change in Bylaws, Most Institutions in**
        **Most Sports Have Not Added Paid Coaching Positions**
4

5      In January of 2023, the NCAA Division I membership voted to
6  repeal the challenged bylaws.  That repeal eliminated the
7  volunteer coach position and increased the number of paid coaches
8  that schools could hire in the sports where volunteers previously
9  were permitted.  McCreadie Decl. Ex. 4, Tealer Dep., at 107:16-19,
10 114:21-115:8.  The amended bylaws went into effect on July 1,
11 2023, before the 2023-2024 academic year.  *Id*. at 128:14-22.

12     According to the data used by the *Colon* Plaintiffs' expert,
13 63 percent of programs in the sports at issue in the *Colon* case
14 did *not* add an additional paid coach in the 2023-2024 academic
15 year.  In fact, in all but three sports, the majority of programs
16 in each sport chose not to add an additional paid coach.  *Id.*
17 Ex. 5, Ashenfelter Dep., at 128:12-16, 129:1-6; *see also id.*
18 Ex. 1, Expert Report of Jee-Yeon K. Lehmann, (hereinafter "Lehmann
19 Report") ¶¶ 35-36 & Exhibit 2.  In men's and women's golf, men's
20 and women's tennis, and women's field hockey, more than two-thirds
21 of programs did not add new positions.  Lehmann Report ¶¶ 35-36 &
22 Exhibit 2.  Even in baseball, the *Smart* Plaintiffs' expert found
23 that 46 percent of the Division I baseball programs he analyzed
24 did not add a paid assistant baseball coach in the year following
25 the bylaw change.[18]  Amended Expert Declaration of Daniel A.

26

27 [18] Jack Karraker at Fresno State is an example of a volunteer
baseball coach who was retained as an unpaid assistant coach after
28 the bylaw change.  *See* Acunto Decl. ¶ 8.

-23

1  Rascher in Support of Motion for Class Certification, dated Nov.

2  7, 2024 (ECF 64-02), ("Rascher Report") ¶ 23.

3      Colleges and universities made different decisions about

4  their volunteer coaches for different reasons.  The University of

5  Arkansas chose to hire additional assistant coaches in four of the

6  sports in which it previously had volunteers, but not in ten

7  others (men's track and field, men's cross country, women's cross

8  country, men's tennis, women's tennis, women's swimming and

9  diving, men's golf, women's golf, women's track and field, and

10 women's volleyball).  Hamilton Decl. ¶¶ 25-27.  Only two of the

11 four coaches hired to fill the new positions had previously been

12 volunteers at Arkansas.  *See id.* ¶ 28.

13     Arizona State University ("ASU") hired additional paid

14 assistant coaches for the 2023-2024 school year in only 11 of the

15 23 sports that ASU supports in which a volunteer coach previously

16 had been permitted.  Wombacher Decl. ¶ 18.  Although Arkansas did

17 *not* add paid positions in men's tennis, women's tennis, and

18 women's swimming and diving, ASU did.  *See id.*  ASU's Athletics

19 Department also turned down requests from several other teams to

20 add another paid coach and did not hire additional paid assistant

21 coaches in 12 sports.  ASU did not add paid positions in women's

22 cross country/track and field (indoor and outdoor), men's golf,

23 and women's golf even though Arkansas *did* add paid positions in

24 those sports.  *Id.* ¶¶ 17-18, 20.  And the men's and women's golf

25 and beach volleyball teams at ASU each continued to hire an unpaid

26 coach following the bylaw change.  *See id.*

27     UC Davis, meanwhile, added only four paid assisted coaching

28 positions and chose not to expand its paid coaching staff for

1   twelve other sports in which it used volunteers.  Flushman Decl.

2   ¶¶ 14, 17-18.  Only two of the new paid coaches had previously

3   been volunteer coaches at UC Davis; each was given an annual

4   salary of $10,000 with no benefits.  *Id.* ¶¶ 17-18.  UC Davis did

5   not add additional paid positions because "it was not an

6   institutional priority for UC Davis to convert its volunteer coach

7   position to a paid coach position" and "[t]here was insufficient

8   funding and support to add paid assistant coach positions in our

9   other sports."  *Id.* ¶¶ 16, 19.  UC Davis continues to hire unpaid

10  coaches in eleven sports.  *Id.* ¶¶ 20-21.[19]

11       Finally, Fresno State added *no* additional paid assistant

12  coach positions following the bylaw change, *see* Acunto Decl. ¶ 6,

13  because "[t]here is no money to hire more assistant coaches,"

14  Adishian-Astone Decl. ¶ 16.  Fresno State's athletics department

15  has "operated at a deficit of $3-5 million in recent years" and

16  the University "took a 5% budget cut [from California] for the

17  2024-2025 academic year."  *Id.* ¶¶ 7, 12.[20]  Fresno State continues

18  to hire unpaid coaches in several sports, including baseball and

19

20  _____

21  [19] The University of Minnesota did not hire all of the volunteer
    coaches who worked in 2022-2023 for paid positions for 2023-2024,
22  and after the bylaw repeal, Minnesota continued to hire volunteer
    coaches in track and field, soccer, and rowing.  McCreadie Decl.
23  Ex. 3, Carter Dep., at 272:18-276:5.  The University of Pittsburgh
    created eight new paid assistant coach positions for the 2023-2024
24  season, but only hired one of its then-existing volunteers to fill
    those positions.  Varley Decl. ¶ 19.
25
26  [20] Not all schools in Division I have been affected by budget
    cuts.  At the University of Florida, for example, the athletics
27  budget "grew every year," which allowed the school to hire
    additional coaches following the bylaw repeal.  McCreadie Decl.
28  Ex. 4, Tealer Dep., at 167:14-168:17.

1  softball (the sports for four of the seven Plaintiffs in these

2  cases).  *See* Acunto Decl. ¶¶ 6-8.

3      Even schools within the same conference made very different

4  decisions about whether to add additional coaches in particular

5  sports and, if so, how much to pay them.  *See* Lehmann Report

6  ¶¶ 70-75 & Exhibits 8-9 (providing examples).  For example, the

7  University of Wyoming added a paid coaching position in 2023 in

8  women's volleyball, but hired someone other than the previous

9  year's volunteer coach for that position.  McCreadie Decl. ¶ 5,

10  Ex. 23.  By contrast, the University of Nevada, Las Vegas, which

11  competes against Wyoming in the Mountain West, did not add a paid

12  position in women's volleyball and continued hiring a volunteer

13  instead.  *Id.* ¶ 6, Ex. 24.  And in the Big South Conference, only

14  1 of 8 schools added a third paid assistant baseball coach

15  following the bylaw change; four retained an unpaid third

16  assistant baseball coach; and three others did not add a position

17  and did not have a volunteer.  *See* Lehmann Report ¶¶ 74-75 &

18  Exhibit 9.  As the NCAA's expert has explained, "[t]he fact that

19  schools in the same conference who share some characteristics made

20  different hiring decisions in the same sport suggests that the

21  factors affecting the decision to hire additional paid coaches are

22  school-specific."  *Id.* ¶ 72.

23      **E.    Plaintiffs Have Never Worked in Paid Division I Coaching
         Positions**

24

25      Plaintiffs assert that *all* volunteers who are members of the

26  class would have been hired for paid positions in Division I.  But

27  *none* of the named Plaintiffs in either case was hired for a paid

28  assistant coach position after the NCAA membership amended the

bylaws.  Indeed, none of the named Plaintiffs has ever held a paid coaching position at a Division I university.  *See* McCreadie Decl. Ex. 8, Smart Dep., at 214:21-215:3; *id.* Ex. 13, Hacker Dep., at 140:17-23; *id.* Ex. 12, Ray Dep., at 121:4-7; *id.* Ex. 9, Robinson Dep., at 185:18-21; *id.* Ex. 11, Taylor Dep., at 240:3-7; *id.* Ex. 10, Barajas Dep., at 38:20-23; *id.* Ex. 14 at 8-10.  Only one has ever held a paid coaching position at *any* level of collegiate competition—and that was in Division II.[21]  *See id.* Ex. 15, Sebbane Dep., at 44:15-45:15; *id.* Ex. 16 at 5-8 (interrogatory responses reflecting that neither Mr. Hacker nor Mr. Smart has held a paid college-level coaching position); *id.* Ex. 17 at 8 (same for Mr. Barajas); *id.* Ex. 18 at 8-10 (same for Ms. Ray, Mr. Robinson, and Ms. Taylor).

Several of the Plaintiffs repeatedly applied to paid Division I coaching positions but did not receive offers.  *See id.* Ex. 11, Taylor Dep., at 232:1-234:13, 236:3-8 (applied to paid softball coaching positions at 13 different DI schools and did not receive any offers); *id.* Ex. 15, Sebbane Dep., at 189:13-192:12 (applied to paid softball coaching positions at 4 different Division I programs and received an offer only at one).

Some Plaintiffs have not been hired for jobs even coaching at levels that they claim are less competitive than coaching in Division I.  *See id.* Ex. 11, Taylor Dep., at 232:1-234:13, 236:3-8

---

[21] Another, Mr. Smart, worked as a student assistant baseball coach at the University of Tennessee and a graduate assistant baseball coach at the University of Arizona before working as a volunteer at Arkansas.  McCreadie Decl. Ex. 8, Smart Dep., at 14:20-15:12.  In this capacity, he earned a stipend to cover the costs of completing his degree.  *Id.* at 52:16-53:11.

1  (rejected from DII and high school coaching positions); *id.*

2  Ex. 15, Sebbane Dep., at 189:13-192:12 (rejected from DII and DIII

3  positions); *id.* Ex. 10, Barajas Dep., at 148:14-149:3 (rejected

4  from junior college position); *see also id.* Ex. 18 at 5-6

5  (describing "high school and lower division collegiate" sports

6  competition as "inferior to Division I"); *id.* Ex. 17 at 11.

7  **III. <u>LEGAL STANDARD</u>**

8      "Class actions are the exception to the usual rule that

9  litigation is conducted by and on behalf of the individual named

10 parties only.  They are also onerous and costly for defendants,

11 who may feel pressured into settling questionable claims" to avoid

12 even a small chance of a devastating loss." *Black Lives Matter*,

13 113 F.4th at 1257–58 (quotations omitted).  "Class certification

14 is thus not to be granted lightly.  To ensure that it is not, Rule

15 23 mandates that district courts rigorously analyze whether a

16 proposed class meets various requirements." *Id.* at 1258

17 (quotations and citation omitted).

18      To grant certification, this Court would need to "first find,

19 among other things, that the class raises common questions under

20 Rule 23(a)—meaning, questions that are 'central to the validity'

21 of the claims and capable of being resolved 'in one stroke.'" *Id.*

22 (citation omitted).  "And to certify a damages class under

23 Rule 23(b)(3), the burden is even higher: the district court must

24 find that common questions predominate over individual ones.

25 Showing predominance is difficult, and it regularly presents the

26 greatest obstacle to class certification." *Id.* (quotations marks

27 and citations omitted).

28

1    "Rule 23 does not impose a mere pleading standard; plaintiffs

2    cannot plead their way to class certification through just

3    allegations and assertions."  *Id.*  Instead, Plaintiffs "must

4    affirmatively demonstrate by a preponderance of actual evidence

5    that they satisfy all the Rule 23 prerequisites."  *Id.* (quotations

6    and citation omitted).  To meet that standard, "plaintiffs must

7    actually *prove*—not simply plead—that their proposed class

8    satisfies each requirement of Rule 23."  *Id.* (quotations and

9    citation omitted).

10    "With respect to the predominance inquiry specifically, a

11    district court must evaluate the method or methods by which

12    plaintiffs propose to use the class-wide evidence to prove the

13    common question in one stroke."  *Lytle v. Nutramax Lab'ys, Inc.*,

14    114 F.4th 1011, 1023 (9th Cir. 2024) (quotations and citation

15    omitted).

16    **IV.**    **ARGUMENT**

17        **A.**    **Plaintiffs Cannot Show Predominance Because They Lack**
                **Class-Wide Proof Of Whether Each Class Member Was**
18                **Injured**

19             **1.**    **Plaintiffs Need Class-Wide Proof of Whether Each**
                    **Class Member Was Injured**
20

21    To satisfy the requirements of Rule 23(b)(3), Plaintiffs must

22    prove by a preponderance of the evidence that "essential elements

23    of the cause of action, such as . . . an antitrust violation or

24    antitrust impact, are capable of being established through a

25    common body of evidence, applicable to the whole class."  *Olean*,

26    31 F.4th at 666 (quotations and citation omitted).

27    "Antitrust 'impact'—also referred to as antitrust injury—is

28    the 'fact of damage' that results from a violation of the

1  antitrust laws," *Sidibe v. Sutter Health*, 333 F.R.D. 463, 492

2  (N.D. Cal. 2019) (citation omitted), and it is "critically

3  important for . . . Rule 23(b)(3)'s predominance requirement."

4  *High-Tech*, 289 F.R.D. at 565-66 (citation omitted).  In short,

5  "for cases involving antitrust violations, common issues do not

6  predominate unless the issue of impact is also susceptible to

7  class-wide proof."  *Id.* at 566 (denying class certification); *see*

8  *also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d

9  619, 623 (D.C. Cir. 2019) ("Without common proof of injury and

10  causation, [antitrust damage] plaintiffs cannot establish

11  predominance.").[22]

12      Courts thus regularly deny class certification when antitrust

13  plaintiffs lack one body of evidence to prove the issue of impact

14  to each class member.  That was what happened in *Rock v. NCAA*, a

15  putative antitrust class action in which the plaintiffs alleged

16  that they would have received multi-year scholarships were it not

17  for an NCAA bylaw.  *See* No. 112CV01019TWPDKL, 2016 WL 1270087, at

18  *1 (S.D. Ind. Mar. 31, 2016).  The court there denied class

19  certification after concluding that real-world data showed that

20  the plaintiffs' assumptions about what the world would have been

21  like for them without the challenged bylaw were "unsubstantiated"

22  and that instead "individual inquiries [about whether each class

23  member suffered antitrust injury] predominate."  *Id.* at *14.  The

24  same conclusion is compelled here.

25

26  [22] The NCAA preserves for Supreme Court review the argument that
   Plaintiffs must show that *all* class members suffered injury as a
27  result of the challenged conduct to comport with Article III
   standing requirements.  *See TransUnion LLC v. Ramirez*, 594 U.S.
28  413, 430-31 (2021).

1    The plaintiffs in *Rock* challenged NCAA rules that limited the

2 total number of athletic scholarships——known as grants-in-aid or

3 "GIAs"——that an institution could award and capped the duration of

4 each GIA at one year.  *Id.* at *1.  Plaintiffs alleged that these

5 rules harmed competition in what they called a "labor market" for

6 Division I football student-athletes.  *Id.*  Dr. Daniel Rascher,

7 who is also the *Smart* Plaintiffs' expert in this case, opined

8 that, "but for the [challenged GIA rules], all [potential recruits

9 to FBS football teams] (including all [class members]) would have

10 received a multi-year Division I GIA."  *Id.* at *13.[23]

11    The Court, however, found that "the facts do not support

12 Rascher's extreme position" because after the challenged rules

13 were repealed, "many member institutions . . . declined to offer

14 multi-year GIAs, and even those institutions that d[id] make such

15 awards, d[id] not offer them to all student-athletes."  *Id.* at

16 *14.  In other words, the real world did not reflect Dr. Rascher's

17 prediction that all class members would receive multi-year GIAs—

18 which is similar to Dr. Rascher's baseless assumption in this case

19 that all *Smart* class members would have been hired for paid

20 Division I coaching positions (*see* pages 41-45 and 49-50 below).

21 Accordingly, the court in *Rock* found that "anti-trust injury as to

22 each member of the class cannot be proven without considering the

23 facts surrounding each class member, including whether each member

24 would have actually received a multi-year GIA or would not have

25 otherwise had their GIA reduced or canceled."  2016 WL 1270087, at

26

27 [23] Dr. Rascher testified here that he had no memory of the
opinions he offered in the *Rock* case.  McCreadie Decl. Ex. 2,

28 Rascher Dep., at 43:6-19.

1  *14.  The Court therefore held that "issues of liability,

2  particularly the impact of the alleged anti-trust violations,

3  cannot be easily established through class-wide proof because

4  *individual inquiries predominate*," and denied class certification.

5  *Id.* (emphasis added).

6       Similarly, courts have denied certification in other putative

7  antitrust class actions alleging interference in a labor market

8  because plaintiffs lacked common proof of whether each class

9  member was injured.  For example, in *Johnson v. Arizona Hospital &*

10 *Healthcare Association*, Plaintiffs challenged the defendants'

11 alleged unlawful conspiracy to "fix[] . . . wages" for travel

12 nurses on behalf of a putative class of such nurses.  No. CV07-

13 1292-PHX-SRB, 2009 WL 5031334, at *1 (D. Ariz. July 14, 2009).

14 The Court denied certification of the class because it failed the

15 predominance requirement.  *See id.* at *8-9.  The Court explained:

16 "Each traveling nurse's arrangement [with their employer] appears

17 to be different, which would require the Court to engage in

18 individualized inquiries in order to determine whether and to what

19 extent each nurse was impacted by Defendants' allegedly

20 anticompetitive behavior."  *Id.* at *9.

21      The Court in *Fleischman v. Albany Medical Center* denied class

22 certification for similar reasons.  *See* No. 06-CV-0765, 2010 WL

23 681992 (N.D.N.Y. Feb. 16, 2010).  In that case, the plaintiffs

24 were registered nurses in the Albany, New York area who alleged

25 that Albany hospitals had conspired to suppress wages.  Dr. Orley

26 Ashenfelter, who is the *Colon* Plaintiffs' expert in this case,

27 opined that "all or nearly all" of the nurses in the class were

28 underpaid "in comparison to what they would have been paid but-for

-32-

1 the conspiracy." *Id.* at \*6.  The defendants responded that

2 "[w]ages of staff nurses vary for many reasons, including

3 experience, tenure, job title, hospital, education and training,

4 unit of care, part-time versus full-time employment status, and

5 alternative employment opportunities." *Id.*  The Court agreed that

6 "these variables cannot be accounted for without individualized

7 inquiry," and denied certification.  *Id.*

8     In short, "[w]hat really matters is whether the class can

9 point to common proof that will establish antitrust injury . . .

10 on a classwide basis." *In re Capacitors Antitrust Litig. (No.*

11 *III)*, No. 14-CV-03264-JD, 2018 WL 5980139, at \*14 (N.D. Cal.

12 Nov. 14, 2018) (quotations and citation omitted).  As explained

13 below, the evidence and undisputed facts show that the answer in

14 this case is No.

15        **2.   In this Case, Proof of Injury Will Turn on Evidence**
            **Unique to Each Class Member, Requiring Mini-Trials**
16

17     Plaintiffs do not have common proof of injury because the

   evidence shows that whether each class member was injured will
18
   depend on evidence unique to each class member.  Plaintiffs must
19
   show "whether a class-member-by-class-member assessment of the
20
   individualized issue will be unnecessary or workable." *Van*, 61
21
   F.4th at 1069.  Plaintiffs cannot meet that burden here because
22
   "of the complexity of the individualized questions." *Bowerman*, 60
23
   F.4th at 471.  Here, determining whether each putative class
24
   member was injured would require (1) reconstructing thousands of
25
   budgeting decisions by hundreds of different colleges and
26
   universities, and then (2) doing the same for each institution's
27
   decision about whether to hire their former volunteer coaches for
28

1   any newly created paid positions.  Each of these questions

2   necessarily will depend on proof that differs from institution to

3   institution, sport to sport, year to year, and coach to coach.  A

4   failure to show a common body of proof on *either* question is fatal

5   to class certification.[24]  *See Olean*, 31 F.4th at 665-66.

6           **(a)   Plaintiffs Lack Common Proof to Reconstruct
                    Decisions To Add Additional Positions Needed to
7                   Prove Injury**

8                   **(i)   Evidence of Actual School Behavior Creates
                            Individualized Issues**

9           The threshold step in proving injury to each class member

10  here would be to prove that the institution where they coached

11  would have added an additional paid coaching position in their

12  sport if the NCAA Division I bylaws had permitted the institution

13  to do so.  Without that showing, the Court need not proceed

14  further on this motion.  Plaintiffs do not have a common body of

15  evidence to prove that fact for each position in each year of the

16  class period.  The problem for Plaintiffs is that most schools did

17  *not* hire additional paid coaches in most sports when the NCAA

18  bylaws were amended in 2023 to permit schools to do so.  *See*

19  McCreadie Decl. Ex. 6, Ashenfelter Dep., at 128:12-16, 129:1-6.

---

[24] The individualized issues that defeat class certification here
include the individualized defenses that the NCAA may raise as to
certain class members' claims.  *See, e.g.*, *True Health
Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir.
2018) ("Defenses that must be litigated on an individual basis can
defeat class certification.").  For example, certain putative
class members served as volunteer coaches in sports programs that
had *fewer* than the maximum allowable number of paid coaches.  *See*
Lehmann Report ¶¶ 38-39 & Exhibit 3 (providing statistics by
sport).  These individuals did not suffer antitrust injury because
the at-issue bylaws did not prevent them from being paid.
Identifying these individuals, however, requires individualized
facts.

-34

1    The majority of schools for which the *Colon* Plaintiffs'
2  expert had data did not hire an additional paid coach in *any* of
3  the sports that they sponsor that are at issue in the *Colon* case.
4  *See* pages 23-26 above; McCreadie Decl. Ex. 6, Ashenfelter Dep., at
5  208:3-10; Lehmann Report ¶¶ 35-36 & Exhibit 3.  In some sports,
6  like women's field hockey, men's golf, and women's tennis, fewer
7  than a third of programs added a new coach.  Lehmann Report ¶¶ 35-
8  36 & Exhibit 2.  In fact, 20 percent of programs at issue in *Colon*
9  (meaning those that used a volunteer coach) did not hire the
10  maximum number of paid coaches even in the academic year preceding
11  the bylaw change.[25]  *Id.* ¶¶ 38-39 & Exhibit 3; *see also* McCreadie
12  Decl. Ex. 19 (assistant commissioner of the Missouri Valley
13  Conference explaining ████████████████████████████████████
14  ███████████████████████████████████████████████████████████
15  ███████████

16    In baseball, the amendment to the bylaws increased the
17  maximum number of paid assistant coaches in baseball from two to
18  three.  The *Smart* Plaintiffs' expert, Dr. Rascher, found that, of
19  the 85 Division I member schools he analyzed, only 54 percent had
20  added a third paid assistant baseball coach after the bylaws were
21  amended.  Rascher Report ¶ 23.[26]  Even during the class period, 3

---

[25] Importantly, any putative class members who volunteered at such
schools would not have suffered antitrust injury, because the NCAA
bylaws did not prevent them from being paid.

[26] Fresno State is an example of a school that did not add an
additional paid assistant baseball coach.  Jack Karraker was a
volunteer baseball coach at Fresno State in the 2022-2023 season,
and after the bylaw repeal, he continued as an unpaid assistant
coach for the 2023-2024 season.  *See* Acunto Decl. ¶ 8.  Yet,
Fresno State baseball remains in the proposed class.  *See Smart*
Motion at p. ii.

percent of schools with a volunteer baseball coach did not hire both paid assistant baseball coaches that the bylaws permitted at that time.   Lehmann Report ¶¶ 38-39 & Exhibit 3.

Thus, this case is like *Rock*, where the court denied class certification, because "the facts do not support" the "extreme position that all" schools would have added an additional paid coaching position "in the absence of the challenged rules."  2016 WL 1270087, at *14.  "[S]ince the repeal of the" challenged rules "many member institutions have declined to" add additional paid positions.  *Id.*  Accordingly, it is "clear that, in order to determine the actual impact to the individual class members, individual inquires will predominate over common ones."  *Id.*

Under Ninth Circuit law, evidence that most schools did not add an additional paid coaching position when the bylaws permitted them to do so "substantiates" the existence of "an individualized issue," *Van*, 61 F.4th at 1069:  would each school that did not hire an additional paid coach have made a different budget decision in a but-for world?  Indeed, evidence that *most* programs did not hire additional paid coaches "summon[s] the spectre of class-member-by-class-member adjudication" even more strongly than in *Van*.  *Id.*  There, based on evidence that only 18 out of 13,680 may not have had a claim, the Ninth Circuit held that "a class-member-by-class-member assessment of the individualized issue will be unnecessary or workable."  *Id.*

                     (ii) Plaintiffs Lack Common Proof to Address Those Individual Issues

Plaintiffs cannot meet their burden because they do not have one body of evidence that would enable them to reconstruct in a

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

single trial thousands of school decisions about adding a paid position.  As explained above, a school's decision whether to add an additional paid coaching position depends on budget constraints, resources, athletic program priorities, sports traditions, fan support, and other factors that vary enormously among more than 350 very different colleges and universities. *See* pages 10-16 above (describing differences among Division I institutions); *see also* Lehmann Report ¶ 46 ("A [sports] program's ability to hire an additional paid coach depends on its demand for coaching services, which depends on a range of school-, sport-, and program-specific factors."); *id.* ¶¶ 47-64 (discussing specific factors and record evidence).  Even schools in the same conference who share certain characteristics and schools that spent similar amounts on the same sports made different decisions, suggesting that the factors driving those decisions are highly school-specific.  *Id.* ¶ 72.  Thus, the NCAA itself predicted in the official proposals to amend the bylaws that the "estimated budget impact" of increasing the number of paid coaches that schools can hire in each sport will be "dependent on institutional decisions." McCreadie Decl. Ex. 20 at 12; *see also id.* Ex.21 at 2 (rationale for 2018 effort to repeal bylaws for baseball and softball stating that "estimated budget impact" would "vary based upon institutional hiring decisions").  The *Colon* Plaintiffs' expert thus admitted that in order to explain why a school did not hire an additional paid coach in a particular sport after the bylaws were amended, "[y]ou obviously would have to depose people" at each school, which "would be hard."  *Id.* Ex. 6, Ashenfelter Dep., at 141:9-142:3.

**Colon Plaintiffs.** That expert, Dr. Ashenfelter, testified that he was not offering any opinion that *all* programs would have added an additional paid coach position in *all* sports even in a fully competitive market or whether they could have afforded to do so. McCreadie Decl. Ex. 6, Ashenfelter Dep., at 89:10-15, 90:7-15, 105:15-20, 132:18-136:5, 145:19-146:2. He also did not even try to build a model that would predict which programs would have added an additional paid coach position in the but-for world. *Id.* at 123:16-21, 125:12-16. Nor did he try to address why each program that did not add an additional paid coach position in a particular program after the bylaws were amended made that decision. *Id.* at 144:8-13. He did not even investigate how any college or university athletic department (even at Princeton, where he teaches) is funded, allocates its budget, approves adding paid positions or prioritizes various sports. *Id.* at 95:8-102:11.

In short, Dr. Ashenfelter did nothing to determine which schools would have hired an additional paid coach in which sports, and which would not have done so. This alone precludes class certification in the *Colon* case. *See, e.g.*, *Olean*, 31 F.4th at 666 n.9 (noting that "[c]ourts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23" where, for example, "the evidence contained unsupported assumptions"); *Sidibe*, 333 F.R.D. at 497 (denying class certification where expert "assumed what she set out to prove").

Dr. Ashenfelter's assertions that "lingering effects" or "residual collusion" could explain why some schools did not add paid positions in 2023-2024 are not common proof of injury to each

coach during the class period.  *See* Ashenfelter Report ¶¶ 50-51;
*see also Colon* Mot. at 32.  Dr. Ashenfelter testified that he did
not study and had no evidence that any Division I schools colluded
after the bylaws were amended.  McCreadie Decl. Ex. 6, Ashenfelter
Dep., at 147:19-148:11.  And he admitted that these explanations
were *not* "affirmative evidence that all colleges and universities
in Division I would have paid additional coaches in every sport
during the class period."  *Id.* at 132:1-10.  Thus, the "lingering
effects" explanations are merely hypotheses about why some schools
did not add paid positions in the actual world, not proof of what
would have happened in the but-for world.  *Id.* at 132:11-19.  Dr.
Ashenfelter did not try to determine whether any of his "lingering
effects" hypotheses explained *any* school's decision, let alone all
of them.  *Id.* at 146:13-18, 147:6-13, 147:19-148:3.  In fact, he
has no opinion at all "as to why any particular Division I sports
program didn't hire an additional paid coach after the bylaws were
changed."  *Id.* at 136:6-10.

        To the extent that the *Colon* Plaintiffs are simply assuming
that *all* schools would have added an additional paid position in
*all* programs where they hired a volunteer (which is not their
expert's opinion), that assumption is not based on evidence and
cannot support class certification.  It ignores that the bylaw
change only gave member schools the *option* of hiring additional
paid coaches, but left the decision whether to do so to each
school individually.  As an assistant commissioner of the
Division I Missouri Valley Conference put it:  "What the NCAA did
not and cannot do [via the bylaw change] . . . is dictate
institutional employment policy.  Each institution must

1  independently determine how much they pay employees and whether
2  they will permit unpaid individuals." McCreadie Decl. Ex. 19.

3      Indeed, the analysis of the *Smart* Plaintiffs' expert,
4  Dr. Rascher, undercuts any assumption that *all* schools would have
5  hired an additional paid coach in *all* sports. Dr. Rascher
6  testified that he was not offering the opinion that "all schools
7  who hired a volunteer baseball coach would have hired a third paid
8  baseball assistant in the but-for world." *Id.* Ex. 2, Rascher
9  Dep., at 150:6-151:2; *see also id.* 162:17-19, 169:8-23; Rascher
10  Report ¶ 174 (some schools may "never" hire additional paid
11  coach). Dr. Rascher's model predicted that more than 70 baseball
12  programs would not have hired an additional paid coach, so the
13  *Smart* Plaintiffs dropped volunteers at those programs from the
14  class. McCreadie Decl. Ex. 2, Rascher Dep., at 151:3-153:3. The
15  *Colon* Plaintiffs cannot explain why schools would have added an
16  additional paid coach in every sport other than baseball when that
17  is not what the *Smart* Plaintiffs say schools would have done in
18  baseball.[27]

19      The *Colon* Plaintiffs cannot waive these problems away simply
20  by noting that schools would have paid additional coaches because
21  volunteers provided some value. The parties' experts agree that
22  it is basic economics that market actors will sometimes accept
23  products or services for free that they would not or could not pay

24  ────────────
25  [27] Any assumption to the contrary also contradicts published
    studies that have found that almost 20% of NCAA Division I
26  programs did not pay the maximum amount of scholarship grants to
    student-athletes years after NCAA bylaws were amended to increase
27  the cap. Rascher Report ¶ 178 & n.194. Dr. Ashenfelter could not
    recall any such study. McCreadie Decl. Ex. 6, Ashenfelter Dep.,
28  at 148:12-18.

1  for, just as fans at a baseball game will accept giveaways that

2  they would not necessarily buy at the souvenir stand.  *Id.* at

3  99:1-100:1; *id.* Ex. 6, Ashenfelter Dep., at 41:13-44:1; Lehmann

4  Report ¶ 118.  Further, both the *Colon* and *Smart* Plaintiffs'

5  experts have admitted that, unlike for-profit corporations, non-

6  profit colleges and universities will not always make expenditures

7  that will deliver more value than they cost.  McCreadie Decl.

8  Ex. 6, Ashenfelter Dep., at 57:10-22; *see also id.* at 55:13-17;

9  Rascher Report ¶ 165 ("Since D1 athletic departments are almost

10  entirely housed within non-profit institutions, they do not behave

11  in a purely profit-maximizing fashion, as a publicly traded

12  business typically does.").  Thus, the mere fact that volunteers

13  may have provided value does not necessarily mean that *all* schools

14  would have created or could have afforded to create additional

15  paid coaching positions.  Indeed, Dr. Ashenfelter testified that

16  he has no opinion about whether any school's athletic department

17  revenue would have been higher during the class period or where

18  the schools would have obtained the funds to support salaries for

19  more paid coaches.  McCreadie Decl. Ex. 6, Ashenfelter Dep., at

20  85:17-25.

21      ***Smart* Plaintiffs.**  In the *Smart* case, Dr. Rascher testified

22  that he was not offering the opinion that "all schools who hired a

23  volunteer baseball coach would have hired a third paid baseball

24  assistant in the but-for world."  *Id.* Ex. 2, Rascher Dep., at

25  150:23-151:2; *see also id.* at 162:17-19, 169:8-23; Rascher Report

26  ¶ 174.  Thus, Dr. Rascher conceded that some method is needed to

27  determine which schools would have added paid positions.  But

28  Dr. Rascher also conceded that Division I schools use "individual

1  decision making" in allocating their athletic budgets.  McCreadie

2  Decl. Ex. 2, Rascher Dep., at 25:25-27:3.  He thus testified that

3  he was not "offering any specific opinion as to why any particular

4  school did not hire an additional paid baseball coach after the

5  bylaws changed."  *Id.* at 160:22-161:3.  And he further testified

6  that he was not "offering any opinion that lingering effects and

7  the amount of time it takes for budgets to adjust explains why

8  every school that did not higher an additional paid baseball coach

9  made that decision."  *Id.* at 160:15-21.  Those concessions alone

10 warrant denial of class certification because the *Smart* Plaintiffs

11 have no model to explain the individualized issue of why each

12 baseball program that did not add a paid baseball coach position

13 after the bylaws were amended would have made a different decision

14 during the class period.

15        Dr. Rascher attempted to predict whether a school would have

16 added a paid baseball coaching position.  The inputs into his

17 model include a variety of factors that vary by school, including

18 head coach salary, salaries for paid assistant baseball coaches

19 during the class period and athletic department profits (or

20 losses).  Rascher Report ¶¶ 158-165.  Dr. Rascher's model,

21 however, is flawed and is not sufficient common proof to support

22 class certification.  *E.g. Reed v. Advoc. Health Care*, 268 F.R.D.

23 573, 589 (N.D. Ill. 2009) (denying motion for class certification

24 in case alleging collusion to suppress nursing wages where there

25 were "fundamental problems with" expert's regression "analysis

26 that go to the core of the predominance issue").

27        *First*, Dr. Rascher's model is wrong more than 20% of the

28 time——predicting additional coaches where there were none in the

-42-

1  real world after the bylaw amendment and missing additional

2  coaches that were hired in approximately equal proportion at that

3  time.  Rascher Report ¶ 169 & n.186; McCreadie Decl. Ex. 2,

4  Rascher Dep., at 204:4-14, 205:5-15; *see also Reed*, 268 F.R.D. at

5  593 (identifying "regression's high error rate" as a "glaring

6  problem" and denying class certification).[28]  At his deposition,

7  Dr. Rascher conceded that he did not know why any baseball program

8  made a different decision than his model predicts.  McCreadie

9  Decl. Ex. 2, Rascher Dep., at 206:19-209:13.  That also concedes

10 that there is an individualized issue here: to explain why

11 Dr. Rascher's model is wrong, "members of [the] proposed class

12 will need to present evidence that varies from member to member."

13 *Tyson Foods*, 577 U.S. at 453 (quotations and citation omitted).

14     *Second*, Dr. Rascher's model also cannot support class

15 certification because it predicts "nonsensical results such as

16 false positives."  *Olean*, 31 F.4th at 666 n.9.  Dr. Rascher's

17 model predicts damages to many coaches who are not part of the

18 class because they were not volunteers during the class period.

19 Lehmann Report ¶ 169.  In fact, Dr. Rascher's model predicts

20 damages for coaches at twenty-two schools "that did not hire any

21 additional coach—either paid or unpaid"—in the 2023-2024 season.

22 *Id.* ¶ 170.  As Dr. Rascher admitted, this means that his model

23 predicts damages for coaches who do not exist.  McCreadie Decl.

24 Ex. 2, Rascher Dep., at 220:5-12; *see Olean*, 31 F.4th at 683

25

[28] Indeed, for approximately 20% of the programs Dr. Rascher
26 predicts would have added a third paid assistant baseball coach in
   the but-for world, his conclusions "do not meet the 95 percent
27 confidence level threshold that is widely used to assess the
   statistic reliability of estimates."  Lehmann Report ¶ 148.
28

1  (court must consider whether model reflects "nonsensical

2  outputs").  A model that "detects injury where none could exist"

3  cannot support class certification.  *In re Rail Freight Fuel*

4  *Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013).

5      *Third*, Dr. Rascher assumed that the challenged bylaws would

6  not have been in effect for at least three years prior to the

7  start of the class period.  McCreadie Decl. Ex. 2, Rascher Dep.,

8  at 81:8-14.  But there is no evidence to support that assumption.

9  *See Olean*, 31 F.4th at 666 n. 9 (even admissible expert testimony

10  with "unsupported assumptions" is insufficient under Rule 23).

11      The mere fact that Dr. Rascher has proffered a model is not

12  enough to support class certification.  It is not the law that "at

13  the class-certification stage *any* method of measurement is

14  acceptable so long as it can be applied classwide, no matter how

15  arbitrary the measurements may be."  *Behrend,* 569 U.S. at 36.

16  Rather, "a district court must evaluate the method or methods by

17  which plaintiffs propose to use," *Lytle*, 114 F.4th at 1023

18  (quoting *Olean*, 31 F.4th at 666), and "[c]ertification should not

19  be automatic every time counsel dazzle the courtroom with graphs

20  and tables."  *In re Optical Disk Drive Antitrust Litig.*, 303

21  F.R.D. 311, 320 (N.D. Cal. 2014) (citation omitted).  "Rule 23 not

22  only authorizes a hard look at the soundness of statistical models

23  that purport to show predominance—the rule commands it."  *Sidibe*,

24  333 F.R.D. at 493 (citation omitted).  With a 20 percent error

25  rate, Dr. Rascher's model fails that hard look.

26              *       *       *       *

27      Neither the *Colon* nor the *Smart* Plaintiffs have proffered a

28  viable form of common evidence of whether each Division I

1   institution would have added additional paid coaching positions in

2   the absence of the challenged bylaws.  As a result, individualized

3   issues of antitrust injury will predominate and class

4   certification must be denied.  *See Olean*, 31 F.4th at 666.  The

5   Court does not have to go further.

> **(b)   Plaintiffs Lack Common Proof to Reconstruct Hiring Decisions Needed to Prove Injury**

6

7       Even if Plaintiffs had single body of evidence to show

8   whether each school would have added an additional paid coach in

9   the sport where the volunteer coached (which they do not), there

10  is an independent reason why the Court must nevertheless conclude

11  that Plaintiffs do not have class-wide evidence capable of proving

12  antitrust injury:  they do not have common proof that each

13  particular volunteer coach would have been hired for the

14  additional paid position.  Their experts do not proffer any model

15  to address this issue.  In fact, the *Colon* Plaintiffs' counsel

16  objected to questions about who would have hired one of the

17  Plaintiffs as "rank speculation."  *E.g.*, McCreadie Decl. Ex. 10,

18  Barajas Dep., at 146:5-10.

19      Instead, Plaintiffs raise a pure question of law, arguing

20  that they can show antitrust impact without accounting for

21  competition between class members and candidates who would have

22  been attracted to paid positions.  As set forth below, that is not

23  the law in this Circuit, and it is inconsistent with undisputed

24  economic principles.

> **(i)   There is No Dispute that Coaches Would Have Faced More Competition for Paid Positions**

25

26

27      There is no dispute that if Plaintiffs' positions had been

28  paid, then class members would have faced more competition for

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

coaching positions.  Plaintiffs' economists both agreed that it is "textbook, econ 101" that "higher pay will tend to . . . increase the labor supply": the more workers are paid for a job, the more workers who will be interested in that job.  McCreadie Decl. Ex. 2, Rascher Dep., at 112:12-20, 113:14-23; *see also id.* Ex. 6, Ashenfelter Dep., at 56:23-57:4 (economists "generally assume" that "higher wages would attract more workers").  In fact, Dr. Rascher conceded that nearly 30% of the coaches who were hired for newly-created Division I positions in baseball entered the market to take those positions.  *See* Rascher Report Ex. 1; McCreadie Decl. Ex. 2, Rascher Dep., at 120:11-16.  He said this reflects "market forces" at work.  *Id.* at 237:25-238:9.

The additional competition in the but-for world would come from several sources.  *First*, as Dr. Ashenfelter put it, some coaches "who would not have been interested in a volunteer coach position" would have been "interested in a paid coach position" because "people prefer jobs that pay more."  *Id.* Ex. 6, Ashenfelter Dep., at 173:9-25.  Plaintiff Taylor Smart agreed that this would be true for "any sort of job."  *Id.* Ex. 8, Smart Dep., at 140:18-141:2.

*Second*, some coaches who were already paid assistant coaches in Division I might have been interested in applying for paid positions that would have been added in the but-for world.  *Id.* Ex. 6, Ashenfelter Dep., at 58:3-12, 180:18-182:6.  Dr. Ashenfelter's model predicts that some schools would have paid an additional assistant coach more than other schools actually paid assistants in the same sport during the class period.  Lehmann Report ¶ 84.  Dr. Ashenfelter conceded that coaches who were paid

1  less than additional paid positions supposedly would have paid

2  would be interested in those additional paid positions.  McCreadie

3  Decl. Ex. 6, Ashenfelter Dep., at 178:14-179:6.  Indeed,

4  Dr. Rascher's analysis shows that 34% of coaches in his data

5  sample who were hired for paid baseball coaching positions added

6  after the bylaws were amended had worked as paid assistants at

7  different schools the year before.  Rascher Report Ex. 1.

8      *Third*, to the extent that coaches who were volunteers would

9  have stayed longer in their positions if they were paid, those

10 coaches would have potentially competed against volunteers who

11 began coaching in the same sport at the same school later in the

12 class period.  For example, Plaintiff Taylor Smart testified that

13 if he had been a paid coach, he would have been more likely to

14 continue coaching at Arkansas rather than leaving.  McCreadie

15 Decl. Ex. 8, Smart Dep., at 180:6-15.

16     The evidence shows that not all volunteers would have been

17 hired for paid positions if they faced these additional sources of

18 competition.  As noted, many schools that did add paid coaching

19 positions did not hire existing volunteers for those positions.

20 *See* pages 24-26 above.  For example, Plaintiff Khala Taylor, a

21 volunteer softball coach at San Jose State in the 2022-2023

22 season, applied for a paid assistant softball coach position there

23 for the 2023-2024 and 2024-2025 seasons and was not selected

24 either time.[29]  McCreadie Decl. Ex. 11, Taylor Dep., at 241:10-

25

26 [29] The position to which Ms. Taylor applied was a preexisting paid
   coaching position; San Jose State did not add a third assistant
27 softball coach position following the change in bylaws due to
   funding constraints.  McCreadie Decl. Ex. 11, Taylor Dep., at
28 191:7-192:11.  Ms. Taylor also applied to serve as a volunteer at

242:1.   Plaintiff Rudy Barajas, a volunteer women's volleyball coach at Fresno State from 2018 through December 2023, continued to coach as a volunteer following the bylaw change and was not offered compensation by the university even though the bylaws permitted him to be paid.  *Id.* Ex. 10, Barajas Dep., at 132:23-134:6.   In fact, Barajas was not hired for a paid position coaching volleyball at a junior college (a less competitive position) that he applied for in 2024.  *Id.* at 148:14-149:3; *id.* Ex. 17 at 11; *see also* Wombacher Decl. ¶ 19 (Arizona State created ten new paid assistant coaching positions, but only hired five of the prior year's volunteer coaches into those positions).

Consistent with this evidence, in the *Smart* case, Dr. Rascher found that nearly half of schools in his data set did not hire their existing volunteer baseball coach for a newly-added paid assistant baseball coach position.  McCreadie Decl. Ex. 2, Rascher Dep., at 173:6-174:14.   Neither of the *Smart* Plaintiffs were hired as paid Division I coaches.   Although Plaintiff Taylor Smart testified that he would have been hired as a paid assistant coach at the University of Arkansas in the absence of the bylaws (*id.* Ex. 8, Smart Dep., at 125:25-126:4), Arkansas's associate athletic director at the time has attested that Bobby Wernes, who was ultimately hired for the position after it was created, was the preferred candidate over Mr. Smart because he was "more qualified."   *See* Hamilton Decl. ¶ 12; *see also* Lehmann Report ¶ 80 (providing examples of individuals who were hired for newly

San Jose State for the 2023-2024 season if she was not selected for a paid position, but the team opted not to use a volunteer. *Id.* at 200:13-201:5, 206:6-15.

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  created paid assistant coach positions in 2023-2024 who were more

2  experienced than the previous year's volunteer coach).

3      *No named plaintiff* in either case has *ever* held a paid

4  coaching position at a Division I institution.  *See* pages 26-27

5  above.  Most have never held a paid coaching position at any

6  college or university at any level.  *See* pages 26-28 above.  As

7  noted, several Plaintiffs applied repeatedly for Division I

8  coaching positions but were rejected, and were even rejected from

9  positions they claim are less competitive than coaching at

10  Division I.  *See* pages 27-28 above.  A "rigorous assessment of

11  th[is] available evidence," *Olean*, 31 F.4th at 666, does not

12  support the blanket assumption that *all* coaches who were hired as

13  volunteers would have prevailed in the competition for paid

14  positions.

15                    (ii) Reconstructing Hiring Decisions Depends on
                           Individualized Proof
16

17      Because there is no dispute that coaches would have faced

    more competition for paid positions and not all coaches would have
18
    won that competition, proving that each coach would have been paid
19
    in the but-for world requires reconstructing who would have been
20
    hired.  But Plaintiffs have no single body of evidence to prove
21
    which volunteer coaches in the putative class would have been
22
    hired over the competition.  Dr. Ashenfelter conceded, "I don't
23
    know who they would actually hire into those positions."
24
    McCreadie Decl. Ex. 6, Ashenfelter Dep., at 105:24-106:10.
25
    Rather, Dr. Ashenfelter testified that the only way to determine
26
    whether each volunteer coach was sufficiently skilled to be hired
27
    if a paid position existed in the relevant sport at the relevant
28

institution would be to "actually contact the person, the coach, to ask them what their characteristics" were. *Id.* at 240:2-22. Dr. Rascher similarly testified that he could not explain why some volunteers did not get hired for paid positions after the bylaws changed because he "didn't reach out to each volunteer and survey them and ask them . . . why they ended up where they ended up." *Id.* Ex. 2, Rascher Dep., at 176:15-178:1. These are concessions that Plaintiffs "will need to present evidence that varies from member to member." *Tyson*, 577 U.S. at 453 (citation omitted).

That follows from the concededly textbook principles of labor economics that different workers have different skills and experiences that make them more or less attractive to employers. McCreadie Decl. Ex. 6, Ashenfelter Dep., at 56:7-22, 71:18-72:15, 74:20-23; *id.* Ex. 2, Rascher Dep., at 96:9-97:17, 230:1-231:23. Plaintiffs and their experts also agree that different coaches have different skills and experiences and that different head coaches might evaluate the same coach's skills differently and value different skills and experience. *Id.* Ex. 6, Ashenfelter Dep., at 109:14-17; *id.* Ex. 2, Rascher Dep., at 239:14-240:8, 242:19-246:23. As Plaintiff Rudy Barajas acknowledged, what makes a good volleyball coach is "subjective." *Id.* Ex. 10, Barajas Dep., at 137:4-7. Christine Wombacher, the Senior Associate Athletics Director at Arizona State, explained that at her University, hiring decisions for assistant coach positions are "individualized and depend on the sport . . . . Different coaches may be looking for different qualifications, abilities, and experience for different positions depending on their needs at the time." Wombacher Decl. ¶ 23.

1    Courts deny class certification in cases where plaintiffs
2 must prove facts about each individual worker.  In *Wal-Mart*
3 *Stores, Inc. v. Dukes*, the Supreme Court reversed a grant of class
4 certification to a class of current and former female Walmart
5 employees who alleged systemic discrimination in pay and promotion
6 at the company.  564 U.S. 338, 342 (2011).  In so ruling, the
7 Court explained that the "criteria for hiring and promotion" are
8 too varied, and too dependent on the individual decision-makers,
9 for class treatment.  *Id.* at 356-59; *see also*, *e.g.*, *Wynn v. Nat'l*
10 *Broad. Co.*, 234 F. Supp. 2d 1067, 1084-85 (C.D. Cal. 2002)
11 (denying class certification in a putative employment class action
12 because "individualized issues would abound, considering the Court
13 would be faced with the potential of over 2500 different hiring
14 decisions").

15    Similar problems have led courts to deny class certification
16 in other antitrust cases against the NCAA.  For example, in *In re*
17 *NCAA I-A Walk-On Football Players Litigation*, the court denied
18 certification of a class of walk-on football student-athletes who
19 alleged that "annual limits on the number of football scholarships
20 that a member school may award" violated the antitrust laws.  No.
21 C04-1254C, 2006 WL 1207915, at *1 (W.D. Wash. May 3, 2006).  The
22 court reasoned that if "each school would have awarded 20
23 additional scholarships," the plaintiffs would "have to prove who
24 would have received those scholarships."  *Id.* at *9.  The court
25 found that doing so would require "considering the facts
26 surrounding each class member, including whether each one of them
27 would have actually been awarded one of the additional

28

1  scholarships and which school he would have attended." *Id.* at

2  *12.

3     The Court in *Rock* reached a similar conclusion where the

4  plaintiffs sought to certify a class of all Division I football

5  players who had not received GIAs "for the full duration of their

6  undergraduate education." 2016 WL 1270087, at *6. After

7  rejecting Dr. Rascher's model as "unsubstantiated," the court

8  explained that "anti-trust injury as to each member of the class

9  cannot be proven without considering *the facts surrounding each*

10 *class member*, including whether each member would have actually

11 received a multi-year GIA or would not have otherwise had their

12 GIA reduced or canceled." *Id.* at *14 (emphasis added). Because

13 the plaintiff had offered no "evidence that is common to the

14 class" that could show antitrust impact (i.e., that a class member

15 would have been selected to receive a GIA), the court denied

16 certification. *Id.*

17    This Court should do the same here where the evidence shows

18 that Plaintiffs themselves did not win competition for paid

19 positions in the real world. To the extent that there is a

20 factual dispute about whether Mr. Smart or Mr. Barajas or Ms.

21 Taylor would have beat out competition for a paid position in the

22 but-for world, that simply underscores why class certification is

23 not appropriate: the Court would have to hold a mini-trial with

24 this kind of disputed evidence from coaches and institutions for

25 each of the thousands of putative class members in these cases.

26 *See, e.g.*, *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1226

27 (9th Cir 2024) (denying class certification where "individualized

28 questions would have to be resolved through a series of mini-

1    trials, undermining the 'efficiency and economy' that Rule 23 was

2    designed to promote").

3                    (iii) Plaintiffs' Arguments for Insulating
                            Themselves from Competition Are Flawed
4
         Plaintiffs try to argue that the additional competition they
5
     indisputably would have faced is irrelevant in these antitrust
6
     cases.  *See Colon* Mot. at 36; *Smart* Mot. at 52.  That is not the
7
     law.  In the Ninth Circuit, an antitrust damages model "must
8
     presume the existence of rational economic behavior in the
9
     hypothetical free market."  *Dolphin Tours*, 773 F.2d at 1511; *see*
10
     *also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)
11
     (antitrust damages are found "by comparison of profits, prices and
12
     values as affected by the [antitrust violation], with what they
13
     would have been in its absence under freely competitive
14
     conditions.") (quotations omitted); McCreadie Decl. Ex. 2, Rascher
15
     Dep., at 52:16-53:13 (agreeing that a "fundamental assumption of
16
     economics" is that "people generally act in accordance with their
17
     incentives"); *id.* Ex. 6, Ashenfelter Dep., at 80:11-21 (same).
18
         Based on that principle, binding precedent establishes a
19
     simple proposition: antitrust plaintiffs cannot ignore competition
20
     that would have occurred in a world without the alleged restraints
21
     on competition.  Rather, plaintiffs in an antitrust case must
22
     embrace and account for increased competition.  For instance, in
23
     *Dolphin Tours*, a company that offered tours of Northern California
24
     alleged that competing companies conspired to exclude it from the
25
     market.  The plaintiff proffered testimony by an economist
26
     calculating its market share in a market without the allegedly
27
     unlawful conduct.  The Ninth Circuit identified "deficiencies" in
28

1  these calculations, including that they did not address "the

2  possibility that Dolphin would have had competition in a free

3  market. . . ." *Dolphin Tours*, 773 F.2d at 1512.  The Ninth

4  Circuit concluded:  "Antitrust plaintiffs are not entitled to

5  assume favorable aspects of an anticompetitive market such as

6  . . . *limited competition from third parties*," because doing so

7  would lead to "artificially high damage estimate[s]."  *Id.*

8  (emphasis added).

9       This Court applied *Dolphin Tours* in *Toscano v. PGA Tour, Inc*.

10  In that case, the plaintiff alleged that the PGA Tour unlawfully

11  prevented competition from other senior golf tours, which enabled

12  it to adopt eligibility rules that prevented the plaintiff from

13  competing and earning income.  *Toscano*, 201 F. Supp. 2d at 1111.

14  Citing *Dolphin Tours*, the Court held that the plaintiff failed to

15  create a triable issue of fact on damages because "his evidence

16  entirely ignores 'competitive reaction.'"  *Id.* at 1125 (quoting

17  *Dolphin Tours*, 773 F.2d at 1512 n.12).  The plaintiff "completely

18  failed to account for how his damages might change in a truly

19  competitive environment" because (among other things) he did not

20  "account[] for the fact that it would be more difficult for [him]

21  to qualify under liberal eligibility rules that encourage more

22  senior golfers to attempt to qualify."  *Id.*  The plaintiff could

23  "not ignore these likely changes in the market."  *Id.*

24       The Court in *In re NCAA Student-Athlete Name & Likeness

25  Licensing Litigation* denied certification of a damages class for

26  similar reasons.  No. C 09-1967 CW, 2013 WL 5979327, at *10 (N.D.

27  Cal. Nov. 8, 2013).  The plaintiffs in that case alleged injury

28  from NCAA bylaws prohibiting compensation to student-athletes for

the use of their names, images, or likenesses ("NIL").  The
evidence from the plaintiffs' expert showed that if such
compensation were available, then some student-athletes who turned
professional would have "stayed in college" and "would have
displaced other student-athletes on their respective teams."  *Id.*
at *8.  The displaced class members "would not have suffered
injuries as members of the teams for which they actually played
because . . . they would never have been able to play for those
teams in the absence of the challenged restraints."  *Id.*  The
court denied certification because the plaintiffs had "not
proposed any method for addressing this substitution effect among
individual student-athletes."  *Id.* at *9.

The same legal rule applies here—and it is fatal to class
certification.  Plaintiffs' legal arguments to the contrary
reflect flawed attempts to insulate themselves from the
competition that the antitrust laws are designed to protect.

*First*, this Court did not resolve this issue for class
certification purposes in a footnote in its decision denying the
NCAA's motion to dismiss.  Plaintiffs cite the Court's footnote
stating that "[b]ecause plaintiffs were all hired as volunteer
coaches, the issue here is whether they would have been paid, not
whether they would have been hired."  *See Smart* Mot. at 52.
Plaintiffs claim this is dispositive and relieves them of their
obligations to prove that class-certification requirements are
satisfied here.  Not so.  As the Court later explained, its "Order
did no more nor no less than dispose of the motion which was
before the court."  *Colon* ECF 50; *Smart* ECF 43.  The Court's
motion to dismiss decision was issued before discovery and before

the parties created the record now before the Court, which shows
that (1) many schools did not create paid positions following the
bylaw change, (2) volunteers indisputably would have faced more
competition for paid positions, and (3) many Plaintiffs were *not
hired* for paid positions when the bylaw changed.

A footnote in an order on a motion to dismiss based purely on
the pleadings cannot displace the evidentiary record presented by
the NCAA in opposition to this motion (and the lack of record
presented by Plaintiffs) where, under binding precedent,
"plaintiffs must actually *prove*—not simply plead—that their
proposed class satisfies each requirement of Rule 23." *Black
Lives Matter*, 113 F.4th at 1258 (citation omitted).   This Court
must "make a rigorous assessment of the available evidence and the
method or methods by which plaintiffs propose to use the class-
wide evidence to prove" impact.   *Olean*, 31 F.4th at 666.   At the
motion to dismiss stage, there was no evidence before this Court
to support any such rigorous assessment, and the Court did not
purport to engage in what would have been a premature inquiry at
the motion to dismiss stage.   As another court in this Circuit has
explained in issuing a decision that led to decertification of a
class, "the path to a fair result often has some turns,
particularly as the record develops in a complex antitrust dispute
such as this one."   *In re Google Play Store Antitrust Litig.*, No.
20-CV-05761-JD, 2023 WL 5532128, at *4 (N.D. Cal. Aug. 28, 2023).

*Second*, the record of undisputed evidence distinguishes this
case from *House v. NCAA*, which is heavily relied upon by both
Plaintiff groups.   *See Smart* Mot. at 52-53; *Colon* Mot. at 35-37;
*see also generally In re Coll. Athlete NIL Litig.*, 2023 WL 8372787

1  (N.D. Cal. Nov. 3, 2023) ("*House*").  The Court in *House* stated

2  that antitrust "injury and damages are determined by comparing

3  . . . the payments that each class member who falls within the

4  class definition received in the real world with . . . the

5  payments that that *same class member would have received* in the

6  but-for world."  *House*, 2023 WL 8372787, at *27 (emphasis added).

7  That is true.  Here, that comparison requires determining whether

8  the class member or another coach would have been hired for their

9  position if the position had been paid.  The basic economics are

10  undisputed that paid positions would have attracted more

11  competition than volunteer positions, and a coach who would not

12  have won a paid position over that competition would not have

13  "received" any payments in the but-for world.

14      Of course, "the identity of the class members does not change

15  between the real world and the but-for world."  *Id.*  But the

16  record in this case shows that the identity of *the coaches hired*

17  would have been different if the volunteer positions had been

18  paid.  Indeed, when those positions were paid in the real world,

19  different coaches were often hired.  *See* pages 24-26 above.  Thus,

20  the record in this case does not permit the conclusion that the

21  Court reached in *House* that "substitutions or displacements that

22  may or may not take place" as a result of competition "in a

23  hypothetical but-for world are irrelevant."  2023 WL 8372787, at

24  *27.

25      To the extent that the *House* court (or the court in the *Law*

26  case) was suggesting that such effects can *never* be relevant, that

27  is inconsistent with the Ninth Circuit's decision in *Dolphin Tours*

28  as well as with decisions such as *Van* and *Olean* that require the

Court to give effect to the record evidence.  Indeed, the same court that granted class certification in *House* denied it in a prior case where the evidence showed that increased competition for positions on teams meant that some class members "would never have been able to play" in the but-for world and the plaintiffs had "not proposed any method for addressing this substitution effect among individual student-athletes." *Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, *8-9.

*Finally*, Plaintiffs fall back on the overblown contention that requiring them to account for increased competition in an antitrust case would make it impossible to certify *any* putative class action.  Not so.  The need to account for increased competition is particularly acute in this case because Plaintiffs concede that the but-for world would have involved a capped number of coaching positions.  McCreadie Decl. Ex. 2, Rascher Dep., at 59:4-12, 60:10-22; *id.* Ex. 6, Ashenfelter Dep., at 81:16-22, 83:6-10, 84:7-11.  That is not typically the case in other price-fixing cases where the defendant firms could increase production to capture demand from additional consumers.  *Id.* Ex. 6, Ashenfelter Dep., at 84:18-24.

Ultimately, requiring proof that Plaintiffs would have been hired if their positions had been paid not only gives effect to the competition that the antitrust laws are designed to protect, but also reflects the unexceptional fact that, for some coaches, as for people in many lines of work, a volunteer position provided an opportunity that otherwise would not have been available.  *See id.* Ex. 2, Rascher Dep., at 145:25-146:22 (college graduates "sometimes . . . work without compensation to try to enter a

market"). As Dr. Rascher put it, the volunteer coach position was "a way for coaches to move their way up in the labor market." *Id.* at 140:6-10. Indeed, Plaintiff Katherine Sebbane chose a volunteer coach position at the University of Pittsburgh over paid positions because of the benefits of coaching at a Division I school in a major athletic conference. *See id.* Ex. 15, Sebbane Dep., at 58:4-63:24. And Plaintiff Taylor Smart testified that the volunteer coach position was the first rung on the ladder for baseball coaches to work their way up. *See id.* Ex. 8, Smart Dep., at 56:7-21, 88:23-89:6. The University of Minnesota's new head baseball coach got his first Division I coaching job as a volunteer coach almost a decade ago, shortly after graduating from that school, *see id.* Ex. 3, Carter Dep., at 270:18-272:1, and Jack Karraker chose to work as an unpaid assistant baseball coach at Fresno State even *after* the bylaws were amended because he was seeking a paid coaching position elsewhere, Acunto Decl. ¶ 8.

The Court does not have to find that all or even most coaches benefitted from the volunteer coach position in this way. But because the challenged NCAA bylaws insulated *at least some* coaches from competition that they would have faced from more experienced or qualified candidates, Rule 23 requires Plaintiffs to identify common proof to determine who those coaches were and which coaches would in fact have been hired for paid positions in the but-for world. Plaintiffs have not even tried to put forward that proof. Accordingly, class certification must be denied.

### 3. Plaintiffs Cannot Take Shortcuts to Proving Impact

Unable to satisfy their burden to show that "a class-member-by-class-member assessment" of whether each coach was injured

-59-

1  "will be unnecessary or workable," *Van*, 61 F.4th at 1069,

2  Plaintiffs ask the Court to let them take shortcuts.  Plaintiffs'

3  arguments contravene the law.

4          **(a)    The Common Issue Of Whether A Conspiracy Existed
                    Does Not Predominate In All Price-Fixing Cases.**

5

6          Plaintiffs misstate the law in arguing that whether an

7  agreement existed "inherently" predominates in alleged price-

8  fixing cases.  *See Colon* Mot. at 15, 20, 23; *Smart* Mot. at 30.

9  Plaintiffs do not cite any Ninth Circuit authority that so holds

10 and there is none.  Instead, the Ninth Circuit has held that the

11 "allegation that a conspiracy existed to violate the antitrust

12 laws does not insure that common questions will predominate."

13 *Hotel Tel. Charges*, 500 F.2d at 89.  Plaintiffs' own authority

14 thus explains that "courts have found predominance lacking in

15 horizontal price-fixing cases where the class members purchased

16 different products or were subject to different prices or

17 competitive conditions."  6 Newberg and Rubenstein on Class

18 Actions § 20:52 (6th ed.).

19          "Notably, there are no hard and fast rules regarding the

20 suitability of a particular type of antitrust case for class

21 action treatment.  Rather, the unique facts of each case will

22 generally be the determining factor governing certification."

23 *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330,

24 345 (5th Cir. 2012) (quotations and citation omitted).  That is

25 why, as noted, courts have denied class certification of alleged

26 price-fixing claims where the plaintiffs lacked common evidence of

27 impact.  *Cf. Garza v. City of Sacramento*, No. 220CV01229WBSJDP,

28 2022 WL 2757600, at *6 (E.D. Cal. July 14, 2022) (Shubb, J.)

1  (denying class certification "even if the alleged policies were

2  established on a class-wide basis" because "the court would in

3  effect be required to conduct a 'mini-trial' for each class member

4  evaluating complex and fact-intensive issues of causation and

5  injury").[30]

6      Plaintiffs' argument to the contrary arises from the mistaken

7  premise that proof of injury is not a liability issue. *E.g.*,

8  *Smart* Mot. at 39-40. "The fact of individual injury . . . is a

9  liability issue, not simply a damages issue." 1 McLaughlin on

10 Class Actions § 5:36 (21st ed.). Indeed, the fact of injury to

11 the plaintiff is an essential element of a claim for antitrust

12 damages under Section 4 of the Clayton Act. *See Am. Ad Mgmt.,*

13 *Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)

14 (claim for antitrust damages requires proof (among other things)

15 of "(1) unlawful conduct, (2) causing an injury to the

16 plaintiff"); *see also Rail Freight*, 934 F.3d at 623 ("To establish

17 liability under section 4, each plaintiff must prove not only an

18 antitrust violation, but also an injury to its business or

19 property and a causal relation between the two.").

20     Accordingly, courts have denied class certification of

21 antitrust damages claims against the NCAA where the plaintiffs

22 lacked common proof of injury because individualized inquiries

23 would be required to prove *liability*. In the *Walk-On* case, the

24 court denied class certification where "a threshold number of

25

26 [30] In *Four In One Co. v. S.K. Foods, L.P.*, No. 2:08-CV-3017, 2014
   WL 28808, at *6 (E.D. Cal. Jan. 2, 2014), which is cited in the
27 *Smart* Plaintiffs' Motion (*see Smart* Mot. at 30), the Court
   considered a request for preliminary approval of a settlement
28 class, not a motion for certification of a damages class.

1  individualized inquiries will be required such that individual

2  issues will predominate on the question of antitrust injury, and,

3  therefore, *liability*."  2006 WL 1207915, at *12 (emphasis added).

4  Likewise, in the *Rock* case, the court denied class certification

5  because "issues of *liability*, particularly the impact of the

6  alleged anti-trust violations, cannot be easily established

7  through class-wide proof."  2016 WL 1270087, at *14.

8      Here, too, Plaintiffs lack common proof of liability because

9  they lack a single body of evidence that can prove whether each

10  coach was injured.

11          **(b)  There Is No Presumption Of Classwide Impact.**

12      Plaintiffs also are wrong that an alleged "conspiracy's

13  existence alone gives rise to a presumption of classwide impact."

14  *Colon* Mot. at 27; *see also Smart* Mot. at 42.  No Ninth Circuit

15  precedent recognizes such a presumption of impact, which would

16  flout the requirement to "make a rigorous assessment of the

17  available evidence and the method or methods by which plaintiffs

18  propose to use. . . ."  *Olean*, 31 F.4th at 666.  Courts have

19  "emphasize[d] that [a]ctual, not presumed, conformance with the

20  Rule 23 requirements is essential," and that "[a]pplying a

21  presumption of impact based solely on an unadorned allegation of

22  price-fixing would appear to conflict with the 2003 amendments to

23  Rule 23, which emphasize the need for a careful, fact-based

24  approach, informed, if necessary, by discovery."  *Hydrogen*

25  *Peroxide*, 552 F.3d at 326.

26      Plaintiffs' argument for a presumption incorrectly relies on

27  a statement in the Tenth Circuit's decision in *In re Urethane*

28  *Antitrust Litigation*, that "price-fixing affects all market

-62

participants, creating an inference of class-wide impact even when prices are individually negotiated."  768 F.3d 1245, 1254 (10th Cir. 2014).  The Ninth Circuit has simply described the statement in *Urethane* as a conclusion that could be supported on a proper record.  That record is missing here.

The Ninth Circuit did not say anything about a presumption when it cited *Urethane* in the *Olean* case.  The Court reviewed in detail the plaintiffs' expert's "pricing correlation test" and found it "consistent with" the conclusion that "price-fixing affects all market participants."  *Olean*, 31 F.4th at 671 (quoting *Urethane*, 768 F.3d at 1254).  That would have been unnecessary if there were a presumption.  The Ninth Circuit went on to reject the argument that plaintiffs' model could not "plausibly serve as common evidence for all class members," *id.* at 677, concluding that "a district court *could* reasonably conclude 'that price-fixing would have affected the entire market, raising the baseline prices for all buyers.'"  *Id.* at 678 (emphasis added) (quoting *Urethane*, 768 F.3d at 1255).  That was simply a case-specific conclusion that evidence common to the class in *Olean* made it "both logical and plausible that the conspiracy could have raised the baseline prices for all members of the class by roughly ten percent."  *Id.*  No such evidence exists here.

The statement in *Urethane* is therefore best understood as a statement about a particular case or type of case, not as a statement about all cases—let alone this one.  But to the extent this Court were to read *Urethane* to say that a rigorous analysis of the evidence of impact is never necessary in a price-fixing case, that would be inconsistent with the law in this Circuit, and

with Third Circuit precedent, on which *Urethan* relied.   *Urethane* cited the Third Circuit's 2002 decision in *In re Linerboard Antitrust Litigation,* 305 F.3d 145 (3d Cir. 2002), but the Third Circuit has since held that *Linerboard* does not require a presumption of impact in every antitrust case.   Indeed, the Third Circuit *reversed* class certification that a district court granted in a price-fixing case based in part on a supposed presumption of impact under *Linerboard*.   *See Hydrogen Peroxide*, 552 F.3d at 326. In doing so, the Third Circuit emphasized that "[a]ctual, not presumed, conformance with the Rule 23 requirements is essential" and that "a presumption of impact" would "conflict" with "the need for a careful, fact-based approach."   *Id.*

Here, a rigorous analysis of the evidence shows that no common proof of impact exists—and no presumption could be appropriate—because this case presents issues that consumer price-fixing cases like *Olean* and *Urethane* did not.   *E.g.*, *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 202 (E.D. Pa. 2015) (rejecting "inference" that "the alleged conspiracy, if successful, would have affected virtually every member of the egg products subclass").   Whether each class member in this case suffered injury depends on whether the relevant school would have added a paid position in the relevant sport *and* whether that school would have hired the plaintiff instead of another candidate for that position.   *Olean*, *Urethane*, and consumer price-fixing cases did not present that issue or a similar one because consumers who purchased at inflated prices would have been able to afford the same products at lower, un-fixed prices.

1    Those cases are also distinguishable for an additional

2 reason:  a cap on the number of available positions.  According to

3 Plaintiffs' own experts, the but-for world here is one where NCAA

4 bylaws would have limited the number of paid coaches on each team.

5 McCreadie Decl. Ex. 2, Rascher Dep., at 59:4-12, 60:10-22.  In

6 cases involving price-fixing of consumer products, by contrast,

7 the world without the challenged agreement would not have involved

8 a restriction on the number of products that could be sold.  *Id.*

9 Ex. 6, Ashenfelter Dep., at 84:18-24.  Accordingly, the plaintiffs

10 in cases like *Olean* and *Urethane* did not did not need to determine

11 which class members would have been able to transact in the market

12 in the but-for world.

13    Finally, a presumption of impact is unwarranted here because,

14 as a matter of economics, the challenged bylaws are entirely

15 consistent with a but-for world where some Division I institutions

16 did not pay additional assistant coaches in some sports and thus

17 the volunteers in those programs were not injured.  Some

18 Division I institutions may have supported the challenged bylaws

19 because they could not afford to add additional paid coaching

20 positions, which means they would not have paid class members in

21 the but-for world.  Lehmann Report ¶ 118.

22    Regardless, any supposed presumption of impact would be

23 "rebuttable" and would "not foreclose defendants' arguments

24 concerning the need for individualized proof to establish the fact

25 (as opposed to the extent) of individual class member damages,"

26 particularly "where intricacies of the market or the industry at

27 issue complicate proof of impact."  1 McLaughlin on Class Actions

28 § 5:36 (21st ed.).

-65-

1          **(c)    Exposure To The Challenged Conduct Is Not Proof of
2                   Impact In An Antitrust Case.**

3        Contrary to Plaintiffs' arguments, proof that coaches were

4   "exposed" to NCAA bylaws is not sufficient to certify a class

5   asserting claims for antitrust damages.  *Contra Colon* Mot. at 31,

6   39-40 & n.18.  Plaintiffs do not cite any antitrust case that so

7   holds.

8        Plaintiffs have misapplied the Ninth Circuit's decision in

9   *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016),

10  which was not an antitrust case.  The plaintiffs in *Torres* alleged

11  that the defendant "had a common policy or practice of failing to

12  inform domestic farm workers of the availability of H-2A work that

13  paid $12 per hour" in violation of the Agricultural Workers'

14  Protection Act and the Washington Consumer Protection Act ("CPA").

15  *Id.* at 1130.  The alleged injury was "an informational one," and

16  under the Washington CPA, "informational injury need not result in

17  direct pecuniary loss" *id.* at 1135.  "Under the informational

18  injury theory" recognized by Washington state law, it sufficed to

19  show that a class member "was denied the opportunity to apply for

20  a job as a result of Mercer's policy of omission."  *Id.* at 1136.

21  The federal antitrust laws, however, do not recognize a claim for

22  damages based on informational injury.  Damages under the federal

23  antitrust laws are available only for injuries to "business or

24  property."  15 U.S.C. § 15(a).

25       Plaintiffs' other authorities regarding the "loss of

26  opportunity" concern whether an injury is sufficient for

27  Article III standing, not whether the loss of opportunity alone

28  can support an antitrust claim for damages.  *See* 13A Fed. Prac. &

1  Proc. Juris. § 3531.4 (3d ed.) (discussing Article III standing);

2  *De Sousa v. Dir. of U.S. Citizenship & Immigr. Servs.*, 720 F.

3  Supp. 3d 794, 801-02 (N.D. Cal. 2024) (referring to "a

4  constitutionally cognizable injury"); *Abboud v. INS*, 140 F.3d 843,

5  847 (9th Cir. 1998) (analyzing "standing to bring suit in federal

6  court").  And *Tennessee v. NCAA*, 718 F. Supp. 3d 756 (E.D. Tenn.

7  2024), involved a preliminary injunction, not certification of a

8  damages class.[31]

9     If evidence that each class member was exposed to an

10  allegedly unlawful agreement were sufficient to prove that each

11  class member was injured in an antitrust case, then it would have

12  been unnecessary for courts in case after case, including the

13  Ninth Circuit in *Olean*, to analyze plaintiffs' experts' models.

14         **(d)  Proof Of The Value Of Services Is Not Proof Of
                Impact.**

15

16     Plaintiffs cannot prove common impact simply by asserting

17  that class members' coaching provided value to Division I schools.

18  The Court dismissed the *Smart* Plaintiffs' unjust enrichment

19  claims, and the *Colon* Plaintiffs never asserted any.  Plaintiffs

20  therefore have no claim that the NCAA "received the benefit of the

21  transaction and cannot avoid paying the value of the benefits they

22  received."  *Colon* Mot. at 39.

23

24  _____

[31] The only way that Plaintiffs' experts could identify for how

25  coaches could have been harmed if they were not hired for a paid
    position by the school where they volunteered was "losing out on

26  compensation that they would have earned at a different school."
    McCreadie Decl. Ex. 2, Rascher Dep., at 84:1-10, 85:24-86:7,

27  86:24-87:8.  But determining which schools would have hired which
    coaches would require matching coaches and schools.  Plaintiffs'

28  experts admittedly have no "matching model."  *Id.* at 94:22-95:23.

1    Antitrust law "do[es] not provide for damages on an unjust

2  enrichment theory.  Injury to the plaintiff's business or property

3  must be proved." *Malchman v. Davis*, 588 F. Supp. 1047, 1056

4  (S.D.N.Y. 1984), aff'd as modified, 761 F.2d 893, 901 n.3 (2d Cir.

5  1985) ("a theory of unjust enrichment is inappropriate in proving

6  damages for an antitrust violation").  *Cf.* 15 U.S.C. § 15(a)

7  (claim for antitrust damages requires proof of "injur[y to their]

8  business or property").

9    Plaintiffs cannot prove any such injury to the coaches who

10  are the members of the putative classes here.  The measure of any

11  injury to class members is what the coaches would have received

12  from the schools.  As Plaintiffs' own authority explains, an

13  alleged "antitrust victim should recover the difference between

14  *its* actual economic condition and *its* 'but for' condition" absent

15  the antitrust violation."  *House*, 2023 WL 8372787, at *9 (emphasis

16  added).  But measuring injury in terms of the value that coaches

17  provided measures what the *schools* received from the *coaches*.

18  That measures the condition of the schools, not the coaches, and

19  so does not establish any antitrust injury as to the putative

20  class members.

21    Moreover, the value that schools derived from volunteer

22  coaches cannot be the measure of antitrust damages because it is

23  basic economics that the value of a service to the buyer is not

24  the same as the market price of that service.  Plaintiffs' experts

25  have conceded this point.  McCreadie Decl. Ex. 2, Rascher Dep., at

26  108:12-18; *id.* Ex. 6, Ashenfelter Dep., at 42:13-21.  People

27  regularly pay less for services than the value of those services;

28  that is why they decide to buy them.  *Id.* Ex. 2, Rascher Dep., at

-68-

1  99:12-100:1; *id.* Ex. 6, Ashenfelter Dep., at 41:13-16.  The market

2  rate reflects supply and demand, not the value of services to one

3  buyer.  *Id.* Ex. 2, Rascher Dep., at 108:19-109:6; *id.* Ex. 6,

4  Ashenfelter Dep., at 183:16-18.  Thus, as Dr. Ashenfelter

5  testified, standard economics indicates that schools will compare

6  the value that they get from potential coaches to the compensation

7  needed to hire them and hire the coach that provides the most net

8  value.  *Id.* Ex. 6, Ashenfelter Dep., at 157:9-22, 158:6-17. In

9  other words, in a competitive market, schools would hire coaches

10 with "the most payoff."  *Id.*  Thus, evidence that coaches provided

11 value is not evidence of injury in the market.

12          **(e)   The *Law* Case Does Not Support Certification.**

13         The District of Kansas's decision to certify a class decades

14 ago in the *Law* case does not support class certification here.

15 There are key differences in the law and the facts.

16         As an initial matter, the court in *Law* did not apply the

17 standards for class certification under current Ninth Circuit law.

18 *Law* held that "the fact that defendant may counter plaintiffs'

19 proof with individualized evidence does not make it improper for

20 plaintiffs to maintain their suit as a class action."  *Law v.*

21 *NCAA*, No. 94-2053-KHV, 1998 U.S. Dist. LEXIS 6608, at *16 (D. Kan.

22 Apr. 17, 1998) (Lieberman Decl. Ex. 24, *Colon* ECF 85-27).  But the

23 law today in the Ninth Circuit is that "[w]hen a defendant

24 substantiates [] an individualized issue," then the plaintiff must

25 prove that "class-member-by-class-member assessment of the

26 individualized issue will be unnecessary or workable."  *Van*, 61

27 F.4th at 1069.

28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1    The court in *Law* also held that "plaintiffs need only make a
2 threshold showing that their proof will be sufficiently
3 generalized that a class action will provide tremendous savings of
4 time and effort."  1998 U.S. Dist. LEXIS 6608, at *8 n.6.  But
5 since then, Supreme Court precedent has made clear that "[a] party
6 seeking class certification must affirmatively demonstrate his
7 compliance" with Rule 23, *Dukes*, 564 U.S. at 350, which means that
8 "plaintiffs must prove the facts necessary to carry the burden of
9 establishing that the prerequisites of Rule 23 are satisfied by a
10 preponderance of the evidence."  *Olean*, 31 F.4th at 665.  The
11 Ninth Circuit has rejected the argument that "merely putting
12 forward a viable method is sufficient" to carry that burden.
13 *Lytle*, 114 F.4th at 1032 n.8.  Rather, Ninth Circuit precedent
14 requires the Court to "make a rigorous assessment of the available
15 evidence," including "weighing conflicting expert testimony and
16 resolving expert disputes where necessary to ensure that Rule
17 23(b)(3)'s requirements are met and the common, aggregation-
18 enabling issue predominates over individual issues."  *Olean*, 31
19 F.4th at 666 (quotations and citation omitted).

20    The court in *Law* did not undertake such a rigorous
21 assessment, and this case involves different issues and different
22 evidence.  *First*, the *Law* case did not involve whether schools
23 would have added an additional paid coaching position.  The *Law*
24 case involved an NCAA bylaw that imposed a salary cap for certain
25 paid coach positions.  But here, each class member's injury
26 depends on whether each school would have *added* paid coaching
27 positions to begin with, which requires reconstructing schools'
28 budgeting decisions and making other individualized inquiries.

-70

1     *Second*, as explained more fully in the NCAA's *Daubert*

2 motions, Plaintiffs' experts here have proposed different methods

3 than the plaintiffs' expert in *Law* used. The plaintiffs' expert

4 in *Law* took steps to control for factors such as coaches' level of

5 experience that would "affect coaches' earnings and hence the

6 estimation of damages." Aff. of Robert D. Tollison, *Law v. NCAA*,

7 1996 WL 34400119 (D. Kan. 1996) ("Tollison *Law* Aff."). That is

8 standard economics. Indeed, Dr. Ashenfelter used "controls" for

9 "employee-specific variables, such as age and tenure," in

10 estimating injury and damages in another antitrust case. *Nitsch*

11 *v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 305 (N.D. Cal.

12 2016); *see also* McCreadie Decl. Ex. 6, Ashenfelter Dep., at 244:3-

13 7. But here neither Dr. Ashenfelter nor Dr. Rascher controlled

14 for factors such as age or experience that could affect whether

15 coaches were injured or by how much. *Id.* at 240:23-241:11, 242:7-

16 243:4 250:20-22; McCreadie Decl. Ex. 2, Rascher Dep., at 244:12-

17 246:12; *see also Reed*, 268 F.R.D. at 591 (denying class

18 certification where "regression does not, in fact, control for all

19 of the wide variance in RN base wages") (quotations omitted).

20     *Third*, the plaintiffs' expert in *Law* took steps to exclude

21 volunteers from his damages model because they would not have been

22 injured by any effect that the challenged bylaws had on the

23 market—a conclusion that dooms Plaintiffs' claims in this case.

24 As the expert explained, "To the extent, for example, that some of

25 these coaches were essentially volunteer laborers, whose main

26 compensation derived from a close association with a team or

27 sport, some procedure must be found to exclude from the damage

28 analysis individuals who are likely to be below the 'ripple'

effect" of the bylaws on market conditions.   Tollison *Law* Aff.,
1996 WL 34400119.

Record evidence shows that here numerous class members
volunteered because of a "close association with a team" or other
reasons that could mean that they would not have been better off
without the challenged bylaws.   For example, Rudy Barajas, an
alumnus of Fresno State and local retired State Farm insurance
agent, agreed to volunteer as a volleyball coach at Fresno State
even after the NCAA bylaws were changed.   McCreadie Decl. Ex. 10,
Barajas Dep., at 94:21-96:18, 134:3-25.[32]   And Shannon Ray chose
to volunteer at Arizona State so she could train for professional
track meets with the Arizona State head coach, which she testified
was hard to do on her own.   *Id.* Ex. 12, Ray Dep., at 62:19-66:5.
To the extent that the benefits available to volunteers like Mr.
Barajas and Ms. Ray would not have been available to coaches in
paid positions, any "ripple effect" of the bylaws on the market
would not have injured them.

*          *          *          *

The Plaintiffs cannot avoid that proof of injury to each
class member will require a coach-by-coach inquiry simply by
asserting that the NCAA engaged in "price-fixing" or pointing to
other cases where certification was granted. Under binding
precedent, Plaintiffs must show that "the existence of an
antitrust violation or antitrust impact, are capable of being

---

[32] Similarly, Larry Bercutt was a volunteer women's water polo
coach at UC Davis.   He is a local doctor in Davis who helps train
the team's goalie.   He comes to practice when his schedule allows.
*See* Flushman Decl. ¶ 12.

1  established through a common body of evidence, applicable to the

2  whole class." *Olean*, 31 F.4th at 666.  Plaintiffs cannot sustain

3  that burden, so their motions must be denied.

4      **B.    Plaintiffs Cannot Show Predominance Because Proving Each
             Class Member's Damages Will Require Mini-Trials**

5

6      Even if Plaintiffs could establish that they have classwide

   proof capable of addressing both showings needed to prove injury

7  to each class member (they do not), class certification must still

8  be denied because each class member's alleged damages (if any)

9  will depend on numerous factors that vary widely from coach to

10  coach.  Plaintiffs' experts' damages models do not account for

11  these factors, which can be addressed only through testimony and

12  documents from each coach and Division I school.  As a result,

13  determining each class member's damages will require thousands of

14  mini-trials, making class treatment improper.

15      The Supreme Court has ruled that plaintiffs "cannot show

16  Rule 23(b)(3) predominance" where "[q]uestions of individual

17  damage calculations will inevitably overwhelm questions common to

18  the class." *Comcast*, 569 U.S. at 34.  Thus, the Ninth Circuit has

19  concluded that plaintiffs failed to prove predominance where

20  "individual questions going to injury *and damages*" meant that a

21  "individualized mini-trials" were "required to establish liability

22  *and damages*." *Bowerman*, 60 F.4th at 469-70 (emphasis added).  As

23  Plaintiffs' own authority explains, "courts must also ensure that

24  damage issues do not defeat the predominance requirement" and that

25  "if a case threatens to break down into myriad individual damage

26  issues, common issues may no longer predominate."  6 Newberg and

27  Rubenstein on Class Actions § 20:52 (6th ed.).

28

Plaintiffs are not correct that the need for mini-trials regarding damages can *never* serve as a basis for denying class certification.  Although the mere "need for individual damages calculations does not, *alone*, defeat class certification," *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (emphasis added), class certification is inappropriate where plaintiffs must rely on individualized evidence "to establish the existence of an injury *and the amount of damages*."  *Bowerman*, 60 F.4th at 469 (emphasis added).

Plaintiffs also are incorrect that their only burden is to proffer a method for calculating "classwide" damages.  This term conflates (1) proof of damages to the class in the aggregate with (2) a method to prove the individual damages of each class member across the entire class.  "The law would be clearer if courts did not utilize the phrase 'classwide damages' but instead identified the certification task as requiring the plaintiffs to demonstrate a *classwide method* for determining individual damages."  6 Newberg and Rubenstein on Class Actions § 20:62 (6th ed.).  Courts "at the class certification stage [] seek to ensure that the damage assessment, even if in the aggregate, is accompanied by a method for determining individual damages that is common across the entire class."  *Id.*

Here, for several reasons—each of which is sufficient to deny certification—Plaintiffs' damages methods are inadequate to prove predominance because they do not account for individualized factors that are critical to accurate earnings estimates according to Plaintiffs' own experts.  These deficiencies render Plaintiffs' experts' damages models inadmissible for the reasons set forth in

1  Defendant's *Daubert* motion.  But even if the Court does not grant

2  that motion, these deficiencies in Plaintiffs' models make class

3  certification improper.

### 1.    Plaintiffs Fail to Account for Key Factors that Indisputably Affect Earnings

Plaintiffs' experts' models are not common proof of how much

each class member would have been paid because they fail to

account for the undisputed fact that a coach's salary will depend

on factors such as experience, skills and tenure that differ from

coach to coach.  Plaintiffs' experts agreed that this fact is

standard economics, known as "human capital theory."  McCreadie

Decl. Ex. 6, Ashenfelter Dep., at 40:9-41:7; *id.* Ex. 2, Rascher

Dep., at 230:24-231:23, 242:5-243:4, 248:6-13, 251:25-252:4,

256:25-257:5.

As Dr. Ashenfelter has explained, "[s]tandard human capital

theory links an individual's earnings to his or her level of

education, job experience, industry and industry experience, and

an individual's job title in a particular industry."  *Id.* Ex. 22.

Similarly, Dr. Rascher's sources explain that "[e]veryone brings

unique skills and abilities to a job.  And no two jobs are exactly

alike.  Variations affect pay for jobs within the same

occupation."[33]  *See id.* Ex. 2, Rascher Dep., at 238:12-241:13

(discussing this source).  For example, "experienced workers

usually earn more than beginners.  Workers who have in-demand

---

[33] Elka Torpey, *Same Occupation, Different Pay: How Wages Vary*, U.S. BUREAU OF LAB. STAT. (May 2015), https://www.bls.gov /careeroutlook/2015/article/wage-differences.htm.

1  skills also may earn more."[34]  In other words, as Dr. Rascher

2  testified, "individual factors" drive what workers are paid.  *Id.*

3  at 230:24-231:9.

4      Thus, Plaintiffs' experts agreed that different coaches

5  provide different value.  *Id.* at 247:22-248:13.  *Cf. id.* at

6  251:25-252:4.  For instance, Dr. Ashenfelter agreed that "one

7  reason why a school that hired an additional paid coach"

8  nevertheless "didn't hire the volunteer in the prior season" could

9  be that the coach the school hired "was more qualified."  *Id.*

10  Ex. 6, Ashenfelter Dep., at 172:22-173:2; *id.* Ex. 2, Rascher Dep.,

11  at 151:3-153:3.

12      Here, the named Plaintiffs had very different qualifications,

13  which different schools and different head coaches value

14  differently.  For example, in the *Colon* case, before he

15  volunteered at Fresno State, Plaintiff Rudy Barajas had coached

16  volleyball for 20 years in various capacities, including as a

17  volunteer coach in Division I.  *Id.* Ex. 10, Barajas Dep., at 39:6-

18  7.  But Shannon Ray, a plaintiff in the same case, had no coaching

19  experience at all before she volunteered at Arizona State, having

20  just graduated from college.  *Id.* Ex. 12, Ray Dep., at 225:21-

21  226:11.  In the *Smart* case, Plaintiff Michael Hacker had run a

22  youth baseball academy for several years before volunteering at UC

23  Davis, but Plaintiff Taylor Smart's experience was only as a

24  student assistant.  *Id.* Ex. 13, Hacker Dep., at 33:17-35:4, 39:23-

25  40:2; *id.* Ex. 8, Smart Dep., at 13:18-22.

26

27  _____

28  [34] *Id.*

1    Because many factors in coach salaries are subjective,

2  Plaintiffs themselves testified that "two coaches with the same

3  set of experiences and skills might be paid different amounts

4  because the coach could value their services differently," (*id.*

5  Ex. 8, Smart Dep., at 133:9-22, 134:3-24), and that "different

6  head coaches use different factors in deciding who will be their

7  assistant coaches," *id.* Ex. 12, Ray Dep., at 173:16-175:25 ("That

8  is with any job.  Some people look for different qualities than

9  other people."); *see also id.* Ex. 15, Sebbane Dep., at 199:15-

10  202:1 ("Q.  So different coaches can prefer different skills in

11  coaches? . . . A.  Correct.").

12    In cases prior to this one, the *Colon* Plaintiffs' expert,

13  Dr. Ashenfelter, tried to control for these "employee-specific"

14  factors.  *Id.* Ex. 22 ¶¶ 113-114; *id.* Ex. 6, Ashenfelter Dep., at

15  244:3-7.  The plaintiffs' expert in the *Law* case also tried to

16  control for the effect of coaches' tenure on salaries.  Tollison

17  *Law* Aff., 1996 WL 34400119 ("account[ing] for the effect of age on

18  earnings" in the damages model because age is a proxy for "the

19  accumulation of experience and human capital over time").  But in

20  this case, neither Plaintiff expert did anything to control for

21  coach-specific factors in salaries.  McCreadie Decl. Ex. 6,

22  Ashenfelter Dep., at 240:23-241:11, 242:7-243:4, 250:20-22; *id.*

23  Ex. 2, Rascher Dep., at 24:12-246:12, 249:7-24.

24    As explained in the NCAA's *Daubert* motions, this departure

25  from textbook economic principles renders Plaintiffs' damages

26  models unreliable and inadmissible.  Indeed, Dr. Ashenfelter's

27  damages model generates completely unreliable estimates of what

28  coaches actually earned in the 2023-2024 year, over-estimating

some coaches' earnings by several times and under-estimating other coaches' earnings by several times. *See* Lehmann Report ¶¶ 124-25 & Exhibit 10. To take just one example, Dr. Ashenfelter's model predicts that the new paid assistant women's volleyball coach at the University of Utah would make $36,000, when she actually made $4,000, only one-ninth as much. *Id.* ¶ 125.

Regardless, Plaintiffs' experts' failure to control for coach-specific factors in earnings simply papers over individualized issues that will require mini-trials—which means that a class cannot be certified. *See Reed*, 268 F.R.D. at 591 (denying class certification where "regression does not, in fact, control for all of the wide variance in RN base wages"). Indeed, Dr. Ashenfelter testified that the only way to determine a coach's qualifications relevant to their earnings would be to "actually contact" the person and "ask them." McCreadie Decl. Ex. 6, Ashenfelter Dep., at 240:2-22. That is not feasible for every coach.

### 2. Plaintiffs Do Not Have Any Method for Accounting for Undisputed Benefits to Class Members

Plaintiffs also do not have any method for addressing evidence that some class members received benefits from a volunteer arrangement that they would not have received as paid assistants. *E.g., Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1191 (11th Cir. 2003) (denying class certification where some "class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off" with that conduct). That precludes class certification because "a class cannot be

1  certified when . . . it consists of members who benefit from the
2  same acts alleged to be harmful to other members of the class."
3  *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
4  247 F.R.D. 156, 177 (C.D. Cal. 2007) (quotations and citation
5  omitted).

6      The benefits to coaches from acting as volunteers, rather
7  than taking up paid spots, were varied.  *See* pages 19-22 above.
8  Plaintiffs and their experts have no class-wide method for
9  accounting for these kinds of benefits, which precludes class
10  certification.  *Conrad*, 2021 WL 3268339, at *10 (evidence that
11  "class members likely *benefited* from the" challenged conduct by
12  receiving "training" presenting "overwhelming individualized
13  questions precluding certification").  Rather, collecting evidence
14  from each school would be necessary to determine whether free
15  training would have been available to class members pursuing
16  professional athletic careers if those class members were paid
17  assistants and, if not, whether these professionals would have
18  chosen to work as paid assistants.  After all, the NCAA was able
19  to adduce evidence about Ms. Ray's experience training as a
20  professional athlete while serving as a volunteer coach only by
21  taking her deposition and obtaining documents from Arizona State.
22  Thus, accounting for valuable benefits to volunteer coaches will
23  require mini-trials with evidence from each coach and university.
24  *See Bowerman*, 60 F.4th at 470.

25      Other coaches earned income while working as volunteer
26  coaches that they would not have earned if they were paid
27  assistants.  In the *Smart* case, Plaintiff Taylor Smart earned
28  approximately $100,000 working at baseball camps run by the head

baseball coach at the University of Arkansas. McCreadie Decl. Ex. 8, Smart Dep., at 111:16-112:5. Mr. Smart testified that if he had been a paid assistant coach, then he would have worked less at the baseball camps. *Id.* at 110:16-21. Mr. Smart's damages thus must be offset by what he was paid for work at camps that he would not have done as a paid assistant.[35] Similarly, while she was a volunteer track coach at Arizona State, Ms. Ray also worked as an auditor earning up to $60,000 per year, plus bonuses and benefits. *Id.* Ex. 12, Ray Dep., at 167:19-168:8. If Ms. Ray could not have held that job as a full-time paid assistant coach, then her damages must be offset by her salary, bonus, and benefits at that job.[36]

Once again, Plaintiffs and their experts have no method for accounting for those benefits, and doing so will depend on evidence regarding each coach's duties and individual preferences about income that they would not have been able to earn if they had been full-time paid assistant coaches. *See Bowerman*, 60 F.4th at 470. Such "*complicated individualized inquiries*" make class

---

[35] Many volunteer coaches worked at sports camps run by the head coach at their University. These camps were generally run by an outside entity affiliated with the head coach, the head coach had discretion on who to hire and how much to pay, and often the volunteer coach was paid through those camps. *See* Wombacher Decl. ¶ 15 (Arizona State); Varley Decl. ¶ 16 (University of Pittsburgh); Adishian-Astone Decl. ¶ 17 (Fresno State); Flushman Decl. ¶ 25 (UC Davis).

[36] So, too, with Larry Bercutt from UC Davis, who is a doctor in and a volunteer coach with the women's water polo team working with the goalie. He coaches as his schedule allows. *See* Flushman Decl. ¶ 12. If he could not have earned the same income as a doctor while working as a paid assistant coach, then the damages assessment for him would need to take that into account.

certification improper.  *Castillo v. Bank of Am., NA*, 980 F.3d 723, 731 (9th Cir. 2020) (denying class certification in case alleging use of improper overtime formula because some employees benefitted from the challenged formula).  Again, the NCAA was able to explore examples like Mr. Smart's camp income and Ms. Ray's full-time job and compensation as an auditor only by taking depositions and obtaining documents from the schools through discovery.

### 3.    Plaintiffs Do Not Account for Coaches' Geographic Preferences

Plaintiffs' damages model also does not account for coaches' geographic preferences that will affect their damages.  According to standard economic theory regarding negotiations, the outcome of any salary negotiation will depend on each side's outside options—for coaches, the choice to walk away from the negotiating table and take a different position.  Lehmann Report ¶¶ 97-101. Generally, the better the outside options a coach has, the stronger the coach's negotiating position.  *Id.* ¶ 99.

Some coaches' regional limitations would have affected their ability to negotiate by limiting their alternatives if they walked away from the negotiations.  For example, Plaintiff Michael Hacker testified that he would have considered baseball coaching jobs only in the Sacramento area.  McCreadie Decl. Ex. 13, Hacker Dep., at 78:19-22.  Plaintiff Rudy Barajas testified that he would have considered volleyball coaching jobs only in the Central Valley, *id.* Ex. 10, Barajas Dep., at 38:24-39:5.  Plaintiff Katherine Sebbane testified that she turned down softball coaching positions in places where she preferred not to live and had a preference for

1  being in the Pittsburgh area.  *Id.* Ex. 15, Sebbane Dep., at 36:7-

2  13, 62:16-63:13.  And Plaintiff Peter Robinson testified that he

3  withdrew his application for a paid Division I swim coach position

4  to be close to his wife in Austin.  *Id.* Ex. 9, Robinson Dep., at

5  174:9-176:22.  As Plaintiff Shannon Ray testified, coaches in

6  different regions might be paid differently to reflect differences

7  in the cost of living.  *Id.* Ex. 12, Ray Dep., at 186:19-187:15.

8  But Plaintiffs' experts do not have a model to account for these

9  coach-specific geographic factors because they depend on facts

10 personal to each coach.  Again, the NCAA was able to learn about

11 these geographic limitations only by deposing Plaintiffs.

12 Accordingly, accounting for these important factors in damages

13 will require thousands of mini-trials.  Class certification is

14 inappropriate for that reason as well.

15          **4.   Individualized Issues Preclude Certification of the**
              ***Smart* Plaintiffs' Claims for Damages Related to**
16            **Health Insurance**

17     Dr. Rascher's damages model calculates damages for each

18 volunteer baseball coach in the class equal to an estimated value

19 of health insurance that allegedly would have been provided to

20 them if the NCAA bylaws were not in effect.  These claims for

21 damages cannot be certified for two reasons.

22     *First*, "lost insurance coverage, unless replaced or unless

23 actual expenses are incurred, is simply not a monetary benefit

24 owing to the plaintiff" and "would make a plaintiff more than

25 whole."  *Galindo v. Stoody Co.*, 793 F.2d 1502, 1517 (9th Cir.

26 1986).  Thus, a plaintiff can recover damages from not having been

27 provided with health insurance only "if the plaintiff has

28 purchased substitute insurance coverage or has incurred,

1  uninsured, out-of-pocket medical expenses for which he or she

2  would have been reimbursed under the employer's insurance plan."

3  *Id.* (reversing award of health insurance damages); *see also EEOC*

4  *v. Farmer Bros. Co.*, 31 F.3d 891, 902 (9th Cir. 1994) (same). No

5  class seeking such damages could be certified because each

6  plaintiff's expenses (if any) on health insurance requires an

7  individualized inquiry, and Plaintiff's expert, Dr. Rascher, has

8  not calculated damages for health insurance that way.

9      *Second*, some volunteer baseball coaches had health insurance

10  while working as volunteers.  For example, Plaintiff Michael

11  Hacker testified that he had health insurance from his wife's job.

12  Hacker Dep. 89:17-21.  So, too, did Rudy Barajas and Shannon Ray

13  in the *Colon* case.  McCreadie Decl. Ex. 6, Barajas Dep., at 81:16-

14  20 (had insurance through his wife); *id.* Ex. 12, Ray Dep., 105:23-

15  106:3 (had insurance from her full-time job as an auditor).

16  Volunteer coaches who had health insurance from other sources were

17  not damaged by any NCAA bylaws restricting Division I schools from

18  providing health insurance to volunteer coaches.[37]  But as

19  Dr. Rascher conceded, determining which volunteer coaches had

20  health insurance from other sources would require testimony and/or

21  documentary evidence from each volunteer coach.  He could not

22  "think of any way to figure out the health insurance that each

23  class member had other than asking them."  *Id.* Ex. 2, Rascher

24  Dep., at 260:19-23.  Indeed, the NCAA learned about the insurance

25

26  _____

27  [37] Dr. Rascher conceded that whether coaches would negotiate to
    have the value of health insurance paid to them as additional
    salary would vary from coach to coach.  McCreadie Decl. Ex. 2,

28  Rascher Dep., at 261:1-12.

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

that Mr. Hacker, Mr. Barajas, and Ms. Ray had only by taking their depositions.

If the *Smart* Plaintiffs' theory is that health insurance from NCAA Division I institutions would have been more valuable than the health insurance that volunteer baseball coaches had from other sources, then that would compound rather than cure the problem of needing individualized proof.  Comparing the value of health insurance from NCAA Division I institutions to the health insurance that volunteer baseball coaches had from other sources would require an inquiry into each health insurance plan and the healthcare needs of each putative class member. *Id.* at 260:9-261:22.  Dr. Rascher's damages model does not attempt to conduct that comparison for any coach in the proposed class, let alone for all of them.

*Finally*, there is no basis to assume that all schools would have offered all coaches health insurance even if they were permitted to do so.  After the bylaws were amended, UC Davis hired their volunteer baseball and softball coaches as paid coaches with $10,000 salary and no benefits.  Flushman Decl. ¶ 17; *see also* Lehmann Report ¶ 172-76.  Plaintiffs have not proffered any method to determine which schools would have made a similar decision. Again, then, Plaintiffs have not met their burden to show that class certification is impermissible.[38]

---

[38] Because of the numerous individualized inquiries needed to determine whether each class member suffered antitrust injury and, if so, their proper amount of damages, Plaintiffs' proposed classes also fail Rule 23(b)(3)'s superiority requirement. *See Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1140 (9th Cir. 2022).  Even if the Court were to conclude that issues like whether the challenged bylaws were anticompetitive could be

C.    **The *Colon* Plaintiffs Cannot Satisfy Their Burden To Certify A Class of Coaches In Dozens of Different Sports**

The *Colon* Plaintiffs' request to represent a class of coaches in 44 different sports creates additional, independent reasons why that class cannot be certified.

First, the *Colon* Plaintiffs have failed to account for the fact that supply and demand conditions differ across the 44 sports in their class.  Courts reject class certification in antitrust cases where proving impact for the entire class would require accounting for many different market dynamics.

*Second*, because Division I schools have fixed budgets and thus likely would (at most) create additional paid positions in only some sports, each *Colon* class member would have an incentive to argue that the school where they volunteered would have created an additional paid position in *that class member's* sport, and not in the sports coached by other class members.  This will create intractable intra-class conflicts.

1.    **Individualized Issues Will Predominate Because Different Sports Have Different Labor Markets**

The *Colon* Plaintiffs have not offered any proof that coaches in all 44 sports in their putative class face the same competitive conditions.  Courts deny class certification in cases presenting "individualized market conditions, which would require individualized, not common, hypothetical markets" and thus

_____

decided on a class-wide basis (which it should not), "this is not a case where liability and damages can be determined by a simple formula or uncomplicated follow-on proceedings."  *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 889 (7th Cir. 2024).  Simply put, "[i]ndividual trials would be a better way to adjudicate" class members' claims.  *Lara*, 25 F.4th at 1140.

-85-

1  "individualized, not common, evidence." *Blades*, 400 F.3d at 574.

2  This variation can be by job type or job location.

3      The denial of class certification in *Todd v. Exxon Corp.*, 275

4  F.3d 191, 202 (2d Cir. 2001), is emblematic of that principle.

5  There, the plaintiffs alleged that oil and gas companies had

6  conspired in violation of the Sherman Act to keep the wages of

7  "nonunion managerial, professional, and technical ('MPT')

8  employees . . . at artificially low levels." *Id.* at 195.  The

9  proposed class included employees in many different types of jobs,

10 from geologists to lawyers.  Then-Judge Sotomayor recognized that

11 "the large differences among the various MPT jobs" indicated "that

12 not all MPT employees are affected by the conspiracy in the same

13 way——thus creating potential difficulties with class

14 certification." *Id.* at 202 n.5.  That was because "at trial the

15 geologists must present evidence of the relative job prospects for

16 geologists outside the oil industry, while the lawyers must

17 explore the legal job market." *Id.*

18     The district court in that case went on to deny certification

19 of a damages class because the differences between the jobs of the

20 putative class members prevented common proof of injury. *See In*

21 *re Comp. of Managerial, Pro., & Tech. Emps. Antitrust Litig.*,

22 No. CIV. 02-2924 AET, 2003 WL 26115698, at *5 (D.N.J. May 27,

23 2003).  The court explained that "[t]he relevant job market for an

24 attorney will differ from that of an accountant or a geologist or

25 project engineer, all positions, along with many others, that

26 comprise the putative class." *Id.* at *3.  Accordingly, the Court

27 agreed with the defendants that the way that the alleged conduct

28 "affects each type of employee will be vastly different." *Id.*

1  Whether each employee was injured would depend on their "ability

2  to seek employment in other industries, salary history,

3  educational and other qualifications," which were "factors that

4  cannot be shown with common proof." *Id.* at *4.

5      The Court in *Conrad v. Jimmy John's Franchise, LLC*, No. 18-

6  CV-00133-NJR, 2021 WL 3268339 (S.D. Ill. July 30, 2021), reached a

7  similar conclusion based on geographic variation in market

8  conditions.  In *Conrad*, a plaintiff who worked at a Jimmy John's

9  sandwich store alleged that the chain and its franchisees had

10  agreed to a "No-Poach" policy that suppressed wages for a class of

11  Jimmy John's workers across the country.  *Id.* at *1.  The court

12  found, however, that the plaintiff's expert had simply assumed

13  that "every Jimmy John's employee nationwide was injured . . . no

14  matter their position or location."  *Id.* at *11.  The court

15  concluded that the plaintiff had not established predominance

16  because "individualized inquiries would still be needed to

17  determine whether a given Jimmy John's employee could have been

18  injured given the varied and dynamic labor markets across the

19  country."  *Id.*

20      The variation in competitive conditions facing the volunteer

21  coaches in the many different sports at issue in *Colon* warrants

22  the same conclusion.  Plaintiffs' expert economist, Dr.

23  Ashenfelter, agreed that the "market rate" that coaches supposedly

24  would have earned in the but-for world would have depended on

25  supply and demand.  McCreadie Decl. Ex. 6, Ashenfelter Dep., at

26  183:16-18.  Dr. Ashenfelter conceded that "in order to calculate"

27  an "accurate" market rate, "you need to use jobs whose salaries

28  are determined by the same factors."  *Id.* at 186:12-15.  But while

he acknowledged that workers with "different sets of skills" may not be in the "same labor market," *id.* at 14:9-17, he did not address whether "supply and demand for coaches in each Division I sport is the same." *Id.* at 189:12-17. He did not even try to address, for example, "whether jobs coaching swimming belong in the same market in the economic sense as jobs coaching softball." *Id.* at 192:22-193:5. Dr. Ashenfelter did not attempt to define any relevant labor market at all. *Id.* at 17:2-6.

But it is obvious that coaches in different sports may face different competitive conditions, including outside of Division I. *Id.* at 195:15-23. After all, a swimming coach is unlikely to be qualified to coach field hockey at the Division I level; most wrestling coaches are not qualified to coach soccer; and so on. Golf or tennis coaches might have the option to be a pro at a local country club, but field hockey coaches likely do not. Coaches in some sports may have options to coach at elite private club teams that do not exist in other sports. For example, Mr. Robinson, one of the *Colon* Plaintiffs, currently works full time at a private swim club and has not looked for paid positions in Division I because he expects to earn more coaching at his club. *Id.* Ex. 9, Robinson Dep., at 221:6-223:6.

Thus, the *Smart* Plaintiffs' economist, Dr. Rascher, has opined that "*coaches in each sport*[] provide their labor services in a distinct market formed around a distinct reference labor product." Rascher Report ¶¶ 73-74 (emphasis added); *see also* McCreadie Decl. Ex. 2, Rascher Dep., at 134:20-135:6. Dr. Rascher thus defined a market for coaches in only one sport–baseball. Rascher Report ¶¶ 13, 70, 73. Dr. Ashenfelter acknowledged that

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  supply and demand for coaching could be affected by job

2  opportunities outside of NCAA Division I, but did not analyze that

3  issue.  McCreadie Decl. Ex. 6, Ashenfelter Dep., at 197:11-198:15.

4  Thus, he does not know whether jobs outside of Division I affect

5  supply and demand, and thus wages, in some sports more than

6  others.

7       Supply and demand in some sports also could be local rather

8  than nationwide.  For example, Plaintiff Rudy Barajas testified

9  that he would never consider coaching outside of the Central

10  Valley in California.  *Id.* Ex. 10, Barajas Dep., at 38:24-39:5.

11  Plaintiff Katherine Sebbane testified that geography mattered for

12  her job search.  *Id.* Ex. 15, Sebbane Dep., at 36:7-13 (choosing

13  not to stay in one coaching job because she did not like northeast

14  Pennsylvania); *id.* 62:16-63:13 (turning down job at Dartmouth

15  because it was too remote and she had a preference for the

16  Pittsburgh area).  Dr. Ashenfelter acknowledged that supply and

17  demand for coaching could be localized rather than national, or

18  could even encompass job opportunities in Canada in sports like

19  ice hockey and lacrosse.  *Id.* Ex. 6, Ashenfelter Dep., 199:2-11,

20  200:10-201:5.  But he did not analyze that issue.  *Id.* at 198:17-

21  199:1, 201:7-12.

22       Dr. Ashenfelter's failure to account for variable economic

23  conditions facing coaches across sports makes his model

24  inadmissible for the reasons explained in the NCAA's *Daubert*

25  motion.  Dr. Ashenfelter himself testified that if "supply and

26  demand factors in different sports were different," then his

27  analysis would need to be "adjusted" in order to "predict

28  correctly."  *Id.* at 190:8-17.  Otherwise, he said, some

-89-

1  predictions could be "too high" and others could be "too low."

2  *Id.* at 191:2-9.  As he put it, grouping jobs coaching multiple

3  different sports together "could mask variation between those

4  sports."  *Id.* at 50:11-14.

5       The NCAA's expert shows exactly that:  considering each sport

6  separately dramatically changes Dr. Ashenfelter's results.  *See*

7  Lehmann Report ¶¶ 127-28 & Exhibit 11.  For example, Dr.

8  Ashenfelter's model predicts that for *all* sports that are allowed

9  to have six paid coaches since the bylaw change, all newly added

10 assistant coaches in those sports would make 48% less than the

11 second-lowest paid coach.  Ashenfelter Report ¶ 68 & Table 5.  If

12 one separates the data out by sport, however, a new paid assistant

13 in combined men's and women's swimming would be expected to make

14 just 1.1% less than the second-lowest paid coaching, but a new

15 paid assistant in men's track & cross country would be expected to

16 earn 74% less than the second-lowest paid coach in that sport.

17 *See* Lehmann Report ¶¶ 127-28 & Exhibit 11.  This shows that a

18 proper economic analysis must account for supply and demand in

19 each sport, including the extent to which supply and demand are

20 affected by jobs coaching outside of Division I.  *See id.* ¶ 134.

21 Dr. Ashenfelter has not done that analysis and cannot do it

22 without conducting dozens of different analyses for different

23 sports.

24      Even if Dr. Ashenfelter's cross-sport analysis were

25 admissible, it could not support class certification because it

26 rests on "unsupported assumptions."  *Olean*, 31 F.4th at 666 n.9.

27 Unlike the expert in *Law v. NCAA* who ran "sport-specific"

28 regressions to model "each sport separately," Tollison *Law* Aff.

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1996 WL 34400119, Dr. Ashenfelter used arbitrary groups of sports, averaging salaries for coaching in unrelated sports such as indoor volleyball, field hockey, gymnastics, ice hockey, lacrosse, rugby, soccer, softball, track and field, water polo, and wrestling simply because NCAA bylaws permit those programs to hire four paid coaches.  At the same time, even though Plaintiff Rudy Barajas testified that indoor volleyball coaches can coach beach volleyball and vice versa (McCreadie Decl. Ex. 10, Barajas Dep., at 66:18-20, 67:13-15, 69:14-70:2), Dr. Ashenfelter put those sports into separate groups and did not address Mr. Barajas's testimony or analyze the relatedness of those two sports.

It does not matter whether this case would be adjudicated on the merits under a "quick look" or "rule of reason" framework.[39] Even if identifying the relevant market is not among the "required elements of [Plaintiffs'] antitrust claims," section 4 of the Clayton Act "requires proof of antitrust impact, which *in turn* requires proof of the relevant market." *Funeral Consumers*, 695 F.3d at 348 (emphasis added).

Thus, variable competitive conditions have precluded class certification even in cases involving *per se* illegal price-fixing. *See Blades*, 400 F.3d at 574; *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 328 (5th Cir. 1978) ("[W]e do not understand how the plaintiffs can make this proof [of antitrust impact] without examining the relevant school bus market where each individual plaintiff is located.") (reversing class certification in alleged

---

[39] For clarity, the NCAA disagrees that a "quick look" approach is warranted here.

1  price-fixing case).  The boundaries of the market also can be

2  relevant even to the merits in a "quick look" case, where there is

3  merely a rebuttable presumption of anticompetitive harm.  *See*

4  *Agnew v. NCAA*, 683 F.3d 328, 337 (7th Cir. 2012) ("the existence

5  of a relevant market cannot be dispensed with altogether" in a

6  quick-look case).

7      Finally, the *Colon* Plaintiffs argue that courts in other

8  cases certified classes of workers with numerous different kinds

9  of jobs.  But the rigid pay structures and pay equity dynamics

10 that enabled the plaintiffs in those cases to certify multi-job

11 classes are missing here.  *See Colon* Mot. at 18-19 (citing *In re*

12 *High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal.

13 2013), and *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270

14 (N.D. Cal. 2016)).

15     The plaintiffs in *High-Tech Employee Antitrust Litigation*

16 were technical and R&D employees at large technology companies

17 (including Apple, Google, and Intel) who alleged that the

18 defendants had engaged in collusive behavior to depress class

19 members' wages.  985 F. Supp. 2d at 1177.  They adduced evidence

20 that the technology companies had "formal administrative

21 compensation structures [that] divided jobs into pay bands, zones,

22 grades, and ranges by which they . . . paid employees in groups in

23 relationship to other groups."  *Id.* at 1197.  These "rigid

24 compensation structures" enabled the court to find that the

25 challenged agreements "would have had class wide effect and would

26 have impacted all or nearly all" class members.  *Id.* at 1221-22.

27 Similarly, in *Nitsch v. Dreamworks Animation SKG Inc.*,  Dr.

28 Ashenfelter pointed to evidence that the defendant animation

studios "had a relatively rigid wage structure that provided similar compensation to similarly situated employees."  315 F.R.D. at 300.

In this case, however, Dr. Ashenfelter not only failed to point to evidence of any similar "rigid" wage structures among assistant coaches in the 44 sports, but also testified that he is not offering any opinion on that topic.  McCreadie Decl. Ex. 6, Ashenfelter Dep., at 61:22-25.  *Cf. id.* Ex. 2, Rascher Dep., at 127:20-24, 171:10-14 (same); *see also id.* Ex. 6, Ashenfelter Dep., at 159:15-161:14 (no opinion on whether need for "pay equity" between coaches at the same school or across schools affects any coach salaries).  In fact, the evidence shows that coach compensation varies widely across sports, across schools, and across conferences, which is inconsistent with pay equity.  *See* Lehmann Report ¶¶ 92-96, 162-63.  Jeremiah Carter at the University of Minnesota testified that there are substantial differences in assistant coach salaries within sports and across sports.  McCreadie Decl. Ex. 3, Carter Dep., at 261:22-262:15; Lehmann Report ¶¶ 59-61 & Exhibit 7 (providing evidence that "[t]he share of coaching expenditures [] varies significantly across sports in a given school, which reflects school- and program-specific budget constraints and priorities").  Indeed, Arizona State University paid one of its assistant hockey coaches ███████ and its assistant lacrosse coach ███████.  Wombacher Decl. Ex. A.  And UC Davis paid its assistant softball coach $10,000.  Flushman Decl. ¶¶ 17-18.  Louisiana State University's highest-paid assistant gymnastics coach makes ███████, while the

1   lowest-paid assistant gymnastics coach at that school makes

2   ██████.   McCreadie Decl. ¶ 7, Ex. 25.

3      Thus, in this case, the supply and demand conditions that

4   affect hiring and market wages will differ for coaching in

5   different sports.  Accordingly, analyzing market wages in the but-

6   for world will require dozens of different inquiries that the

7   *Colon* Plaintiffs' economist has not even tried to conduct.  In

8   those circumstances, where individualized evidence would be

9   required at trial for the claims of thousands of different coaches

10   in dozens of different sports with different supply and demand for

11   coaching, Rule 23 does not permit certification of a class.

12        **2.    A Multi-Sport Class Would Involve Conflicts Between**
            **Class Members**

13

14      The *Colon* Plaintiffs' multi-sport class cannot be certified

15   for the additional, independent reason that there would be

16   conflicts between putative class members who coached different

17   sports.  Even highly resourced member institutions have limited

18   budgets and often hire paid coaches in only some sports.  Indeed,

19   as noted, after the bylaws were amended to permit programs to add

20   paid coaching positions in sports where they had previously had

21   volunteers, most schools did not do so in most sports.  *See* page

22   23 above.  Thus, class members in the *Colon* case will need to

23   argue that the schools where they coached would have chosen to

24   spend extra money on *their* sport, rather than on one of the sports

25   coached by other volunteers (who are also class members).

26      This is not hypothetical.  Plaintiff Shannon Ray volunteered

27   as a track and field coach at Arizona State University.  After the

28   bylaws were amended, Arizona State added paid assistant coaches in

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  only 11 of 23 sports in which a volunteer had previously been

2  permitted.[40]  Wombacher Decl. ¶ 18.  Arizona State did not add a

3  paid assistant women's track and field coach.  *Id.*  Thus, to prove

4  her claim, Ms. Ray will have to try to establish that Arizona

5  State would have added a paid assistant women's track and field

6  coach if NCAA bylaws had permitted doing so even though that is

7  not what Arizona State did in the actual world.  By contrast,

8  class members who were volunteer coaches in volleyball at Arizona

9  State will have to try to prove that if Arizona State had budget

10 constraints, then it would have hired volunteer coaches in

11 volleyball, as it did in the actual world.  Arizona State's Senior

12 Associate Athletic Director explains that more sports requested

13 new paid assistant coach positions after the bylaw repeal than the

14 University could offer, effectively having to choose between

15 sports where to create the limited positions.  *Id.* ¶¶ 17-18.

16      The argument that Arizona State simply would have spent more

17 money on coaching salaries overall cannot solve this problem.

18 Dr. Ashenfelter has no opinion that any school would have had more

19 revenue in the but-for world.  McCreadie Decl. Ex. 6, Ashenfelter

20 Dep., at 85:17-25.  Plaintiffs therefore would have to prove that

21 Arizona State would have allocated its athletic budget differently

22 in the but-for world.  But Plaintiffs' expert did not investigate

23 that issue and doing so would require evidence from the university

24

25 [40] ASU did not add new paid assistant coaches in the following
   sports:  women's water polo, women's triathlon, beach volleyball,
26 women's lacrosse, and men's and women's cross country/track and
   field (indoor and outdoor), men's golf, and women's golf.
27 Wombacher Decl. ¶ 20.  Of these, men's golf, women's golf, and
   beach volleyball have continued to use an *unpaid* assistant coach.
28 *Id.*

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

1  itself.  *Id.* at 141:9-142:3.  That process would have to be

2  repeated for more than 300 schools large and small, as sworn

3  declarations from several schools show.  *See* pages 23-26 above.

4  Thus, in order to try to address a class conflict between class

5  members who volunteered in different sports, "members of a

6  proposed class will need to present evidence that varies from

7  member to member."  *Tyson Foods*, 577 U.S. at 453 (citation

8  omitted).

9       The court in *NCAA I-A Walk-On Football Players Litigation*

10  cited just that kind of conflict when it denied certification of a

11  class of student-athletes who were challenging limits on the

12  number of football scholarships each team could offer.  The Court

13  explained:  "In order to prove that he is entitled to a particular

14  piece of the damages pie, each class member will have to offer

15  proof that necessarily will involve arguing that a threshold

16  number of other players (class members and non-class members)

17  would not have gotten that same scholarship money."  2006 WL

18  1207915, at *8.  "If, for example, the players can prove that each

19  school would have awarded 20 additional scholarships, they then

20  will have to prove who would have received those scholarships—and

21  for each to prove that he would have been in that group, he will

22  have to prove that others were not."  *Id.* at *9.  The court denied

23  certification because the plaintiffs in the *Walk-On* case had "<u>no</u>

24  <u>method at all</u> . . . to deal with th[is] problem of intra-class

25  antagonism."  *Id.* (emphasis added).

26       The same is true here and the Court should deny class

27  certification for the same reason:  the *Colon* Plaintiffs have no

28  method to deal with the problem that class members who coached one

1  sport will want to argue that schools would not have created paid

2  positions for class members who coached other sports.

3  **V.    CONCLUSION**

4      For the reasons stated herein and in the documents filed in

5  support of this Opposition, the NCAA respectfully requests that

6  the Court deny both the *Colon* Plaintiffs' and the Smart

7  Plaintiffs' Motions for Class Certification.

8

9  Respectfully submitted,

10  DATED:  December 20, 2024    MUNGER, TOLLES & OLSON LLP

11

12

13                    By:    /s/ Carolyn Hoecker Luedtke
                             CAROLYN HOECKER LUEDTKE

14
                          *Attorneys for Defendant National*
15                        *Collegiate Athletic Association*

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION