Exhibit 2

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1                UNITED STATES DISTRICT COURT
 2      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3                        --oOo--
 4    TAYLOR SMART AND MICHAEL HACKER,
      individually and on behalf of all
 5    those similarly situated,
                    Plaintiffs,
 6    vs.                                 Case No.
                                          22-cv-02125-WBS-CSK
 7    NATIONAL COLLEGIATE ATHLETIC
      ASSOCIATION, an unincorporated
 8    association,
                    Defendant.
 9    _____/
      SHANNON RAY, KHALA TAYLOR, PETER
10    ROBINSON, KATHERINE SEBBANE, and
      RUDY BARAJAS, individually and on
11    behalf of all those similarly
      situated,
12                  Plaintiffs,
      vs.                                 Case No.
13                                        23-cv-00425-WBS-CSK
      NATIONAL COLLEGIATE ATHLETIC
14    ASSOCIATION, an unincorporated
      association,
15                  Defendant.
      _____/
16
17
18       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
19
20     VIDEO-RECORDED DEPOSITION OF DANIEL RASCHER, Ph.D.
21                 SAN FRANCISCO, CALIFORNIA
22                 MONDAY, DECEMBER 9, 2024
23    Reported by:
24    Anrae Wimberley, CSR No. 7778
25    Job No.  7029700
```

Page 1

```
 1                   UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3                           --oOo--
 4        TAYLOR SMART AND MICHAEL HACKER,
          individually and on behalf of all
 5        those similarly situated,
                       Plaintiffs,
 6        vs.                                Case No.
                                             22-cv-02125-WBS-CSK
 7        NATIONAL COLLEGIATE ATHLETIC
          ASSOCIATION, an unincorporated
 8        association,
                       Defendant.
 9        _____/
          SHANNON RAY, KHALA TAYLOR, PETER
10        ROBINSON, KATHERINE SEBBANE, and
          RUDY BARAJAS, individually and on
11        behalf of all those similarly
          situated,
12                     Plaintiffs,
          vs.                                Case No.
13                                           23-cv-00425-WBS-CSK
          NATIONAL COLLEGIATE ATHLETIC
14        ASSOCIATION, an unincorporated
          association,
15                     Defendant.
          _____/
16
17          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
18                 Transcript of video-recorded deposition
19        of DANIEL RASCHER, Ph.D., taken at Munger Tolles &
20        Olson LLP, 560 Mission Street, 27th Floor,
21        San Francisco, California 94105, and also via Zoom
22        videoconference, beginning at 8:38 a.m. and ending
23        at 3:57 p.m. on Monday, December 9, 2024, before
24        Anrae Wimberley, Certified Shorthand Reporter No.
25        7778.
```

                                                Page  2

```
 1    APPEARANCES:
 2    for Plaintiffs Taylor Smart and Michael Hacker,
 3    individually and on behalf of all those similarly
 4    situated:
 5              KOREIN TILLERY, LLC
 6              BY:  GARRETT R. BROSHUIS, ESQ.
 7              STEVEN M. BEREZNEY, ESQ. (VIA ZOOM)
 8              505 North 7th Street, Suite 3600
 9              St. Louis, Missouri 63101
10              (314) 241-4844
11              gbroshuis@koreintillery.com
12              sberezney@koreintillery.com
13
14    For Plaintiffs Shannon Ray, Khala Taylor, Peter
15    Robinson, Katherine Sebbane, and Rudy Barajas,
16    individually and on behalf of all those similarly
17    situated:
18              GUSTAFSON GLUEK PLLC
19              BY:  DENNIS J. STEWART, ESQ.
20              600 West Broadway, Suite 3300
21              San Diego, California 92101
22              (619) 595-3299
23              dstewart@gustafsongluek.com
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1    For Defendant National Collegiate Athletic
2    Association:
3              MUNGER, TOLLES & OLSON, LLP
4              BY:  JUSTIN P. RAPHAEL, ESQ.
5              560 Mission Street, 27th Floor
6              San Francisco, California 94105
7              (415) 512-4000
8              justin.raphael@mto.com
9
10   Also present:
11             SHAWNA HYNES, Videographer
12             VERITEXT LEGAL SOLUTIONS
13                     --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page  4
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1      Veritext Legal Solutions, and I'm the videographer.        08:40:08

2      The court reporter is Anrae Wimberley from the firm

3      Veritext Legal Solutions.

4              I am not related to any party in this

5      action nor am I financially interested in the            08:40:20

6      outcome.

7              If there are any objections to proceeding,

8      please state them at the time of your appearance.

9              Counsel and all present will now state

10     their appearances and affiliations for the record        08:40:32

11     beginning with the noticing attorney.

12         MR. RAPHAEL:  Justin Raphael, Munger, Tolles &

13     Olson, for the NCAA.

14         MR. BROSHUIS:  Garrett Broshuis of Korein

15     Tillery on behalf of the witness and the plaintiffs      08:40:44

16     in the Smart case.

17              And joining me remotely is Steve Berezney,

18     also from Korein Tillery.

19         MR. STEWART:  Dennis Stewart of the firm of

20     Gustafson Gluek on behalf of the Ray plaintiffs.         08:40:58

21         THE VIDEOGRAPHER:  Thank you.  Will the court

22     reporter please swear in the witness.

23              DANIEL RASCHER, Ph.D.,

24      sworn in personally as a witness by the Certified

25         Shorthand Reporter, testified as follows:           08:41:15
```

Page 7

```
  1                    EXAMINATION                    08:41:15

  2    BY MR. RAPHAEL:

  3         Q.   Good morning, Dr. Rascher.

  4         A.   Good morning.

  5         Q.   My name is Justin Raphael.  I represent    08:41:33

  6    the NCAA.

  7              You have been deposed many times; correct?

  8         A.   Yes.

  9         Q.   About how many?

 10         A.   Three dozen, something in that order.    08:41:45

 11         Q.   How many times have you testified as an

 12    expert in a case against the NCAA?

 13         A.   Let's see, O'Bannon, Alston, Rock, House,

 14    Hubbard -- is that five?

 15         Q.   I counted five there, yes.              08:42:10

 16         A.   About five, I think, yes.

 17         Q.   So this would make your sixth time

 18    testifying as an expert in a case against the NCAA?

 19         A.   I believe so.

 20         Q.   And you've been testifying against the    08:42:22

 21    NCAA in antitrust cases for more than a decade?

 22         A.   Yes.

 23         Q.   And how much have you earned in total in

 24    your career from testifying as an expert against the

 25    NCAA?                                             08:42:37
```

                                                    Page 8

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1           MR. BROSHUIS:  Objection; lack of foundation,      09:02:39

 2     outside the scope.

 3           MR. STEWART:  Join.

 4           THE WITNESS:  I mean, it depends.  Both private

 5     and public universities generate revenues.  Some of     09:02:49

 6     them get revenues from their school directly.

 7               The fact that the public universities get

 8     money from the state sort of passes through the

 9     university.  It's not coming directly from the state

10     typically.                                              09:03:09

11               So in other words, once it -- you know,

12     once the campus is deciding how to run its athletic

13     department, it doesn't -- it sort of doesn't matter

14     that the source is coming from the state versus from

15     their own endowment or from their own private          09:03:20

16     university sources.

17     BY MR. RAPHAEL:

18           Q.  Do you know whether any state universities

19     need approval of the state legislature to add

20     personnel in their athletic department?                09:03:31

21           MR. BROSHUIS:  Same objections.

22           MR. STEWART:  Join.

23           THE WITNESS:  I do not know if that's the case.

24     BY MR. RAPHAEL:

25           Q.  Now, were there differences among the        09:03:43
```

Page 25

```
 1    Division I schools that you consulted for in how        09:03:47
 2    they allocated their athletic budgets to different
 3    sports?
 4         MR. BROSHUIS:  Objection; outside the scope.
 5         THE WITNESS:  Yes.                                   09:03:57
 6    BY MR. RAPHAEL:
 7         Q.   So some of the schools that you consulted
 8    for might have allocated a bigger proportion of
 9    their budget to some sports, whereas other schools
10    may have allocated a bigger portion of their budgets   09:04:11
11    to different sports; right?
12         MR. BROSHUIS:  Objection; vague, outside the
13    scope.
14         THE WITNESS:  I mean, yeah, they're not all
15    spending exactly the same amount or same percentages   09:04:22
16    on each sport.
17    BY MR. RAPHAEL:
18         Q.   And based on your work consulting for
19    these Division I schools, what accounts for that?
20         MR. BROSHUIS:  Same objections and foundation.     09:04:30
21         MR. STEWART:  Join.
22         THE WITNESS:  I mean, the schools decide how
23    they're going to invest their dollars.  And so some
24    of that is accounted for by some of the NCAA rules,
25    by conference rules, and then by their own             09:04:48
```

Page 26

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    individual decision making, which, you know, is          09:04:52

 2    affected by the stakeholders that are helping them

 3    make their decisions.

 4    BY MR. RAPHAEL:

 5        Q.   And what are some of the factors that you        09:05:03

 6    have observed in your consulting work for Division I

 7    schools that go into their individual decision

 8    making about how to allocate their budgets?

 9        MR. BROSHUIS:   Same objections.

10        MR. STEWART:   Join.                                  09:05:17

11        THE WITNESS:   Really, looking at what their

12    goals are.

13             So if they want to have a broad-based

14    program or not, the schools that I've worked with,

15    some of them have -- you know, they try to look at       09:05:42

16    their ROI on each sort of investment that they might

17    make.

18             But the factors are really -- you know,

19    really that.  It's like sort of what do we need to

20    do to meet our conference requirements and our NCAA      09:05:58

21    requirements?  What do we need to do to try to

22    compete within our conference?  What's the return on

23    investing over here versus over there?

24    BY MR. RAPHAEL:

25        Q.   In your experience consulting for                09:06:12
```

Page 27

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
1          THE WITNESS:  No.  Some of them have sort of        09:07:24

2      the minimum number of sports and others have a lot

3      of sports, like an Ohio State or a Stanford or a

4      Williams College.

5      BY MR. RAPHAEL:                                          09:07:34

6          Q.   And some schools in Division I, in your

7      experience, decide to focus maybe disproportionately

8      on a few sports that may earn them the most return

9      on investment; right?

10         MR. BROSHUIS:  Objection; misstates the              09:07:48

11     testimony, vague, outside the scope, lack of

12     foundation.

13         MR. STEWART:  Join.

14         THE WITNESS:  I mean, as I said before, just

15     each school has its own separate P&L statement.  In     09:08:00

16     other words, it's -- of course, the amount of

17     dollars they're investing in a particular sport is

18     going to vary across schools.

19             And the amount relative within the

20     department can vary, although a lot of the schools      09:08:15

21     sort of tend to follow a similar pattern, especially

22     within the same conferences.

23     BY MR. RAPHAEL:

24         Q.   I guess what I'm asking is, not all

25     schools in Division I allocate their athletic           09:08:27
```

Page 29

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    budgets proportionally in the same way; right?          09:08:32

 2         MR. BROSHUIS:  Objection; vague, also lacks

 3    foundation.

 4         MR. STEWART:  The same.  Join.

 5         THE WITNESS:  When you say --                       09:08:41

 6         MR. BROSHUIS:  Outside the scope.

 7         THE WITNESS:  When you say, "proportionally,"

 8    to what?

 9    BY MR. RAPHAEL:

10         Q.   Well, different schools in Division I          09:08:48

11    allocate their athletic budgets to different sports

12    in different proportions; right?

13         MR. BROSHUIS:  Same objections.

14         MR. STEWART:  Join.

15         THE WITNESS:  Yeah, as I said before, they --       09:09:02

16    yeah, the relative dollar amounts or the absolute

17    dollar amounts can vary from school to school, but

18    they do tend to, within conferences, push themselves

19    in similar directions.  So like having, you know,

20    somewhat relative investments.                          09:09:22

21         I talked about this a fair amount in the

22    O'Bannon case.

23    BY MR. RAPHAEL:

24         Q.   Is it the case that all schools in

25    Division I allocate their athletic budgets to           09:09:38
```

Page 30

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    different sports in the same proportion?              09:09:41

 2         A.   No.

 3         MR. BROSHUIS:  Objection.  The same objections.

 4         MR. STEWART:  Join.

 5         THE WITNESS:  No.                                 09:09:47

 6    BY MR. RAPHAEL:

 7         Q.   Why not?

 8         MR. BROSHUIS:  Same objections.

 9         MR. STEWART:  Join.

10         THE WITNESS:  Because they're investing to try    09:09:54

11    to satisfy their objectives.

12    BY MR. RAPHAEL:

13         Q.   And in your experience, different schools

14    in Division I have different objectives for their

15    athletic departments; right?                          09:10:07

16         MR. BROSHUIS:  Objection; misstates testimony,

17    asked and answered, outside the scope still, and

18    still lack of foundation.

19         MR. STEWART:  Join.

20         THE WITNESS:  Could you ask that again?  Sorry.   09:10:18

21    BY MR. RAPHAEL:

22         Q.   In your experience, different schools in

23    Division I have different objectives for their

24    athletic departments; right?

25         MR. BROSHUIS:  Same objections.                  09:10:28
```

Page 31

```
 1          MR. STEWART:  Join.                        09:10:30

 2          THE WITNESS:  So as I said before, I think they

 3     broadly have similar objectives and they invest

 4     maybe in different ways to try to meet those

 5     objectives, but they broadly have similar          09:10:40

 6     objectives.

 7     BY MR. RAPHAEL:

 8          Q.  Now, I think two of the schools that you

 9     consulted for were UC Berkeley and USF; right?

10          A.  Yes.                                    09:10:52

11          Q.  Do UC Berkeley and USF prioritize the same

12     sports in their athletic department?

13          MR. BROSHUIS:  Objection; lack of foundation,

14     outside the scope.

15          MR. STEWART:  Join.                         09:11:06

16          THE WITNESS:  I mean, they have -- Berkeley

17     offers more sports than USF.  So just by that, USF

18     can't prioritize football because it doesn't offer

19     football.

20               Of the sports that they offer in common,  09:11:20

21     they both, you know, emphasize basketball, men's and

22     women's.  They both emphasize baseball.

23               Obviously, Cal Berkeley emphasizes

24     football and water polo and swimming.  USF doesn't

25     offer water polo and swimming.                  09:11:44
```

                                                    Page 32

```
 1          THE WITNESS:  I'm trying to -- I know the        09:23:03
 2   length was part of it.
 3          I don't remember if the number was part of
 4   it, the number of scholarships.
 5   BY MR. RAPHAEL:                                          09:23:25
 6      Q.   Are there any differences from the
 7   analysis that you did regarding injury and damages
 8   in this case and the analysis of injury and damages
 9   that you did in the Rock case?
10      MR. BROSHUIS:  Objection; foundation, outside        09:23:39
11   the scope.
12          THE WITNESS:  I don't remember.  I don't
13   remember what I did in the Rock case.
14   BY MR. RAPHAEL:
15      Q.   Sitting here today, do you have any memory      09:23:48
16   of the opinions that you put forward regarding
17   injury and damages in Rock versus the NCAA?
18      MR. BROSHUIS:  Objection; outside the scope.
19          THE WITNESS:  I don't remember.
20      MR. RAPHAEL:  All right.  Let's mark this as          09:24:07
21   Exhibit 80.
22          (Deposition Exhibit 80 was marked.)
23          (Witness reviews document.)
24   BY MR. RAPHAEL:
25      Q.   So Exhibit 80 is a copy of the expert           09:24:50
```

Page 43

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    available in basketball and football.                    09:34:45

 2        Q.   Those are the only sources of publicly

 3    available information on salaries paid to coaches at

 4    Division I schools that you're aware of?

 5        A.   That I'm aware of, yes.                          09:34:57

 6        Q.   How does an economist define the but-for

 7    world?

 8        MR. BROSHUIS:  Objection; vague, overbroad.

 9        THE WITNESS:  Generally, it's if the

10    allegations in the case were true and there was --        09:35:16

11    you could sort of rewind the clock and say, Let's

12    assume that these -- whatever -- in this case this

13    rule was not in place, what would the world look

14    like?

15    BY MR. RAPHAEL:                                           09:35:39

16        Q.   Would you agree that incentives are very

17    important in economics?

18        MR. BROSHUIS:  Objection; vague, foundation.

19        THE WITNESS:  Yes.

20    BY MR. RAPHAEL:                                           09:35:46

21        Q.   And should an economist modeling the

22    but-for world assume that all market participants

23    would act consistent with their economic incentives?

24        MR. BROSHUIS:  Objection; outside the scope,

25    vague, foundation.                                        09:36:01
```

Page 52

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1              THE WITNESS:  When modeling the but-for world?    09:36:03

2     BY MR. RAPHAEL:

3         Q.   Yes.

4         A.   It sort of depends on the situation and

5     the structure that they're in.                            09:36:11

6              But, generally, they're going to make

7     decisions that benefit them in the way that they see

8     how their benefits work.

9         Q.   And that's a fundamental assumption of

10    economics, that people generally act in accordance       09:36:24

11    with their incentives?

12             MR. BROSHUIS:  Same objections.

13             THE WITNESS:  Yes.

14    BY MR. RAPHAEL:

15        Q.   In modeling the but-for world in this            09:36:33

16    case, have you assumed that coaches who worked as

17    volunteers would have negotiated their salaries?

18        A.   I don't make that assumption.

19        Q.   Okay.  Could you go to paragraph 39 of

20    your report?                                              09:36:53

21             Your declaration, excuse me.

22        A.   This one or my -- the most recent one?

23        Q.   The one that's in front of you.

24        A.   What was that paragraph?

25        Q.   It's on page 19, paragraph 39.                   09:37:12
```

Page 53

```
 1      without NCAA rules saying, you know, they couldn't    09:43:36

 2      do that or that they had to pay them zero.

 3      BY MR. RAPHAEL:

 4          Q.   So as we sit here today in 2024, the NCAA

 5      Division I bylaws say that baseball programs can      09:43:48

 6      only pay four paid coaches?

 7          A.   The head coach and then the three

 8      assistant coaches, yeah.

 9          Q.   Okay.  Now, are you assuming that that

10      rule would have been in place during the class       09:44:05

11      period in the but-for world that you're modeling?

12          A.   Yes.

13          Q.   In your view, is there anything

14      anticompetitive about an NCAA bylaw that says that

15      baseball programs can only hire a paid head coach    09:44:31

16      and three paid assistants?

17          MR. BROSHUIS:  Objection; outside the scope,

18      lack of foundation.

19          THE WITNESS:  I don't have an opinion on that.

20      BY MR. RAPHAEL:                                       09:44:48

21          Q.   So the but-for world that you have modeled

22      in this case is one where there is a maximum number

23      of transactions in the labor market that could have

24      taken place; right?

25          A.   Can you clarify what you mean by that?      09:45:00
```

Page 59

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1         Q.   Sure.  So I think you testified that the        09:45:04

 2    but-for world you're assuming in this case is one

 3    where each baseball program could only hire a

 4    maximum of three paid assistants; right?

 5         A.   Yes.                                              09:45:15

 6         Q.   Okay.  So -- and the labor market that you

 7    have defined in this case is for Division I

 8    assistant baseball coaches?

 9         A.   Yes.

10         Q.   Okay.  So in the but-for world that you          09:45:27

11    have modeled in this case, there is a maximum number

12    of transactions in the market for Division I

13    assistant baseball coaches; right?

14         MR. BROSHUIS:  Objection; vague.

15         THE WITNESS:  "Transactions," you mean the            09:45:42

16    hiring of a coach?

17    BY MR. RAPHAEL:

18         Q.   Correct.

19         A.   Oh, okay.

20              Well, let's see.  There's a number of            09:45:51

21    schools and three coaches -- assistant coaches, so,

22    yeah, I guess there would be a fixed number.

23         Q.   And the fixed number of paid assistant

24    coaches who could have been hired in the market in

25    the but-for world could be lower than the number of       09:46:11
```

Page 60

```
 1        Q.   Have you ever worked on cases involving      09:47:20

 2   price fixing of consumer products?

 3        A.   Yes.  Contact lenses, carpets, brand-name

 4   drugs, flat-panel televisions.

 5             There may be others.  Those are ones that    09:47:49

 6   come to mind.

 7        Q.   And in those cases involving alleged price

 8   fixing of consumer products, was there a fixed cap

 9   on the number of transactions that could have

10   occurred in the market in the but-for world?         09:48:03

11        MR. BROSHUIS:  Objection; foundation.

12        THE WITNESS:  I mean, I don't remember the

13   details of those cases.

14        MR. STEWART:  Just when you hit a convenient

15   spot, could we take a break?                          09:48:14

16        MR. RAPHAEL:  That's fine now.

17        THE VIDEOGRAPHER:  This marks the end of Media

18   No. 1.  Off the record.  The time is 9:48.

19            (Recess taken.)

20        THE VIDEOGRAPHER:  This marks the beginning of    09:59:34

21   Media No. 2 in the deposition of Daniel Rascher.

22   We're back on the record.  The time is 9:59.

23   BY MR. RAPHAEL:

24        Q.   Dr. Rascher, are you offering any opinion

25   about the amount of revenue that any athletics        09:59:51
```

Page 62

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    department in Division I would have earned in the        09:59:57

 2    but-for world?

 3          MR. BROSHUIS:  Objection.  Report speaks for

 4    itself.

 5          THE WITNESS:  No, I'm not offering an opinion       10:00:10

 6    on that.

 7    BY MR. RAPHAEL:

 8          Q.   So you're not assuming -- you're not

 9    making any assumption about the amount of revenue

10    that any athletics department in Division I would        10:00:19

11    have earned in any year during the class period?

12          MR. BROSHUIS:  Same objection.

13          THE WITNESS:  My analysis takes -- again, as an

14    economist is supposed to do in the but-for world,

15    I'm trying to change as little as possible tied          10:00:33

16    directly to the case.

17               So just change the rule, go back in time.

18    So the athletics departments were earning revenues

19    from their baseball programs.  And so my analysis

20    continues with that same set of information.             10:00:54

21    BY MR. RAPHAEL:

22          Q.   So you're not assuming that any Division I

23    athletics department would have earned more revenue

24    or had more funding during the class period in the

25    but-for world than they actually had in the actual      10:01:11
```

Page 63

```
 1              And we see this in Alston payments.  We          10:04:50

 2    see this in cost-of-attendance payments, which are

 3    much larger total dollar amounts, that the schools

 4    adjust to that as it goes forward.

 5              And so some of the schools may wait a year       10:05:03

 6    to do that, and that's why we have the lingering

 7    effects problem that we need to solve.  Other

 8    schools may do it right away.  Just like we saw in

 9    '23/'24, schools all of a sudden were allowed to

10    hire a third coach, and they did and they paid them      10:05:23

11    and then they came up with the funding for it.

12    BY MR. RAPHAEL:

13         Q.   Do you agree that at least some schools in

14    order to fund the salary of an additional paid

15    baseball coach would have had to reduce some other       10:05:30

16    expenditure at the university?

17         MR. BROSHUIS:  Objection; misstates testimony.

18         MR. STEWART:  Objection; lacks foundation.

19         MR. BROSHUIS:  And lacks foundation.

20         THE WITNESS:  At the university, possibly, yes.     10:05:42

21              But they also may have, you know,

22    continued to sort of fundraise or they would have

23    waited a year and then they would have allocated

24    some of that 6 percent growth in their revenues.

25              (Reporter seeks clarification.)                 10:06:07
```

Page 67

```
 1    BY MR. RAPHAEL:                                        10:06:07

 2         Q.   Do you know which of those strategies for

 3    funding the additional paid baseball coach each

 4    university would have taken in the but-for world?

 5         MR. BROSHUIS:  Objection; foundation.             10:06:22

 6         THE WITNESS:  I don't need to know that, and I

 7    don't know that.

 8    BY MR. RAPHAEL:

 9         Q.   Okay.  So you've not done any analysis of

10    where the schools who you say would have hired an      10:06:28

11    additional paid baseball coach in the but-for world

12    would have gotten the money to do that; right?

13         MR. BROSHUIS:  Same objection.

14         THE WITNESS:  I mean, as I -- as we've

15    discussed here, in all of the work I've done in        10:06:41

16    these NCAA cases and the work for universities,

17    right, they basically take from the least important

18    thing on campus.

19              Another thing that happened at USF was

20    they used to collect our trash in our offices every    10:06:58

21    day.  When we had a budget crisis, one of the

22    things, they started collecting trash twice a week,

23    and they saved tens of thousands of dollars doing

24    that.

25              So, you know -- and they spent that.  I      10:07:13
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | do it in the first year, and so you might apply | 10:18:43 |
| 2 | damages to those schools.  And then in the second | |
| 3 | year, we pick a number of more schools and then in a | |
| 4 | third year and then you finally get to equilibrium. | |
| 5 | I just made that -- those steps, you know, | 10:18:55 |
| 6 | three-plus years before. | |
| 7 | BY MR. RAPHAEL: | |
| 8 | Q.  So you assumed that the NCAA bylaws that | |
| 9 | are being challenged in this case would have ceased | |
| 10 | to exist at least three years before the start of | 10:19:05 |
| 11 | the class period; is that correct? | |
| 12 | MR. BROSHUIS:  Objection; asked and answered. | |
| 13 | THE WITNESS:  Yeah, that's what my analysis | |
| 14 | assumes. | |
| 15 | BY MR. RAPHAEL: | 10:19:13 |
| 16 | Q.  Does your but-for world assume that the | |
| 17 | COVID pandemic would have occurred? | |
| 18 | MR. BROSHUIS:  Objection; incomplete | |
| 19 | hypothetical. | |
| 20 | THE WITNESS:  Yes. | 10:19:24 |
| 21 | BY MR. RAPHAEL: | |
| 22 | Q.  And are you offering any opinion about how | |
| 23 | the COVID-19 pandemic would have affected revenues, | |
| 24 | funding or expenditures at any Division I school? | |
| 25 | A.  Well, I account for that in my analysis. | 10:19:36 |

Page 81

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1          Q.   How is someone harmed who was a volunteer       10:21:53

2     at a school who would not have hired an additional

3     paid baseball coach in the but-for world?

4          MR. BROSHUIS:  Misstates prior testimony.

5          THE WITNESS:  Because the market is harmed, and       10:22:06

6     so that person -- imagine there's a school near them

7     that does pay, then all of a sudden maybe that

8     person or someone else takes that job, and then it

9     opens up another -- like there's more paid jobs

10    available for this person to try to compete for.        10:22:19

11            When there's fewer paid jobs available,

12    then the market is harmed and, you know, that's what

13    antitrust harm is.

14    BY MR. RAPHAEL:

15         Q.   So the way that someone who volunteered at      10:22:29

16    a school who would not have hired an additional paid

17    baseball coach in the but-for world could have been

18    harmed is that they might have been able to work

19    coaching baseball at a different school?

20         MR. BROSHUIS:  Objection; still misstates the        10:22:43

21    prior testimony.

22         THE WITNESS:  I mean, the whole market -- you

23    know, the whole market wage was going up, and so

24    that essentially puts pressure on schools to meet

25    that wage, right, because that person may go and        10:22:53
```

                                                    Page 84

| | |
|---|---|
| 1 | coach at this other school nearby, for instance. | 10:22:56 |
| 2 | BY MR. RAPHAEL: |
| 3 |     Q.  Right. |
| 4 |     A.  So everyone in the market is harmed. |
| 5 | That's how -- when a market is harmed, it affects | 10:23:05 |
| 6 | the entire market.  It may affect different elements |
| 7 | of the market, you know, differently, but all of |
| 8 | these volunteer coaches had no chance to try to go |
| 9 | and compete for these paid positions because the |
| 10 | rules say it was in place. | 10:23:22 |
| 11 |     Q.  And what is the amount of damage that |
| 12 | someone who volunteered at a school that would not |
| 13 | have hired an additional paid baseball coach in the |
| 14 | but-for world suffered? |
| 15 |     MR. BROSHUIS:  Objection; still misstates the | 10:23:41 |
| 16 | testimony. |
| 17 |     THE WITNESS:  So my analysis is measuring a |
| 18 | zero dollar damage for them, if I'm understanding |
| 19 | your hypothetical, but there is potentially a damage |
| 20 | to them because, you know, they couldn't have gotten | 10:23:52 |
| 21 | some other job.  It's just more of -- it's just a |
| 22 | different way of trying to measure damages. |
| 23 | BY MR. RAPHAEL: |
| 24 |     Q.  How would you try to measure damages for |
| 25 | someone who volunteered at a school that would not | 10:24:04 |

Page 85

```
 1    have hired an additional paid baseball coach?         10:24:06

 2         MR. BROSHUIS:  Objection; still misstates the

 3    testimony.

 4         THE WITNESS:  I would have to sit down and try

 5    to figure out a way to do that.                       10:24:24

 6              As I sit here, I can't give you an expert

 7    opinion on that.

 8    BY MR. RAPHAEL:

 9         Q.   To estimate the damages for someone who

10    was a volunteer at a school that would not have       10:24:33

11    hired an additional paid baseball coach, would you

12    have to figure out what other school would have

13    hired that person?

14         MR. BROSHUIS:  Objection; still misstates the

15    testimony and incomplete hypothetical.                10:24:47

16         THE WITNESS:  I mean, one might be able to look

17    at sort of what is happening to the marketplace in

18    general, right?  What is the market wage now, what

19    was it before, right?  Could you apply something

20    around that controlling for some set of factors       10:25:00

21    about schools, conferences, things like that?

22              But I'm not doing that in this case.

23    BY MR. RAPHAEL:

24         Q.   Can you think of any way that someone who

25    was a volunteer at a school that would not have       10:25:19
```

Page 86

| | | |
|---|---|---|
| 1 | hired an additional paid baseball coach would have | 10:25:22 |
| 2 | been harmed other than losing out on compensation | |
| 3 | they would have earned at a different school? | |
| 4 | MR. BROSHUIS:  Objection; still misstates the | |
| 5 | testimony. | 10:25:35 |
| 6 | THE WITNESS:  I mean, not as I sit here, I | |
| 7 | can't think of a way to do that.  But I've given you | |
| 8 | some examples. | |
| 9 | BY MR. RAPHAEL: | |
| 10 | Q.   If a Division I college or university | 10:26:02 |
| 11 | would have hired a different coach for a paid | |
| 12 | position that it hired for the volunteer position, | |
| 13 | was the volunteer who had the volunteer position | |
| 14 | harmed? | |
| 15 | MR. BROSHUIS:  Objection; lack of foundation, | 10:26:17 |
| 16 | outside the scope. | |
| 17 | THE WITNESS:  Again, they're in a market in | |
| 18 | which they are harmed and they didn't have a chance | |
| 19 | to be able to try to compete for that position or | |
| 20 | positions at other schools. | 10:26:34 |
| 21 | BY MR. RAPHAEL: | |
| 22 | Q.   Right.  So my hypothetical is that the | |
| 23 | Division I college or university would have hired a | |
| 24 | coach for the paid position in the but-for world who | |
| 25 | was different than the volunteer at that school | 10:26:47 |

Page 87

```
 1          A.   I don't remember the title.  I believe it      10:33:35
 2     has the word "coconuts" in the title, so you could
 3     probably find it.
 4          Q.   And Peter Diamond's work, is that
 5     considered standard in labor economics?              10:33:44
 6          A.   Yeah, it's very foundational.
 7          Q.   And you did not try to implement any
 8     version of the Peter Diamond type model where you
 9     calculated the probability that coaches would
10     actually find a match with a school; right?          10:33:58
11          MR. BROSHUIS:  Objection; misstates testimony.
12          THE WITNESS:  My analysis, I have a different
13     way of measuring damages.
14               You asked me about how one could measure
15     damages for people that I'm not measuring damages    10:34:13
16     for.  I have my own method for measuring damages for
17     the volunteers at the schools that would have hired
18     in the but-for world had they been allowed to.
19     BY MR. RAPHAEL:
20          Q.   Oh, okay.  Thank you.  Let me just make     10:34:26
21     sure I understand that.
22               So the Peter Diamond type model where you
23     try to estimate the probability of workers finding
24     matches, that's a way that you might try to estimate
25     damages for people who volunteered at a school that  10:34:40
```

Page 94

```
 1    wouldn't have hired an additional paid coach; right?    10:34:44

 2         A.   Again, I -- you would have to sit down and

 3    work through all of that, but that is a possibility

 4    or a path to go down.

 5         Q.   Right.                                         10:34:53

 6         A.   My analysis -- I mean, I have better data

 7    than Peter Diamond had in his articles in terms of

 8    like he was looking at prospecting information.

 9              I have a natural experiment here, that,

10    you know, we didn't have this natural experiment, if    10:35:08

11    this rule were still in place, right, then we would

12    have to come up with a different way of measuring

13    damages, and one might go down the path that I was

14    talking about with Peter Diamond.

15         Q.   And -- but just to be clear, you did not      10:35:20

16    implement any model of the sort that Peter Diamond

17    did about predicting the probability that coaches in

18    the class would have found a match at any particular

19    school; right?

20         A.   I mean, I'm predicting the probability of     10:35:36

21    the coaches being hired, and those coaches did those

22    jobs.  So that's how I do it.

23              But I'm not doing a matching model.

24         Q.   What are some of the inputs into the

25    matching model that Peter Diamond has put forward in    10:35:52
```

Page 95

```
 1    the economic literature?                           10:35:55

 2         MR. BROSHUIS:  Objection; outside the scope.

 3         THE WITNESS:  I mean, I don't recall.  He just

 4    has skill -- people have skill sets.  There's firms

 5    with different demands.  They're in the same labor  10:36:06

 6    market.  There's search cost.

 7              You know, it's mostly theoretical is the

 8    work that he was doing it with.

 9    BY MR. RAPHAEL:

10         Q.   So is it standard labor economics that    10:36:23

11    workers' skill sets will affect their ability to get

12    matches with employers?

13         MR. BROSHUIS:  Objection; outside the scope.

14         THE WITNESS:  I mean, certainly, workers'

15    skills affect the labor market, yeah.  I mean,      10:36:40

16    that's pretty straightforward.  More so in a -- sort

17    of a textbook labor market, meaning things are open,

18    things are competitive, information is known on both

19    sides of the table.

20              You know, as you start to restrict what's  10:36:57

21    allowed or what's known, then all of a sudden, you

22    can have -- you know, you can have different

23    outcomes.

24              Again, I don't have to worry about any of

25    that stuff because I have a natural experiment.      10:37:08
```

Page 96

```
 1    BY MR. RAPHAEL:                                    10:37:11

 2        Q.   So is it standard labor economics that the

 3    matches between workers and employers will depend on

 4    the employers' demand and the workers' skill sets?

 5        MR. BROSHUIS:  Objection; misstates             10:37:26

 6    testimony --

 7        THE WITNESS:  Among other things.

 8        MR. BROSHUIS:  -- misstates testimony, outside

 9    the scope --

10        THE WITNESS:  I mean, again --                  10:37:28

11        MR. BROSHUIS:  -- foundation.

12            (Reporter seeks clarification.)

13        THE WITNESS:  I mean, in a labor market, you

14    know, you have buyers and sellers, right?  And the

15    sellers have various skill sets and the buyers have   10:37:39

16    various demands, and so they -- that's true in this

17    labor market, and that's true in other labor

18    markets.

19    BY MR. RAPHAEL:

20        Q.   And skill sets and demand vary from         10:37:49

21    employee to employee and employer to employer?

22        MR. BROSHUIS:  Objection; outside the scope.

23        THE WITNESS:  I mean, they can.

24    BY MR. RAPHAEL:

25        Q.   Can you think of any reason why volunteer   10:38:01
```

Page 97

```
 1          Q.   As a matter of economics, is it true that      10:39:30

 2     some people might accept something for free that

 3     they wouldn't pay for if they had to?

 4          MR. BROSHUIS:  Objection; outside the scope,

 5     foundation.                                              10:39:43

 6          THE WITNESS:  "Accept something," like can you

 7     give me an example?

 8     BY MR. RAPHAEL:

 9          Q.   Sure.  So we're looking across from the

10     ballpark; right?                                         10:39:51

11          A.   Yes.

12          Q.   Okay.  So is it true that sometimes at

13     baseball games, the team gives out stuff for free

14     that people will accept even though they might not

15     buy those things if they had to?                         10:40:04

16          MR. BROSHUIS:  Objection; incomplete

17     hypothetical, outside the scope.

18          THE WITNESS:  Yes.

19     BY MR. RAPHAEL:

20          Q.   So as a matter of economics, is it true        10:40:10

21     that sometimes people or companies will accept

22     things for free that they wouldn't pay for if paying

23     for them was required?

24          MR. BROSHUIS:  Same objections.

25          THE WITNESS:  Sure, that's possible.  It's not      10:40:25
```

Page 99

```
 1    relevant here, but that's possible.                    10:40:28

 2    BY MR. RAPHAEL:

 3        Q.   Could you go to paragraph 136 of your

 4    expert declaration that's in front of you.

 5             (Witness reads document.)                     10:41:07

 6        Q.   Sorry, paragraph 135, just above that.

 7    I'm sorry, the same page.  And I'm looking at the

 8    end of the paragraph.

 9        A.   All right.  Let me just take a look at it.

10        Q.   Sure.  Feel free to read whatever you need   10:41:33

11    to read.

12             (Witness reads document.)

13        A.   Okay.

14        Q.   So do you see at the end of paragraph 135

15    of your November 1st expert declaration, you say      10:42:12

16    that "the harm is measured as an appropriate

17    estimate of the value of the services actually

18    provided, in a world without collusion to zero out

19    pay."

20             Do you see that?                              10:42:28

21        A.   Somehow, I didn't see where you read that

22    even though I'm here.  Is that the last sentence?

23        Q.   It is.  I apologize.

24        A.   Okay.  No, no, that's okay.  I was somehow

25    up a sentence.                                         10:42:40
```

Page 100

```
 1          A.   Some of them did, but many of them hired        10:45:30

 2     the same coaches, also.

 3          Q.   And some hired different coaches; right?

 4          A.   Yes.

 5          Q.   So are you assuming that, at schools that        10:45:35

 6     hired an additional paid coach who was different

 7     than the volunteer they hired, that both of those

 8     coaches provided the exact same amount of value to

 9     the university?

10          MR. BROSHUIS:  Objection; irrelevant.               10:45:49

11          THE WITNESS:  I don't need to assume that they

12     provided the exact same amount of value.

13     BY MR. RAPHAEL:

14          Q.   And because you didn't need to assume it,

15     you didn't assume it?                                   10:45:57

16          MR. BROSHUIS:  Objection; irrelevant.

17          THE WITNESS:  Yeah, I don't assume that.

18     BY MR. RAPHAEL:

19          Q.   Did you do any analysis to determine

20     whether any two coaches who were hired, either         10:46:12

21     before or after the class period, provided the same

22     or a different amount of value to the schools where

23     they coached?

24          MR. BROSHUIS:  Objection; irrelevant.

25          THE WITNESS:  Not directly.  I mean, it's --       10:46:34
```

Page 103

```
 1    some of that's baked into, I think, what they were      10:46:37

 2    paid, but that wasn't necessary for me to do in

 3    order to do my analysis.

 4    BY MR. RAPHAEL:

 5         Q.   And so you didn't do it?                       10:46:44

 6         MR. BROSHUIS:  Same objections.

 7         THE WITNESS:  Yeah, I didn't -- I didn't --

 8    yeah, I didn't need to compare that because we have

 9    what the schools actually decided to do.

10    BY MR. RAPHAEL:                                          10:46:56

11         Q.   Would you agree that the amount of value

12    that a school gets from a coach's services is a

13    function of the skills of that coach?

14         MR. BROSHUIS:  Objection; foundation.

15         MR. STEWART:  Vague.                                10:47:11

16         THE WITNESS:  Part of it, yeah.

17    BY MR. RAPHAEL:

18         Q.   And so all things being equal, a school

19    that gets the benefit of services from a more

20    skilled coach would get more value than they get        10:47:21

21    from a less skilled coach; right?

22         MR. BROSHUIS:  Objection; incomplete

23    hypothetical.

24         THE WITNESS:  If everything else is held

25    constant and assuming that the more skilled coach is     10:47:32
```

Page 104

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    able to provide more valuable services, then the        10:47:38

 2    school would get more out of them.

 3            But that's a lot of assumptions in that

 4    hypothetical.

 5    BY MR. RAPHAEL:                                          10:47:49

 6        Q.   Okay.  And would you agree that the amount

 7    that a school will pay a coach is a function of the

 8    value that they'll get from that coach's services?

 9        MR. BROSHUIS:  Same objections.

10        THE WITNESS:  That's what I said, part --            10:48:02

11    it's -- one of the factors in how much a school is

12    going to pay a coach is based on what that coach is

13    going to do for that school.

14    BY MR. RAPHAEL:

15        Q.   And so a school might be willing to pay a       10:48:12

16    more skilled coach more than a less skilled coach;

17    right?

18        MR. BROSHUIS:  Same objections, incomplete

19    hypothetical.

20        THE WITNESS:  I mean, again, if they were            10:48:26

21    presented with that.  And in this case, again, the

22    coaches actually did -- they actually did hire the

23    coaches, they just weren't allowed to pay them.

24            So they chose the coaches that they wanted

25    at whatever skill level that they had.  They already    10:48:41
```

Page 105

```
 1          MR. BROSHUIS:  Same objection.              10:51:09

 2          THE WITNESS:  I mean, no, I didn't need to do

 3     that, so no.

 4     BY MR. RAPHAEL:

 5          Q.   For an economist, is the value that a     10:51:17

 6     product or services provide the buyer the same as

 7     the market price of that product or service?

 8          MR. BROSHUIS:  Objection; vague.

 9          THE WITNESS:  I mean, it depends.  It depends

10     on the nature of the demand.                      10:51:36

11     BY MR. RAPHAEL:

12          Q.   Right.  So the value that a product or

13     service provides a particular buyer is not always

14     the same as the market price of that product or

15     service?                                          10:51:50

16          A.   Usually, the value is higher than the

17     market price or else they wouldn't have purchased

18     it.

19          Q.   And the market price of a product or

20     service depends on the supply and demand of all of   10:52:00

21     the other buyers and all of the other suppliers in

22     the market; right?

23          MR. BROSHUIS:  Objection; incomplete

24     hypothetical.

25          THE WITNESS:  So, yeah, generally, in a      10:52:12
```

Page 108

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    textbook situation, you know, where you don't have        10:52:14

 2    certain restrictions or you have information

 3    asymmetries and so forth, yeah, the market price

 4    evolves out of the demand and supply and the

 5    aggregation of the different demands and different      10:52:28

 6    supplies.

 7    BY MR. RAPHAEL:

 8         Q.   So if an economist wanted to determine the

 9    market price of a product or service, they couldn't

10    look at the value that one buyer got from that          10:52:39

11    product or service; right?

12         A.   I mean, that could provide information,

13    sure.  In fact, that's part of usually when someone

14    does that process.

15              But they might look at other things, too.     10:52:51

16         Q.   Do economists model the decisions of

17    universities the same way that they model the

18    decisions of for-profit firms?

19         MR. BROSHUIS:  Objection; outside the scope.

20         THE WITNESS:  Depends on the situation.            10:53:12

21              I discuss this quite a bit in O'Bannon and

22    Alston, sort of the revenue theory of cost of

23    running a nonprofit and how the nonprofits will tend

24    to spend their revenues at a higher rate than say a

25    for-profit might who tries to -- a for-profit might     10:53:32
```

Page 109

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    whole paragraph for context.                    10:56:25

 2         THE WITNESS:  Yeah.

 3              (Witness reviews document.)

 4         THE WITNESS:  Now, I'm sorry, what was your

 5    question?                                        10:57:00

 6    BY MR. RAPHAEL:

 7         Q.   Why would volunteer coaches be at risk of

 8    being lost to other paid positions in Division I?

 9         A.   Well, I mean, they might have been able to

10    go to say a smaller school and be the second      10:57:15

11    assistant or something like that.

12         Q.   Is it correct as a matter of economics

13    that, in general, the more compensation that is

14    offered for labor, the more workers will be

15    interested in providing that labor?              10:57:41

16         MR. BROSHUIS:  Objection; vague.

17         THE WITNESS:  I mean, again, with all the

18    assumptions that go with that, yeah, compensation

19    has a positive impact on a worker choosing a job,

20    all else equal.                                  10:58:06

21    BY MR. RAPHAEL:

22         Q.   And as an economist, all else equal, would

23    you expect more workers to be interested in

24    providing labor at a salary than for no salary?

25         MR. BROSHUIS:  Objection; incomplete         10:58:17
```

                                                    Page 112

| | | |
|---|---|---|
| 1 | hypothetical. | 10:58:18 |
| 2 | THE WITNESS: Again, it depends on the | |
| 3 | situation. Are there -- you know, depends on the | |
| 4 | labor market itself. | |
| 5 | Yeah, it depends on the labor market. | 10:58:29 |
| 6 | BY MR. RAPHAEL: | |
| 7 | Q. Why would it depend on the labor market? | |
| 8 | A. Well, are there workers . . . | |
| 9 | You know, if the San Francisco Giants | |
| 10 | offered to pay me a bunch of money to play baseball, | 10:58:44 |
| 11 | that doesn't mean that I'm qualified to play | |
| 12 | baseball, you know? And so it depends on the nature | |
| 13 | of the labor market. | |
| 14 | Q. As an economist, all else equal, would you | |
| 15 | expect more qualified workers to be interested in | 10:59:02 |
| 16 | providing labor at a salary than at no salary? | |
| 17 | MR. BROSHUIS: Objection; incomplete | |
| 18 | hypothetical. | |
| 19 | THE WITNESS: As I said, it depends on what | |
| 20 | else is happening in the labor market. | 10:59:14 |
| 21 | But assuming we're in sort of a textbook, | |
| 22 | econ 101, then higher pay will tend to, you know, | |
| 23 | increase the labor supply. | |
| 24 | But, again, it depends if that's -- you | |
| 25 | know, if that's the nature of the particular | 10:59:30 |

Page 113

```
1     question that you're asking.                    10:59:34

2     BY MR. RAPHAEL:

3         Q.   And have you studied that question in this

4     case?

5         A.   I mean, I have looked at where a lot of --  10:59:40

6     where the coaches came from, right, you know,

7     what -- you know, what the coaches were doing prior

8     to the rule change, and it's that coaches are coming

9     from within the same labor pool.

10             So I have looked at that.                 10:59:57

11        Q.   Okay.  And is it your opinion that there

12    would not be more coaches interested in coaching at

13    a salary than coaching at no salary?

14        A.   Well, there's a fixed number of positions.

15    So those -- the coaches that we saw move into these  11:00:18

16    paid positions are coming from the same labor pool,

17    right?

18             They're the ones who are getting these

19    positions, were the prior volunteers at the various

20    schools and the prior workers at those various     11:00:34

21    baseball teams.

22        Q.   Well, not all of the coaches who got paid

23    positions after the bylaws changed had been

24    volunteers; right?

25        A.   Not all of them but a majority of them.   11:00:49
```

                                                    Page 114

```
1        Q.   So if coaches who took paid positions        11:06:39
2    after the bylaws were amended had previously been
3    coaching outside of Division I or not coaching in
4    Division I at all, those jobs were not in the labor
5    market that you've defined?                           11:06:53
6        A.   The prior jobs?
7        Q.   Yeah.
8        A.   Yes, some of them had prior jobs that were
9    outside of the labor market, but the bulk of them
10   had coaching jobs within the Division I baseball.     11:07:04
11       Q.   So some people who took paid coaching jobs
12   that were created after the bylaws were amended
13   entered the labor market you have defined after the
14   rules changed; right?
15       A.   It's a small amount, but yes, they did,      11:07:22
16   and it doesn't impact my analysis of them.
17       MR. RAPHAEL:   I'm not recalling when we last
18   broke but --
19       MR. BROSHUIS:   It's an hour eight.
20       MR. RAPHAEL:   -- this might be an okay time.      11:07:45
21       THE WITNESS:   Okay.
22       THE VIDEOGRAPHER:   This marks the end of Media
23   No. 2.  Off the record.  The time is 11:07.
24           (Recess taken.)
25       THE VIDEOGRAPHER:   This marks the beginning of    11:24:02
```

Page 120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              Certainly could have been possible, and      11:31:29
 2     the actual data would have borne that out anyway,
 3     like the actual experiment, but it doesn't impact my
 4     analysis.
 5          Q.  Well, in fact, some coaches who were first    11:31:41
 6     or second paid assistants at one school became the
 7     third paid assistant at another school after the
 8     bylaws were amended; right?
 9          MR. BROSHUIS:  Objection; assumes facts not in
10     evidence.                                              11:31:54
11          THE WITNESS:  I believe that was true.  I think
12     it was a small number of folks, yeah.
13     BY MR. RAPHAEL:
14          Q.  Is there a concept in labor economics
15     called a formal or systemic pay structure?            11:32:02
16          A.  Yeah, I mean, there's pay structures,
17     sure.  I don't know, I'm not thinking about -- a
18     systemic pay structure is something that I'm not
19     recalling as I sit here.
20          Q.  Are you offering any opinion that all        11:32:18
21     Division I colleges and universities use a formal or
22     rigid pay structure for coaches in their athletic
23     departments?
24          A.  No.
25          Q.  Are you familiar with the concept of         11:32:33
```

Page 127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1      selection bias?                                        11:32:36

 2         A.   Yes.

 3         Q.   What is that?

 4         A.   If you're wanting to analyze, say, a

 5      population and you take a sample from that             11:32:46

 6      population, is the sample representative of the

 7      population further questions that you're

 8      answering -- or asking.

 9         Q.   And is it important in econometric

10      analysis to avoid selection bias?                     11:33:08

11         A.   It can be.  It depends on the nature of

12      the selection bias.

13         Q.   Well --

14         A.   In other words, if it's small, then it

15      doesn't change the outcomes very much.  And, in       11:33:23

16      fact, trying to account for it can sometimes make

17      the outcomes worse, which is interesting, because

18      there aren't perfect ways to account for it.  There

19      are sort of estimators that one can use.

20              So sometimes the estimators overshoot and     11:33:38

21      if you apply them, you may make the analysis worse.

22         Q.   So there are tools that economists have

23      developed to try to address selection bias in

24      econometric analysis?

25         A.   Yes.                                           11:33:56
```

Page 128

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1            Q.   And, in fact, Dr. James Heckman won the        11:33:56
 2      Nobel Prize for coming up with some of those
 3      methods; right?
 4            A.   That and other work that he did, but yes.
 5            Q.   Did you do anything in your models in this     11:34:12
 6      case to avoid selection bias?
 7            A.   Yes.  I mean, I looked at -- we had a very
 8      large sample.  Usually you're talking -- selection
 9      bias becomes a problem when you have a small sample.
10            We have a very large sample.  It's like          11:34:31
11      what, two-thirds of the schools, which is a super
12      large sample, right?
13            Yeah, and then I looked at that data
14      compared to the population on some of the MFRS
15      variables.  In some of my sensitivity analysis, I       11:34:43
16      looked at -- in fact, I forgot, Dr. Heckman, I used
17      an inverse Mills ratio and looked at some of that
18      analysis.
19            So I did look at that, but I didn't --
20      it's really not likely to be a problem, especially     11:34:57
21      in a probative analysis where you have got
22      representation across the gamut of schools in terms
23      of big and small or however else you want to define
24      that.
25            Q.   How about in your damages model, did you      11:35:10
```

Page 129

```
 1    do anything to avoid selection bias there?         11:35:14

 2        A.    Well, the damages model is based on the

 3    first step, which is, would the school pay or not.

 4    And then let me just think through this for a

 5    minute.                                            11:35:30

 6             And then I'm relying on the actual

 7    payments.  I don't see a selection bias issue there.

 8    Because those are the actual payments.  And then I'm

 9    just doing a deflationary adjustment.

10             No, I don't see any sort of selection bias 11:35:46

11    in the calculation of damages.

12        Q.    You don't see any -- and so because you

13    didn't see any potential selection bias issue with

14    your method for calculating damages, you didn't take

15    any steps to address selection bias in the          11:36:01

16    calculation of damages after doing your regression?

17        A.    Yeah, I didn't see -- I didn't see an

18    issue.

19             I mean, the interesting part here, as you

20    know, is that, you know, to my knowledge, the        11:36:19

21    attorneys subpoenaed all of the schools, and so to

22    the extent that one were to have found a selection

23    bias, it would be driven by the defendants or the

24    cartel members not turning over information, which

25    economists have written for a while is not a         11:36:40
```

                                                    Page 130

```
 1    defense -- it should not be a defense because it        11:36:41

 2    creates poor incentives in antitrust cases.

 3         Q.   The only selection bias issue you could

 4    potentially see would be one created by which

 5    schools turned over information in response to          11:36:55

 6    subpoenas?

 7         A.   First, also for schools potentially that

 8    essentially an equilibrium might not have paid a

 9    coach.

10              Like, in other words, someone could think     11:37:14

11    of a bias like that where you have a series of

12    schools that an equilibrium wouldn't pay a coach,

13    right?  But I'm analyzing only damages for those

14    schools that I believe in -- by conservative

15    measure, where the equilibrium is, because I only go    11:37:28

16    three years out, would pay a coach.

17         Q.   Right.  And so I'm just asking, in your

18    damages model, after completing your regression

19    where you predicted damages for coaches at schools

20    that you say would have paid an additional coach,       11:37:46

21    you didn't take any steps to address any selection

22    bias problem that you were worried about?

23         A.   I mean, I thought about the proper way to

24    do damages, and I didn't see a selection bias

25    problem there.                                          11:38:01
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    little more competitive.  Yes, I guess it's           11:41:41
 2    calculating sort of that market rate.
 3         Q.   And as an economist, could you calculate
 4    the market rate in the but-for world without having
 5    some idea of what the market is?                       11:41:55
 6         A.   Well, a single market rate, maybe that
 7    would -- I haven't thought enough about that because
 8    I haven't had to do that calculation.
 9              But the individual amounts that are paid,
10    you can see that appearing.  You know, one could       11:42:22
11    investigate a particular school and find out what
12    they're paying for a particular position and then
13    one would check to see, okay, is the market being
14    restrained in some fashion.  If it's not, then that
15    can be representative of a market rate.                11:42:39
16              Again, assuming -- you know, in
17    information, asymmetries are not there and common
18    information -- perfect information is occurring
19    across both parties.
20         Q.   Now, your opinion is that the relevant       11:42:51
21    labor market for baseball coaches is limited to
22    baseball coaches; right?
23              Doesn't include coaches in other sports;
24    right?
25         A.   Correct.                                     11:43:05
```

Page 134

1      Q.   And why is that?            11:43:06

2      A.   Essentially, based on some of the analysis

3  that I've done in other cases, sort of that each

4  sport has its own set of skills that aren't always

5  transferable at the athlete and at the coaching      11:43:24

6  level.

7          And based on sort of where we saw, even in

8  this case, where those hires came from, they came

9  from within baseball, actually.  You didn't see the

10  swimming coach saying, Hey, I'm going to become a     11:43:40

11  third assistant coach over at such and such school.

12     Q.   And so your opinion is that supply and

13  demand for coaching services in baseball is

14  different from supply and demand for coaching

15  services in other sports?              11:43:54

16     MR. BROSHUIS:  Objection; misstates testimony,

17  foundation.

18     THE WITNESS:  When you say, "different," I

19  mean, it's -- you could have markets that look

20  similar and they could be two different sports for    11:44:03

21  sure.

22         But, I mean, from my analysis, I didn't

23  need to consider any of these other markets.

24  BY MR. RAPHAEL:

25     Q.   Now, what analysis did you do to reach    11:44:21

Page 135

```
1     into becoming a Division I third assistant coach.        11:50:25

2          So like every labor market has people who

3     enter the labor market who haven't had that exact

4     training before.  But the labor market is still

5     defined as those jobs.                                   11:50:42

6          Q.   During the class period, was the volunteer

7     coach position a way for coaches to move their way

8     up in the labor market?

9          MR. BROSHUIS:  Objection; foundation.

10         THE WITNESS:  Yes, generally.                        11:50:56

11    BY MR. RAPHAEL:

12         Q.   All right.  So just to be clear, the

13    position of baseball director is not in the relevant

14    market you've defined; right?

15         A.   Yeah.  I mean, this is the previous job.       11:51:23

16    So it -- yeah, it's not -- it's not in -- the

17    relevant market is the Division I assistant baseball

18    coaches.

19         Q.   Right.  And 8 percent of coaches who took

20    additional paid positions after the bylaws were         11:51:35

21    amended in your analysis in your November 1st

22    declaration were baseball directors prior to doing

23    that; right?

24         A.   I don't know what the percentage is for,

25    the updated version of Exhibit 1.                        11:51:50
```

Page 140

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1        A.   For the previous job they had, yes.          11:56:24

 2        Q.   Right.  So --

 3        A.   That's important to keep in mind.

 4        Q.   I agree.

 5        A.   Okay.                                         11:56:34

 6        Q.   But 29 percent of the coaches who took

 7   newly added paid positions, according to the data

 8   that you looked at in your November 1st declaration,

 9   previously had jobs that are outside of the relevant

10   market that you defined; right?                        11:56:47

11        MR. BROSHUIS:  Objection; asked and answered.

12             You've asked that same question four times

13   now.

14        THE WITNESS:  Previously had jobs, just like a

15   college kid graduating from college with no           11:56:57

16   experience in a particular field is entering a

17   market that's not defined by them entering that

18   market as much as it's defined by the jobs that

19   people take in that market and what happens when

20   someone changes -- when there's a 5 or 10 percent     11:57:11

21   pay change.

22             Which, again, here, we have 100 percent

23   pay change.

24   BY MR. RAPHAEL:

25        Q.   Is it common, sir, for kids graduating      11:57:19
```

Page 145

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    college and trying to enter a particular job market      11:57:22

 2    to take a job for free for a little while?

 3         MR. BROSHUIS:  Objection; foundation, calls for

 4    speculation.

 5         THE WITNESS:  Graduating from school?             11:57:31

 6    BY MR. RAPHAEL:

 7         Q.   Yeah.

 8         A.   Common?  It's not the majority.  I'm sure

 9    it happens, but most students who are graduating who

10    get a job are getting paid for that job.              11:57:44

11         Q.   And some students who graduate college

12    take a job where they don't get paid in order to try

13    and enter a market, right?

14         MR. BROSHUIS:  Same objection.

15         THE WITNESS:  That generally occurs while they   11:57:58

16    are in college.

17    BY MR. RAPHAEL:

18         Q.   Does it sometimes occur after people leave

19    college that they work without compensation to try

20    to enter a market?                                    11:58:06

21         MR. BROSHUIS:  Same objection.

22         THE WITNESS:  Of course it sometimes occurs.

23         MR. STEWART:  Just a note, I'm continuing to

24    join in all of Mr. Broshuis' objections.  Is that

25    correct, Justin?                                      11:58:19
```

                                                    Page 146

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    testimony.                                          12:02:10

 2        THE WITNESS:  Can you say that again?  I'm

 3    sorry.

 4    BY MR. RAPHAEL:

 5        Q.   Sure.                                      12:02:15

 6            Your model predicts that some schools who

 7    hired volunteer baseball coaches would not have

 8    hired a third assistant paid baseball coach in the

 9    but-for world.

10        MR. BROSHUIS:  Objection; misstates prior       12:02:29

11    testimony.

12        THE WITNESS:  My analysis says conservatively,

13    here are the schools that it's reasonable to

14    conclude would have hired a third paid baseball

15    assistant in the but-for world.                     12:02:43

16            That doesn't mean that -- because I only

17    went three years out.  That doesn't mean that in

18    some further equilibrium, you wouldn't eventually

19    get to the bulk of Division I schools paying a third

20    assistant coach.                                    12:02:58

21            I just didn't measure that.

22    BY MR. RAPHAEL:

23        Q.   Well, are you offering the opinion that

24    all schools who hired a volunteer baseball coach

25    would have hired a third paid baseball assistant in 12:03:09
```

Page 150

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    the but-for world?                                    12:03:14

 2         A.   No, I'm not offering that opinion.

 3         Q.   Now, you're aware that the class

 4    definition in this case is narrower in the context

 5    of your report than it was when the complaint was    12:03:29

 6    filed; right?

 7         A.   I don't remember what the class definition

 8    was when the complaint was filed.

 9         Q.   But are you aware that the class

10    definition in your report has dropped a number of    12:03:41

11    schools that fielded baseball teams in Division I?

12         A.   Yes.  It doesn't have all of the schools

13    that field baseball teams in Division I.

14         Q.   Right.  And, in fact, the class definition

15    in your report has dropped a number of schools that  12:03:55

16    hired volunteer coaches in baseball during the class

17    period?

18         A.   Yeah.

19              And, remember, I'm not defining the class.

20    I list the class.  The class is defined --           12:04:09

21         Q.   I understand.

22         A.   Yeah, okay.

23              But yeah, yeah, it has -- there are

24    schools that are not listed in the class definition

25    that hired volunteer baseball coaches in the past.   12:04:20
```

Page 151

```
 1          Q.  And the schools that are no longer listed       12:04:25

 2    in the class who hired volunteer baseball coaches

 3    during the class period are the schools that your

 4    model did not predict would have hired an additional

 5    paid baseball coach in the but-for world; right?       12:04:40

 6         MR. BROSHUIS:  Objection; misstates prior

 7    testimony.

 8         THE WITNESS:  So my model predicts a certain

 9    number of schools and the class list, I think,

10    largely mirrors -- the class definition largely       12:04:52

11    mirrors those same schools.

12    BY MR. RAPHAEL:

13          Q.  Are you aware of any -- are you aware of

14    any school that you predict would have hired an

15    additional paid baseball assistant in the but-for       12:05:03

16    world who is not in the class?

17          A.  I'm not aware of that, no.

18          Q.  Are you aware of any school that you

19    predict would not have hired an additional paid

20    baseball coach that is in the class?       12:05:17

21          A.  Not that I'm aware of.

22          Q.  So the schools that are in the class, as

23    you lay it out in your report, are the schools that

24    your model predicts would have hired an additional

25    paid baseball assistant in the but-for world?       12:05:33
```

Page 152

```
 1        A.   I mean, I didn't -- I think that's largely    12:05:36
 2    true.  I mean, I don't know of a case where it's
 3    not.
 4        Q.   And so far as you know, the schools that
 5    hired paid -- strike that.                             12:05:46
 6             As far as you know, the schools that hired
 7    volunteer assistant coaches in the actual world who
 8    are not in the class are the schools that your model
 9    predicted would not have hired additional paid
10    baseball coaches in the but-for world?                 12:06:02
11        MR. STEWART:  Actually, can I just understand
12    the question for a second?
13        THE REPORTER:  Yeah, you're going to have to
14    repeat it.
15        MR. RAPHAEL:  I'm hearing a consensus in the       12:06:09
16    room to repeat it, so I will.
17    BY MR. RAPHAEL:
18        Q.   As far as you know, the schools who hired
19    volunteer assistant coaches in the actual world who
20    are not in the class are the schools where your        12:06:19
21    model predicted they would not have hired additional
22    paid assistants in baseball in the but-for world?
23        MR. BROSHUIS:  And that's where I'll object to
24    it misstating prior testimony.
25        THE WITNESS:  My analysis provides a               12:06:36
```

Page 153

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | is it takes time for them to sort of figure out what | 12:13:56 |
| 2 | they want to do and then how they're going to | |
| 3 | actually do it. | |
| 4 |     Q.  So one reason why a school might not have | |
| 5 | hired an additional paid coach after the bylaws were | 12:14:10 |
| 6 | changed is that it takes time for their budgets to | |
| 7 | adjust? | |
| 8 |     A.  Yes. | |
| 9 |     Q.  And another reason I think you proffer as | |
| 10 | to why a school might not have hired an additional | 12:14:19 |
| 11 | paid baseball coach after the rules changed is | |
| 12 | something called "lingering effects"; right? | |
| 13 |     A.  Yes.  I mean, lingering effects is the | |
| 14 | broader term, I guess. | |
| 15 |     Q.  Are you offering any opinion that | 12:14:32 |
| 16 | lingering effects and the amount of time it takes | |
| 17 | for budgets to adjust explains why every school that | |
| 18 | did not higher an additional paid baseball coach | |
| 19 | made that decision? | |
| 20 |     A.  No.  I don't need to know why, I just need | 12:14:50 |
| 21 | to know whether they hired a coach or not. | |
| 22 |     Q.  Okay.  So -- and are you offering any | |
| 23 | specific opinion, understanding you think you don't | |
| 24 | need to, but are you offering any specific opinion | |
| 25 | as to why any particular school did not hire an | 12:15:11 |

Page 160

```
 1    additional paid baseball coach after the bylaws        12:15:17
 2    changed?
 3        A.   No.
 4        Q.   Could you go to paragraph 174 of your
 5    declaration, please.                                   12:15:29
 6        MR. STEWART:  Can I inquire whether the
 7    questioner is getting hungry?
 8            I know some of the participants are
 9    getting hungry.
10        MR. BROSHUIS:  We're a little short of an hour.    12:15:43
11    If we could go another like 15 minutes?
12        MR. RAPHAEL:  Yeah, that makes sense.
13        MR. BROSHUIS:  Great.  Thank you.
14        MR. RAPHAEL:  I thought Dennis was commenting
15    on the tone of my questions.                           12:15:50
16        MR. STEWART:  No, no.  You're showing great
17    staying power.
18    BY MR. RAPHAEL:
19        Q.   All right.  So in paragraph 74 --
20        MR. BROSHUIS:  174?                                12:16:06
21    BY MR. RAPHAEL:
22        Q.   174, excuse me, you refer to "(a) the
23    schools that have already adopted."
24            Do you see that?
25        A.   Yes.                                          12:16:18
```

Page 161

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1            Q.   And "(b) the schools that will never        12:16:19

 2       adopt."

 3            Right?

 4            A.   Sure.

 5            Q.   So is it your opinion that some schools      12:16:27

 6       will never adopt an additional paid baseball coach

 7       position?

 8            MR. BROSHUIS:  Objection; asked and answered.

 9            THE WITNESS:  I think -- I guess I'm not liking

10       my word choice now that I sit here.  I'm just saying  12:16:44

11       that aren't adopting in the three years that I'm

12       looking at.

13            You know, again, eventually, these schools

14       may end up adopting that because they hit their

15       equilibrium a little bit later, you know.            12:17:02

16       BY MR. RAPHAEL:

17            Q.   Or eventually, some schools may not adopt

18       an additional paid baseball coach position; right?

19            A.   Yes.

20            Q.   Did you investigate whether any Division I   12:17:36

21       school that did not adopt an additional paid

22       baseball coach position made that decision for

23       reasons related to Title IX or gender equity?

24            A.   Not specific to any particular school, but

25       I did note that in both the actual world and the     12:18:02
```

Page 162

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    experiment is still occurring.  That's the whole      12:20:42
 2    point of this.  I mean, that's a big part of this.
 3    BY MR. RAPHAEL:
 4        Q.   Are you aware of any information in the
 5    record that you think is a better source of           12:20:52
 6    information about what schools would have done with
 7    their baseball programs in the but-for world than
 8    what they actually did after the bylaws were
 9    amended?
10        A.   I am not.                                     12:21:13
11        Q.   You didn't conduct any study as to the
12    extent to which the need for university budgets to
13    adjust explains why schools did not add additional
14    paid baseball coaching positions; right?
15        A.   No.  As I said before, the -- first of        12:21:52
16    all, this is a rounding error for any university
17    budget hiring an assistant baseball coach.
18             But besides that, I looked at what they
19    just actually did, meaning that they made whatever
20    adjustments that they felt that they needed to make   12:22:09
21    in order to hire those coaches.
22        Q.   Now, the logic of lingering effects is
23    residual collusion?
24        A.   That's one way that lingering effects can
25    occur, right?  That isn't the only way that           12:22:28
```

Page 165

```
 1    AFTERNOON SESSION                        1:05 P.M.

 2                         - - -

 3        THE VIDEOGRAPHER:  This marks the beginning of

 4    Media No. 4 in the deposition of Dr. Daniel Rascher.

 5    We're back on the record.  The time is 1:05.          13:05:58

 6                    EXAMINATION RESUMED

 7    BY MR. RAPHAEL:

 8        Q.    Dr. Rascher, is it your opinion that the

 9    existence of the NCAA bylaws that are being

10    challenged proves that all volunteer coaches would    13:06:07

11    have been hired for paid positions without those

12    bylaws?

13        A.    No.  I mean, I don't have an opinion on

14    it, obviously, outside of baseball.

15            Within baseball, as I said, I'm only sort     13:06:30

16    of measuring a certain number of schools and,

17    therefore, a certain number of volunteer coaches and

18    potentially more beyond sort of the outside of the

19    class.

20            But I'm not saying -- I think you asked me     13:06:44

21    this before, I'm not saying all 312 schools, I

22    think, doing their data, would have necessarily

23    hired a paid volunteer coach.

24        Q.    All right.  Thank you.

25            Is it true that many Division I baseball       13:07:02
```

                                                    Page 169

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    programs -- let me ask that differently.              13:07:05

 2           Is it true that some Division I baseball

 3    programs did not pay the maximum number of paid

 4    coaches even during the class period?

 5       A.   Yes, I believe that's true.                    13:07:20

 6       Q.   Do you know how many Division I baseball

 7    programs didn't pay the maximum number of paid

 8    coaches during the class period?

 9       A.   Excuse me.  I don't know that as I sit

10    here, no.                                              13:07:35

11       Q.   As an economist, can you explain why some

12    baseball programs would not have hired the maximum

13    number of paid coaches that they were permitted to

14    during the class period?

15       MR. BROSHUIS:  Objection; foundation, outside       13:07:51

16    the scope.

17       THE WITNESS:  I mean, again, I didn't study the

18    why.  I just sort of observed the data.

19           But I think it just stems from their

20    decision on their objectives and emphasis in that     13:08:10

21    particular -- in baseball, you know.  Like they've

22    chosen not to emphasize as much baseball.

23    BY MR. RAPHAEL:

24       Q.   Did you perform any study of the effect of

25    either internal or external pay equity on Division I   13:08:32
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    baseball coach salaries?                              13:08:36

 2         MR. BROSHUIS:  Objection; outside the scope.

 3         THE WITNESS:  Not specific to that but,

 4    obviously, I did look at sort of the pay structures

 5    within each team and within each peer group to sort    13:09:00

 6    of get a sense -- you know, to understand sort of

 7    that pay ladder that we see at the various schools.

 8    And that helped me measure damages, yeah.

 9    BY MR. RAPHAEL:

10         Q.   But you didn't perform any study to          13:09:20

11    calculate the extent to which internal or external

12    pay equity explains the pay structure or salaries of

13    any baseball coaches?

14         A.   No.

15         Q.   Are you offering any opinion on who would    13:09:44

16    have applied to any paid position that would have

17    been offered in the but-for world, other than the

18    volunteer coaches who worked in the actual world?

19         MR. BROSHUIS:  Objection; relevance.

20         THE WITNESS:  I mean, only to the extent that I   13:10:06

21    looked at who did get the job.  I don't know who

22    else applied, right, for each of the schools that

23    did end up paying someone, but I know who got the

24    job.

25              And you can see, as we talked about         13:10:23
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | became available. | 13:11:34 |
| 2 | So I think you generally can see the type | |
| 3 | of person but no, not name by name, person by | |
| 4 | person. | |
| 5 | BY MR. RAPHAEL: | 13:11:47 |
| 6 | Q.   What percentage of the coaches who got one | |
| 7 | of the newly added paid assistant baseball coach | |
| 8 | positions after the bylaws were amended were a | |
| 9 | volunteer coach at the same school the year before? | |
| 10 | A.   What percentage? | 13:12:05 |
| 11 | Q.   Yeah. | |
| 12 | A.   I think it was a little over 50 percent, | |
| 13 | if I remember. | |
| 14 | Q.   Could we go back to Exhibit 1 from your | |
| 15 | declaration, which I think is page 37. | 13:12:14 |
| 16 | So you see there in your November 1st | |
| 17 | declaration, Exhibit 1, says that 66 percent of the | |
| 18 | coaches who took the newly added positions in | |
| 19 | baseball in 2023/2024 had been a D-I assistant the | |
| 20 | year before; right? | 13:12:48 |
| 21 | A.   Yes. | |
| 22 | Q.   And that D-I assistant category includes | |
| 23 | both paid and volunteer positions, right? | |
| 24 | A.   I believe in this exhibit, it does.  I | |
| 25 | don't recall if I broke it out in my other Exhibit 1 | 13:13:01 |

Page 173

```
1     that's in my more recent report.  But I think in          13:13:06

2     this one, yes, it includes both paid and unpaid.

3          Q.   Okay.  And you're saying that, to the best

4     of your memory, the percentage of coaches who took

5     newly added paid positions in 2023/2024 who had been      13:13:17

6     volunteer coaches at the same school the year before

7     was about 50 percent?

8          A.   Well, I had the number calculated

9     somewhere.  I think I even report it.  I don't know

10    if it's in this section or not.  But it's in here          13:13:33

11    somewhere, I'm pretty sure.  And if not, I know that

12    it's a little above 50.  It's more than half.

13         Q.   Is it more than 60 percent?

14         A.   I don't recall.

15         Q.   But fair to say then that maybe a little         13:13:49

16    less than half of the volunteer coaches at schools

17    that then added a paid position in 2023/2024 were

18    not hired for that position?

19         A.   Well, some of them were hired for that

20    position at another school, a good chunk of them,          13:14:11

21    yeah.

22         Q.   What percentage of volunteers in 2022 and

23    2023 were hired for a paid position at a different

24    school than where they volunteered?

25         A.   Do you mean '23/'24 or are you being            13:14:27
```

Page 174

```
 1              So we're trying to understand what would        13:16:01

 2     have happened in the but-for world based on a

 3     particular year that isn't in the -- sort of the

 4     middle of the class period.

 5              So like if a volunteer decides, okay, now       13:16:11

 6     I'm going on to do whatever, sort of regardless what

 7     the labor market was, I'm not assuming that that was

 8     like they couldn't get a job in that -- you know, we

 9     don't know either way, right?

10              But I don't know the percentages of -- I       13:16:27

11     just don't know them as I sit here.  It's sort of

12     breaking down a little bit, I think, that first line

13     there in the old exhibit.

14        Q.    Agreed.

15              But could it be the case that at least         13:16:48

16     some of the volunteers in the 2022/2023 academic

17     year who did not get paid positions the following

18     year failed to do that because they were less

19     qualified than other candidates for that paid

20     position?                                               13:17:06

21        MR. BROSHUIS:  Objection; assumes facts not in

22     evidence, lack of foundation.

23        THE WITNESS:  I mean, I just don't have a -- I

24     don't have information on that, on the why.  Again,

25     it's the what and it's the whether they would have     13:17:16
```

                                                    Page 176

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    been paid or not is sort of what I looked at.  I         13:17:21

2    don't know why.

3    BY MR. RAPHAEL:

4         Q.   But you can't conceive of it being the

5    case that, for at least some of the volunteers who        13:17:27

6    did not get paid positions the year after the bylaws

7    changed, that that was because they were less

8    qualified than other candidates?

9         MR. BROSHUIS:  Same objections.

10        THE WITNESS:  Again, I don't have -- you know,        13:17:41

11   I don't know who applied for these jobs, so I don't

12   know what the -- I can only see who ended up getting

13   the jobs.

14   BY MR. RAPHAEL:

15        Q.   Right.  And you say you don't have any           13:17:54

16   information on why any coaches who were volunteers

17   in 2022/2023 didn't get paid positions the following

18   year; right?

19        A.   Yeah.  I mean, I don't have information on

20   that.                                                     13:18:09

21        Q.   And why don't you have information on

22   that?

23        A.   I mean, it just wasn't part of what I

24   needed to be able to do my analysis.  I didn't reach

25   out to each volunteer and survey them and ask them,       13:18:20
```

Page 177

```
 1     you know, why they ended up where they ended up.          13:18:23

 2          Q.   You haven't investigated the

 3     qualifications of coaches who volunteered during the

 4     class period as compared to the coaches of who were

 5     hired for paid positions after the bylaws were          13:18:49

 6     amended; right?

 7          A.   I haven't investigated what about them?

 8          Q.   Their qualifications.

 9          MR. STEWART:   Objection; vague.

10          THE WITNESS:   To the extent that they were        13:19:03

11     hired, in both cases, they were qualified.

12               I mean, remember, even the volunteer

13     position was limited.  You couldn't hire more than

14     one, so the schools had to pick who they wanted to

15     hire for those positions.  Once they are paid, it's     13:19:18

16     the same situation.

17               But no, I did not look at each volunteer

18     to try to figure out were they good pitching coaches

19     or not.

20     BY MR. RAPHAEL:                                          13:19:35

21          Q.   Is it possible that some of the coaches

22     who were hired for paid positions after the bylaws

23     were amended were more skilled or qualified than

24     some coaches who were volunteers during the class

25     period?                                                  13:19:48
```

Page 178

```
 1          MR. BROSHUIS:  Objection; lack of foundation,          13:19:49
 2     assumes facts not in evidence, outside the scope.
 3          THE WITNESS:  I mean, again, a lot of the same
 4     folks were hired, but it is possible, of course,
 5     that a school hired a coach.                              13:20:02
 6               But, remember, those are two different
 7     years, also, right?  So could they have hired that
 8     coach in the prior year?  We don't know.  But they
 9     ended up hiring who they ended up hiring.
10               Again, I didn't need to ask or answer that     13:20:15
11     question in order to do my analysis.
12     BY MR. RAPHAEL:
13          Q.   Okay.  So you have no opinion on whether
14     coaches who were hired for a paid position at a
15     school after the bylaws were amended had more skills     13:20:26
16     or experience or were more qualified than the
17     coaches who volunteered at the same school during
18     the class period?
19          A.   Well, we see of those more than half who
20     were hired by the same school, they were a year or       13:20:44
21     more qualified.  Like it's the same person but
22     they're a year more qualified.
23               And then the other volunteers who were
24     hired by other schools, right, they're a year more
25     qualified.                                               13:20:57
```

Page 179

```
 1          Q.   Do you have any opinion on whether the          13:20:58

 2    coaches who were hired for the paid coach positions

 3    that were added after the bylaws were amended were

 4    more qualified or skilled than the volunteers who

 5    never got any paid position?                               13:21:11

 6          A.   I mean, again, some of them are the same,

 7    but for the ones who are not the same, I mean, I

 8    don't have an opinion on that.

 9          Q.   Does your Probit model apply to schools

10    that hired fewer than two paid assistant coaches          13:21:49

11    during the class period?

12          A.   I guess it -- yeah, I -- right, I plug all

13    the schools in to see what the result is.

14               So, yes, some of the schools that hired

15    fewer than two or two assistant coaches are in the        13:22:18

16    analysis, yeah.

17          Q.   And is it your opinion that the bylaws

18    that are being challenged explain why a school might

19    not have hired the maximum number of paid coaches

20    that were permitted during the class period?              13:22:45

21          A.   Wait, is it my opinion that the

22    bylaws . . .

23          Q.   Well, if a school didn't hire the maximum

24    number of paid coaches that were permitted during

25    the class period, is that because of the challenged       13:22:58
```

Page 180

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    calibrate it."                                      13:53:27

 2          You see that?

 3      A.   Yeah.

 4      Q.   And you're talking about a key test of the

 5    model's effectiveness is to see how accurate its    13:53:33

 6    predictions were; right?

 7      A.   Yes.

 8      Q.   All right.  And your model predicted what

 9    actually happened in 2023 and 2024 79 percent of the

10    time?                                               13:53:55

11      A.   Yes, 79 percent of the time when you

12    account for false positives and false negatives,

13    right?

14      Q.   Right.

15      A.   If you're looking at it from the            13:54:05

16    perspective of being conservative, meaning you don't

17    like to see a false positive, meaning that the model

18    predicts that they would have paid in '23/'24 but

19    they didn't, right, then you're sort of adding a

20    school to a list that may not really be there.      13:54:24

21          But I'm less concerned with a false

22    negative, meaning a school that the model doesn't

23    predict would have paid but, you know, lo and

24    behold, they decided to anyway, right?

25          So that's sort of why I've written it the    13:54:42
```

Page 204

```
 1    way that I've written it here.                    13:54:45

 2           And that's 89.4 percent accurate when you

 3    look at the model, whether it's correct or

 4    conservative.

 5         Q.   But your regression analysis incorrectly   13:54:58

 6    predicted the hiring decisions of baseball programs

 7    in 2023/2024 21 percent of the time for the data you

 8    had; right?

 9         MR. BROSHUIS:  Objection; asked and answered.

10         THE WITNESS:  It overpredicts 10 percent of the  13:55:16

11    time.  It over and underpredicts about 20 percent of

12    the time --

13    BY MR. RAPHAEL:

14         Q.   Right.

15         A.   -- yeah.                                   13:55:24

16         Q.   Now, for any of the 20 percent of the

17    time, roughly, that your model either overpredicts

18    or underpredicts, do you know why it got the

19    prediction wrong?

20         A.   For the underpredict, it's real           13:55:36

21    interesting.  The peer conduct variable, it's like

22    if you don't include that, you get more

23    underprediction.

24           So in other words, you get schools that

25    financially, you're like why are they paying this   13:55:57
```

Page 205

```
 1    person, but then they feel the pressure from the          13:56:00

 2    competition in their conference and then they end up

 3    paying anyway, you know, like, you know, in the real

 4    world, right?

 5          So that was sort of driving what I call             13:56:11

 6    the lower left side of the matrix, which is the

 7    false negatives.

 8          The false positives, I mean, some of that

 9    comes from the fact that we have one year of data.

10    You know, we have -- we don't have all the schools,       13:56:26

11    right?  It's just a -- it's a model that, you know,

12    that has -- I think it's sufficient by far but would

13    certainly be, I think, even more accurate if it had

14    more data.

15          And, unfortunately, we don't have that              13:56:45

16    because some schools -- I don't know legally why,

17    but some schools somehow can refuse subpoenas.  I

18    don't understand how that works.

19       Q.   Other than only having one year of data,

20    do you have any opinion on why any of the false           13:56:57

21    positives in your model's predictions occurred?

22       A.   I remember looking -- at one point, some

23    of them actually were paying, and once I did another

24    round of cleaning of the data, you see that they

25    were actually paying.                                     13:57:36
```

                                                    Page 206

```
 1              But that isn't in the final model because      13:57:37

 2    I think we cleaned the data quite well.

 3              As I sit here, I can't think of why some

 4    of those schools are overpredicted.  I would be

 5    surprised in the second year of data if a number of   13:57:49

 6    those don't end up paying.

 7        Q.   And -- well, let's look at an example just

 8    to understand.

 9              So if you could go to Appendix C to your

10    report?                                               13:58:06

11        A.   It's at the end, yeah?

12        Q.   Yes.

13        A.   Okay.

14        MR. STEWART:  Are you referring to a certain

15    page?                                                 13:58:26

16        MR. RAPHAEL:  I'm sorry, there's not.  It's

17    just towards the end.

18        THE WITNESS:  It' an appendix.  It's the last

19    pages, yeah.

20        MR. BROSHUIS:  Three pages from the very end.     13:58:34

21        MR. STEWART:  I got it.  Thank you.

22    BY MR. RAPHAEL:

23        Q.   So could you look at -- on the first page

24    of Appendix C, could you look at, let's say, Bradley

25    University.                                           13:58:46
```

Page 207

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                You see that?                          13:58:46

 2        A.   Sure, I see that.

 3        Q.   And you predict that Bradley was

 4   72.4 percent likely to hire an additional paid

 5   baseball coach; right?                              13:58:56

 6        A.   Yes, that's what the model predicts.

 7        Q.   But, in fact, when Bradley was permitted

 8   by NCAA bylaws to hire an additional paid baseball

 9   coach, they didn't; right?

10        A.   Right.                                    13:59:11

11        Q.   And do you know why Bradley didn't do

12   that?

13        A.   I don't.

14        Q.   How would you try to figure out why

15   Bradley didn't hire an additional paid coach when   13:59:27

16   they were permitted to do so?

17        MR. BROSHUIS:  Objection; relevance, outside

18   the scope.

19        THE WITNESS:  I mean, I suppose someone could

20   ask them or someone could dig into that.  It's not  13:59:44

21   required for my analysis.

22             I mean, any model is not going to be

23   100 percent perfect, obviously, right?  So it's

24   going to have errors on both sides, right, but it

25   does have high goodness of fit.                     14:00:00
```

Page 208

```
 1              And so I don't know why Bradley did not        14:00:04

 2    pay in the first year, but, you know, we've talked

 3    about some of the possible reasons, budget, timing.

 4    You know, that's sort of, I think, one of the main

 5    ones, is sort of when they decided to get around to    14:00:20

 6    doing it.

 7    BY MR. RAPHAEL:

 8        Q.   But you don't know whether any of those

 9    things explained why Bradley didn't pay an

10    additional paid baseball coach in 2023/2024; right?    14:00:29

11        MR. BROSHUIS:  Objection; misstates the

12    testimony, outside the scope, irrelevant.

13        THE WITNESS:  No.

14    BY MR. RAPHAEL:

15        Q.   I think you said that the underpredictions     14:00:39

16    in your model, the false negatives, make your model

17    conservative; right?

18        A.   I mean, yeah.  I mean, I'm not calculating

19    damages for the volunteers at those schools because

20    the model doesn't think in equilibrium, you know,      14:01:03

21    look at 2018, a number of years ago, right, would

22    they have paid that third coach?

23              In '23/'24, they did, but the model says

24    that they would not likely have done that in

25    2018/'19, at least, again, with -- you know, with      14:01:21
```

Page 209

```
 1    you know, easily be corrected using evidence that's      14:31:36

 2    common to the class.

 3              I'm just not -- as I sit here, I don't --

 4    I can't think of a school that does that.

 5        Q.   Well, if you did calculate damages for the       14:31:44

 6    year 2023/2024 at a school that didn't hire a third

 7    assistant coach that year, you would have calculated

 8    damages for people who don't exist; right?

 9        MR. BROSHUIS:  Objection; vague, argumentative,

10    asked and answered.                                       14:32:01

11        THE WITNESS:  Yeah, I think that's probably

12    true, yes.

13    BY MR. RAPHAEL:

14        Q.   If a school hired a third paid assistant

15    in 2023/2024 and you had data from that school, then      14:32:27

16    you used that school's salary for the third paid

17    assistant as the baseline for damages for that

18    school during the class period; right?

19        A.   Yes.

20        Q.   So what you did was you just took the            14:32:43

21    salary that a school that did pay a third assistant

22    and then you kind of just discounted that for the

23    time factors; right?

24        A.   Yes.

25        Q.   All right.  Now, if a school did not hire        14:32:57
```

Page 220

```
 1    an additional paid coach, a third paid assistant, in      14:33:01

 2    2023/2024, but they provided data and you predict

 3    that school would have hired a third paid assistant,

 4    then you calculate a base salary; right?

 5         A.   Yes.                                             14:33:18

 6         Q.   All right.  And what you did to calculate

 7    that base salary is that you divided the schools in

 8    your sample into deciles; right?

 9         A.   Yes.

10         Q.   And then you calculate how much do the          14:33:28

11    schools in each decile pay their top two assistant

12    coaches; right?

13         A.   Yes.

14         Q.   And you average those?

15         A.   Yes, you can add them or average them,          14:33:38

16    yes.

17         Q.   Right.  And then you compare the ratio of

18    the school's salaries for its top two assistant

19    coaches to the average of the other schools in its

20    decile; right?                                            14:33:51

21         A.   Yes.

22         Q.   And then what you do is you multiply that

23    by the average salary that schools in the decile

24    paid their third assistant coach if they hired one

25    in 2023/'24?                                              14:34:03
```

Page 221

```
 1          A.   Yes.                                      14:34:08

 2          Q.   So the salaries that you predict that

 3   coaches would have earned at schools that didn't

 4   hire a third paid assistant when they could have are

 5   based in part on the salaries of the coaches who      14:34:18

 6   were hired as third paid assistants?

 7          A.   Yes.

 8          Q.   Are the schools that did hire third paid

 9   assistants likely to be different from the schools

10   that didn't hire third paid assistants in any way?    14:34:45

11        MR. BROSHUIS:  Objection; vague, foundation.

12        THE WITNESS:  I mean, they hired them, so

13   they're -- you know, they're interested in investing

14   in baseball.

15   BY MR. RAPHAEL:                                        14:35:12

16          Q.   Sure.  The schools that hired third paid

17   assistants after the bylaws were amended are, all

18   things being equal, more likely to be interested in

19   baseball than the schools that didn't hire third

20   paid assistants?                                       14:35:27

21        MR. BROSHUIS:  Objection; vague.

22        THE WITNESS:  Again, all things being equal is

23   carrying a lot of water, but yes, generally.

24   BY MR. RAPHAEL:

25          Q.   And, in fact, the whole point of your      14:35:36
```

Page 222

```
1        Q.   For a labor economist, what are some of        14:44:51

2    the factors that can affect earnings?

3        MR. BROSHUIS:  Objection; outside the scope,

4    foundation, overbroad.

5        THE WITNESS:  I mean, generally, you know,          14:45:04

6    skills, experience, demand for labor, the

7    competitiveness of the supply of labor, and the

8    competitiveness of the demand of labor.

9            I think those are generally the big

10   factors.                                                14:45:24

11   BY MR. RAPHAEL:

12       Q.   Could tenure affect earnings?

13       MR. BROSHUIS:  Objection; vague and some other

14   objections.

15   BY MR. RAPHAEL:                                          14:45:32

16       Q.   But by "tenure," I mean like how long

17   someone has worked at a particular school.

18       MR. BROSHUIS:  The same objections.

19       THE WITNESS:  Yeah, when I said, "experience,"

20   maybe I was including that, but we can add             14:45:42

21   experience separate from tenure and then tenure, if

22   you want.

23   BY MR. RAPHAEL:

24       Q.   And are you familiar with standard human

25   capital theory?                                         14:45:48
```

Page 230

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          A.   Yes.                                    14:45:49

 2          Q.   And what is that?

 3               (Whereupon, someone briefly entered and

 4               exited the deposition room.)

 5          A.   It's essentially that workers are paid the    14:45:52

 6     value of their -- are paid the value of their

 7     marginal revenue product in competitive markets and

 8     that individual factors can sort of drive what that

 9     value is.

10          Q.   And is human capital theory standard in    14:46:17

11     the field of economics?

12          MR. BROSHUIS:   Objection; outside the scope.

13          THE WITNESS:   I mean, it's one of the theories.

14     Obviously, you can't apply it to every situation.

15     But, yeah, it's one theory that's pretty common.    14:46:32

16     BY MR. RAPHAEL:

17          Q.   You would find human capital theory in an

18     economics textbook; right?

19          A.   In a labor textbook, probably.   You might

20     not find it in a macro and micro textbook, but yeah.    14:46:43

21          Q.   You would find human capital theory in a

22     labor economics textbook?

23          A.   Yes.

24          Q.   Did you apply human capital theory in this

25     case?                                              14:47:05
```

Page 231

1    incentives.                                              14:53:33

2    BY MR. RAPHAEL:

3         Q.   Right.  And the point of economics is that

4    the person's personal incentives in the market are

5    part of looking at the entire market; right?            14:53:40

6         MR. BROSHUIS:  Objection; argumentative.

7         MR. STEWART:  Vague.

8         THE WITNESS:  Right.  And that's what I did.

9    Those volunteers worked all those years back to 2018

10   unpaid, right, because of the cartel.  And when the     14:53:52

11   cartel changed its rule, right, then some of those

12   same people worked for those same schools, some of

13   those people worked for other schools and then other

14   people came in and worked for some of those schools,

15   right?                                                   14:54:11

16   BY MR. RAPHAEL:

17        Q.   You keep describing the 2023/2024 as --

18   what happened there as a result of the market; is

19   that right?

20        A.   It's the beginning of an equilibrium.          14:54:21

21        Q.   Right.  And what you're starting to see

22   are -- in 2023/2024 are market forces working;

23   right?

24        A.   You're starting to, yes.

25        Q.   Right.  And so when you see the decisions       14:54:32

                                                       Page 237

```
1    that schools made about who they would hire for          14:54:34

2    their third paid assistant position in baseball,

3    that also is the market forces starting to work;

4    right?

5         MR. BROSHUIS:  Objection; misstates prior            14:54:47

6    testimony and asked and answered several times now

7    and, also, argumentative.

8         THE WITNESS:  It's the beginning of the market

9    starting to work, but it's not at equilibrium.

10   BY MR. RAPHAEL:                                           14:54:58

11        Q.   Great.

12             Let me show you a document.  I believe

13   this is Exhibit 81.

14             (Deposition Exhibit 81 was marked.)

15   BY MR. RAPHAEL:                                           14:55:31

16        Q.   Take as much time as you want to review

17   it.

18        A.   Little tiny font.

19        Q.   I'm sorry about that.

20        A.   No, that's okay.  I need better glasses.        14:55:48

21   I can't use them too long because I get sort of a

22   headache, but they work for the tiny font.

23             Okay.  Sure.  I recognize this.

24        Q.   Do you recognize Exhibit 81 as a document

25   that you cite in your report?                             14:55:59
```

Page 238

```
1          A.   Yes, I believe so.                          14:56:02

2          Q.   Exhibit 81 is an article from the U.S.

3     Bureau of Labor Statistics; right?

4          A.   Yes.

5          Q.   And the U.S. Bureau of Labor Statistics,    14:56:14

6     as an economist, you see that as a generally

7     reliable source of information?

8          A.   Yes.

9          Q.   So do you see -- this is the third page of

10    the document -- there's a header that says, "Reasons  14:56:29

11    Wages Vary."

12             Do you see that?

13         A.   Yes.

14         Q.   All right.  And it says, "Everyone brings

15    unique skills and abilities to a job and no two jobs  14:56:38

16    are exactly alike."

17             You see that?

18         A.   Yes.

19         Q.   And do you agree that that's consistent

20    with standard labor economic principles?            14:56:53

21         MR. BROSHUIS:  Objection; outside the scope,

22    foundation.

23         THE WITNESS:  I mean, of course no two jobs are

24    exactly alike.  You know, that doesn't mean you

25    can't analyze them in the labor market, but yeah.    14:57:04
```

Page 239

```
 1    BY MR. RAPHAEL:                                    14:57:07

 2         Q.   And you agree that it's standard labor

 3    economics that everyone brings unique skills and

 4    abilities to a job; right?

 5         MR. BROSHUIS:  The same objections.           14:57:14

 6         THE WITNESS:  Again, every person is different.

 7    BY MR. RAPHAEL:

 8         Q.   So the answer to my question is yes?

 9         A.   Yes.

10         Q.   And then this document from the Bureau of  14:57:22

11    Labor Statistics that you cited says, "Variations

12    affect pay for jobs within the same occupation.

13    Often, the more pronounced these variations are, the

14    bigger the wage difference."

15              Do you see that?                         14:57:36

16         A.   You lost me on where that is.  Just --

17    wait --

18         Q.   Oh, I apologize.  I'm looking just where

19    we finished under the heading "Reasons Wages

20    Vary" --                                           14:57:47

21         A.   Oh, yeah.

22         Q.   -- and this document from the U.S. Bureau

23    of Labor Statistics says that "Variations affect pay

24    for jobs within the same occupation.  Often, the

25    more pronounced these variations are, the bigger the  14:57:56
```

Page 240

```
 1    wage difference."                                    14:57:59

 2         Do you see that?

 3    A.    Yes.

 4    Q.    And do you agree that that reflects

 5    standard labor economic principles?                  14:58:03

 6    MR. BROSHUIS:  Same objections.

 7    THE WITNESS:  Yeah, I cited this because of

 8    exactly this, that in this case, when you have the

 9    same school, so the geography is the same, which is

10    one of the points she lists, and you have the same   14:58:24

11    industry, right, and you have the same employer, you

12    can take what the market said in '23/'24 and apply

13    it to the previous years.

14    BY MR. RAPHAEL:

15    Q.    Well, how about if you had different            14:58:36

16    employers, is what you said still the same?

17    MR. BROSHUIS:  Objection; incomplete

18    hypothetical, vague.

19    THE WITNESS:  As this says, industry or

20    employer.  So you have the same industry, also.       14:58:47

21    BY MR. RAPHAEL:

22    Q.    Okay.

23    A.    And you have employers that are competing

24    directly with each other under a same set of rules

25    that the NCAA puts forth about baseball teams,        14:58:57
```

Page 241

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    right, similar number of scholarships, number of        14:59:01
 2    coaches.
 3              You know, the NCAA sort of creates the
 4    rules to make these similar across schools.
 5        Q.   Is it a standard principle of labor          14:59:14
 6    economics that variations in the skill affect pay
 7    for jobs within the same occupation?
 8        MR. BROSHUIS:  Objection; outside the scope,
 9    foundation.
10        THE WITNESS:  Again, in a textbook, yes.  When    14:59:28
11    there's other restrictions, you may not have that.
12              For instance, variations in skill caused
13    all of the volunteer coaches to make zero dollars
14    even though they were at different schools, right?
15              So sometimes you have labor market rules    14:59:48
16    that don't make this true.  So this is a general
17    statement about a general competitive labor market.
18    BY MR. RAPHAEL:
19        Q.   Right.  It's standard in labor economics
20    that in general, in a competitive labor market,       15:00:00
21    variations affect pay for jobs within the same
22    occupation; correct?
23        MR. BROSHUIS:  Same objections.
24        THE WITNESS:  Again, yes, that can be the case.
25    BY MR. RAPHAEL:                                       15:00:10
```

Page 242

```
 1            Q.   And I think you said that that -- you        15:00:10

 2      would see that principle in a textbook; right?

 3            MR. BROSHUIS:  Same objections.

 4            THE WITNESS:  Yes, generally.

 5      BY MR. RAPHAEL:                                         15:00:18

 6            Q.   All right.  And is it standard in labor

 7      economics that, in general, in a competitive labor

 8      market, the more pronounced variations in the skill

 9      are, the bigger the wage difference will be among

10      workers?                                               15:00:34

11            MR. BROSHUIS:  Same objections.

12            THE WITNESS:  Again, it depends.

13      BY MR. RAPHAEL:

14            Q.   What does it depend on?

15            A.   It depends on the nature of the labor        15:00:43

16      market.  Does it have restrictions or not, like this

17      labor market that we're talking about.

18            Q.   Okay.  So in a labor market without

19      restrictions, is it standard labor economics that

20      the more pronounced variations in skill are, the       15:01:03

21      bigger the wage difference among workers?

22            MR. BROSHUIS:  Same objections, and asked and

23      answered now as well.

24            THE WITNESS:  Again, it depends on the

25      distribution of the companies in those labor markets   15:01:17
```

Page 243

```
 1   and their individual demand.                    15:01:21

 2           I mean, it really depends on all aspects

 3   of the labor market.

 4   BY MR. RAPHAEL:

 5       Q.   Right.  Wage levels at any particular job   15:01:28

 6   in a market depend on the employer's individual

 7   demand and the individual worker's skills; right?

 8       MR. BROSHUIS:  Objection; asked and answered,

 9   vague, outside the scope.

10       THE WITNESS:  Among other things.            15:01:41

11   BY MR. RAPHAEL:

12       Q.   Did you do anything to control for the

13   possibility that the coaches who were hired as

14   additional paid coaches in 2023/2024 had more

15   skills, experience or tenure than the coaches who   15:02:05

16   were volunteers during the class period?

17       A.   I noted that, again, many of them were the

18   same volunteers during the class period.

19       Q.   And many of them were not; correct, sir?

20       A.   Some were not.                          15:02:26

21       Q.   Right.

22       A.   But many more were.

23       Q.   Well, the number of paid coaches who were

24   hired as the third paid coach in 2023 and 2024 is a

25   lot smaller than the total number of volunteers    15:02:37
```

Page 244

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    isn't it?                                                   15:02:40

 2         MR. BROSHUIS:  Objection; vague, and, also,

 3    we've covered all of this.

 4         THE WITNESS:  Yes.

 5    BY MR. RAPHAEL:                                              15:02:50

 6         Q.   All right.  And so did you do anything to

 7    try to control for the fact that the paid coaches

 8    hired as third assistants in 2023/2024 had more

 9    skills or experience than coaches who were

10    volunteers during the class period?                         15:03:08

11         A.   Again, it was not -- it was not needed for

12    my analysis.

13         Q.   And because you thought it was not needed

14    to control for differences in skill and experience

15    between volunteers and paid coaches who were hired          15:03:26

16    for the third assistant position in 2023/2024, you

17    didn't make any effort to control for that; right?

18         MR. BROSHUIS:  Same objections.

19         MR. STEWART:  Lacks foundation.

20         MR. BROSHUIS:  Lacks foundation.                       15:03:40

21         THE WITNESS:  The analysis controls for the

22    amount that these coaches were paid, and as I said,

23    many of them were volunteers.

24              So like it's the same coaches from the

25    same labor market, right?  Volunteers from the same         15:03:55
```

Page 245

```
 1    school, volunteers from different schools, it's the        15:03:59

 2    same labor market, so these are the same group of

 3    coaches.

 4           No, I didn't look at a particular school

 5    and a particular coach to see if they had one more         15:04:09

 6    year of experience than the volunteer from the year

 7    before.  Now, that could be the same person because

 8    they had one more year experience, right?

 9           No, I did not look at that.  I looked at

10    what the market said that filling that position on         15:04:19

11    that team was worth, right, playing the role of that

12    position on that team.

13    BY MR. RAPHAEL:

14        Q.   But a coach playing the same role on the

15    same team could provide a different marginal revenue       15:04:33

16    product to the school; right?

17        MR. BROSHUIS:  Objection; asked and answered,

18    foundation.

19        THE WITNESS:  I mean, that is possible.  But

20    we're dealing with the same sort of pool of coaches.       15:04:47

21    So I don't think that that's a -- it's not like a

22    Major League baseball coach came and decided to be

23    the third assistant coach.

24    BY MR. RAPHAEL:

25        Q.   Have you calculated the marginal revenue          15:05:02
```

Page 246

```
 1    product for any coach in Division I, ever?          15:05:05
 2         MR. BROSHUIS:  Objection; foundation,
 3    relevance.
 4         THE WITNESS:  I actually have.  It's been two
 5    decades.  It was not baseball.  It was basketball.  15:05:24
 6    But that's what you asked.
 7    BY MR. RAPHAEL:
 8         Q.   All right.  So you --
 9         A.   So I have calculated the MRP of coaches
10    and athletes.                                       15:05:34
11         Q.   Not a good question.  Let me ask a better
12    one.
13              Have you calculated the marginal revenue
14    product of any baseball coach in Division I during
15    the class period or after?                          15:05:41
16         MR. BROSHUIS:  Same objections.
17         THE WITNESS:  I have appealed.  I have not
18    calculated their MRP on the input side.  I have
19    calculated what they are being paid on the output
20    side.                                               15:05:57
21    BY MR. RAPHAEL:
22         Q.   Right.  And so you're not offering the
23    opinion that the marginal revenue product of all
24    coaches who coached in Division I since the start of
25    the class period was the same, are you?             15:06:05
```

                                                    Page 247

```
 1          MR. BROSHUIS:  Objection; relevance, lack of        15:06:08

 2     foundation, argumentative.

 3          THE WITNESS:  No, I'm not.  I'm not providing

 4     that opinion, no.

 5     BY MR. RAPHAEL:                                          15:06:17

 6          Q.   In fact, standard labor economics would

 7     tell you that different coaches have different

 8     marginal revenue products; isn't that right?

 9          MR. BROSHUIS:  Objection; same objections.

10          THE WITNESS:  Again, depends on the situation.      15:06:27

11     But generally, if you have lots of coaches at

12     different schools, they're going to have different

13     MRPs.

14     BY MR. RAPHAEL:

15          Q.   And did you do anything to calculate -- to     15:06:36

16     control for the possibility that the MRPs of the

17     coaches who were hired as paid assistants for the

18     third paid assistant position had higher MRPs than

19     volunteers during the class period?

20          MR. BROSHUIS:  Objection; outside the scope,        15:07:00

21     irrelevant, foundation.

22          THE WITNESS:  Again, I looked at the labor

23     market and took note that these weren't a bunch of

24     folks coming in from outside of the pool that

25     already existed.                                         15:07:12
```

Page 248

```
 1            I mean, that -- if you had seen that, a        15:07:13

 2    bunch of coaches coming from outside who had a lot

 3    more experience, right, then that becomes a more

 4    interesting question.  But we have the same pool of

 5    coaches basically moving into these paid positions.     15:07:26

 6    BY MR. RAPHAEL:

 7        Q.   So other than noting that the coaches who

 8    moved into the paid positions, many of them were

 9    already in the labor market you've defined, did you

10    do anything to control for the possibility that the     15:07:41

11    coaches hired for third paid assistant positions in

12    2023/2024 had higher MRPs than the volunteers during

13    the class period?

14        MR. BROSHUIS:  Objection; vague, outside the

15    scope, irrelevant, asked and answered multiple          15:07:58

16    times.

17        THE WITNESS:  As I sit here, I can't recall.

18    I'm just trying to think of whether I did something

19    related to that but . . .

20            Yeah, I think I really just looked at what      15:08:24

21    the market actually did in '23/'24 and noted that

22    these are from the same labor market and that they

23    essentially are doing the same job.  It's the third

24    assistant coach.

25    BY MR. RAPHAEL:                                          15:08:41
```

Page 249

1      Q.   So other than that, nothing to control for          15:08:42

2   whether the coaches hired for new third paid

3   assistant positions in 2023/2024 had higher MRPs

4   than the volunteers during the class period?

5      MR. BROSHUIS:  Same objections.                          15:08:57

6      THE WITNESS:  Again, I think that the estimate

7   that I provide of what these coaches would have been

8   paid is a reasonable estimate because it's what

9   these coaches -- these same type of coaches -- were

10   actually paid in the actual labor market, in a labor    15:09:10

11   market that's not even at equilibrium yet.

12          So not only are you going to see more

13   schools jumping in increasing demand, but you're

14   going to see those wages rise over time.

15          So it's a conservative estimate based on       15:09:27

16   what the schools were paying their other coaches and

17   based on what they actually paid these coaches of

18   what the damages were for these different

19   volunteers.

20   BY MR. RAPHAEL:                                          15:09:37

21      Q.   Okay.  I know your counsel is objecting as

22   asked and answered, but I just don't think I've

23   gotten a clear answer to my question.

24          So other than looking at the actual

25   salaries that were paid and noting that there were     15:09:45

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSHANT TO PROTECTIVE ORDER

```
 1      coaches filling the new third paid assistant           15:09:48
 2      positions who came from the labor market, did you do
 3      anything to control for the possibility that the
 4      coaches who were hired for the new third paid
 5      assistant positions had higher MRPs than the           15:10:02
 6      volunteers?
 7          MR. BROSHUIS:  Same objections; still vague,
 8      outside the scope, irrelevant, asked and answered
 9      multiple times.
10              He's giving you his best answer and you        15:10:12
11      just don't like it.
12          THE WITNESS:  The revenues -- I do, actually,
13      account for that directly with the revenues.  So
14      half of MRP is the marginal revenue, which comes
15      from the revenues that the schools are generating.     15:10:22
16              The revenues that the schools are
17      generating in '23/'24, I forecast that backwards to
18      '22/'23, and it goes down typically because revenues
19      go up over time.  And so that's accounting for the
20      MRP, if you will, of those coaches in '23/'24.         15:10:37
21              I'm accounting for that sort of step down
22      because the revenues of those programs are going
23      down over time.
24      BY MR. RAPHAEL:
25          Q.   When you say, "MRP" or "marginal revenue      15:10:53
```

Page 251

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    product," is that another way of saying the value        15:10:56

 2    that a coach provides?

 3         MR. BROSHUIS:  Objection; vague.

 4         THE WITNESS:  The dollar value, yeah.

 5    BY MR. RAPHAEL:                                           15:11:03

 6         Q.   And is the dollar value that the coach

 7    provides always reflected directly in the revenues

 8    that a school earns from baseball?

 9         A.   It's the combination of the revenues and

10    the productivity.                                         15:11:16

11         Q.   And so the marginal revenue product could

12    provide value -- a coach could provide value to a

13    school as part of their marginal revenue product

14    that was not reflected in the dollar amount of the

15    revenues from the baseball program in any particular      15:11:36

16    year?

17         A.   I mean, we talked about the schools having

18    objective functions like branding and stuff.  So, I

19    mean, all that is sort of baked into it, but yes,

20    that's not just directly the revenues from the            15:11:49

21    baseball program.

22         Q.   You used essentially the same method that

23    you used to calculate the salaries that volunteer

24    coaches would have been paid to calculate the value

25    of the health benefits you say they would have            15:12:07
```

Page 252

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          MR. BROSHUIS:  Same objection.              15:14:45

 2          THE WITNESS:  Other than from the coming from

 3     the same pool of volunteers who more than half of

 4     them ended up at the same school doing the same job

 5     as an indicator of the importance of what those      15:14:57

 6     schools value to those assistant coaches.

 7     BY MR. RAPHAEL:

 8          Q.   So you're inferring something from how

 9     much coaches in 2023/2024 were paid about the value

10     they provided; is that fair?                          15:15:12

11          A.   I mean, I don't need to measure the value

12     they provided for my analysis.  I'm measuring

13     damages, right?

14               But as I said, all those volunteers who

15     ended up being hired at the same school for some --   15:15:24

16     whatever amount they were paid is at least an

17     indication of what those schools were willing to pay

18     in order to have them coach for them, which partly

19     includes at least the value that they bring.

20          Q.   Right.  The amount that the schools paid    15:15:38

21     the third paid assistants they hired in 2023/2024 is

22     in part based on the value they perceived they would

23     get from the coaches; right?

24          MR. BROSHUIS:  Same objections.

25          THE WITNESS:  In part, yes.                      15:15:52
```

Page 255

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    BY MR. RAPHAEL:                                    15:15:53

 2        Q.   Right.  And you don't have any salaries

 3    for the coaches who volunteered during the class

 4    period because they weren't paid anything; right?

 5        A.   That is correct.                          15:16:01

 6        Q.   Right.  So you don't have any data on the

 7    coaches who were never hired for a paid position

 8    what their value to the schools was, do you?

 9        A.   I mean, the cartel didn't allow that.

10        Q.   Right.  And so you don't have that data;   15:16:13

11    right?

12        A.   I don't know what the volunteer -- I know

13    what the volunteer was paid, zero dollars.

14             I think a fair estimate of what they would

15    have been paid is what is the fact that they did the  15:16:27

16    job and then we see what the similar job was paid

17    once it was allowed.

18        Q.   Right.  So you're inferring that the value

19    that the volunteers provided and the third paid

20    assistants provided was the same because they did   15:16:43

21    the same job?

22        A.   I mean, generally, they were hired into a

23    position that the year before they weren't allowed

24    to be paid for, yeah.

25        Q.   Okay.  But do you agree that different      15:16:54
```

Page 256

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1     workers can provide different value in the same job?        15:16:56

 2          MR. BROSHUIS:  Objection; asked and answered,

 3     foundation, outside the scope.

 4          THE WITNESS:  Again, generally, that may be the

 5     case.  It all depends on the situation.                     15:17:08

 6     BY MR. RAPHAEL:

 7          Q.   So if I looked at your damages model,

 8     would I see any specific data or variables for the

 9     tenure, skills, age or experience for any Division I

10     baseball coach?                                             15:17:22

11          A.   See any variables?

12          Q.   Yeah.

13          A.   You just don't observe them -- we don't

14     observe them directly.  They're baked into the

15     amount that's being paid.                                   15:17:38

16          Q.   Okay.  So other than them being a part of

17     the amount that's paid, you don't have any part of

18     your damages model that has a variable or piece of

19     data for age, tenure, experience or skills; right?

20          A.   Yeah, I mean, it's part of what's baked         15:18:02

21     into the market wage itself.

22          Q.   And other than what's baked in, you don't

23     have any variables or specific pieces of data about

24     age, tenure, experience or skills for any D-I coach

25     in your damages model; right?                               15:18:19
```

Page 257

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          MR. BROSHUIS:  Objection; asked and answered.      15:18:21

 2          THE WITNESS:  I don't need to have it in my

 3     model, so I don't have it in my model.

 4     BY MR. RAPHAEL:

 5          Q.   Thank you.                                    15:18:26

 6               Let's go back to health insurance.

 7               Were you aware that some baseball coaches

 8     had health insurance from other sources while they

 9     were volunteers?

10          MR. BROSHUIS:  Objection; assumes facts not in     15:18:39

11     evidence.

12          THE WITNESS:  That may be the case.

13     BY MR. RAPHAEL:

14          Q.   Did you know whether Michael Hacker had

15     health insurance from another source while he was a    15:18:51

16     volunteer coach at UC Davis?

17          A.   I'm unaware of that.

18          Q.   Would it be your expectation that at least

19     some of the volunteer coaches had health insurance

20     through another source, like a spouse or a parent's    15:19:08

21     job?

22          MR. BROSHUIS:  Objection; calls for

23     speculation.

24               (Reporter seeks clarification.)

25          THE WITNESS:  Regardless, as part of an offer      15:19:20
```

Page 258

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1      to be paid health insurance as part of the cartel        15:20:30
 2      rule.
 3              So I can't see what their health insurance
 4      would have been from the school, but you see the
 5      other coaches right next to them, the second           15:20:39
 6      assistant, the first assistant, the head coach
 7      getting, you know, health insurance payments.
 8      BY MR. RAPHAEL:
 9          Q.   You didn't investigate whether any class
10      member had health insurance through another source    15:20:57
11      during the class period, did you?
12          MR. BROSHUIS:  Objection; asked and answered.
13          THE WITNESS:  I don't know whether these
14      various volunteers -- I don't have access to that
15      information.                                           15:21:09
16              I think that would probably violate HIPAA
17      or FERPA.
18      BY MR. RAPHAEL:
19          Q.   Can you think of any way to figure out the
20      health insurance that each class member had other     15:21:16
21      than asking them?
22          MR. BROSHUIS:  Same objections and irrelevant.
23          THE WITNESS:  As I sit here, no.
24      BY MR. RAPHAEL:
25          Q.   I think you -- well, strike that.             15:21:33
```

Page 260

```
 1              When an employee already has health        15:21:38
 2     insurance from another source, do they always get
 3     the value of the health insurance offered to them
 4     from their employer in extra cash?
 5          MR. BROSHUIS:  Objection; vague.               15:21:49
 6          THE WITNESS:  They can, but I wouldn't say they
 7     always do, no.
 8     BY MR. RAPHAEL:
 9          Q.   It would vary from employee to employee?
10          MR. BROSHUIS:  Objection; foundation,          15:21:57
11     irrelevant.
12          THE WITNESS:  It might.
13     BY MR. RAPHAEL:
14          Q.   Did you do any analysis or investigation
15     of how the health insurance plans available to      15:22:05
16     coaches at Division I colleges and universities
17     compared to health insurance plans that any
18     volunteer coaches actually had?
19          MR. BROSHUIS:  Objection; irrelevant.
20          THE WITNESS:  I mean, I couldn't.  I don't know 15:22:26
21     what health insurance plans the volunteer coaches
22     actually had.
23     BY MR. RAPHAEL:
24          Q.   And so you don't know whether some of the
25     health insurance plans that volunteer coaches       15:22:34
```

Page 261

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    actually had during the class period were more          15:22:37

 2    valuable to them than the health insurance they

 3    would have gotten through the school they

 4    volunteered for?

 5         MR. BROSHUIS:  Objection; vague, irrelevant,       15:22:46

 6    assumes facts not in evidence.

 7         THE WITNESS:  Well, I do know that, again, as

 8    part of an offer, the health insurance package that

 9    one gets is at least an option value.  I mean, at

10    least it has value in terms of the option of being      15:22:59

11    able to accept it as a health insurance plan.

12    BY MR. RAPHAEL:

13         Q.  Does your damages for health insurance in

14    this case measure the option value of health

15    insurance?                                               15:23:11

16         A.  No.

17         MR. RAPHAEL:  Why don't we take a break here

18    and I can see how much more I have.

19         MR. BROSHUIS:  Sure.

20         THE VIDEOGRAPHER:  This marks the end of Media      15:23:18

21    No. 5.  Off the record.  The time is 3:23.

22              (Recess taken.)

23         THE VIDEOGRAPHER:  This marks the beginning of

24    Media No. 6 in the deposition of Dr. Daniel Rascher.

25    We're back on the record.  The time is 3:40.            15:40:05
```

Page 262

```
 1    on that team and be part of the labor market or not.          15:52:09

 2            So I don't really have an answer for that

 3    one person.

 4        Q.   Okay.  So you have no opinion on whether a

 5    graduate assistant is participating in the labor             15:52:18

 6    market you've defined at the time that they are

 7    working as a graduate assistant; is that right?

 8        A.   I mean, I would sort of have to see

 9    what . . .

10            Yeah, you know, I think you can -- whether            15:52:43

11    you define them inside the market or out, it doesn't

12    change my opinion on this entire case.

13            As I sit here, I guess, to me, it sort of

14    depends on what they're doing for that school.

15            So, you know, you can define them inside              15:53:00

16    the labor market or out.  It doesn't affect the

17    general relevant market or the market power that the

18    schools have.

19        Q.   Am I correct then that, in Exhibit 1 in

20    your amended declaration, of the coaches who were            15:53:11

21    hired for third paid assistant jobs that you had

22    data for, 32 percent of those coaches were working

23    at a job outside of the labor market you have

24    defined in the year before they became paid

25    assistants?                                                   15:53:30
```

Page 271

```
 1          MR. BROSHUIS:  Objection; misstates prior          15:53:31

 2     testimony.

 3          THE WITNESS:  So as I said, the baseball

 4     director is sort of that next person down typically

 5     from those third assistant coaches.  So they're part    15:53:37

 6     of the team, right, part of the staff.  I know

 7     there's rules about what they're allowed to do and

 8     not allowed to do that the NCAA puts forth.

 9              So in the year before, they're the

10     baseball director, right, they're doing the             15:53:56

11     logistics and other things.  In the year that they

12     were hired, they became part of that labor market.

13              So in the year before, 32 percent are not

14     in the labor market until the following year.

15     BY MR. RAPHAEL:                                          15:54:17

16          Q.   Can you tell me anything other than the

17     numbers in this chart and some changes to reflect

18     claw backs by the NCAA that you made in your amended

19     report?

20          A.   Oh, what were the changes --                   15:54:37

21          Q.   Yeah.

22          A.   -- from the first report?

23          Q.   Yes.

24          A.   So this table -- you're right, there's a

25     claw back you mentioned of a document.                   15:54:44
```

                                                    Page 272

1                  I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4                  That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12                Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript (X) was ( ) was not requested.

16              I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any attorney of any party to this

19   action.

20              IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: 12/10/24

23

24

25               ANRAE WIMBERLEY, CSR No. 7778

Page 277