# Exhibit 9

```
 1              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF CALIFORNIA
 2                 SACRAMENTO DIVISION
 3   TAYLOR SMART and         )
     MICHAEL HACKER,          )
 4   individually and on      )
     behalf of all those      )
 5   similarly situated,      )
      Plaintiffs,             )
 6                            )
     vs.                      ) Case No.
 7                            ) 22-cv-02125-WBS-CSK
     NATIONAL COLLEGIATE      )
 8   ATHLETIC ASSOCIATION,    )
     an unincorporated        )
 9   association,             )
      Defendant.              )
10   _____     )
                              )
11   JOSEPH COLON, SHANNON    )
     RAY, KHALA TAYLOR,       )
12   PETER ROBINSON, and      )
     KATHERINE SEBBANE,       )
13   individually and on      )
     behalf of all those      )
14   similarly situated,      )
      Plaintiffs,             )
15                            )
     vs.                      ) Case No.
16                            ) 23-cv-00425-WBS-CSK
     NATIONAL COLLEGIATE      )
17   ATHLETIC ASSOCIATION,    )
     an unincorporated        )
18   association.             )
      Defendant.              )
19
20        PORTIONS OF THE TRANSCRIPT HAVE BEEN
21           DESIGNATED AS CONFIDENTIAL
22   *********************************************
            ORAL AND VIDEOTAPED DEPOSITION OF
23
                   PETER ROBINSON
24
                 OCTOBER 17, 2024
25   *********************************************
```

Page 1

1              ORAL AND VIDEOTAPED DEPOSITION OF PETER

2    ROBINSON, produced as a witness at the

3    instance of the Defendant, and duly sworn,

4    was taken in the above-styled and numbered

5    cause on October 17, 2024, from 9:35 a.m. to

6    3:57 p.m., before Donna Wright, CSR in and

7    for the State of Texas, reported by machine

8    shorthand, at the law offices of PERKINS

9    COIE, 405 Colorado Street, Suite 1700,

10   Austin, Texas, pursuant to the Federal Rules

11   of Civil Procedure and the provisions stated

12   on the record or attached hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                 A P P E A R A N C E S
2
     FOR PLAINTIFFS IN COLON V. NCAA:
3           Mr. Robert J. Gralewski, Jr.
            KIRBY MCINERNEY LLP
4           1420 Kettner Boulevard, Suite 100
            San Diego, California 92101
5           (619) 784-1442
            bgralewski@kmllp.com
6
                  -and-
7
            Mr. Yinka Onayemi
8           FAIRMARK PARTNERS LLP
            1825 7th Street NW, Suite 821
9           Washington, DC 20001
            (619) 507-4182
10          yinka@fairmarklaw.com
11
     FOR PLAINTIFFS IN SMART V. NCAA:
12          Mr. Garrett R. Broshuis (via Zoom)
            Mr. David Walchak (via Zoom)
13          KOREIN TILLERY, LLC
            505 North 7th Street, Suite 3600
14          St. Louis, Missouri 63101
            (314) 241-4844
15          gbroshuis@koreintillery.com
            dwalchak@koreintillery.com
16
17   FOR DEFENDANT NATIONAL COLLEGIATE
     ATHLETIC ASSOCIATION:
18          Ms. Megan L. McCreadie
            Mr. Justin P. Raphael (via Zoom)
19          MUNGER, TOLLES & OLSON LLP
            560 Mission Street, 27th Floor
20          San Francisco, California 94105
            (415) 512-4000
21          megan.mccreadie@mto.com
            justin.raphael@mto.com
22
23   ALSO PRESENT:
            Timothy Desadier, Videographer
24
25
```

Page 3

1           defendant NCAA.

2                   MR. GRALEWSKI:  Bob Gralewski,

3           Kirby McInerney, on behalf of the

4           witness, Peter Robinson, and the

5           proposed class.

6                   MR. ONAYEMI:  Yinka Onayemi,

7           counsel for plaintiffs Colon, of

8           Fairmark Partners Law Firm.

9                   MR. BROSCHUIS:  Garrett

10          Broschuis here in the Smart versus NCA

11          matter for plaintiffs in Smart versus

12          NCA.

13                  THE VIDEOGRAPHER:  Will the

14          court reporter please swear in the

15          witness and counsel may proceed.

16                  PETER ROBINSON,

17     having been first duly sworn, testified as

18     follows:

19                       EXAMINATION

20     BY MS. MCCREADIE:

21          Q.     Good morning, Mr. Robinson.

22          A.     Good morning.

23          Q.     We met earlier.  My name is

24     Megan McCreadie.  I'm from the law firm

25     Munger, Tolls & Olson, and I represent the

                                    Page 7

1          Q.      (BY MS. MCCREADIE)  Do you
2    remember roughly how long you met each time?
3          A.      Twice for an hour and then a
4    third and final time for two.
5          Q.      And did you speak to anyone
6    besides your counsel about today's
7    deposition?
8          A.      No, ma'am.
9          Q.      Where did you grow up, Mr.
10   Robinson?
11         A.      Coto de Caza, California.
12         Q.      Where do you currently live?
13         A.      Leander, Texas.
14         Q.      Is that near here?
15         A.      About 45 minutes.
16         Q.      When did you move to Leander?
17         A.      2021.
18         Q.      And before that, were you in
19   Charlottesville?
20         A.      Yes, ma'am.
21         Q.      For roughly how long were you
22   in Charlottesville?
23         A.      Approximately two years.
24         Q.      What is your current job,
25   Mr. Robinson?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          A.      I'm a swim coach.
 2          Q.      When did you start swimming?
 3          A.      13 years old.
 4          Q.      And were you swimming
 5   competitively at that time?
 6          A.      Yes, ma'am.
 7          Q.      Where were you swimming
 8   competitively?
 9          A.      Southern California.
10          Q.      For your high school team?
11          A.      Yes.
12          Q.      For a club team?
13          A.      Yes.
14          Q.      What did you enjoy about
15   swimming?
16          A.      California is -- has many
17   outdoor pools, so just being outside.  It's
18   quite a different sport from others.
19          Q.      Because you can be outside when
20   competing?
21          A.      Yes, ma'am.
22          Q.      Did you enjoy the competition?
23          A.      Yes, ma'am.
24          Q.      What did you enjoy about the
25   competition?
```

Page 12

```
1              Q.      Is UVA a better, as in more
2       competitive, swim program than Florida State?
3              A.      That is correct.
4              Q.      In 2019, at the time you were
5       applying for these volunteer positions, did
6       you apply for any paid coaching positions?
7              A.      No.
8              Q.      Why not?
9              A.      At the time, these two jobs
10      interested me the most.
11             Q.      Had you not seen any job
12      postings for paid positions?
13             A.      I had.
14             Q.      Why didn't you apply to them?
15             A.      Charlottesville and
16      Tallahassee, those two programs, seemed to be
17      the most interesting.
18             Q.      So you chose to apply to unpaid
19      positions over potentially paid positions?
20             A.      That is correct.
21             Q.      Did you think you were
22      qualified to be a paid assistant at this
23      point in time?
24             A.      Yes.
25             Q.      And why is that?
```

Page 47

```
 1            Q.      So I think you said you took a
 2    job to learn from smart people?
 3            A.      Uh-huh.
 4            Q.      Is that because the coaches for
 5    UVA were one of the best programs in the
 6    country?
 7            A.      At the time, they had not won
 8    any women's national titles.
 9            Q.      Were they still particularly
10    competitive?
11            A.      Relatively, yes.
12            Q.      And did you believe them to be
13    one of the best programs in the country at
14    the time?
15            A.      They were good at the time, not
16    one of the best.
17            Q.      Did you apply for a job at one
18    of the best?
19            A.      No.
20            Q.      Why not?
21            A.      I did not see a job listing.
22            Q.      Did you take the experience to
23    be able to gain experience to move up the
24    coaching ladder?
25                    THE REPORTER:  Able to gain --
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    Interrogatory No. 6.

 2          A.     Okay.

 3          Q.     It says, "For each of you

 4    individually, identify all paid

 5    sports-related positions to which you applied

 6    and the compensation for these positions,"

 7    correct?

 8          A.     Correct.

 9          Q.     Okay.  And then on the next

10    page, page 11, there is a section that says,

11    "Plaintiff, Peter Robinson," which is you,

12    and it says, "Mr. Robinson applied for the

13    following position to the University of Santa

14    Barbara to serve as a swimming coach where

15    the salary was $45,000 per year."

16                 Is that correct?

17          A.     Correct.

18          Q.     And this is accurate, this is

19    the only paid D1 coaching position to which

20    you applied?

21          A.     That is correct.

22          Q.     When did you apply to this

23    position?

24          A.     Spring of '21.

25          Q.     So either while you were about
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    to end your volunteer position or right after

2    your volunteer position?

3         A.    I believe I was still in the

4    position.

5         Q.    Okay.  But you were looking for

6    a job because the volunteer -- you knew the

7    volunteer position was about to end?

8         A.    Yes.

9         Q.    Okay.  Santa Barbara is a D1

10   program, correct?

11        A.    Yes.

12        Q.    And why did you apply to Santa

13   Barbara specifically?

14        A.    I grew up up near the area and

15   knew people who had swam in the program and

16   spoke highly of it.

17        Q.    Did you interview with anyone

18   at Santa Barbara?

19        A.    Yes.

20        Q.    Who did you interview with?

21        A.    Head coach at the time, Matt

22   Macedo.

23        Q.    Were you offered the position?

24        A.    No.

25        Q.    Did you ever hear anything

Page 175

1   about why you weren't offered the position?

2       A.    I withdrew my application after

3   the first-round interview.

4       Q.    Why did you withdraw your

5   application?

6       A.    I received a job offer for

7   Waterloo Swimming.

8       Q.    Excuse me.

9             And Waterloo Swimming is a club

10  in the Austin area; is that correct?

11      A.    That is correct.

12      Q.    And why did you withdraw your

13  application from Santa Barbara upon receiving

14  the offer from Waterloo?

15      A.    I had spent the last two years

16  in a long-distance relationship with my

17  girlfriend, now wife, and we made the

18  decision to take the job that would bring me

19  back to her.

20      Q.    And she was, I take it, based

21  in the Austin area?

22      A.    That is correct.

23      Q.    What does she do?

24      A.    She's a consultant.

25      Q.    Can she move for her job?

                                Page 176

1          A.      Yep.

2          Q.      Do you think coaches at UVA,

3    swim coaches at UVA are expected to have

4    different skills than coaches at UC Santa

5    Barbara?

6                  MR. GRALEWSKI:  Foundation.

7          Speculation.

8                  THE WITNESS:  I can't say.

9          Q.      (BY MS. MCCREADIE)  Why not?

10                 MR. GRALEWSKI:  Same

11         objections.

12                 THE WITNESS:  I only had brief

13         conversations with the Santa Barbara

14         coach, mainly talking about my

15         background.  I would assume further

16         interview rounds and experience with

17         that coach would reveal those details.

18         Q.      (BY MS. MCCREADIE)  So you have

19    never received an offer to be a paid D1

20    coach; is that correct?

21         A.      Correct.

22                 MR. GRALEWSKI:  Asked and

23         answered.

24         Q.      (BY MS. MCCREADIE)  Do you

25    believe you had -- did you have the skills

                                    Page 185

1    UVA and you had one spot to fill, would you

2    have hired you or Courtney Caldwell?

3                  MR. GRALEWSKI:  Object to form.

4         Incomplete hypothetical.  Calls for

5         speculation.

6                  THE WITNESS:  I'm not -- I

7         can't answer.

8         Q.    (BY MS. MCCREADIE)  Does the

9    head coach typically make a decision as to

10   who is hired as an assistant coach?

11        A.    Yes.

12        Q.    And you have worked with a

13   number of different head coaches, whether at

14   UVA or swim clubs, right?

15        A.    Yes.

16        Q.    In your experience, do

17   different head coaches have different views

18   about who is a better coach?

19                  MR. GRALEWSKI:  Lacks

20        foundation.  Calls for speculation.

21                  THE WITNESS:  "Better" is very

22        subjective.

23        Q.    So different head coaches might

24   value different skill sets in assistant

25   coaches.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1           Would that be fair to say?

2               MR. GRALEWSKI:  Speculation.

3       Foundation.  Overbroad.

4               THE WITNESS:  For any job in

5       any field, I would assume so.

6           Q.    (BY MS. MCCREADIE)  And

7   different swim teams or swim clubs might have

8   different coaching needs at any particular

9   time; is that correct?

10          A.    I would imagine, yes.

11          Q.    And different swim coaches are

12  going to have different sets of skills that

13  might enable them to meet or not meet those

14  needs, correct?

15          A.    As with any job market in any

16  field, yes.

17          Q.    So which assistant coach a head

18  swimming coach decides to hire for any

19  particular position is going to depend on

20  which coaching skills they value, correct?

21              MR. GRALEWSKI:  It's overbroad.

22      It's vague and ambiguous.  It lacks

23      foundation and calls for speculation.

24              THE WITNESS:  I have never been

25      a head coach, so I would not know.

                                    Page 198

1          A.    The owner, Mike Koleber, is
2    very energetic, really strives for that deep
3    connection, even at an athletic facility with
4    1,200 members.  They also pay you a salary,
5    health insurance, 401(k).  So for a young
6    adult who just went through two years of not
7    even breaking even every month, it was very
8    attractive.
9          Q.    At Waterloo, were you being
10   paid a salary or were you being paid hourly?
11         A.    Hourly.
12         Q.    Do you remember how much you
13   were being paid?
14         A.    I do not.
15         Q.    Did you get other benefits at
16   Waterloo?
17         A.    No.
18         Q.    Switching to Nitro, you still
19   work at Nitro, correct?
20         A.    Correct.
21         Q.    And what are your job duties at
22   Nitro?
23         A.    I am the head age group coach,
24   so everything ages 12 and under is my
25   specific purview.

Page 209

```
 1          Q.      And that's for all swimmers who
 2    happen to take classes at Nitro?
 3          A.      That is correct.
 4          Q.      How many such swimmers are
 5    there?
 6          A.      About 800.
 7          Q.      Is it a full-time position?
 8          A.      It is.
 9          Q.      And you're paid salary.  How
10    much is your salary currently?
11          A.      I assume this is all
12    confidential, right?
13                  MR. GRALEWSKI:  It is, it is.
14          And while we're on the record, I'll
15          just take the opportunity to mark this
16          confidential pursuant -- the
17          transcript confidential pursuant to
18          the protective order.
19                  And you should answer the
20          question.
21                  THE WITNESS:  Okay.  70,000.
22          Q.      (BY MS. MCCREADIE)  And you get
23    benefits?
24          A.      Yes.
25          Q.      What benefits do you get it?
```

Page 210

1          A.      Medical, dental, vision,
2     401(k).
3          Q.      They have 401(k) matching?
4          A.      Yes.
5          Q.      How many hours a week do you
6     generally work?
7          A.      It varies.
8          Q.      How does it vary?  Is it
9     seasonal?
10          A.      Competitions.
11          Q.      So what would be the lowest
12     number of hours you would work in a week?
13          A.      40.
14          Q.      What would be the most?
15          A.      70.
16          Q.      And that would be in weeks
17     where you have competitions?
18          A.      Yeah.
19          Q.      Do you travel for competitions,
20     at least sometimes?
21          A.      Yes.
22          Q.      Where do you -- do you travel
23     nationally?
24          A.      No.
25          Q.      Within Texas?

Page 211

1            to do with the school, location,

2       program.

3            Q.    (BY MS. MCCREADIE)

4   Compensation?

5            A.    As with any job, yes.

6            Q.    So it sounds like there are

7   some situations and some D1 schools for which

8   you would prefer to remain -- rather than

9   being a coach there, you would remain at

10  Nitro?

11           A.    I'm sorry, I was reading this.

12  Please repeat.

13           Q.    So it sounds like you would

14  choose to remain at Nitro over at least some

15  D1 coaching positions, depending on the

16  circumstances?

17           A.    Ostensibly.

18           Q.    All right.  Is coaching at

19  Nitro different than coaching swimming in

20  Division I?

21           A.    Yes.

22           Q.    Is that for the same reasons we

23  have discussed in connection with Waterloo?

24           A.    Yes.  It's just such a higher

25  caliber of athlete and environment.  I mean,

Page 216

1          Q.     I'm going to introduce an

2     exhibit.  That's going to be Exhibit 34.

3               (Exhibit 34 marked)

4          Q.     It's Robinson_000000011.  It is

5     also marked highly confidential.

6               So, Mr. Robinson, is this a

7     copy of your 2022 W-2 from Nitro Swimming?

8          A.     Yes.

9          Q.     Okay.  And it shows in gross

10    pay, in the top right area, that you made

11    $50,000 -- $50,225.89; is that correct?

12         A.     Correct.

13         Q.     So that's more than the salary

14    at the position at which -- to which you

15    applied at UC Santa Barbara, correct?

16         A.     Yes.

17         Q.     The next exhibit, this is

18    Exhibit 35, Bates No. Robinson_12 -- sorry,

19    Robinson_000000012.  It is also marked highly

20    confidential.

21               (Exhibit 35 marked)

22         Q.     This is a copy of your 2023 W-2

23    from Nitro Swimming, correct?

24         A.     Correct.

25         Q.     It shows gross pay of

Page 221

CONFIDENTIAL

```
 1    $58,530.90; is that correct?
 2         A.    Correct.
 3         Q.    And that is, again, more than
 4    the salary of the position to which you
 5    applied at UC Santa Barbara?
 6         A.    Correct.
 7         Q.    And you also previously
 8    testified that your current salary for the
 9    year 2024 is about $70,000, correct?
10         A.    Correct.
11         Q.    That is, again, more than the
12    salary of the position to which you applied
13    at UC Santa Barbara?
14         A.    Correct.
15         Q.    And you have not applied to any
16    other D1 coaching positions since you applied
17    to the position at UC Santa Barbara in 2021,
18    correct?
19         A.    Correct.
20         Q.    Is one of the reasons you
21    haven't applied for more D1 coaching
22    positions is that you expect to make more or
23    just as much in your current job as you would
24    in D1 coaching positions?
25         A.    Repeat, please.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1              Q.      Is one of the reasons you have
 2    not applied for any additional D1 coaching
 3    positions since that time that you expect to
 4    make more or as much at your current job than
 5    you would in the D1 coaching position?
 6              A.      Yes.
 7              Q.      Have you had any other sources
 8    of income besides Waterloo or Nitro since you
 9    left UVA?
10              A.      No.
11              Q.      Do you do any private coaching?
12              A.      Yes, but it's part of Nitro.
13    That's included in my wages.
14              Q.      Okay, okay, I get it.
15              But that's like -- so many of
16    the sessions you may lead are group sessions,
17    but you also sometimes do one-on-one
18    sessions?
19              A.      Yes.
20              Q.      Got it.
21              What circumstances do you do
22    one-on-one sessions?
23              A.      Depends.  A parent will reach
24    out and schedule a session.
25              Q.      And will you generally agree to
```

Page 223

```
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
 2                  SACRAMENTO DIVISION
 3   TAYLOR SMART and       )
     MICHAEL HACKER,        )
 4   individually and on    )
     behalf of all those    )
 5   similarly situated,    )
      Plaintiffs,           )
 6                          )
     vs.                    ) Case No.
 7                          ) 22-cv-02125-WBS-CSK
     NATIONAL COLLEGIATE    )
 8   ATHLETIC ASSOCIATION,  )
     an unincorporated      )
 9   association,           )
      Defendant.            )
10   _____   )
                            )
11   JOSEPH COLON, SHANNON  )
     RAY, KHALA TAYLOR,     )
12   PETER ROBINSON, and    )
     KATHERINE SEBBANE,     )
13   individually and on    )
     behalf of all those    )
14   similarly situated,    )
      Plaintiffs,           )
15                          )
     vs.                    ) Case No.
16                          ) 23-cv-00425-WBS-CSK
     NATIONAL COLLEGIATE    )
17   ATHLETIC ASSOCIATION,  )
     an unincorporated      )
18   association.           )
      Defendant.            )
19
20
          REPORTER'S CERTIFICATION OF THE ORAL
21           DEPOSITION OF PETER ROBINSON
                 OCTOBER 17, 2024
22
23        I, Donna Wright, a Certified Shorthand
24   Reporter and Notary Public in and for the
25   State of Texas, hereby certify to the
```

Page 288

1    following:

2         That the witness, PETER ROBINSON, was

3    duly sworn by the officer and that the

4    transcript of the oral deposition is a true

5    record of the testimony given by the witness;

6         That the original deposition was

7    delivered to Mr. Robert Gralewski;

8         That a copy of this certificate was

9    served on all parties and/or the witness

10   shown herein on _____;

11        I further certify that pursuant to FRCP

12   Rule 30(3) that the signature of the

13   deponent:

14        __X__ was requested by the deponent or

15   a party before the completion of the

16   deposition and that the signature is to be

17   before any notary public and returned within

18   30 days from date of receipt of the

19   transcript.  If returned, the attached

20   Changes and Signature Page contains any

21   changes and the reasons therefore:

22        ____ was not requested by the deponent

23   or a party before the completion of the

24   deposition.

25        I further certify that I am neither

Page 289

1    counsel for, related to, nor employed by any
2    of the parties or attorneys in the action in
3    which this proceeding was taken, and further
4    that I am not financially or
5    otherwise interested in the outcome of the
6    action.
7          Certified to by me on this, the 5th
8    day of November, 2024.
9
10
11
12

DONNA WRIGHT, Texas CSR 1971
13   Expiration Date:  11/30/24
     VERITEXT LEGAL SOLUTIONS
14   300 Throckmorton Street
     Ft. Worth, Texas 76102
15   Firm Registration No. 571
16
17
18
19
20
21
22
23
24
25

Page 290

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127