Exhibit 12

```
 1                 UNITED STATES DISTRICT COURT
 2     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
 3
 4   TAYLOR SMART AND MICHAEL
     HACKER, individually and
 5   on behalf of all those
     similarly situated
 6              Plaintiffs,
 7                          Case No. 22-cv-02125-WBS-CSK
     vs.
 8
     NATIONAL COLLEGIATE
 9   ATHLETIC ASSOCIATION, an
     unincorporated
10   association
11              Defendant.
12    - AND -
13   JOSEPH COLON, SHANNON
     RAY, KHALA TAYLOR, PETER
14   ROBINSON, and KATHERINE
     SEBBANE, individually and
15   on behalf of all those
     similarly situated
16
                Plaintiffs,
17                          Case No. 23-cv-00425-WBS-CSK
     vs.
18
     NATIONAL COLLEGIATE
19   ATHLETIC ASSOCIATION, an
     unincorporated
20   association
21              Defendants.
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
22          Portions of the Transcript Have Been
                 Designated as Confidential
23              VIDEOTAPED DEPOSITION OF
                        SHANNON RAY
24                  October 15, 2024
25

                                            Page 1
```

```
1   (TITLE PAGE - CONTINUED)

2

3                   Held at Butler Snow, LP
              445 North Boulevard, Suite 300

4              Baton Rouge, Louisiana  70802

5

6                   (Beginning at 9:13 a.m.)

7

8

9   Reported by:

10  Rita A. DeRouen, CCR, RPR
    (CCR #2014018)

11  (RPR #006908)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS IN COLON V. NCAA:
 3
     KIRBY MCINERNEY
 4   1420 Kettner Boulevard, Suite 100
     San Diego, California  90101
 5   858.834.2044
     BY:  ROBERT J. GRALEWSKI, JR., ESQ.
 6   bgralewski@kmllp.com
 7            - AND -
 8   FAIRMARK PARTNERS LLP
     68 Jay Street
 9   Brooklyn, New York  11201
     617.642.5569
10   BY:  YINKA OUAYEMI, ESQ.
     yinka@fairmarklaw.com
11
12   REPRESENTING THE PLAINTIFFS IN SMART VS. NCAA:
13
     KOREIN TILLERY, LLC
14   505 North 7th Street, Suite 3600
     St. Louis, Missouri  63101
15   314.241.4844
     BY:  GARRETT R. BROSHUIS, ESQ.
16   gbroshuis@koreintillery.com
     (Via Zoom)
17
18   REPRESENTING THE DEFENDANT NCAA:
19   MUNGER, TOLLES & OLSON, LLP
     560 Mission Street, 27th Floor
20   San Francisco, California  94105-2907
     415.512.4027
21   BY:  CAROLYN HOECKER LUEDTKE, ESQ.
     Carolyn.Luedtke@mto.com
22
23
24
25
```

                                              Page 3

1          he not able to talk?

2          THE VIDEOGRAPHER:

3               It says he's muted.

4          MR. GRALEWSKI:

5               Okay.  Is there anybody else making

6          an appearance on the Zoom?

7               Okay.

8          THE VIDEOGRAPHER:

9               Will the court reporter please swear

10         in the witness and then counsel may

11         proceed.

12                    SHANNON RAY,

13   having been first duly sworn, was examined and

14   testified as follows:

15                    EXAMINATION

16   BY MS. LUEDTKE:

17     Q.   Good morning, Ms. Ray.

18     A.   Good morning.

19     Q.   Can you just state your name for the

20   record.

21     A.   Shannon Ray.

22     Q.   And have you ever been deposed before?

23     A.   No.

24     Q.   Were you able to meet with your counsel

25   to go over what to expect in a deposition?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1        Q.    For approximately how long?

2        A.    About a year.

3        Q.    What did you study?

4        A.    Concentration in accounting.

5        Q.    Did you get a degree or certificate or

6    anything?

7        A.    No.

8        Q.    Okay.  I'm going to ask you to walk me

9    through your work history, starting with any

10   current employment that you have.

11       A.    Okay.  I currently work remotely for

12   Calvary Portfolio Services.

13       Q.    What do you do for Calvary Portfolio

14   Services?

15       A.    I'm an auditor.

16       Q.    What -- what's generally the nature of

17   Calvary Portfolio Services' business?

18       A.    It's a debt collections.  We work on

19   the -- I work on the legal side, so a lot of garn

20   -- I work with the law firms to make sure our

21   accounts match up with theirs, reporting

22   garnishments, assets, and things of that nature,

23   and judgments.

24       Q.    How long have you worked there?

25       A.    Four years.

Page 16

1    your volunteer coach position in January 2019?

2         A.   I do not recall.  And also I don't even

3    know the password to my LinkedIn.

4         Q.   When was the last time you logged in to

5    LinkedIn?

6         A.   I would say years ago.  It is not needed

7    because I have a great job.

8         Q.   Did you use LinkedIn to find your great

9    job at Calvary Portfolio Services?

10        A.   No, I did not.

11        Q.   How did you find that job?

12        A.   Job -- like maybe the site was Indeed,

13   like something of that sort.

14        Q.   You can set that aside.

15        A.   Okay.

16        Q.   So when you -- when you started as a

17   volunteer coach in January 2019 at Arizona State,

18   were you also still running professionally in

19   track?

20        A.   Yes.

21        Q.   So tell me about how -- where did you

22   train in Phoenix for track?

23        A.   We trained at Arizona State.

24        Q.   Who was your coach?

25        A.   Dion Miller.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          Q.    Was he the head coach for Arizona State?

2          A.    He was not the head coach, he was

3     assistant sprints coach.  But it was the head

4     coach -- they was getting the head coach job the

5     year after.  So...

6          Q.    He became the head coach in 2020?

7          A.    He became the head coach in 2020.

8          Q.    Did you know him before you went to

9     Phoenix?

10         A.    Yes.

11         Q.    How did you know Dion Miller?

12         A.    He was a coach at Alabama prior to

13     Arizona State.

14         Q.    How did you first get introduced to him?

15         A.    He approached me at a track meet at the

16     national championship meet and was like, I would

17     like to coach you professionally.

18         Q.    The NCAA national championships?

19         A.    Yes.

20         Q.    And had you met him before then?

21         A.    Yes.

22         Q.    Like on how many occasions would you

23     say?

24         A.    I'm not sure.

25         Q.    In connection with -- had you met him in

                                        Page 42

1    connection with running for Ole Miss?

2        A.    Yes.

3        Q.    When Ole Miss would run in track meets,

4    you would run against Alabama?

5        A.    Yes.

6        Q.    And you would encounter him at those

7    meets?

8        A.    Yes.

9        Q.    So at the national championship in 2018,

10   you were running in the national championship, I

11   assume?

12       A.    Yes.

13       Q.    And he approached you about wanting to

14   coach you?

15       A.    Yes.

16       Q.    After you graduated?

17       A.    Yes.

18       Q.    And then he moved from Alabama to

19   Arizona State?

20       A.    Yes.

21       Q.    To be an assistant sprints coach?

22       A.    Yes.

23       Q.    And then the next year he became the

24   head coach?

25       A.    Yes.

Page 43

1        Q.    And what did you say when he approached
2    you about wanting to coach you?
3        A.    I was very excited because I know that
4    he had coached really great athletes.
5        Q.    And when you were graduating from Ole
6    Miss, were you hoping to continue to run?
7        A.    Yes.
8        Q.    At the time you graduated, did you have
9    a plan for how you were going to continue to
10   train?
11       A.    I did not have a full, thought-out plan.
12       Q.    Where did you train between when you
13   graduated and when you moved to Phoenix?
14       A.    I trained back home in New Orleans.
15       Q.    Where?
16       A.    The Westbank area on -- it's on the
17   outskirts of New Orleans.  So different parks,
18   recreation parks in New Orleans.
19       Q.    Was it hard to train that way?
20       A.    Very.
21       Q.    What made it hard?
22       A.    Just training alone.  And so originally,
23   the -- Dion Miller, he -- I was going to Alabama
24   with him.  And then he -- I got my apartment in
25   Alabama, and then he decided to change.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  of the indoor season.

2        Q.    And then the outdoor season is in the

3  spring?

4        A.    Yes.

5        Q.    Is there a summer season?

6        A.    Depending on how good you are, you can

7  go as long as September, October, depending on

8  collegiate, professionally.  It varies.

9        Q.    All right.  So Dion Miller, when he

10  approached you about wanting to coach you, did --

11  he also suggested that you could work as a

12  volunteer coach?

13        A.    Yes, that was my -- that was my duty if

14  I was going to come here, I would have to work as

15  a volunteer coach.

16        Q.    Okay.  When he approached you about

17  that, did he explain to you what your duties would

18  be as a volunteer coach?

19        A.    Not necessarily.  He was just an

20  assistant coach.  But he did explain and he also

21  was still feeling out the -- the -- feeling out

22  everything himself.  So he didn't know specific

23  what my duties were, but the main duties were to

24  help, help out the students whenever was needed

25  and work as a mentor, and while I'm training

Page 47

1        A.   Yes.

2   BY MS. LUEDTKE:

3        Q.   And then when you started work at

4   Calvary, tell me what was a normal day for you

5   with all of your different time commitments.  Walk

6   me through a typical Shannon Ray day after you

7   started at Calvary.

8        A.   So I started work at 5:30 in the

9   morning.

10       Q.   At Calvary?

11       A.   Yes.

12            And I would get off at 2:00 -- maybe

13   2:15, and then practice starts at 3:00.

14       Q.   And how long would you be at practice?

15       A.   It varied.

16       Q.   Again, sort of between 6:00 and

17   8:00 p.m.?

18       A.   Yes.

19       Q.   And when did you do your own training

20   after you started at Calvary?

21       A.   I would train in the -- at the time with

22   the collegiates.

23       Q.   You trained with the student athletes?

24       A.   Yes.

25       Q.   Describe to me, what does your training

Page 62

1    encompass?  What would you do to train with the

2    student athletes?

3        A.    What would I do to train with them?  So

4    most of the time I did do the same workouts unless

5    I was competing that weekend or -- but most of the

6    time I did do the same workouts.  Or sometimes my

7    workout could be a little easier so I'll finish up

8    early and be able to help them more.

9            But are you asking like what's a typical

10   practice?  A typical practice would be we start

11   off with some drills.  I'm always in the front.

12   I'm leading the drills because that's the way

13   the -- Dion Miller wanted it to show an example.

14   So -- and then we would do the drills in the line.

15           So I'm able to finish up my drill and

16   then also correct those that are coming behind me.

17   And then we stretch.  I introduce them to like new

18   stretching techniques and things like that.  And

19   then we would put on our spikes and compete, which

20   I would always be in the front running with the

21   faster girl, and then pushing each other.  So

22   that's...

23        Q.    Can you just give me an example of what

24   is a drill?

25        A.    A drill, like A skip, B skip.  So you're

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    just doing like a high knees, high knees.
 2         Q.   Got it.
 3         A.   Yes.
 4         Q.   And then you would -- you said you would
 5    put on your spikes and compete.  You would run
 6    actual sprints against one another?
 7         A.   Yes.
 8         Q.   And sometimes the coach would say full
 9    sprint or half sprint or things like that?
10         A.   Yes.
11         Q.   And then would you then go to the weight
12    room and do the workout in the weight room with
13    the student athletes?
14         A.   Yes.
15         Q.   And so you would do your practice
16    alongside the student athletes from about 3:00
17    until whenever you-all finished between 6:00 and
18    8:00; is that right?
19         A.   Yes.
20         Q.   And if you had a meet that weekend, you
21    might moderate the workout based on whatever your
22    coach advised you?
23         A.   Yes.
24         Q.   And your coach was Dion Miller?
25         A.   Yes.
```

Page 64

1          Q.    Did you work with other coaching staff
2    at Arizona State?
3          A.    Yes.
4          Q.    Who was that?
5          A.    Shannon Hatchett.
6          Q.    She was an assistant coach?
7          A.    Yes.
8          Q.    Anyone else?
9          A.    There was another strictly hurdles coach
10   and recruiter; I cannot remember his name at the
11   moment.
12         Q.    And then was there like a strength and
13   conditioning coach that worked with you?
14         A.    Yes.
15         Q.    And who was that?
16         A.    Her name was Coach D.
17         Q.    D like David?
18         A.    D like David.
19         Q.    And so Coach D worked with the Arizona
20   State student athletes as well as with you?
21         A.    Yes.
22         Q.    Were there other professional track and
23   field athletes training alongside you at Arizona
24   State?
25         A.    Yes.

1      Q.   And they were also working with Dion

2    Miller?

3      A.   Yes.

4      Q.   Were they also volunteer coaches?

5      A.   Yes.

6      Q.   What were their names?

7      A.   Vanessa Clerveaux, and that was the --

8    she was a hurdler; and then Gino Hall, he was a

9    400-meter runner, male sprinter.  So total of --

10   it was three volunteer coaches that were actually

11   competing and then one volunteer coach, his name

12   was Ronnie.  I'm not sure of his last name, but

13   his name was Ronnie.

14     Q.   And he wasn't a professional athlete?

15     A.   No.

16     Q.   Did you get to work with any of the

17   nutritionists from Arizona State who worked with

18   the athletes?

19     A.   I can't remember.

20     Q.   So other than the sprints coaches and

21   the strength and conditioning coaches, were there

22   other coaches or resources you got from Arizona

23   State to assist you in your training?

24     A.   I can't remember.

25     Q.   What did you do with the strength and

Page 66

1          A.    Not during the 2021 season.

2          Q.    At any point in 2021 were you a

3    volunteer coach for Arizona State?

4          A.    No.

5          Q.    So you were a volunteer coach for

6    Arizona State from January 2019 until sometime the

7    end of 2020?

8          A.    December 2020, yes.

9          Q.    And you moved to Orlando around that

10   time of December of 2020?

11         A.    Yes.

12         Q.    Why did you stop being a volunteer coach

13   for Arizona State?

14         A.    I moved away.

15         Q.    Did you start training with somebody in

16   Orlando?

17         A.    Yes.

18         Q.    A different coach?

19         A.    Yes.

20         Q.    Is that why you moved?

21         A.    Yes.

22         Q.    Who was your coach in Orlando?

23         A.    Gary Evans.

24         Q.    And was he affiliated with a university?

25         A.    No.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        Q.    What facility did you train at with Gary
 2   Evans in Orlando?
 3        A.    It varied between different facilities.
 4        Q.    There wasn't one particular home
 5   facility?
 6        A.    Correct.
 7        Q.    When did you decide to move to Orlando?
 8        A.    November 2020.
 9        Q.    What was your driving reason for moving,
10   was it to train with a different coach?
11        A.    Yes.
12        Q.    Because you weren't happy with the
13   Arizona State coach?
14        A.    Yes.
15        Q.    Because he was wishy-washy?
16        A.    Very.
17        Q.    When COVID shut down the track and field
18   season in February-ish of 2020, did you continue
19   training at Arizona State's facilities?
20        A.    Yes.
21        Q.    You were able to continue your own
22   professional athlete training?
23        A.    I can't answer that question because
24   it's not accurate.  There was a point where I kept
25   training and thought there would be a season, and
```

Page 100

1        Q.    Are you in touch with anybody who is a
2    volunteer coach at Arizona State still?
3        A.    No.
4        Q.    All right.  You said that you worked at
5    Calvary full-time as an auditor while you were a
6    volunteer coach; is that right?
7        A.    Correct.
8        Q.    And you still work there?
9        A.    Yes.
10        Q.    And you like the job?
11        A.    Yes.
12        Q.    It was flexible and allowed you to train
13    as a professional athlete?
14        A.    Yes.
15        Q.    It still is?
16        A.    Yes.
17        Q.    When you worked at Calvary in 2019 as an
18    auditor, what was your salary?
19        A.    In 2019?  I'm not sure of the exact
20    salary.
21        Q.    Approximately.
22        A.    I would say 40, around 40K.
23        Q.    Did you receive any benefits in 2019?
24        A.    What do you mean by "benefits"?
25        Q.    Sure.  Did you receive health insurance?

Page 105

1          A.    Yes.

2          Q.    Did you receive dental insurance?

3          A.    Yes.

4          Q.    Did you receive any other medical or

5     benefits of that type?

6          A.    I received medical and dental insurance,

7     and those were the only benefits.

8          Q.    Did you receive a bonus of any kind?

9          A.    Yes.

10         Q.    How much in 2019?

11         A.    Maybe roughly around $7,000.

12         Q.    And in 2019 did you receive any other

13    compensation from Calvary for your work as an

14    auditor?

15         A.    I'm sorry, there was no bonus in 2019.

16    We do not get bonuses until the end -- at that

17    very moment, I didn't get bonus until January.

18         Q.    Of 2020?

19         A.    Correct.

20         Q.    For your work in 2019?

21         A.    Yes.

22         Q.    Did you receive any other compensation

23    for your work in 2019 for Calvary?

24         A.    Could you repeat the question.

25         Q.    Sure.  Other than your salary, medical

Page 106

CONFIDENTIAL

1    and dental benefits, and your bonus that you got

2    in January 2020, did you receive any other

3    compensation for your work at Calvary in 2019?

4         A.    No.

5         Q.    And did your -- was your salary the same

6    in 2020?

7         A.    No.

8         Q.    What was it in 2020 for Calvary?

9         A.    I'm not sure, roughly maybe like 47,000.

10        Q.    And did you still get medical and dental

11   benefits in 2020?

12        A.    Correct.

13        Q.    And did you receive a bonus in January

14   of 2021 for your work in 2020?

15        A.    Yes.

16        Q.    How much?

17        A.    Maybe 3,000.  I'm not completely sure.

18   It could have ranged from 1,000 to 3,000.

19        Q.    Did you receive any compensation from

20   Arizona State for your work as a volunteer coach?

21        A.    Your question is did I receive any

22   compensation from Arizona?  What would be your

23   examples of compensation?

24        Q.    What would you understand to be

25   compensation?

Page 107

1        A.    Basically you can use the card to pay

2   for medical expenses.

3        Q.    Got it.

4              So Arizona State, did you receive any

5   meals from Arizona State?

6        A.    Yes, I received meals.

7        Q.    How often?

8        A.    We were able to eat at a restaurant

9   called Bodhi, which you had two meals per week.

10       Q.    And you received coaching from Arizona

11  State's coaching staff, correct?

12       A.    Could you further explain what you mean

13  by that?

14       Q.    Sure.  Did you have to pay for the

15  coaching services of Dion Miller?

16       A.    No, I did not pay for the coaching

17  services.

18       Q.    Did you have to pay to use the track and

19  weight room facilities for your own training?

20       A.    No, I did not have to pay.

21       Q.    Do you have to pay for Gary Evans -- did

22  you have to pay for Gary Evans as a coach in

23  Orlando?

24       A.    Yes.

25       Q.    How much did you have to pay Gary Evans

Page 110

1    as a coach?

2        A.    $700 monthly.

3        Q.    Did you have to pay an additional amount

4    to use certain facilities?

5        A.    Yes.

6        Q.    How much?

7        A.    $250 monthly.

8        Q.    Were there other expenses associated

9    with being a professional athlete in Orlando?

10       A.    Yes.

11       Q.    What were those?

12       A.    Physical therapy, traveling, rent, food.

13       Q.    When you were at Arizona State and you

14   traveled to meets where you both worked as a coach

15   and ran as an athlete, did Arizona State cover

16   your travel expenses?

17       A.    No, they did not.

18       Q.    Did you ever have to pay for your own

19   hotel?

20       A.    Yes.

21       Q.    When you traveled as a coach for Arizona

22   State, you paid for your own hotel?

23       A.    Yes.

24       Q.    How often?

25       A.    Back then it was the NCAA's rule you

                                        Page 111

1      Q.   But if it was inside Arizona State, that
2   was provided to you as something that came with
3   being a coach?
4      A.   Correct.
5      Q.   Who is your coach now?
6      A.   My coach now is Dennis Shaver.
7      Q.   Is he with LSU?
8      A.   Yes.
9      Q.   Do you train at LSU?
10     A.   Yes.
11     Q.   Do you have to pay for Dennis Shaver's
12  coaching?
13     A.   Yes.
14     Q.   How much do you pay him?
15     A.   $300 monthly.
16     Q.   Do you have to pay to use the
17  facilities?
18     A.   No.
19     Q.   Do you have to pay for physical therapy
20  if you have that when you're here at LSU?
21     A.   Outside of LSU, yes.
22     Q.   Do you have a position of any kind at
23  LSU?
24     A.   No.
25     Q.   Do you have any coaching

Page 113

1    responsibilities at LSU?

2         A.    No.

3         Q.    Do you train at the same time as the LSU

4    student athletes?

5         A.    No.

6         Q.    What time do you train here?

7         A.    We train at 11:00 a.m.

8         Q.    And when do the student athletes train?

9         A.    I'm not sure, but it's after.

10        Q.    When you were at Arizona State, were any

11   of the paid assistant coaches also competing as

12   professional athletes?

13        A.    No.

14        Q.    When you were at Arizona State, were any

15   of the paid assistant coaches also working a

16   full-time job?

17             MR. GRALEWSKI:

18                  Object to form, lacks foundation,

19             calls for speculation.

20   BY MS. LUEDTKE:

21        Q.    I'm sorry, when you were at Arizona

22   State, were any of the paid assistant coaches also

23   working a full-time job outside of Arizona State?

24             MR. GRALEWSKI:

25                  Same objections.

                                        Page 114

1          A.    No.   Their full-time job was Arizona

2    State.

3    BY MS. LUEDTKE:

4          Q.    Was there an application process for

5    being a volunteer coach after Dion Miller

6    approached you at NCAA nationals?

7          A.    Could you further explain what an

8    application process is?

9          Q.    Sure.  Let's start with did you fill out

10   a job application?

11         A.    I did not fill out a job application,

12   but I did sign a contract to be a volunteer coach.

13         Q.    And you submitted your resume?

14         A.    Yes.

15         Q.    Do you know whether there was a

16   different process for being hired as a paid

17   assistant coach at Arizona State?

18         A.    I do not know the process of a paid

19   assistant coach.  I was just a volunteer coach.

20              MS. LUEDTKE:

21                   Let's mark this as Exhibit 20.

22              (Exhibit 20 was marked.)

23              MS. LUEDTKE:

24                   Garrett, this is NCAA_SC_SUBPOENA_2.

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    hotel?

2        A.   I would say roughly under 400.  300 to

3    400, I cannot remember.

4        Q.   Have you ever applied for any other

5    coaching jobs other than the volunteer coach job

6    at Arizona State?

7        A.   No.

8        Q.   Why not?

9        A.   I just never thought about it.

10        Q.   Do you want to be a track coach?

11        A.   I've never thought about it.

12        Q.   Did you ever ask to be considered as a

13    paid assistant coach at Arizona State?

14        A.   No.

15        Q.   Why not?

16        A.   I'm not sure.  You would have to ask the

17    coaches.

18        Q.   I'm just asking whether you, Ms. Ray,

19    ever asked to be a paid assistant coach at Arizona

20    State?

21            MR. GRALEWSKI:

22                Hold on.  Is there a question

23            pending?  Because she answered your --

24            what's the question?

25

Page 121

1   BY MS. LUEDTKE:

2       Q.   And Mr. Miller never told you, I would

3   pay you if the bylaws allowed me, right?

4           MR. GRALEWSKI:

5               Objection to form, asked and

6           answered.

7       A.   No, he has never told me that.

8   BY MS. LUEDTKE:

9       Q.   Nobody from Arizona State ever told you

10  that Arizona State would pay you if the NCAA

11  bylaws allowed them to do so, right?

12      A.   Right.

13      Q.   And you didn't ask to be paid?

14          MR. GRALEWSKI:

15              Objection to form, asked and

16          answered.

17      A.   I did not ask to be paid.

18  BY MS. LUEDTKE:

19      Q.   Okay.  If we turn to Interrogatory

20  Number 4, which starts on page 7, if you go down

21  to line 21, it says, "Ms. Ray received no

22  compensation from the institution for which she

23  served as a volunteer coach in exchange for any or

24  all of the services she provided as a volunteer

25  coach."

Page 146

1        Q.    Why not?

2        A.    I just didn't put much thought into it.

3        Q.    You sought to be a coach at Arizona

4    State because you wanted to work with Dion Miller

5    as a coach as a professional track athlete, right?

6        A.    Yes.

7        Q.    And so the coaches at the high school

8    club teams wouldn't have offered that opportunity?

9        A.    It was like a -- one person's job and

10   that was enough.  So...

11       Q.    If the coaching position that you had at

12   Arizona State had been paid, do you think there

13   would have been more competition to get the job?

14            MR. GRALEWSKI:

15                 Objection to form, incomplete

16            hypothetical, calls for a legal

17            conclusion, calls for expert testimony.

18       A.    What do you mean by "competition"?

19   BY MS. LUEDTKE:

20       Q.    Sure.  If the coaching position at

21   Arizona State had been a paid coaching position,

22   do you think that more people would have applied

23   in addition to you to compete to get the position?

24            MR. GRALEWSKI:

25                 Objection to form, lacks foundation,

                                        Page 163

1    BY MS. LUEDTKE:

2        Q.    You don't know one way or the other?

3            MR. GRALEWSKI:

4                Same objections.

5        A.    No.

6    BY MS. LUEDTKE:

7        Q.    And you don't know whether or not

8    Arizona State paid an additional track and field

9    assistant coach after rule changes in 2023?

10           MR. GRALEWSKI:

11               Objection to form, lacks foundation,

12           calls for speculation.

13       A.    I was not there.  I can only speak of

14   2019 to 2020, like the years that I was there for.

15   BY MS. LUEDTKE:

16       Q.    Earlier we talked about your job as an

17   auditor at Calvary and you told me about your

18   salary in 2019 and 2020.

19           What was your salary -- what is your

20   salary at Calvary as an auditor now?

21       A.    I would say 60K.

22       Q.    Did you get a bonus for 2023?

23       A.    We have quarterly bonuses.  So yes.

24       Q.    How much were you paid in bonuses for

25   2023?

Page 167

1       A.    I don't remember.

2       Q.    Approximately?

3       A.    Maybe 5,000.

4       Q.    How much have you been paid for bonuses

5   in 2024?

6       A.    I don't remember the exact amounts.

7       Q.    Approximately?

8       A.    5,000.

9       Q.    And you still get health and dental

10  benefits?

11      A.    Yes.

12      Q.    And you said you train right now at LSU

13  at approximately 11:00 o'clock every day; is that

14  right?

15      A.    Yes.

16      Q.    For how many hours do you train at LSU

17  right now?

18      A.    It varies.

19      Q.    What is the range?

20      A.    Maybe two to three hours.

21      Q.    And do you work at Calvary before and

22  after you train?

23      A.    Yes.

24      Q.    And approximately how many professional

25  track meets did you run in 2024?

Page 168

1              speculation, and lacks foundation.

2        A.    Are you saying a head coach and

3    assistant job is different?

4    BY MS. LUEDTKE:

5        Q.    No.  I'm asking, when a head coach is

6    deciding how to put together their team of

7    assistant coaches, do different head coaches value

8    different things?

9              MR. GRALEWSKI:

10                  Objection to form, incomplete

11              hypothetical -- sorry, strike that.

12              Objection to form, lacks foundation,

13              calls for speculation.

14        A.    Could you rephrase your question.

15    BY MS. LUEDTKE:

16        Q.    Sure.  In your experience working with

17    head coaches and the head coaches assemble their

18    assistant coach staff, do different head coaches

19    use different factors in deciding who will be

20    their assistant coaches?

21              MR. GRALEWSKI:

22                  Same objections.

23        A.    Yes.  That is with any job.  Some people

24    look for different qualities than other people.

25    So...

                                        Page 173

1    BY MS. LUEDTKE:

2        Q.   And a head coach in track and field,

3    from listening to your testimony, it sounds like

4    sometimes they'll hire an assistant coach who has

5    expertise in a particular event; is that right?

6            MR. GRALEWSKI:

7                Objection to form, lacks foundation,

8            calls for speculation.

9        A.   What testimony?

10   BY MS. LUEDTKE:

11       Q.   I'm not trying to trick you here.  It

12   sounds like from your testimony that -- you said

13   sometimes there's -- for example, there was a pole

14   vault coach or a hurdles coach?

15       A.   Yes.

16       Q.   And you were a sprinting coach, correct?

17       A.   Yes, correct.

18       Q.   So is it typical that on a track and

19   field team, that some of the assistant coaches

20   would have expertise in particular events?

21       A.   Correct.

22       Q.   And it's up to the head coach to decide

23   what expertise makes sense for the team?

24       A.   I would not say it's up to the head

25   coach, like I'm not sure.  But I could assume that

Page 174

1    they all amongst each other decide.

2         Q.   But the head coach might work with the

3    other assistant coaches to decide what makes sense

4    for the team?

5         A.   Yes.

6         Q.   And some teams might have multiple

7    sprint assistant coaches and some teams might just

8    have one sprint assistant coach?

9         A.   Yes.

10        Q.   Depending on the priorities for that

11   team?

12        A.   Yes.

13        Q.   And am I right that some teams might

14   have throwing coaches that help with discus and

15   shotput and hammer?

16        A.   Yes.

17        Q.   And some teams might have somebody who

18   has an expertise at jumps, like pole vault and

19   high jump?

20        A.   Yes.

21        Q.   Is it typical for track and field teams

22   you've been involved with to have a coach for

23   discus and then a separate coach for shotput, or

24   does it depend on the team?

25        A.   It depends on the team.

Page 175

1          Q.    And how about for the jumps, is it
2    typical to have an assistant coach who focuses on
3    pole vault and then a different person who focuses
4    on long jump, or does it depend on the team?
5          A.    It all depends on the team.
6          Q.    At LSU, when you're training in sort of
7    the late morning before the other athletes start
8    training, are you training with other professional
9    athletes?
10         A.    Yes.
11         Q.    Are you familiar with a gentleman named
12   Vernon Norwood?
13         A.    Yes.
14         Q.    He's a sprinter?
15         A.    Yes.
16         Q.    Is he one of the people you train with
17   at LSU?
18         A.    Yes.
19         Q.    And do you understand that he is a
20   volunteer coach at LSU?
21         A.    I didn't know that.
22               MR. GRALEWSKI:
23                    Objection to form, calls for
24               speculation, and lacks foundation, and
25               misstates the record.

                                        Page 176

```
 1            MR. GRALEWSKI:
 2                 Objection to form, misstates the
 3            testimony, asked and answered,
 4            incomplete hypothetical, calls for
 5            speculation, calls for a legal
 6            conclusion, and calls for expert
 7            testimony.
 8       A.   So you are saying if there was not an
 9   illegal agreement and she decided to work, is it
10   fair?
11   BY MS. LUEDTKE:
12       Q.   Yeah.  If she decided to work for free;
13   is that fair?
14            MR. GRALEWSKI:
15                 Same objections.
16       A.   If she decided to work for free without
17   the illegal agreement and antitrust, then yes.
18   BY MS. LUEDTKE:
19       Q.   Do you have a view on whether Vernon
20   Norwood should have been paid more or less than
21   you for his time as a volunteer coach?
22            MR. GRALEWSKI:
23                 Objection to form, incomplete
24            hypothetical, lacks foundation, calls
25            for speculation, calls for a legal
```

Page 186

1                conclusion, and calls for expert

2                testimony.

3          A.   Are you asking should he have been more

4     or equal to my pay?  I don't really know the

5     numbers.  And, also, this is Louisiana; I worked

6     in Arizona.  Cost of living is way much more

7     there.  So just off the cost of living I would

8     assume it would be more.

9                But other than that, I do not have exact

10    numbers to give on how much he should have been

11    paid or how does the payment works.

12    BY MS. LUEDTKE:

13         Q.   So the cost of living is more in Arizona

14    than it is in Louisiana?

15         A.   Correct.

16         Q.   And so you think it would be fair to

17    potentially pay coaches more in Arizona, where

18    it's more expensive to live, than you would pay

19    coaches in Louisiana, where it's less expensive to

20    live?

21              MR. GRALEWSKI:

22                   Objection to form, incomplete

23              hypothetical, calls for a legal

24              conclusion, calls for expert testimony,

25              lacks foundation, and calls for

                                         Page 187

1          speculation.
2      A.   I don't know what they should -- who
3  should be paid what.  It could vary -- like I
4  said, it could vary on numerous amount of things.
5  We can -- the sport, the school, the division.  I
6  feel like it varies, so I can't give you an exact
7  number.
8  BY MS. LUEDTKE:
9      Q.   The amount that a volunteer coach should
10 have been paid could vary based on the sport?
11          MR. GRALEWSKI:
12              Objection to form, asked and
13          answered, incomplete hypothetical, it
14          calls for a legal conclusion, and it
15          calls for expert testimony.
16     A.   It could vary on numerous amount of
17 things.
18 BY MS. LUEDTKE:
19     Q.   What things other than the sport, the
20 school, the division and the location?
21          MR. GRALEWSKI:
22              Misstates testimony, asked and
23          answered, incomplete hypothetical, lacks
24          foundation, calls for speculation, it
25          seeks a legal conclusion, and it seeks

                                    Page 188

```
 1              foundation, calls for speculation, calls
 2              for a legal conclusion, and calls for
 3              expert testimony.
 4       A.   So I said the location, the school, the
 5   division, and I'll say et cetera, because it
 6   varies.  So I can't -- I don't know, we can make a
 7   bubble map or something.  I don't know.  It could
 8   depend on a lot of things that -- I am not in the
 9   HR department.  I don't know.  I don't know.  I
10   don't know.
11   BY MS. LUEDTKE:
12       Q.   What would you put in your bubble map?
13              MR. GRALEWSKI:
14                 Same objections.  This entire line
15              of questioning is improper.  It is an
16              incomplete hypothetical, it calls for a
17              legal conclusion, seeks expert
18              testimony, speculation, and foundation.
19       A.   We can -- I don't know what they should
20   be paid.  I don't even know if I'm getting paid
21   the right amount at my own job.
22   BY MS. LUEDTKE:
23       Q.   Your job at Calvary?
24       A.   Yes.  So I'm not sure of the numbers.
25   Like I don't know.
```

Page 191

1    State.

2         A.    Could you repeat your question.

3         Q.    Sure.  I'm just asking if you are

4    familiar with alumni using the Arizona State

5    weight room who are not employees of Arizona State

6    or otherwise affiliated with Arizona State, like

7    actively affiliated with Arizona State?

8         A.    Through word of mouth, we know who

9    graduated with track and field.

10        Q.    So track and field alums?

11        A.    Yes.

12        Q.    Mr. -- your lawyer --

13              MR. GRALEWSKI:

14                   Gralewski.

15   BY MS. LUEDTKE:

16        Q.    Your lawyer asked you why you believe

17   you should have been hired as a paid Division 1

18   coach.

19              Do you remember that?

20        A.    Yes.

21        Q.    When you started working as a coach at

22   Arizona State, you had no coaching experience,

23   correct?

24        A.    That's not correct.

25        Q.    What was your coaching experience?

Page 225

1          A.    I -- my coaching experience comes from

2    doing the sport and competing inside the sport.

3    And when I ran summer track, we would have younger

4    kids there, so -- and also my high school, I would

5    go out and help out them during my off periods,

6    like collegiate breaks and stuff like that.

7          Q.    You had no experience being a paid track

8    coach?

9          A.    No.

10         Q.    And you had no experience having any

11   formal coaching title, correct?

12         A.    No coaching title.

13               MS. LUEDTKE:

14                    All right.  I don't have any further

15               questions for the witness.

16               MR. GRALEWSKI:

17                    And I don't either, and I assume

18               Garrett doesn't, so I think we are done.

19               THE VIDEOGRAPHER:

20                    Before we go off the record, would

21               anybody like a copy of the video?

22               MS. LUEDTKE:

23                    I don't need one yet, but I likely

24               will later.  And I would like the rough

25               and regular delivery.

Page 226

```
1                    REPORTER'S PAGE
2            I, RITA A. DEROUEN, Registered
3   Professional Reporter (RPR #6908) and Certified
4   Court Reporter in and for the State of Louisiana,
5   (CCR #2014018), as defined in Rule 28 of the
6   Federal Rules of Civil Procedure and/or Article
7   1434(B) of the Louisiana Code of Civil Procedure,
8   do hereby state on the Record:
9                 That due to the interaction in the
10  spontaneous discourse of this proceeding, dashes
11  (--) have been used to indicate pauses, changes in
12  thought, and/or talkovers; that same is the proper
13  method for a Court Reporter's transcription of
14  proceeding, and that the dashes (--) do not
15  indicate that words or phrases have been left out
16  of this transcript;
17                 That any spelling of words and/or names
18  which could not be verified through reference
19  material have been denoted with the phrase
20  "(phonetic)";
21                 That (sic) denotes when a witness stated
22  word(s) that appears odd or erroneous to show that
23  the word is quoted exactly as it stands.
24
25                      RITA A. DEROUEN, RPR, CCR

                                         Page 228
```

1              REPORTER'S CERTIFICATE

2         I, Rita A. DeRouen, Registered

3    Professional Reporter (RPR #6908) and Certified

4    Court Reporter (Certificate #2014018) in and for

5    the State of Louisiana, as the officer before whom

6    this testimony was taken, do hereby certify that

7    on October 15, 2024, in the above-entitled and

8    numbered cause, the deposition of SHANNON RAY,

9    after having been duly sworn by me upon authority

10   of R.S. 37:2554, did testify as hereinbefore set

11   forth in the foregoing 228 pages;

12

13        That this testimony was reported by me

14   in stenographic shorthand, was prepared and

15   transcribed by me or under my personal direction

16   and supervision, and is a true and correct

17   transcript to the best of my ability and

18   understanding;

19

20        That the transcript has been prepared in

21   compliance with transcript format guidelines

22   required by statute or by rules of the board;

23

24        That I have acted in compliance with the

25   prohibition on contractual relationships, as

                                        Page 229

1    defined by Louisiana Code of Civil Procedure
2    Article 1434 and in rules and advisory opinions of
3    the board;

4

5            That I am not of Counsel, nor related to
6    any person participating in this cause, and am in
7    no way interested in the outcome of this event.

8

9            SIGNED THIS 31st DAY OF OCTOBER, 2024.

10

11

12

13            RITA A. DEROUEN
              Registered Professional Reporter
14            Certified Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                                        Page  230