# Exhibit 15

1                UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
2
                        CASE NO.:  23-cv-00425-WBS-CSK
3

4
      JOSEPH COLON, SHANNON RAY,
5     KHALA TAYLOR, PETER ROBINSON, and
      KATHERINE SEBBANE, individually and
6     on behalf of all those similarly
      situated,
7
               Plaintiffs,
8
      vs.
9
      NATIONAL COLLEGIATE ATHLETIC
10    ASSOCIATION, an unincorporated association,
11             Defendant.
12    _____/
13
14    PORTIONS OF THE TRANSCRIPT HAVE BEEN
15        DESIGNATED AS CONFIDENTIAL
16
17    VIDEO-RECORDED
      DEPOSITION OF:  KATHERINE SEBBANE
18
      DATE:           October 28, 2024
19
      TIME:           COMMENCED:  10:05 a.m.
20                     CONCLUDED:   5:10 p.m.
21    TAKEN BY:       Defendant
22    PLACE:          Veritext
                      800 North Magnolia Avenue
23                    Suite 400
                      Orlando, Florida 32803
24
      REPORTED BY:    Mae Fisher, RMR, CRR
25

                                              Page 1

```
 1                A P P E A R A N C E S:
 2    YINKA ONAYEMI, ESQUIRE
      Of:  Fairmark Partners, LLP
 3         1825 7th Street NW
           #821
 4         Washington, DC 20001
           (619) 507-4182
 5         Yinka@fairmarklaw.com
 6    ROBERT GRALEWSKI JR., ESQUIRE
      Of:  Kirby McInerney LLP
 7         1420 Kettner Boulevard
           Suite 100
 8         San Diego, California 92101
           (858) 834-2044
 9         Bgralewski@kmllp.com
10            Counsel for the COLON PLAINTIFFS
11    STEVEN BEREZNEY, ESQUIRE
      Of:  Korein Tillery, LLC
12         505 North 7th Street
           Suite 3600
13         St. Louis, Missouri 63101
           (314) 241-4844
14         Sberezney@koreintillery.com
15         (Via videoconference)
16            Counsel for the SMART PLAINTIFFS
17    MEGAN MCCREADIE, ESQUIRE
      Of:  Munger, Tolles & Olson LLP
18         560 Mission Street
           27th Floor
19         San Francisco, California 94105-2907
           (415) 512-4000
20         Megan.mccreadie@mto.com
21            Counsel for the DEFENDANT
22
      ALSO PRESENT:
23
      ALEX JACOBS
24    Videographer
25
```

                                              Page 2

1       please state them at the time of your appearance.

2       Counsel and all present, including remotely, will now

3       state their appearances and affiliations for the

4       record, beginning with the noticing attorney.

5            MS. MCCREADIE:  Megan McCreadie from the law

6       firm Munger Tolles & Olson on behalf of the defendant

7       NCAA.

8            MR. ONAYEMI:  Yinka Onayemi with Fairmark

9       Partners on behalf of the Colon plaintiffs.

10           MR. GRALEWSKI:  Bob Gralewski, Kirby McInerney

11      on behalf of the witness and proposed class.

12           MR. BEREZNEY:  Steve Berezney from Korein

13      Tillery on behalf of the Smart plaintiffs.

14           THE COURT REPORTER:  Can you raise your right

15      hand, please.

16           Do you solemnly swear or affirm that the

17      testimony you are about to give in this cause will be

18      the truth, the whole truth, and nothing but the truth?

19           THE WITNESS:  I do.

20                     KATHERINE SEBBANE,

21      a witness herein, having been first duly sworn, was

22      examined, and testified as follows:

23                     DIRECT EXAMINATION

24      BY MS. MCCREADIE:

25      Q.  Good morning, Ms. Sebbane.  My name is Megan

Page 6

1             MR. ONAYEMI:  I'll just cut in here to say that
2      of course don't disclose any actual substance of
3      communications.
4             THE WITNESS:  Three, three or four times.
5      BY MS. MCCREADIE:
6      Q.  And roughly how long was each meeting?
7      A.  I don't remember.
8      Q.  Did you speak to anyone besides your counsel
9      about today's deposition?
10     A.  No.
11     Q.  Where did you grow up?
12     A.  Maryland.
13     Q.  Maryland?
14     A.  Frederick, Maryland.
15     Q.  And where do you currently live?
16     A.  Sanford, Sanford, Florida.
17     Q.  And that's like 20, 30 minutes from here?
18     A.  Something like that, yeah.
19     Q.  How long have you been in Sanford?
20     A.  Six -- six, seven weeks.
21     Q.  And why did you move to Sanford?
22     A.  I'm completing a program to become an airline
23     pilot.
24     Q.  Cool.  And where were you before you moved to
25     Sanford six or seven weeks ago?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      Q.  So in summer of 2018, looks like you applied to

2   Seton Hill, to Penn.  Do you remember any other coaching

3   positions to which you applied?

4      A.  I believe Adrian College was in there at that

5   time.

6      Q.  Where is Adrian College?

7      A.  Michigan.

8      Q.  Is it a DIII school?

9      A.  It is.

10     Q.  Was it a paid position at Adrian College to which

11  you applied?

12     A.  It was.

13     Q.  Did you get the job?  Did you get the offer for

14  the job?

15     A.  I believe I accepted the job at Seton Hill before

16  I went up to campus, so I -- I believe I was offered an

17  on-campus interview and I withdrew.

18     Q.  So why -- why did you apply to Seton Hill?

19     A.  I knew the head coach through coaching in

20  general.  She was a new head coach there.  I did always

21  like that area, the Pittsburghish-esque area.  And the

22  program was really good.  And it was my way into

23  Division II.  And her and I saw eye to eye with some

24  coaching, and she really let me take control of a lot of

25  things and when I went to go visit, I like -- I loved

Page 44

CONFIDENTIAL

```
 1    the school and it's -- they're also in a very
 2    competitive Division II conference which is the
 3    Pennsylvania State Athletic Conference, which was really
 4    neat -- is still really neat.
 5       Q.  And are those same reasons the reasons why you
 6    ended up choosing the Seton Hill position?
 7       A.  Yes.
 8       Q.  Any other -- sorry.
 9       A.  That was the Seton Hill position, yes.
10       Q.  Yes.  And are there any other reasons you chose
11    the Seton Hill position ultimately?
12       A.  I think that covered -- I think that covered it,
13    yeah.
14       Q.  Seton Hill position was paid, correct?
15       A.  Correct.
16       Q.  What was the compensation?
17       A.  I believe it was -- I believe it was 10 --
18    10,000, 12,000, 10,000.
19       Q.  Is that a year?
20       A.  Yeah.  Yes.
21       Q.  Was it a part-time position?
22       A.  It was a part-time position, yes.
23       Q.  And what were the hours?
24       A.  I would say similar to Misericordia.  It was --
25    but then in the fall time, it was more -- it was more
```

Page 45

1    need at the University of Pittsburgh and I knew one of

2    the staff members and I essentially -- from there, I

3    essentially applied for the position.

4        Q.  What coaching need had you heard there was at the

5    University of Pittsburgh?

6        A.  They had -- their volunteer assistant I believe

7    ended up going to go play in Australia and they needed

8    somebody to work with defense.

9        Q.  So you had heard that there was a opening for a

10   volunteer assistant position at Pittsburgh?

11       A.  Correct.

12       Q.  And I think you mentioned knowing somebody who

13   was on staff at Pittsburgh.  Who did you know?

14       A.  Very informally, Jillian Van Wagnen.

15       Q.  And she was an assistant coach for the softball

16   team at Pittsburgh at the time?

17       A.  Correct.

18       Q.  Did you apply to any other coaching positions

19   around this time, spring or summer of 2019?

20       A.  I did.

21       Q.  What other positions did you apply to?

22       A.  I believe I applied to Dartmouth and I applied to

23   West Point.

24       Q.  Those are both also DI schools?

25       A.  Yes.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1       Q.   As is -- as is the University of Pittsburgh?

2       A.   Yes.

3       Q.   Was the Dartmouth position paid?

4       A.   Yes.

5       Q.   Was the West Point position paid?

6       A.   I don't -- yes.

7       Q.   Do you recall the salary for the West Point

8    position?

9       A.   I don't.

10      Q.   Do you recall the salary for the Dartmouth

11   position?

12      A.   I recall a range.  I don't remember the exact

13   amount.

14      Q.   What was the range that you recall?

15      A.   Around 30,000.

16      Q.   Did you receive offers at either Dartmouth or

17   West Point?

18      A.   Dartmouth.

19      Q.   But not at West Point?

20      A.   Correct.

21      Q.   Did you have to submit a formal application for

22   the Pittsburgh position?

23      A.   What do you mean by that?

24      Q.   Was there -- you know, did you have to submit a

25   resume or any sort of application materials to

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Pittsburgh?

2        A.  I submitted material to the head coach, yes.

3        Q.  Did you interview for the position?

4        A.  I did.

5        Q.  With whom did you interview?

6        A.  Jodi Hermanek.

7        Q.  And she was the head coach of the softball team

8    at the time?

9        A.  Correct.

10       Q.  Had others applied for the volunteer position at

11   Pittsburgh?

12           MR. ONAYEMI:  Object to form.  Calls for

13       speculation.

14           THE WITNESS:  I'm not the head coach so I have

15       no idea.

16   BY MS. MCCREADIE:

17       Q.  You don't remember hearing if anyone else

18   applied?

19       A.  Not that I can recall, no.

20       Q.  Was the application process to become a volunteer

21   coach different from the application process to become a

22   assistant coach of Pittsburgh?

23           MR. ONAYEMI:  Object to form.  Calls for

24       speculation, lacks foundation.

25           THE WITNESS:  I wouldn't know.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    BY MS. MCCREADIE:

2        Q.  Because you never applied to be an assistant

3    coach at Pittsburgh, a paid assistant coach at

4    Pittsburgh?

5        A.  Correct.

6        Q.  Who had ultimate authority in choosing whether to

7    hire you as a volunteer?

8            MR. ONAYEMI:  Object to form.  Vague and

9        ambiguous, calls for speculation.

10           THE WITNESS:  Could you repeat the question?

11       I'm sorry.

12   BY MS. MCCREADIE:

13       Q.  Who had the ultimate authority to pick you to be

14   the volunteer coach at Pittsburgh?

15       A.  That, I -- I'm not sure.

16       Q.  Did Ms. Hermanek have hiring authority?

17       A.  She offered me the position.

18       Q.  Did you ever receive feedback about why you were

19   chosen for the volunteer position at Pittsburgh?

20       A.  Yes.

21       Q.  What was that feedback?

22       A.  She liked -- she liked that I worked with

23   infield.  She liked my infield philosophy.  She liked

24   that I was a defensive specialist.  And she liked my

25   experience and my track record in my past.

Page 61

1      Q.  What do you mean by your track record in your

2   past?

3      A.  I took -- I took defensive teams that had less

4   than a 900 fielding percentage and we had close -- we

5   had an over 95 percent fielding percentage.

6      Q.  So you mean at your time at Misericordia and

7   Seton Hill?

8      A.  Yep.

9      Q.  And when you were talking about the person who

10  gave you this feedback, that was Ms. Hermanek?

11     A.  Correct.

12     Q.  So it says like in the summer of 2019, you were

13  choosing between the volunteer position at Pittsburgh

14  and the assistant coach position at Dartmouth, correct?

15     A.  Correct.

16     Q.  Why did you end up choosing the Pittsburgh

17  position?

18     A.  Multiple reasons.  Opportunity to coach in the

19  ACC.  University of Pittsburgh is right up the road.

20  And she offered me first.

21     Q.  But did you receive an offer from Dartmouth

22  before you chose the Pittsburgh position?

23     A.  Did I --

24     Q.  Let me rephrase.

25     A.  Sorry.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1      Q.  Did you receive an offer of employment from

2    Dartmouth before you accepted the Pittsburgh position?

3      A.  Yes.

4      Q.  Dartmouth -- Dartmouth is in New Hampshire,

5    correct?

6      A.  Yes.  Or Vermont -- yeah.  New Hampshire.

7      Q.  It's either in Vermont or New Hampshire.

8          And did you -- did you have a preference for

9    staying in the Pittsburgh area?

10     A.  Yes.

11     Q.  You didn't want to move to somewhere quite so

12   remote?

13     A.  Yes.

14     Q.  At the time you were offered the Pittsburgh

15   position, were you told that the position would be for a

16   certain number of years?

17     A.  No.

18     Q.  There was no -- no given end date that you were

19   told?

20     A.  Correct.

21     Q.  And when you agreed to become a volunteer coach

22   at Pittsburgh, you knew that the position was unpaid,

23   correct?

24     A.  Correct.

25          MS. MCCREADIE:  I'll introduce another exhibit.

Page 63

```
 1              THE WITNESS:  Thank you.
 2      BY MS. MCCREADIE:
 3         Q.  This is Plaintiffs' Second Amended Objections and
 4      Responses to Defendant's Second Set of Interrogatories.
 5              Have you seen these before?
 6         A.  Yes.
 7         Q.  If you would flip to page 6, please -- or, I'm
 8      sorry, page 3.
 9         A.  Page 3?
10         Q.  Um-hmm.  Okay.  And you see Interrogatory No. 6
11      towards the top of the page?
12         A.  Yes.
13         Q.  And it says, For each of you individually,
14      identify all paid sports-related positions to which you
15      have applied and the compensation for those positions.
16              Correct?
17         A.  Correct.
18         Q.  Okay.  And your response begins at the bottom of
19      the page?
20         A.  Yes.
21         Q.  All right.  And it reads, Ms. Sebbane applied for
22      the following positions:  Volunteer assistant softball
23      coach position at University of Pittsburgh, assistant
24      softball coach at Emory University, assistant softball
25      coach at Columbia University, head softball coach at
```

Page 189

1     Brandeis University, assistant softball coach at

2     Muskingum University, assistant softball coach at

3     Dartmouth College, assistant softball coach at

4     University of Pennsylvania, assistant softball coach at

5     Adrian College, head softball coach at Salisbury

6     University, assistant softball coach at Chico State,

7     assistant softball coach at Lynn University, assistant

8     softball coach at West Point Academy.  Ms. Sebbane does

9     not recall specific salary advertisements for each of

10    these.

11         Did I read that correctly?

12    A.  Yes.

13    Q.  Okay.  And then there's a brief amendment and

14    that says, Ms. Sebbane also applied for a position on

15    the coaching staff at Thiel College.

16         Did I read that correctly?

17    A.  Thiel.

18    Q.  Thiel College.

19    A.  Right.

20    Q.  I was not guessing that.

21         But between both your original response and your

22    amended respond, does this list all collegiate softball

23    coaching positions to which you applied?

24    A.  Yes.

25    Q.  Okay.  Do you know what the advertised salary was

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1   for the Thiel College coaching position?

2       A.  I don't recall.

3       Q.  And were these all full-time positions?

4       A.  Some were, some weren't.

5       Q.  Do you remember which ones were not?

6       A.  Were not full-time?

7       Q.  Correct.

8       A.  Actually, I really -- I really don't remember.

9       Q.  So these schools listed, Chico State and Lynn

10  University are DII, correct?

11      A.  Correct.

12      Q.  And then Emory, Brandeis, Muskingum, Adrian,

13  Salisbury and Thiel are DIII?

14      A.  Correct.

15      Q.  Okay.  And then Pittsburgh, Columbus, Dartmouth,

16  University of Pennsylvania and West Point are

17  Division I, correct?

18      A.  Correct.

19      Q.  All right.  Could you look back at Exhibit 21.

20  That is a related interrogatory response.

21      A.  Yes.

22      Q.  Can you look at page 12, please.  Do you see

23  Interrogatory No. 7?

24      A.  Yes.

25      Q.  Says, For each of you individually, identify all

                                          Page 191

1    paid sports-related positions you were offered and the

2    compensation you were offered.

3         Correct?

4    A.  Yes.

5    Q.  Could you flip to page 13.

6    A.  Yes.

7    Q.  All right.  So this says for you, Ms. Sebbane was

8    offered positions at University of Pittsburgh, zero

9    salary, Muskingum University, approximately 40,000

10   salary, Dartmouth College, approximately 30,000 salary

11   and Adrian College, approximately $25,000 salary.

12        Did I read that correctly?

13   A.  Yes.

14   Q.  And is that -- this accurate, which is to say did

15   you receive offers from any of the other institutions

16   listed in your responses to Interrogatory No. 6?

17   A.  This is accurate.

18   Q.  Okay.  So of the ones you've listed here, we've

19   already spoken about the Pittsburgh, Penn, Dartmouth and

20   Muskingum positions, correct?

21   A.  Correct.

22   Q.  I think we also briefly touched on the Adrian

23   College offer.

24   A.  Correct.

25   Q.  You received that in 2018, around the same time

Page 192

1      A.   The only one I remember was West Point, but they

2    were going through a head coaching change and it was

3    a -- it was a whole mess, so it wasn't a me issue.  But

4    the rest, no.

5      Q.   Okay.  And what did the folks at West Point tell

6    you about your application?

7      A.   That it would be passed on to the next, I think,

8    head coach that they were in the process of hiring and I

9    just didn't want to wait any longer so I withdrew.

10     Q.   And you took the Pittsburgh position instead?

11     A.   I don't remember when I applied for that job.

12     Q.   So you've applied for DII positions in the past,

13   correct, and have coached a DII?

14     A.   Correct.

15     Q.   What skills are required to coach a DII?

16          MR. ONAYEMI:  Object to form.  Lacks

17      foundation, calls for speculation, it's vague and

18      ambiguous.

19          THE WITNESS:  Really whatever the hiring --

20      whoever's hiring wants.  So I can't really -- I can't

21      really speak to that.

22   BY MS. MCCREADIE:

23     Q.   So it can vary, depending on who is hiring?

24     A.   Correct.

25     Q.   How can it vary?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

 1            MR. ONAYEMI:  Object to form.  Calls for
 2        speculation -- calls for speculation, lacks
 3        foundation.
 4            THE WITNESS:  Really, it's personal preference.
 5    BY MS. MCCREADIE:
 6        Q.  So different coaches can prefer different skills
 7    in coaches?
 8            MR. ONAYEMI:  Object to form.  Calls for
 9        speculation and it lacks foundation.
10            THE WITNESS:  Correct.
11    BY MS. MCCREADIE:
12        Q.  Okay.  And different -- different teams might
13    have different needs in terms of coaches at any
14    particular time?  Is that fair to say?
15            MR. ONAYEMI:  Object to form.  Calls for
16        speculation and it lacks foundation.
17            THE WITNESS:  Correct.
18    BY MS. MCCREADIE:
19        Q.  And different softball coaches or people applying
20    for softball coach positions can have different
21    strengths and weaknesses as a coach?
22            MR. ONAYEMI:  Object to form.  Incomplete
23        hypothetical, calls for speculation and lacks
24        foundation.
25            THE WITNESS:  Correct.

                                        Page  200

1   BY MS. MCCREADIE:

2       Q.  So which coach a head softball coach hires can

3   depend on who the coach thinks he or she can work best

4   with; would that be fair to say?

5              MR. ONAYEMI:  Object to form.  Lacks

6         foundation, calls for speculation.

7              THE WITNESS:  Correct.

8   BY MS. MCCREADIE:

9       Q.  And does which coach a head coach decides to

10  hire --

11             (Court reporter clarification.)

12  BY MS. MCCREADIE:

13      Q.  And does which coach a head softball coach decide

14  to hire depend on how the potential hire fits in with

15  the existing coaching staff?

16             MR. ONAYEMI:  Object to form.  Calls for

17        speculation and it lacks foundation.

18             THE WITNESS:  You're asking if the coach

19        determines whether that person being hired is a good

20        fit?

21  BY MS. MCCREADIE:

22      Q.  Yes.

23             MR. ONAYEMI:  Same objections, if that's a

24        question.

25             THE WITNESS:  It's whatever their preferences

Page 201

```
 1        are.
 2    BY MS. MCCREADIE:
 3        Q.  And in order to know who is going to be hired as
 4    an assistant softball coach, would you have to look at
 5    all the applications for the position?
 6            MR. ONAYEMI:  Object to form.  Calls for
 7        speculation and it lacks foundation.
 8            THE WITNESS:  I'm not a hiring person so I
 9        don't know what the -- I don't know what the
10        legalities of that would be.
11    BY MS. MCCREADIE:
12        Q.  But as a practical matter, were you a head coach,
13    would you need to look at all the applications for a
14    position before deciding on who to hire?
15            MR. ONAYEMI:  Object to form.  It calls for
16        speculation and lacks foundation.  It's an incomplete
17        hypothetical.
18            THE WITNESS:  I'm not a head coach, nor have I
19        been, so I have no clue.
20    BY MS. MCCREADIE:
21        Q.  If you were a head softball coach, how would you
22    go about deciding who to hire as an assistant softball
23    coach?
24            MR. ONAYEMI:  Object to form.  Calls for
25        speculation, lacks foundation.  It's an incomplete
```

Page 202

```
1                    CERTIFICATE OF OATH

2

    STATE OF FLORIDA)

3   COUNTY OF ORANGE)

4

5        I, MAE FISHER, Registered Merit Reporter,

6   Certified Realtime Reporter and Notary Public, State of

7   Florida, certify that KATHERINE SEBBANE personally

8   appeared before me on October 28, 2024, and was duly

9   sworn/affirmed.

10

11       WITNESS my hand and official seal this 7th day of

12  November, 2024.

13

14

15

16                   MAE FISHER, RMR, CRR

                     Notary Public - State of Florida

17                   Commission HH 443649

                     Expires:  January 8, 2028

18

19

20                        Personally known _____

21                 OR Produced Identification X_____

22         Type of Identification Produced Driver's license

23

24

25

                                         Page 239
```

```
 1                    TRANSCRIPT CERTIFICATE
 2      STATE OF FLORIDA)
        COUNTY OF ORANGE)
 3
 4           I, MAE FISHER, Registered Merit Reporter,
        Certified Realtime Reporter and Notary Public, State of
 5      Florida, certify that I was authorized to and did
        stenographically report the deposition of Katherine
 6      Sebbane; that a review of the transcript was not
        requested; and the foregoing transcript, pages 5 through
 7      238, is a true record of my stenographic notes.
 8           I FURTHER CERTIFY that I am not a relative,
        employee, attorney, or counsel of any of the parties,
 9      nor am I a relative or employee of any of the parties'
        attorney or counsel connected with the action, nor am I
10      financially interested in the action.
11
             DATED this 7th day of November, 2024, at Orlando,
12      Orange County, Florida.
13
14
15
16
17
                     MAE FISHER, Notary Public
18                        State of Florida
19
20
21
22
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127