1  CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
   Carolyn.Luedtke@mto.com
2  JUSTIN P. RAPHAEL (State Bar No. 292380)
   Justin.Raphael@mto.com
3  MEGAN McCREADIE (State Bar No. 330704)
   Megan.McCreadie@mto.com
4  CHRISTOPHER CRUZ (State Bar No. 346128)
   Christopher.Cruz@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
6  San Francisco, California 94105-2907
   Telephone:(415) 512-4000
7  Facsimile:(415) 512-4077

8  *Attorneys for Defendant National*
   *Collegiate Athletic Association*

9                      UNITED STATES DISTRICT COURT

10                     EASTERN DISTRICT OF CALIFORNIA

11

12

13  TAYLOR SMART and MICHAEL          Case No. 2:22-cv-02125-WBS-CSK
    HACKER, individually and on
    behalf of all those similarly     **DEFENDANT NCAA'S NOTICE OF**
14  situated,                         **MOTION AND MOTION TO EXCLUDE**
                                      **EXPERT TESTIMONY OF DR. ORLEY**
15            Plaintiffs,             **ASHENFELTER AND DR. DANIEL**
                                      **RASCHER ON CLASS CERTIFICATION;**
16      v.                            **MEMORANDUM OF POINTS AND**
                                      **AUTHORITIES IN SUPPORT THEREOF**
17  NATIONAL COLLEGIATE ATHLETIC
    ASSOCIATION                       Judge:   Hon. William B. Shubb
18                                    Courtroom: 5
              Defendant.              Date:    March 3, 2025
19                                    Time:    1:30 p.m.

20  SHANNON RAY, KHALA TAYLOR,        Case No. 1:23-cv-00425-WBS-CSK
    PETER ROBINSON, KATHERINE
21  SEBBANE, and RUDY BARAJAS,
    individually and on behalf of
22  all those similarly situated,

23            Plaintiffs,

24      v.

25  NATIONAL COLLEGIATE ATHLETIC
    ASSOCIATION, an unincorporated
26  association,

27            Defendants.

28

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2       PLEASE TAKE NOTICE that, on March 3, 2025, at 1:30 p.m., or

3    as soon thereafter as the matter may be heard, in Courtroom 5 of

4    this Court, located at 501 I Street, Sacramento, California,

5    Defendant National Collegiate Athletic Association ("NCAA") will,

6    and hereby does, move this Court pursuant to Federal Rule of Civil

7    Procedure 702 for an order excluding the testimony of Dr. Orley

8    Ashenfelter and Dr. Daniel Rascher in connection with Plaintiffs'

9    Motions for Class Certification in the above-captioned actions.

10      This Motion is based upon the following Memorandum of Points

11   and Authorities, the Declaration of Megan McCreadie, all other

12   materials supporting this Motion, all pleadings on file, including

13   Defendant's concurrently filed Opposition to Plaintiffs' Motions

14   for Class Certification and supporting documents, and any other

15   matter submitted before or at the hearing on the Motion.

16

17   DATED:  December 20, 2024    MUNGER, TOLLES & OLSON LLP

18

19                              By:   _/s/ Justin P. Raphael_

20                                    JUSTIN P. RAPHAEL

21                                    *Attorneys for Defendant National*
                                      *Collegiate Athletic Association*
22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

**Page**

2

3  MEMORANDUM OF POINTS AND AUTHORITIES...............................1

4  I.    INTRODUCTION................................................1

5  II.   RELEVANT BACKGROUND.........................................4

6     A.    The Coaching Landscape and Data Available To
             Experts................................................4

7

       B.    Dr. Ashenfelter's Model................................6

8
       C.    Dr. Rascher's Model....................................9

9
   III.  LEGAL STANDARDS.............................................10

10
    IV.   ARGUMENT....................................................11

11
       A.    Both Experts Fail to Address Standard Economic
             Factors in Determining Earnings........................11

12

13     B.    Neither Expert Addresses Sample Selection Bias.........17

14     C.    Dr. Ashenfelter's Model Relies on Arbitrary Groups
             of Different Sports....................................26

15
    V.    CONCLUSION..................................................30
16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

1

**TABLE OF AUTHORITIES**

2

Page(s)

3 FEDERAL CASES

4 *Allgood v. Gen. Motors Corp.*,
    No. 102CV1077DFHTAB, 2006 WL 2669337 (S.D. Ind. Sept.
5    18, 2006) .......................................................25

6 *Bickerstaff v. Vassar Coll.*,
    196 F.3d 435 (2d Cir. 1999), as amended on denial of
7    reh'g (Dec. 22, 1999) ..........................................16

8 *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013) ..........................25
9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
10    509 U.S. 579 (1993) .....................................1, 4, 11

11
*Ellis v. Costco Wholesale Corp.*,
12    657 F.3d 970 (9th Cir. 2011) ...................................10

13 *Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ..................................11
14

*Gen. Elec. Co. v. Joiner*,
15    522 U.S. 136 (1997) ............................................11

16
*In re Google Play Store Antitrust Litigation*,
17    No. 20-CV-05761-JD, 2023 WL 5532128 (N.D. Cal. Aug.
    28, 2023) ..................................................26, 27
18

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
19    254 F.3d 825 (9th Cir. 2001) ...................................11

20 *Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................11
21

*Law v. NCAA*,
22    1996 WL 34400119 (D. Kan. 1996) ....................2, 14, 15, 29

23
*In re Live Concert Antitrust Litig.*,
24    863 F. Supp. 2d 966 (C.D. Cal. 2012) ..................11, 12, 16

25 *Moussouris v. Microsoft Corp.*,
    311 F. Supp. 3d 1223 (W.D. Wash. 2018) .........................18
26

*Munoz v. Orr*,
27    200 F.3d 291 (5th Cir. 2000) ...................................16

28

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ............................2, 14

*Orthoflex, Inc. v. ThermoTek, Inc.*,
    986 F. Supp. 2d 776 (N.D. Tex. 2013) ........................18

*In re: Pella Corp. Architect & Designer Series Windows
    Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    214 F. Supp. 3d 478 (D.S.C. 2016) .................2, 17, 18, 25

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands
    Corp.*,
    100 F. App'x 296 (5th Cir. 2004) .............................4

*Reed v. Advoc. Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) .............................16

*Werede v. Allright Holdings, Inc.*,
    No. CIV.A03CV01167WDMCBS, 2005 WL 2124553 (D. Colo.
    Sept. 2, 2005) .............................................16

FEDERAL RULES

Fed. R. Evid. 702......................................10, 16, 25

OTHER AUTHORITIES

Elka Torpey, *Same Occupation, Different Pay: How Wages
    Vary*, U.S. BUREAU OF LAB. STAT. (May 2015),
    https://www.bls.gov /careeroutlook/2015/article/wage-
    differences.htm ...........................................13

Federal Judicial Center, Reference Manual on Sci. Evid.
    § 211 (3d ed.) .............................................25

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3      In support of their motions for class certification, the

4  Plaintiffs in both the *Colon* case and the *Smart* case have

5  proffered expert models for predicting what volunteer coaches

6  would have earned.  These models violate basic economic

7  principles.  In order to estimate earnings, an economist should

8  account for the fact that workers with more experience, tenure and

9  skill earn more.  But Plaintiffs' experts did not do that.  An

10 economist should not assume that different jobs are subject to the

11 same supply and demand conditions.  But that is not what the *Colon*

12 Plaintiffs' expert did.  All of this contradicted economic

13 principles that Plaintiffs' experts agreed are standard in the

14 field.  Accordingly, the testimony of Dr. Orley Ashenfelter in the

15 *Colon* case and Dr. Daniel Rascher in the *Smart* case regarding

16 earnings models is unreliable, inadmissible and should be excluded

17 under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

18 (1993).

19     *First*, both experts admittedly failed to control for the

20 textbook economic principle that skill and experience affect

21 earnings.  As Dr. Ashenfelter himself has explained in earlier

22 work, "[s]tandard human capital theory links an individual's

23 earnings to his or her level of education, job experience,

24 industry and industry experience, and an individual's job title in

25 a particular industry."  Declaration of Megan McCreadie

26 ("McCreadie Decl.") Ex. 1 ¶ 96.  Both experts agreed that this

27 human capital theory is fundamental to labor economics.  In his

28 prior work, including in antitrust cases, Dr. Ashenfelter

-1-

1  controlled for "employee-specific variables" in estimating

2  earnings.  *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D.

3  270, 305 (N.D. Cal. 2016).  So did the expert in *Law v. NCAA*,

4  which is Plaintiffs' template for this case.  *See* Aff. of Robert

5  D. Tollison, *Law v. NCAA*, 1996 WL 34400119 (D. Kan. 1996)

6  ("Tollison *Law* Aff.").  But here, Dr. Ashenfelter and Dr. Rascher

7  did not even try to account for skills and experience that affect

8  earnings but vary from coach to coach.  Thus, their earnings

9  models are unreliable and inadmissible.

10      *Second*, both experts failed to address sample selection bias,

11  which they agreed is a well-recognized problem in economic

12  analysis of data.  The basic concept is that "when an expert

13  attempts to draw conclusions about an entire population from a

14  sample-based analysis, the sample[ ] must be chosen using some

15  method that assures the sample[ ] [is] appropriately

16  representative of the larger entity or population being measured."

17  *In re: Pella Corp. Architect & Designer Series Windows Mktg.,*

18  *Sales Pracs. & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 493

19  (D.S.C. 2016) (quotations and citation omitted).  Otherwise, "a

20  study of that sample will tend to produce inaccurate results."

21  *Id.* at 492.

22      Here, both experts estimated earnings for the entire

23  population of volunteers using a sample of salaries for coaches

24  who were hired for positions created after the bylaws were

25  amended.  Those coaches were not representative of all volunteer

26  coaches for reasons related to both supply and demand.  On the

27  supply side, the fact that the coaches in the sample were hired

28  for paid positions suggests that they were more experienced and

skilled than the volunteers, who were not hired for paid positions.  Because more experienced and skilled coaches generally earn more, using salaries of coaches who were hired for paid positions would tend to overestimate what volunteer coaches would have earned.  On the demand side, schools that hired paid coaches after the bylaws were amended likely had higher demand for coaching than schools who did not, which means that they would have been willing to pay more.  Neither expert addressed either of these potential problems with their sample.  That departure from standard economic practice makes both experts' earnings models unreliable.

*Third*, Dr. Ashenfelter's earnings model in the *Colon* case improperly assumes that the same supply and demand conditions apply to jobs coaching different sports.  Dr. Ashenfelter conceded that "the market rate is determined by supply and demand," McCreadie Decl. Ex. 2, Ashenfelter Dep., at 183:16-18, and that to calculate a market wage, "you need to use jobs whose salaries are determined by the same factors."  *Id.* at 186:12-15.  But Dr. Ashenfelter used jobs coaching many different sports without analyzing whether salaries for those jobs are the function of the same supply and demand conditions.  Dr. Ashenfelter did not analyze whether jobs coaching indoor volleyball, field hockey, gymnastics, ice hockey, lacrosse, rugby, soccer, softball, track and field, water polo and wrestling are in the same market, but his model grouped together salaries in those sports.  Dr. Ashenfelter admitted that this approach "could mask variation between" sports.  *Id.* at 50:11-14.  It is not reliable to model

1  market wages using salaries that are generated by different supply
2  and demand conditions.

3       This is not a "battle of the experts" about the minutiae of
4  statistical models.  Plaintiffs' experts agreed that the economic
5  principles that form the basis for this motion are standard in the
6  field.  Plaintiffs' failure to apply those principles cannot be
7  excused because they use terms like "t-statistics."  "[R]egression
8  analysis is not a magic formula."  *Piggly Wiggly Clarksville, Inc.*
9  *v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004).
10 Plaintiffs' experts' earnings models do not even try to address
11 differences that standard economic principles say matter.
12 Accordingly, the models are unreliable and inadmissible under
13 *Daubert*.

14 **II.   RELEVANT BACKGROUND**

15       **A.    The Coaching Landscape and Data Available To Experts**

16       The NCAA has bylaws governing collegiate sports in
17 Division I, the Division at issue in this lawsuit.  The bylaws are
18 adopted by the membership of the NCAA, comprised of colleges and
19 universities across the country of varying sizes and with varying
20 priorities for their sports programs.  McCreadie Decl. Ex. 5,
21 Fraser Dep., at 51:13-54:9.  The coaching bylaws set forth the
22 maximum number of coaches that a Division I member school can pay
23 in each sport that the school sponsors.  *Id.* at 128:17-129:14.
24 Each member school chooses how many sports to sponsor and, in each
25 sport, how many coaches to hire and whether or not to pay them.
26 Each school may structure their coaching staff differently.  Most
27 schools will have a head coach and then several assistant coaches
28 for each sport.

1    Some schools choose to hire and pay assistant coaches up to

2 the maximum number allowed in each sport, and others do not.

3 There is variation across schools and across sports.  *See*

4 Defendant's Opposition to Plaintiffs' Motions for Class

5 Certification ("Opp") at 23-26, 35-36, 93.  Some schools choose to

6 pay some of their assistant coaches significantly more than other

7 assistant coaches in the same sport.  *See id.* at 93.  Some schools

8 choose to pay assistant coaches in one sport more than assistant

9 coaches in other sports.  *See id.*  And some choose not to pay some

10 of their assistant coaches at all even though the bylaws would

11 permit doing so.  *See id.* at 23-26, 35-36.

12    Until 2023, in most sports, NCAA bylaws allowed member

13 schools to hire an *additional* volunteer coach in addition to the

14 maximum number of paid coaches in that sport.  As the name

15 implies, the bylaws prohibited the school from paying the

16 volunteer coach.  *See* McCreadie Decl. Ex. 5, Fraser Dep., at

17 129:22-132:12.  Thus, for example, before July 1, 2023, baseball

18 programs could hire up to three paid coaches as well as a

19 volunteer coach for a total of four coaches.

20    In early 2023, the NCAA membership amended the bylaws,

21 eliminated the formal position of volunteer coach and, in most

22 sports where volunteers had been permitted, increased the number

23 of paid coaches that each team could hire if they chose.  Under

24 the amended bylaws, programs are not required to pay any of their

25 coaches and can choose not to pay one or more coaches on each

26 team.  Thus, for example, under the amended bylaws, baseball

27 programs can now hire up to four paid coaches, but they are not

28

-5-

1  required to do so.  Baseball programs, as well as programs in

2  other sports, may choose not to pay one or more of their coaches.

3       **B.    Dr. Ashenfelter's Model**

4       The putative *Colon* class consists of coaches in 44 different

5  NCAA sports, such as softball, rowing, gymnastics, golf, lacrosse,

6  ice hockey and many more.  Their expert is Dr. Ashenfelter.  His

7  model is based on a sample of salaries earned by coaches at 85 of

8  the more than 300 Division I schools.  Report of Orley Ashenfelter

9  in Support of *Colon* Plaintiffs' Motion for Class Certification, as

10  Corrected November 26, 2024 ("Ashenfelter Report") ¶ 61.[1]  Those

11  85 schools added at least one paid position in 2023 in at least

12  one sport other than baseball beyond the maximum number of paid

13  coaches permitted in that sport during the proposed Class period.

14  *Id.*

15       For each sport in which these schools hired an additional

16  paid coach, Dr. Ashenfelter "rank[ed]" the paid coaches from

17  highest to lowest salary.  *Id.* ¶ 67.  Dr. Ashenfelter then

18  "categorize[d]" each program depending on how many unpaid coaches

19  the amended NCAA bylaws permit each program to hire as of July 1,

20  2023.  *Id.* ¶ 66.  The categories are as follows:

21

22

23

24

25

26

27  [1] The Ashenfelter Report was lodged with the Court on December 13,
2024, along with *Colon* Plaintiffs' Notice of Request to Seal

28  Documents and Amend Filings.

| Paid Coaches Permitted | Sports |
|---|---|
| 3 | women's bowling, women's beach volleyball, men's or women's cross country, men's or women's fencing, men's or women's golf, rifle, men's or women's skiing, men's or women's swimming, men's or women's tennis, women's triathlon |
| 4 | women's field hockey; men's or women's gymnastics; men's or women's ice hockey; men's or women's lacrosse; women's rugby; men's or women's soccer; women's softball; men's or women's track and field; men's or women's volleyball; men's or women's water polo; men's or women's wrestling |
| 5 | women's acrobatics and tumbling; combined cross country; women's equestrian; men's or women's swimming and diving |
| 6 | combined fencing; combined golf; combined skiing; combined swimming; combined tennis; men's or women's track and field/cross country |
| 8 | combined swimming & diving; combined track and field; combined water polo |
| 9 | women's rowing |
| 12 | combined track and field/cross country |
| 13 | Football Championship Subdivision ("FCS") football[2] |

*Id.* Pooling together the salaries for all coaches and all sports in each category, Dr. Ashenfelter calculates the average ratio between the salary of the second-lowest paid coach and the salary of the lowest paid coach to estimate the percentage "stepdown" from the second-lowest salary to the lowest salary. *Id.* ¶¶ 67-68 & Table 5.

To illustrate, take sports in which the NCAA bylaws now permit four paid coaches, such as men's lacrosse and women's softball. *Id.* ¶ 66. Dr. Ashenfelter found that across those

---

[2] Division I football is divided into two subdivisions: FBS football, in which teams are eligible to participate in postseason bowl games such as the Rose Bowl, and the Football Championship Subdivision, where teams are not.

sports, at schools that hired four coaches after the bylaws were amended, the lowest paid coaches on average made 50.5% of what the second-lowest paid coach made.  *See id* ¶ 68 & Table 5.

To calculate damages, Dr. Ashenfelter assumed that all Division I programs for all sports in each category would have paid all volunteers the salary of the lowest paid coach in the actual world adjusted by the same calculated "stepdown" percentage.  *See id.* ¶ 71.  Thus, Dr. Ashenfelter assumed that *all* men's lacrosse programs would have hired the coaches who volunteered at a salary equal to 50.5% of the salary of their lowest paid assistant men's lacrosse coach—even if those programs did not hire an additional paid coach after the bylaws permitted them to do so.  *See id.* ¶ 71.  Dr. Ashenfelter did not take into account whether that calculated "stepdown" percentage makes sense for men's lacrosse as compared to women's softball.  He just assumed one uniform stepdown number calculated for all sports that were allowed under the rules to pay four coaches.  *See id.* ¶¶ 65-71.

As explained below, Dr. Ashenfelter did not do anything to account for the possibility that the coaches in his sample who were hired for new paid positions were different from the coaches who worked as volunteers in ways that would affect their earnings. McCreadie Decl. Ex. 2, Ashenfelter Dep., at 240:23-241:3.  He did not do anything to determine whether the coaches hired for new positions were more experienced, tenured or skilled than the volunteers, and did not account for that possibility.  And he did not do anything to account for differences in qualifications or resulting pay across sports.

1          **C.   Dr. Rascher's Model**

2          The putative class in the *Smart* case consists of volunteer

3    baseball coaches.  Their expert is Dr. Rascher.  To estimate

4    damages for coaches who volunteered at programs during the class

5    period that did *not* hire an additional paid baseball coach after

6    the bylaws permitted them to do so in 2023, Dr. Rascher used

7    salaries earned by coaches at 105 Division I schools that did hire

8    a third paid assistant baseball coach after the bylaws were

9    amended.  Amended Expert Declaration of Daniel A. Rascher in

10   Support of Motion for Class Certification, dated Nov. 7, 2024, ECF

11   64-02 ("Rascher Report") ¶ 182 & n.198; McCreadie Decl. Ex. 3,

12   Rascher Dep., at 222:2-7.  Dr. Rascher divided the Division I

13   baseball programs into deciles based on their expenditures on

14   baseball.  Rascher Report ¶ 184 & n.198.  He then compared the

15   salaries that schools that did not hire additional paid coaches

16   paid to the average salaries paid by schools in the same decile.

17   Specifically, he divided (1) the salaries that schools that did

18   not hire additional paid coaches paid their assistant baseball

19   coaches in the actual world by (2) the average salaries that

20   baseball programs in each decile paid to their two highest paid

21   assistant coaches.  McCreadie Decl. Ex. 3, Rascher Dep., at

22   220:25-222:7; Rascher Report ¶ 184.

23         To calculate damages, Dr. Rascher assumed that this same

24   ratio of salaries for the two highest paid assistant coaches in

25   each decile in the actual world would have held for salaries paid

26   to the lowest-paid coaches in the but-for world.  *See* Rascher

27   Report ¶¶ 184-85.  Thus, if in the 2023-2024 season Program A—

28   which did *not* hire an additional paid coach—paid its assistant

coaches 75% of what schools in its decile paid, then Dr. Rascher
assumed that Program A would have paid its volunteers 75% of what
coaches who were hired for new positions at programs in that
decile were paid in the 2023-2024 season, adjusted for inflation
in coaching salaries.[3]

    As explained below, Dr. Rascher did not do anything to
account for the possibility that the coaches in his sample who
were hired for new paid positions were different from the coaches
who worked as volunteers in ways that would affect their earnings.
*See* McCreadie Decl. Ex. 3, Rascher Dep., at 249:7-24.  He did not
do anything to determine whether the coaches hired for new
positions were more experienced, tenured or skilled than the
volunteers, and did not account for that possibility.

**III. LEGAL STANDARDS**

    Under Federal Rule of Evidence 702, "[a] witness who is
qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if
the proponent demonstrates to the court that it is more likely
than not that" (among other things) "the testimony is the product
of reliable principles and methods" and "the expert's opinion
reflects a reliable application of the principles and methods to
the facts of the case."  Fed. R. Evid. 702.

---

[3] To estimate what volunteers at baseball programs who hired a
third paid assistant coach in 2023-2024 would have earned,
Dr. Rascher simply assumed that those volunteers would have earned
the same amount as the coaches who were actually hired for the
newly created positions (adjusted for inflation in coaching
salaries).  McCreadie Decl. Ex. 3, Deposition of Daniel Rascher,
at 220:14-24, 249:7-250:11; Rascher Report ¶¶ 184-85.

Under Rule of Evidence 702, this court acts as a "gatekeeper" to ensure that expert testimony is reliable. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The purpose of judicial gatekeeping under Rule 702 is "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

"To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citation omitted). Courts exclude expert testimony based on assumptions that are "not sufficiently founded on facts." *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831–32 (9th Cir. 2001). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV.  ARGUMENT

### A.  Both Experts Fail to Address Standard Economic Factors in Determining Earnings

Plaintiffs' experts' models of what volunteer coaches supposedly would have earned if NCAA Division I bylaws had permitted teams to pay additional coaches are unreliable because they fail to control for factors that standard economics finds have a significant effect on earnings. The "key question

regarding the admissibility of" expert "statistical analyses is whether they account for the 'major factors.'"  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012).  "The importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation."  *Id.* at 973.  Both Dr. Ashenfelter and Dr. Rascher testified that workers' experience, tenure and skill are major factors in their earnings.  *See* McCreadie Decl. Ex. 2, Ashenfelter Dep., at 71:18-72:4; *id.* Ex. 3, Rascher Dep., at 230:1-10.  But neither accounted for these factors.

**Ashenfelter.**  Dr. Ashenfelter characterized this principle, known as "human capital theory," as "standard in labor economics," *id.* Ex. 2, Ashenfelter Dep., 74:20-23; *see also id.* at 41:5-12, and the "norm" in the field—"one of the topics that we always cover."  *Id.* at 72:5-12.  Indeed, nearly fifty years ago, Dr. Ashenfelter wrote in a published academic paper that "any theory of the determination of earnings will imply that current earnings are the result of a variety of historical factors," including experience, and that "good summary measures" of a worker's cumulative experience are "age and previous earnings."  McCreadie Decl. Ex. 9.  He also provided sworn testimony in a prior antitrust case that "[s]tandard human capital theory links an individual's earnings to his or her level of education, job experience, industry and industry experience, and an individual's job title in a particular industry."  McCreadie Decl. Ex. 1 ¶ 96.

**Rascher.**  Dr. Rascher agrees that, according to "standard labor economics," workers' skills will affect their wages.  *Id.* Ex. 3, Rascher Dep., at 96:10-97:18.  He testified that, according

-12-

to standard human capital theory, workers' pay is a function of their value and "individual factors can sort of drive what that value is." *Id.* at 230:24-231:9.  Dr. Rascher acknowledged that this principle would be found in a "labor economics textbook." *Id.* at 231:17-23.  Indeed, Dr. Rascher's own source from the Bureau of Labor Statistics (which he testified is "generally reliable," *id.* at 239:2-8) states:  "Everyone brings unique skills and abilities to a job.  And no two jobs are exactly alike. Variations affect pay for jobs within the same occupation.  Often, the more pronounced these variations are, the bigger the wage difference."[4]  *See* Rascher Report ¶ 74 n.87 (citing the source).

Thus, there is no dispute that "experienced workers usually earn more than beginners.  Workers who have in-demand skills also may earn more."[5]  *See also* McCreadie Decl. Ex. 4, Report of Jee-Yeon K. Lehmann (hereinafter "Lehmann Report"), ¶¶ 126-36 (discussing Dr. Ashenfelter's failure to account for various factors impacting human capital, including the impact on his results).

There also is no dispute that experience and skills vary from worker to worker:  in Dr. Rascher's words, "every person is different."  McCreadie Decl. Ex. 3, Rascher Dep., at 97:20-23, 240:2-6, 247:22-248:13, 251:25-252:2.  In fact, Dr. Rascher testified that it is "textbook" economics that "variations in [] skill affect pay for jobs within the same occupation."  *Id.* at

---

[4] Elka Torpey, *Same Occupation, Different Pay: How Wages Vary*, U.S. BUREAU OF LAB. STAT. (May 2015), https://www.bls.gov /careeroutlook/2015/article/wage-differences.htm.

[5] *Id.*

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY

242:5-24.  That is why economists typically control for these employee-specific factors when trying to isolate the effect of a defendant's conduct or an external event on earnings.  *See* Lehmann Report ¶ 132 (noting that "Dr. Ashenfelter's own previous expert work and academic work underscores the importance of controlling for variations in the levels and types of human capital in determining compensation").

For example, Dr. Ashenfelter controlled for employee-specific factors in estimating earnings in an antitrust case where the plaintiffs alleged that animation studios agreed not to recruit or hire each other's employees.  He used compensation data "to estimate the standard human capital earnings model" for the defendants.  *Nitsch*, 315 F.R.D. at 299.  His model used "age as a proxy for an individual's total job market experience" and "tenure with the current employer to account for the fact that earnings increase as the total job market experience and tenure with the employer increase."  McCreadie Decl. Ex. 1 ¶¶ 98, 113-114.  In the animation studio case, Dr. Ashenfelter included variables for those factors in his regression to control for their effect on earnings.  *See id.*; *see also Nitsch*, 315 F.R.D. at 305 (noting that "Dr. Ashenfelter's regression model controls for . . . employee-specific variables, such as age and tenure with the Defendant"); McCreadie Decl. Ex. 2, Ashenfelter Dep., at 244:3-7.  Dr. Ashenfelter also has controlled for how workers' experience affects their earnings as an expert in discrimination cases.  *Id.* at 78:22-79:5.

The plaintiffs' expert in *Law v. NCAA*, which Plaintiffs herald as the proper comparator for this case, also used age to

control for experience in modeling what Division I coaches would
have earned if NCAA bylaws had not been in effect.  In that case,
Dr. Robert Tollison stated in his expert report that it "is well
known among economists [that] age has an independent effect upon
worker earnings, due, for example, to the accumulation of
experience and human capital over time."  Tollison *Law* Aff., 1996
WL 34400119.  According to Dr. Tollison's report in the *Law* case,
"it is appropriate to account for the effect of age on earnings in
the basic damage model."  *Id.*  In fact, he stated that this was
the "first order of business" in order to "to allow for the
control of other factors that affect coaches' earnings and hence
the estimation of damages."  *Id.*  Dr. Tollison accordingly used a
regression "to estimate the impact of age on coaches' earnings."
*Id.*

     Unlike Dr. Ashenfelter in prior cases and unlike the
plaintiffs' expert in the *Law* case, here neither Dr. Ashenfelter
nor Dr. Rascher controlled for experience, skill, tenure, age or
other factors that standard economics finds affect earnings.  *See*
McCreadie Decl. Ex. 2, Ashenfelter Dep., at 242:7-243:4, 250:20-22
("Q. In this case you did not control for employee specific
effects?  A. That is correct."); *id.* Ex. 3, Rascher Dep., at
257:22-258:3.

     In short, both Dr. Ashenfelter and Dr. Rascher (1) agreed
that it is standard economics that workers' earnings depend on
(among other things) their skills and experience, (2) agreed that
experience and skills vary from worker to worker, but (3) did not
make any attempt to control for differences in workers' experience
and skills in estimating earnings.  This could be why

Dr. Ashenfelter's model makes significant errors in predicting actual coach salaries, estimating that coaches would have made several times more than, or only a fraction of, what they actually made after the bylaws were amended.  *See* Lehmann Report ¶ 124 & Exhibit 10.  To take just one example, Dr. Ashenfelter's model predicted that the lowest-paid Women's Volleyball coach at the University of Utah would receive around $36,000, yet they actually received around ▮▮▮▮▮.  *Id.* ¶ 125.

Dr. Ashenfelter and Dr. Rascher failed to account for a textbook principle of labor economics and, frankly common sense, that more skilled, experienced workers are paid more.  *See Reed v. Advoc. Health Care*, 268 F.R.D. 573, 594-95 (N.D. Ill. 2009) (economist's testimony was "essentially inadmissible" where his earnings model "fails to account" for factors such as "nurse performance and merit . . . that may play into an individual nurse's" wage); *Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 975 (excluding expert analysis that "fails to account for differences in artist quality/popularity" where "[c]ommon sense dictates that a more popular music artist typically will command higher ticket prices than a less popular artist").

Accordingly, their earnings models are unreliable and inadmissible under Rule 702.  *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (court properly excluded testimony of expert who "admitted to failing to consider other variables such as education and experience as explanations for any observed discrepancy between promotion rates"); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) (same where expert did "not even purport to account for two

-16-

1  of the[] major variables" in salaries: "merit and seniority");

2  *Werede v. Allright Holdings, Inc.*, No. CIV.A03CV01167WDMCBS, 2005

3  WL 2124553, at *5 (D. Colo. Sept. 2, 2005) (same where expert

4  incorporated "no consideration of variables of education,

5  experience and so forth").

6       **B.    Neither Expert Addresses Sample Selection Bias**

7       Both experts' earnings models are unreliable and should be

8  excluded for the related but independent reason that they do not

9  address sample selection bias, which is a fundamental problem with

10 statistical analysis in economics.  In a nutshell, the issue is

11 that both experts' models use a sample of salaries of coaches who

12 *were* hired as paid assistant coaches in the real world to predict

13 salaries of volunteer coaches who were not.  *See* Lehmann Report

14 ¶¶ 137-42, 166-67.  As compared to volunteers who were not hired

15 for paid positions, the coaches who were hired as paid assistant

16 coaches in the sample were likely (1) more skilled and

17 experienced, and (2) hired by schools that had greater demand for

18 coaches.  Together, those factors would have increased the

19 salaries of coaches in the sample compared to many volunteers.

20 But neither expert tried to account for that risk of error from

21 the sample.

22       The sample selection problem arises "where experts have

23 attempted to draw generalizable conclusions from limited data."

24 *Pella Corp.*, 214 F. Supp. 3d at 492.  "[W]hen an expert attempts

25 to draw conclusions about an entire population from a sample-based

26 analysis, the sample[ ] must be chosen using some method that

27 assures the sample[ ] [is] appropriately representative of the

28 larger entity or population being measured."  *Id.* at 493 (citation

-17-

omitted).  If "a sample is drawn from a subsection of the overall
population that possesses some trait not shared by the remainder
of the population, a study of that sample will tend to produce
inaccurate results if this subsection-specific trait affects or
correlates with the dependent variable" that the expert is trying
to study.  *Id.* at 492.

"This type of systematic difference between the observations
included in the study versus those that are not renders expert
testimony based on these data unreliable."  *Orthoflex, Inc. v.
ThermoTek, Inc*., 986 F. Supp. 2d 776, 805 (N.D. Tex. 2013); *see
also Moussouris v. Microsoft Corp*., 311 F. Supp. 3d 1223, 1244
(W.D. Wash. 2018) ("Representativeness is essential to the
reliability of a study because to the extent that a sample
systematically differs from the population, inferences about the
population from the sample are misleading.") (quotations omitted).

Thus, according to Dr. James Heckman (who won the Nobel Prize
in Economics in part for his work on the sample selection bias
problem, which is "very famous . . . in labor economics," *see*
McCreadie Decl. Ex. 2 at 63:14-21, 64:8-11), the "essence of the
selection problem" is the use of data regarding a sample that is a
"distorted representation" of the population the researcher is
trying to study so that the sample "does not accurately describe
the true population."  *Id*. Ex. 6; *see also* Lehmann Report ¶ 138
("Selection bias occurs when the sample used for analysis is not
randomly selected from the population, leading to systematic
differences between those included in the sample and those
excluded.").  Both of Plaintiffs' experts agreed.

1    **Ashenfelter.**  Dr. Ashenfelter testified that "the sample

2   selection bias problem arises where there is some difference

3   between the population reflected in the data that you're looking

4   at and the population that you're trying to study."  McCreadie

5   Decl. Ex. 2, Ashenfelter Dep., at 62:25-63:7.  According to Dr.

6   Ashenfelter, it is "important in labor economic analysis to avoid

7   sample selection bias."  *Id.* at 64:12-14.  He testified that it is

8   a "standard technique in economics" to address sample selection

9   bias by using a random sample.  *Id.* at 142:24-143:15.  But Dr.

10  Ashenfelter did not use a random sample.  *Id.* at 143:16-23.

11  Instead, he based his damages model on a hand-picked sample of

12  coaches who were hired for paid positions created after the bylaws

13  were amended.  *Id.* at 207:15-19, 210:5-18.

14      Dr. Ashenfelter did not study how the qualifications of any

15  coach who was hired as an additional paid coach after the bylaws

16  were amended (and in the sample) compared to the qualifications of

17  any coach who volunteered in the same sport in the same school

18  during the class period.  *Id.* at 239:12-17.  In fact, Dr.

19  Ashenfelter did not investigate the qualifications of any

20  Division I coach compared to any other Division I coach.  *Id.* at

21  173:9-12.  Accordingly, Dr. Ashenfelter could not rule out that

22  coaches who were hired for additional paid coaching positions were

23  more skilled or experienced than the coaches who volunteered

24  during the class period.  *Id.* at 238:5-11.

25      Record evidence suggests that was the case.  Named Plaintiffs

26  Khala Taylor and Rudy Barajas were not hired as paid assistant

27  coaches after the NCAA bylaws were changed.  McCreadie Decl.

28  Ex. 7, Taylor Dep., at 241:10-242:1; *id.* Ex. 8, Barajas Dep., at

148:14-149:3.  San Jose State's softball program and Fresno State's women's volleyball program hired other coaches (not their volunteer coaches) as paid assistants.  *Id.* Ex. 7, Taylor Dep., at 204:1-205:5; *id.* Ex. 8., Barajas Dep., at 133:19-134:25.  Indeed, San Jose State would not even agree to allow Ms. Taylor to continue coaching in an *unpaid* capacity following the bylaw change.  *Id.* Ex. 7, Taylor Dep., at 200:13-201:5, 206:6-15.  As Dr. Ashenfelter admitted, according to standard economics, schools would hire the coach with the skills and experience that will provide "the most payoff."  *Id.* Ex. 2, Ashenfelter Dep., at 157:9-22, 158:6-17.  Indeed, the NCAA's expert found evidence that schools have done exactly that since the bylaw repeal.  *See* Lehmann Report ¶ 80 (giving specific examples).

Differences in skill and experience between coaches in the sample and volunteers are important because Dr. Ashenfelter admitted that "it's standard in labor economics that an individual's earnings will depend on their skills and their experience."  McCreadie Decl. Ex. 2, Ashenfelter Dep., at 74:20-23.  Dr. Ashenfelter, however, did not do anything to address the possibility that coaches hired for newly created paid positions would have been paid more than volunteers applying for those positions because they had more valuable skills and experience.  *Id.* at 240:23-241:3 ("Q.  Did you do anything to try to account for or address the possibility that the coaches who were hired as additional paid coaches after the bylaws were amended had more skills or experience than the coaches who were volunteers?  A. No."); *see also* Lehmann Report ¶ 141 (NCAA expert explaining that failure to account for coach-specific skills and experience "will

likely overestimate salaries" because coaches hired for new paid positions are likely to be "more experienced and better qualified than at least some volunteer coaches").

In addition to ignoring differences in coaches' skills, Dr. Ashenfelter also failed to address differences in schools' demand, which he agreed affects market wages.  McCreadie Decl. Ex. 2, Ashenfelter Dep., at 42:18-21, 183:5-18.  Dr. Ashenfelter agreed that schools in the sample that added paid coaching positions could have had "higher demand for coaching services than the schools who did not."  *Id.* at 241:4-9.  But Dr. Ashenfelter did not "do anything to control for that."  *Id.* at 241:10-11; *see also* Lehmann Report ¶ 139 (NCAA expert explaining that failure to control for difference between schools that hired additional paid coaches and those that did not will bias results because schools that hired additional paid coaches likely had greater demand and would have paid more).

In fact, Dr. Ashenfelter deliberately excluded evidence from schools that did not add paid coaching positions after the bylaws were amended.  McCreadie Decl. Ex. 2, Ashenfelter Dep., at 210:5-18.  For example, Plaintiff Rudy Barajas was hired to coach women's volleyball at Fresno State after the bylaws were amended, but was not paid.  *Id.* Ex. 8, Barajas Dep., at 132:23-134:6.  Dr. Ashenfelter acknowledged that Mr. Barajas's rate was not dictated by the NCAA rules and that Mr. Barajas's salary would affect supply and demand for volleyball coaching.  *Id.* Ex. 2, Ashenfelter Dep., at 214:16-215:1, 216:12-19.  But Dr. Ashenfelter did not include Mr. Barajas's salary of zero in his damages model.  *Id.* at 217:9-13.  Nor did he do any analysis to identify how many

-21-

1  schools had chosen to keep on their volunteer coach at a salary of

2  zero after the bylaw change, as Fresno State did with Mr.

3  Barajas.[6]

4      Because Dr. Ashenfelter has failed to correct for selection

5  bias in any way, his damages model is unreliable.

6      **Rascher.**  Dr. Rascher described sample selection bias in

7  terms of the following question:  when "you're wanting to analyze"

8  a given "population and you take a sample from that population,"

9  "is the sample representative of the population"?  McCreadie Decl.

10  Ex. 3, Rascher Dep., at 127:25-128:8.  Dr. Rascher agreed that it

11  can be "important in econometric analysis to avoid selection

12  bias."  *Id.* at 128:9-12.  He also acknowledged that economists

13  have developed tools to address sample selection problems, and

14  that Dr. Heckman, for example, won the Nobel Prize for developing

15  some of those methods.  *Id.* at 128:22-129:4.

16      Dr. Rascher used salaries of coaches who were hired for

17  newly-created paid positions to predict what volunteers would have

18  earned.  *Id.* at 222:2-7.  He acknowledged that different coaches

19  could provide different value, which might affect their earnings.

20  *Id.* at 242:19-24, 247:22-248:13.  But Dr. Rascher did nothing to

21  compare the skills and experience of coaches hired for newly-

22  created positions and the coaches who volunteered.  He testified

23  that he is not offering any opinion regarding whether the coaches

24  _____

25  [6] Mr. Barajas was not an anomaly.  Other schools—including Arizona
   State University, the University of Arkansas, and UC Davis—have
   continued to hire volunteers in multiple sports.  *See* Opp. at 23-
26  26; *see also* Lehmann Report ¶¶ 71-75 & Exhibits 8-9 (giving
   further examples in the Atlantic Coast Conference, Mountain West
27  Conference, PAC-12 Conference, Big West Conference, and Big South
   Conference).
28

1  hired for newly created paid positions after the bylaws were

2  amended were more qualified or skilled than the coaches who

3  volunteered during the class period.  *Id.* at 180:1-8.

4      Thus, the only evidence in the record on this issue suggests

5  that at least some volunteer baseball coaches were not as

6  qualified as the coaches who were hired instead.  *See, e.g.*,

7  Lehmann Report ¶ 80 (providing examples).  Dr. Rascher's own

8  analysis shows that almost half of the volunteer baseball coaches

9  in the 2022-2023 year were not hired for newly-created paid

10  positions after the bylaws were amended.  McCreadie Decl. Ex. 3,

11  Rascher Dep., at 174:3-14; Rascher Report ¶ 78 & Exhibit 1.

12  Similarly, testimony from the University of Arkansas suggests that

13  Plaintiff Taylor Smart, who was a volunteer baseball coach there,

14  was not considered as qualified as Bobby Wernes, who was hired for

15  a newly created paid assistant baseball coach position there after

16  the bylaws were amended.  Declaration of Clayton Hamilton in

17  Support of NCAA's Opposition to Plaintiffs' Motions for Class

18  Certification ¶ 12.

19      Dr. Rascher himself testified that the volunteer position was

20  a "way for coaches to move their way up" in coaching, *i.e.*,

21  volunteers were still gaining experience so that they could be

22  hired for a paid coaching position.  McCreadie Decl. Ex. 3,

23  Rascher Dep., at 140:6-10; *see also* Opp. at 21-22 (citing

24  examples). Indeed, this is still happening even after the bylaw

25  repeal.  One of Fresno State's baseball coaches is a volunteer who

26  lives with his parents and is gaining valuable experience coaching

27  as an unpaid coach while looking for a paid coaching job.  *See*

28

1  Declaration of Rob Acunto in Support of NCAA's Opposition to

2  Plaintiffs' Motions for Class Certification ¶ 8.

3      Dr. Rascher, however, did not do anything to "control for the

4  possibility" that coaches hired for additional paid positions

5  created after the bylaws were amended were more skilled and

6  experienced than the volunteers who were still trying to gain

7  experience.  McCreadie Decl. Ex. 3, Rascher Dep., at 249:7-24.

8  Nor could he now claim to have tried to address potential sample

9  bias because he testified that he "didn't see a selection bias

10 problem" in the first place.  *Id.* at 129:25-131:25.

11      On the demand side, Dr. Rascher agreed that schools' demand

12 would affect market earnings.  *Id.* at 97:2-18, 230:1-10, 244:5-10.

13 He admitted that, generally, "[t]he schools that hired third paid

14 [baseball] assistants after the bylaws were amended are, all

15 things being equal, more likely to be interested in baseball than

16 the schools that didn't hire third paid assistants."  *Id.* at

17 222:16-23.  But Dr. Rascher did not address the fact that schools

18 that hired paid coaches after the bylaws were amended had greater

19 demand for coaching services.  This, too, results in selection

20 bias and "will tend to overestimate salaries" for third paid

21 assistant baseball coaches in the but-for world.  Lehmann Report

22 ¶ 166.

23          *          *          *          *

24      In short, both Dr. Ashenfelter and Dr. Rascher agreed that

25 sample selection problems are well-known in economics and arise

26 when a sample is not representative of the population being

27 studied.  Evidence suggests that both experts' sample of coaches

28 who were hired for newly created positions after the bylaw change

-24-

1   were not representative because they were more skilled and

2   experienced and were hired by schools with greater demand.  But

3   neither expert even tried to address that issue.

4       Courts exclude testimony from experts who fail to ensure that

5   their samples do not bias their results.  *See Pella Corp.*, 214 F.

6   Supp. 3d at 492-93 (excluding expert's testimony where "focusing

7   on these allegedly defective Windows would seemingly tend to

8   overstate the incidence of Window problems in the overall

9   population"); *Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB,

10  2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) (same where

11  plaintiff's expert "failed to offer any scientific justification

12  for his sample selection choices"); *In re Countrywide Fin. Corp.*

13  *Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1039 (C.D. Cal.

14  2013) (same due to selection bias in plaintiff's expert's model

15  that used a "nonrandom selection of subjects for study").

16      Even if, "as a practical matter, it may be impossible to

17  conduct a rigorous statistical analysis" of the issue the expert

18  has examined," the courts conclude that "convenience is not a

19  substitute for reliability under Daubert."  *Pella Corp.*, 214 F.

20  Supp. 3d at 493; *see also Countrywide*, 984 F. Supp. 2d at 1040

21  ("The Court cannot countenance the use of this type of convenience

22  sample that is 'easy to take but may suffer from serious bias.'")

23  (quoting Federal Judicial Center, Reference Manual on Sci. Evid.

24  § 211 (3d ed.), 2011 WL 7724256, at *46).

25      Plaintiffs' experts' unexplained failure to account for the

26  standard economic problem of selection bias renders both models

27  unreliable and inadmissible under Rule 702.

28

**C.    Dr. Ashenfelter's Model Relies on Arbitrary Groups of Different Sports**

Dr. Ashenfelter's earnings model also is unreliable because he tries to estimate earnings using averages of salaries of coaches in different sports with different supply and demand conditions.  That is, Dr. Ashenfelter tried to estimate a market wage by lumping together salaries of coaches in different markets.  *See* Lehmann Report ¶ 127.

The court's decision in *In re Google Play Store Antitrust Litigation*, No. 20-CV-05761-JD, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023), is instructive as to how an expert cannot construct a damages model that relies on grouping together products that are not generated by the same supply and demand conditions.  In the *Google Play* case, the plaintiff's expert built a damages model to predict the prices of smartphone apps and transactions in those apps.  The model assumed that smartphone apps "in each category" in the app store were "substitutes for one another."  *Id.* at *8.  For example, the model assumed that an app for identifying plants and an app for learning languages were substitutes.

However, this was an "unproven assumption" that "flies in the face of the huge diversity of apps" in the store's "categories." *Id.*  The court found it "obvious that users looking for an app to learn Italian will not try to avoid a price hike by switching to an app that identifies the type of geranium in their kitchen." *Id.* at *7.  Because the plaintiff's expert did "not provide usable guidance on what to do with the myriad of differences and distinctions between apps" and did "not provide any boundaries on

substitution in broad app categories that contain many unlike products," it was unreliable to build a damages model based on those categories.  *Id.*  Because the damages model was "based on assumptions" that were "not supported by the evidence," the Court found that it would "not give the jury a sound basis on which to make a reasoned and reasonable judgment about antitrust impact and damages," and thus was inadmissible.  *Id.* at *9.

The same is true here.  Dr. Ashenfelter's model relies on salaries in categories of sports based not on supply and demand, but on how many paid coaches the amended NCAA bylaws permit a program to hire in each sport.  *See* Lehmann Report ¶¶ 127-28.  In order for that approach to be meaningful, there must be some relationship between salaries for coaching the sports in each group.  As Dr. Ashenfelter testified, "the market rate is determined by supply and demand throughout the entire market," McCreadie Decl. Ex. 2, Ashenfelter Dep., at 183:16-18, and "in order to calculate a relative wage rate that is accurate . . . you need to use jobs whose salaries are determined by the same factors."  *Id.* at 186:12-15.  Thus, Dr. Ashenfelter admitted, "if there's different supply and demand in different Division I sports," then an analysis "based on grouping sports together" would result in some estimates of earnings that "were too high and some that were too low."  *Id.* at 191:2-9.  Such an approach "could mask variation between those sports."  *Id.* at 50:11-14.

Dr. Ashenfelter did not do any analysis to determine whether supply and demand for coaching in one sport affects supply and demand or salaries for coaching in any other sport, and he formed no opinion on that issue: "Q.  Do you have an opinion as to

whether supply and demand for coaches in each Division I sport is the same? A. Well, I haven't done that test, so I haven't done the analysis of what would allow you to say." *Id.* at 189:7-17. Dr. Ashenfelter did not analyze whether "differentials in one sport between salaries for different coaches in that sport are affected by the differentials among salaries in another sport." *Id.* at 163:12-164:2. Indeed, Dr. Ashenfelter did not define any labor market at all. *Id.* at 192:15-20. He therefore reached no opinion on whether, for example, "jobs coaching swimming belong in the same market in the economic sense as jobs coaching softball." *Id.* at 192:22-193:5.

It is obvious that, in general, most people who coach one sport have different skills than most people who coach other sports, and that people qualified to coach one sport generally are not qualified to coach other sports. Dr. Ashenfelter himself testified that workers with "different sets of skills" should be in separate markets. *Id.* at 14:9-25. Even Dr. Rascher in his report agreed that "*coaches in each sport*[] provide their labor services in a distinct market formed around a distinct reference labor product." Rascher Report ¶¶ 73-74 (emphasis added); *see also* McCreadie Decl. Ex. 3, Rascher Dep., at 134:20-135:6. That is because "each sport has its own set of skills that aren't always transferable at the athlete and at the coaching level." McCreadie Decl. Ex. 3, Rascher Dep., at 134:20-135:11.[7]

---

[7] Indeed, Dr. Ashenfelter's own regression model shows that for several groups of sports, the number of permitted coaches is not a statistically significant variable for predicting how salaries of additional paid coaches compare to other coaches' salaries. Ashenfelter Report ¶ 68 & Table 5.

-28-

1    Perhaps that is why the plaintiffs' expert in the *Law v. NCAA*

2  case used a different approach in an antitrust case challenging a

3  different NCAA bylaw related to coach wages.  The plaintiffs'

4  expert in that case (Dr. Tollison) conducted regressions that were

5  "sport-specific" to model damages "for each sport separately."

6  Tollison *Law* Aff., 1996 WL 34400119.

7    That is not what Dr. Ashenfelter did here.  Dr. Ashenfelter

8  tries to estimate market rates of pay for coaches in one sport by

9  using salaries for coaching in other sports that are determined by

10  different supply and demand conditions.  *See* Ashenfelter Report

11  ¶¶ 66-68, 71.  That violates basic economic principles that Dr.

12  Ashenfelter himself acknowledged.

13    Even worse, Dr. Ashenfelter's approach separates salaries of

14  coaches who have similar skills.  Plaintiff Rudy Barajas, who was

15  a volunteer coach in both indoor and beach volleyball, testified

16  that indoor volleyball coaches are qualified to coach beach

17  volleyball and vice versa.  McCreadie Decl. Ex. 8, Barajas Dep.,

18  at 66:18-20, 67:13-16, 69:14-70:2.  Since the pool of potential

19  coaches in both sports overlap, the salaries of coaches in those

20  sports should be related.  But Dr. Ashenfelter's model puts indoor

21  volleyball coach salaries and beach volleyball coach salaries in

22  different categories based on the mere fact that the bylaws permit

23  three paid coaches in one sport and four paid coaches in the

24  other.  *See* Ashenfelter Report ¶ 66.  Dr. Ashenfelter did not

25  explain why this distinction makes sense or contend with Mr.

26  Barajas's testimony.

27    Instead, Dr. Ashenfelter averaged salaries for coaches in

28  indoor volleyball along with salaries for coaches in field hockey,

gymnastics, ice hockey, lacrosse, rugby, soccer, softball, track and field, water polo and wrestling, and averaged salaries for coaches in beach volleyball with salaries for coaches in bowling, cross country, fencing, golf, rifle, skiing, swimming, tennis and triathlon.  *See id.* ¶¶ 66-68, 71.  This makes no economic sense. Indeed, applying Dr. Ashenfelter's model to each sport separately dramatically changes Dr. Ashenfelter's predictions of what coaches in each sport would have earned, which suggests that salaries in each sport are based on different supply and demand conditions. Lehmann Report ¶¶ 127-28 & Exhibit 11.  Dr. Ashenfelter has not analyzed those conditions for any sport, let alone all of them.

Accordingly, in addition to failing to control for factors that affect earnings and to address selection bias, Dr. Ashenfelter's model assumes without any basis that salaries for coaching dozens of different sports are subject to the same supply and demand conditions.  That is an additional reason why his model is unreliable and inadmissible.

**V.   CONCLUSION**

For the reasons set forth above, the NCAA respectfully requests that the Court exclude Dr. Ashenfelter's and Dr. Rascher's earnings models in connection with ruling on Plaintiffs' motions for class certification.

1    Respectfully submitted,

2    DATED:   December 20, 2024        MUNGER, TOLLES & OLSON LLP

3

4                                     By:      /s/ Justin P. Raphael

5                                           JUSTIN P. RAPHAEL

6                                        *Attorneys for Defendant National*
                                         *Collegiate Athletic Association*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S MOTION TO EXCLUDE EXPERT TESTIMONY