UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and RUDY BARAJAS, Individually and on Behalf of All Those Similarly Situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>        Defendant. | No. 1:23-cv-00425 WBS CSK<br><br>MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY |

----oo0oo----

Plaintiffs Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Rudy Barajas brought this putative class action against defendant National Collegiate Athletic Association ("NCAA"), alleging violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  (Second Amended Compl. (Docket No. 84) ("SAC").)  Plaintiffs have moved for class certification.  (Docket No. 85 ("Class Cert. Mot.").)  Defendant opposes the motion (Docket No.

1

1   94) and moves to exclude plaintiff's expert evidence (Docket No.
2   95 ("Daubert Mot.")).

3   I.    Factual and Procedural Background

4           The NCAA is an association whose members are colleges
5   and universities competing in intercollegiate athletics. (See
6   Pl. Ex. 7 (Docket No. 85-10); Expert Report of Orley Ashenfelter
7   ("Ashenfelter Rep.") (Docket No. 113-2) ¶ 16; Expert Report of
8   Jee-Yeon K. Lehmann ("Lehmann Rep.") (Docket Nos. 119-2, 122-2) ¶
9   21.)  The NCAA governs student athletic competition at its member
10  schools. (See id.)

11          NCAA schools are divided into three divisions: Division
12  I, Division II, and Division III. (Id.)  Division I schools,
13  which are at issue in this litigation, generally "manage the
14  largest athletic budgets and offer the highest number of
15  athletics scholarships." (See id.)  Coach compensation is the
16  largest athletics expense for NCAA Division I schools.
17  (Ashenfelter Rep. ¶ 19.)

18          NCAA bylaws limit the number of coaches that Division I
19  schools can hire in a given sport. (Lehmann Rep. ¶ 24;
20  Ashenfelter Rep. ¶ 26.)  Prior to 2023, Division I programs other
21  than basketball and men's bowl-division football were permitted
22  to hire a certain number of "unrestricted coaches," who had no
23  restrictions on compensation, plus one or two "volunteer
24  coaches."[1] (See Lehmann Rep. ¶ 27; Ashenfelter Rep. ¶¶ 26-28.)
25  The bylaw at issue here, NCAA Bylaw 11.01.06 (hereinafter

26  ─────────────
          [1]    Most single-gender sports programs were permitted to
27  hire one volunteer coach, while most combined-gender programs
    were permitted to hire two volunteer coaches. (Lehmann Rep. ¶
28  27.)

                                    2

"Volunteer Coach Bylaw" or "the Bylaw"), defined a "volunteer coach" as "any coach who does not receive compensation or remuneration" from the school's athletics department.  (See Docket No. 85-12 at 62; Lehmann Rep. ¶ 28.)[2]

Following the repeal of the Volunteer Coach Bylaw, effective July 2023, the volunteer coach designation was eliminated and the number of unrestricted coaches was increased, typically by the number of volunteer coaches allowed under the prior rule.  (Ashenfelter Rep. ¶ 29.)  For instance, programs previously permitted one volunteer coach were allotted one additional paid coach.  (See Lehmann Rep. ¶ 29.)

Plaintiffs brought this putative class action alleging that the Volunteer Coach Bylaw violated § 1 of the Sherman Act. The proposed class consists of "[a]ll persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball[3] in the position of 'volunteer coach,' as designated by NCAA Bylaws."  (SAC ¶ 19.)

II.  Plaintiffs' Expert Report

Plaintiffs' motion for class certification relies primarily on an expert report authored by Dr. Orley Ashenfelter. (Ashenfelter Rep.)  Plaintiffs have also provided a supplemental declaration from Dr. Ashenfelter that provides additional

---

[2]    Volunteer coaches were allowed to receive certain benefits from schools, for example tickets to home games, meals during team events, and compensation for working at sports camps and clinics.  (Lehmann Rep. ¶ 28.)

[3]    The related case Smart v. NCAA, a parallel class action representing baseball coaches, recently settled.  (See 2:22-cv-02125, Docket No. 70.)

1    explanation of his methodology and updates based on additional

2    data.  (Ashenfelter Suppl. Decl. (Docket Nos. 115-2, 121-1).)[4]

3    Defendant seeks to exclude all evidence from this expert, as

4    discussed below.

5         Dr. Ashenfelter is an emeritus professor of economics

6    at Princeton University and has extensive experience and

7    professional qualifications in the area of labor economics.  (See

8    App. A to Ashenfelter Rep. (Docket No. 85-4 at 49-79).)  In

9    support of plaintiffs' motion for class certification, Dr.

10   Ashenfelter created a statistical model to estimate the damages

11   suffered by the members of the proposed class.

12        To formulate his model, Dr. Ashenfelter relied upon

13   _____

14        [4]    The supplemental declaration was provided as an exhibit
     to plaintiffs' opposition to defendant's Daubert motion to
     exclude Dr. Ashenfelter's testimony.  Defendant filed an
15   evidentiary objection in which it argues that the court should
     not rely upon the supplemental declaration in ruling on class
16   certification, instead limiting the court's consideration of the
     new material to its ruling under Daubert.  (See Docket No. 104.)
17   Defendant argues that it would be unfair for the court to rely
     upon the supplemental declaration because defendant has not been
18   given a chance to respond to it in its class certification
     briefing, as the declaration was filed following defendant's
19   filing of its opposition to class certification.  Alternatively,
     defendant seeks leave to file an additional brief in opposition
20   to the motion for class certification addressing the supplemental
     declaration.  (See id.)
21        Contrary to defendant's objection, defendant has had a
     chance to address Dr. Ashenfelter's supplemental declaration in
22   its reply brief in support of its Daubert motion, and indeed has
     done so at length.  (See Docket No. 111.)  Defendant has also
23   deposed Dr. Ashenfelter concerning his supplemental declaration.
     (See id. at 2 n.1.)  Further, the supplemental declaration does
24   not change the underlying methodology or reasoning plaintiff
     relies upon in arguing the class certification requirements are
25   met.  Because defendant has had a fair opportunity to respond,
     the court may rely on the supplemental Ashenfelter declaration in
26   ruling on both the Daubert and class certification issues.
     Defendant's objection (Docket No. 104) is therefore OVERRULED.

27

28

1   wage data and other documentation from hundreds of NCAA Division

2   I schools, focusing on those that expanded their coaching staff

3   beyond the prior limits on the number of unrestricted coaches

4   following the repeal of the Volunteer Coach Bylaw.  (See

5   Ashenfelter Rep. ¶ 61; Ashenfelter Suppl. Decl. ¶¶ 11, 21.)  He

6   focuses on this subset of schools because they "provide the best

7   currently-available evidence of what a competitive market will

8   look like" in the absence of the repealed Bylaw.  (Ashenfelter

9   Suppl. Decl. ¶ 21.)  The model uses actual coach salary data

10  following the Bylaw repeal as a "benchmark" to estimate the "but-

11  for" compensation class members would have received.  (See

12  Ashenfelter Rep. ¶ 40.)  "But-for" analysis refers to the

13  practice in antitrust cases of calculating classwide damages

14  based on what class members' economic position would have been

15  absent the alleged antitrust violations (i.e., in the world that

16  would have existed but for the alleged violation).  See Comcast

17  Corp. v. Behrend, 569 U.S. 27, 36 (2013); ABA Section of

18  Antitrust Law, Proving Antitrust Damages: Legal and Economic

19  Issues § II.4.B (2d ed. 2010).

20         Dr. Ashenfelter's analysis proceeds in two steps.  In

21  the first step, Dr. Ashenfelter categorizes sports programs

22  according to how many unrestricted coaches each program was

23  permitted to have under NCAA rules beginning July 1, 2023 (i.e.,

24  following the repeal of the Bylaw).  (Ashenfelter Rep. ¶ 66.)  He

25  ranks coaches within each "program" (each sport within each

26  school, broken down by gender if applicable) according to their

27  actual annual pay.  (See id. ¶ 67; Ashenfelter Suppl. Decl. ¶ 22

28

5

1    n.39.)  He then employs a regression analysis[5] to calculate the

2    "step-down" -- i.e., degree of difference -- in pay between the

3    lowest-paid and second-lowest-paid coaches.  (Ashenfelter Rep. ¶¶

4    67-68.)  For example, the model concluded based on currently

5    available data that for sports with a three-coach limit (for

6    instance tennis), the lowest-paid coach received pay 45% lower

7    than that of the second-lowest-paid coach.  (See id. ¶ 68.)

8          In the second step, Dr. Ashenfelter produces an

9    estimate of the compensation class members would have received in

10   the "but-for" world.  (See id. ¶ 70.)  Within each sport at each

11   school, the model uses the step-down differential identified at

12   step one to calculate a salary value one or more steps lower than

13   the lowest-paid coach.  (See id. ¶ 71.)  So, in the example

14   above, the but-for compensation of a volunteer tennis coach based

15   on one "step" down would be 45% lower than the salary of the

16   lowest-paid coach.  The number of steps down that are applied

17   varies based on school-specific factors for a given sport.  (See

18   id.)  The model determines the damages allegedly suffered by a

19   given class member based on the step-down level and actual salary

20   data associated with the sports program that employed him or her.

21   III. Defendant's *Daubert* Motion

22         Defendant seeks to exclude the expert report of Dr.

23   Ashenfelter pursuant to Daubert v. Merrell Dow Pharmaceuticals,

24   Inc., 509 U.S. 579, 580 (1993).  Daubert requires "a flexible

25   inquiry focused 'solely on principles and methodology, not on the

26   _____

27         [5]    A regression analysis models the relationship between
     the target dependent variable -- here, coach salary -- and one or
     more independent variables.  See Proving Antitrust Damages §

28   II.6.C.1.

1    conclusions that they generate.'" <u>United States v. Prime</u>, 431

2    F.3d 1147, 1153 (9th Cir. 2004) (quoting <u>Daubert</u>, 509 U.S. at

3    595). "[T]he trial court must act as a 'gatekeeper' to exclude

4    junk science that does not meet Federal Rule of Evidence 702's

5    reliability standards by making a preliminary determination that

6    the expert's testimony is reliable." <u>Ellis v. Costco Wholesale</u>

7    <u>Corp.</u>, 657 F.3d 970, 982 (9th Cir. 2011) (citing <u>Kumho Tire Co.</u>

8    <u>v. Carmichael</u>, 526 U.S. 137, 145, 147–49 (1999)). "<u>Daubert</u> does

9    not require a court to admit or to exclude evidence based on its

10    persuasiveness; rather it requires a court to admit or exclude

11    evidence based on its scientific reliability and relevance."

12    <u>Id.</u>; <u>see also</u> <u>Primiano v. Cook</u>, 598 F.3d 558, 564 (9th Cir. 2010)

13    ("Shaky but admissible evidence is to be attacked by cross

14    examination, contrary evidence, and attention to the burden of

15    proof, not exclusion.").

16          "The manner and extent to which the <u>Daubert</u> framework

17    applies at the class certification stage is an unsettled

18    question." <u>Lytle v. Nutramax Lab'ys, Inc.</u>, 114 F.4th 1011, 1030

19    (9th Cir. 2024) (collecting cases). However, the Ninth Circuit

20    explained in <u>Lytle</u> that at class certification, where the

21    plaintiff's expert is relied upon for purposes of the

22    predominance inquiry under Rule 23, "such Daubert <u>factors</u> as peer

23    review of the proffered model may be highly relevant, while

24    others, such as known error rate, may be more applicable to the

25    later-executed results of the test." <u>Id.</u>  Further, "whether a

26    'full' or 'limited' <u>Daubert</u> analysis should be applied may depend

27    on the timing of the class certification decision." <u>Id.</u> at 1031.

28    "If discovery has closed and an expert's analysis is complete and

1    her tests fully executed, there may be no reason for a district
2    court to delay its assessment of ultimate admissibility at
3    trial." Id.

4         But where "an expert's model has yet to be fully
5    developed, a district court is limited at class certification to
6    making a predictive judgment about how likely it is the expert's
7    analysis will eventually bear fruit," and therefore a "full-blown
8    Daubert assessment of the results of the application of the model
9    would be premature." Id. In the instant case, discovery is
10   ongoing and Dr. Ashenfelter is still receiving new data and
11   updating his analysis, which indicates that a full Daubert
12   analysis is "premature" at this stage of the proceedings. See
13   id.

14        It is undisputed that Dr. Ashenfelter possesses
15   extensive experience and qualifications in the field of labor
16   economics and that he based his analysis on the review of
17   reliable documentation produced by NCAA Division I member
18   schools. Regression analysis based on a "benchmark" or
19   "yardstick," like that employed by Dr. Ashenfelter, is a well-
20   established method of calculating class-wide antitrust impact.
21   See Proving Antitrust Damages § II.4.C. Dr. Ashenfelter
22   represents that a similar methodology to the one applied here has
23   previously been used to evaluate the class-wide antitrust impact
24   of NCAA coach compensation restrictions. (See Ashenfelter Suppl.
25   Decl. ¶ 23 n.41 (discussing expert method relied upon in Law v.
26   Nat'l Collegiate Athletic Ass'n, 5 F. Supp. 2d 921 (D. Kan.
27   1998)).) Further, Dr. Ashenfelter has previously performed
28   similar statistical analysis in antitrust cases. See, e.g.,

8

1   <u>Cason-Merenda v. Detroit Med. Ctr.</u>, No. 06-15601, 2013 WL
2   1721651, at *1 (E.D. Mich. Apr. 22, 2013) (denying <u>Daubert</u> motion
3   to exclude Dr. Ashenfelter's "benchmark" analysis of but-for
4   wages in alleged wage-fixing conspiracy).  These factors indicate
5   that his evidence is sufficiently reliable at this stage.  <u>See</u>
6   <u>Lytle</u>, 114 F.4th at 1031 (expert's "unchallenged credentials,"
7   "review of documentary evidence and . . . data," use of a "well-
8   established" methodology, and the fact expert had "successfully
9   performed" similar analyses in prior cases established that
10  expert evidence was admissible under <u>Daubert</u> at class
11  certification).

12          Defendant argues that Dr. Ashenfelter's report is
13  nonetheless inadmissible because it fails to account for several
14  key factors.  First, defendant contends that Dr. Ashenfelter's
15  model fails to control for the experience and skill level of
16  coaches because (1) his calculations did not incorporate
17  experience level as a variable, and (2) he did not address
18  potential selection bias in the sample of additional paid coaches
19  hired after the bylaw repeal, who could have higher experience
20  levels and therefore warrant higher wages.  These arguments are
21  factually unfounded, as Dr. Ashenfelter's analysis does account
22  for experience using both pay ranking within the coaching
23  hierarchy and age as proxies for experience.  (<u>See</u> Ashenfelter
24  Rep. ¶ 71; Ashenfelter Suppl. Decl. ¶¶ 32-35).

25          Second, defendant argues that Dr. Ashenfelter "excluded
26  evidence from schools that did not add paid coaching positions
27  after the bylaws were amended."  (<u>Daubert</u> Mot. at 21.)  Again,
28  this argument is unfounded.  (<u>See</u> Ashenfelter Rep. ¶ 71 ("If

1  . . . a program reports an unrestricted coach who earns no

2  compensation, then the volunteer coach is estimated to also earn

3  no compensation [under the but-for analysis].  However, this case

4  is rare: according to my analysis of the schools' data, more than

5  99% of unrestricted coaches are paid.").)

6       Finally, defendant argues that Dr. Ashenfelter's

7  analysis is based around groupings of dissimilar sports and

8  "tries to estimate market rates of pay for coaches in one sport

9  by using salaries for coaching in other sports that are

10 determined by different supply and demand conditions."  (Daubert

11 Mot. at 29.)  This argument mischaracterizes Dr. Ashenfelter's

12 analysis.  While the calculation of the step-down differential at

13 step one uses groupings of sports based on how many coaches the

14 NCAA permits a school to hire, the damage calculation at step two

15 uses actual salary data from each sports program at each school

16 and therefore accounts for differences across sports.  (See

17 Ashenfelter Rep. ¶ 71.)

18       To the extent that defendant thinks Dr. Ashenfelter's

19 analysis inadequately accounts for the variables discussed above,

20 that is not a basis for exclusion under Daubert, but rather goes

21 to the weight of the evidence.  See Obrey v. Johnson, 400 F.3d

22 691, 695 (9th Cir. 2005) ("[O]bjections to a [statistical]

23 study's completeness generally go to 'the weight, not the

24 admissibility of the statistical evidence,' and should be

25 addressed by rebuttal, not exclusion.") (quoting Mangold v. Cal.

26 Pub. Utils. Comm'n, 67 F.3d 1470, 1476 (9th Cir. 1995)).

27 Defendant has failed to establish that Dr. Ashenfelter's

28 "methodology is flawed or that there is a likelihood that he will

10

1    improperly apply that method to the facts."  See Lytle, 114 F.4th

2    at 1031.  Accordingly, defendant's motion to exclude Dr.

3    Ashenfelter's expert report will be denied.[6]

4    IV.  Class Certification

5            The proposed class consists of "[a]ll persons who, from

6    March 17, 2019, to June 30, 2023, worked for an NCAA Division I

7    sports program other than baseball in the position of 'volunteer

8    coach,' as designated by NCAA Bylaws."  (SAC ¶ 19.)

9            To prevail on class certification, plaintiffs must

10   establish "by a preponderance of the evidence" that the proposed

11   class satisfies the requirements of Federal Rules of Civil

12   Procedure 23(a) and 23(b).  Olean Wholesale Grocery Coop., Inc.

13   v. Bumble Bee Foods LLC, 31 F.4th 651, 664-65 (9th Cir. 2022).

14           "Rule 23 does not set forth a mere pleading standard."

15   Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

16   "[C]ertification is proper only if 'the trial court is satisfied,

17   after a rigorous analysis, that the prerequisites of Rule 23(a)

18   have been satisfied.'"  Id. at 350-51 (quoting Gen. Tel. Co. of

19   Sw. v. Falcon, 457 U.S. 147, 161 (1982)).  "Merits questions may

20   be considered to the extent -- but only to the extent -- that

21   they are relevant to determining whether the Rule 23

22   prerequisites for class certification are satisfied."  Amgen Inc.

23   v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

24       A.   Rule 23(a)

25           Rule 23(a) restricts class actions to cases where: "(1)

26

27           [6]   The court expresses no opinion at this time as to
     whether any evidence would be admissible or inadmissible at
28   trial.

11

1  the class is so numerous that joinder of all members is

2  impracticable [numerosity]; (2) there are questions of law or

3  fact common to the class [commonality]; (3) the claims or

4  defenses of the representative parties are typical of the claims

5  or defenses of the class [typicality]; and (4) the representative

6  parties will fairly and adequately protect the interests of the

7  class [adequacy of representation]." See Fed. R. Civ. P. 23(a).

8          Defendant appears to concede that the numerosity,

9  commonality, and typicality requirements are satisfied, as its

10 brief does not address them.  The court nonetheless addresses all

11 factors as part of its "rigorous" analysis.  See Wal-Mart, 564

12 U.S. at 350-51.

13          1.  Numerosity

14          "Although 'no specific minimum number of plaintiffs

15 asserted' is required to obtain class certification, 'a proposed

16 class of at least forty members presumptively satisfies the

17 numerosity requirement.'"  Alger v. FCA US LLC, 334 F.R.D. 415,

18 422 (E.D. Cal. 2020) (England, J.) (quoting Nguyen v. Radient

19 Pharmaceuticals Corp., 287 F.R.D. 563, 569 (C.D. Cal. 2012)).

20          Here, plaintiffs present evidence that the putative

21 class has thousands of members (see Ashenfelter Rep. ¶ 63), which

22 defendant does not dispute.  The proposed class therefore

23 satisfies the numerosity requirement.

24          2.  Commonality

25          Commonality requires that the class members' claims

26 "depend upon a common contention" that is "capable of classwide

27 resolution -- which means that determination of its truth or

28 falsity will resolve an issue that is central to the validity of

12

each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350. "[A]ll questions of fact and law need not be common to satisfy the rule," and the "existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). "So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." Wang v. Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013) (internal citation and quotation marks omitted).

The question of whether the Volunteer Coach Bylaw violated antitrust law is common to the entire class. "Antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in one stroke, because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members." In re High-Tech Emp. Antitrust Litig., 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (internal quotation marks and citations omitted). Thus, "[w]here an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'" See id. at 1181 (quoting In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 593 (N.D. Cal. 2010)). Because plaintiffs have identified a common question applicable to the whole class, they have satisfied the commonality requirement.

       3.   Typicality

       Typicality requires that named plaintiffs have claims

1    "reasonably coextensive with those of absent class members," but

2    their claims do not have to be "substantially identical."

3    Hanlon, 150 F.3d at 1020.  The test for typicality "is whether

4    other members have the same or similar injury, whether the action

5    is based on conduct which is not unique to the named plaintiffs,

6    and whether other class members have been injured by the same

7    course of conduct."  Hanon v. Dataproducts Corp., 976 F.2d 497,

8    508 (9th Cir. 1992) (citation omitted).

9         Here, each class representative -- like each class

10   member -- worked as a volunteer coach at an NCAA Division I

11   school, was subject to the NCAA's Volunteer Coach Bylaw

12   precluding them from receiving compensation, and alleges

13   antitrust injury under the Sherman Act.  "In antitrust cases,

14   this uniformity of class members' injuries, claims, and legal

15   theory is typically sufficient to satisfy Rule 23(a)(3)."  See In

16   re NCAA Student-Athlete Name & Likeness Licensing Litig. ("NCAA

17   Name & Likeness Litig."), No. 09-cv-1967 CW, 2013 WL 5979327, at

18   *5 (N.D. Cal. Nov. 8, 2013) (finding typicality requirement

19   satisfied for class consisting of all Division I men's football

20   and basketball players subject to an NCAA policy alleged to

21   violate antitrust law).  Because defendant has not identified

22   "any unique defenses which threaten to become the focus of the

23   litigation" that would cut against these similarities, see Hanon,

24   976 F.2d at 508, plaintiffs have satisfied the typicality

25   requirement.

26             4.   Adequacy of Representation

27        To resolve the question of adequacy, the court must

28   consider two factors: (1) whether the named plaintiffs or their

14

1    counsel have any conflicts of interest with other class members,

2    and (2) whether the named plaintiffs and their counsel will

3    vigorously prosecute the action on behalf of the class.  In re

4    Hyundai & Kia Fuel Econ. Litig., 926 F.3d 539, 566 (9th Cir.

5    2019).

6                    a.  Conflicts of Interest

7            The first portion of the adequacy inquiry "serves to

8    uncover conflicts of interest between named parties and the class

9    they seek to represent."  Kim v. Allison, 87 F.4th 994, 1000 (9th

10    Cir. 2023) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591,

11    625 (1997)).  Here, the class representatives "possess the same

12    interest and suffer[ed] the same [alleged] injury as the class

13    members," indicating that their interests are "aligned."  See

14    Amchem, 521 U.S. at 625–26.

15            Defendant argues that each class member would need to

16    prove that a given school would have added paid positions for

17    their sport, creating a conflict with other class members who

18    coached for a different sport at the same school.  As discussed

19    in greater detail below, this argument is premised on a merits-

20    based dispute between the parties' experts about how but-for

21    damages should be calculated.  Further, plaintiffs and their

22    expert expressly reject defendant's contention that they will

23    need to prove what hiring decisions would have been made by each

24    school, instead relying on a different method of calculating

25    antitrust injury.  The issue identified by defendant therefore

26    presents only a "speculative conflict" that is not "fundamental

27    to the suit."  See In re Online DVD-Rental Antitrust Litig., 779

28    F.3d 934, 942 (9th Cir. 2015).  Accordingly, there are no

1    conflicts of interest precluding class certification.

2                    b.    <u>Vigorous Prosecution</u>

3            The second portion of the adequacy inquiry examines the

4    vigor with which the named plaintiffs and their counsel have

5    pursued the class's claims.  "Although there are no fixed

6    standards by which 'vigor' can be assayed, considerations include

7    competency of counsel."  <u>Kim</u>, 87 F.4th at 1002 (quoting <u>Hanlon</u>,

8    150 F.3d at 1021).

9            Plaintiffs are represented by the firms Gustafson

10   Gluek, Kirby McInerney, and Fairmark Partners.  The extensive

11   experience and strong qualifications of plaintiffs' counsel in

12   litigating complex antitrust cases, including litigation against

13   the NCAA concerning allegedly anticompetitive restrictions on

14   coach compensation, are undisputed.  (<u>See</u> Decl. of Dennis Stewart

15   (Docket No. 85-1); Decl. of Robert Gralewski, Jr. (Docket No. 85-

16   2); Decl. of Michael Lieberman (Docket No. 85-3).)  Plaintiffs'

17   counsel represents that they have expended thousands of hours and

18   considerable resources in litigating this case thus far.  (<u>See</u>

19   Class Cert. Mot. at 19.)  The court's review of the docket and

20   plaintiffs' filings supports this conclusion.  Further, there is

21   no indication that the named plaintiffs will fail to vigorously

22   prosecute this case.  (<u>See</u> Decl. of Michael Lieberman ¶ 8

23   (describing named plaintiffs' efforts to support this litigation,

24   including responding to interrogatories, searching for responsive

25   documents, sitting for depositions, and consulting with counsel

26   about case strategy and discovery).)  Accordingly, plaintiffs and

27   their counsel satisfy the adequacy requirement.

28

                                16

1      B.    Rule 23(b)

2           After fulfilling the threshold requirements of Rule

3    23(a), the proposed class must satisfy the requirements of one of

4    the three subdivisions of Rule 23(b).  Leyva v. Medline Indus.

5    Inc., 716 F.3d 510, 512 (9th Cir. 2013).  Plaintiffs seek

6    certification under Rule 23(b)(3), which provides that a class

7    action may be maintained only if the court finds that (1)

8    "questions of law or fact common to class members predominate

9    over questions affecting only individual members," and (2) "a

10   class action is superior to other available methods for fairly

11   and efficiently adjudicating the controversy."  Fed. R. Civ. P.

12   23(b)(3).  Defendant disputes that the predominance requirement

13   is satisfied, but does not address superiority.

14         1.    Predominance

15         "The predominance inquiry asks whether the common,

16   aggregation-enabling, issues in the case are more prevalent or

17   important than the non-common, aggregation-defeating, individual

18   issues."  Olean, 31 F.4th at 664 (quoting Tyson Foods, Inc. v.

19   Bouaphakeo, 577 U.S. 442, 453 (2016)).  "When one or more of the

20   central issues in the action are common to the class and can be

21   said to predominate, the action may be considered proper under

22   Rule 23(b)(3) even though other important matters will have to be

23   tried separately, such as damages or some affirmative defenses

24   peculiar to some individual class members."  Tyson Foods, 577

25   U.S. at 453 (cleaned up).

26         "'Considering whether questions of law or fact common

27   to class members predominate begins, of course, with the elements

28   of the underlying cause of action.'"  Olean, 31 F.4th at 665

(quoting Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011)) (cleaned up).  The elements of a claim under § 1 of the Sherman Act are "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation (i.e., the conspiracy); and (iii) measurable damages." Id. at 666.  Antitrust impact is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

Accordingly, "to prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that 'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class."  Id. (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)).  In other words, plaintiffs' evidence must be "capable of answering a common question for the entire class in one stroke" and of "reasonably sustain[ing] a jury verdict in favor of the plaintiffs, even though a jury could still decide that the evidence was not persuasive."  See id. at 668 (citing Tyson Foods, 577 U.S. at 453; Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 276 (2014)).

"In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."  Olean, 31

18

F.4th at 666-67.  "While such an analysis may 'entail some overlap with the merits of the plaintiff's underlying claim,' the 'merits questions may be considered [only] to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'"  Id. (quoting Wal-Mart, 564 U.S. at 351; Amgen, 568 U.S. at 466) (alterations in original).

It is undisputed that there are common questions concerning the existence of an antitrust violation.  "The question of whether an antitrust violation under Section 1 exists naturally lends itself to common proof, because that determination 'turns on defendants' conduct and intent along with the effect on the market, not on individual class members.'"  In re Coll. Athlete NIL Litig. ("House"), No. 20-cv-03919 CW, 2023 WL 8372787, at *8 (N.D. Cal. Nov. 3, 2023) (quoting In re Glumetza Antitrust Litig., 336 F.R.D. 468, 475 (N.D. Cal. 2020)).  See also Law v. Nat'l Collegiate Athletic Ass'n, No. 94-2053-KHV, 1998 U.S. Dist. LEXIS 6608, at *15-16 (D. Kan. Apr. 17, 1998) (requirements of Rule 23(b)(3) satisfied where "the NCAA adopted a scheme to fix salaries for restricted earnings coaches . . . the purpose and effect of [which] was to make coaching salaries unresponsive to forces that would normally prevail in a competitive marketplace," and the "plaintiff class members were employed in the restrained market and . . . subjected to defendant's illegal scheme").

Defendant argues that despite the presence of common questions, individual issues predominate because plaintiffs have not proffered a viable form of common evidence on the issue of

1  antitrust impact.  Defendant's expert, Dr. Jee-Yeon Lehmann,

2  contends that Dr. Ashenfelter's model is incapable of providing

3  common proof because it does not address (1) whether each school

4  would have added an additional paid coaching position in the

5  absence of the Bylaw rather than choosing to provide zero pay,

6  and (2) whether each class member would have been hired for that

7  additional paid position.  (See Lehmann Rep. ¶¶ 31, 33, 77.)  Put

8  differently, defendant argues that if the Volunteer Coach Bylaw

9  had not been in place, NCAA schools could have nonetheless chosen

10 to provide zero compensation to the additional coaches; and even

11 if they did decide to pay the additional coaches, it is not a

12 given that the proposed class members would have been hired for

13 those positions.  Defendant refers to this as the "substitution

14 effect," so called because other individuals could have been

15 substituted for the class members in the but-for world.

16      Plaintiffs contend that the "substitution effect" is

17 not grounded in accepted economic theory or binding case law and

18 instead, the proper focus in constructing the but-for world is on

19 what competitive wages would have been for plaintiffs' coaching

20 positions absent the Bylaw.  Dr. Ashenfelter avers that his

21 analysis uses the proper framing of the but-for world and that in

22 prior wage-fixing cases he has worked on, he has never been

23 required to show that the class members would also have been

24 hired in the but-for world.  (See Ashenfelter Suppl. Decl. at 6

25 n.14.)[7]

26      ───────────────
27      [7]    Plaintiffs argue that this court already took a
   position on the merits of the "substitution theory" in its order
   denying defendant's motion to dismiss.  (See Docket No. 38.)  The
28 court did not do so.  (See Docket No. 50 (explaining that the

1    This issue comes down to a merits-based dispute between

2    the parties' experts concerning the appropriate method for

3    measuring impact.  Both positions strike the court as plausible.

4    Indeed, some authorities support plaintiffs' position,[8] while

5

6    court's order on the motion to dismiss "did no more nor no less
     than dispose of the motion which was before the court").)

7

8    [8]  See House, 2023 WL 8372787, at *8 (Antitrust "injury
     and damages are determined by comparing, on the one hand, the
9    payments that each class member . . . received in the real world
     with, on the other hand, the payments that that same class member
10   would have received in the but-for world," and "the identity of
     the class members does not change between the real world and the
11   but-for world . . . Accordingly, the so-called substitutions or
     displacements that may or may not take place in a hypothetical
12   but-for world are irrelevant."); Law v. Nat'l Collegiate Athletic
     Ass'n, 185 F.R.D. 324, 330 n.6 (D. Kan. 1999) (rejecting the
13   merits of NCAA's "substitution theory" argument that plaintiffs
     suffered no damage because they would not have been hired at all
14   absent the rule at issue, which "was not anchored in established
     case law"); Tawfilis v. Allergan, Inc., No. 8:15-cv-00307 JLS
15   JCG, 2017 WL 3084275, at *11-12 (C.D. Cal. June 26, 2017) ("[A]n
     antitrust impact analysis for direct purchasers need not consider
16   downstream substitution effects that could have affected the
     amount of the product purchased in the but-for world."); Kamakahi
17   v. Am. Soc'y for Reprod. Med., 305 F.R.D. 164, 192-93 (N.D. Cal.
     2015) (rejecting argument that "substitution theory" defeated
18   predominance and noting that "[t]o allow the specter of
     substitution to defeat class certification, without evidence that
19   substitution would actually occur, would have wide ranging
     effects on the ability to resolve antitrust claims as class
20   actions").
         Plaintiffs' position also aligns with authorities
21   discussing the but-for analysis more generally.  See Comcast, 569
     U.S. at 36 (After determining "a 'but for' baseline -- a figure
22   that would show what the competitive prices would have been if
     there had been no antitrust violations" -- damages are
23   "determined by comparing to that baseline what the actual prices
     were during the charged period.") (emphasis added); ABA Section
24   of Antitrust Law, Econometrics: Legal, Practical and Technical
     Issues § 13.B.1.c (2d ed. 2014) ("A test of classwide impact
25   requires the estimation of 'but-for prices' (i.e., prices that
     would have prevailed but for the alleged anticompetitive act).")
26   (emphasis added); Proving Antitrust Damages § II.4.B ("[I]t is

27

28

21

1    others support defendant's.[9]  It is not for the court to engage

2    in a "battle of the experts" over the merits at this juncture.

3    See In re NCAA I-A Walk-On Football Players Litig., No. C04-

4    1254C, 2006 WL 1207915, at *11 (W.D. Wash. May 3, 2006)

5    (declining to take a position on the "fundamental difference

6    between Plaintiffs' expert and the NCAA's expert" concerning the

7    appropriate "frame" of the but-for analysis, which was a merits

8    issue not suited for consideration at class certification).  See

9    also Comcast, 569 U.S. at 35 (plaintiffs' damage model must

10   measure damages attributable to the theory advanced by

11   plaintiffs); Dolphin Tours, Inc. v. Pacifico Creative Serv.,

12   Inc., 773 F.2d 1506, 1512-13 (9th Cir. 1985) (noting

13   "deficiencies" in plaintiff's damages model which did not

14

15   not relevant that the defendant . . . could theoretically have
     caused the same harms through lawful means," for instance by
16   choosing to fix prices individually rather than as part of a
     cartel.).
17

18       [9]   See NCAA Name & Likeness Litig., 2013 WL 5979327, at *8
     (crediting the NCAA expert's "substitution theory" model and
19   denying class certification because plaintiffs failed to
     "provide[] a feasible method for determining which members of the
20   [proposed class] would still have played for Division I teams --
     and, thus, suffered the injuries alleged here -- in the absence
21   of the challenged restraints"); Rock v. Nat'l Collegiate Athletic
     Ass'n, No. 1:12-cv-01019 TWP DKL, 2016 WL 1270087, at *14 (S.D.
22   Ind. Mar. 31, 2016) (denying class certification in challenge to
     NCAA rule that limited athletic scholarships because "the facts
23   do not support [plaintiffs' expert's] extreme position that all
     members of the [proposed class] would have received a
24   [scholarship] in the absence of the challenged rules").  See also
     Walk-On Football Players Litig., 2006 WL 1207915, at *1 (denying
25   class certification because plaintiffs failed to provide method
26   of proving their own theory that the class members would have
     received scholarships absent the NCAA rule at issue, but taking
27   no position on whether plaintiffs' or the NCAA's conception of
     the but-for world was appropriate).
28

1  sufficiently address competitive behavior in the but-for world,

2  but reversing grant of summary judgment and allowing the issue of

3  damages to proceed to trial).

4        "Rule 23 grants courts no license to engage in [such]

5  free-ranging merits inquiries at the certification stage."  See

6  Amgen, 568 U.S. at 466.  Cf. Van v. LLR, Inc., 61 F.4th 1053,

7  1067-68 (9th Cir. 2023) (individual issues predominated where

8  court and parties agreed that presence of individual discounts

9  defeated claim for relief, and defendants provided evidence of

10 individual discounts that would "bar recovery," which raised "the

11 spectre of class-member-by-class-member adjudication of the

12 issue").

13        Defendant presents a litany of other critiques of Dr.

14 Ashenfelter's analysis -- for instance, that it does not account

15 for benefits that class members received by virtue of their

16 volunteer coach positions that could reduce their damages, and

17 does not sufficiently control for variations across different

18 sports and schools in different regions -- arguing that these

19 issues would necessitate individual damage inquiries that would

20 predominate.  These critiques similarly speak to the weight of

21 plaintiffs' evidence as applied to merits issues.  See Tyson

22 Foods, 577 U.S. at 457 (arguments that an expert study is

23 "unrepresentative or inaccurate" go to the merits and do not

24 defeat class certification).

25        Further, the Ninth Circuit has repeatedly held that

26 individualized damage calculations alone do not defeat class

27 certification.  See, e.g., Olean, 31 F.4th at 681-82 ("there is

28 no per se rule that a district court is precluded from certifying

a class if plaintiffs may have to prove individualized damages at trial") (citing Halliburton, 573 U.S. at 276); Leyva, 716 F.3d at 514 ("the amount of damages is invariably an individual question," and "the potential existence of individualized damage assessments does not detract from the action's suitability for class certification") (quoting Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975); Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1089 (9th Cir. 2010)).  Defendant has not established that individualized inquiries into damages would predominate over the common issues already identified.  See Olean, 31 F.4th at 679–80 ("While individualized differences among the [actual damages of each class member as compared to the regression model's estimates] may require a court to determine damages on an individualized basis, such a task would not undermine the regression model's ability to provide evidence of common impact.").

As discussed in detail above, Dr. Ashenfelter has provided a model that estimates but-for wages for each proposed class member based on extensive documentation produced by NCAA Division I schools.  His model uses regression analysis based on a benchmark, a widely accepted form of expert evidence, and Dr. Ashenfelter avers that his analysis provides "a reasonable methodology by which to estimate damages using data" and employs "methods that are common to the class."  (See Ashenfelter Rep. ¶ 10.)  Plaintiffs have established that Dr. Ashenfelter's model is "capable of showing that the [proposed class] members suffered antitrust impact on a class-wide basis, notwithstanding [Dr. Lehmann's] critique," which is "all that [is] necessary at the

1   certification stage." See Olean, 31 F.4th at 681 (emphasis

2   added); see also id. at 683 ("a regression model . . . may be

3   capable of showing class-wide antitrust impact, provided that the

4   district court considers factors that may undercut the model's

5   reliability").  Accordingly, plaintiffs have established that

6   common questions of law and fact predominate.

7           2.   Superiority

8           The second part of the inquiry under Rule 23(b)(3) asks

9   whether "a class action is superior to other available methods

10  for fairly and efficiently adjudicating the controversy."

11  "Generally, the factors relevant to assessing superiority include

12  '(A) the class members' interests in individually controlling the

13  prosecution or defense of separate actions; (B) the extent and

14  nature of any litigation concerning the controversy already begun

15  by or against class members; (C) the desirability or

16  undesirability of concentrating the litigation of the claims in

17  the particular forum; and (D) the likely difficulties in managing

18  a class action.'"  Wolin v. Jaguar Land Rover N. Am., LLC, 617

19  F.3d 1168, 1175 (9th Cir. 2010) (quoting Fed. R. Civ. P.

20  23(b)(3)).

21          The proposed class contains thousands of individuals,

22  and the parties have not identified any competing litigation

23  involving members of the proposed class.  It appears unlikely

24  that the amount of damages each coach suffered is high enough to

25  make individual litigation an efficient method of resolving their

26  claims, especially given the complexity of antitrust litigation

27  and the presence of several common legal and factual questions.

28  "Forcing individual [class members] to litigate their cases,

1   particularly where common issues predominate for the proposed

2   class," would be "an inferior method of adjudication."  See

3   Wolin, 617 F.3d at 1176.  Accordingly, "class-wide adjudication

4   of 'common issues will reduce litigation costs and promote

5   greater efficiency,'" and the superiority requirement is

6   satisfied.  See id. (quoting Valentino v. Carter-Wallace, Inc.,

7   97 F.3d 1227, 1234 (9th Cir. 1996)).

8           For the foregoing reasons, the class certification

9   requirements of Rules 23(a) and 23(b)(3) are satisfied.

10  V.   Appointment of Class Counsel

11          "An order that certifies a class action . . . must

12  appoint class counsel under Rule 23(g)."  Fed. R. Civ. P.

13  23(c)(1)(B).  In appointing class counsel, the court considers

14  "(i) the work counsel has done in identifying or investigating

15  potential claims in the action; (ii) counsel's experience in

16  handling class actions, other complex litigation, and the types

17  of claims asserted in the action; (iii) counsel's knowledge of

18  the applicable law; and (iv) the resources that counsel will

19  commit to representing the class."  Fed. R. Civ. P. 23(g)(1).  As

20  discussed above, plaintiffs' counsel has considerable knowledge

21  and experience in antitrust litigation and has dedicated

22  significant effort and resources to litigating this action.

23  Accordingly, the court will appoint Gustafson Gluek, Kirby

24  McInerney, and Fairmark Partners as co-lead class counsel.

25          IT IS THEREFORE ORDERED that defendant's motion to

26  exclude expert testimony (Docket No. 95) be, and the same hereby

27  is, DENIED.

28          IT IS FURTHER ORDERED that plaintiffs' motion for class

1  certification (Docket No. 85) be, and the same hereby is,

2  GRANTED.  The certified class consists of: All persons who, from

3  March 17, 2019, to June 30, 2023, worked for an NCAA Division I

4  sports program other than baseball in the position of "volunteer

5  coach," as designated by NCAA Bylaws.

6          Plaintiffs Shannon Ray, Khala Taylor, Peter Robinson,

7  Katherine Sebbane, and Rudy Barajas are hereby appointed as class

8  representatives.  The law firms Gustafson Gluek, Kirby McInerney,

9  and Fairmark Partners are hereby appointed as co-lead class

10 counsel.

11 Dated: March 10, 2025

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28