Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson, MN Bar No. 202241
Joshua J. Rissman, MN Bar No. 391500
Anthony J. Stauber, MN Bar No. 401093
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B.
SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644

Michael Lieberman, DC Bar No. 1033827
Jamie Crooks, CA Bar No. 310447
Yinka Onayemi, NY Bar No. 5940614
Michael Goldberg, MA Bar No. 709203
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (818) 585-2903

*Attorneys for Plaintiffs Shannon Ray, Khala Taylor,
Peter Robinson, Katherine Sebbane, and Rudy Barajas
Individually and on Behalf of All Those Similarly Situated*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

SHANNON RAY, KHALA TAYLOR, PETER
ROBINSON, KATHERINE SEBBANE, and
RUDY BARAJAS Individually and on Behalf of
All Those Similarly Situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, an unincorporated association,

Defendant.

Case No. 1:23-cv-00425

**PLAINTIFFS' NOTICE OF MOTION
AND MOTION FOR SUMMARY
JUDGMENT THAT DEFENDANT
VIOLATED THE SHERMAN ACT**

Judge: Hon. William B. Shubb
Courtroom: 5
Date: September 15, 2025
Time: 1:30 PM

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 15, 2025, before the Honorable William B. Shubb, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, CA 95814, the Class Plaintiffs will and hereby do move the Court for summary judgment that Defendant violated the Sherman Act, 15 U.S.C. § 1, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260. This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Statement of Undisputed Facts, the Declaration of Michael Lieberman, all exhibits and appendices to such documents, any papers filed in reply, any argument as may be presented at the hearing, and all other papers and records on file in this matter.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1

## **Table of Contents**

NOTICE OF MOTION AND MOTION ........................................................................ i

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 2

    A.    NCAA and College Sports ............................................................. 2

    B.    NCAA and its Member Schools Agreed to Fix Compensation for Coaches. ........................................................................................ 3

    C.    In *Law v. NCAA*, the Restricted Earnings Coach Rule is Invalidated at Summary Judgment. ................................................. 5

    D.    NCAA Continues to Enforce the Volunteer Coach Rule, Fixing Class Members' Compensation at $0. ....................................... 6

    E.    NCAA Repeals the Wage Fix. ..................................................... 6

PROCEDURAL BACKGROUND ............................................................................. 7

LEGAL STANDARD ........................................................................................... 8

ARGUMENT .................................................................................................... 9

I.    The Wage Fix Is Unlawful *Per Se*. ................................................... 10

II.    In The Alternative, Summary Judgment Should Be Granted Under The "Quick Look" Rule of Reason. ................................................... 14

    A.    If The Court Holds That The *Per Se* Rule Does Not Apply, Quick-Look Review Would Be Appropriate. ................................. 14

    B.    NCAA's Procompetitive Justifications are Invalid as a Matter of Law. ................. 16

        1.    NCAA's Procompetitive Justifications Are All Pretextual........................ 16

        2.    All Three Justifications Are Legally Invalid for Additional Reasons. ......................................... 19

            a.    The "Expanded Opportunities" Justification is Legally Invalid. ........................... 20

            b.    The "Competitive Balance" Justification is Legally Invalid. ........................... 24

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

        c.      The "Increased Resources" Justification is Legally Invalid. ........................................................................ 27

CONCLUSION ...................................................................................................... 29

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*Alston v. NCAA*,
  594 U.S. 69 (2021).................................................................................. passim

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................ 8

*Arizona v. Maricopa Cty. Med. Soc'y*,
  457 U.S. 332 (1982)................................................................................. 10, 14

*Aya Healthcare Servs. v. AMN Healthcare*, Inc.,
  9 F.4th 1102 (9th Cir. 2021) ........................................................................ 12

*Blackburn v. Sweeney*,
  53 F.3d 825 (7th Cir. 1995) .......................................................................... 14

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979)........................................................................................... 12

*Brown v. Pro* Football,
  1992 WL 88039 (D.D.C. Mar. 10, 1992) .......................................... 21, 22, 28

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)........................................................................... 5, 14, 15

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ...................................................................... 14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................................... 8

*Clarett v. NFL*,
  306 F. Supp. 2d 379 (S.D.N.Y. 2004) ......................................... 2, 20, 26, 28

*Deslandes v. McDonald's United States, LLC*,
  81 F.4th 699 (7th Cir. 2023)........................................... 12, 25, 26, 29

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)................................................................................ 21, 27

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023).................................................................. 17, 24

*Fleischman v. Albany Med. Ctr.*,
  728 F. Supp. 2d 130 (N.D.N.Y. 2010) ......................................................... 10

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ........................................................... 12, 13, 22

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ......................................................................... 9, 14

*FTC v. Superior Court Trial Lawyers Assn.*,
    493 U.S. 411 (1990) ............................................................................. 23

*FTC v. Ticor Title Ins. Co.*,
    504 U.S. 621 (1992) ............................................................................... 1

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) ............................................................... 13

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
    714 F.2d 1384 (5th Cir. 1983) ............................................................. 25

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................. 10, 17, 18, 19

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
    2018 WL 1524005 (N.D. Cal. March 28, 2018) ...................................... 8

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    37 F. Supp. 3d 1126 (N.D. Ca 2014) ............................................. 20, 26

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 1142860 (E.D.N.Y. Mar. 15, 2024) ...................................... 16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ................................................................. 9

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190 (9th Cir. 2009) ............................................................... 8

*Law v. NCAA*,
    185 F.R.D. 324 (D. Kan. 1999) ............................................................. 5

*Law v. NCAA*,
    902 F. Supp. 1394 (D. Kan. 1995) ........................................... 1, 5, 10, 24

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ....................................................... 17, 19

*Nat'l Football League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*,
    933 F.3d 1136 (9th Cir. 2019) ............................................................. 12

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
 435 U.S. 679 (1978).................................................................. 23

*NCAA v. Bd. of Regents*,
 468 U.S. 85 (1984)............................................................. passim

*New York v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015) ..................................................... 17

*Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*,
 210 F.3d 1099 (9th Cir. 2000)..................................................... 8

*O'Bannon v. NCAA*,
 7 F. Supp. 3d 955 (N.D. Cal. 2014) .......................................... 3, 22

*O'Bannon v. NCAA*,
 802 F.3d 1049 (9th Cir. 2015) ................................................... 28

*Ohio v. NCAA*,
 706 F. Supp. 3d 583 (N.D.W. Va. 2023) ................................... 11, 26

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
 32 F.4th 824 (9th Cir. 2022)................................................... 9, 16

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995) .................................................... 16

*Smith v. Pro Football*,
 593 F.2d 1173 (D.C. Cir. 1978).............................................. 25, 29

*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006)................................................................. 12

*United States v. Google LLC*,
 747 F. Supp. 3d 1 (D.D.C. 2024) ........................................... 21, 27

*United States v. Jindal*,
 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) ............................... 10

*United States v. Lopez*,
 No. 23-cr-55 (D.N.V. Apr. 14, 2025) .......................................... 10

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ................................................ 21, 27

*United States v. Phila. Nat'l Bank*,
 374 U.S. 321 (1963).............................................................. 25

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*United States v. Topco Assocs.*,
    405 U.S. 596 (1972) ............................................................................ 24, 25, 26

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ............................................................................ 22

**Statutes and Rules**

15 U.S.C. § 1 ............................................................................ 9, 11

Fed. R. Civ. P. 56(a) ............................................................................ 8

**Other Authorities**

*Directive Regarding Labor Markets Task Force*,
    Federal Trade Commission Chairman Andrew N. Ferguson, (Feb. 26, 2025) ...................... 10

Statement of Interest of the United States of America, *Zeigler v. NCAA*,
    No. 25-cv-00226 (E.D. Tenn. Jun. 3, 2025) ............................................................................ 12, 13

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

"No antitrust offense is more pernicious than price fixing," *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 639 (1992), and rarely does price-fixing present itself with such clarity. National Collegiate Athletic Association ("NCAA") and its member schools agreed to eliminate all salary competition for an entire class of coaches by fixing wages at $0. They codified this agreement in formal bylaws. They enforced it through fines and penalties. And they now defend it with *post hoc* justifications the historical record conclusively refutes and established law conclusively rejects. There is no genuine dispute of fact: NCAA and its member schools fixed wages for the sole purpose of saving money, and saving money does not "qualif[y] as a defense under the antitrust laws." *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998).

Plaintiffs are entitled to summary judgment that NCAA's wage-fixing conspiracy violated the Sherman Act, 15 U.S.C. § 1. The course has already been charted: in *Law v. NCAA*, plaintiffs challenged a materially identical wage-fixing conspiracy in which NCAA and its member schools capped the wages for certain assistant coaches at $16,000. The district court granted summary judgment on liability to the plaintiffs, holding that the wage cap was "prohibited by the Sherman Act" and that "plaintiffs are entitled to judgment as a matter of law on the issue of liability." *Law v. NCAA*, 902 F. Supp. 1394, 1410 (D. Kan. 1995). The Tenth Circuit affirmed. *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998). If anything, this case is easier: NCAA and its member schools did more than cap wages at $16,000, they fixed them uniformly at $0—and kept doing so even after *Law* made clear that fixing the wages of coaches violated federal antitrust law.

NCAA's wage-fixing agreement should be deemed *per se* illegal under the Sherman Act. There is no factual dispute that NCAA's member schools agreed to fix the wages of class members at $0, and there is no exception to the *per se* rule of invalidity for such unabashed horizontal agreements to fix the price of labor. *See United States v. Alston*, 974 F.2d 1206, 1208 (9th Cir. 1992) ("Price fixing is illegal regardless of pro-competitive justifications offered therefor.").

Furthermore, even if the "quick look" rule of reason were applied, NCAA's wage-fixing conspiracy is just as unlawful as the conspiracy in *Law*. NCAA could not show then, and it cannot show now, that an agreement to *completely eliminate* salary competition somehow *enhanced*

economic competition. NCAA's proffered justifications have been rejected multiple times by multiple courts, and they likewise fail here as a matter of law. First, a procompetitive justification is legally cognizable only if it was the defendant's actual reason for imposing the restraint, but NCAA has no evidence that it fixed wages at $0 to serve any of its proffered justifications (rather than simply to save money). Even if NCAA's proffered justifications were genuine, moreover, they would still be legally invalid under established antitrust law—they describe benefits of having more coaches rather than benefits of fixing wages; they identify non-economic benefits rather than benefits to competition; and they improperly seek to justify harm in the labor market with benefits to different markets. While some of these "may be reasonable *concerns*, none are reasonable *justifications* under the antitrust laws." *Clarett v. NFL*, 306 F. Supp. 2d 379, 408 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124.

The restraint at issue here is a price-fix; no more and no less. As in *Law*, there is no triable issue of material fact on the question of the NCAA's violation of Section 1 of the Sherman Act, and Plaintiffs are entitled to summary judgment on that issue.

## FACTUAL BACKGROUND

Class Representatives Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Rudolph Barajas, along with all members of the certified class, are former coaches for NCAA Division I athletic teams. They are all victims of the same wage-fixing conspiracy, through which NCAA and its member schools agreed to eliminate salary competition by jointly agreeing to pay them $0 (the "Wage Fix").

### A.    NCAA and College Sports

NCAA is an unincorporated association whose members are colleges and universities that compete in intercollegiate athletics. SUF 1.[1] NCAA's members are organized into three Divisions—Divisions I, II, and III—based on the strength of competition chosen by the school. SUF 2. This case involves Division I schools, which provide the highest quality of competition because they expend greater resources to support their teams than schools in Divisions II and III— and, as a result, attract the highest quality players. *See O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 987

---

[1] All "SUF" citations refer to Plaintiffs' Statement of Undisputed Facts.

(N.D. Cal. 2014). Division I is thus the only place where coaches can provide their services at the elite, collegiate level. As NCAA's Vice President of Division I Governance put it, "there is no other entity in the world like Division I." SUF 3. More than 390 schools compete in Division I, and they compete in 45 sports (though not every school competes in every sport). SUF 4. Through its membership in NCAA Division I, each institution agrees with NCAA and every other institution to uphold and enforce NCAA Division I bylaws, including the bylaws at issue in this case. SUF 5.

**B.    NCAA and its Member Schools Agreed to Fix Compensation for Coaches.**

The Wage Fix resulted from a series of cost-cutting recommendations by NCAA's aptly-named "Special Committee on Cost Reduction" ("Cost-Reduction Committee"). NCAA established the Cost-Reduction Committee at the 1989 NCAA Convention, giving it the "specific charge of recommending means by which to reduce costs in intercollegiate athletics, without denying students access to higher education or significantly altering the competitive balance among NCAA member institutions." SUF 6. In January 1990, the Chairman of the Cost-Reduction Committee told NCAA members that the Committee would "look at every conceivable way to cut costs and save money." SUF 7; *see Law v. NCAA*, 134 F.3d 1010, 1013 (10th Cir. 1998).

The Cost Reduction Committee identified unrestrained wage competition for coaches as a major driver of overall spending. Its final report advised that "[t]he largest expense item in the athletics budget is personnel" and urged schools that they could "reduce costs" by agreeing not to compete so vigorously for coaches. SUF 8-9; *see Law*, 134 F.3d at 1013-15. NCAA's members turned this advice into several new rules enacted at the 1991 NCAA Convention. Most notably here, NCAA's members voted to limit the number of coaches that each school could hire in each sport, and to also cap the compensation for the lowest-ranked coach within those staff-size limits at $12,000 for the academic year and $4,000 for the summer months. SUF 10. This latter rule was known as the "Restricted Earnings Coach Rule," and was summarily adjudicated to be in violation of Section 1 of the Sherman Act in *Law v. NCAA*, as described in more detail below.

After the 1991 Convention, NCAA and its member schools created a new subcommittee to continue the Cost-Reduction Committee's work, called the NCAA Council Subcommittee To Review 1991 Reform Proposals (the "Fine-Tuning Subcommittee"). SUF 11. The Fine-Tuning

Subcommittee's charge was to recommend additional rule changes that would further advance "the basic intent" of the 1991 rule changes—*i.e.*, to cut costs and save money. SUF 12-13. The Fine-Tuning Subcommittee's chairperson "emphasized" to the NCAA Presidents Commission that "the subcommittee's recommendations were intended neither to compromise nor to change the basic intent" of the 1991 reforms. SUF 12.

When the Fine-Tuning Subcommittee concluded that the staff-size limits had gone too far and eliminated positions previously filled by coaches who provided important guidance to student-athletes, it did not simply recommend expanding the staff-size limits by one coach in each sport. Doing so would "compromise the intent" of the 1991 reforms. Instead, the Subcommittee proposed not only expanding staff-size limits by one coach in each sport, but also imposing the Wage Fix by getting every school to agree that none of them would pay the additional allowed coaches. Specifically, the Subcommittee proposed that "Division I member institutions should be permitted to utilize the services of one volunteer coach" who may not "receive compensation or remuneration from the institution's athletics department except for a maximum of two complimentary tickets to home athletics contests." SUF 14. The NCAA Presidents Commission reviewed this proposal and did not object to putting it up for a vote at the 1992 NCAA Convention, emphasizing that the proposal did not "compromise the basic intent of the [1991] reform legislation," *i.e.*, cutting costs. SUF 13.

Craig Thompson of the Sun Belt Conference introduced the proposal at the 1992 NCAA Convention, assuring voting members that "adoption of this proposal would not result in any significant additional cost to the institution." SUF 15-16. Marcia Saneholtz of Washington State University stated that increasing the staff-size limits would allow schools to offset the "staff reductions" from the prior year's rule changes and "improve[] the coach/student-athlete ratios." SUF 17. After listing those benefits of increasing staff-size limits, she then explained that the Wage Fix of $0 for the new positions meant that "[t]here is no cost attached to this legislation." *Id.* The Division I membership approved the staff-size increases and the Wage Fix, officially enacting them as Division I Bylaws. SUF 18; *see* SUF 24 (Bylaw 11.7.6.2.3 authorized "volunteer coach" position); SUF 25 (Bylaw 11.01.6 prohibited compensation to that position). The enactment's

official rationale stated that the additional coaches hired into the new position would "provid[e] assistance to student-athletes" but, because of the Wage Fix, would do so without "any significant additional costs to the institution." SUF 19.

The enactment euphemistically referred to the new coaching positions as "volunteer coach" positions, to indicate that NCAA member schools were not permitted to pay the coach hired into that slot. *See* SUF 20. By labeling these roles as "volunteer" positions, NCAA and its members embedded the Wage Fix directly into the definition of the job. But as Justice Kavanaugh made clear in *Alston*: "NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." *Alston v. NCAA*, 594 U.S. 69, 112 (2021) (Kavanaugh, J., concurring).

### C.    In *Law v. NCAA*, the Restricted Earnings Coach Rule is Invalidated at Summary Judgment.

The Restricted Earnings Coach rule was struck down on summary judgment in *Law v. NCAA*. The district court ruled that the "quick look" standard applied and that the wage-fixing conspiracy was so plainly unlawful that "plaintiffs are entitled to judgment as a matter of law on the issue of liability." *Law v. NCAA*, 902 F. Supp. 1394, 1410 (D. Kan. 1995). The Tenth Circuit carefully addressed the NCAA's asserted procompetitive justifications and then unanimously affirmed the liability decision. It agreed with the district court that "quick look" review was appropriate, held that the Restricted Earnings Coach Rule was "nothing more than a cost-cutting measure" with no procompetitive benefits, and declared that the plaintiffs were entitled to "summary judgment … on the issue of antitrust liability." *Law v. NCAA*, 134 F.3d at 1024. The U.S. Supreme Court later favorably cited the opinion. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). On remand, the claims of three certified damages classes were tried together to a jury on the question of damages, and the jury returned multi-million-dollar verdicts for all three classes. *See Law v. NCAA*, 185 F.R.D. 324, 331 n.7 (D. Kan. 1999).

**D.      NCAA Continues to Enforce the Volunteer Coach Rule, Fixing Class Members' Compensation at $0.**

Despite the unequivocal decisions in *Law* and the obvious similarities between the Restricted Earnings Coach Rule and the Wage Fix, NCAA and its member schools continued to enforce the Wage Fix. The Wage Fix is functionally identical to the Restricted Earnings Coach Rule. The only difference is that it is even more extreme: compensation is not capped at $16,000 but fixed at $0.

Before its repeal in 2023, the Wage Fix was codified in the NCAA Division I Bylaws ("Bylaws"). These Bylaws are enacted by Division I member institutions, and compliance with the Bylaws is a condition of participation in Division I. SUF 21-22. The Bylaws authorized schools to fill a specific number of coaching positions in each sport, including one position labeled as a "volunteer coach" position. SUF 23-24. The Bylaws then prohibited compensation to anyone working in the "volunteer coach" position. SUF 25. NCAA strictly enforced the Wage Fix throughout the class period. SUF 26.

All members of the class worked as coaches in NCAA Division I sports to which the Wage Fix applied and were designated as "volunteer coaches" when they were hired.[2] As a result, they did not receive, and were prohibited by NCAA bylaws from receiving, any compensation for their work as coaches. Meanwhile, the unrestricted coaches whom class members worked alongside, coaching the same athletes on the same teams, were almost universally paid and paid well, making about $78,000 per year on average. SUF 28.

**E.      NCAA Repeals the Wage Fix.**

NCAA and its member schools voted to repeal the Wage Fix, effective July 1, 2023. SUF 29-30. The proposal for repeal originated with NCAA's Transformation Committee, which the Division I Board of Directors created in 2021 and charged with making recommendations that would "elevate the experience of today's student-athletes and ensure the continued excellence of intercollegiate athletics." SUF 31-32. As part of its work, the Transformation Committee requested

---

[2] The Wage Fix did not apply to Football Bowl Subdivision, Men's Basketball, or Women's Basketball. In those sports, the number of coaches was regulated, but schools were free to pay their coaches as much as they wanted.

that the NCAA Division I Legislative Committee Modernization of the Rules Subcommittee ("Modernization Subcommittee") "review existing rules" and make "specific recommendations" for modifications. SUF 33-34. As part of that review and the resulting report, the Modernization Subcommittee described the post-1991 regulations involving volunteer coaches as being "primarily motivated by … cost containment." SUF 34-35.

The Modernization Subcommittee ultimately recommended "[e]liminat[ing] the volunteer coach designation" and allowing schools to pay all their coaches. SUF 36-37 ("This proposal offsets the proposed elimination of the volunteer coach designation … by increasing the number of individuals who may serve as [unrestricted] coaches."). The Transformation Committee's final report noted this recommendation as one of several proposals designed "to create fairer and more equitable Division I athletics competition." SUF 36.   The repeal proposal was introduced as Division I Proposal No. 2022-28 at the 2023 NCAA Convention, where the Division I Council voted to enact it. The proposal's official rationale stated that "[e]liminati[ng] the volunteer coach designation … will help provide better support to student-athletes" and that the rule change would promote NCAA's "Commitment to Student-Athlete Well-Being." SUF 37-38.

Since the repeal, college athletics has continued without disruption, and NCAA generated record revenue and operating surplus in 2024. SUF 47.

## PROCEDURAL BACKGROUND

Plaintiffs filed their original complaint in March 2023 and the operative Second Amended Complaint in October 2024. NCAA moved to dismiss Plaintiffs' claims in May 2023. In a Memorandum and Order issued in July 2023, this Court denied NCAA's motion to dismiss, ruling that "plaintiffs have alleged facts sufficient to show a violation of § 1 of the Sherman Act." Mem. and Order re: Def.'s Mot. to Transfer and Mot. to Dismiss ("MTD Order") at 20, ECF No. 38. The Court denied NCAA's motion for reconsideration of this ruling. See Order Re: Def.'s Motion for Clarification at 2, ECF No. 50.

Plaintiffs moved for class certification in November 2024. In March 2025, this Court granted Plaintiffs' motion and certified a class of "[a]ll persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of

'volunteer coach,' as designated by NCAA Bylaws." Mem. and Order re: Pltfs.' Mot. for Class Cert. and Def.'s Mot. to Exclude Expert Testimony, ECF 128 at 11. In May 2025, the Ninth Circuit denied NCAA's petition for permission to appeal the Court's order granting class certification. *See* ECF 137. Meanwhile, in *Smart v. NCAA*, No. 22-cv-2125—a coordinated case that alleged an identical wage-fixing violation on behalf of assistant baseball coaches subject to the same NCAA bylaw—NCAA agreed to a class settlement that, if approved, would pay "approximately 99%" of the damages claimed to every "volunteer" baseball coach during the class period. *Smart*, ECF 73 at 36.

## **LEGAL STANDARD**

Summary judgment is warranted if "there is no genuine dispute as to any material fact and [Plaintiffs are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact issue is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* For issues on which the non-moving party bears the burden of proof (*e.g.*, procompetitive justifications), the "moving party may produce evidence negating an essential element of the nonmoving party's case, or … the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

Partial summary judgment may be granted to establish a legal violation, leaving other issues to be determined at trial. *See, e.g. Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.4 (1986) ("[S]ummary judgment ... may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."). Partial summary judgment may also be granted as to some but not all elements of the Section 1 liability analysis, while leaving any genuine factual disputes on liability for trial. *See, e.g.*, *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1524005, at *8 (N.D. Cal. March 28, 2018) (granting partial summary judgment on issue of anticompetitive effects). There are thus a variety of ways that partial summary judgment may narrow the issues for trial. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 n.9 (9th Cir. 2009)

("[P]artial summary judgment … serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact").

## **ARGUMENT**

Section 1 of the Sherman Act prohibits all "unreasonable" restraints of trade. *NCAA v. Bd. of Regents*, 468 U.S. 85, 98 (1984) (holding that NCAA's restraint on televising college football games was unreasonable); *see* 15 U.S.C. § 1. Courts use "two kinds of analysis to determine whether a restraint of trade is unreasonable: the *per se* approach and the rule of reason." *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022). Summary judgment is warranted here under either analysis.

First, Plaintiffs are entitled to summary judgment because the Wage Fix is *per se* illegal. The *per se* approach applies to restraints that are known to be "so destructive of competition, and so devoid of redeeming value" that they are unreasonable as a matter of law and automatically unlawful. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000). "Foremost in the category of per se violations is horizontal price-fixing among competitors." *Id.*[3] The Wage Fix is exactly that: an unabashed horizontal agreement to fix the price of labor for all members of the class at $0. No exception to the *per se* rule applies on the facts of this case, which involves a naked wage-fixing scheme with no redeeming value.

Second, in the alternative, Plaintiffs are entitled to summary judgment under the "quick look" rule of reason. Under "quick look" review, the defendant bears the burden of proving that the challenged restraint is justified by procompetitive benefits that, on balance, cause the restraint to enhance competition in the relevant market—here, the labor market for assistant coaches. *FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013). That is a burden NCAA cannot satisfy, as a Wage Fix that *eliminates* economic competition cannot possibly *enhance* economic competition. Indeed, NCAA cannot even get past the threshold: all three justifications NCAA has offered are invalid as a matter of law. For one thing, they are all invalid because they are pretextual: the historical record

---

[3] A "horizontal restraint" is "an agreement among competitors on the way in which they will compete with one another." *Bd. of Regents*, 468 U.S. at 99. In contrast, a "vertical restraint" is a restrictive agreement between entities at different levels of the supply chain, like those between a manufacturer and a retailer. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). Horizontal restraints are far less likely to survive antitrust scrutiny than vertical ones. *Id.*

1  shows that these supposed justifications "played no part in [NCAA's] decision" to impose the Wage

2  Fix, making them invalid as a matter of law. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125

3  F.3d 1195, 1219 (9th Cir. 1997). Even if they were genuine, moreover, they would fail as a matter

4  of law for other reasons—they are justifications for the additional coaching position rather than

5  the Wage Fix on that position; they are improper non-economic justifications; or they improperly

6  seek to justify labor-market harms with benefits to other markets. None of them can justify

7  NCAA's repressive wage-fixing conspiracy.

8       Whether analyzed as *per se* illegal price-fixing or under the "quick look" rule of reason,

9  NCAA's wage-fixing conspiracy is illegal as a matter of law, and just as in the *Law* case, "plaintiffs

10  are entitled to judgment as a matter of law on the issue of liability." *Law*, 902 F. Supp. at 1410.

11  **I.    The Wage Fix Is Unlawful *Per Se*.**

12       Agreements among competitors to fix prices "are unlawful *per se* under the Sherman Act."

13  *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 345 (1982). Wage-fixing agreements, which

14  are just price-fixing agreements regarding the price of labor, are *per se* unlawful as well. As the

15  current Commissioner of the FTC recently put it, "wage-fixing agreements … represent a hardcore

16  violation of the competition laws subject to the *per se* standard." Federal Trade Commission

17  Chairman Andrew N. Ferguson, *Directive Regarding Labor Markets Task Force* (Feb. 26, 2025);

18  *see also, e.g.*, Jury Verdict, ECF No. 662, *United States v. Lopez*, No. 23-cr-55 (D.N.V. Apr. 14,

19  2025) (criminal jury verdict finding defendant guilty of wage-fixing); *Fleischman v. Albany Med.

20  Ctr.*, 728 F. Supp. 2d 130, 157 (N.D.N.Y. 2010) ("Wage-fixing agreements are considered a per se

21  violation of the Sherman Act." (alteration omitted)); *United States v. Jindal*, 2021 WL 5578687, at

22  *6 (E.D. Tex. Nov. 29, 2021) (collecting cases)). Because price-fixing and wage-fixing agreements

23  are *per se* unlawful, judgment is warranted as soon as the fact of an illegal agreement is established:

24  "Whatever economic justification particular price-fixing agreements may be thought to have, the

25  law does not permit an inquiry into their reasonableness. They are all banned." *United States v.

26  Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).

27       The Wage Fix is a textbook wage-fixing conspiracy. No one disputes that NCAA's member

28  schools compete in the labor market for coaches, spending several billion dollars each year to

attract and retain top talent. SUF 40. But because of the Wage Fix, they agreed to forgo that competition for an assistant coach on each team and set that coach's pay at $0. The existence of this agreement is undisputed and, indeed, it was written explicitly into NCAA's Division I Bylaws, which prohibited schools from paying class members any "compensation or remuneration" beyond minimal, incidental non-cash benefits. SUF 25; NCAA Bylaw 11.01.6.[4] In short, there is no question that NCAA and its member schools agreed to fix prices for labor. Under long-established antitrust law, the Wage Fix is "unlawful per se under the Sherman Act." *Socony-Vacuum*, 310 U.S. at 218; *see also United States v. Alston*, 974 F.2d 1206, 1208 (9th Cir. 1992) ("Price fixing is illegal regardless of pro-competitive justifications offered therefor.").

As it has in the past, NCAA will likely try to escape the rule of *per se* illegality by arguing that the Sherman Act applies differently to NCAA than it does to other defendants. It will likely base that argument on the Supreme Court's *Board of Regents* decision, which applied "quick look" review rather than the *per se* rule to invalidate an NCAA restraint of trade. *See Bd. of Regents*, 468 U.S. at 100 ("[W]e have decided that it would be inappropriate to apply a *per se* rule to this case."). That argument is outdated and incorrect, and it would conflict with Ninth Circuit precedent specifically rejecting such an overbroad reading of *Board of Regents*.

In *Board of Regents*, the Supreme Court addressed NCAA rules fixing the price and the terms on which college football games could be televised. *See* 468 U.S. at 92-94. The Court reiterated that "[h]orizontal price fixing [is] ordinarily condemned as a matter of law under an 'illegal *per se*' approach.' *Id.* at 100. But it declined to apply the *per se* rule in recognition of the fact that some kinds of cooperation between NCAA member schools "is necessary if the type of competition [they] seek to market is to be preserved." *Id.* at 117. Specifically, if the schools were not allowed to agree on the rules of the game and how to market their joint product, college sports "might otherwise be unavailable." *Id.* at 102; *see also id.* at 101 ("[R]ules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon."). The Supreme Court accordingly

---

[4] NCAA bylaws are agreements among competitors that satisfy Sherman Act Section 1's first element of a "contract, combination, … or conspiracy." 15 U.S.C § 1; *see, e.g.*, *Ohio v. NCAA*, 706 F. Supp. 3d 583, 591 (N.D.W. Va. 2023).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

applied "quick look" review rather than the *per se* rule, ultimately holding that NCAA's price-fixing was unreasonable and did "not in fact serve any [] legitimate purpose." *Id.* at 110.

*Board of Regents* does not create a blanket exception to *per se* treatment for all NCAA rules. Instead, the Ninth Circuit has explained that *Board of Regents*' exception to the *per se* rule is "very narrow," and that price-fixing "fall[s] within [*Board of Regents*'] protection" only if it is "reasonably ancillary to the legitimate cooperative aspects of the venture." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003).[5] The Supreme Court has described *Board of Regents* the same way: a restraint escapes *per se* invalidity under *Board of Regents* only if it is "ancillary to the legitimate and competitive purposes of the business association." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006) (citing *Bd. of Regents*, 468 U.S. at 113-15). The Department of Justice likewise explained just a few weeks ago that "restraints involving college sports may be per se unlawful [when] they have little or no connection to the schools' need to cooperate." Statement of Interest of the United States of America ("USA *Zeigler* Brief"), ECF 28 at 7 n.1, *Zeigler v. NCAA*, No. 25-cv-00226 (E.D. Tenn. Jun. 3, 2025).

This "ancillary restraints" test is well-established in antitrust law. Under the ancillary-restraints doctrine, a restraint does not escape *per se* invalidity "merely because it accompanies some other agreement that is itself lawful." *Deslandes v. McDonald's United States, LLC*, 81 F.4th 699, 704 (7th Cir. 2023) (Easterbrook, J.). Instead, to avoid *per se* liability, a defendant must prove that the challenged restraint was "reasonably necessary" to achieve the cooperative venture's broader purpose. *Aya Healthcare Servs. v. AMN Healthcare*, Inc., 9 F.4th 1102, 1109 (9th Cir. 2021); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21 (1979) (restraint held to be ancillary because it was "necessary to achieve these efficiencies"); *Freeman*, 322 F.3d at 1151 (requiring an "organic connection between the restraint and the cooperative needs of the enterprise").

---

[5] The Ninth Circuit has occasionally described *Board of Regents*'s holding more broadly, in cases in which no party argued that the *per se* rule applied. *See Nat'l Football League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*, 933 F.3d 1136, 1150 n.5 (9th Cir. 2019). But when the *per se* rule's applicability was squarely presented, as it was in *Freeman*, the Ninth Circuit made clear *Board of Regents* requires a showing of ancillarity before displacing the *per se* rule.

The Ninth Circuit has rejected attempts to avoid *per se* invalidity under *Board of Regents*. In *Freeman*, for example, the defendant realtor association argued that its price-fixing was ancillary to its broader joint venture. The Ninth Circuit rejected the argument, holding that defendants did not satisfy *Board of Regents*' requirement to demonstrate a "plausible connection between the specific restriction and the essential character of the product." *Id.* (quoting *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984)). Because the price-fixing agreement was not ancillary, it was invalid *per se*. *Id.*

NCAA likewise cannot plausibly contend that a rule restricting the pay of the lowest-ranked coach on each team is part of the "essential character" of college athletics. *Freeman*, 322 F.3d at 1151. While certain agreements among NCAA schools—such as the requirement that the players be college students—may be part of college athletics' essential character and thus reasonably ancillary, nothing in the record even arguably supports the conclusion that college athletics "could not function" without fixing the wages of the lowest-ranked coach on each team. *Maricopa Cty.*, 457 U.S. at 353; *see Bd. of Regents*, 468 U.S. at 117 (restraints escape *per se* review when they are "necessary if [college athletics] is to be preserved"). To the contrary, given that college athletics has functioned for decades with unlimited spending on head coaches, other assistant coaches, non-coaching staff, facilities, and equipment, SUF 39, it plainly does not require fixing any coach's wages at $0. *See Alston*, 594 U.S. at 90 ("That *some* restraints are necessary to create or maintain a league sport does not mean *all* aspects of elaborate interleague cooperation are."). Indeed, NCAA's repeal of the Wage Fix in 2023—after which college athletics has continued unabated and is generating record revenues, SUF 47—conclusively demonstrates that the Wage Fix "ha[s] little or no connection to the schools' need to cooperate." USA *Zeigler* Brief at 7 n.1.

The Wage Fix constitutes a textbook wage-fixing agreement that serves no function reasonably necessary to college athletics, making it subject to *per se* condemnation under the Sherman Act. And because there is no factual dispute that the Wage Fix occurred, summary judgment for Plaintiffs should be granted under the *per se* standard. *See, e.g.*, *Freeman*, 322 F.3d at 1152-54 (directing summary judgment for plaintiff after rejecting ancillarity argument);

13

1   *Maricopa Cty.*, 457 U.S. at 353-54 (same); *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995)

2   (same).

3   **II.     In The Alternative, Summary Judgment Should Be Granted Under The "Quick**

4   **Look" Rule of Reason.**

5            Even if the *per se* rule did not apply, the Wage Fix would be unlawful under the "quick

6   look" rule of reason. Quick-look analysis is the appropriate framework for horizontal price-fixing

7   restraints that are not treated as *per se* invalid, as demonstrated by the Supreme Court's quick-look

8   analysis in *Board of Regents*, 468 U.S. 85, and the Tenth Circuit's quick-look analysis in *Law v.*

9   *NCAA*, 134 F.3d 1010. *See* MTD Order at 17. Under quick-look review, anticompetitive effects

10  are presumed and "the burden shifts to the [defendant] to produce evidence of procompetitive

11  justification or effects." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir.

12  2011). NCAA has identified three supposed procompetitive justifications in this case, but all three

13  fail at the threshold because they are not legally cognizable under antitrust law.

14           **A.     If The Court Holds That The *Per Se* Rule Does Not Apply, Quick-Look Review**

15           **Would Be Appropriate.**

16           Restraints not subject to *per se* invalidity are analyzed under the rule of reason to determine

17  whether they unreasonably restrain competition. *See Bd. of Regents*, 468 U.S. at 100. The rule of

18  reason has two forms: "full" and "quick look." Under the full rule of reason, the plaintiff has the

19  initial burden to prove anticompetitive effects, which sometimes (but not always) requires

20  "elaborate industry analysis, market definitions, [and] complicated testimony of high-priced expert

21  economists." MTD Order at 18 n.7. Quick-look analysis, by contrast, applies "when the great

22  likelihood of anticompetitive effects can easily be ascertained" from the nature of the restraint.

23  *Cal. Dental Ass'n*, 526 U.S. at 770; *see id.* (quick-look applies when "an observer with even a

24  rudimentary understanding of economics could conclude that the arrangements in question would

25  have an anticompetitive effect"). Under the quick-look framework, once the plaintiff demonstrates

26  the existence of an "inherently suspect" restraint, anticompetitive effects are presumed and "the

27  burden shifts to the [defendant] to produce evidence of procompetitive justification or effects."

28  *Harris*, 651 F.3d at 1138; *see FTC v. Actavis, Inc.*, 570 U.S. at 159.

Horizontal price-fixing, if not *per se* illegal, falls squarely within the quick-look framework because it is "perhaps the paradigm of an unreasonable restraint of trade." *Bd. of Regents*, 468 U.S. at 100. As the Supreme Court explained in *Board of Regents*, "when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." 468 U.S. at 109. Accordingly, the Supreme Court applied "quick look" review to NCAA's horizontal price-fixing agreement in *Board of Regents*, assuming anticompetitive effects and ultimately holding that NCAA's procompetitive justifications failed to justify NCAA's price-fixing. *Id.* at 109-20.

Likewise in *Law*, the Tenth Circuit analyzed NCAA's nearly-identical wage-fixing conspiracy under the quick-look framework. The *Law* court explained that "where a practice has obvious anticompetitive effects—as does price-fixing— … the court is justified in proceeding directly to the question of whether the procompetitive justifications advanced for the restraint outweigh the anticompetitive effects under a 'quick look' rule of reason." *Law*, 134 F.3d at 1020. The Supreme Court later endorsed *Law*'s application of the "quick look" framework, citing it as an example of a case in which "quick-look analysis carries the day [because] the great likelihood of anticompetitive effects can easily be ascertained." *Cal. Dental Ass'n*, 526 U.S. at 770.

If the *per se* rule is not applied, quick-look analysis would be the correct framework here. That is the framework that was applied in *Board of Regents* and *Law*, and this Court applied that framework at the motion to dismiss stage, explaining that "a quick-look analysis is appropriate here." MTD Order at 17. The evidence now confirms the existence of the exact restraint alleged in the complaint, so "quick-look analysis" would be the appropriate form of the rule of reason at this stage as well. The Wage Fix was an explicit horizontal wage-fixing agreement among NCAA and its member schools to eliminate all salary competition for coaches in the class and uniformly fix their wages at $0. "[A]n observer with even a rudimentary understanding of economics" would conclude that fixing wages at $0 would have the anticompetitive effect of decreasing wages. *Cal. Dental Ass'n*, 526 U.S. at 770. Anticompetitive effects are therefore presumed, and the Wage Fix

"requires some competitive justification even in the absence of a detailed market analysis." *Bd. of Regents*, 468 U.S. at 110.[6]

### B.    NCAA's Procompetitive Justifications are Invalid as a Matter of Law.

NCAA cannot carry its burden to prove that "on balance, 'the challenged restraint enhances competition.'" *Law*, 134 F.3d at 1021 (quoting *Bd. of Regents*, 468 U.S. at 104). It cannot even get past the threshold: the three procompetitive justifications it has offered are invalid as a matter of law, making summary judgment appropriate without the need for any balancing. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1142860, at *4 (E.D.N.Y. Mar. 15, 2024) ("Courts routinely assess whether proffered procompetitive justifications are cognizable as a matter of law and regularly do so at the summary judgment stage.").

NCAA has offered three justifications for the Wage Fix, asserting that it: (1) "expanded opportunities for individuals interested in gaining experience and pursuing careers in coaching sports"; (2) "enhanced equitable competition between NCAA Division I member institutions"; and (3) "increased resources available to student-athletes." SUF 41-42. The first legal problem with these justifications is that they are pretextual: NCAA cannot show that it fixed coaching wages to serve these ends, as the historical record makes clear that the only motivation was saving money. The second legal problem is that even if these rationales were NCAA's true reasons for acting, they are not legally cognizable under the antitrust laws.

### 1.    NCAA's Procompetitive Justifications Are All Pretextual.

NCAA's proffered procompetitive justifications are invalid as a matter of law because NCAA cannot show that they were its actual reasons for fixing wages at $0. A procompetitive

---

[6] Plaintiffs could also demonstrate anticompetitive effects with common evidence under a full-blown rule-of-reason analysis, even though doing so is unnecessary here. *See Law v. NCAA*, 134 F.3d at 1020. Under the full rule of reason, a plaintiff may show anticompetitive effects directly through "proof of actual detrimental effects on competition," such as decreased wages. *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022). When a plaintiff makes that showing, no "inquir[y] into market definition and market power" is required. *Id.*; *see also, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the plaintiff puts forth evidence of … supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."). Here, the wage-fixing conspiracy had "detrimental effects on competition" because it undisputedly fixed the price for labor at $0, thereby precluding competition among schools and depressing wages across the class. *PLS.COM*, 32 F.4th at 834.

justification is legally cognizable only if it is "a nonpretextual claim." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 986 (9th Cir. 2023) (alterations omitted)). A defendant cannot justify a restraint with *post hoc* rationales that were not the actual reasons for imposing the restraint. Instead, if the historical record shows that an asserted procompetitive justification "played no part in the decision to act," it is pretextual and invalid as a matter of law. *Image Tech. Servs.*, 125 F.3d at 1219; *see also, e.g.*, *New York v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (affirming judgment because "[a]ll of Defendants' procompetitive justifications … are pretextual"); *McWane, Inc. v. FTC*, 783 F.3d 814, 841 (11th Cir. 2015) (affirming judgment because "internal documents belie the notion that the [restraint] was designed for any procompetitive benefit").

Here, there is no genuine dispute about why NCAA and its member schools enacted the Wage Fix: to save money. The historical record shows that NCAA may have had various motivations *for adding new coaching positions* in 1992, but its only motivation *for fixing the wages of those positions at $0* was to save money. As the *Law* court put it in analogous circumstances, "[t]he undisputed record reveals that the [wage cap] is nothing more than a cost-cutting measure." 134 F.3d at 1024. Likewise here, the historical record—which is largely the same as in *Law*—shows that fixing wages at $0 was not done in service of "expand[ing] opportunities for individuals interested in gaining experience and pursuing careers in coaching sports," "enhanc[ing] equitable competition," or "increas[ing] resources available to student-athletes," but merely to obtain those benefits for free.

The historical record leaves no genuine dispute of fact: The Wage Fix was designed to save money, not enhance competition. The Wage Fix emerged from recommendations by NCAA's aptly-named "Cost Reduction Committee," which was formed in 1989 with the express purpose of "look[ing] at every conceivable way to cut costs and save money." SUF 7; *see Law*, 134 F.3d at 1013. In 1991, NCAA and its member schools adopted new rules to implement the Cost Reduction Committee's cost-cutting recommendations, including limiting the number of coaches in each sport and imposing the Restricted Earnings Coach Rule that was invalidated in *Law v. NCAA*. SUF 10. As the *Law* court found in granting summary judgment to the plaintiffs, the recommended reforms were "nothing more than [] cost-cutting measure[s]." *Law*, 134 F.3d at 1024.

After the 1991 Convention, NCAA and its member schools continued the Cost Reduction Committee's cost-cutting work through the Fine-Tuning Subcommittee. SUF 11-13. The Fine-Tuning Subcommittee was authorized to recommend additional rule changes only if they were consistent with "the basic intent" of the Cost-Reduction Committee—*i.e.*, "to cut costs and save money." *Id.* Accordingly, when the Fine-Tuning Subcommittee decided that the 1991 staff-size limits were set too low, it did not recommend simply increasing the limits, as paying more coaches would compromise the cost-saving intent of the 1991 reforms. Instead, the Fine-Tuning Subcommittee recommended expanding the staff-size limits by one coach in each sport and then imposing the Wage Fix—*i.e.*, getting all schools to agree to pay these new coaches $0 instead of competing on salary. SUF 14. The Fine-Tuning Subcommittee's final report recommending the Wage Fix does not mention any of NCAA's procompetitive justifications, SUF 43, making clear that those considerations "played no part in the [Subcommittee's] decision to act." *Image Tech. Servs.*, 125 F.3d at 1219.

NCAA representatives explicitly confirmed this cost-cutting rationale when they formally introduced and approved the Wage Fix at the 1992 Convention. The proposal's supporters described benefits that would result from expanding the staff-size limits, including that allowing schools to hire more coaches would provide more opportunities for "women to test the coaching waters" and "enhanc[e] the student-athlete experience." SUF 17. But no one suggested that fixing wages for these additional coaches at $0 served any such ends. Instead, they simply emphasized that the Wage Fix meant that "adoption of this proposal would not result in any significant additional cost to the institution," SUF 16, and that "[t]here is no cost attached to this legislation," SUF 17. Nobody argued that fixing wages would do anything other than save money.

NCAA's own retrospective review of the historical record admits the cost-cutting rationale. In 2022, the NCAA Modernization of the Rules Subcommittee, which ultimately recommended repeal of the Wage Fix, reviewed the history of Division I coaching regulations. The resulting report made explicit what the historical record already demonstrated: rules regarding "volunteer coaches" were "primarily motivated by … cost containment." SUF 35. NCAA's pre-litigation

historical review does not list NCAA's proffered procompetitive justifications as being among the reasons NCAA imposed the Wage Fix.

Most damning, NCAA's litigation claim that it *enacted* the Wage Fix to serve the asserted procompetitive rationales contradicts NCAA's own statements that *repealing* the Wage Fix would serve those exact same ends. Whereas NCAA's *post hoc* litigation position is that the Wage Fix was enacted to "enhance[] equitable competition," its own Transformation Committee described the *repeal* as part of "an effort to create fairer and more equitable Division I athletics competition." SUF 36. Whereas NCAA's *post hoc* litigation position is that the Wage Fix was designed to "increase[] resources available to student-athletes," the official rationale for *repeal* stated that "[e]limination of the volunteer coach designation … will help provide better support to student-athletes." SUF 37. And whereas NCAA's *post hoc* litigation position is that the Wage Fix was designed to "expand[] opportunities for individuals interested in gaining experience and pursuing careers in coaching sports," NCAA's co-conspirators, before there was litigation, wrote that *repeal* of the Wage Fix would "provide increased opportunities for individuals to pursue entry into legitimate and sustainable coaching positions, including notably recent former student-athletes seeking to identify an off-the-field career path." SUF 44.

These contradictions confirm what the historical record makes clear: NCAA's asserted procompetitive justifications are nothing more than *post hoc* rationalizations created for litigation purposes and bear no relationship to NCAA's actual motivations for enacting the Wage Fix. There is no dispute of material fact: NCAA enacted the wage cap to "cut costs and save money," *Law*, 134 F.3d at 1013, and the justifications it offers in this litigation "played no part in the decision" to fix wages, *Image Tech.*, 125 F.3d at 1219. Because the undisputed evidence "belie[s] the notion that the [Wage Fix] was designed for any procompetitive benefit," *McWane*, 783 F.3d at 841, NCAA's procompetitive justifications are legally invalid and summary judgment is appropriate.

### 2.    All Three Justifications Are Legally Invalid for Additional Reasons.

Even if any of NCAA's justifications were genuine and not invented for litigation, they still would fail as a matter of law—and have repeatedly been rejected as a matter of law in other cases. NCAA bears the burden of proving that the Wage Fix "actually promote[d] competition in a

relevant market." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1150 (N.D. Cal. 2014); *see Board of Regents*, 468 U.S. at 104 ("[T]he criterion to be used in judging the validity of a restraint on trade is its impact on competition."). NCAA's attempt to do so fails at the threshold: its proffered procompetitive justifications are invalid as a matter of law because they have nothing to do with the Wage Fix's effect on economic competition in the labor market: NCAA's justifications describe benefits of increasing staff-size limits rather than of the Wage Fix itself; rely on non-economic social benefits that are not cognizable under antitrust law; and improperly seek to justify harm in the labor market with alleged benefits to entirely different markets. As another court put it in rejecting many of the same arguments, "[w]hile these may be reasonable *concerns*, none are reasonable *justifications* under the antitrust laws." *Clarett*, 306 F. Supp. 2d at 408.

It is no wonder NCAA has not and cannot identify any way in which the Wage Fix actually promoted economic competition in the labor market: because the entire purpose and effect of fixing wages at $0 was to *eliminate* economic competition. Because NCAA "has failed to offer *any* legitimate procompetitive justifications for the Rule, [Plaintiffs] must prevail." *Id.* (granting summary judgment).

### a. The "Expanded Opportunities" Justification is Legally Invalid.

NCAA's first asserted justification—that the Wage Fix "expanded opportunities for individuals interested in gaining experience and pursuing careers in coaching sports," SUF 42—is invalid as a matter of law for three reasons: (1) these "expanded opportunities" are a result of the staff-size limits being increased, not the Wage Fix on the added coaching positions; (2) NCAA's stated desire to "expand[] opportunities" specifically for inexperienced coaches (while perhaps admirable as a social goal) is a noneconomic objective that cannot justify a wage-fixing conspiracy under the Sherman Act; and (3) the Wage Fix is not tailored to the stated goal of providing "expanded opportunities" to inexperienced coaches.

*First*, the "expanded opportunities" rationale is legally invalid because it is a rationale for increasing the staff-size limits, not fixing the wages for the new positions at $0. A procompetitive justification is legally valid only if the restraint itself, rather than unchallenged conduct, "is a

substantial cause of" the proposed benefit. *United States v. Google LLC*, 747 F. Supp. 3d 1, 173 (D.D.C. 2024); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 484–85 (1992) ("[Kodak's inventory-costs] justification fails to explain … [challenged conduct] that would have no effect on Kodak's inventory costs."); *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001) (procompetitive benefit valid only if it justifies "the specific means here in question"). Here, while increasing the overall number of permitted coaching positions "expanded opportunities" for coaches, the Wage Fix on those new coaches did nothing of the sort; it simply fixed the wages of any coach providing those additional services.

The National Football League ("NFL") once tried to justify its own wage fix on this same basis, and the argument was rejected at summary judgment. In *Brown v. Pro Football*, the NFL and its teams created new "Developmental Squads" and fixed the wages for players on those squads at $1,000 per week. 1992 WL 88039, at *1 (D.D.C. Mar. 10, 1992). NFL argued that the wage fix was procompetitive because the Developmental Squads provided new "development and training opportunities" for the players. *Id.* at *9. The court rejected the argument and granted summary judgment for the plaintiffs: "The same opportunities would be available if [the squads] did not have a salary restraint. The fact that an employer creates jobs does not allow that employer to violate the Sherman Act by fixing salaries." *Id.*

Likewise here, "the same opportunities [for coaches] would be available" without the Wage Fix. *Id.* The Wage Fix did not expand opportunities; it just made those opportunities *worse* for the coaches (and cheaper for the members of the conspiracy). This is clear from the current state of affairs: when NCAA repealed the Wage Fix, it left the total number of coaching positions unchanged, meaning that the same number of "opportunities" for coaches exist now as existed when the Wage Fix was in effect. This definitively shows that the coaching position and the Wage Fix are two separate things, and benefits of the former cannot be used to justify the latter. *See Brown*, 1992 WL 88039, at *1. If anything, the Wage Fix *decreased* opportunities for coaches by making the new positions unavailable to coaches who could not afford to work for free. That is why the Commissioner of NCAA's Southeastern Conference—one of NCAA's co-conspirators—conceded that the way to "expand opportunities" for inexperienced coaches was to *eliminate* the

Wage Fix: "[Repeal] will also provide increased opportunities for individuals to pursue entry into legitimate and sustainable coaching positions." SUF 44.

To the extent NCAA argues that the Wage Fix caused more schools to hire additional coaches by making those coaches cheaper, that argument would fail. For one thing, the Wage Fix did not create the ability to hire unpaid coaches; schools would have been free under NCAA bylaws to offer unpaid coaching jobs even without the Wage Fix. The Wage Fix thus provided no benefit that schools could not have achieved through their own individual decisions about compensation levels. *See O'Bannon*, 7 F. Supp. 3d at 1004 (rejecting similar argument because "the Plaintiffs are not seeking an injunction requiring schools to provide compensation to their student-athletes -- they are seeking an injunction to permit schools to do so"), *aff'd*, 802 F.3d 1049.

An argument that wage-fixing is permissible because it lowers labor costs is circular: this alleged "benefit" of suppressed wages is precisely the anticompetitive harm the Sherman Act prohibits. As the Tenth Circuit explained in *Law*, "[i]f holding down costs … is a procompetitive effect justifying joint conduct, then section 1 can never apply to input markets or buyer cartels. That is not and cannot be the law." *Law*, 134 F.3d at 1023; *see id.* at 1022 ("Cost-cutting by itself is not a valid procompetitive justification."); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 479 (7th Cir. 2020) ("Any claimed benefits … must be procompetitive and not simply the result of eliminating competition."); *Freeman*, 322 F.3d at 1152 ("Firms cannot fix prices as a mere quid pro quo for providing consumers with better products."). While the antitrust laws encourage cutting costs through innovation and efficiency, they flatly prohibit cutting costs by fixing wages. As the *Brown* court put it, "The fact that an employer creates jobs does not allow that employer to violate the Sherman Act by fixing salaries." 1992 WL 88039, at *9.

*Second*, NCAA's stated desire to "expand[] opportunities" specifically for "individuals interested in gaining experience and pursuing careers in coaching sports," SUF 42, is a non-economic objective that cannot justify a restraint on trade under the Sherman Act. Under the Sherman Act, defendants must show that their restraint "enhances competition"—meaning *economic* competition in the relevant market, not social goals like helping particular groups of people. *Bd. of Regents*, 468 U.S. at 104. The Supreme Court "has regularly refused [] requests

from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition." *Alston*, 594 U.S. at 69; *see, e.g.*, *FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 424 (1990) (rejecting argument that restraining competition would improve legal representation to indigent defendants); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687-96 (1978) (rejecting argument that restraining competition improved safety).

Applying this fundamental principle under the Sherman Act, the *Law* court rejected the same argument NCAA makes here: "While opening up coaching positions for younger people may have social value apart from its [e]ffect on competition, we may not consider such values unless they impact upon competition." *Law*, 134 F.3d at 1021-22 (affirming summary judgment). Likewise here, while providing opportunities for inexperienced coaches may be socially desirable, it "do[es] not make [wage-fixing] any less unlawful." *Alston*, 594 U.S. at 95. Fixing wages at zero eliminates competition by definition. Under the Sherman Act, no social objective, however worthy, can justify an agreement that eliminates economic competition.

*Third*, even if restricting hiring to inexperienced coaches were a valid goal under antitrust law (and it is not), the Wage Fix "is not even arguably tailored to serve" that goal. *Bd. of Regents*, 468 U.S. at 118-19. The *Law* court rejected an identical argument for the identical reason. NCAA argued that the $16,000 salary cap in *Law* would "allow younger, less experienced coaches entry into Division I coaching positions." 134 F.3d at 1021. The Court held this justification invalid on summary judgment because the restraint was not even tailored to serve it, as NCAA Bylaws "contained no restrictions other than salary designed to insure that the position would be filled by entry-level applicants." *Id.* at 1022 (granting summary judgment).

Likewise here, if expanding opportunities for inexperienced coaches were genuinely the goal, the Wage Fix is not designed to achieve it. A wage fix affects only compensation—it does nothing to ensure that the positions actually go to inexperienced coaches rather than experienced ones willing to work for less. If NCAA wanted to reserve these positions for inexperienced coaches, it had straightforward regulatory tools available: it could have restricted the positions to coaches without Division I experience. NCAA has used precisely such experience-based

restrictions before. *See* SUF 45 (legislation restricting certain coaching positions to those with limited prior experience). Instead, NCAA imposed only the Wage Fix—a blunt instrument that suppresses compensation but does nothing to ensure the positions actually go to inexperienced coaches. This fundamental mismatch between the rule's mechanism (wage restriction) and its stated goal (helping inexperienced coaches) renders the justification legally invalid. *See Law*, 134 F.3d at 1022 (holding justification invalid at summary judgment because rule was not tailored to serve stated purpose). Summary judgment is warranted as to this justification.

### b.    The "Competitive Balance" Justification is Legally Invalid.

NCAA's contention that the Wage Fix "enhanced equitable competition between NCAA Division I member institutions," SUF 42, likewise cannot sustain a wage-fixing agreement. By "equitable competition," NCAA is referring to on-field "competitive balance" among member schools—*i.e.*, more evenly matched sporting contests. This justification is invalid because (1) it improperly seeks to justify harm in the labor market for coaches with supposed benefits to a different market—the consumer market for sporting events; and (2) the Wage Fix is not tailored to promote competitive balance.

*First,* this "competitive balance" justification is invalid because "[p]rocompetitive justifications for price-fixing must apply to the same market in which the restraint is found, not to some other market." *Law*, 902 F. Supp. at 1406. NCAA violates this rule by improperly trying to justify anticompetitive harm in the labor market for assistant coaches with supposedly procompetitive benefits in a different market: the consumer market for sporting events. As detailed below, courts at every level—including multiple circuits, several district courts, and the Supreme Court in dicta—have deemed such "cross-market balancing" impermissible under the Sherman Act, which does not allow courts "to sacrifice competition in one portion of the economy for greater competition in another portion." *United States v. Topco Assocs.*, 405 U.S. 596, 611 (1972). While the Ninth Circuit has not yet ruled on the issue, *see Epic Games*, 67 F.4th at 989, this Court should join the consensus and reject NCAA's invalid cross-market balancing argument.

For starters, it is black-letter antitrust law that in merger challenges under the Clayton Act, "[a]nticompetitive effects in one market [cannot] be justified by procompetitive consequences in

another." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963). The Supreme Court has invoked this same principle in a Sherman Act case, explaining in dicta that "[c]ompetition cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." *Topco*, 405 U.S. at 610. As the Court explained in *Topco*, courts are not equipped to make relative value judgments about whether workers should be forced to bear harms to deliver benefits to consumers, or to make any other incommensurate comparisons: "If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion, this [] is a decision that must be made by Congress and not by private forces or by the courts." *Id.* at 611.[7]

Following the Supreme Court's lead, courts of appeals have consistently rejected cross-market balancing. Most recently, the Seventh Circuit squarely rejected the "approach" of treating "benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)," explaining that such balancing wrongly suggests "that antitrust law is unconcerned with competition in the markets for inputs." *Deslandes*, 81 F.4th at 703. The D.C. Circuit reached the same conclusion while rejecting a "competitive balance" argument akin to the one NCAA makes here. In *Smith v. Pro Football*, 593 F.2d 1173 (D.C. Cir. 1978), the NFL argued that the anticompetitive features of its annual college player draft were justified because the draft "promote[d] the teams' playing-field equality." *Id.* at 1185. The D.C. Circuit rejected this argument, holding that the anticompetitive effects to the labor market could not be "netted out" against alleged benefits in the consumer market because such effects "are not comparable" and "it is impossible to 'net them out.'" *Id.* at 1186. The Tenth and Fifth Circuits have likewise rejected cross-market balancing. *See Law*, 134 F.3d at 1022 ("Lower prices [to consumers] cannot justify a cartel's control of prices charged by suppliers."); *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1392 (5th Cir. 1983) ("[T]he anticompetitive evils of a restrictive practice must be

---

[7] In *Alston*, the Supreme Court declined to squarely address the question because no party raised it. 594 U.S. at 87. Other courts have likewise considered cross-market benefits where no party raised the issue.

balanced against any procompetitive benefits or justifications *within the confines of the relevant market*." (emphasis added)).

District courts across the country have likewise held that "[a]s a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for [] labor," *Ohio*, 706 F. Supp. 3d at 596, and that a sports league "may not justify the anticompetitive effects of a policy by arguing that it has procompetitive effects *in a different market*," *Clarett*, 306 F. Supp. 2d at 408-09. As one court explained, it is "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d at 1151.

This Court should likewise reject NCAA's argument "to sacrifice competition in one portion of the economy"—the labor market for assistant coaches—"for greater competition in another portion"—the consumer market for sporting events. *Topco*, 405 U.S. at 610. In essence, NCAA asks this Court to force coaches to subsidize benefits to the consumer market for NCAA's product through below-market wages. This is precisely the kind of cross-market balancing courts have consistently rejected. "[B]enefits to consumers" cannot "justify[] detriments to workers." *Deslandes*, 81 F.4th at 702. NCAA's attempt to justify labor market harm with alleged consumer benefits should be rejected as a matter of law.

*Second*, even if "competitive balance" were a cognizable procompetitive justification for labor-market restraints, it would still be unavailing because the Wage Fix is not aligned with that justification. In *Board of Regents*, the Supreme Court rejected NCAA's competitive balance defense for this very reason. 468 U.S. at 118-19. NCAA argued that its restraint on television revenue helped maintain competitive balance, but the Court held that the restraint "is not even arguably tailored to serve such an interest" because it "simply imposes a restriction on one source of revenue" while leaving entirely unregulated "the amount of money that any college may spend on its football program [and] the way in which the colleges may use the revenues that are generated by their football programs." *Id.* Likewise in *Law*, the Tenth Circuit affirmed summary judgment for the plaintiffs despite a similar argument from NCAA, explaining that the challenged rule "does

not equalize the overall amount of money Division I schools are permitted to spend on their [] programs," but only regulated the salary of a single coach on each team. *Law*, 134 F.3d at 1023.

Here too, restraining the pay of the lowest-ranked assistant coach on each team "is not even arguably tailored to serve" competitive balance. It is undisputed that NCAA schools are unrestrained in their spending on head coaches, other assistant coaches, support staff, facilities, equipment, travel, and so on. SUF 39. A rule that fixes the salary of the lowest-ranked coach on each team while leaving so many other competitive expenditures unrestricted cannot credibly claim to promote competitive balance. Accordingly, as in *Law*, summary judgment on this justification is warranted: "[O]n its face, the [Wage Fix] is not directed towards competitive balance." *Law*, 134 F.3d at 1024. Summary judgment is warranted as to this justification.

### c.    The "Increased Resources" Justification is Legally Invalid.

NCAA's contention that the Wage Fix "enabl[ed] member institutions to provide additional coaching resources for their student-athletes," SUF 42, is legally invalid as well—for the same reasons already discussed.  Specifically, this justification is invalid because (1) any benefits to student-athletes flow from increasing the staff-size limits, not from the Wage Fix; (2) helping student-athletes is not an *economic* justification, so it is not cognizable under the antitrust laws; and (3) this argument improperly seeks to justify harm in one market with purported benefits to a different market.

*First*, providing "increased resources for athletes" is a rationale for increasing staff sizes, not fixing wages on coaches at $0. As detailed above, while increasing staff-size limits permitted more coaches and therefore "increased resources for student-athletes," the Wage Fix simply suppressed the wages of any coach providing those additional services. In fact, NCAA's own pre-litigation position was that the Wage Fix was *hindering* student-athletes, not helping them: the official rationale for *repealing* the Wage Fix stated that "*elimination* of the volunteer coach designation … will help provide better support to student-athletes." SUF 37 (emphasis added).

A restraint cannot be justified by benefits it does not actually produce—much less benefits that defendant admit the restraint undermines. *See Google*, 747 F. Supp. 3d at 173; *Kodak*, 504 U.S. at 484–85; *Microsoft*, 253 F.3d at 71. In *O'Bannon*, for example, NCAA argued that

challenged limits on student-athlete compensation were procompetitive because the existence of college sports "widens the choices available to athletes." *O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015). The Ninth Circuit rejected the argument because the choice of competing in college "would still be available to student-athletes if they were paid some compensation." *O'Bannon*, 802 F.3d at 1073. Thus, even accepting the importance of the purported benefit, it could not justify the restraint because it was not a benefit *of the restraint*. *Id.*; *see also Brown*, 1992 WL 88039, at *9 (rejecting procompetitive justifications because they are "plainly irrelevant insofar as they lack any correlation between the salary restraint itself and the asserted procompetitive purpose"). Likewise here, NCAA admits that coaches could have supported student athletes *even better* without the Wage Fix.

   *Second*, providing more resources for student-athletes is a social objective, not an economic justification cognizable under the antitrust laws. *See Alston*, 594 U.S. at 94-95 ("social objectives beyond enhancing competition" are invalid). The NFL tried a similar argument in defending one of its labor-market restraints, contending that a rule setting a minimum age for players was procompetitive because it "protect[ed] younger athletes from injury or over-training." *Clarett*, 306 F. Supp. 2d at 408. The court held that this argument "can be dismissed out of hand" because "the NFL's concern for the health of younger players is laudable, but it has nothing to do with promoting competition." *Id.* (granting summary judgment for plaintiff). Likewise here, NCAA's desire to provide better training to its student-athletes is laudable, but it too "has nothing to do with promoting competition." *Id.* The "antitrust laws require a *procompetitive* justification in the face of a demonstrably anticompetitive rule," *id.*, and NCAA has not offered one.

   *Third*, this justification is invalid because it improperly seeks to justify labor-market harm with alleged benefits in a different market. At most, providing student-athletes with more coaching resources may improve their performance, which may in turn improve the quality of athletic contests. But even if NCAA could prove that causal chain (and that is doubtful), improved quality of athletic contests is a benefit to the consumer market for sporting events, not the labor market for coaches. NCAA's argument once again asks this Court to force coaches to subsidize benefits to the consumer market for NCAA's product. As detailed above in the competitive balance

discussion, this is precisely the kind of cross-market balancing courts have consistently rejected. *See, e.g.*, *Deslandes*, 81 F.4th at 702; *Smith*, 593 F.2d at 1186; *Law*, 134 F.3d at 1022. NCAA's attempt to justify labor market harm with alleged consumer benefits should be rejected, and for this reason and the others argued above, this Court should hold that NCAA's "increased resources" justification fails as a matter of law.

*     *     *

The Wage Fix should be invalidated as *per se* unlawful, but even if the Court considers NCAA's procompetitive justifications, those justifications fail completely. The historical record establishes that NCAA enacted the Wage Fix solely to save money, not to serve any of the procompetitive purposes it now offers in litigation. NCAA's own contemporaneous statements, internal documents, and contradictory positions on repeal expose these justifications as nothing more than *post hoc* rationalizations. Moreover, even if NCAA's justifications were non-pretextual, each would still fail as a matter of law. The "expanded opportunities" argument asks this Court to accept non-cognizable social benefits that do not even flow from the challenged restraint. The "competitive balance" argument improperly seeks to justify labor market harms with alleged consumer market benefits, and is not even designed to deliver any such benefits. The "increased resources" argument suffers from the same fundamental flaws: it asks this Court to accept non-cognizable social benefits that do not even flow from the challenged restraint and to engage in impermissible cross-market balancing. NCAA is left defending a naked wage-fixing conspiracy with the same discredited arguments the Tenth Circuit rejected on summary judgment in *Law v. NCAA* and that many other courts have rejected in cases involving sports leagues. Whether under the *per se* rule or quick-look analysis, summary judgment against NCAA is appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion for Summary Judgment That Defendant Violated The Sherman Act.

DATED: June 30, 2025

Respectfully submitted,

**GUSTAFSON GLUEK PLLC**

By: */s/ Dennis Stewart*
Dennis Stewart, CA Bar No. 99152
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Daniel E. Gustafson, MN Bar No. 202241
(*pro hac vice*)
Joshua J. Rissman, MN Bar No. 391500
(*pro hac vice*)
Anthony J. Stauber, MN Bar No. 401093
(*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
jrissman@gustafsongluek.com
tstauber@gustafsongluek.com

**FAIRMARK PARTNERS, LLP**

By: */s/ Michael Lieberman*
Michael Lieberman, DC Bar No. 1033827
(*pro hac vice*)
Jamie Crooks, CA Bar No. 310447
(*pro hac vice*)
Yinka Onayemi, NY Bar No. 5940614
(*pro hac vice*)
Michael Goldberg, MA Bar No. 709203
(*pro hac vice*)
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (818) 585-2903
michael@fairmarklaw.com
jamie@fairmarklaw.com
yinka@fairmarklaw.com
mgoldberg@fairmarklaw.com

KIRBY McINERNEY LLP

By: */s/ Robert J. Gralewski*
Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone:    (559) 248-4820
dhorowitt@ch-law.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

*Attorneys for Plaintiffs and the Class*