CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
Carolyn.Luedtke@mto.com
JUSTIN P. RAPHAEL (State Bar No. 292380)
Justin.Raphael@mto.com
MEGAN McCREADIE (State Bar No. 330704)
Megan.McCreadie@mto.com
DANIEL E. RUBIN (State Bar No. 359920)
Daniel.Rubin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

*Attorneys for Defendant National Collegiate
Athletic Association*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and RUDY BARAJAS, individually and on behalf of all those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, <br><br> Defendant. | Case No. 1:23-cv-00425-WBS-CSK <br><br> **DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Judge: Hon. William B. Shubb <br> Courtroom: 5, 14th Floor <br> Date: September 29, 2025 <br> Time: 1:30 PM |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ....................................................................................................... 4

    A.   NCAA Bylaws ................................................................................................ 4

    B.   Limits on the Number of Coaches in 1991 Generated Concern about
    Volunteers' Ability to Assist Student-Athletes ............................................... 5

    C.   NCAA Division I Addressed That Concern by Permitting Volunteer
    Coaches in 1992 .............................................................................................. 6

    D.   The Division I Membership Eliminated the Volunteer Coach Position in
    2023 ................................................................................................................. 7

III.  LEGAL STANDARDS ............................................................................................. 8

    A.   Summary Judgment Standard ......................................................................... 8

    B.   Antitrust Framework ...................................................................................... 9

IV.   ARGUMENT .......................................................................................................... 10

    A.   There Is a Dispute of Fact as to the Purpose and Justification for the
    Volunteer Coach Position .............................................................................. 10

    B.   Plaintiffs Cannot Evade Their Burden of Proof ........................................... 14

        1.   The Volunteer Coach Position Was Not *Per Se* Illegal. ............................. 14

        2.   Quick Look Does Not Apply. .............................................................. 16

            (a)   Record Evidence Shows That the Volunteer Coach Position
            Increased Output. ............................................................... 16

            (b)   Record Evidence Shows That the Volunteer Coach Position
            Was Reasonably Necessary to Bylaws That Plaintiffs Have
            Not Challenged. ................................................................. 20

            (c)   Record Evidence Regarding Market Definition Casts Doubt
            on Anticompetitive Effects. ............................................... 23

    C.   Even If Quick Look Applies, the NCAA Has Adduced Evidence to Shift the
    Burden Back to Plaintiffs .............................................................................. 26

V.    CONCLUSION ....................................................................................................... 30

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

**FEDERAL CASES**

4

*Agnew v. NCAA*,
    683 F.3d 328 (7th Cir. 2012)................................................................20

5

*Am. Needle, Inc. v. NFL*,
    560 U.S. 183 (2010)..............................................................................20, 28

6

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021).................................................3, 19, 21, 23

7

8

*Bd. of Trade of City of Chi. v. United States*,
    246 U.S. 231 (1918)..............................................................................4

9

10

*Brown v. Pro Football, Inc.*,
    50 F.3d 1041 (D.C. Circ. 1995)............................................................17

11

*Brown v. Pro Football*,
    No. 90-1071(REL), 1992 WL 88039 (D.D.C. Mar. 10, 1992) ............17

12

13

*Burch v. Regents of Univ. of Cal.*,
    433 F. Supp. 2d 1110 (E.D. Cal. 2006).................................................8, 9, 12

14

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999)..............................................................................10, 16, 18, 19

15

16

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) (en banc) .............................................passim

17

*Chemehuevi Indian Tribe v. McMahon*,
    934 F.3d 1076 (9th Cir. 2019)..............................................................11

18

19

*City of Lincoln v. Cnty. of Placer*,
    668 F. Supp. 3d 1079 (E.D. Cal. 2023).................................................11

20

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
    277 F.3d 499 (4th Cir. 2002).................................................................10, 22

21

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010)..................................................................10, 23

22

23

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023).................................................................9, 28

24

*First Nat'l Bank of Ariz. v. Cities Serv. Co*,
    391 U.S. 253 (1968)..............................................................................8

25

26

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003)..............................................................15, 22

27

28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*Giordano v. Saks Inc.*,
    654 F. Supp. 3d 174 (E.D.N.Y. 2023) ...................................................................19

*In re Google Play Store Antitrust Litig.*,
    No. 24-6256, 2025 WL 2167402 (9th Cir. July 31, 2025) .....................................28

*Hennessey v. NCAA*,
    564 F.2d 1136 (5th Cir. 1977) ...............................................................................20

*In re HIV Antitrust Litig.*,
    656 F. Supp. 3d 963 (N.D. Cal. 2023) .......................................................3, 22, 24

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ...........................................................................26, 27

*Ixchel Pharma, LLC v. Biogen Inc.*,
    No. 2:17-00715 WBS EFB, 2018 WL 558781 (E.D. Cal. Jan. 25, 2018) ...............20

*Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*,
    670 F.2d 421 (3d Cir. 1982) ...................................................................................29

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ..................................................................13, 14, 25, 29

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ..........................................................................................4, 14

*In re Loestrin 24 Fe Antitrust Litig.*,
    433 F. Supp. 3d 274 (D.R.I. 2019) .........................................................................29

*Los Angeles Memorial Coliseum Comm'n v. NFL*,
    726 F.2d 1381 (9th Cir. 1984) ...............................................................................28

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ...................................................................................16

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ...............................................................................27

*In re NFL's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ..................................................................3, 14, 15

*NCAA v. Alston*,
    594 U.S. 69 (2021) ....................................................................................... passim

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ....................................................................................... passim

*New York v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ...................................................................................27

*Noble v. McClatchy Newspapers*,
    533 F.2d 1081 (9th Cir. 1975) ......................................................................13, 27

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*Nostalgic Partners, LLC v. Office of Comm'r of Baseball*,
    637 F. Supp. 3d 45 (S.D.N.Y. 2022) ...................................................................19

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015) .........................................................................28

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .........................................................................................9

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    No. 14-md-02503, 2018 WL 734655 (D. Mass. Feb. 6, 2018) ........................29

*Sullivan v. NFL*,
    34 F.3d 1091 (1st Cir. 1994) ...........................................................................28

*Teradata Corp. v. SAP SE*,
    124 F.4th 555 (9th Cir. 2024) ...........................................................................9

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) .......................................................9, 10

*United States v. Patel*,
    No. 3:21-CR-220 (VAB), 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ............15

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
    388 F.3d 955 (6th Cir. 2004) .................................................................4, 23, 24

**RULES**

Fed. R. Civ. P. 56 .....................................................................................................8

Fed. R. Evid. 803 ....................................................................................................11

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   I.    **<u>INTRODUCTION</u>**

2        Plaintiffs' motion for summary judgment asks the Court to decide disputed factual disputes

3   and misconstrues antitrust law.

4        Before 1991, volunteer coaches supported sports programs in NCAA Division I sports

5   other than football and basketball.  That year, for the first time, colleges and universities that were

6   members of the NCAA's Division I adopted limits on the number of paid coaches on each team in

7   sports other than football and basketball.  Plaintiffs do not argue that those limits were

8   anticompetitive or violated the antitrust laws.  At the time, some in the membership expressed

9   concerns that these new rules would prevent volunteers from providing important support to

10  student-athletes.  To address those concerns, in 1992, the Division I membership decided that

11  "member institutions should be *permitted* to utilize the services of one volunteer coach" in

12  addition to the maximum number of coaches who could be paid.  This opposition refers to the

13  position of such a coach as the "volunteer coach position."

14       Plaintiffs ask the Court to grant summary judgment holding as a matter of law that the

15  volunteer coach position violated the Sherman Act.  But Plaintiffs are wrong that "there is no

16  genuine dispute" that the NCAA Division I membership enacted the volunteer coach legislation

17  "to save money."  Mot. at 17.  Steve Mallonee, the NCAA staff liaison to the subcommittee that

18  proposed the volunteer coach legislation, testified that saving money was ***not*** the purpose of

19  permitting volunteer coaches in addition to the maximum number of coaches who could be paid.

20  SDF 7.[1]  Rather, the purpose was to protect coaches' ability to volunteer to support student-

21  athletes without undermining the limits on the number of paid coaches enacted the previous year,

22  which Plaintiffs have not challenged.  SDF 6.

23       Documents from the debate over the volunteer coach position confirm this testimony.

24  According to the NCAA Convention Proceedings, proponents of permitting the volunteer

25  coaching position noted that, "[i]n response to the new limitations, many institutions expressed

26

27  _____

    [1] "SDF" refers to Defendant NCAA's Statement of Disputed Facts In Opposition To Plaintiffs'
28  Motion For Partial Summary Judgment.

1   concern that a group of unpaid volunteers, such as former student-athletes and local club coaches,

2   would not be allowed to coach and provide assistance to student-athletes," and that "in light of the

3   attending staff reductions" adopted in 1991, "the [volunteer coach] legislation allows improvement

4   of the coach/student athlete ratio in several sports with large numbers of participants, for example,

5   track and field, thus enhancing the student-athlete experience." SDF 5 (quoting Declaration of

6   Stephen Mallonee in Support of NCAA's Opposition to Summary Judgment ("Mallonee Decl.")

7   Ex. 2 at _0143420).

8          Plaintiffs cite these documents but omit the quoted statements. They have not submitted

9   testimony from any witness who was involved in the debate over the volunteer coach position or

10  any document from the time saying that the volunteer coach position was adopted to "save

11  money." Plaintiffs cite no evidence that in 1992 the Division I membership wanted to increase the

12  number of paid coaches agreed upon in the previous year but decided against it because doing so

13  would be too costly. Instead, Plaintiffs misleadingly invite inferences from (1) documents created

14  during debates regarding other bylaws *before* the volunteer coach position was proposed, and

15  (2) documents generated three decades *later*, when the Division I membership decided that

16  evolving conditions in collegiate athletics warranted eliminating the volunteer coaching position.

17  The jury must decide whether to credit those indirect inferences rather than testimony from

18  Mr. Mallonee based on his direct involvement and documents from the time. SDF 1–10. This

19  factual dispute alone requires that summary judgment be denied.

20         Plaintiffs' motion also must be denied because Plaintiffs have not met their burden to show

21  that the Court should apply heightened legal scrutiny to the volunteer coach position. The general

22  rule in antitrust cases is the "rule of reason," which requires a plaintiff to "demonstrate that a

23  particular" agreement "is in fact unreasonable and anticompetitive." *California ex rel. Harris v.*

24  *Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011) (en banc) (citation omitted). Plaintiffs do not

25  argue that they can meet that burden of proof on summary judgment. Instead, Plaintiffs argue that

26  they do not have to meet their usual burden because the volunteer coach position was either *per se*

27  illegal or presumptively anticompetitive after a "quick look." But Plaintiffs have not established

28  the stringent requirements for either *per se* or "quick look" treatment.

1          No NCAA bylaw has ever been invalidated as *per se* illegal.  That is because "the Supreme

2    Court has concluded that the *per se* rule does not apply to agreements involving teams engaged in

3    league sports, on the ground that such sports 'can only be carried out jointly.'"  *In re NFL's*

4    *Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 n.5 (9th Cir. 2019) (quoting *NCAA v. Bd. of*

5    *Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984)).  Thus, "when considering agreements among

6    entities involved in league sports . . . a court must determine whether the restriction is

7    unreasonable under the rule of reason."  *Id.*

8          For several reasons, Plaintiffs also fall short of their burden to show that a quick look

9    presumption of competitive harm should apply.

10          *First*, Plaintiffs have not shown that the volunteer coach position "would always or almost

11    always tend to restrict competition and decrease output" as required to invoke the quick look

12    standard.  *Safeway*, 651 F.3d at 1138 & n.17.  To the contrary, the volunteer coach position

13    *increased* the number of coaches who could coach in Division I.  SDF 11.  There is no evidence

14    that the Division I membership would have increased the limit on the number of coaches who

15    could be paid if they did not adopt the volunteer coach position, and Mr. Mallonee testified that

16    the membership would not have done so.  SDF 9–10.  Thus, without the volunteer coach position,

17    there would have been fewer coaches in Division I.  At a minimum, the volunteer coach position's

18    effect on coaching opportunities is "uncertain" and "not obvious," which precludes a quick look.

19    *Safeway*, 651 F.3d at 1137.

20          *Second*, restricting compensation to volunteers "is reasonably necessary to" give effect to

21    limits on the number of coaches who could be paid that Plaintiffs have not disputed are

22    procompetitive.  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 (9th

23    Cir. 2021).  If programs could have paid volunteers as well as the maximum number of coaches

24    who could be paid, then those limits would not have meant what they said.  *See In re HIV Antitrust*

25    *Litig.*, 656 F. Supp. 3d 963, 992, 995 (N.D. Cal. 2023) (denying summary judgment on "quick

26    look" theory where challenged terms "may have facilitated" a "procompetitive" collaboration).

27          *Third*, the contours of the relevant market are not "sufficiently well-known or defined to

28    permit the court to ascertain without the aid of extensive market analysis whether the challenged

1    practice impairs competition." *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955,

2    961 (6th Cir. 2004) (rejecting quick look).  Plaintiffs have not even tried to prove the market, but

3    the analysis of the NCAA's expert, Dr. Justin McCrary, shows that the market plausibly includes

4    jobs coaching outside of Division I.  That means that NCAA Division I institutions had to compete

5    for coaches with non-Division I employers that would have benefitted if the Division I institutions

6    tried to restrict competition for coaches.  SDF 16.  Quick look is not appropriate where "[o]ne

7    might want to have an understanding of the market impact" of employers outside the NCAA to

8    determine effects on competition.  *Safeway*, 631 F.3d at 1137.

9        Plaintiffs cannot overcome these factual disputes and legal deficiencies by invoking the

10   *Law v. NCAA* case and labeling the volunteer coach rule as "price-fixing."  A "departure from the

11   rule-of-reason standard must be based upon demonstrable economic effect rather than upon

12   formalistic line drawing."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887

13   (2007) (citation omitted).  Unlike the restricted-earnings coach position in the *Law* case, the

14   volunteer coach position was adopted to *expand* the number of coaches who could support each

15   team, rather than simply to cut costs.  SDF 2–7.  Different evidence warrants a different result.

16       Plaintiffs ignore disputed evidence regarding the "history of the" position, "the reason for

17   adopting" it, and "the purpose or end sought to be attained" by doing so, which "are all relevant

18   facts." *Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918).  The Court should

19   reject Plaintiffs' attempt to avoid their burden of proof and deny their motion for partial summary

20   judgment.

21   **II.    BACKGROUND**

22       **A.    NCAA Bylaws**

23       The NCAA is an unincorporated membership organization with more than 1,000 member

24   colleges and universities (sometimes referred to as "member institutions") across the country that

25   compete in over 50 different sports in three different divisions.  Plaintiffs' Statement of

26   Undisputed Facts In Support of Motion For Summary Judgment ("SUF"), Dkt. No. 144-2, 1–2, 4.

27       The NCAA's members have agreed to rules, standards, and regulations (embodied in

28   written "bylaws") that govern their relationships with each other and with their student-athletes,

1  coaches and staff.  SUF 5.  As the Supreme Court has recognized, these bylaws enable the NCAA

2  to create "contests between competing institutions."  *Bd. of Regents*, 468 U.S. at 101.  This

3  mission "would be completely ineffective if there were no rules on which the competitors agreed

4  to create and define the competition to be marketed."  *Id.*

5      **B.    Limits on the Number of Coaches in 1991 Generated Concern about
          Volunteers' Ability to Assist Student-Athletes**

6

7          Prior to 1991, volunteers helped coach student-athletes at many Division I programs.

8  SDF 1.  In many instances, those volunteers were "former student-athletes[,] local club coaches,"

9  or other members of the local community who offered their time due to their passion for the sport

10  and their desire to give back to their communities.  SDF 1 (quoting Mallonee Decl. Ex. 2 at

11  _0143420).  These volunteers typically had no expectation of being paid.  SDF 1.

12          At that time, Division I bylaws did not limit the number of coaches a Division I program

13  could hire—paid or unpaid—for a team in sports other than football and basketball.  In 1991, the

14  NCAA Division I membership considered adopting "limits on the number of coaches who may be

15  employed" in sports other than football and basketball for the first time.  SUF 10; SDF 2.  The

16  Division I membership considered that proposal at the 1991 NCAA Convention.  SUF 10.

17          During the 1991 Convention, opponents of the limits on the number of coaches expressed

18  concern that the proposed coaching limits would jeopardize volunteers' ability to assist student-

19  athletes.  SDF 2.  For example, Glenn Patton of the University of Iowa expressed the view that the

20  proposed limits would "eliminate true volunteers in a lot of our individual sports programs who

21  give a lot of individual attention and enhance safety, and improve the quality of instruction for

22  many of our sports programs."  SDF 2 (quoting Mallonee Decl. Ex. 1 at _0143109).  Patton urged

23  the membership to "consider a way of allowing the true volunteer coach to continue with our

24  intercollegiate sports programs" even with the newly imposed coaching limitations.  SDF 5

25  (quoting Mallonee Decl. Ex. 1 at _0143109).

26          The proposed limits on the number of coaches in sports other than football and basketball

27  were nevertheless adopted at the 1991 Convention.  SUF 10.

28

**C.    NCAA Division I Addressed That Concern by Permitting Volunteer Coaches in 1992**

Following the 1991 NCAA Convention, the NCAA Council appointed a new subcommittee called the Subcommittee to Review 1991 Reform Proposals (the Review Subcommittee).  SUF 11.  That Subcommittee was tasked with reviewing the "reform proposals adopted by the membership" in 1991.  SDF 3.  The Review Subcommittee held a series of hearings and ultimately proposed a volunteer coach position.  SDF 4.  Specifically, the Review Subcommittee proposed that "member institutions should be *permitted* to utilize the services of one volunteer coach" in sports other than football and basketball in addition to the maximum number of coaches that they could hire for paid positions.  SDF 4 (quoting Declaration of Michael Lieberman in Support of Plaintiffs' Motion for Summary Judgment ("Lieberman Decl.") Ex. 9, Dkt. No. 144-12, at _0270047 (emphasis added)).

The volunteer coach position was not proposed or adopted as an alternative to raising the limits on the number of paid coaches that the Division I membership had adopted in the previous year.  SDF 5, 9–10.  Mr. Mallonee was the former Managing Director of Academic and Membership Affairs at the NCAA and served as an NCAA staff liaison to the Review Subcommittee.  He does not recall anyone proposing raising those limits or discussing that the volunteer coach position was adopted for the purpose of controlling or cutting costs.  SDF 7, 9.  Rather, according to Mr. Mallonee, the Review Subcommittee's proposal was designed to ensure that volunteer coaches could continue to support student-athletes without undermining the limits on the number of paid coaches that were adopted the previous year.  SDF 5–6.

The Division I membership considered the proposed volunteer coach position at the 1992 NCAA Convention.  SDF 5 (citing Mallonee Decl. Ex. 2 at _0143420).  At that Convention, delegates explained that the proposal was designed to address concerns about the new coach-count limits on volunteers' ability to support student-athletes.  SDF 5–6.  For example, the sponsor of the proposal, Craig Thompson, stated that the volunteer coach position was being proposed in "response to the new [coaching] limitations," because "many institutions expressed concern that a group of unpaid volunteers, such as former student-athletes and local club coaches, would not be

1  allowed to coach and provide assistance to student-athletes."  SDF 5 (quoting Mallonee Decl.

2  Ex. 2 at _0143420).  Marcia Saneholtz, a delegate from Washington State University, supported

3  the volunteer coaching legislation "in light of the attending staff reductions" because it would

4  allow for "improvement of the coach/student-athlete ratio in several sports with large numbers of

5  participants, for example, track and field, thus enhancing the student-athlete experience."  SDF 5

6  (quoting Mallonee Decl. Ex. 2 at _0143420).

7         Mr. Mallonee does not recall anyone at the 1992 Convention expressing the view that the

8  purpose of the volunteer coach position was to control or cut costs.  SDF 7.  Indeed, the Division I

9  membership did not even consider adding a paid coaching position at the 1992 NCAA Convention

10  Proceedings because that would have enhanced the advantage that highly-resourced schools had

11  over lower-resourced schools.  SDF 9–10.  Thus, had the volunteer coach legislation not been

12  adopted, teams would have retained the limits on coaches that were enacted in 1991.  SDF 9.

13         **D.    <u>The Division I Membership Eliminated the Volunteer Coach Position in 2023</u>**

14         Thirty years later, following revisions to the NCAA's governing constitution in 2022, the

15  NCAA appointed a Division I Transformation Committee to "look at the big picture of what

16  Division I would be in the future."  SDF 18 (quoting Declaration of Megan McCreadie in Support

17  of NCAA's Opposition to Plaintiffs' Motion for Partial Summary Judgment ("McCreadie Decl.")

18  Ex. 1 (Fraser Dep.) at 77:4–5).  One purpose of the Transformation Committee was to "consider if

19  there are ways to have the NCAA . . . adapt to . . . current conditions within college athletics and

20  make recommendations for areas where the NCAA may consider changing its rules in order to

21  transform, as it were, to . . . meet current needs, current . . . facts on the ground."  SDF 18 (quoting

22  McCreadie Decl. Ex. 2 (Tealer Dep.) at 46:23–47:6).  Among the Transformation Committee's

23  charges was to review all Division I bylaws with an eye toward "[w]hat areas did [the NCAA]

24  need to modernize, and how would the division be organized in the future."  SDF 18 (quoting

25  McCreadie Decl. Ex. 1 (Fraser Dep.) at 77:7–9); *see also* SDF 18 (citing McCreadie Decl. Ex. 2

26  (Tealer Dep.) at 115:25–116:19 (testifying that the committee was tasked with "effectuating

27  transformational change in modernizing the [Division I] rules")).

28

1    The Transformation Committee met weekly over several months to discuss potential

2  legislation, culminating in a report recommending numerous changes to the Division I bylaws that

3  was presented to the Division I Board of Directors in January 2023.  SDF 18 (citing McCreadie

4  Decl. Ex. 1 (Fraser Dep.) at 79:1–80:24).  Among the changes recommended by the

5  Transformation Committee was eliminating the volunteer coach position.  SDF 18.

6    In January 2023, the Division I membership voted to repeal the volunteer coach position

7  effective July 1, 2023.  SUF 29.  At the same time, the Division I membership also voted to permit

8  programs to add an additional coach who could be paid in sports other than football and

9  basketball.  SUF 30.  In other words, the Division I membership voted to raise the limits on the

10  number of coaches who could be paid that had been adopted in 1991.

11    Plaintiffs filed this lawsuit on March 21, 2023.  Dkt. No. 1.  Plaintiffs are not alleging that

12  either (a) the limits on the number of coaches who could be paid in effect from 1991 through 2023

13  or (b) the limits on the number of coaches who could be paid in place from 2023 through today are

14  or were anticompetitive.  SDF 19 (citing McCreadie Decl. Ex. 3 (Plaintiffs' Response to NCAA's

15  Interrogatory No. 3) ("Plaintiffs take no position on whether a limitation on the number of

16  coaches, standing alone, is or was anticompetitive.")).

17  **III.    LEGAL STANDARDS**

18    **A.    Summary Judgment Standard**

19    As the parties moving for summary judgment, Plaintiffs have the burden to establish "there

20  is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of

21  law."  Fed. R. Civ. P. 56(a).  Plaintiffs can meet that burden only by "citing to particular parts of

22  materials in the record" that would be admissible in evidence at trial, Fed. R. Civ. P. 56(c), and

23  cannot rely on "mere suspicions and undocumented arguments."  *Burch v. Regents of Univ. of*

24  *Cal.*, 433 F. Supp. 2d 1110, 1126 n.16 (E.D. Cal. 2006) (Shubb, J.).

25    A genuine dispute of material fact exists if there is evidence in the record that "could

26  permit a reasonable jury to enter a verdict in the non-moving party's favor."  *Id.* at 1124.

27  Summary judgment is improper if there is "sufficient evidence" with which a jury can "resolve the

28  parties' differing versions of the truth at trial."  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

1  U.S. 253, 289 (1968).  Accordingly, when evaluating a motion for summary judgment, the court

2  must "not engage in credibility determinations or weigh the evidence, for these are jury functions."

3  *Burch*, 433 F. Supp. 2d at 1125.  And insofar as the evidence is susceptible to multiple plausible

4  interpretations, any inferences "must be viewed in a light most favorable to" the NCAA as "the

5  party opposing the motion."  *Id.*

6      **B.**    <u>**Antitrust Framework**</u>

7        "Courts rely on three tests to determine whether an agreement constitutes an unreasonable

8  restraint of trade: (1) *per se* analysis; (2) quick look analysis; and (3) the rule of reason."  *Toscano*

9  *v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1120 (E.D. Cal. 2002).

10      **Rule of Reason.**  "Most restraints . . . are subject to the Rule of Reason: a multi-step,

11  burden-shifting framework that 'requires courts to conduct a fact-specific assessment' to

12  determine a restraint's 'actual effect' on competition."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th

13  946, 974 (9th Cir. 2023) (citation omitted).  "Under this framework, the plaintiff has the initial

14  burden to prove that the challenged restraint has a substantial anticompetitive effect that harms

15  consumers in the relevant market."  *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018).  "If the

16  plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive

17  rationale for the restraint."  *Id.*  Plaintiffs have ***not*** moved for summary judgment under this rule of

18  reason framework.

19      ***Per Se.***  "A small group of restraints are unreasonable *per se* because they 'always or

20  almost always tend to restrict competition and decrease output.'"  *Epic Games*, 67 F. 4th at 974

21  (citation omitted).  "Under the per se approach, restraints may be 'conclusively presumed to be

22  unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have

23  caused or the business excuse for their use.'"  *Teradata Corp. v. SAP SE*, 124 F.4th 555, 564 (9th

24  Cir. 2024) (citation omitted).  "The Supreme Court has admonished courts against expanding this

25  category."  *Toscano*, 201 F. Supp. 2d at 1120.

26      **"Quick Look."**  Finally, courts use quick look analysis when "the anticompetitive impact

27  of a restraint is clear from a quick look, as in a *per se* case, but procompetitive justifications for it

28  also exist."  *Id.* at 1120–21.  "[C]ourts have been wary of summary judgment in the context of

1   quick-look analysis." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 511 (4th Cir.

2   2002). Quick look is "reserved for cases in which 'an observer with even a rudimentary

3   understanding of economics could conclude that the arrangements in question would have an

4   anticompetitive effect on customers and markets.'" *Toscano*, 201 F. Supp. 2d at 1121 (quoting

5   *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). "[B]efore concluding that an alleged

6   restraint has the sorts of anticompetitive effects that justify quick look analysis, courts must

7   consider whether in the context of the allegedly restrained market, the 'restrictions might plausibly

8   be thought to have a net procompetitive effect, or possibly no effect at all on competition.'" *Id.*

9   (quoting *Cal. Dental*, 526 U.S. at 771).

10      "Under 'quick look' analysis, the competitive harm is presumed, and 'the defendant must

11  promulgate 'some competitive justification' for the restraint." *Deutscher Tennis Bund v. ATP

12  Tour, Inc.*, 610 F.3d 820, 831 (3d Cir. 2010). "If the defendant offers sound pro-competitive

13  justifications," then "the court must proceed to weigh the overall reasonableness of the restraint

14  using a full-scale rule of reason analysis." *Id.*

15  **IV.    ARGUMENT**

16      **A.    There Is a Dispute of Fact as to the Purpose and Justification for the
               Volunteer Coach Position**

17

18      Plaintiffs are wrong that "there is no genuine dispute" that the Division I membership

19  enacted the volunteer coach bylaw "to save money." Mot. at 17; *see also* SDF 2, 5–8. Record

20  evidence—including testimony from Mr. Mallonee, who participated in the enactment of the

21  challenged bylaws—shows that the Division I membership acted to enable more coaches to coach

22  without undermining limits on the number of coaches that had been recently adopted and that

23  Plaintiffs have not challenged here. SDF 2–10. Only a jury can decide this factual dispute, so

24  summary judgment must be denied. Indeed, the Court can and should reach that conclusion

25  without deciding whether a "quick look" presumption applies.

26      Division I enacted the volunteer coach bylaws in 1992. Plaintiffs have described those

27  bylaws as restrictive. In fact, as Mr. Mallonee explains, they were permissive. SDF 5–6, 9. As

28  the Division I Subcommittee that proposed the challenged bylaws stated, "Division I member

1  institutions should be *permitted* to utilize the services of one volunteer coach."  SDF 4 (quoting

2  Lieberman Decl. Ex. 9, Dkt. No. 144-12, at _0270047 (emphasis added)).

3       The context and history of the process that led to the adoption of the volunteer coach

4  position makes clear the challenged bylaws' permissive character.  In 1991, for the first time, the

5  Division I membership adopted limits on the number of coaches who could be paid in sports other

6  than football and basketball.  SDF 2 (citing Mallonee Decl. ¶¶ 3–5).  In other words, for the first

7  time, the Division I membership *prohibited* programs in these sports from hiring more than a

8  specific number of coaches.  SDF 2.

9       During the debate over these new limits, committee members expressed concern that "a

10  reduction in the number of coaches will make it impossible for the level of attention now given to

11  student-athletes to be maintained by the coaching staff."  SDF 2 (quoting Mallonee Decl. Ex. 1 at

12  _0143109 (statement of a representative of the NCAA's Student-Athlete Advisory Committee at

13  the 1991 NCAA Convention Proceedings)).  In particular, there was some concern that unpaid

14  volunteers would be unable to continue contributing to the student-athlete experience.  SDF 2.  For

15  example, Glenn Patton of Iowa expressed concern that the new limits would "eliminate true

16  volunteers in a lot of our individual sports programs who give a lot of individual attention and

17  enhance safety, and improve the quality of instruction for many of our sports programs."  SDF 2

18  (quoting Mallonee Decl. Ex. 1 at _0143109).[2]

19       As Mr. Mallonee has testified, the Division I membership continued to express these

20  concerns after the 1991 limits were adopted.  SDF 2, 4–5.  Indeed, according to the official record

21  of the 1992 NCAA Convention proceedings, the sponsor of the proposal to adopt the volunteer

22  coach position stated:  "In response to the new limitations, many institutions expressed concern

23  that a group of unpaid volunteers, such as former student-athletes and local club coaches, would

24  not be allowed to coach and provide assistance to student-athletes."  SDF 5 (quoting Mallonee

25  ─────────────────────────────

26  [2] Documents from the legislative proceedings in 1991 and 1992 are admissible as "ancient documents" under Federal Rule of Evidence 803(16).  *See Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1081 (9th Cir. 2019) (ancient documents are admissible even if they "contain multiple levels of hearsay"); *City of Lincoln v. Cnty. of Placer*, 668 F. Supp. 3d 1079, 1087 (E.D. Cal. 2023) (statements in meeting minutes from 1949 were admissible as ancient documents).

1    Decl. Ex. 2 at _0143420).  Plaintiffs quote this document but omit this portion.  Also during the

2    1992 NCAA Convention, Marcia Saneholtz, from Washington State University, expressed the

3    view that "in light of the attending staff reductions, the [volunteer coach] legislation allows

4    improvement of the coach/student athlete ratio in several sports with large numbers of participants,

5    for example, track and field, thus enhancing the student-athlete experience."  SDF 5 (quoting

6    Mallonee Decl. Ex. 2 at _0143420).

7        Thus, as Mr. Mallonee recounts, the volunteer coach position was not designed to restrict

8    what some coaches could be paid but rather to permit more coaches to participate without

9    undermining the limits that had been adopted the previous year.  SDF 2, 4–7.  As Mr. Mallonee

10   testified, the alternative to the volunteer coach position was not to permit each program to pay an

11   additional coach but to simply keep in place the recently enacted limits on the number of coaches

12   who could be paid.  SDF 9–10.  If the Division I membership did not adopt the volunteer coach

13   position in 1992, then it would not have permitted programs to hire an additional paid coach.

14   SDF 9.  Whether to credit this testimony is for the jury at trial.  *See Burch*, 433 F. Supp. 2d at

15   1125 ("[T]he court must not engage in credibility determinations or weigh the evidence, for these

16   are jury functions.").

17       No witness has testified that the volunteer coach position was designed to cut costs, and

18   Mr. Mallonee does not recall any discussion of permitting volunteer coaches in order to reduce

19   costs.  SDF 7.  Indeed, Plaintiffs' motion does not cite any testimony from any witness who

20   participated in the enactment of the volunteer coach legislation.

21       Plaintiffs cite evidence regarding the Cost Reduction Committee from 1991, but that

22   Committee was *not* involved in designing or proposing the volunteer coach legislation that was

23   adopted in 1992.  SDF 8.  Plaintiffs cite documents stating that the bylaws adopted in 1992 would

24   not "compromise" the 1991 bylaws and "would not result in any significant additional cost to the

25   institution."  Lieberman Decl. Ex. 8, Dkt. No. 144-11, at _0270033; *see also* Mallonee Decl. Ex. 2

26   at _0143420.  But none of those documents says that the purpose of permitting volunteer coaches

27   was, in fact, to cut costs.  And the fact that the final report of the Subcommittee that proposed the

28   volunteer coach bylaw did not mention the reasons Mr. Mallonee recalls for enacting the bylaw,

1    Mot. at 18, is hardly undisputed evidence that affirmatively supports Plaintiffs' theory that the

2    position was enacted to save money. *Contra* SDF 5–8.

3    Oddly, Plaintiffs try to show that the NCAA's position is a "*post hoc*" litigation position

4    by using evidence from decades *after* the volunteer coach legislation was enacted. Mot. at 19. It

5    is Plaintiffs' reasoning that is hindsight. Plaintiffs do not explain how the Court can rely on an

6    NCAA report from 2022 (Lieberman Decl. Ex. 20, Dkt. No. 144-23) to prevent the jury from

7    hearing testimony and documents from when the volunteer coach position was proposed thirty

8    years earlier. And the fact that the Division I membership decided in 2023 that a different set of

9    limits on the number of paid coaches would better serve the goals that the membership had three

10   decades earlier is not an admission as a matter of law that the position was designed to cut costs.

11   *Cf. NCAA v. Alston*, 594 U.S. 69, 102 (2021) ("[A]ntitrust courts must give wide berth to business

12   judgments before finding liability."); *see also* SDF 18. Indeed, under Ninth Circuit precedent, it

13   would be improper to infer a wrongful purpose for the volunteer coach position based on its

14   repeal. *See Noble v. McClatchy Newspapers*, 533 F.2d 1081, 1090 (9th Cir. 1975) ("[E]vidence

15   that McClatchy deleted allegedly anticompetitive provisions in the distributorship contracts . . . is

16   not admissible to prove culpability of prior conduct." (citing Fed. R. Evid. 407)), *vacated on other*

17   *grounds,* 433 U.S. 904 (1977).

18   Even if Plaintiffs' evidence could create some inference that the volunteer coach position

19   was designed to cut costs (and it does not), Mr. Mallonee's testimony based on his personal

20   experience and contemporaneous documents would enable a jury to reject that inference and

21   accept the NCAA's version of events. SDF 2, 5–8. Summary judgment therefore must be denied.

22   *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998)—where the Tenth Circuit agreed that

23   "increasing output" is a cognizable procompetitive justification—does not support summary

24   judgment here because the two cases are not "nearly-identical." *Contra* Mot. at 15. The

25   legislative history of the "restricted-earnings coach" position at issue in *Law* stated that one

26   purpose of that position was "effectively limiting compensation to such coaches." *Law*, 134 F.3d

27   at 1014. As noted, there is no comparable evidence about the purpose of the volunteer coach

28   position. SDF 7–8. Further, "[t]he restricted-earnings coach category was created to replace"

1    coaching positions that previously existed, *Law*, 134 F.3d at 1013, not to *expand* the number of

2    personnel who were "permitted" to coach.  SDF 4–6, 9–10.  Thus, unlike the volunteer coach

3    position, the restricted-earnings coach position did not expand the number of coaches who could

4    coach, but simply restricted their compensation.  Where the NCAA's evidence shows that the facts

5    regarding the volunteer coach position are different than they were in the *Law* case, there is no

6    basis to grant summary judgment based on the *Law* case.

7              **B.      Plaintiffs Cannot Evade Their Burden of Proof**

8              Even if all of these disputes of fact could be overlooked, Plaintiffs still cannot win

9    summary judgment as a matter of law.  "The rule of reason is the presumptive or default standard"

10   for evaluating alleged restraints of trade, and it "requires the antitrust plaintiff to 'demonstrate that

11   a particular contract or combination is in fact unreasonable and anticompetitive.'"  *Safeway*, 651

12   F.3d at 1133 (citation omitted).  Plaintiffs do not argue that they could sustain that burden of proof

13   on summary judgment without a trial.  Instead, Plaintiffs ask the Court to condemn the volunteer

14   coach position as *per se* illegal or to presume that it is anticompetitive under a "quick look."

15   Plaintiffs have not met the demanding standards for either shortcut.

16              **1.      The Volunteer Coach Position Was Not *Per Se* Illegal.**

17             No NCAA bylaws have been invalidated as *per se* illegal.  The bylaws in Plaintiffs'

18   flagship case, *Law v. NCAA*, were not.  134 F.3d at 1018–19 (noting "all horizontal agreements

19   among NCAA members" are "subject to a rule of reason analysis").  And for good reason:

20   condemning the volunteer coach position as *per se* illegal without permitting the NCAA to defend

21   it would contravene Supreme Court and Ninth Circuit precedent.

22             The Supreme Court has "expressed reluctance to adopt *per se* rules with regard to restraints

23   imposed in the context of business relationships where the economic impact of certain practices is

24   not immediately obvious."  *Leegin*, 551 U.S. at 887.  In particular, "the Supreme Court has

25   concluded that the per se rule does not apply to agreements involving teams engaged in league

26   sports, on the ground that such sports 'can only be carried out jointly.'"  *Sunday Ticket*, 933 F.3d

27   at 1150 n.5 (quoting *Bd. of Regents*, 468 U.S. at 101).  Rather, as the Ninth Circuit has explained,

28

1    "when considering agreements among entities involved in league sports . . . a court must

2    determine whether the restriction is unreasonable under the rule of reason." *Id.*

3        Plaintiffs do not cite any case where a court has applied *per se* treatment to an agreement

4    among teams in a sports league.  Instead, Plaintiffs rely on the Ninth Circuit's decision in

5    *Freeman v. San Diego Association of Realtors*, 322 F.3d 1133, 1150–51 (9th Cir. 2003), which

6    involved real estate agents, not sports teams.  Nothing in *Freeman* is inconsistent with Supreme

7    Court or Ninth Circuit precedent rejecting the *per se* rule in cases involving sports teams.

8        Plaintiffs also misapprehend *Freeman* on its own terms.  Plaintiffs cite *Freeman* for the

9    proposition that horizontal competitors' agreements related to prices are *per se* illegal unless they

10   can show a "connection between the specific restriction and the essential character of the product."

11   Mot. at 13.  But the Ninth Circuit in *Freeman* explained that "price fixing need not itself be

12   essential" for the usual rule of reason analysis to apply.  322 F.3d at 1151.  Rather, an agreement

13   on price is not *per se* illegal if it is "reasonably ancillary to the legitimate cooperative aspects of

14   the venture."  *Id.*  If that standard applies, then the NCAA has met it here, for the reasons

15   explained below in Part IV(B)(2)(b).  When Plaintiffs argue that the volunteer coach position is

16   not "essential" to the NCAA in the sense that the NCAA "could . . . function" without it, Mot. at

17   13, they are applying a test that *Freeman* explains is not the law.[3]

18       In sum, invalidating the volunteer coach position as *per se* illegal would be unprecedented

19   and contradict Supreme Court and Ninth Circuit precedent holding that sports league rules are not

20   *per se* illegal.  Plaintiffs' motion for summary judgment on a *per se* theory must be denied.

21

22

23

24   [3] In any event, Plaintiffs' claim that the fact that "college athletics has continued unabated and is
     generating record revenues . . . conclusively demonstrates that the Wage Fix 'ha[s] little or no
25   connection to the schools' need to cooperate," Mot. at 13, makes an impermissible inference of
     culpability.  *See United States v. Patel*, No. 3:21-CR-220 (VAB), 2023 WL 2643815, at *28 (D.
26   Conn. Mar. 27, 2023) ("[E]vidence that, after the end of the alleged conspiracy, Defendants
     . . . successfully engag[ed] in the business of aerospace engineering services without the use of no-
27   poach agreements with competitors is inadmissible under Rule 407." (citation omitted)).  The
     Court should not consider the evidence for that purpose.
28

2.      **Quick Look Does Not Apply.**

Plaintiffs also seek summary judgment on the theory that the volunteer coach position was presumptively anticompetitive after a "quick look."  The record evidence provides numerous reasons why Plaintiffs have not met their burden to establish the quick look presumption.  Each of those reasons is an additional reason why the *per se* rule does not apply.

(a)      **Record Evidence Shows That the Volunteer Coach Position Increased Output.**

First, Plaintiffs have not met their "burden to show that the" volunteer coach position "is obviously anticompetitive" because it "almost always tend[s] to . . . decrease output." *Safeway*, 651 F.3d at 1138 & n.17 (citation omitted).  Quick look review is "reserved for practices that facially appear to be ones that would always or almost always tend to restrict competition and decrease output." *Id.* at 1137–38 & n.16.  Thus, in *California Dental*, the Supreme Court held that quick look did not apply to a dental association rule that the plaintiffs had not shown "obviously tends to limit the total delivery of dental services."  526 U.S. at 776.

Quick look cannot apply here because Plaintiffs have not shown that the volunteer coach position reduced output of coaching services.  Plaintiffs cite no evidence of reduced output.  To the contrary, the NCAA's evidence supports an inference that the volunteer coach position *increased* output by enabling more coaches to coach than would have been able to do so if the volunteer coach position did not exist.  SDF 9–11; *see also Bd. of Regents*, 468 U.S. at 103 (restraints may "increase sellers' aggregate output *and thus be procompetitive*" (emphasis added)); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 332 (2d Cir. 2008) (declining to apply quick look to agreement that caused "only increases, not decreases, in output").

In 1991, before the challenged bylaws were adopted, the Division I membership had just *limited* the number of coaches a member institution could hire in each sport.  SUF 10.  As noted, there was concern among the membership that these new limits would eliminate coaching opportunities for volunteers.  SDF 2.  By *permitting* volunteers in addition to the maximum number of coaches who could be paid, Division I increased the number of coaching opportunities.

1    SDF 11.  Plaintiffs' own motion thus acknowledges that "increasing the overall number of

2    permitted coaching positions 'expanded opportunities' for coaches."  Mot. at 21.

3        Plaintiffs argue that "the same opportunities would be available" to coaches if the bylaws

4    permitted volunteer coaches to be paid, *id.*, but this improperly asks the Court to credit one side of

5    a factual dispute.  Plaintiffs assume that if the Division I membership did not enact the volunteer

6    coach legislation in 1992, then the membership would have created an additional paid coaching

7    position instead.  But Mr. Mallonee testified that the Division I membership would not have

8    increased the limits on the number of coaches that they had adopted for the first time in the prior

9    year because that would have given highly resourced schools more access to coaching than lower-

10   resourced schools.  SDF 9–10.

11       Plaintiffs cite no contrary evidence that adding paid coaching positions was even proposed

12   or considered at the time that the volunteer coach legislation was adopted.  Nor do Plaintiffs cite

13   evidence that the Division I membership wanted to increase the number of coaches regardless of

14   whether they were paid but decided to prohibit the coaches from being paid to save money.

15   Rather, the documentary evidence from the time shows that the purpose of the volunteer coach

16   position was always to maintain opportunities for *volunteers*.  SDF 1–2, 4–6.  At a minimum,

17   there is a factual dispute about whether the volunteer coach position would have existed without

18   the volunteer requirement, which precludes summary judgment.  SDF 9–10.

19       That distinguishes *Brown v. Pro Football*, where the "same opportunities would [have]

20   be[en] available if" the challenged rule "did not have a salary restraint."  No. 90-1071(REL), 1992

21   WL 88039, at *9 (D.D.C. Mar. 10, 1992).  Moreover, *Brown*—which was reversed by the D.C.

22   Circuit, *see* 50 F.3d 1041 (D.C. Circ. 1995)—does not support a quick look approach.  In that

23   case, the court decided to "analyze the restraint under the rule of reason" because the defendants

24   "offered procompetitive purposes for the salary restraint."  1992 WL 88039, at *8.  The NCAA

25   has offered such purposes here and Plaintiffs have not moved for summary judgment under the

26   rule of reason approach applied in *Brown*.

27       Plaintiffs also ask the Court to decide a factual dispute in arguing that the volunteer coach

28   position "*decreased* opportunities for coaches by making the new positions unavailable to coaches

1  who could not afford to work for free."  Mot. at 21; *contra* SDF 9–11.  That displacement is the

2  "substitution effect" that Plaintiffs argued on class certification was not relevant.  Plaintiffs'

3  Notice of Motion and Motion for Class Certification, Dkt. No. 85, at 36.  Setting aside Plaintiffs'

4  change of heart, the effect of the volunteer coach position on coaching opportunities is in part "a

5  question susceptible to empirical" analysis, which makes "quick look" inappropriate. *Cal. Dental*,

6  526 U.S. at 774.

7         The NCAA's expert, Dr. Justin McCrary, analyzed data regarding coach hiring and

8  program budgets.  He found that in the 2022 academic year, many programs—especially programs

9  with below-average expenditures—did not hire the maximum number of coaches who could be

10  paid.  SDF 12.  And when those limits were increased in 2023, many programs did not hire the

11  maximum number of coaches who could be paid.  SDF 13.  These data cast doubt on whether

12  more programs would have hired coaches even if (contrary to fact) Division I had chosen to

13  increase the limits on the number of paid coaches instead of permitting one volunteer coach in

14  most sports.  SDF 15 (citing Expert Declaration of Dr. Justin McCrary in Support of NCAA's

15  Opposition to Plaintiffs' Motion for Partial Summary Judgment ("McCrary Decl.") ¶ 12(d) ("If

16  programs with fewer resources are not hiring the maximum number of countable coaches that the

17  Division I bylaws permit, then increasing the maximum number of countable coaches would not

18  necessarily result in those lower-resourced schools hiring more coaches.")).  Plaintiffs' expert did

19  not even try to predict which programs would have hired an additional paid coach if they were

20  permitted to do so.  SDF 14.  Quick look is not warranted where "empirical analysis is required"

21  to determine the volunteer coach position's net competitive effect.  *Safeway*, 651 F.3d at 1138.

22         Moreover, there is evidence from the named Plaintiffs themselves that the volunteer coach

23  position created opportunities for some coaches who otherwise would not be able to coach.

24  Named Plaintiff Shannon Ray is a competitive sprinter who agreed to fill a volunteer track and

25  field coach position at Arizona State University so that she could have access to ASU's coaching

26  staff and facilities to further her own training.  SDF 11 (citing McCreadie Decl. Ex. 6 (Ray Dep.)

27  at 110:10–113:4, 163:3–6).  Ms. Ray also worked full time as an auditor while volunteering and

28  was not interested in a full-time paid coaching position.  SDF 11 (citing McCreadie Decl. Ex. 6

1   (Ray Dep.) at 105:4–7, 121:4–122:6).  The same is true of volunteer coaches at other DI member

2   institutions.  At the University of California, Davis, a doctor who works full-time at a local

3   hospital volunteers in his spare time as a women's water polo coach.  SDF 11 (citing Declaration

4   of Josh Flushman in Support of Defendant NCAA's Opposition to Plaintiffs' Motion for Class

5   Certification, Dkt. No. 94-28, ¶ 12).  And at Arizona State, a retired PGA tour pro volunteers as a

6   men's golf coach a few hours each week to help players with their swings.  SDF 11 (citing

7   Declaration of Christina Wombacher in Support of Defendant NCAA's Opposition to Plaintiffs'

8   Motion for Class Certification, Dkt. No. 94-36, ¶ 13).

9        Thus, at a minimum, the volunteer coach position "might plausibly be thought to have a

10  net procompetitive effect, or possibly no effect at all on competition," so "[t]he obvious

11  anticompetitive effect that triggers abbreviated analysis has not been shown."  *Cal. Dental*, 526

12  U.S. at 771, 778; *see also Safeway*, 651 F.3d at 1137 (rejecting quick look because of "uncertain

13  effect[s]" of agreements that "render any anticompetitive effects of the [restraint] not obvious");

14  *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 204 (E.D.N.Y. 2023) (finding quick look unwarranted

15  given "the uncertainty of the ultimate anticompetitive effect of the challenged agreement"), *aff'd*,

16  2025 WL 799270 (2d Cir. Mar. 13, 2025); *Nostalgic Partners, LLC v. Office of Comm'r of*

17  *Baseball*, 637 F. Supp. 3d 45, 53 (S.D.N.Y. 2022) (rejecting quick look for agreement that

18  restricted baseball teams from entering a developmental league due to the "complex relationship"

19  between the leagues); *see also* SDF 11–13.

20       Finally, there is no basis to apply quick look based on *Board of Regents*.  In that case, the

21  district court "found that if member institutions were free to sell television rights, many more

22  games would be shown on television," making "output lower" than it "would otherwise be"

23  without the challenged agreement.  468 U.S. at 105–07.  Here, by contrast, there is a factual

24  dispute about whether more coaches would have coached if the Division I membership had not

25  "permitted" volunteer coaches in addition to the maximum number of coaches who could be paid

26  on each team.  SDF 4, 9–10.

27

28

**(b)**     **Record Evidence Shows That the Volunteer Coach Position Was Reasonably Necessary to Bylaws That Plaintiffs Have Not Challenged.**

In addition, neither *per se* or quick look treatment applies because there is evidence that the challenged bylaws were reasonably necessary to ensure that other bylaws that Plaintiffs have *not* challenged in this case would be effective.

Under the ancillary restraint doctrine, an agreement must be "analyzed under the rule-of-reason" where it is "(1) subordinate and collateral to a separate, legitimate transaction, and (2) reasonably necessary to achieving that transaction's procompetitive purpose." *Aya Healthcare*, 9 F.4th at 1109; *see also Ixchel Pharma, LLC v. Biogen Inc.*, No. 2:17-00715 WBS EFB, 2018 WL 558781, at *3 (E.D. Cal. Jan. 25, 2018) (*per se* rule did not apply to agreement "that is subordinate to the larger, lawful agreement") (Shubb, J.).  This rule is "well-established in antitrust law," Mot. at 12, and evidence supports its application here.  A rule that volunteers could not be paid is reasonably necessary to ensure that permitting volunteers to support student-athletes would not undermine limits on the number of coaches who could be paid, which Plaintiffs have not challenged in this case.

There is no dispute that NCAA bylaws limiting the number of coaches on each team who could be paid are lawful regardless of the number of paid coaches permitted.  Courts have recognized that personnel limits in NCAA bylaws can be procompetitive because they prevent "stockpiling" by "elite programs." *Agnew v. NCAA*, 683 F.3d 328, 344 (7th Cir. 2012) ("[T]he rules limiting the number of scholarships available for every NCAA team may have procompetitive effects, such as the prevention of elite programs stockpiling athletes."); *Hennessey v. NCAA*, 564 F.2d 1136, 1153 (5th Cir. 1977) (upholding NCAA bylaws limiting the number of coaches on a team designed to address "potentially monopolistic practices by the more powerful").  And the Supreme Court has made clear that such an "interest in maintaining a competitive balance among athletic teams is legitimate and important." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 204 (2010) (internal quotation marks omitted).

Plaintiffs thus have not challenged the Division I bylaws that limit the number of coaches on each team who could be paid—even today.  SDF 19.  Plaintiffs' expert, Dr. Ashenfelter, has

1    not offered any opinion that such bylaws are anticompetitive.  SDF 19 (citing McCreadie Decl.

2    Ex. 4 (Ashenfelter First Dep.) at 84:2–6).  To the contrary, his opinion is that even if the

3    challenged bylaws did not exist, the NCAA bylaws still would have limited the number of coaches

4    on each team who could be paid, as the NCAA bylaws do today.  SDF 19 (citing McCreadie Decl.

5    Ex. 4 (Ashenfelter First Dep.) at 84:7–11).

6          There also is no dispute that a rule against paying volunteers permitted to contribute to

7    athletic programs is reasonably necessary to limits on the number of coaches who could be paid.

8    Obviously, if volunteers could have been paid, then the limits on the number of coaches who

9    could have been paid would have been higher.  Take volleyball, for example.  During the class

10   period, the bylaws permitted Division I volleyball teams to hire three paid coaches.  Lieberman

11   Decl. Ex. 3, Dkt. No. 144-6, at Bylaw 11.7.6.  If Division I volleyball teams were permitted to hire

12   three paid coaches and pay a volunteer, then the rule limiting teams to three paid coaches would

13   not have been effective because teams could have hired four paid coaches.

14         Plaintiffs do not and cannot dispute that the Division I membership has leeway to decide

15   what number of paid coaches in each sport best enhances competition while also supporting

16   student-athletes.  *Cf. Alston*, 594 U.S. at 102 ("[A]ntitrust courts must give wide berth to business

17   judgments before finding liability.").  As Mr. Mallonee testified, the Division I membership would

18   not have created an additional paid coaching position if it had not created the volunteer coach

19   position in 1992 because this would have benefitted highly resourced schools at the expense of

20   less-resourced schools.  SDF 9–10.

21         An analysis of salary and budget data by Dr. McCrary, the NCAA's economic expert,

22   shows that judgment was reasonable.  Dr. McCrary found that programs that had the resources to

23   invest more in their athletic programs were able to hire more paid coaches and to pay those

24   coaches almost twice as much as programs with fewer resources.  SDF 15.  Indeed, across all the

25   sports analyzed by Dr. McCrary, the average coach salaries at above-average-expenditure schools

26   were 65 percent to 109 percent higher than at other schools.  SDF 15 (citing McCrary Decl. ¶ 41 &

27   Ex. 6).  The upshot is that the more paid coaches that programs could hire, the greater the disparity

28   in coaching available to student-athletes at Division I programs.  SDF 15 (citing McCrary Decl.

¶ 12(d) (concluding that because programs with fewer resources did not hire the maximum number of countable coaches, "increasing the maximum number of countable coaches would not necessarily result in those lower-resourced schools hiring more coaches, and these programs might fall behind competing programs that can hire more coaches")).  Limiting the number of coaches who could be paid but permitting a volunteer coach mitigated the disparity while also supporting student-athletes.  The court "must give wide berth" to that judgment.  *Alston*, 594 U.S. at 102.

Evidence that bylaws against paying volunteers were reasonably necessary to make bylaws limiting the number of paid coaches effective defeats both *per se* and quick look treatment.  For example, in *Aya Healthcare*, the Ninth Circuit rejected both *per se* and quick look treatment where "the challenged restraint is reasonably necessary to the parties' procompetitive collaboration."  9 F.4th at 1110–13 & n.6 ("Because *per se* liability is unwarranted here, the quick look standard is also inapplicable." (internal quotation marks omitted)).

In *HIV Antitrust*, 656 F. Supp. 3d at 990–91, the district court applied *Aya Healthcare* and denied summary judgment for similar reasons.  In that case, the defendants collaborated to develop and sell pharmaceutical products consisting of multiple drugs.  Just as Plaintiffs here do not dispute that limits on the number of paid coaches were procompetitive, there was "no dispute" in the *HIV Antitrust* case that the collaborations were "procompetitive."  *Id.* at 992.  The companies' collaboration agreements prohibited them from selling a product that competed with the collaborative product.  The court found that these provisions "*may* have facilitated the collaborations," so it held that "the rule of reason therefore applies."  *Id.* at 995.  And because "Plaintiffs' motion for summary judgment" was "dependent on a quick look review," the court "denied" the motion.  *Id.* at 996.

The Court should do the same here.  At a minimum, there are disputed issues of fact as to whether the challenged bylaws are reasonably necessary to make procompetitive limits on the number of paid coaches effective, which would preclude quick look.  *E.g.*, *Cont'l Airlines*, 277 F.3d at 514 (reversing grant of summary judgment where "the record reveals factual disputes as to whether the proffered justifications plausibly enhance competition").  The Court in *Law* did not apply this ancillary restraints doctrine, which further distinguishes that case from this one.

Plaintiffs' motion misconstrues the ancillary restraint doctrine. *First*, Plaintiffs argue that college athletics has "functioned for decades" without limits on other expenditures, Mot. at 13, but, again, they are wrong that a restraint can only be "ancillary" if "college athletics 'could not function'" without it. *Contra id.* The Ninth Circuit has made clear that even price-fixing "need not itself be essential" to be ancillary. *Freeman*, 322 F.3d at 1151. All that is required is that the agreement is "reasonably ancillary to the legitimate cooperative aspects of the venture." *Id.* That is true of the relationship between the volunteer coach position and the limits on the number of coaches who could be paid, which Plaintiffs do not dispute were legitimate cooperation.

*Second*, the Division I membership's decision to eliminate the volunteer coach position in 2023 does not mean that bylaws regarding that position cannot be ancillary. *Contra* Mot. at 13. The NCAA "need not satisfy a less-restrictive-means test to demonstrate that" a bylaw is a permissible "ancillary restraint." *Aya Healthcare*, 9 F.4th at 1111. The fact that the Division I membership made a policy judgment to increase limits on the number of paid coaches after observing an evolution in college athletics does not mean that rules against paying volunteers were not reasonably necessary to making the prior limits effective. If the Division I membership had simply increased the maximum number of coaches who can be paid while still permitting an additional coach to volunteer, then bylaws against paying volunteers would be no less reasonably necessary to the limits on the number of paid coaches simply because those limits are higher than they were in 2022. The NCAA must balance enhancing competition between members and supporting student-athletes, among other goals. The antitrust laws do not authorize "micromanagement of" those "legitimate" ends. *Alston*, 594 U.S. at 101.

**(c)     Record Evidence Regarding Market Definition Casts Doubt on Anticompetitive Effects.**

A third reason why neither *per se* nor quick look treatment applies is that unrebutted evidence regarding the labor markets at issue casts doubt on whether the challenged bylaws' effects on competition are obvious.

As the Supreme Court has recognized, entities with a "small market share are incapable of impairing competition." *Alston*, 594 U.S. at 89. The Ninth Circuit thus has rejected both *per se*

1   and quick look scrutiny where "[o]ne might want to have an understanding of the market impact of

2   other competitors" who were "not in the defendant group" that "would have to be taken into

3   account in a competitive market." *Safeway*, 631 F.3d at 1137.

4       An "abbreviated or 'quick-look' analysis may only be done where the contours of the

5   market . . . are sufficiently well-known or defined to permit the court to ascertain without the aid

6   of extensive market analysis whether the challenged practice impairs competition." *Worldwide

7   Basketball*, 388 F.3d at 961; *see also Deutscher Tennis Bund*, 610 F.3d at 832 ("Because the

8   contours of the market here are not sufficiently well known or defined to permit the court to

9   ascertain without the aid of extensive market analysis whether the challenged practice impairs

10  competition, quick look is not appropriate and proof of relevant market is required under full-scale

11  rule of reason." (internal quotation marks omitted)); *HIV Antitrust*, 656 F. Supp. 3d at 995 n.24

12  ("[I]t is hard to say that anticompetitive effects are obvious if only because whether there are

13  anticompetitive effects will turn in part on what the product market is.").

14      For example, the Sixth Circuit reversed a lower court's decision to apply quick look to an

15  NCAA bylaw limiting the number of tournaments a basketball program could participate in

16  because "the relevant market is not readily apparent and the Plaintiffs have failed to adequately

17  define a relevant market, thereby making it impossible to assess the effect" of the bylaw.

18  *Worldwide Basketball*, 388 F.3d at 961.  The Court explained that where "the precise product

19  market is neither obvious nor undisputed, the failure to account for market alternatives and to

20  analyze the dynamics of consumer choice simply will not suffice" and the "district court therefore

21  erred in applying a quick-look analysis." *Id.*

22      Here, the parties' experts *agree* that the scope of the relevant market is relevant to

23  determining competitive effects.  Dr. Ashenfelter has previously testified that "Plaintiffs cannot

24  prove an effect on the market without defining the market," and that if competitors "did not have

25  market power, they would not be able to profitably" distort a "product's price due to competition

26  from other firms and products."  Declaration of Megan McCreadie in Support of NCAA's Reply

27  in Support of Its Motion to Exclude Expert Testimony ("McCreadie *Daubert* Decl."), Ex. 3, Dkt.

28

1  No. 111-4, ¶¶ 10–11.[4]  The NCAA's expert, Dr. McCrary, has similarly testified that "[a]s a

2  matter of economics, for the [volunteer coach bylaws] to have suppressed class members'

3  compensation, NCAA Division I schools must have controlled the compensation of a sufficiently

4  large share of jobs to which class members could plausibly have switched."  McCrary Decl. ¶ 18.

5       The Ninth Circuit has suggested that quick look would be inappropriate if "experts gave

6  conflicting views" regarding whether there are non-defendant competitors in the market.  *Safeway*,

7  631 F.3d at 1138 n.16.  That is even more true here, where the evidence is one-sided.

8  Dr. McCrary has cited evidence suggesting that jobs coaching outside of Division I may be part of

9  the same labor market as coaching in Division I.  SDF 16.  For example, named plaintiff Katherine

10  Sebbane worked as a softball coach at a college in NCAA Division II both before and after being a

11  volunteer at a Division I school.  SDF 16 (citing McCrary Decl. ¶ 26(a)).  After volunteering as a

12  swimming coach at the University of Virginia, named plaintiff Peter Robinson has worked full-

13  time as a coach at a private swim club—a job he believes may pay him more than he would earn

14  coaching in Division I.  SDF 16 (citing McCrary Decl. ¶ 27(a)).  Plaintiffs' expert,

15  Dr. Ashenfelter, has not tried to define any labor market.  SDF 17.  But he agreed that "jobs

16  coaching a sport outside of Division I could affect the wage level of jobs coaching in Division I."

17  SDF 16 (quoting McCreadie Decl. Ex. 4 (Ashenfelter First Dep.) at 195:4–198:15).

18       Thus, the only testimony in the record suggests that coaching employers other than

19  Division I universities compete against those schools for coaches' labor.  These employers were

20  not involved in the alleged antitrust violation but "would have to be taken into account in a

21  competitive market."  *Safeway*, 631 F.3d at 1137.  In those circumstances, under the Ninth

22  Circuit's decision in *Safeway*, the bylaws' effects are "not obvious" and quick look scrutiny is not

23  appropriate.  *Id.*

24       *Safeway*, not the Tenth Circuit *Law* case, is binding on this Court.  But *Law* is not to the

25  contrary.  The *Safeway*, *Worldwide Basketball*, *Deutscher Tennis Bund*, and *HIV Antitrust* cases

26  _____

27  [4] Dr. Ashenfelter did not remember anything about this declaration from another antitrust case, McCreadie Decl. Ex. 5 (Ashenfelter Second Dep.) at 305:9–306:12, so he should not be permitted

28  to address that testimony's import here.

1  were all decided after *Law* and did not identify any conflict between their reasoning and that

2  decision.  The Tenth Circuit in the *Law* case simply held *if* "a practice has obvious anticompetitive

3  effects," *then* "there is no need to prove that the defendant possesses market power."  134 F.3d at

4  1020.  But the Tenth Circuit in the *Law* case did not hold that evidence about the market is

5  irrelevant to *whether* anticompetitive effects are sufficiently obvious for quick look to apply in the

6  first place.  The principle that "[f]ull rule of reason treatment is unnecessary *where the*

7  *anticompetitive effects are clear* even in the absence of a detailed market analysis," *Safeway*, 651

8  F.3d at 1134 (emphasis added), does not mean that quick look still applies even where market

9  analysis suggests that anticompetitive effects are *not* clear.

10      A contrary rule would contravene Supreme Court precedent and basic economic theory.

11  The Supreme Court has cited the principle that "[i]f the exercise of market power is not plausible,

12  the challenged practice is legal."  *Alston*, 594 U.S. at 89 (internal quotation marks omitted).  This

13  reflects basic economics, as Dr. Ashenfelter and Dr. McCrary agree.  McCreadie *Daubert* Decl.

14  Ex. 3, Dkt. No. 111-4, ¶¶ 10–11; McCrary Decl. ¶¶ 18–20.  If employers of coaches other than

15  Division I schools are "waiting in the wings to exploit any anticompetitive" agreement, *Safeway*,

16  631 F.3d at 1137, then any effort by the Division I schools to try to suppress wages through the

17  volunteer coach position would fail because the other employers "would simply take over the

18  abandoned business" of coaches qualified enough to be paid and who value a salary more than the

19  opportunity to get Division I experience.  *Alston*, 594 U.S. at 89.  All of this is for the jury at trial,

20  not for the Court on summary judgment.

21      **C.    Even If Quick Look Applies, the NCAA Has Adduced Evidence to Shift the Burden Back to Plaintiffs**

22

23      The foregoing shows that Plaintiffs have not met their burden to establish a quick look

24  presumption.  But even if Plaintiffs had met that burden, the NCAA has adduced record evidence

25  to justify the volunteer coach position before a jury.  As noted, the purpose of the volunteer coach

26  position was to maintain coaching opportunities without overriding newly adopted limits on the

27  number of coaches per team who could be paid, which Plaintiffs have not challenged here.

28  SDF 5–6, 19.  As explained, that evidence supports multiple procompetitive justifications for the

1  volunteer coach position, including that it expanded output of coaching opportunities and was

2  reasonably necessary to the limits on coaches who could be paid.  SDF 6, 11, 15.  Plaintiffs'

3  arguments to take these justifications away from a jury lack merit.

4         *First*, Plaintiffs' argument that the NCAA's justifications are "pretextual" is both factually

5  and legally incorrect.  On the facts, Plaintiffs are simply wrong that the NCAA's justifications are

6  a "*post hoc* litigation position" that "played no part in the decision to act."  Mot. at 19.  As

7  explained, the NCAA's justifications are supported by testimony from Mr. Mallonee based on his

8  experience, as well as by documents created at the time.  SDF 2–10.

9         Plaintiffs also misstate the law.  The Ninth Circuit's decision in *Image Technical Services,*

10 *Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997), does not hold that a jury could

11 *never* credit procompetitive justifications that were not documented at the time that a challenged

12 practice was adopted.  The *Kodak* case was not resolved on summary judgment.  It went to trial.

13 On appeal from the jury verdict, the Ninth Circuit concluded that the jury would have been

14 permitted to reject a justification as pretextual based on an employee's testimony that the

15 justification "'did not cross his mind' at the time" the challenged policy was implemented.  *Id.*

16 Plaintiffs here have cited no such evidence, but even if they had, that would simply be part of the

17 record for the jury to consider at trial in evaluating the NCAA's justifications.[5]

18        *Second*, Plaintiffs are wrong that the Division I membership's decision to eliminate the

19 volunteer coach position somehow disproves the NCAA's justifications as a matter of law.

20 Plaintiffs cite no case holding that a decision to change a policy renders it pretextual as a matter of

21 law, and that rule would chill businesses from adapting their conduct to changing economic

22 conditions.  The Supreme Court has instructed that "antitrust courts must give wide berth to

23 business judgments."  *Alston*, 594 U.S. at 102.  In particular, "courts should not second-guess

24 degrees of reasonable necessity" so that "the lawfulness of conduct turn[s] upon judgments of

25

---

26 [5] Neither *McWane, Inc. v. FTC*, 783 F.3d 814, 841 (11th Cir. 2015), nor *New York v. Actavis PLC*,
27 787 F.3d 638, 658 (2d Cir. 2015), addressed this issue or granted summary judgment.  The courts
   in those cases merely affirmed findings of pretext based on documentary evidence at trial or on a
28 preliminary injunction.

1  degrees of efficiency," because this "would risk interfering with the legitimate objectives at issue

2  without adding that much to competition." *Id.* at 98 (internal quotation marks omitted).  Thus,

3  there are any number of choices that a business can make (or any number of variations on

4  coaching-related bylaws that the Division I membership could adopt) that would comport with

5  antitrust laws.

6       Plaintiffs do not contend that it is or was anticompetitive for the Division I membership to

7  limit the number of paid coaches a program could hire.  Thus, the Division I membership's

8  decision to increase that limit thirty years after it was originally created does not support any

9  inference of anticompetitive conduct.  Indeed, as noted, under Federal Rule of Evidence 407, such

10 evidence is "not admissible to prove [the] culpability of prior conduct."  *Noble*, 533 F.2d at 1090.

11 Moreover, the Division I membership's decision to eliminate the volunteer coach position was not

12 recommended or made in isolation.  It was part of a broader set of initiatives to adapt NCAA

13 bylaws to evolving conditions in collegiate athletics.  *See supra* at 7–8; SDF 18.  That context

14 further erodes any inference that eliminating the volunteer coach position was somehow an

15 admission that the position was never justified in the first place.  At the least, whether the

16 justifications are legitimate and pretextual remains a disputed factual issue.  SDF 2–10.

17      *Third*, Plaintiffs are incorrect that the NCAA's justifications are invalid because

18 "competitive balance" is not a cognizable justification.  To begin with, the Supreme Court has

19 held that an "interest in maintaining a competitive balance among athletic teams is legitimate and

20 important."  *Am. Needle*, 560 U.S. at 204 (internal quotation marks omitted).  That alone disposes

21 of Plaintiffs' argument and should be the end of the inquiry.

22      Plaintiffs' additional argument that competitive balance cannot be legitimate because

23 competition among teams and competition for coaches are in different markets ignores Supreme

24 Court and Ninth Circuit precedent.  "[T]he Supreme Court has considered cross-market rationales"

25 in antitrust cases.  *Epic Games*, 67 F.4th at 989.  The Ninth Circuit also has "previously

26 considered cross-market rationales when applying the Rule of Reason."  *Id.*  For example, in *Los*

27 *Angeles Memorial Coliseum Commission v. NFL*, 726 F.2d 1381, 1397 (9th Cir. 1984), the Ninth

28 Circuit considered whether the need to compete against "other forms of entertainment" could

1  justify rules restricting the movement of NFL teams.  And in numerous cases, both the Ninth

2  Circuit and the Supreme Court have considered whether increasing demand for collegiate athletics

3  among fans could justify restrictions on compensation to student-athletes.  *E.g.*, *Alston*, 594 U.S.

4  at 101 (2021); *O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015).[6]

5      Other courts also have recognized that it is "appropriate" to justify restrictions on

6  competition in one market as enhancing competition in related markets.  *Sullivan v. NFL*, 34 F.3d

7  1091, 1112 (1st Cir. 1994) (jury should have been instructed that evidence regarding benefits in

8  market for NFL games could justify restrictions on competition for ownership of NFL teams in a

9  separate market); *see also, e.g.*, *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*,

10  670 F.2d 421, 424, 432 (3d Cir. 1982) (restrictions on contractor hiring justified by increase in

11  competition in fast food market); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 317–

12  18 (D.R.I. 2019) (rejecting argument that "procompetitive justifications must be in the same

13  market as the anticompetitive effects"); *In re Solodyn (Minocycline Hydrochloride) Antitrust*

14  *Litig.*, No. 14-md-02503, 2018 WL 734655, at *5 (D. Mass. Feb. 6, 2018) ("The Court is not

15  persuaded that the range of procompetitive justifications contemplated . . . is so limited to require

16  excluding a theory limiting procompetitive benefits to one market.").

17      Plaintiffs are incorrect that the Tenth Circuit in the *Law* case "rejected cross-market

18  balancing."  Mot. at 25.  The Court in the *Law* case considered the NCAA's alternative argument

19  that the restricted-earnings coach position—which restricted competition for coaches' labor—was

20  necessary "to ensure some competitive equity between member institutions in order to produce a

21  marketable product," *i.e.*, competitive sport events.  134 F.3d at 1023–24.  The Tenth Circuit

22  determined that the NCAA had not presented sufficient evidence to support the justification, but it

23  did not say that such a justification could never be cognizable.  *See id.*  Here, by contrast, the

24  NCAA has adduced evidence supporting multiple procompetitive justifications.

25

26

27  [6] The Ninth Circuit recently declined to resolve whether cross-market justifications are cognizable and rejected a request to adopt the rule that Plaintiffs here argue *is* the law.  *See In re Google Play Store Antitrust Litig.*, No. 24-6256, 2025 WL 2167402, at *14 (9th Cir. July 31, 2025).

28

1  **V.**    **CONCLUSION**

2        Plaintiffs' motion for partial summary judgment should be denied because there is a

3  genuine factual dispute about the purpose of the volunteer coach position.  In addition, if the Court

4  reaches the issue of which standard of antitrust scrutiny applies, then Plaintiffs have not

5  established the requirements for avoiding their burden of proving that the position was

6  anticompetitive, which they admit they cannot sustain on summary judgment.

7

8  DATED:  August 15, 2025                    MUNGER, TOLLES & OLSON LLP

9

10                                    By:    _/s/ Carolyn Hoecker Luedtke_____
                                            CAROLYN HOECKER LUEDTKE
11
                                        *Attorneys for Defendant National Collegiate*
12                                      *Athletic Association*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys or record registered for electronic filing.

By: */s/ Carolyn Hoecker Luedtke*
Carolyn Hoecker Luedtke