Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson, MN Bar No. 202241
Joshua J. Rissman, MN Bar No. 391500
Anthony J. Stauber, MN Bar No. 401093
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B.
SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644

Michael Lieberman, DC Bar No. 1033827
Jamie Crooks, CA Bar No. 310447
Yinka Onayemi, NY Bar No. 5940614
Michael Goldberg, MA Bar No. 709203
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (818) 585-2903

*Attorneys for Plaintiffs Shannon Ray, Khala Taylor,*
*Peter Robinson, Katherine Sebbane, and Rudy Barajas*
*Individually and on Behalf of All Those Similarly Situated*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

SHANNON RAY, KHALA TAYLOR, PETER
ROBINSON, KATHERINE SEBBANE, and
RUDY BARAJAS Individually and on Behalf of
All Those Similarly Situated,

        Plaintiffs,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, an unincorporated association,

        Defendant.

Case No. 1:23-cv-00425

**PLAINTIFFS' REPLY IN SUPPORT
OF MOTION FOR SUMMARY
JUDGMENT THAT DEFENDANT
VIOLATED THE SHERMAN ACT**

Judge: Hon. William B. Shubb
Courtroom: 5
Date: September 29, 2025
Time: 1:30 PM

1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    This Case Is About NCAA's Wage Fix, Not Its Limits On The Number Of Coaches .................................................................................................................. 3

II.   The Wage Fix Is Unlawful *Per Se* ....................................................................... 6

    A.    NCAA Is Not Exempt From The *Per Se* Rule ...................................... 6

    B.    NCAA Has Not Shown That The Wage Fix Was An Ancillary Restraint ............. 8

III.  In The Alternative, Summary Judgment Should Be Granted Under The "Quick Look" Rule of Reason ........................................................................................... 13

    A.    If The Court Decides That The Per Se Rule Does Not Apply, The Quick-Look Framework Applies Here And Anticompetitive Effects Are Presumed .......................................................................................... 14

    B.    NCAA's Procompetitive Justifications Fail As A Matter Of Law ........ 18

        1.    NCAA's Procompetitive Justifications Are Pretextual ........... 18

        2.    NCAA's Procompetitive Justifications Are Not Legally Cognizable .............................................................................. 23

            a.    The "Expanded Opportunities" Justification Is Legally Invalid ............................................................................... 24

            b.    The "Competitive Balance" Justification Is Legally Invalid ............................................................................... 28

            c.    The "Increased Resources" Justification Is Legally Invalid ............................................................................... 32

CONCLUSION ................................................................................................................. 33

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1

2

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agnew v. NCAA*,
 683 F.3d 328 (7th Cir. 2012) ............................................................... 16

*Alston v. NCAA*,
 958 F.3d 1239 (9th Cir. 2020) ............................................................... 6

*Am. Needle, Inc. v. Nat'l Football Ass'n*,
 560 U.S. 183 (2010)............................................................................. 29

*Apotex, Inc. v. Cephalon, Inc.*,
 2017 WL 10963610 (E.D. Pa. May 24, 2017) ...................................... 30

*Apple, Inc. v. Samsung Elecs. Co.*,
 2012 WL 2571332 (N.D. Cal. June 30, 2012) ...................................... 16

*Arizona v. Maricopa Cty. Med. Soc'y*,
 457 U.S. 332 (1982)........................................................................... 6, 7

*Aya Healthcare Servs. v. AMN Healthcare, Inc.*,
 9 F.4th 1102 (9th Cir. 2021) ............................................................ 9, 11

*Bd. of Regents v. Nat'l Collegiate Athletic Ass'n*,
 707 F.2d 1147 (10th Cir. 1983) ........................................ 8, 16, 17, 31

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
 441 U.S. 1 (1979)............................................................................... 11

*Brown v. Pro Football*,
 1992 WL 88039 (D.D.C. Mar. 10, 1992) ....................................... 25, 26

*Brown v. Pro Football, Inc.*,
 50 F.3d 1041 (D.C. Cir. 1995) ............................................................ 26

*Burch v. Regents of the Univ. of Cal.*,
 433 F. Supp. 2d 1110 (E.D. Cal. 2006) ............................................... 27

*Cal. Dental Ass'n v. FTC*,
 526 U.S. 756 (1999)........................................................ 13, 14, 16, 17

*Cal. ex rel. Harris v. Safeway, Inc.*,
 651 F.3d 1118 (9th Cir. 2011) ...................................................... passim

*Chicago Professional Sports Ltd. Partnership v. National Basketball Assn.*,
 95 F. 3d 593 (7th Cir. 1996) ................................................................ 7

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Clarett v. Nat'l Football League*,
  306 F. Supp. 2d 379 (S.D.N.Y. 2004) ......................................................... 24, 28

*Deslandes v. McDonald's United States, LLC*,
  81 F.4th 699 (7th Cir. 2023) ........................................................... 3, 8, 9, 28

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
  610 F.3d 820 (3d Cir. 2010) ........................................................................ 17

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) ...................................................................... 21

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ......................................................... 18, 21, 30

*Flannery Assocs. LLC v. Barnes Family Ranch Assocs., LLC*,
  727 F. Supp. 3d 895 (E.D. Cal. 2024) ........................................................... 7

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ............................................................. 8, 9, 11

*Giordano v. Saks Inc.*,
  654 F. Supp. 3d 174 (E.D.N.Y. 2023) ......................................................... 17

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
  714 F.2d 1384 (5th Cir. 1983) ..................................................................... 28

*Image Tech. Servs. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ..................................................................... 19

*In re HIV Antitrust Litig.*,
  656 F. Supp. 3d 963 (N.D. Cal. 2023) ......................................................... 11

*In re Loestrin 24 Fe Antitrust Litigation*,
  433 F. Supp. 3d 274 (D.R.I. 2019) .............................................................. 27

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  2018 WL 1524005 (N.D. Cal. Mar. 28, 2018) ............................................. 24

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*,
  375 F. Supp. 3d 1058 (N.D. Cal. 2019) ......................................................... 6

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 3
  7 F. Supp. 3d 1126 (N.D. Cal. 2014)...................................................... 28, 29

*In re NFL's Sunday Ticket Antitrust Litig.*,
  2017 WL 3084276 (C.D. Cal. June 30, 2017) ............................................... 7

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*In re NFL's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................................. 7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 1142860 (E.D.N.Y. Mar. 15, 2024) ....................................... 23

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    2018 WL 734655 (D. Mass. Feb. 6, 2018) ............................................. 30

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
    791 F.3d 388 (3d Cir. 2015) ................................................................... 30

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .............................................................. 2, 8

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984) ................................................................. 9

*Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*,
    670 F.2d 421 (3d Cir. 1982) ................................................................... 30

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ...................................................... passim

*Law v. NCAA*,
    902 F. Supp. 1394 (D. Kan. 1995) ..................................................... 6, 28

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015). ........................................................ 18, 23

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ................................................................... 8

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
    468 U.S. 85 (1984) ........................................................... 9, 13, 14, 17

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) ............................................................................... 24

*NCAA v. Alston*,
    594 U.S. 69 (2021) ........................................................................ passim

*Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) .......................................................... 19, 23

*Nostalgic Partners, LLC v. Office of Comm'r of Baseball*,
    637 F. Supp. 3d 45 (S.D.N.Y. 2022) ...................................................... 17

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Ohio v. NCAA*,
  706 F. Supp. 3d 583 (N.D.W. Va. 2023) ................................................ 28

*Shields v. World Aquatics*,
  2024 WL 4211477 (9th Cir. 2024) ......................................................... 8

*Smart v. NCAA*,
  2023 WL 4827366 (E.D. Cal. July 27, 2023) .............................. 14, 15

*Smith v. Pro Football*,
  593 F.2d 1173 (D.C. Cir. 1978) ............................................................ 28

*Stitching Pensioenfonds ABP v. Countrywide Financial Corp.*,
  802 F. Supp. 2d 1125 (C.D. Cal. 2011) ........................................ 24, 33

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) ............................................................... 30

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................... 16

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985) ............................................................ 10

*United Food and Com. Workers Loc. 1776 & Participating Emps. Health and
  Welfare Fund v. Teikoku Pharma USA*,
  296 F. Supp. 3d 1142 (N.D. Cal. 2017) ............................................. 16

*United States v. Alston*,
  974 F.2d 1206 (9th Cir. 1992) .............................................................. 6

*United States v. Brown Univ.*,
  5 F.3d 658 (3d Cir. 1993) .................................................................... 15

*United States v. Joyce*,
  895 F.3d 673 (9th Cir. 2018) ................................................................ 7

*United States v. McKesson & Robbins, Inc.*,
  351 U.S. 305 (1956) ............................................................................. 21

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) ............................................................................. 28

*United States v. Topco Assocs.*,
  405 U.S. 596 (1972) ............................................................................. 28

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
  388 F.3d 955 (6th Cir. 2004) ........................................................ 16, 17

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Zeiger v. WellPet LLC,*
    526 F. Supp. 3d 652 (N.D. Cal. 2021) .................................................................. 16

**Other Authorities**

Br. for Petitioner NCAA,
    *NCAA v. Alston*, No. 20-512 (U.S.) ...................................................................... 9

Br. of the United States and the Federal Trade Commission as Amici Curiae,
    *Epic Games, Inc. v. Google LLC*, Nos. 24-6256, 24-6274 (Jan. 7, 2025) .............................. 28

Statement of Interest of the United States of America,
    *Zeigler v. NCAA*, No. 25-cv-00226 (E.D. Tenn. Jun. 3, 2025) ................................ 8

**Rules**

Fed. R. Evid. 407 ............................................................................................ 10

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

Faced with the task of justifying an express agreement to fix wages at $0, NCAA instead defends something else entirely—the number of allowed coaching positions for each team. Over and over again, NCAA defends its decision to have an assistant coach position that it called the "volunteer coach position" and describes the benefits of having this coach. But Plaintiffs do not challenge NCAA's decision to allow teams to hire the class members; they challenge NCAA's agreement ***to fix class members' wages*** (the "Wage Fix"). To survive summary judgment, NCAA must justify not its decision to allow teams to have, *e.g.*, four coaches, but its decision to fix the wages of the fourth coach. This wage-fixing agreement, which NCAA studiously avoids defending, is what this case is about, and NCAA cannot survive summary judgment by changing the topic.

NCAA's conflation of the position and the Wage Fix on that position pervades its brief and makes most of its arguments beside the point and most of its facts immaterial. NCAA's lead argument, for example, is that "[t]here is a dispute of fact as to the purpose and justification for the Volunteer Coach Position." Opp. at 10. Not only is there no such dispute, but any dispute about the purpose or effect of the "volunteer coach position" is immaterial to this case, which is about *the Wage Fix* on that position. NCAA spends several pages claiming (inaccurately) that having the "volunteer coach position" "enable[d] more coaches to coach" than if the position did not exist, *id.*, but it offers not a single fact suggesting that fixing those coaches' wages was designed to serve, or actually served, any procompetitive purpose.

This is no accident or misunderstanding. NCAA defends the wrong restraint because the right one—the Wage Fix—is indefensible. It is wage-fixing and it is illegal, pure and simple, just as the court in *Law v. NCAA* held in granting summary judgment to the plaintiffs. 134 F.3d 1010 (10th Cir. 1998). If NCAA cannot legally fix the wages of a category of coaches at $16,000, *see id.*, it even more clearly cannot legally fix the wages of another category of coaches at $0. The Court should reject NCAA's misdirection and grant Plaintiffs' motion.

First, the Wage Fix is *per se* unlawful, making any discussion of procompetitive justifications beside the point. Indeed, "[f]oremost in the category of per se violations is horizontal

price-fixing among competitors." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000). NCAA's argument that it is categorically exempt from the *per se* rule is foreclosed by *NCAA v. Alston*, 594 U.S. 69 (2021), which expressly rejected NCAA's argument that it should be uniquely "exempt from the usual operation of the antitrust laws." *Id.* at 96. The normal rules apply to NCAA, and under those rules, wage-fixing is *per se* unlawful—especially when imposed on workers rather than student-athletes. NCAA invokes the "ancillary restraints" exception to *per se* invalidity, but that exception would apply only if NCAA could show that fixing wages of entry-level coaches was "reasonably necessary" to NCAA's joint venture, the production of college sports. NCAA does not even try to satisfy that test. Instead, it applies the wrong test and tries to justify the wrong restraint (the number of coaches), wholly failing to meet its burden on the actual question presented. Thus, the *per se* rule applies and the Wage Fix is unlawful.

Second, even if the Wage Fix were not *per se* unlawful, Plaintiffs would be entitled to summary judgment under the quick-look standard. Under quick look, inherently suspect restraints like wage-fixing agreements are presumed to have anticompetitive effects without the need for any detailed expert or market analysis. NCAA's efforts to argue otherwise misstate the doctrine. To survive summary judgment under quick-look, NCAA must come forward with a procompetitive justification that is *both* non-pretextual *and* legally valid. Its proffered justifications fail both of those requirements and thus fail to rebut the quick-look presumption twice over.

As to pretext, a procompetitive justification is cognizable only if it was the defendant's *actual* reason for imposing the restraint, rather than a *post hoc* rationale invented for litigation. That is a fatal threshold problem for NCAA because it has no contemporaneous evidence that the procompetitive justifications it offers here were its true reasons for fixing wages. It offers evidence that it thought *having another coaching position* would be beneficial, but no evidence that it *fixed wages on that position* in pursuit of the procompetitive justifications it offers here. That distinction is critical and conclusive.

Even if NCAA's justifications were genuine and not pretextual (and there is no evidence they are), summary judgment would still be warranted because those justifications are not legally valid under the Sherman Act. NCAA does not even respond to most of Plaintiffs' arguments on

this point, effectively conceding that two of its justifications—expanding opportunities for young coaches and increasing resources for student-athletes—are not cognizable. And while NCAA does at least try to defend its "competitive balance" justification, it cannot overcome the overwhelming authority, wholly ignored by NCAA, that supposed "benefits to consumers" cannot "justify[] detriments to workers." *Deslandes v. McDonald's United States, LLC*, 81 F.4th 699, 703 (7th Cir. 2023). Indeed, NCAA does not cite *a single case* squarely holding that this kind of "cross-market balancing" is permissible, and it offers no reason why this Court should become the first to adopt a rule that every other court has rejected. Regardless, no reasonable jury could credit NCAA's claim that the Wage Fix actually promotes competitive balance given the undisputed absence of any other restriction on team spending, like on head coach salaries, facilities, or training equipment. NCAA offers no response to the Supreme Court's holding in *Board of Regents* or the Tenth Circuit's in *Law* rejecting this justification on exactly those grounds.

In the end, what happened here is clear: NCAA fixed wages to reduce labor costs, then scrambled to invent *post hoc* justifications when sued. Those litigation-driven justifications are irrelevant because fixing the wages of workers is *per se* unlawful, whether perpetrated by NCAA or anyone else. But even if the proffered justifications mattered, they fail twice over because they lack support in the contemporaneous record and are not valid under the Sherman Act. It is thus no wonder why NCAA devotes most of its brief to defending a different restraint entirely, one that Plaintiffs do not challenge. To the extent NCAA identifies any factual disputes about the purpose or effect *of having coaching positions*, those disputes are immaterial. The only question is whether NCAA can justify *fixing wages* on one of those positions. It cannot. A horizontal agreement among competitors to fix wages is anticompetitive, full stop. The Court should grant summary judgment that the Wage Fix violated the Sherman Act.

## **ARGUMENT**

### I.    **This Case Is About NCAA's Wage Fix, Not Its Limits On The Number Of Coaches.**

Plaintiffs and the members of the certified class are challenging NCAA bylaws that fixed their wages at $0. They are not challenging NCAA's limits on the number of coaches on each team

or any decision to increase those limits. They are challenging NCAA's restraint on wages.[1] Even if NCAA could lawfully limit the number of coaches at each school, it cannot fix the wages of all or any category of them. The Sherman Act demands that each coach's compensation is set by competition, not by collusion. That is the gist of the case. Accordingly, the issue on this motion is not how many assistant coaches there are, but the legality of the NCAA and its schools agreeing among themselves to pay $0 to a subset of those assistant coaches. Whether analyzed under *per se* or quick look, the relevant restraint is the agreement to fix wages, not the agreement about staff size.

Instead of trying to defend the Wage Fix, NCAA repeatedly defends its limits on the number of coaches or its "addition" of a new "coaching position." *See, e.g.*, Opp. at 3 (claiming, incorrectly, that "the volunteer coach position *increased* the number of coaches who could coach in Division I").[2] But whatever the benefits of allowing teams to have four coaches instead of three, this case is about the separate decision to forbid teams from paying that fourth coach—a decision for which NCAA offers no viable defense and identifies no disputes of fact.

The mismatch between what Plaintiffs are challenging and what NCAA chooses to defend pervades NCAA's brief and undermines nearly every argument it makes. In one glaring example,

---

[1] This has been clear at every stage of this case. *See, e.g.*, Complaint, ECF 1 ¶ 1 ("[NCAA] and its member schools … agreed, through a binding NCAA bylaw, to fix the compensation of an entire category of college coaches at zero."); Pltfs.' Opp. to Mot. to Dismiss, ECF 32 at 10 ("Equally meritless is NCAA's insistence on mischaracterizing the Complaint as challenging the *numerical cap* on coaches per team rather than the bylaws fixing the wages of these coaches at $0."); Second Am. Class Action Compl., ECF 84 ¶ 40 ("NCAA and its member schools have illegally agreed to fix the compensation for one of the assistant coaches authorized by the Division I bylaws—and they have agreed to fix that compensation at $0."); Pltfs.' Am. Obj. and Resp. to NCAA's Second Set of Interrogatories (Exh. 3 to McCreadie Decl.), at 5 ("Plaintiffs do contend that fixing the compensation of one of the allowed coaching positions at $0, as well as other compensation restrictions put on that position, such as the prohibition on paying benefits, which is what the bylaws at issue in this case did, was anticompetitive.").

[2] Ironically, NCAA's immaterial contention that the challenged bylaws "increased the number of coaches who could coach" is false. Before the challenged bylaws took effect in the sports at issue here, there were no restrictions on the number of coaches or the compensation of coaches. After the challenged bylaws took effect, schools were limited to hiring only a certain number of coaches and were forbidden from paying one of them. *See infra* Part III.B.2.a. The challenged bylaws thus restricted both the number of coaches and their compensation. Regardless, only the compensation restrictions are at issue here.

4

NCAA insists that its bylaws regarding volunteer coaches were "permissive," not "restrictive," because they allowed, rather than required, schools to hire coaches. Opp. at 10-11. But Plaintiffs are not challenging the bylaws that allowed schools to hire coaches; they are challenging the bylaws that restricted schools from paying coaches hired into that NCAA-created position. That restraint—the Wage Fix—is the very definition of "restrictive," and NCAA's insistence that what it did was "permissive" only confirms that it is defending the wrong restraint.

To the extent NCAA is suggesting that the term "volunteer coach" makes the compensation restrictions inseparable from the coaching position, the Supreme Court rejected an identical argument in *Alston*. There, NCAA argued that it could restrict the wages of student-athletes because student-athletes are "amateurs," and by definition, "amateurs" are unpaid. *Alston*, 594 U.S. at 101. The Supreme Court rejected this argument as little more than wordplay, holding that "a party [cannot] relabel a restraint as a product feature and declare it immune from § 1 scrutiny." *Id.* Or, as Justice Kavanaugh put it, "NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." *Id.* at 112 (Kavanaugh, J., concurring). Likewise here, NCAA cannot relabel the Wage Fix as some inherent feature of the assistant coach position for which it restrained wages. The Wage Fix is an agreement among competitors to fix the wages for a subset of assistant coaches at $0, and calling those coaches "volunteers" does not change its fundamental nature. *Alston* did not excuse restricting wages just because NCAA called the victims "amateurs"; *Law* did not excuse restricting wages just because NCAA called the victims "restricted-earnings coaches"; and this Court should not excuse restricting wages just because NCAA called the victims "volunteers."

The distinction between the position and the wage-fix is clearly articulated in *Law v. NCAA*, where the Plaintiffs challenged NCAA's restraint on the wages of so-called "Restricted Earnings Coaches." 134 F.3d 1010 (10th Cir. 1998). The courts in that case did not analyze whether NCAA had procompetitive justifications for adding the "Restricted Earnings Coach" position to the schools' staff, but whether it had procompetitive justifications for restricting those coaches' compensation. *See id.* at 1024 ("Nowhere does the NCAA prove that *the salary restrictions* enhance competition, level an uneven playing field, or reduce coaching inequities." (emphasis

added)); *Law v. NCAA*, 902 F. Supp. 1394, 1410 (D. Kan. 1995) ("The NCAA has submitted no evidence to this Court that *requiring schools to pay their fourth-ranked basketball coaches all the same low salary* levels the playing field in any significant way." (emphasis added)); *see also Law*, 134 F.3d at 1024 ("We AFFIRM the district court's order granting a permanent injunction barring the NCAA from reenacting *compensation limits* such as those contained in the REC Rule." (emphasis added)). Likewise in *Alston v. NCAA*, the courts did not ask whether having amateur athletes was procompetitive, but whether restricting their compensation was. *See Alston v. NCAA*, 958 F.3d 1239, 1265 (9th Cir. 2020) ("[T]he district court properly concluded that NCAA limits on education-related benefits do not play by the Sherman Act's rules."); *In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1062 (N.D. Cal. 2019) ("NCAA limits on other education-related benefits that can be provided on top of a grant-in-aid are invalidated.").

This case is exactly the same. Plaintiffs are challenging NCAA's Wage Fix, not its rules regarding the number of coaches each team may have. No amount of wordplay can turn this case into a case about coaching limits. So-called "paid" assistant coaches and so-called "volunteer" assistant coaches were all coaches; the only difference is that one of those coaching titles embodied the horizontal wage-fix at the center of this case. To defeat this motion, NCAA must justify fixing wages. As shown next, it cannot do so.

## II.    The Wage Fix Is Unlawful *Per Se*.

### A.    NCAA Is Not Exempt From The *Per Se* Rule.

Procompetitive justifications are not even an issue under the standard that should govern this case, *i.e.*, the *per se* test. Agreements among competitors to fix prices "are unlawful *per se* under the Sherman Act." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 345 (1982); *United States v. Alston*, 974 F.2d 1206, 1208 (9th Cir. 1992) ("Price fixing is illegal regardless of pro-competitive justifications offered therefor."); *see also* Mot. at 10-14. NCAA's attempts to escape this *per se* rule are unavailing.

NCAA is incorrect that the *per se* rule is categorically inapplicable to sports leagues. *See* Opp. at 14-15. To the contrary, the Supreme Court and Ninth Circuit have repeatedly made clear that "the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform

rule applicable to all industries alike." *Maricopa Cty.*, 457 U.S. at 349; *see United States v. Joyce*, 895 F.3d 673, 678 (9th Cir. 2018) ("[T]he per se rule is applicable to price-fixing agreements … regardless of the industry in which the conduct occurred."); *Flannery Assocs. LLC v. Barnes Family Ranch Assocs., LLC*, 727 F. Supp. 3d 895, 906 (E.D. Cal. 2024) ("[H]orizontal price-fixing conspiracies are a per se violation of the Sherman Act, regardless of the industry in which the conduct occurred.").

This principle applies with full force to NCAA. In *Alston*, the Supreme Court expressly rejected NCAA's request to "modif[y] the antitrust laws" for its industry, explaining that only Congress could do so: "The NCAA is free to argue that, because of the special characteristics of its particular industry, it should be exempt from the usual operation of the antitrust laws—but that appeal is properly addressed to Congress." *Alston*, 594 U.S. at 96 (quotation marks and alterations omitted). NCAA is now making the same argument the Supreme Court just rejected, contending once again that it should get special treatment under the antitrust laws. The Supreme Court could not have been clearer in rejecting that argument. *Id.* "NCAA is not above the law." *Id.* at 112 (Kavanaugh, J., concurring).

NCAA's only citation for the proposition that *per se* rules do not apply to sports leagues is a passing comment in a footnote in a pre-*Alston* case, *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019); *see* Opp. at 14. That comment is textbook dicta, as the plaintiffs did "not allege … and did not argue … that the per se rule should apply." *In re NFL's Sunday Ticket Antitrust Litig.,* 2017 WL 3084276, at *8 n.9 (C.D. Cal. June 30, 2017).[3] More important, that dicta predates, and is abrogated by, the Supreme Court's decision in *Alston*, which squarely rejected the argument that NCAA was "exempt from the usual operation of the antitrust laws." 594 U.S. at 96;

---

[3] The parties in *NFL Sunday Ticket* agreed that the *per se* rule did not apply because that case involved a restraint related to NFL's joint marketing of its product through broadcast rights, and *Board of Regents* already held that restraints related to broadcasting rights are not *per se* invalid. But as the *Alston* Court made clear, "the ability of sports teams to agree on a TV contract need not imply an ability to set wages." *Alston*, 594 U.S. at 90 (quoting *Chicago Professional Sports Ltd. Partnership v. National Basketball Assn.*, 95 F. 3d 593, 600 (7th Cir. 1996).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*see also id.* at 112 (Kavanaugh, J., concurring) ("[I]t is not evident why college sports should be any different.").[4]

Since *Alston*, there is no longer any doubt: "[R]estraints involving college sports may be per se unlawful." Statement of Interest of the United States of America, ECF 28 at 7 n.1, *Zeigler v. NCAA*, No. 25-cv-00226 (E.D. Tenn. Jun. 3, 2025); *see also Shields v. World Aquatics*, 2024 WL 4211477, at *1 (9th Cir. 2024) (in case involving swimming league, rejecting argument for sports-league exemption and holding that "Plaintiffs have created a triable issue as to … a per se unlawful group boycott"). NCAA's contention that applying the *per se* rule here would "contradict Supreme Court and Ninth Circuit precedent," Opp. at 14, thus gets things exactly backwards: the Ninth Circuit has held that horizontal price-fixing is *per se* unlawful under the antitrust laws, *see Knevelbaard*, 232 F.3d at 986, and the Supreme Court has now made clear that NCAA is not exempt from "the usual operation of the antitrust laws," *Alston*, 594 U.S. at 96.

**B.    NCAA Has Not Shown That The Wage Fix Was An Ancillary Restraint.**

Under "the usual operation of the antitrust laws," *id.*, horizontal wage-fixing is *per se* unlawful. NCAA argues, however, that the "ancillary restraints" doctrine saves the Wage Fix from *per se* invalidation. Opp. at 20-23. NCAA is wrong: it has not satisfied the ancillary-restraints test, which requires it to show that the Wage Fix was "reasonably necessary" to produce college sports. That is a proposition NCAA could not possibly prove, and so it instead invents and purports to satisfy its own, watered-down test. Applying the correct test, which NCAA makes no effort to meet, the Court should hold that the Wage Fix is not "ancillary" and therefore *per se* unlawful.[5]

---

[4] The Tenth Circuit's decision to apply quick-look rather than the *per se* rule in *Law v. NCAA*, 134 F.3d at 1016, likewise predates *Alston*, and is therefore no longer persuasive authority for a special NCAA exemption from the *per se* rule.

[5] Whether a challenged restraint is "ancillary" under this test is for the Court to decide, and NCAA bears the burden of proof. *See, e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003) (holding, on appeal from summary judgment, that "[t]he fixed support fee is not reasonably ancillary"); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 847 (5th Cir. 2015) ("The decision to analyze the conspiracy under a per se theory of liability is a question of law that we review de novo"); *Deslandes* 81 F.4th at 706 (7th Cir. 2023) (Ripple, J., concurring) ("[T]he ancillary restraint defense requires that the defendants establish [ancillarity]."); *Bd. of Regents v. Nat'l Collegiate Athletic Ass'n*, 707 F.2d 1147, 1154 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984) (holding that burden is on defendant "when considering whether to apply per se or rule

8

The ancillary-restraints doctrine recognizes that some joint ventures are procompetitive, but may require embedded restraints to function. For example, the creation of a new law firm is procompetitive because it increases competition in the legal services market, but for that new venture to be successful, its partners need to agree not to compete with the new firm. That embedded non-compete agreement is not *per se* unlawful because it is ancillary—reasonably necessary to the broader venture's efficiency and success. *See Deslandes*, 81 F.4th at 704 (using this example). Similarly, the agreement among NCAA schools to use only college students on their sports teams is reasonably necessary to the joint venture of college sports, because it differentiates college sports from professional sports and thus "enables a product to be marketed which might otherwise be unavailable." *NCAA v. Bd. of Regents*, 468 U.S. 85, 102 (1984).

The ancillary-restraints test reflects this principle. A restraint is "ancillary," and therefore not *per se* invalid, if it is "subordinate and collateral to another legitimate transaction and necessary to make that transaction effective." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984). NCAA wrongly accuses Plaintiffs of misstating the standard for ancillarity. Opp. at 15, 23. Plaintiffs never said that the restraint must be "essential"; Plaintiffs stated, accurately, that a restraint is ancillary only if there is a "plausible connection between the specific restriction and the essential character of the product," Mot. at 13 (quoting *Freeman*, 322 F.3d at 1152), or if the restraint is "reasonably necessary" to achieve the cooperative venture's broader purpose, Mot. at 12 (quoting *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021)).

NCAA makes no attempt to satisfy any formulation of this test. The broader, legitimate collaboration in which NCAA and its members are engaged is the production of college sports. *See* Br. for Petitioner NCAA at 22, *NCAA v. Alston*, No. 20-512 (U.S.) ("The NCAA's procompetitive activity is offering … a particular brand of sports, namely, amateur college sports."). NCAA never even tries to demonstrate that fixing the wages of the lowest-ranked coach on each team was "reasonably necessary" to this broader collaboration or that there is a "plausible

---

of reason analysis to admitted price restraints that the defendant attempts to justify as properly ancillary").

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

connection" between fixing coaches' wages and the "essential character" of college sports. There is simply no plausible link—in the record or in common sense—between fixing wages on one entry-level coach (but only that coach and no other coaches or expenses) and the existence, efficiency, or success of college sports.

Nor does NCAA rebut Plaintiffs' evidence and arguments. NCAA does not dispute that college athletics has thrived for decades without any restraints on head coach compensation, other assistant coach compensation, noncoaching staff compensation, facilities spending, equipment spending, and so on. SUF 39. That NCAA does not restrain these much larger categories of spending undercuts any claim that restraining one entry-level coach's salary was some important ingredient to NCAA's success. NCAA also admits that it has never imposed a $0 wage fix on coaches in its highest-revenue, most popular sports (FBS football and basketball), Opp. at 8, further undermining the idea that fixing entry-level coach compensation is important or necessary to college sports. Most telling, NCAA does not contend—and offers no evidence—that eliminating the Wage Fix in 2023 disrupted or caused any detriment to its product.[6] The ease with which the Wage Fix was abandoned is conclusive proof it was never needed. Indeed, NCAA cites no case finding that a restraint was "ancillary" when the joint venture had already discarded it.[7]

Unable to make this required showing, NCAA improperly narrows and misfocuses the analysis, arguing that the Wage Fix "is reasonably necessary to limits on the number of coaches who could be paid." Opp. at 21; *see id.* at 20-23. That argument fails on its own terms, *see infra*,

---

[6] NCAA objected to a document evidencing NCAA's repeal of the Wage Fix "insofar as Plaintiffs rely on the repeal of the challenged bylaws to prove the NCAA engaged in culpable conduct." NCAA's Evidentiary Objections, ECF 151 ¶¶ 1-2. Plaintiffs respond to this and all other evidentiary objections in their contemporaneously filed Response to NCAA's Evidentiary Objections. Here, evidence of repeal is not offered to prove that NCAA engaged in culpable conduct or as an admission of guilt, but rather to show that the Wage Fix was not reasonably necessary to college sports—*i.e.*, that eliminating the Wage Fix was feasible. *See* Fed. R. Evid. 407 (allowing evidence to show "feasibility"); *see also, e.g.*, *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985) ("[E]vidence of subsequent change may be admitted for the limited purpose of showing the practicability of making a change.").

[7] Contrary to NCAA's characterization, this is not a "less-restrictive-means" test. Opp. at 23. A less-restrictive-means test would require the defendant to show that the restraint was reasonably necessary for the venture to achieve its procompetitive benefits *and* that those procompetitive benefits could not have been achieved in some less restrictive way. Here, Plaintiffs argue only that NCAA has not shown reasonable necessity.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

but the ancillary restraints test does not ask about the challenged restraint's relationship to some other (possibly unlawful) restraint within the joint venture; it asks about the restraint's relationship *to the overall venture*:

- *NCAA v. Alston*, 594 U.S. at 90 (describing test as whether the "restraints are **necessary to create or maintain a league sport**" (emphasis added));

- *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) (evaluating whether the restraint "is **necessary to market the product at all**" (emphasis added));

- *Aya Healthcare*, 9 F.4th at 1110 (evaluating whether "the challenged restraint is reasonably necessary to **the parties' pro-competitive collaboration**" (emphasis added));

- *Freeman*, 322 F.3d at 1151 (in case about price-fixing within joint venture to create a Multiple Listing Service ("MLS") database, holding that "[t]he fixed support fee is not reasonably ancillary **to the combined MLS database**" (emphasis added)).

The focus is on the overall joint venture because, as noted above, the ancillary-restraints doctrine exists to facilitate joint ventures that increase competition by creating a new product or competitor. If the challenged restraint is not part of the reason why that product can be offered or that new competitor can compete, its invalidation will not jeopardize the joint venture's contribution to the marketplace, and it is evaluated like any other restraint of its kind.[8] Fixing the wages of entry-level coaches self-evidently is not part of the reason why college sports can be offered or why it contributes to the marketplace for sports entertainment, and NCAA has not even contended otherwise.

NCAA's misfocused argument that the Wage-Fix was "reasonably necessary to limits on the number of coaches who could be paid," Opp. at 21, is not just legally irrelevant, but tries to make the central issue in the case disappear behind a tautology. The issue in this case is whether

---

[8] NCAA's lead authority, *see* Opp. at 22, illustrates the point. In *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963 (N.D. Cal. 2023), competing drug manufacturers combined their patented drugs into new products that could not have otherwise existed. To make the collaborations work, the companies agreed not to sell generic versions of the new drugs. The court held that this non-compete restraint was ancillary *to the collaborations as a whole* (not just to some other restraint within them) because it "facilitated those collaborations" and made it "more likely that [the manufacturers] would enter into the collaborations in the first place." *Id.* at 992. Here, in contrast, NCAA does not claim, let alone prove, that fixing the wages of an entry-level coach on each team made any school more likely to join NCAA and compete in college sports, let alone facilitated the existence of college sports as a whole.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

the NCAA's actual wage-fix on an actual assistant-coach position was illegal. It is a meaningless tautology to say, as NCAA does, that "if volunteers could have been paid, then the limits on the number of coaches who could have been paid would have been higher." Opp. at 21; *see also id.* ("If Division I volleyball teams were permitted to hire three paid coaches and pay a volunteer, then … teams could have hired four paid coaches."). It is true enough that eliminating the wage fix on the fourth coach would allow teams to have four paid coaches instead of three paid coaches plus one wage-fixed coach. But NCAA nowhere explains why this shift would undermine its staff-size limits when those limits already allow four coaches, let alone why it would harm its production of college sports. And NCAA cannot justify a wage fix with the circular claim that prohibiting pay for one coach was necessary to ensure that one coach would not be paid.[9] *Cf. Alston*, 594 U.S. at 101 ("A party [cannot] relabel a restraint as a product feature and declare it immune from § 1 scrutiny."). Not only would NCAA's logic permit any restraint to be self-justifying, but NCAA does not even contend, let alone prove, that the Wage Fix's repeal had any deleterious effect over the past two years. The wage-fixing was superfluous to both the staff-size limits and to college sports as a whole.[10]

To the extent NCAA is offering Dr. McCrary's report as evidence of ancillarity, his report adds nothing material. Dr. McCrary's report identifies some spending disparities among schools and opines that "these disparities could grow" if schools were allowed to pay all their coaches. McCrary Decl. ¶ 44. But even accepting these observations as true, Dr. McCrary does not show or opine that any marginal increase in spending disparities from adding one entry-level salary would affect competitive balance in any way, let alone affect NCAA's ability to produce college sports or its efficiency in doing so. Nor does he show or opine that the 2023 repeal of the Wage Fix had any such effect. His silence on that topic speaks volumes: NCAA has now completed two full seasons

---

[9] NCAA's assertion that "restricting compensation to volunteers is reasonably necessary to give effect to limits on the number of coaches who could be paid," Opp. at 3, is similarly circular. It amounts to saying: "we could not have both wage-fixed and non-wage-fixed assistant coaches if we did not fix the wages of the wage-fixed coach." That tautology says nothing about whether the Wage Fix on one of the allowed assistant coaches is lawful.

[10] NCAA states that "Plaintiffs here do not dispute that limits on the number of paid coaches were procompetitive." Opp. at 22. To be clear, Plaintiffs take no position on this question because it is not relevant to this case, but they do not concede that those limits are procompetitive.

in every sport without the Wage Fix, providing a very clear test of whether the Wage Fix was reasonably necessary to any aspect of NCAA's operations. Yet neither Dr. McCrary nor NCAA has identified a single way in which repeal negatively affected NCAA's operations or its ability to compete in the marketplace. They make no effort to prove such a thing because it is demonstrably unprovable—as has been recognized for years, any disparities in the salaries of the lowest-ranked coaches are dwarfed by disparities in other spending that has been unrestrained for decades and remains unrestrained today, *see Law*, 134 F.3d at 1023.[11]

NCAA has failed to offer any support whatsoever for the idea that the Wage Fix was "necessary to create or maintain" the college sports product, *Alston*, 594 U.S. at 90, and it fails to identify any triable issue of fact that would inform this Court's determination on that question. NCAA's attempt to substitute coaching limits for college sports as the relevant "joint venture" has no support in the law, and it fails to satisfy even its own improper test. Because NCAA cannot satisfy the ancillary restraints test, the *per se* rule applies, and Plaintiffs are entitled to summary judgment.

## III. In The Alternative, Summary Judgment Should Be Granted Under The "Quick Look" Rule of Reason.

Because the *per se* rule applies, the Court need not go any further to grant this motion. In the alternative, however, summary judgment is also warranted under the quick-look framework. Wage-fixing is an inherently suspect restraint with obvious anticompetitive effects, requiring NCAA to come forward with valid procompetitive justifications even before any detailed market analysis. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). NCAA's arguments that quick-look is inapplicable—based on supposed procompetitive effects and market definition disputes—miss the point: wage-fixing triggers the quick-look presumption precisely because its anticompetitive

---

[11] "[T]he REC Rule does not equalize the overall amount of money Division I schools are permitted to spend on their basketball programs. There is no reason to think that the money saved by a school on the salary of a restricted-earnings coach will not be put into another aspect of the school's basketball program, such as equipment or even another coach's salary, thereby increasing inequity in that area." *Law*, 134 F.3d at 1023; *accord Bd. of Regents*, 468 U.S. at 118-19 (rejecting NCAA's argument that television rights plan would increase competitive equity among NCAA teams where the plan did not "regulate the amount of money that any college may spend on its football program").

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

effects are obvious and can be presumed *without* a detailed market analysis. *See Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011). Therefore, NCAA must come forward with legally valid procompetitive justifications for the Wage Fix, but its proffered justifications fail for two independent reasons: first, they played no actual role in NCAA's decision to enact the Wage Fix, and second, they are not legally cognizable. Indeed, NCAA does not even defend two of them against Plaintiffs' legal challenges.

A.      **If The Court Decides That The Per Se Rule Does Not Apply, The Quick-Look Framework Applies Here And Anticompetitive Effects Are Presumed.**

NCAA's arguments for avoiding quick-look fundamentally misstate the doctrine and its relevance to this motion. Quick-look review applies when a challenged practice is not *per se* unlawful but has "obvious anticompetitive effects—as does price-fixing." *Law*, 134 F.3d 1010, 1020. The Supreme Court squarely held in *Board of Regents* that the quick-look version of the rule of reason applies where, as here, "there is an agreement not to compete in terms of price or output." 468 U.S. at 109. The Supreme Court also expressly approved the Tenth Circuit's use of the quick-look framework in *Law*, which involved a restraint that is essentially identical to the one at issue here. Citing *Law*, the Supreme Court explained that "quick-look analysis carries the day" where, as in *Law*, the *per se* rule does not apply but "the great likelihood of anticompetitive effects can easily be ascertained." *Cal. Dental*, 526 U.S. at 770. This case is no different: anyone "with even a rudimentary understanding of economics [w]ould conclude" that fixing the wages of thousands of coaches across the country at $0 would have an "anticompetitive effect." *Id.*

What quick-look does is relieve the plaintiff of its initial burden to demonstrate anticompetitive effects. Instead, anticompetitive effects are presumed, without any need for "elaborate industry analysis, market definitions, or complicated testimony of high-priced expert economists." *Smart v. NCAA*, 2023 WL 4827366, at *7 n.7 (E.D. Cal. July 27, 2023); *Cal. Dental*, 526 U.S. at 770 ("[N]o elaborate industry analysis is required to demonstrate the anticompetitive character of horizontal agreements among competitors to [fix prices]."). Here, such elaborate economic analysis is especially unnecessary because the NCAA undeniably established its market power and control over the entire class of so-called "volunteer coaches" when it successfully fixed

14

their wages. *See, e.g.*, *Smart*, 2023 WL 4827366, at *7 n.7 ("[T]he conduct itself is sufficient evidence of the requisite market power.").

Because anticompetitive effects are presumed, the burden "shifts to the [defendant] to produce evidence of procompetitive justification or effects." *Safeway*, 651 F.3d at 1138; *see* Mot. at 14. If the defendant fails to provide any legally valid justification, "the presumption of adverse competitive impact prevails and the court condemns the practice without ado." *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993). If, on the other hand, the defendant identifies non-pretextual, legally valid justifications showing that the restraint "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," *Safeway*, 651 F.3d at 1134, the quick-look presumption is defeated.

NCAA's first argument against the quick-look framework thus puts the cart before the horse. NCAA argues that quick-look should not apply because, in its view, the restraint had the procompetitive effect of "increased output." Opp. at 16-19. That argument fails on its own terms,[12] but it is only an argument that the restraint should *survive* quick-look review, not that quick-look review and its presumption of anticompetitive effects should not apply in the first place. In *Law*, for example, the court held that quick-look applied, presumed that the challenged restraint had anticompetitive effects, and then proceeded to evaluate whether any of NCAA's procompetitive justifications were valid (they were not). *Law*, 134 F.3d at 1021-24 ("NCAA failed to present a triable issue of fact as to whether preserving entry-level positions served a legitimate procompetitive end."). That is also how quick-look would apply here.

NCAA's second argument against the quick-look presumption likewise gets things backwards. NCAA argues that the presumption of anticompetitive effects should not apply because of a supposed dispute about the contours of the market and NCAA's market power. Opp. at 23-26. The whole point of quick-look, however, is that price-fixing is so inherently anticompetitive that the defendant must come forward with valid procompetitive justifications *before* any detailed market analysis: "when there is an agreement not to compete in terms of price or output, no

---

[12] NCAA's specific contentions about the "increased opportunities" justification, along with the multiple reasons why that justification is invalid, are discussed below. *See infra* Part III.B.1.

15

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Bd. of Regents*, 468 U.S. at 109. Accordingly, "[t]he quick-look doctrine permits plaintiffs to forgo any strict showing of market power, and thus a specific definition of the relevant market." *Agnew v. NCAA*, 683 F.3d 328, 337 (7th Cir. 2012); *see also Safeway*, 651 F.3d at 1138 (noting that under quick-look, "the burden shifts to [defendant] to produce evidence of procompetitive justification or effects and thus demonstrate the need for more extensive market inquiry"). Dr. McCrary's testimony about what a "detailed market analysis" might entail is thus wholly irrelevant—quick-look exists precisely to avoid the need for such analysis.[13] And NCAA's fixation on market definition and market power is hard to understand in any event, as it is "the only purchaser" of college sports coaches, making this "a clear monopsony case." *Agnew*, 683 F.3d at 337 n.3.[14]

The cases NCAA cites that rejected quick-look review do not involve price-fixing or other types of restraints that courts have long recognized as having "obvious anticompetitive effects." *Cal. Dental*, 526 U.S. at 770. In *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955 (6th Cir. 2004), the restraint was a rule that schools could compete in only two "certified basketball events" every four years. *Id.* at 957. In *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820 (3d

---

[13] The applicable legal standard is a question for the Court. Dr. McCrary's opinion or assertion that a detailed market analysis "is important to assess Plaintiffs' claims," McCrary Decl. ¶ 11, invokes a full-blown rule of reason test and thus misstates the Plaintiffs' burden under the *per se* rule or quick-look. As an expert, Dr. McCrary is not competent to opine on the proper legal standard, and his incorporation of the wrong standard makes his opinion inadmissible. Courts exclude expert opinions that are contrary to the law. *United Food and Com. Workers Loc. 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017). Moreover, courts exclude expert opinions that instruct on legal principles. *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 679–80 (N.D. Cal. 2021). This is especially true where the legal conclusions are disguised as economic conclusions and would risk confusing a jury as to the applicable law. *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2571332, at *9 (N.D. Cal. June 30, 2012). Plaintiffs thus object to Dr. McCrary's testimony on this point, which in any event is irrelevant for the reasons stated.

[14] Dr. McCrary's suggestion that this case requires a market analysis based on a citation to Dr. Ashenfelter's report in *In Re: Compensation of Managerial, Professional, and Technical Employees Antitrust Litigation (Todd v. Exxon Corp.)*, *see* McCrary Decl. ¶ 19 & n.24, is inapplicable to this case. The *Todd* case involved claims of an information exchange, which is judged under the full-blown rule of reason. *See Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001). Here, in contrast, NCAA's overt horizontal wage-fixing is governed by either the *per se* rule or the quick-look form of the rule of reason, neither of which require detailed market analysis.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Cir. 2010), the restraints were rules making elite tennis players less likely to play in certain events. *Id.* at 827. In *Safeway*, 651 F.3d 1118, the restraint was an "agreement among competitors to share revenues during the term of a labor dispute." *Id.* at 1122. NCAA also cites *Nostalgic Partners, LLC v. Office of Comm'r of Baseball*, 637 F. Supp. 3d 45 (S.D.N.Y. 2022), which involved a reorganization of baseball's minor leagues, and *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174 (E.D.N.Y. 2023), which involved a cooperation agreement between a department store and its concession brands.

Those restraints bear no resemblance whatsoever to the unadorned price-fixing at issue here and in *Law*, which the Supreme Court made clear has obvious anticompetitive effects. *See Cal. Dental*, 526 U.S. at 770. That is precisely why the courts in NCAA's cited cases, as NCAA puts it, "did not identify any conflict between their reasoning and … [t]he Tenth Circuit in *Law*." Opp. at 26. They were not dealing with price-fixing, "the paradigm of an unreasonable restraint of trade." *Bd. of Regents*, 468 U.S. at 100. Indeed, NCAA's cases expressly distinguish the restraints they were dealing with from price-fixing restraints. *See Worldwide Basketball*, 388 F.3d at 960 ("[A] naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis."); *Deutscher Tennis*, 610 F.3d at 830 ("Some categories of restraints, such as horizontal price-fixing … among competitors, … are conclusively presumed to be unreasonable.").

NCAA's contention that "anticompetitive effects are *not* clear" either strains credulity or is another example of NCAA litigating some other case challenging the limit on the number of coaches. *See* Opp. at 26. Reduced wages are the paradigmatic anticompetitive effect in a labor market, and the Wage Fix did not just reduce wages, it expressly and undisputedly *prohibited* them. NCAA may dispute the amount of damages, but its suggestion that fixing wages at $0 might not have any anticompetitive effect *at all* beggars belief. Because wage-fixing has "obvious anticompetitive effects," *Law*, 134 F.3d at 1020, it "requires some competitive justification even in the absence of a detailed market analysis." *Bd. of Regents*, 468 U.S. at 110. As shown next, NCAA has not provided any legally valid justification.

### B.    NCAA's Procompetitive Justifications Fail As A Matter Of Law.

A procompetitive justification can validly rebut the quick-look presumption only if it satisfies two requirements: (1) it must be non-pretextual—*i.e.*, it must be the actual reason the restraint was imposed rather than a made-for-litigation reason; and (2) it must plausibly enhance economic competition in the market in which it is imposed. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 986 (9th Cir. 2023).[15] If a proffered procompetitive justification does not satisfy *both* of these requirements, it is not valid and may not be considered. *Id.* Here, NCAA offered three supposedly procompetitive justifications: (1) "expand[ing] opportunities for individuals interested in gaining experience and pursuing careers in coaching sports"; (2) "enhanc[ing] equitable competition between NCAA Division I member institutions"; and (3) "increas[ing] resources available to student-athletes." SUF 41-42.

These justifications do not satisfy either requirement: they are *both* pretextual *and* invalid as a matter of law. First, NCAA has offered no evidence that the Wage Fix "was designed for any [of its three] procompetitive benefit[s]." *McWane, Inc. v. FTC*, 783 F.3d 814, 841 (11th Cir. 2015). Instead, NCAA points only to its reasons for having or adding a coaching position, which are immaterial because Plaintiffs are challenging only *the Wage Fix* on that position. *See infra* Part III.B.1. Second, even if NCAA had evidence that any of the three proffered justifications played a part in its decision to fix wages, none of those justifications are legally valid under the Sherman Act anyway. Indeed, NCAA does not even respond to Plaintiffs' arguments that "expand[ing] opportunities" for young coaches and "increas[ing] resources for student-athletes" are not cognizable, implicitly conceding that both are invalid. *See infra* Part III.B.2. Summary judgment is warranted for either or both of those reasons.

### 1.    NCAA's Procompetitive Justifications Are Pretextual.

As detailed in the opening brief and below, all three of NCAA's justifications are legally invalid under the Sherman Act because they do not enhance competition in the labor market. *See infra* Part III.B.2. But they also fail at the threshold because they were not NCAA's actual reasons

---

[15] If a justification is legally valid under this test, the question for trial is whether "on balance, 'the challenged restraint enhances competition'" in the relevant market and whether any net procompetitive benefits can be secured through less restrictive means. *Law*, 134 F.3d at 1021.

for fixing wages. The Sherman Act does not allow a defendant to justify a restraint with a *post hoc* rationale that was not its actual reason for imposing the restraint in the first place. Mot. at 16-17. If a "proffered business justification played no part in the decision to act," it cannot be used as a defense. *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997). NCAA's justifications thus cannot even be considered unless NCAA shows that they were the actual reasons it imposed the Wage Fix. It has not offered any such evidence, instead pointing only to irrelevant (and undisputed) evidence about why it *had the coaching position*, not why it fixed wages on that position. Because NCAA "does not have enough evidence" from which a jury could find that any of its procompetitive justifications were its actual reasons for fixing wages, Plaintiffs are entitled to summary judgment. *See Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); Mot. at 16-19.

NCAA claims there are disputes of fact about its reasons for imposing the restraint, but the evidence it cites is all about the wrong restraint. The parties agree on the history: NCAA in 1991 enacted "limits on the number of coaches in sports other than football and basketball," Opp. at 5, seeking "to reduce costs," SUF 9. Those changes were slated to take effect in August 1992. *See* Ex. 1 to Mallonee Decl. at _0143199 (Proposal No. 39). NCAA quickly concluded that these staff-size limits cut too deep and would have forced schools to let go of coaches who "give a lot of individual attention and enhance safety, and improve the quality of instruction for many of our sports programs." Opp. at 5; *see also* Opp. at 4-7; Mot. at 3-5 (recounting same history using same documents).[16] To allow these and other coaches to continue their essential work, NCAA decided at the 1992 Convention to raise the staff-size limits in every sport by one coach compared to the 1991 enactment, before the 1991 enactment ever took effect. But instead of allowing a competitive labor market for these additional coaches, NCAA and its member schools agreed to force them all to work without pay, fixing their compensation at $0.

---

[16] Unlike after the Wage Fix's enactment, there were no limits on what these or any coaches could receive from a school. It was only with the passage of the challenged restraint that all the schools and the NCAA agreed on the specific (and draconian) limits on wages and benefits to assistant coaches classified by NCAA and the schools as "volunteer coaches."

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NCAA's brief relies entirely on evidence about why it increased the number of coaching positions from the 1991 enactment, *see* Opp. at 1-2, 6-7, 10-14, but that evidence is immaterial because Plaintiffs are not challenging the number of coaching positions. NCAA points to statements in the legislative record about how it wanted "to enable more coaches to coach," Opp. at 10, or to "improve the quality of instruction for many of our sports programs," Opp. at 11. NCAA also submits the Declaration of Stephen Mallonee, who principally quotes the same historical statements addressing the reasons for adding coaching positions. *See* Mallonee Decl. ¶¶ 5-15. None of this matters or creates any dispute of material fact. Plaintiffs are not challenging NCAA's determination that having more coaches is beneficial. Needless to say, Plaintiffs agree that they and the class members improved the quality of instruction and added substantial value to their respective teams. NCAA's argument and evidence about why it wanted to have more coaches is entirely beside the point.

What Plaintiffs are challenging is NCAA's agreement to fix wages for one of the allowed coaching positions. And on the purpose of *that* restraint, NCAA offers nothing. It cites nothing in the legislative record, and nothing in the Mallonee Declaration, showing that anyone thought *fixing coaches' wages* would "expand opportunities," "enhance equitable competition," or "increase resources available to student-athletes." SUF 41-42. Of course nobody thought that—it is nonsensical. NCAA schools wanted the benefits of more coaches without the costs of paying market wages. The coaching position provided the former, while the Wage Fix delivered the latter.[17]

The only evidence NCAA cites that even *addresses* the Wage Fix separately from the coaching position is Paragraph 10 of Mr. Mallonee's declaration—and even he does not contend that the Wage Fix was enacted in pursuit of one of NCAA's proffered procompetitive justifications.

---

[17] Even though it conflates them before this Court, NCAA treats the coaching position and the Wage Fix on that position as distinct outside of court. *See* Ex. 27 to Second Declaration of Michael Lieberman at _0179925-26 (proposing to eliminate "the compensation restrictions applicable to a volunteer coach," but not the position itself); Ex. 28 to Second Lieberman Decl. at _0019531 (proposing to remove compensation restrictions in two sports while keeping the coaching positions); Ex. 18 to Lieberman Decl. at _0019545 (officially eliminating "the volunteer coach designation" for coaching positions but not the coaching positions).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

In that paragraph, Mr. Mallonee states that "restrictions on … compensation given to coaches in the volunteer coach position" were "designed to ensure that institutions would not attempt to evade the limits on the number of paid coaches that had been enacted the previous year." Mallonee Decl. ¶ 10. It is undisputed that those 1991 "limits on the number of paid coaches" were enacted to "cut costs and save money." SUF 6-9.[18] By admitting that the Wage Fix was designed to prevent "evasion" of those cost-cutting measures, Mr. Mallonee confirms that the "restrictions on compensation" were also a cost-cutting measure, designed to preserve the savings the 1991 limits had just secured.

Because NCAA has not offered any evidence that it **fixed wages** because it believed doing so would "expand opportunities," "enhance equitable competition," or "increase resources available to student-athletes," it cannot show that any of those proffered justifications are non-pretextual reasons for the Wage Fix. Plaintiffs are thus entitled to summary judgment on all three justifications. *See, e.g., Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("[T]he *Celotex* showing can be made by pointing out through argument [] the absence of evidence to support [the non-moving party's] claim.").

Trying to stave off summary judgment, NCAA incorrectly argues that Plaintiffs must prove that NCAA's true motivation was to save money and that a question of fact on that point precludes summary adjudication of liability. Opp. at 12-13. That is incorrect. Plaintiffs do not have any burden on this point; the Sherman Act does not require Plaintiffs to prove *why* NCAA restrained trade, only that it did so. *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 310 (1956) ("It makes no difference whether the motives of the participants are good or evil."). NCAA's intent matters only because NCAA claims that the Wage Fix served procompetitive ends; that defense is available only if those supposedly procompetitive ends were NCAA's actual reasons for enacting the Wage Fix. *See Epic*, 67 F.4th at 986. Thus, what matters is whether *NCAA* has created a triable issue of fact regarding *its own* procompetitive justifications—and as just shown, it has not.

---

[18] Mr. Mallonee himself testified in the *Law* case that the 1991 enactments were "designed to achieve a reduction in costs." *See* Ex. 29 to Second Lieberman Decl. at _0332655 (56:23-57:4).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

It bears noting, however, that the evidence that NCAA's true motivation for fixing wages was to save money is overwhelming and not contradicted by anything in the record. The undisputed purpose of the Cost-Reduction Committee, as its name makes clear, was "to cut costs and save money." SUF 6-7; *see Law*, 134 F.3d at 1013 ("[T]he Chairman told NCAA members that the goal of the Committee was to 'cut costs and save money.'"). NCAA tries to distance itself from that language by pointing out that the Cost-Reduction Committee "was *not* involved in designing or proposing the volunteer coach legislation that was adopted in 1992." Opp. at 12. But it does not dispute that the Fine-Tuning Committee, as evidenced by its name, was empowered only to "fine-tune" the Cost-Reduction Committee's work and remained bound by the Cost-Reduction Committee's charge to "cut costs and save money." SUF 11-13. The NCAA Presidents Commission, for example, stated that it would "oppose any proposals" from the Fine-Tuning Committee "that would compromise the basic intent of [the 1991 enactments]." SUF 13.

It is also undisputed that the NCAA members who formally introduced the proposal emphasized that it "would not result in any significant additional cost," SUF 15-16, and that "[t]here is no cost attached to this legislation," SUF 17. The significance of those statements is clear and recognizes the aim of every wage-fixing agreement: to limit the competing firms' collective expenses by eliminating price competition on an input; in this case, coaching services. NCAA's false assertion that "Plaintiffs' motion does not cite any testimony from any witness who participated in the enactment of the volunteer coach legislation," Opp. at 12, ignores these two statements by the legislation's proponents, both of which expressly affirm the cost-cutting purpose. NCAA's reliance on Mr. Mallonee's statement that "saving money was not the purpose of permitting volunteer coaches," Opp. at 1, is again beside the point: Plaintiffs do not argue that NCAA *permitted coaches* as a way to reduce costs (which would make no sense), but that it *fixed their wages* to reduce costs—a point Mr. Mallonee never denies.

It is also undisputed that NCAA itself, in conducting a review of its own bylaws, concluded that the Wage Fix was "primarily motivated by … cost containment." SUF 35. NCAA claims that it is somehow "odd[]" for Plaintiffs to cite "an NCAA report from 2022" as evidence of NCAA's intent in 1992, but that was the express purpose of the 2022 report—to provide a retrospective

review of NCAA's own legislation. In other words, NCAA itself looked at the exact question now before the Court—why did NCAA fix wages in 1992?—and concluded that it did so for "cost containment." *Id.* Tellingly, NCAA's review does not cite "expand[ing] opportunities," "enhanc[ing] equitable competition," or "increas[ing] resources available to student-athletes" as one of the reasons for fixing wages. Far from being "odd[]" authority, NCAA's "damning internal document[]" confirms "that its procompetitive justifications are 'merely pretextual.'" *McWane*, 783 F.3d at 841-42.

Finally, NCAA misstates summary judgment law when it claims that the issue of pretext must *always* go to the jury. Opp. at 27. Like any other issue on which the defendant bears the burden of proof, the issue of pretext is for the jury only if the defendant has enough evidence to create a jury issue. *Nissan*, 210 F.3d at 1106. Where, as here, the defendant has *no* evidence that its procompetitive justifications were its actual reasons for fixing wages, summary judgment for the plaintiff is warranted. *Id.* Indeed, the Tenth Circuit in *Law* affirmed summary judgment for the plaintiffs on NCAA's "competitive balance" justification precisely because it was without question pretextual: "The undisputed record reveals that the REC Rule is nothing more than a cost-cutting measure and … is not directed towards competitive balance." *Law*, 134 F.3d at 1024. The same outcome is warranted here.

## 2.    NCAA's Procompetitive Justifications Are Not Legally Cognizable.

Even if there were a triable question of fact as to whether any of NCAA's justifications were genuine and not invented for litigation (which there is not), those justifications fail as a matter of law anyway because they are not cognizable under the Sherman Act. *See* Mot. at 19-29; *contra* Opp. at 10 (claiming that a factual dispute about pretext would require denying the motion). Whether NCAA's justifications are legally cognizable is a question of law for the Court. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1142860, at *4 (E.D.N.Y. Mar. 15, 2024) (collecting cases). Here, NCAA does not even respond to most of Plaintiffs' legal arguments, effectively conceding that two of its three justifications—"expanded opportunities" and "increased resources"—are invalid. And while NCAA does at least try to defend its "competitive balance" justification, it fails to show that this Court should accept "cross-

market balancing" when every other court to consider the question has rejected it. Accordingly, "[t]here is no need to proceed to trial or engage in fact-finding because [NCAA] has failed, as a matter of law, to offer any procompetitive justifications." *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 409-10 (S.D.N.Y. 2004), *rev'd on other grounds*.

### a.    The "Expanded Opportunities" Justification Is Legally Invalid.

NCAA's first asserted justification was that the Wage Fix "expanded opportunities for individuals interested in gaining experience and pursuing careers in coaching sports." SUF 42. Plaintiffs demonstrated three independent reasons why that justification is legally improper in this case, Mot. at 20-24, but NCAA responds to only one of them, forfeiting any opposition to the other two, both of which are independently sufficient to reject this justification and grant summary judgment on it. *See Stitching Pensioenfonds ABP v. Countrywide Financial Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("Failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1524005, at *10 (N.D. Cal. Mar. 28, 2018) (granting summary judgment on procompetitive justifications because NCAA did not defend them in its opposition brief).

First, Plaintiffs showed that NCAA's desire to expand opportunities for inexperienced coaches "is a non-economic objective that cannot justify a restraint on trade under the Sherman Act." Mot. at 22. The *Law* court rejected the same argument for the same reason. *Law*, 134 F.3d at 1021-22 ("While opening up coaching positions for younger people may have social value apart from its [e]ffect on competition, we may not consider such values unless they impact upon competition."); *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 690 (1978) ("[T]he inquiry is confined to a consideration of impact on competitive conditions."). NCAA does not respond, and on this basis alone, Plaintiffs are entitled to summary judgment on this procompetitive justification.[19]

---

[19] Regardless of which Sherman Act framework applies, the Court may grant summary judgment as to one or all of NCAA's procompetitive justifications. *See, e.g.*, *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1524005, at *10 (in rule of reason case, granting summary judgment to plaintiffs on six of NCAA's procompetitive justifications).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Second, Plaintiffs showed that "the Wage Fix is not even arguably tailored to serve" the goal of expanding opportunities for young coaches because it has no age or experience requirement. Mot. at 23-24; *see Law*, 134 F.3d at 1021 (rejecting same argument by NCAA for the same reason). Again, NCAA offers no response, again conceding the point and warranting summary judgment on this procompetitive justification.

Third, Plaintiffs showed that any "expanded opportunities" would be a result of the coaching position, not the Wage Fix on the position. Mot. at 20-22. In response, NCAA just doubles down, arguing again that "*the volunteer coach position* increased output by enabling more coaches to coach." Opp. at 16. Once again, that is not the question here—this case is about fixing wages on the so-called "volunteer coach position," not the existence of the position itself. NCAA's insistence that *the position* "enable[d] more coaches to coach" suggests that employers can freely fix wages as long as the victims are new hires. That is not the law. *See, e.g.*, *Brown v. Pro Football*, 1992 WL 88039, at *1 (D.D.C. Mar. 10, 1992) ("The fact that an employer creates jobs does not allow that employer to violate the Sherman Act by fixing salaries.").

It is a bit of an aside given that Plaintiffs are not challenging the number of coaching positions, but it bears mention that NCAA's claim that the challenged bylaws "enabl[ed] more coaches to coach" is objectively false anyway. As NCAA's own exhibits show, the coaching bylaws enacted at the 1991 and 1992 Conventions both had the same effective date: August 1, 1992. *See* Ex. 1 to Mallonee Decl. at _0143199 (Proposal No. 39); Ex. 2 to Mallonee Decl. at _0143510 (Proposal No. 60). Prior to that effective date, there were no limits on how many coaches any school could hire in any sport relevant to this case. *See* Mallonee Decl. ¶ 3. After that effective date, schools could hire only a limited number of coaches, one of whom was wage-fixed at $0. For the class representatives' sports, for example, the rules that NCAA claims "enabl[ed] more coaches to coach" had the following effect:

| Sport | Coaches Allowed Before the 1991-92 Legislation | Coaches Allowed After the 1991-92 Legislation |
|---|---|---|
| Track & Field | Unlimited | Limited to 4 |
| Softball | Unlimited | Limited to 4 |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| Volleyball | Unlimited | Limited to 4 |
|---|---|---|
| Swimming & Diving | Unlimited | Limited to 4 |

*See* Mallonee Decl. ¶ 3; Ex. 1 to Mallonee Decl. at _0143198 (limits on head coaches, assistant coaches, and restricted-earnings coaches); Ex. 2 to Mallonee Decl. at _0143510 (limits on "volunteer" coaches). The legislation thus simultaneously reduced the overall number of allowed coaching positions and fixed the wages on previously unrestrained coaches. As Mr. Mallonee himself testified during the *Law* case, the package of legislation resulted in "a reduction in coaches." Ex. 29 to Second Lieberman Declaration at _0332655 (56:23-25). Thus, NCAA's claim that the "position" created more coaching opportunities is "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S. 372, 380 (2007), and irrelevant anyway.

Perhaps recognizing that its arguments about whether *the position* was justified all fail, NCAA tries to portray the position and the Wage Fix as somehow inseparable, arguing that it never would have created the position without fixing its wages. Opp. at 17-18. That exact argument was rejected in *Brown v. Pro Football*, where the NFL claimed that it would not have created new "Developmental Squads" if they did not include the challenged salary restraint. But this claim, "even if true," did not justify the salary restraint because "[t]he fact that an employer creates jobs does not allow that employer to violate the Sherman Act by fixing salaries." 1992 WL 88039, at *9. NCAA tries to distinguish *Brown* by falsely suggesting that the court found, as a factual matter, that the NFL would have still created the Developmental Squads even without the salary restraint. Opp. at 17. In reality, the opposite is true: the court *credited* the NFL's factual contention that "without the fixed salary provision, resolution G–2 would not have been adopted by the clubs," *id.* at *6 n. 10—as it was required to do at summary judgment—but it held that this was immaterial because the NFL *did* have the Developmental Squads and *did* fix wages, entitling the plaintiffs to a remedy for the harms they experienced. *Id.* at *9.[20]

---

[20] NCAA says that *Brown* was reversed by the D.C. Circuit, Opp. at 17, but the D.C. Circuit addressed only a separate issue about an antitrust exemption related to collective bargaining agreements, which NCAA does not claim applies here. *Brown v. Pro Football, Inc.*, 50 F.3d 1041 (D.C. Cir. 1995).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  Courts in other contexts routinely reject arguments like NCAA's, holding that defendants

2  cannot escape antitrust liability by claiming their product would not have existed absent the

3  restraint. In *In re Loestrin 24 Fe Antitrust Litigation*, 433 F. Supp. 3d 274 (D.R.I. 2019), for

4  example, defendants argued that if their patent was invalid because they had fraudulently obtained

5  it (as the plaintiffs alleged), there would have been no product at all, and thus no harm. *Id.* at 304.

6  Even though it was factually accurate that the product would not have existed without the patent,

7  the court rejected the argument as a matter of law: "Defendants' first line of attack is a whopper.

8  They assert that … if the patent was procured by fraud and therefore invalid, there would have

9  been no patented product and no one would have been injured in the but-for world. No patent, no

10  product; no product, no purchases; no purchases, no damages, Defendants say. Voila! The problem

11  is this argument has no basis in law … and ignores the reality of the anticompetitive conduct as

12  alleged." Just as the *Loestrin* defendants could not avoid liability by claiming "no patent, no

13  product," NCAA cannot avoid liability by claiming "no wage-fix, no position."

14  For this reason, Mr. Mallonee's speculative opinion as to whether the volunteer coach

15  position would have been enacted without the Wage Fix, *see* Mallonee Decl. ¶ 16; SDF 9-10, is

16  completely irrelevant.[21] The position was enacted, it was wage-fixed, and the only question is

17  whether that restraint on wages violated the Sherman Act. NCAA has not offered any evidence

18  that the Wage Fix (as opposed to the coaching position) increased opportunities for young coaches

19  or anyone else. Thus, for any of the three reasons noted above—two of which are undisputed—

20  summary judgment on this justification is warranted.

21

22  ------

[21] In addition to being legally irrelevant, Mr. Mallonee's statement that "If the volunteer coach
position had not been enacted during the 1992 NCAA Convention, then the coaching limits
23  adopted at the 1991 NCAA Convention would have remained in place," Mallonee Decl. ¶ 16, is
objectionable as either hearsay or speculation. NCAA Bylaws are enacted by vote of its member
24  institutions. SUF 21. Mr. Mallonee cannot purport to know what bylaws would have been enacted
by NCAA's member institutions in the counterfactual world he posits. If he is suggesting that
25  member institutions told him how they would have acted in that counterfactual world, then his
testimony is inadmissible hearsay that cannot be presented in admissible form at trial. If he is
26  speculating about how they would have acted in that counterfactual world, then his statement is
speculative, lacks foundation, and is not based on personal knowledge. Plaintiffs object on each of
27  these grounds, and the speculative nature of the testimony deprives it of any probative value. *See
Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1

### b. The "Competitive Balance" Justification Is Legally Invalid.

2      NCAA's "competitive balance" justification fails twice over. First, it improperly tries to

3  justify anticompetitive harm in the labor market with procompetitive benefits in a different market:

4  the consumer market for sporting events. This "cross-market balancing" is improper and has been

5  rejected by courts across the country and at every level, as the Sherman Act does not allow courts

6  "to sacrifice competition in one portion of the economy for greater competition in another portion."

7  *United States v. Topco Assocs.*, 405 U.S. 596, 611 (1972); *see* Mot. at 24-26. If the rule were

8  otherwise, *all* wage-fixing could be justified on the basis that it lowers the defendant's costs,

9  leading to a better product. But as Judge Easterbrook recently explained, that "is equivalent to

10 saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston*

11 establishes otherwise." *Deslandes*, 81 F.4th at 703; *see also Alston*, 594 U.S. at 112 (Kavanaugh,

12 J., concurring) (stating that college sports' popularity among consumers "cannot justify the

13 NCAA's decision to build a massive money-raising enterprise on the backs of student athletes who

14 are not fairly compensated").

15     NCAA does not deny that the Supreme Court has laid down a general principle against

16 cross-market balancing, that three courts of appeals have squarely rejected cross-market balancing,

17 or that district courts in multiple sports-related antitrust cases have done the same. *See* Mot. at

18 24-26 (collecting cases). NCAA ignores these cases entirely, never citing or trying to reconcile its

19 position with *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963), *Topco*, 405 U.S. at 611,

20 *Deslandes*, 81 F.4th at 704 (7th Cir. 2023), *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d

21 1384, 1392 (5th Cir. 1983), *Smith v. Pro Football*, 593 F.2d 1173 (D.C. Cir. 1978), *Ohio v. NCAA*,

22 706 F. Supp. 3d 583, 596 (N.D.W. Va. 2023), *In re NCAA Student-Athlete Name & Likeness

23 Licensing Litig.*, 37 F. Supp. 3d 1126, 1151 (N.D. Cal. 2014), *Clarett*, 306 F. Supp. 2d at 408-09,

24 or *Law*, 902 F. Supp. at 1406. The U.S. Department of Justice and the Federal Trade Commission

25 agree with the consensus: "Allowing out-of-market benefits to override anticompetitive harm in a

26 relevant market would undermine antitrust protections and is not judicially administrable." Br. of

27 the United States and the Federal Trade Commission as Amici Curiae, *Epic Games, Inc. v. Google

28 LLC*, Nos. 24-6256, 24-6274, at 33 (Jan. 7, 2025). These authorities all squarely reject efforts to

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

justify harms to one market with purported benefits to another, and NCAA has no answer to any of them.

Instead, NCAA cites far weaker authorities and offers no substantive argument, never explaining why the Sherman Act would "validate a practice that is decidedly in restraint of trade simply because [it] produces some unrelated benefits to competition in another market." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d at 1151. NCAA's position is essentially that it should survive summary judgment because the Ninth Circuit has not yet squarely ruled on the issue. But whether cross-market benefits are cognizable is a legal question for the Court to decide on this motion, and NCAA offers no persuasive reason why the Court should reject the overwhelming consensus.

First, NCAA argues that "the Supreme Court has held that an interest in maintaining a competitive balance among athletic teams is legitimate and important." Opp. at 28 (quoting *Am. Needle, Inc. v. Nat'l Football Ass'n*, 560 U.S. 183, 204 (2010)). This is non-responsive. Competitive balance in the consumer market for athletic contests may be a legitimate justification for restraints *in that market*, but that does not make it a legitimate justification for out-of-market restraints. *See Alston*, 594 U.S. at 90 ("[T]he ability of sports teams to agree on a TV contract need not imply an ability to set wages."). Indeed, the case NCAA cites says only that competitive balance might justify some collective decisions, not all of them, and if anything, suggested that competitive balance would not be a valid defense even for the specific restraint at issue in that case. *Am. Needle*, 560 U.S. at 204.

Second, NCAA notes that the Supreme Court and the Ninth Circuit have occasionally "considered cross-market rationales" in antitrust cases. Opp. at 28-29. Plaintiffs acknowledged as much in their motion, Mot. at 25 n.7, but as NCAA does not deny, those courts considered cross-market rationales only when no party objected to their doing so, meaning that the issue was not squarely presented. In *Alston*, for example, the Supreme Court made clear that it was considering NCAA's cross-market arguments only because the plaintiffs "[did] not question that the NCAA may permissibly seek to justify its restraints in the labor market by pointing to procompetitive effects they produce in the consumer market." 594 U.S. at 87 (rejecting NCAA's justifications).

The same is true for the Ninth Circuit decisions that NCAA cites. *See* Opp. at 28-29; *see also, e.g.*, *Epic Games*, 67 F.4th at 989 (noting that Ninth Circuit has not yet ruled on this issue and declining to decide it). Here, Plaintiffs do object to NCAA's use of cross-market justifications, squarely presenting the legal question for the Court's determination.

Third, NCAA mischaracterizes several out-of-circuit cases in claiming they support its position. NCAA cites *Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994), but *Sullivan* did not approve cross-market balancing—quite the opposite. The *Sullivan* court held that out-of-market benefits are relevant only to the extent they "have a beneficial impact on competition *in the relevant market itself*." *Id.* at 1113 (emphasis added). Thus, the *Sullivan* court required that procompetitive benefits be in the same market as the restraint; it simply held that those benefits could be indirect. *Sullivan* supports Plaintiffs' position, not NCAA's.

NCAA's other cases are no more helpful. The court in *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*, 670 F.2d 421 (3d Cir. 1982), did not consider the question, as evidenced by later Third Circuit cases calling it an open issue, *see King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 410 n.34 (3d Cir. 2015), and district courts in that Circuit squarely holding that "increased competition in one market cannot justify anticompetitive conduct in an unrelated market." *Apotex, Inc. v. Cephalon, Inc.*, 2017 WL 10963610, at *2 (E.D. Pa. May 24, 2017). NCAA's final two cases, *see* Opp. at 29, are out-of-circuit district court cases that do not involve labor markets—and in both, it was disputed whether the proffered justifications were "cross-market" at all. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 734655, at *5 (D. Mass. Feb. 6, 2018) ("[T]here also remains a genuine dispute as to whether [the product said to benefit from the restraint] is in the same market as [the product subject to the restraint] when the market is properly defined.").

In sum, the overwhelming weight of authority prohibits cross-market balancing, and NCAA does not cite *a single case* unambiguously supporting its positions. The Court should not become the first to adopt a rule that has been rejected by the Department of Justice, the Federal Trade Commission, and every other court to squarely consider the issue. The "competitive

balance" justification is thus invalid as a matter of law where, as here, it is offered to justify restraints on labor.

Even if "competitive balance" could ever be a cognizable procompetitive justification for labor-market restraints, no reasonable jury could credit NCAA's claim in this case that the Wage Fix actually promotes competitive balance to such an extent as to have a "net procompetitive effect." *Safeway*, 651 F.3d at 1134; *see* Mot. at 26-27. NCAA conspicuously fails to address this argument, offering no response to the Supreme Court's holding in *Board of Regents* or the Tenth Circuit's in *Law* that restraining one small category of spending while leaving all other competitive expenditures unrestricted cannot plausibly equalize spending or enhance competitive balance. *See* SUF 39. Not only is that one coach's salary dwarfed by the numerous unchecked expenditures, but as the *Law* court recognized, "[t]here is no reason to think that the money saved by a school on the salary of a [wage-fixed] coach will not be put into another aspect of the school's [] program." *Law*, 134 F.3d at 1023; *see also Bd. of Regents*, 468 U.S. at 118-19 (rejecting "competitive balance" defense because the restraint "does not regulate the amount of money that any college may spend on its [] program"). NCAA's "competitive balance" defense is no different from, and no better than, the defenses rejected in *Board of Regents* and *Law*, and its failure to even try to distinguish those cases is conclusive.

Because the "competitive balance" defense is implausible on its face, it is no surprise that NCAA has not submitted any evidence tending to show that the Wage Fix actually enhanced competitive balance in Division I sports. While NCAA asserts in its brief that it "has adduced evidence supporting multiple procompetitive justifications," Opp. at 29, not a single piece of evidence in NCAA's brief discusses competitive balance or tries to show either that the Wage Fix enhanced competitive balance or that its repeal harmed competitive balance. Did sports contests become less competitive after July 1, 2023? Did championships become less distributed? NCAA does not even try to answer those questions.

To the extent Dr. McCrary's report is supposed to function as evidence regarding "competitive balance," it does no such thing. Dr. McCrary analyzes data from 2022-23—the final year the Wage Fix was in effect—and finds that there was "wide variation in program expenditures

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

across schools." McCrary Decl. ¶ 35; *see id.* ¶¶ 36-43 (discussing variation in spending among schools). But critically, Dr. McCrary neither connects these spending disparities to actual competitive balance or shows that a marginal increase in these spending disparities from paying one entry-level coach would affect competitive balance. Against the backdrop of schools' unlimited spending in other areas and the already-existing disparities in spending, the notion that fixing one assistant coach's wages meaningfully affected competitive balance is simply not believable—and believable or not, Dr. McCrary does not offer any evidence to that effect.

Most telling, Dr. McCrary does not even consider, much less show, that the 2023 repeal of the Wage Fix harmed competitive balance. He shows that better-funded schools were more likely to immediately hire an additional coach after the repeal, *id.* ¶ 43, but he does not even try to show that this affected competitive outcomes. If the Wage Fix enhanced competitive balance, its repeal should have caused measurable harm to competitive balance. NCAA provides no evidence of any such harm. Worse still for NCAA, the only record evidence about how repeal would affect competitive balance directly contradicts its litigation position. While NCAA now claims that "the Volunteer Coach Rule enhanced equitable competition," SUF 42, NCAA stated before this litigation that *repeal* of that rule would "create ... more equitable Division I athletics competition." SUF 36. NCAA cannot have it both ways: if repeal enhanced competitive equity, the rule itself must have made things worse. As in *Law*, "the nexus between the rule and a compelling need to maintain competitive balance [is not] sufficiently clear on this record to withstand a motion for summary judgment." 134 F.3d at 1024.

### c.  The "Increased Resources" Justification Is Legally Invalid.

NCAA's third asserted justification was that the Wage Fix "increased resources available to student-athletes." SUF 41-42. Plaintiffs provided multiple independent reasons why that justification is legally improper in this case—among them that: (1) "increas[ing] resources for athletes" is a rationale for hiring coaches, not fixing their wages, and (2) providing more resources for student-athletes is a social objective, not an economic justification cognizable under the antitrust laws. *See* Mot. at 27-29. This rationale is also directly contradicted by the official rationale for *repealing* the Wage Fix, which stated: "Elimination of the volunteer coach designation … will

help provide better support to student-athletes." SUF 37. NCAA does not respond to any of these arguments or otherwise mention this justification in its brief. Summary judgment is therefore warranted on this justification, both as a matter of forfeiture and for the reasons stated in Plaintiffs' opening brief. *See Stitching*, 802 F. Supp. 2d at 1132; *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1524005, at *10.

## **CONCLUSION**

At bottom, this case calls for a straightforward application of settled law to undisputed facts. NCAA fixed wages—a quintessential antitrust violation. Wage-fixing agreements do not enhance competition, and this one certainly did not. The Court should grant summary judgment.


DATED: September 9, 2025                        Respectfully submitted,

                                                **GUSTAFSON GLUEK PLLC**

                                                By: */s/ Dennis Stewart*
                                                Dennis Stewart, CA Bar No. 99152
                                                600 W. Broadway, Suite 3300
                                                San Diego, CA 92101
                                                Telephone: (619) 595-3299
                                                dstewart@gustafsongluek.com

                                                Daniel E. Gustafson, MN Bar No. 202241
                                                (*pro hac vice*)
                                                Joshua J. Rissman, MN Bar No. 391500
                                                (*pro hac vice*)
                                                Anthony J. Stauber, MN Bar No. 401093
                                                (*pro hac vice*)
                                                **GUSTAFSON GLUEK PLLC**
                                                Canadian Pacific Plaza
                                                120 South 6th Street, Suite 2600
                                                Minneapolis, MN 55402
                                                Telephone: (612) 333-8844
                                                dgustafson@gustafsongluek.com
                                                jrissman@gustafsongluek.com
                                                tstauber@gustafsongluek.com

                                                **FAIRMARK PARTNERS, LLP**

                                                By: */s/ Michael Lieberman*
                                                Michael Lieberman, DC Bar No. 1033827
                                                (*pro hac vice*)

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Jamie Crooks, CA Bar No. 310447
(*pro hac vice*)
Yinka Onayemi, NY Bar No. 5940614
(*pro hac vice*)
Michael Goldberg, MA Bar No. 709203
(*pro hac vice*)
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (818) 585-2903
michael@fairmarklaw.com
jamie@fairmarklaw.com
yinka@fairmarklaw.com
mgoldberg@fairmarklaw.com

**KIRBY McINERNEY LLP**

By: */s/ Robert J. Gralewski*
Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone:    (559) 248-4820
dhorowitt@ch-law.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

*Attorneys for Plaintiffs and the Class*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT