Dennis Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson, MN Bar No. 202241
Anthony J. Stauber, MN Bar No. 401093
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone: (559) 248-4820

Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
1420 Kettner Blvd., Suite 100
San Diego, California 92101
Telephone: (619) 784-1442

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644

Michael Lieberman, DC Bar No. 1033827
Jamie Crooks, CA Bar No. 310447
Yinka Onayemi, NY Bar No. 5940614
Michael Goldberg, MA Bar No. 709203
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (818) 585-2903

*Attorneys for Plaintiffs Shannon Ray, Khala Taylor,*
*Peter Robinson, Katherine Sebbane, and Rudy Barajas*
*Individually and on Behalf of All Those Similarly Situated*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and RUDY BARAJAS Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>Defendant. | Case No. 1:23-cv-00425<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND MEMORANDUM IN SUPPORT**<br><br>Judge: Hon. William B. Shubb<br>Courtroom: 5<br>Date: December 22, 2025<br>Time: 1:30 PM |

## NOTICE OF MOTION AND MOTION FOR

## PRELIMINARY APPROVAL OF SETTLEMENT AND RELATED MATTERS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 22, 2025, before the Honorable William B. Shubb, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, CA 95814, Plaintiffs and the Class will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 23 for an order: 1) granting preliminary approval of the proposed class action settlement; 2) approving the form and manner of providing Notice of the proposed settlement to the class; 3) appointing AB Data, Ltd as the Claims Administrator; 4) appointing Huntington Bank as escrow agent; 5) setting a hearing date for the Court to consider final approval of the Settlement, approval of the Plan of Allocation of the Net Settlement Fund, Class Counsel's application for attorneys' fees, expenses, and service awards to the class representatives; and 6) establishing various other matters relevant thereto. This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Co-Lead Counsel's Joint Declaration, all exhibits and appendices to such documents, all pleadings on file, and any other matter submitted before or at the hearing on this Motion.

# **Table of Contents**

NOTICE OF MOTION AND MOTION ...................................................................... i

TABLE OF AUTHORITIES........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 3

THE SETTLEMENT .................................................................................................... 7

LEGAL STANDARD ................................................................................................ 10

ARGUMENT ..............................................................................................................11

I.      The Settlement Satisfies the Elements for Preliminary Approval. .....................11

         A.      The Class Has Been Adequately Represented. .......................................11

         B.      The Settlement Resulted From Arm's Length Negotiations. ................. 12

         C.      The Relief Provided by the Settlement Weighs in Favor of Approval................. 14

                 1.      The Settlement Provides Exceptional Relief to the Class........................ 14

                 2.      Costs, Risks, and Delay of Trial and Appeal ............................................ 17

                 3.      The Proposed Plan of Allocation Is Fair ................................................... 19

                 4.      Proposed Award of Attorney's Fees, Including Timing of Payment................................................................................................... 20

                 5.      Request for Service Awards for Class Representatives ............................ 22

                 6.      The Settlement Treats All Class Members Equitably ............................... 23

                 7.      The Experience and Views of Counsel ..................................................... 23

II.     Notice of the Settlement Should Be Approved. ................................................ 24

III.    The Court Should Appoint AB Data as Claims Administrator. ........................ 25

IV.    The Court Should Appoint Huntington Bank as Escrow Agent. ...................... 26

V.     The Court Should Set A Schedule For Final Approval. .................................... 26

CONCLUSION........................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Bedolla,*
    787 F.3d 1218 (9th Cir. 2015) ................................................................. 10

*Carlin v. DairyAmerica, Inc.,*
    380 F. Supp. 3d 998 (E.D. Cal. 2019) ....................................................... 15

*Corzo v. Brown Univ.,*
    2024 WL 3506498 (N.D. Ill. July 20, 2024) .............................................. 14

*Edwards v. Nat'l Milk Producers Fed'n,*
    2017 WL 3623734 (N.D. Cal. June 26, 2017) ............................................ 16

*Evans v. Zions Bancorporation, N.A.,*
    2022 WL 16815301 (E.D. Cal. Nov. 8, 2022) ...................................... 15, 20

*Four in One Co., Inc. v. S.K. Foods, L.P.,*
    2014 WL 4078232 (E.D. Cal. Aug. 18, 2014) ........................................... 16

*Griffin v. Consol. Commc's,*
    2023 WL 3853643 (E.D. Cal. June 6, 2023) .............................................. 20

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ............................................................. 11, 14

*Hudson v. Libre Tech., Inc.,*
    2020 WL 2467060 (S.D. Cal. May 13, 2020) ............................................ 11

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ..................................................................... 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    2017 WL 565003 (N.D. Cal. Feb. 13, 2017) ............................................. 16

*In re Citric Acid Antitrust Litig.,*
    145 F. Supp. 2d 1152 (N.D. Cal. 2001) ..................................................... 19

*In re College Athlete NIL Litig.,*
    2025 WL 1675820 (N.D. Cal. June 6, 2025) ............................................. 16

*In re College Athlete NIL Litig.,*
    No. 20-cv-03919 (N.D. Cal.) ....................................................................... 8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
    2013 WL 12387371 (N.D. Cal. Oct. 30, 2013) ......................................... 21

MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

*In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*,
   2008 WL 11504857 (C.D. Cal. Dec. 31, 2008) ............................ 17

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practice and
   Antitrust Litig.*,
   No. 17-md-2785 (D. Kan. Mar. 11, 2022) ............................ 26

*In re Google Play Developer Antitrust Litig.*,
   2024 WL 150585 (N.D. Cal. Jan. 11, 2024) ............................ 16

*In re High-Tech Employee Antitrust Litig.*,
   2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ............................ 16

*In re Lithium Ion Batteries Antitrust Litig.*,
   2017 WL 1086331 (N.D. Cal. Mar. 20, 2017) ............................ 16

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ............................ 18

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ............................ 22, 25

*In re Opana ER Antitrust Litig.*,
   No. 14-cv-10150 (N.D. Ill. Aug. 24, 2022) ............................ 26

*In re Packaged Ice Antitrust Litig.*,
   2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ............................ 17

*In re Shopping Carts Antitrust Litig.*,
   1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ............................ 22

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ............................ 10

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................ 24

*Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
   2023 WL 4747691 (E.D. Cal. July 25, 2023) ............................ 2, 15

*Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
   2024 WL 477221 (E.D. Cal. Feb 6, 2024) ............................ 10, 20

*Kimbo v. MXD Grp., Inc*,
   2021 WL 492493 (E.D. Cal. Feb. 10, 2021) ............................ 22

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) ............................ 8

*Le v. Zuffa, LLC,*
    No. 15-cv-1045 (D. Nev. Oct. 23, 2024) ........................................................ 26

*Low v. Trump Univ., LLC.,*
    881 F.3d 1111 (9th Cir. 2018) ........................................................ 25

*Martinelli v. Johnson & Johnson,*
    2022 WL 4123874 (E.D. Cal. Sept. 9, 2022) ........................................................ 18

*McDonough v. Toys "R" Us, Inc.,*
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ........................................................ 21

*Mejia v. Walgreen Co.,*
    2020 WL 6887749 (E.D. Cal. Nov. 24, 2020) ........................................................ 15

*Mejia v. Walgreen Co.,*
    2021 WL 1122390 (E.D. Cal. Mar. 23, 2021) ........................................................ 22

*Moorer v. StemGenex Med. Grp., Inc.,*
    2021 WL 4993054 (S.D. Cal. Oct. 26, 2021) ........................................................ 10, 12, 24

*Murillo v. Pac. Gas & Elec. Co.,*
    266 F.R.D. 468 (E.D. Cal. 2010) ........................................................ 11

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) ........................................................ 10, 12, 13, 23

*Nitsch v. DreamWorks Animation SKG Inc.,*
    2017 WL 399221 (N.D. Cal. Jan. 19, 2017) ........................................................ 11

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985) ........................................................ 25

*Reynolds v. Direct Flow Med., Inc.,*
    (N.D. Cal. Sept. 3, 2019) ........................................................ 16

*Rodriguez v. W. Publ'g Corp.,*
    2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) ........................................................ 21

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ........................................................ 10, 15, 22

*Roe v. SFBSC Mgmt., LLC,*
    2022 WL 17330847 (N.D. Cal. Nov. 29, 2022) ........................................................ 16

*Smart v. NCAA,*
    2025 WL 1248794 (E.D. Cal. Apr. 30, 2025) ........................................................ 11

*Smart v. NCAA,*
    2025 WL 2651800 (E.D. Cal. Sept. 16, 2025) ........................................................ 20

*Smart v. NCAA,*
    No. 22-cv-2125 (E.D. Cal.) .............................................................................. 1, 16

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ................................................................................ 22

*US Airways, Inc. v. Sabre Holdings Corp.,*
    2023 WL 3749995 (S.D.N.Y. June 1, 2023) ........................................................ 18

*Vasquez v. Coast Valley Roofing, Inc.,*
    266 F.R.D. 482 (E.D. Cal. 2010) .......................................................................... 17

*Victorino v. FCA US LLC,*
    2023 WL 3296155 (S.D. Cal. May 5, 2023) ........................................................ 13

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002) .............................................................................. 20

**Statutes**

15 U.S.C. § 1 ............................................................................................................... 3

**Other Authorities**

4 Newberg on Class Actions (5th ed.) .................................................................. 11, 27

**Rules**

Fed. R. Civ. P. 23 .............................................................................................. passim

MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

### INTRODUCTION

The parties have reached a proposed $303 million settlement (the "Proposed Settlement" or "Settlement") that provides outstanding relief to approximately 7,718 current and former college sports coaches (the "Class" or "Class Members").[1] The Settlement was reached after Plaintiffs withstood a motion to dismiss, engaged in wide-ranging discovery of Defendant National Collegiate Athletic Association ("NCAA") and its member schools and conference, succeeded in getting the class certified, defeated a *Daubert* motion, defeated an attempt to appeal the certification order, and fully briefed a motion for partial summary judgment. The Proposed Settlement represents over 100% of the Class's single damages as estimated by the Class's damages expert. This is an extraordinary outcome for the Class under any standard. Indeed, to counsel's knowledge, the Settlement would result in one of the largest recoveries ever in a Sherman Act case filed on behalf of workers seeking lost wages. The proposed recovery of over 100% of the Class's estimated single damages also compares favorably to the excellent settlement recently achieved and finally approved in the related *Smart v. NCAA* case, in which this Court approved a classwide settlement that provided a much smaller class of baseball coaches with an estimated 99% of their alleged damages.[2] *Smart v. NCAA*, No. 22-cv-2125 (E.D. Cal.), ECF 85 at 10.

Class Representatives Shannon Ray, Khala Taylor, Peter Robinson, Katie Sebbane, and Rudy Barajas now ask that the Court grant preliminary approval of the Proposed Settlement in this case so that the process leading to distribution of the Settlement proceeds to Class Members can promptly begin. Co-Lead Counsel recognize that the Class Members have waited a long time for compensation they should have received years ago and wish to distribute the very meaningful relief that the Proposed Settlement offers as expeditiously as possible.

"[A]t the preliminary approval stage, the court need only determine whether the proposed settlement is within the range of possible approval and resolve any glaring deficiencies in the

---

[1] The Certified Class is defined as "[a]ll persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of 'volunteer coach,' as designated by NCAA Bylaws." ECF No. 128 at 11.

[2] Plaintiffs in *Smart* reported the settlement as comprising 91.5% of the damages originally estimated by their expert, Dr. Rascher, and 99% of a later re-calculation of their damages. *See Smart* ECF 83 at 20.

MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

settlement agreement before authorizing notice to class members." *Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2023 WL 4747691, at *6 (E.D. Cal. July 25, 2023) (Shubb, J.). The Proposed Settlement easily meets that standard. If finally approved, and assuming a 100% claim rate, the average Class Member will be awarded a gross amount of about $39,260 before allowed fees and expenses, with specific amounts depending on the school, sport, and year(s) each Class Member worked and the compensation paid to other coaches who worked at the same school, in the same sport, and at the same time. Many Class Members will receive a six-figure amount, and no Class Member will be awarded less than $5,000. Simply put, the Settlement results in an outstanding and impressive recovery for the Class.

The Settlement is particularly favorable because of the risks Plaintiffs faced in continuing the litigation. Although Plaintiffs obtained certification of the class, NCAA indicated its intention to challenge certification at later stages in the case. With respect to liability, the standard under which Plaintiffs' claims would be adjudicated remained undecided; NCAA submitted an expert report disputing market definition and market power; and NCAA pursued a procompetitive justification defense with three separate theories. Plaintiffs would have been required to overcome at least one further round of *Daubert* motions, likely motions for decertification, summary judgment motions and various other pre- and post-trial motions, all with potential appeals. Plaintiffs also would have faced uncertainty about the result at trial and the amount of damages a jury would award. Plaintiffs remain confident in their position, but if the NCAA succeeded at any of those stages in whole or in part, the class could have recovered nothing or far less than the amount of the Settlement. Instead, the Settlement would provide the thousands of hardworking coaches in the Class more than the entire amount of wages and health benefits they would have received absent the allegedly unlawful conduct—and far sooner than they would have even assuming the successful litigation of their claims through trial and appeals.

Because the Settlement is fair, reasonable, and adequate, and because the proposed notice, objection, and opt-out procedures are proper and accord class members due process, Plaintiffs request the Court preliminarily approve the Settlement, direct notice to be provided to the Class in

the manner proposed, and grant other relief essential to effectuating the Settlement, including setting a date for a Final Fairness Hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

NCAA is an association whose members are colleges and universities that compete in intercollegiate athletics. ECF 144 at 2. NCAA's members have organized themselves into three Divisions—Divisions I, II, and III—based on their desired level of competition. *Id.* More than 390 schools compete in Division I in at least one sport. *Id.* at 3. NCAA's Division I Bylaws limit these schools to only a specified number of coaches for each team. Most of those coaches can be paid in accordance with free market principles, but from August 1992 until July 2023, NCAA and its member schools agreed that no Division I school would pay any compensation or remuneration to an entire category of coaches, typically the lowest-ranked coach on each team. *See* 2021-22 NCAA Division I Bylaws 11.7.6; 11.01.6. NCAA and its member schools referred to the coaches subject to this wage restraint as "volunteer" coaches, reflecting that the Bylaws prohibited these coaches from being paid. *Id.* Plaintiffs refer to the wage restraint as the "Wage Fix."

The Class Representatives are former Division I coaches who were designated as "volunteer" coaches under these NCAA bylaws and were subject to the alleged Wage Fix, and were therefore paid $0 for their work. Their lawsuit was filed in March 2023 on behalf of a class of all similarly situated coaches in Division I sports other than baseball, alleging that the Wage Fix violated Section 1 of the Sherman Act, 15 U.S.C. § 1. In the related *Smart v. NCAA* case, two former college baseball coaches challenged the same Wage Fix as applied to baseball coaches. NCAA and its member schools voted to repeal the Wage Fix in January 2023, with an effective date of July 1, 2023.

NCAA aggressively defended the case. In May 2023, NCAA moved to transfer the case or, alternatively, to dismiss Plaintiffs' claims on the merits. ECF 26, 27. In a Memorandum and Order issued in July 2023, this Court denied both motions, ruling that "transfer of these cases is not appropriate" and that "plaintiffs have alleged facts sufficient to show a violation of § 1 of the Sherman Act." ECF 38 at 10, 20. The Court later denied NCAA's motion for reconsideration of this ruling. ECF 50. NCAA filed its Answer, raising seven affirmative defenses. ECF 47 at 18-19.

Plaintiffs and Class Counsel then pursued wide-ranging discovery to develop facts, legal theories, economic theories, and models for class-wide damages. *See* Exhibit A, Joint Declaration of Co-Lead Counsel Dennis Stewart, Robert Gralewski, and Michael Lieberman ("Joint Decl.") at ¶¶ 16-27. Class Counsel negotiated discovery protocols and issued discovery to NCAA, including six sets of requests for production, five sets of interrogatories, and two sets of requests for admission. *Id.* ¶ 16. Class Counsel also engaged in numerous meet-and-confers with NCAA's counsel to resolve NCAA's various objections to this discovery. *Id.* NCAA ultimately produced over 330,000 pages of documents in response to Plaintiffs' requests, which Class Counsel reviewed, coded, and categorized for use in developing case strategy, in briefing, in discovery, in consideration by their experts, and in preparation for trial. *Id.* In the course of discovery, Plaintiffs also deposed eight witnesses employed by or otherwise associated with the NCAA its relevant committees and member schools. *Id.* ¶¶ 16, 22.

This case was particularly data-intensive and required a very significant nationwide effort to gather the information and data relevant to identify class members and form the foundation for the well-informed and thorough assessment of the Class's damages by their expert team. *Id.* ¶¶ 17-21. Plaintiffs initially sought data from NCAA that would allow them to identify Class Members and their paid coach peers whose compensation would serve as a benchmark for damages estimates, but NCAA denied it had custody of this data and Magistrate Judge Newman denied Plaintiffs' motion to compel the NCAA to gather the data from its members. *Id.* ¶ 17. Accordingly, to obtain vital evidence needed to support their claims, identify class members, and rigorously estimate damages, Class Counsel issued and served Rule 45 subpoenas to over 400 third parties, located in all 50 states, including all NCAA member schools who competed in Division I athletics and numerous Division I conferences. *Id.* ¶ 18.

Class Counsel spent thousands of hours identifying proper subpoena recipients; determining categories of information necessary to prove their case and support their damages methodologies; designing a method for gathering this data from the hundreds of schools with Division I sports programs; drafting, serving, negotiating and enforcing the subpoenas; corresponding orally and in writing with nearly all of the subpoena recipients regarding the

subpoenas; and reviewing the documents and data produced in response to the subpoenas to ensure accuracy and completeness. *Id.* This entailed, in the case of almost all subpoena recipients, negotiating the terms of the information requested, following up on initial responses and clarifying the scope and content of the requests in oral and written meet and confers, and obtaining further follow-up detail where necessary. *Id.* ¶¶ 18-19. This work also included scouring publicly available sources of information about schools' use of volunteer coaches during the class period (such as every school's website for every sport in the class across multiple years), determining and confirming paid coaching staff identities, and resolving any discrepancies between those public sources and the information provided in response to the subpoenas. *Id.*

Plaintiffs' economists worked extensively with this subpoena data, which was often produced in formats that needed to be modified and then migrated into another usable format, along with additional data produced by NCAA or obtained from the Department of Education, to identify the approximately 7,718 class members, the salaries of thousands more paid coaches during the class period at the approximately 390 schools at issue to derive the salary structures in each class member's school and sport, and developing a model capable of calculating reliable damages estimates for the Class based on this data. *Id.* ¶ 21. This extensive ground-up data work also involved obtaining and utilizing two additional relevant data sources, the NCAA Membership Financial Reporting System and the Department of Education's Equity in Athletics Data. *Id.*

On merits issues, Class Counsel deposed many key fact witnesses, including officials from NCAA, its conferences, and its member schools. *Id.* ¶ 22. Class Counsel also collected, reviewed, and produced print and electronic documents, including e-mails and text messages, from the Class Representatives, and also prepared the Class Representatives for their depositions and defended those depositions. *Id.* ¶ 23. Class Counsel also deposed Defendant's expert economist at the class certification stage. *Id.* ¶ 24.

Plaintiffs moved for class certification in November 2024. Plaintiffs' motion was supported by a detailed report from their economic expert, Dr. Orley Ashenfelter—a world-renowned labor economist from Princeton University—supported by a team of economists at Ashenfelter & Ashmore, LLP. *See* ECF 85-4; Joint Decl. ¶¶ 21, 24. In December 2024, Defendant filed an

extensive opposition to class certification. ECF 94. It included hundreds of pages of evidence in the form of expert and percipient witness Declarations with extensive exhibits, along with a 97-page brief. *Id.* In conjunction with its opposition to the motion for class certification, Defendant also filed a separate motion to exclude Dr. Ashenfelter's testimony, ECF 95, and deposed Dr. Ashenfelter twice. *See* Joint Decl. ¶ 24. Plaintiffs filed their reply in support of class certification and their opposition to Defendant's *Daubert* motion, along with another detailed declaration from Dr. Ashenfelter, in January 2025. ECF 102, 103. Plaintiffs successfully opposed Defendant's motions for leave to file a sur-reply and for a continuance of the class certification hearing. ECF 105, 116, 118. Class Counsel then appeared at a March 2025 hearing on the motion for class certification and motion to exclude Dr. Ashenfelter's testimony. ECF 125.

While this class certification briefing was occurring, NCAA and the *Smart* plaintiffs engaged in private bilateral negotiations (which did not include the Plaintiffs in this case), and those negotiations resulted in a settlement of the *Smart* litigation. *See Smart* ECF 70. This strategy allowed NCAA to narrow its focus to defeating class certification in this case.

Nevertheless, the Court granted Plaintiffs' motion for class certification and certified a class of "[a]ll persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of 'volunteer coach,' as designated by NCAA Bylaws." ECF 128 at 11. The Court also denied NCAA's motion to exclude Dr. Ashenfelter's testimony, *id.*, appointed Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Rudy Barajas as class representatives, *id.* at 27, and appointed Gustafson Gluek, Kirby McInerney, and Fairmark Partners as co-lead class counsel, *id*. NCAA petitioned the U.S. Court of Appeals for the Ninth Circuit for permission to appeal the class-certification order, which Plaintiffs opposed. The Ninth Circuit denied the petition. ECF 137. Plaintiffs subsequently filed a Motion for Summary Judgment That Defendant Violated the Sherman Act, ECF 144, as well as a reply brief in support of that motion, ECF 153. In addition, with the discovery period coming to a close, Plaintiffs engaged in multiple actions to prepare the case for trial, including identifying and formally disclosing several former head coaches, "volunteer" coaches, and student-athletes to

serve as potential trial witnesses, conducting additional discovery, and preparing expert reports on liability (if needed) and damages, and building an order of proof for trial. Joint Decl. at ¶ 27.

A few weeks before the originally scheduled hearing date on the summary judgment motion, serious settlement discussions commenced.[3] After near-daily, arms-length negotiations produced substantial progress toward a settlement, the parties agreed to retain a mediator to assist with continuing their negotiations. ECF 154, 155; *see* Joint Decl. ¶¶ 28-29. The parties requested and received a continuance from the Court of the September 29, 2025 hearing date for Plaintiffs' motion for summary judgment in order to mediate the case. ECF 154, 155; *see* Joint Decl. ¶¶ 28-29.

The parties engaged professional mediator Miles N. Ruthberg of Phillips ADR Enterprises. Joint Decl. ¶ 29. The parties exchanged pre-mediation briefs and conducted pre-mediation conferences with the mediator. *Id.* On October 10, 2025, the parties engaged in a full-day mediation which concluded with a settlement in principle. *Id.* The parties immediately advised the Court of their settlement in principle, ECF 156, and the Court entered an order staying all deadlines in the case pending the Court's ruling on the instant motion, ECF 157. Since October 10, the parties have formalized their settlement in principle into a written Settlement Agreement, attached as Exhibit 1 to the Joint Declaration.

As the chronology above attests, Plaintiffs devoted significant resources to developing the case, discovering key evidence and deposing key witnesses, forming and executing a legal strategy on numerous key issues, building a robust database of paid coach salary information unassisted and from scratch through nationwide discovery from nearly 400 colleges and universities, and otherwise aggressively litigating their claims and defenses until intensive mediator-assisted negotiations, which took place after Plaintiffs filed a motion for summary judgment, resulted in the proposed Settlement now before the Court.

## **THE SETTLEMENT**

NCAA has agreed to pay $303 million into a common settlement fund from which Class Members will be paid, after deduction for court-approved attorneys' fees, costs, expenses, and

---

[3] The parties (in conjunction with the *Smart* Plaintiffs) previously had attempted mediation, which was unsuccessful in both cases. *See* Joint Decl. ¶ 28.

service awards. The gross settlement amount provides more than complete relief and represents over 100% of estimated single damages to the class as calculated by Dr. Ashenfelter. This is an extraordinary result by any metric. Indeed, the Proposed Settlement compares favorably to the excellent recovery obtained and recently approved in the *Smart* case.

NCAA will pay the settlement amount into the common fund in three equal installments over two calendar years, and those amounts will likewise be paid to Class Members in three equal installments. In light of the size of the Settlement (more than a quarter-billion dollars), spreading the payments over two calendar years (spanning three fiscal years) moderates the cashflow impact of this formidable settlement on NCAA and its member schools. This approach will reduce the likelihood of adverse impacts on Class Members who continue to work as NCAA coaches. This multiple-payout structure is similar to, but much less extended than, the ten-year payout involved in the recent settlement approved by Judge Wilken in the *House v. NCAA* matter alleging antitrust violations with respect to student-athletes. *See In re College Athlete NIL Litig.*, No. 20-cv-03919 (N.D. Cal.), ECF 978, 979.

Similar to the plan of allocation utilized in the "Restricted Earnings Coach" cases involving a similar NCAA restriction on coach compensation, *see Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998), the amount of each Class Member's settlement payment will be determined by the school, sport, and year in which he or she worked. More specifically, each Class Member's allocation will be based on the actual wages paid during the class period to the lowest-compensated, non-wage-fixed coach who worked on the same team at the same time, or, in certain cases due to data limitations, an estimate of that compensation. For example, the allocation for a Class Member who coached softball at the University of Pittsburgh in 2022 would be based on the pay of the lowest-paid, non-wage-fixed softball coach at the University of Pittsburgh in 2022, ensuring that her allocation accounts for sport-, school-, and year-specific factors that would be expected to affect compensation.

Plaintiffs' expert, Dr. Ashenfelter, will calculate individual settlement recovery amounts for each class member using a methodology substantially similar to the one he described at the class-certification stage. *See* Exhibit B, Declaration of Orley Ashenfelter ("Ashenfelter Decl."), at

¶¶ 11-14; ECF 85-4 at 38-44; ECF 103-2 at 14-31. As previously described, Dr. Ashenfelter's methodology proceeds in three steps. First, Dr. Ashenfelter uses data provided by NCAA and its member schools to determine how many coaches worked in the "volunteer coach" position during the class period, as well as the school, sport, and year in which they worked. *See* Ashenfelter Decl. ¶ 6. Second, Dr. Ashenfelter uses data provided by NCAA and its member schools to determine the amount of compensation schools paid each year to the coach directly above each class member in their respective coaching hierarchies—*i.e.*, the team's lowest-paid coach who was not in the "volunteer coach" position and thus was not subject to the Wage Fix. Dr. Ashenfelter refers to these coaches as "reference coaches." *Id.* Third, Dr. Ashenfelter estimates the but-for compensation for each Class Member's coach-year(s) by making a downward adjustment ("stepdown") from his or her reference coach's class-period wages. *Id.* This stepdown reflects that each Class Member was lower in the coaching hierarchy than his or her reference coach. The size of the stepdown is calculated using a regression model described in Dr. Ashenfelter's class certification report and is based primarily on real-world data provided by NCAA member schools about their coach compensation in the years after the Wage Fix was repealed. *Id.*

Dr. Ashenfelter's aggregate damages estimate for the class is the sum of the but-for compensation estimates for each Class Member in each year, with additional adjustments described in his declaration. *Id.* ¶ 8. Using this methodology, Dr. Ashenfelter estimates the aggregate damages from lost wages to the class at $253.9 million. Dr. Ashenfelter also estimates the value of health benefits that were not provided but that likely would have been provided absent the Wage Fix.[4] Dr. Ashenfelter estimates the aggregate damages from lost wages and health benefits at $299.6 million. Thus, the $303 million settlement amount represents 119% of the class's estimated damages from lost wages and 101% of the class's estimated damages from lost wages and health benefits.

---

[4] The parties disputed whether such health benefits would be recoverable on a classwide basis, and that question had not been resolved at the time of settlement.

MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

## **LEGAL STANDARD**

The settlement of class actions requires court approval. See Fed. R. Civ. P. 23(e) ("The claims, issues or defenses of a certified class may be settled only with the court's approval."). The Ninth Circuit has "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *see also Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("[W]e have repeatedly noted that there is a strong judicial policy that favors settlements."); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive negotiated resolution."); *Moorer v. StemGenex Med. Grp., Inc.*, 2021 WL 4993054, at *2 (S.D. Cal. Oct. 26, 2021) ("Voluntary conciliation and settlement are the preferred means of dispute resolution in complex class action litigation."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("Unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

Approval of a class action settlement under Rule 23(e) "involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2024 WL 477221, at *1 (E.D. Cal. Feb 6, 2024). For final approval, Rule 23(e) requires the Court to consider whether: (a) the class was adequately represented; (b) the settlement was negotiated at arms-length; (c) the relief provided to the class is adequate; and (d) the proposal treats class members equitably. *See* Fed. R. Civ. P. 23(e)(2). The Ninth Circuit has traditionally identified the following factors for a court's analysis, which overlap with the Rule 23(e) requirements: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in the settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

To grant *preliminary* approval, however, the Court does not have to conduct this full analysis: the issue to be resolved now is only whether "the court will likely be able to … approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1). At this point, the "court need only determine whether the proposed settlement is within the range of possible approval, and resolve any glaring deficiencies in the settlement agreement before authorizing notice to class members." *Smart v. NCAA*, 2025 WL 1248794, at *6 (E.D. Cal. Apr. 30, 2025). This generally requires consideration of "whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys." *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 479 (E.D. Cal. 2010). Preliminary approval establishes an "initial presumption of fairness, such that notice may be given to the class and the class may have a full and fair opportunity to consider the proposed [settlement] and develop a response." *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 399221, at *1 (N.D. Cal. Jan. 19, 2017).

## ARGUMENT

### I.    The Settlement Satisfies the Elements for Preliminary Approval.

#### A.    The Class Has Been Adequately Represented.

Plaintiffs satisfy the first requirement of Rule 23(e)(2), which asks whether "the class representatives and class counsel have adequately represented the class." Fed R. Civ. P. 23(e)(2)(A). This is essentially the same inquiry the Court already applied under Rule 23(a)(4) at the class certification stage. *See Hudson v. Libre Tech., Inc.*, 2020 WL 2467060, at *5 (S.D. Cal. May 13, 2020) ("This analysis is 'redundant of the requirements of Rule 23(a)(4).'" (quoting 4 Newberg on Class Actions § 13:48 (5th ed.)). At the class-certification stage, this Court ruled that "there are no conflicts of interest precluding certification" and "plaintiffs and their counsel satisfy the adequacy requirement." ECF 128 at 15-16.

The same remains true now. As demonstrated, Class Counsel includes counsel substantially experienced in complex antitrust and class litigation, including antitrust wage litigation against NCAA specifically. Class Counsel have vigorously and effectively litigated the case, achieving an outstanding result for the Class. Class Counsel aggressively pursued discovery, serving over 400

third-party subpoenas, analyzing hundreds of thousands of pages of documents, deposing numerous key witnesses and the NCAA's economic expert, and defending depositions of the Class Representatives. Class Counsel also defeated numerous substantive and procedural motions filed by Defendant, including a motion to transfer, a motion to dismiss, a motion for reconsideration, a motion for leave to file a surreply, a motion for a continuance, and a motion to exclude Dr. Ashenfelter's testimony. Class Counsel also filed a successful motion for class certification, successfully opposed Defendant's petition for permission to appeal the order granting that motion, and filed a strong motion for partial summary judgment, several months before the deadline for such motions, that Plaintiffs believe played a role in accelerating serious settlement talks and leading the parties to a negotiated resolution. Additionally, Class Counsel spent months identifying and interviewing former head coaches, volunteer coaches, and student-athletes whom Plaintiffs formally disclosed and expected to call as trial witnesses. The extent and breadth of Class Counsel's efforts in litigating the case is described in the Joint Declaration (¶¶ 8-29), which further demonstrates that counsel has capably and zealously pursued the interests of the Class.[5]

**B.     The Settlement Resulted From Arm's Length Negotiations.**

The Settlement satisfies the second element of Rule 23(e)(2), which requires that the Settlement result from arm's-length negotiations. Class settlements are presumed fair when they are reached "following sufficient discovery and genuine arm's-length negotiation." *DIRECTV*, 221 F.R.D. at 528. "That the settlement was reached with the assistance of an experienced mediator further suggests that the settlement is fair and reasonable." *Moorer*, 2021 WL 4993054, at *5. Each of those elements is present here.

First, as detailed above, the parties engaged in significant motion practice encompassing hotly contested legal issues in a motion to dismiss, a *Daubert* motion, a motion for class certification, a motion for interlocutory appeal, and a motion for summary judgment. In addition, the parties engaged in significant discovery, both fact and expert, as well as analysis of that discovery, much of which was relied upon in Plaintiffs' class certification and summary judgment

---

[5] If the proposed Settlement achieves the Court's preliminary approval, Plaintiffs will more fully detail their substantial efforts in their anticipated motion for attorney's fees and reimbursement of costs.

filings. *See* Joint Decl. ¶¶ 16-24, 27. Class Counsel's detailed investigation, review, and familiarity with the record, along with their collective substantial experience in antitrust and class litigation, enabled them to develop a comprehensive understanding of the claims and the litigation risks prior to settling the case. Moreover, Class Counsel's extensive third-party discovery and close work with expert economists provided them with a strong sense of the value of the claims prior to settlement, based on Dr. Ashenfelter's damages estimates. *See DIRECTV*, 221 F.R.D. at 527 (settlement after discovery approved "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case"); *Victorino v. FCA US LLC*, 2023 WL 3296155, at *5 (S.D. Cal. May 5, 2023) (preliminary approval where "Plaintiff thoroughly investigated and researched the claims in litigating this action and preparing [for] trial"). NCAA's counsel likewise demonstrated familiarity with the facts and the law relevant to this case, working with NCAA's own experts to inform their understanding of the claims and the litigation risks.

Second, the parties reached the settlement through arm's length negotiations undertaken in good faith over a substantial period of time, ultimately with the assistance of a highly experienced complex case mediator. The parties initially attempted mediation in the summer of 2024 but were unable to resolve the case at that time. *See* Joint Decl. ¶ 28. Following additional litigation, including discovery motions, class certification proceedings, a petition for appeal, and filings on Plaintiffs' motion for partial summary judgment, the parties resumed settlement discussions in earnest in September 2025. *Id.* ¶¶ 28-29. These discussions were informed by the substantial litigation process since the initial mediation, which provided the parties with more clarity and certainty about the strength and risks of Plaintiffs' claims and the potential damages in the case. *Id.* ¶¶ 9-10, 28-29. After near-daily discussions and exchanges of proposals over the course of ten days resulted in considerable progress, the parties agreed to request a continuance of the impending hearing on Plaintiffs' motion for summary judgment and engage professional mediator Miles Ruthberg of Phillips ADR. *Id.* ¶¶ 28-29. Following the submission and exchange of memoranda, the parties then engaged in a full-day mediation on October 10, 2025. With the mediator's

assistance, and subsequent negotiations with respect to specific terms, the parties reached the settlement agreement that is now before the Court. *Id.* ¶ 29.

The extensive and informed negotiations between the parties and the assistance of an experienced mediator confirm that the settlement resulted from arm's-length negotiations. *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (noting that "the Settlement was negotiated at arms' length over several full-day mediation sessions with the help of an experienced mediator" and that "the assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive"); *see also Corzo v. Brown Univ.*, 2024 WL 3506498, at *4 (N.D. Ill. July 20, 2024) (finding settlement reached with the assistance of Miles Ruthberg were "the result of *bona fide* and extensive arm's-length negotiations conducted in good faith").

### C.    The Relief Provided by the Settlement Weighs in Favor of Approval.

The Settlement satisfies the third requirement of Rule 23(e), namely that the relief provided by the Settlement is adequate, "taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). Factors that may be considered in the context of this analysis include "the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon*, 150 F.3d at 1026.

### 1.    The Settlement Provides Exceptional Relief to the Class

By any measure, the Settlement provides exceptional relief to the Class. NCAA has agreed to establish a settlement fund of $303 million. Dr. Ashenfelter estimates the aggregate damages to the class from lost wages at $253.9 million and from lost wages and lost health benefits together at $299.6 million. Although the NCAA had not yet publicly provided its own estimate of potential

damages, it is a virtual certainty that its experts would have criticized the Plaintiffs' expert's estimate and would have estimated theoretical damages much lower. Thus, the $303 million settlement fund, which represents 119% of the class's estimated aggregate damages from lost wages and 101% of estimated aggregate damages from lost wages and health benefits, is a fantastic result that makes each Class Member more than whole. Under the Settlement, the average Class Member will be awarded a gross amount[6] of about $39,260, with each Class Member's actual payout depending on the number of years he or she worked and the compensation paid to other coaches who worked at the same school, in the same sport, and at the same time. In no event will any Class Member receive less than $5,000, and the vast majority will receive far more money than that.[7]

The recovery here is much better than many class-action settlements, which typically achieve only some fraction of claimed single damages. "Courts regularly approve class settlements where class members recover less than one quarter of the maximum potential recovery amount." *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1011 (E.D. Cal. 2019). This Court has approved such settlements on multiple occasions. *See Kabasele*, 2023 WL 4747691, at *8 (granting preliminary approval to settlement that was around 27.22% of potential damages); *Evans v. Zions Bancorporation, N.A.*, 2022 WL 16815301, at *7 (E.D. Cal. Nov. 8, 2022) (Shubb, J.) (granting preliminary approval to settlement that was more than 25% of the class's best-case recovery); *Mejia v. Walgreen Co.*, 2020 WL 6887749, at *10 (E.D. Cal. Nov. 24, 2020) (granting preliminary approval to settlement that was around 22% of potential damages).

Antitrust cases are no exception, and often settle for far less than single damages. *See, e.g.*, *Rodriguez*, 563 F.3d at 964 (affirming approval of a settlement that was approximately 30% of the estimated single damages); *In re Google Play Developer Antitrust Litig.*, 2024 WL 150585, at *2 (N.D. Cal. Jan. 11, 2024) (granting final approval of settlement for 36–38% of single damages);

---

[6] Before any allowed award from the settlement fund for attorney's fees, cost of litigation, costs of administration, and service awards.

[7] Because NCAA repealed the Wage Fix in 2023, no injunctive relief was necessary here, which the Court recognized when it granted NCAA's motion to dismiss the *Smart* plaintiffs' claims for injunctive relief. *See* ECF 38 at 28-29.

*Roe v. SFBSC Mgmt., LLC*, 2022 WL 17330847, at *12 (N.D. Cal. Nov. 29, 2022) ("[T]welve percent of the best-case scenario is within the range courts approve."); *Reynolds v. Direct Flow Med., Inc.*, at *3 (N.D. Cal. Sept. 3, 2019) (granting final approval for a settlement representing 13% of plaintiffs estimated damages); *Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3623734, at *7 (N.D. Cal. June 26, 2017) (granting final approval of settlement for 28.7% of single damages); *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1086331, at *4 (N.D. Cal. Mar. 20, 2017) (approving "settlement [that] represents 11.2% of the single damages attributable to Sony sales"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 565003, at *4, *6 (N.D. Cal. Feb. 13, 2017) (granting preliminary approval of settlement representing 24% of single damages, and previously finding 20% of single damages to be a good recovery in other cases); *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) (granting final approval of settlement for 14.2% of single damages and noting that "District courts in the Ninth Circuit routinely approve settlements with much larger differences between the settlement amount and estimated damages"); *Four in One Co., Inc. v. S.K. Foods, L.P.*, 2014 WL 4078232, at *9 (E.D. Cal. Aug. 18, 2014) (granting final approval of settlement for 2.4% of single damages).

The Proposed Settlement also exceeds the settlement in the *Smart* case, which itself provided substantial and very impressive relief to the baseball coaches in that class. In the *Smart* settlement, the $49.25 million settlement fund amounted to 91.5% of the *Smart* expert's original damages estimate for lost wages and health benefits, or approximately 99% of his revised estimate at the time of settlement. *See Smart* ECF 73 at 36. Here, the Proposed Settlement provides Class Members with 101% of Dr. Ashenfelter's calculated damages estimate for lost wages and health benefits.

Likewise, the Proposed Settlement is more favorable, on a percentage basis, than the recent settlement in *House v. NCAA*, where class members received "67.4% of the estimated damages … for NIL-related injuries" and "31.6% of the estimated damages for pay-for-play claims." *In re College Athlete NIL Litig.*, 2025 WL 1675820, at *18 (N.D. Cal. June 6, 2025). In that case, Judge Wilken referred to awards totaling 67.4% and 31.6% of estimated damages as "outstanding results,

particularly given that lesser recoveries in other antitrust actions have been hailed as excellent." *Id.*

In sum, the recovery here is outstanding by any metric and will provide substantial, meaningful relief to all members of the class.

### 2. Costs, Risks, and Delay of Trial and Appeal

"Another relevant factor is the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (Wanger, J.). "It has been held proper to take the bird in hand instead of a prospective flock in the bush." *Id*. In determining risk, courts recognize that "antitrust class actions are notoriously complex, protracted, and bitterly fought." *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*, 2008 WL 11504857, at *7 (C.D. Cal. Dec. 31, 2008). Here, in addition to risk of an unfavorable result, the delay in recovery and payment that would inevitably follow from even a successful result after trial promised to be considerable.

While Plaintiffs remain confident that their claims are well-supported by the evidence and the governing law, the continued prosecution of the case would have posed significant risks, additional costs and further delay. NCAA has vigorously asserted multiple challenges to the merits of Plaintiffs' claims and defended by arguing, among many other things, that three procompetitive justifications existed and outweighed the Wage Fix's anticompetitive effects: preserving competition between member schools, increasing coaching resources available to student athletes, and expanding coaching opportunities for prospective coaches. While Plaintiffs do not believe that any of these justifications would have prevailed on summary judgment or at trial for the reasons stated in their motion for partial summary judgment, the entire class would have recovered nothing had the NCAA prevailed on any one of these three theories. *See In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) (noting that antitrust trials are "arguably the most complex action[] to prosecute" and that "[t]he legal and factual issues involved are always numerous and uncertain in outcome").

Continued prosecution of the case posed other risks as well. While this Court denied NCAA's *Daubert* motion at the class certification stage, NCAA would have had another

opportunity to challenge Dr. Ashenfelter's opinions, as well as the opinions of any other expert offered by Plaintiffs, through a second round of *Daubert* filings later in the case. *See* ECF 128 at 11 n.6 (denying *Daubert* motion at class stage but noting that "[t]he court expresses no opinion at this time as to whether any evidence would be admissible or inadmissible at trial"). Moreover, although the Class was certified and NCAA's petition for interlocutory appellate review was denied, NCAA would still have had the ability to challenge class certification through a decertification motion or on appeal after trial.

Even if Plaintiffs prevailed on the issue of liability and maintained class action status, there was substantial risk that the jury would have awarded less in damages than Dr. Ashenfelter estimated. NCAA would surely have contested Dr. Ashenfelter's damages estimates and likely would have suggested to the jury that if it found for the Plaintiffs on liability, it should award no or substantially less in damages. *See Martinelli v. Johnson & Johnson*, 2022 WL 4123874, at *4 (E.D. Cal. Sept. 9, 2022) ("[B]oth sides have retained expert witnesses, which, should this case go to trial, makes it virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which expert version would be accepted by the jury."). "Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) (citing examples); *see also, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 2023 WL 3749995, at *1 (S.D.N.Y. June 1, 2023) ("[T]he jury returned a verdict for Plaintiff on its monopolization claim under § 2 of the Sherman Act … [and] awarded … one dollar in nominal damages.").

This Court's observations in its order granting final approval in the *Smart* case are equally applicable here:

> Plaintiffs faced numerous hurdles in this antitrust litigation, including proving all elements of the claims, … maintaining class certification, establishing liability, and the costliness of litigation and potential appeals on these issues.… Defendants alleged several procompetitive justifications for their policy, any one of which, had it succeeded, would have defeated plaintiffs' case. Defendants also challenged plaintiffs' expert methodology during certification; had they successfully brought that challenge at a later stage it may well have barred recovery of damages entirely. In light of the risks associated with further litigation and the relative strength of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendant's arguments, the court finds that the value of the settlement counsels in favor of granting final approval.

ECF 85 at 11 (citations omitted).

### 3.    The Proposed Plan of Allocation Is Fair

Preliminary approval is further justified because the proposed method of distributing relief to Class Members is equitable, efficient, and effective. *See*, *e.g.*, Fed. R. Civ. P. 23(e)(2)(C)(ii); *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (a plan of allocation must be "fair, reasonable, and adequate"). The proposed Plan of Allocation ("Plan"), which is attached as Exhibit 2 to the Joint Declaration, is based on Dr. Ashenfelter's damages methodology and treats all Class Members fairly relative to the facts that likely would have influenced their compensation absent the alleged restraint, thereby reasonably accounting for differences among them. Class Members who file a valid claim will receive payment in an amount depending principally on the number of years they coached and the actual (or in a small number of cases, estimated) compensation received by other coaches at the same school, in the same sport, and in the same year(s). This Plan ensures that each Class Member's recovery accounts for the specific conditions within each program that affected coach pay at the time the Class Member was employed. In addition, no Class Member will receive less than $5,000, ensuring that all Class Members receive meaningful relief.

Making a claim will be straightforward. Class Members will be able to submit a claim through an online portal or by mailing a claim form. This information will be included in the Class Notice and Settlement website, and a toll-free number and email address will be established to answer Class Members' questions. Class Members whose claims are accepted will receive up to three separate payments over two calendar years. They will not be required to submit a new claim form for each payment; rather, filling out a claim form will entitle a Class Member to receive all three payments. If a Class Member misses the deadline for filing a claim form for the first distribution, the Claims Administrator will have discretion, in consultation with Class Counsel, to allow that Class Member to participate in subsequent distributions. Any unclaimed funds (*e.g.*, from uncashed checks) will not revert to NCAA but will, instead, be distributed to Class Members in the next scheduled distribution. If there are any remaining funds after the third distribution,

19

subject to Court approval, they will be distributed to the Class based on each Class Member's respective claim values, or, if the amount remaining is too small to justify the expense of a fourth distribution, it will be donated to an appropriate organization approved by the Court under the doctrine of *cy pres*.

### 4.    Proposed Award of Attorney's Fees, Including Timing of Payment.

Class Counsel plans to file a fee petition contemporaneously with its motion for final approval, and that petition will provide full details about the substantial time, resources, and costs expended by counsel, the fee sought by counsel, and the reasonableness of that fee. Class Counsel expect to petition for up to 30% of the common fund (the same percentage awarded in *Smart*) to be paid on a three-payment schedule like the distributions to Class Members, along with reimbursement of their incurred out-of-pocket costs and expenses. While 25% is the benchmark for fees in the Ninth Circuit where a settlement produces a common fund, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 943 (9th Cir. 2011), a higher rate may be awarded when merited, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002), and this Court has often exceeded 25%, including recently in the *Smart* case. *See Smart v. NCAA*, 2025 WL 2651800, at *6 (E.D. Cal. Sept. 16, 2025) (final approval order awarding 30% fee); *Kabasele*, 2024 WL 477221, at *7 (Shubb, J.) (final approval order awarding 33.33% fee); *Griffin v. Consol. Commc's*, 2023 WL 3853643, at *7 (E.D. Cal. June 6, 2023) (Shubb, J.) (final approval order awarding 35% fee); *Evans*, 2022 WL 16815301, at *1 (final approval order awarding 30% fee).

Awarding Class Counsel up to 30% of the common fund would be well within the Court's discretion given the particulars of this case—indeed, it is the same percentage of the common fund this Court awarded in the *Smart* case despite the increased complexity and risk of this case. Unlike the *Smart* case, which involved a single sport and many fewer coaches, this case involved 44 different sports, including many sports in which average coach compensation and overall spending are lower than in baseball. As a result, this case presented greater challenges in data collection, greater complexity in estimating damages, greater risk at class certification, and greater risk at trial. Class Counsel took on that risk and the associated financial risk, and they have now helped the Class achieve a Proposed Settlement that ensures that relief is not limited to coaches in a single

sport, but instead is available to all coaches regardless of their sport. The settlement amount that Class Counsel achieved is outstanding. It is exceptional to recover over 100% of estimated damages in an antitrust settlement. Class Counsel performed an extraordinary amount of work to achieve that result, as detailed above.

An award up to 30% of the common fund would also be reasonable in light of the significant risks Plaintiffs' counsel took on. Plaintiffs faced a significant risk that they would not prevail on their contested motion for class certification and *Daubert* challenges to their expert, as well as the risk that NCAA would later prevail on renewed *Daubert* challenges or its procompetitive justification affirmative defense or convince the jury to award minimal damages. Class Counsel worked on a contingent basis in this case, fully self-funded the considerable expense of this case,[8] and was opposed by one of the largest, well-funded, and well-defended athletic associations in the world. *See* Joint Decl. ¶¶ 31-33. The risks taken on by Class Counsel are especially acute given that this is an antitrust class action, where costs (and particularly expert costs) fronted by counsel almost invariably exceed the costs of litigating other types of cases. *See, e.g.*, *McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2013 WL 12387371, at *24 (N.D. Cal. Oct. 30, 2013) ("It had long been recognized that antitrust class actions are arguably the most complex action to prosecute as the legal and factual issues involved are always numerous and uncertain in outcome."); *Rodriguez v. W. Publ'g Corp.*, 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007) (noting that "[a]ntitrust class actions are notoriously complex, protracted, and bitterly fought" and that "this action … is likely to be enormously expensive and very lengthy); *In re Shopping Carts Antitrust Litig.*, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) ("[A]ntitrust price fixing actions are generally complex, expensive and lengthy.").

---

[8] Plaintiffs' out-of-pocket costs—which were advanced wholly by counsel and include the massive third-party discovery efforts, data work, and extensive expert work described above and which will be detailed in connection with its fee and expense application—currently total about $3.8 million. *See* Joint Decl. ¶ 31.

MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

More broadly, this Court has previously noted that "[t]he nature of contingency work inherently carries risks that counsel will sometimes recover very little to nothing at all, even for cases that may be meritorious. Where counsel do succeed in vindicating statutory and employment rights on behalf of a class of employees, they depend on recovering a reasonable percentage-of-the-fund fee award to enable them to take on similar risks in future cases." *Mejia v. Walgreen Co.*, 2021 WL 1122390, at *8 (E.D. Cal. Mar. 23, 2021) (citing *Kimbo v. MXD Grp., Inc*, 2021 WL 492493, at *7 (E.D. Cal. Feb. 10, 2021)). Plaintiffs' counsel has worked for several years in this case without pay while advancing millions of dollars in costs and should be fairly compensated for the significant risks they undertook.

Plaintiffs' counsel will file their motion for attorneys' fees at a later date, but for now, it suffices that the fee request will be well within the bounds of what has been traditionally approved, including in the *Smart* case. This factor likewise supports preliminary approval.

### 5.    Request for Service Awards for Class Representatives

Class Counsel also plans to request service awards for the Class Representatives in the amount of $25,000 each because of the invaluable assistance and devotion they exhibited, which inured to the ultimate benefit of the Class. The Ninth Circuit has recognized that named plaintiffs are eligible for reasonable service awards. *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). Indeed, "awards that are intended to compensate class representatives for work undertaken on behalf of a class 'are fairly typical in class action cases.'" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (citing *Rodriguez*, 563 F.3d at 958). As detailed in the accompanying Joint Declaration and, as will be further detailed in connection with the motion for final approval, the Class Representatives performed exemplary service on behalf of the Class and played an important and very active role in achieving this excellent result for their fellow Class Members. And it cannot be understated that they each demonstrated an enormous amount of courage and took on substantial reputational risks in choosing to sue the NCAA. Had they not been willing to "stick their necks out," the $303 million in relief to the Class Members would not have been possible.

### 6.      The Settlement Treats All Class Members Equitably

The final Rule 23(e)(2) factor turns on whether the Proposed Settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(C) and (D) advisory committee's note to 2018 amendment.

Here, the Settlement treats all Class Members equitably with an allocation methodology designed to specifically account for potential differences in the valuation of their claims. The Settlement Agreement does not discriminate between any segments of the class, and all Class Members are entitled to monetary relief based on the amount of time worked as a volunteer coach, the sport in which they worked, the school at which they worked, and the compensation of paid coaches in the school, sport, and year(s) in which the Class Member worked. While different Class Members will receive different amounts, those differences are based on relevant factors that, in the judgment of Dr. Ashenfelter and Class Counsel (and as reflected in similar precedent) fairly reflect the contours of the labor market and the but-for compensation each Class Member would have received absent the Wage Fix. Moreover, all Class Members will receive at least $5,000, which provides a floor for compensation and ensures that all Class Members are eligible for substantial, meaningful relief.

### 7.      The Experience and Views of Counsel

Class Counsel, who are experienced antitrust and class action litigators—including in a similar class action case involving a wage restraint on assistant college coaches—believe the Settlement is an excellent result for the Class. *See* Joint Decl. ¶¶ 7-10, 34. "Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV*, 221 F.R.D. at 528. "This is because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Id.*

All parties here were represented by sophisticated counsel with significant experience in class actions and significant, first-hand experience in the industry. Indeed, when the Court appointed class counsel, it noted that "plaintiffs' counsel has considerable knowledge and experience in antitrust litigation and has dedicated significant effort and resources to litigating this action." ECF 128 at 26. Class Counsel regularly work on some of the most complex cases in the country, providing both mastery of the legal issues and a strong understanding of whether and when proposed settlement terms are fair in light of the strengths and risks of a case. Moreover, many members of the counsel team have first-hand industry experience, giving them first-hand knowledge of the stakes and an intimate understanding of the business. In addition to two members of the counsel team having been intimately involved in the *Law v. NCAA* litigation, another was a former Division I baseball coach, and other members of the team are former NCAA student-athletes—providing them all with invaluable perspective on many issues in the case.

Where, as here, counsel are experienced litigators who understand the claims, defenses, and class action issues of the litigation, the Court can rely on that experience as a factor favoring preliminary approval. *See Moorer*, 2021 WL 4993054, at *5 ("Given Plaintiffs' counsels' experience with similar class action litigation, the Court finds that affording deference to their decision to settle the case, as well as the terms of that settlement, is appropriate."); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (preliminarily approving settlement where "experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this settlement"). Class Counsel have carefully evaluated all aspects of the case and the Settlement and have no doubt that this is an outstanding result of the Class. This further bolsters the case for preliminary (and ultimately final) approval.

## II.     Notice of the Settlement Should Be Approved.

The plan for notice to the Settlement Classes (the "Notice Plan") is described in the accompanying Exhibit C, Declaration of Elaine Pang of AB Data, Ltd. ("Pang Decl."). The Notice Plan is similar to, and in some respects more expansive than, the plan the Court previously approved for the notice of pendency. *See* ECF 146. The notices have also been amended to include

information about the Settlement, the guaranteed minimum payment under the Settlement, and the scope of the release. Moreover, while Class Members already had an opportunity to opt out at the pendency stage—and therefore have no due process right to a second opportunity to do so, *see Low v. Trump Univ., LLC.*, 881 F.3d 1111, 1121 (9th Cir. 2018), the Notice Plan provides them with such an opportunity.

An adequate notice should describe "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Online DVD-Rental*, 779 F.3d at 934; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). The Notice Plan achieves this objective with notice documents that use plain, easy to understand language about the case, the Settlement, and Class Members' rights. The Long Form Notice provides information about the nature and status of the case, the amount of the Settlement, the scope of the Release, the estimated amounts Class Counsel will request in fees, litigation expenses, and service awards for the Class Representatives, how Class Members can submit claims, Class Members' rights to object, attend the Fairness Hearing, or opt out, the important deadlines, and how to obtain additional information, including by using a website dedicated to the Settlement or contacting the Claims Administrator. Notice containing the above information satisfies Fed. R. Civ. P. 23(c) and due process of law. *See Online DVD-Rental*, 779 F.3d at 946.

## III.    The Court Should Appoint AB Data as Claims Administrator.

The Court should appoint AB Data, Ltd. as the claims administrator. AB Data was previously appointed by the Court as the notice administrator for the Class. ECF 146. It is knowledgeable about the case, the Class, the data available to administer the claims, and the information relating to noticing the Class Members, including having obtained and researched current address information for Class Members. AB Data is an experienced settlement and claims administration firm with sophisticated technological capabilities and is staffed by personnel well-versed in antitrust issues and class action litigation. *See* ECF 138-4 ¶¶ 1-3. Additionally, Plaintiffs' economic expert, Dr. Ashenfelter, along with his staff, will assist AB Data with calculating the distributions to Class Members. *See* Ashenfelter Decl. ¶ 15.

**IV.    The Court Should Appoint Huntington Bank as Escrow Agent.**

The Class requests that The Huntington National Bank ("Huntington") be appointed as the Escrow Agent. Huntington is a highly respected bank providing consumers, corporations, and others with a broad range of financial services. Huntington has served as escrow agent in many other antitrust class actions and should also be appointed as Escrow Agent here. *See*, *e.g.*, *Le v. Zuffa, LLC*, No. 15-cv-1045, ECF 1053 (D. Nev. Oct. 23, 2024) (order granting preliminary approval motion and appointing Huntington Bank as escrow agent); *In re Opana ER Antitrust Litig.*, No. 14-cv-10150, ECF 1069 (N.D. Ill. Aug. 24, 2022) (same); *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practice and Antitrust Litig.*, No. 17-md-2785, ECF 2594 (D. Kan. Mar. 11, 2022) (same).

**V.    The Court Should Set A Schedule For Final Approval.**

Plaintiffs request that the Court set a schedule for final approval of the settlement and propose the following:

| DATE | EVENT |
| --- | --- |
| 14 days after preliminary approval | Settlement Administrator shall make claim forms available and provide direct notice to the Class and commence the media campaign publication notice plan. |
| 45 days after provision of direct notice, with 15 additional days for re-mailed notices | Deadline for exclusion or objection to the Settlement |
| March 17, 2026 or 35 days before Final Fairness hearing | Class Counsel shall file all motions and papers in support of final approval, attorneys' fees, litigation costs and expenses, and service awards. |
| March 31, 2026 or 21 days before Final Fairness hearing | Deadline for objections to motion for fees, costs, and service awards |
| April 7, 2026 or 14 days before Final Fairness hearing | Class Counsel may file a reply to any objections |
| April 21, 2026 | Final Fairness Hearing |
| May 12, 2026 or 21 days after Final Fairness Hearing | Claims Period Closes |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CONCLUSION

"At the preliminary approval stage, the court is simply determining whether it is 'likely' the substantive standards for settlement approval will be met at the final approval stage." 4 Newberg On Class Actions § 13.15 (5th ed.). That standard is easily met here. Plaintiffs request that the Court: (a) grant preliminary approval of the Proposed Settlement; (b) authorize notice to the class; (c) appoint AB Data as Claims Administrator; (d) appoint Huntington Bank as Escrow Agent; (e) set the above-proposed deadlines; and (f) issue any additional orders necessary to effectuate the Settlement.

DATED: November 10, 2025                    Respectfully submitted,

**GUSTAFSON GLUEK PLLC**

By: */s/ Dennis Stewart*
Dennis Stewart, CA Bar No. 99152
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Daniel E. Gustafson, MN Bar No. 202241
(*pro hac vice*)
Anthony J. Stauber, MN Bar No. 401093
(*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
tstauber@gustafsongluek.com

**FAIRMARK PARTNERS, LLP**

By: */s/ Michael Lieberman*
Michael Lieberman, DC Bar No. 1033827
(*pro hac vice*)
Jamie Crooks, CA Bar No. 310447
(*pro hac vice*)
Yinka Onayemi, NY Bar No. 5940614
(*pro hac vice*)
Michael Goldberg, MA Bar No. 709203

(*pro hac vice*)
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (818) 585-2903
michael@fairmarklaw.com
jamie@fairmarklaw.com
yinka@fairmarklaw.com
mgoldberg@fairmarklaw.com

**KIRBY McINERNEY LLP**

By: */s/ Robert J. Gralewski*
Robert J. Gralewski, Jr., CA Bar No. 196410
Marko Radisavljevic, CA Bar No. 306552
**KIRBY McINERNEY LLP**
1420 Kettner Blvd., Suite 100
San Diego, California 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
mradisavljevic@kmllp.com

Darryl J. Horowitt, CA Bar No. 100898
**COLEMAN & HOROWITT, LLP**
499 West Shaw, Suite 116
Fresno, CA 93704
Telephone:     (559) 248-4820
dhorowitt@ch-law.com

Leonard B. Simon, CA Bar No. 58310
**THE LAW OFFICES OF LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
lens@rgrdlaw.com

*Attorneys for the Class*

MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT