UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBANNE, and RUDY BARAJAS, individually and on behalf of all those similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>                    Defendant. | No. 1:23-cv-425 WBS CSK<br><br><br>MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS |

----oo0oo----

Plaintiffs Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Rudy Barajas brought this class action against defendant National Collegiate Athletic Association ("NCAA"), alleging violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  (Docket No. 84 (Second Am. Compl.).)  On March 11, 2025, the court certified the proposed

1

class in this action.  (See Docket No. 128 (Order Certifying Class) at 27.)  Subsequently, this court granted plaintiffs' motion for preliminary approval of a class action settlement. (Docket No. 163 (Prelim. Approval Order).)

Now Plaintiffs move for final approval of the class action settlement (Docket No. 171 (Pls.' Mot. for Final Approval)), as well as for approval of attorneys' fees, costs, and service awards (Docket No. 172 (Pls.' Mot. for Fees)).

I.    Motion for Final Approval of Class Action Settlement

The Ninth Circuit has declared a strong judicial policy favoring settlement of class actions.  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992); see also Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution[.]") (citation omitted). Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).

"Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing Manual for Complex Litig. (Third), § 30.41 (1995)).  This court satisfied step one by granting plaintiffs' unopposed motion for preliminary approval of class action settlement on January 6, 2026.  (See Prelim. Approval

2

Order.)  Now, following notice to the class members, the court will consider whether final approval is merited by evaluating: (1) the treatment of this litigation as a class action and (2) the terms of the settlement.  See Diaz v. Tr. Territory of Pac. Islands, 876 F.2d 1401, 1408 (9th Cir. 1989).

A.   Class Certification

To be certified, a putative class must satisfy the requirements of Federal Rules of Civil Procedure 23(a) and 23(b). Leyva v. Medline Indus. Inc., 716 F.3d 510, 512 (9th Cir. 2013).

Rule 23(a) restricts class actions to cases where: "(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation]."  See Fed. R. Civ. P. 23(a).

After fulfilling the threshold requirements of Rule 23(a), the proposed class must satisfy the requirements of one of the three subdivisions of Rule 23(b).  Leyva, 716 F.3d at 512. Under Rule 23(b)(3), a class action may be maintained only if (1) "the court finds that questions of law or fact common to class members predominate over questions affecting only individual members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

On March 11, 2025, the court certified a class

3

consisting of "[a]ll persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of 'volunteer coach,' as designated by NCAA Bylaws." (See Order Certifying Class at 27.)  At the time of certification, the class was estimated to contain approximately some 7,718 members.  (See Docket No. 159-2 (Decl. of Dr. Orley Ashenfelter (Dr. Ashenfelter Decl.)) ¶ 10.)

In its order certifying the class, the court found that the putative class satisfied the Rule 23(a) requirements.  (See Order Certifying Class at 11—16.)  The court found also that both the predominance and superiority prerequisites of Rule 23(b)(3) were satisfied.  (Id. at 25—26.) The court is unaware of any changes that would affect its conclusions as to Rule 23(a) or Rule 23(b), and the parties have not indicated that they are aware of any such developments.

B.    Notice

Once a class is certified under Rule 23(b)(3), the court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) governs both the form and content of a proposed notice.  See Ravens v. Iftikar, 174 F.R.D. 651, 658 (N.D. Cal. 1997) (citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 172-77 (1974)).  Although that notice must be "reasonably certain to inform the absent members of the plaintiff class," actual notice is not required.  Silber v. Mabon, 18 F.3d 1449, 1454 (9th Cir. 1994) (citation omitted).

4

Plaintiffs' counsel provided the court with a proposed email notice and proposed postcard notice to be sent to class members, as well as media notices. (See Docket No. 159-3 (Decl. of Elaine Pang (Pang Decl.)) at 3-14.) The notices explained the proceedings, defined the scope of the class, and explained what the settlement provides and the minimum amount each class member can expect to receive in compensation. (See id.) The notices further explained the opt-out procedure, the procedure for objecting to the settlement, and the date and location of the final approval hearing. (See id.) The content of the notices therefore satisfies Rule 23(c)(2)(B). See Fed. R. Civ. P. 23(c)(2)(B); Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'") (quoting Mendoza v. Tucson Sch. Dist. No. 1, 623 F.2d 1338, 1352 (9th Cir. 1980)).

The parties selected A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data") to serve as the Settlement Administrator. (See Prelim. Approval Order at 11.) The class was notified by the Settlement Administrator "via email, a postcard summary notice via first-class U.S. mail, and the long-form notice posted on the settlement website." (Pls.' Mot. for Final Approval at 9.) Emails were sent to class members with last-known or otherwise identifiable email addresses, and first-class mail was sent to class members with last-known physical addresses. (Docket No. 171-1 (Decl. of Eric J. Miller (Miller

Decl.)) at ¶¶ 7–11.)  Any UAA Postcard Notice that the USPS returned as undeliverable was re-sent after contact information was verified and updated, and where no forwarding address was provided, A.B. Data conducted a search for a forwarding address. (Id.)  Email notices were also re-sent after follow-up communications with class members.  (Id.)  Class Counsel further contacted class members to ensure they knew about the settlement and encouraged them to submit information via the settlement website.  (Docket No. 173 (Joint Decl.) at ¶ 38.)

The court appreciates the thorough efforts taken by the parties to effectuate notice and is satisfied that the notice procedure was "reasonably calculated, under all the circumstances," to apprise all class members of the proposed settlement.  See Roes, 1-2 v. SFBSC Mgmt., LLC, 944 F.3d 1035, 1045–46 (9th Cir. 2019).

C.   Settlement Terms

Having determined in its March 2025 order that class treatment is warranted, the court at this stage now need only address whether the terms of the parties' settlement appear fair, adequate, and reasonable.  See Fed. R. Civ. P. 23(e)(2).  To determine the fairness, adequacy, and reasonableness of the agreement, Rule 23(e) requires the court to consider four factors: "(1) the class representatives and class counsel have adequately represented the class; (2) the proposal was negotiated at arm's length; (3) the relief provided for the class is adequate; and (4) the proposal treats class members equitably relative to each other."  Id.  The Ninth Circuit has also

6

identified eight additional factors the court may consider, many of which overlap substantially with Rule 23(e)'s four factors:

> The strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).

### 1.    Adequate Representation

The court must first consider whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  This analysis is "redundant of the requirements of Rule 23(a)(4) . . . ."  Hudson v. Libre Tech., Inc., No. 3:18-cv-1371 GPC KSC, 2020 WL 2467060, at *5 (S.D. Cal. May 13, 2020) (quoting 4 Newberg on Class Actions § 13:48 (5th ed.)); see also In re GSE Bonds Antitr. Litig., 414 F. Supp. 3d 686, 701 (S.D.N.Y. 2019) (noting similarity of inquiries under Rule 23(a)(4) and Rule 23(e)(2)(A)).

Because the Court has found that the class satisfied Rule 23(a)(4) at the class certification stage (Order Certifying Class at 14—16), the adequacy factor under Rule 23(e)(2)(A) here is also met.  See Hudson, 2020 WL 2467060, at *5.

### 2.    Negotiation of the Settlement Agreement

This action was filed in March 2023.  (See Pls.' Mot. for Final Approval at 8.)  The court disposed of NCAA's motions to dismiss and transfer venue in 2023.  (See Docket No. 38 (Order

7

Den. Def.'s Mot. to Transfer & Dismiss).)  In the summer of 2024, the parties engaged in mediation but to no avail, being unable to reach a resolution "or even make meaningful progress."  (Pls.' Mot. for Final Approval at 14.)  Following their unsuccessful 2024 mediation, the parties engaged in substantial further litigation in the form of extensive discovery and motion practice.  (Id.)  Settlement discussions between the parties did not resume until September 2025.  (Id.)

In the roughly one-year period between the first and second settlement talks, the parties' vigorous prosecution of this case included filings for (a) discovery motions and requests to seal (Docket Nos. 86, 87, 89, 91, 93, 101, 112—115, 119—124, 129, 152); (b) a motion to file a second amended complaint (Docket Nos. 82, 84); (c) class certification proceedings (Docket Nos. 85, 94, 95, 102—105, 111, 128); (d) a petition for appeal (Docket No. 131); and (e) motions for partial summary judgment (Docket Nos. 144, 150, 151, 153).  At the same time, the parties also conducted formal and informal discovery and worked closely with experts and economists.  (Pls.' Mot. for Final Approval at 13.)

As a result of zealously litigating this case, the parties developed "clarity and certainty about the strength[s] and risks of Plaintiffs' claims and the potential damages in the case" by the time settlement discussions resumed.  (Id. at 14.) "After near-daily discussions and exchanges of proposals over the course of ten days resulted in considerable progress," the parties agreed to engage the services of a professional mediator.

8

(Id.)  On October 10, 2025, Mr. Miles Ruthberg of Phillips ADR facilitated the parties' negotiations in a full-day mediation that -- along with subsequent additional negotiations -- resulted in the settlement agreement now before the court.  (Id.)

Plaintiffs argue that "[t]he extensive and informed negotiations between the parties and the assistance of an experienced mediator confirm that the settlement resulted from arm's-length negotiations."  (Id.)  The court agrees.

Given the parties' representation that the settlement reached was the product of arms-length negotiation, facilitated by a mediator, and conducted against the backdrop of two and a half years of vigorous litigation and discovery, the court finds that the proposed settlement is the result of informed and non-collusive negotiations between the parties.  See In re Anthem, Inc. Data Breach Litig., 327 F.R.D. 299, 327 (N.D. Cal. 2018); see also La Fleur v. Med. Mgmt. Int'l, Inc., No. 13-cv-00398, 2014 WL 2967475, at *4-5 (C.D. Cal. June 25, 2014).

### 3.   Adequate Relief

In determining whether a settlement agreement provides adequate relief for the class, the court must "take into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any [other] agreement[s]" made in connection with the proposal.  See Fed. R. Civ. P. 23(e)(2)(C); Baker v. SeaWorld Entm't, Inc., No. 14-cv-02129-MMA-

AGS, 2020 WL 4260712, at *6-8 (S.D. Cal. Jul. 24, 2020).

The court notes that, in evaluating whether the settlement provides adequate relief, it must consider several of the same factors outlined in Hanlon, including the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; and the amount offered in settlement.  See Hanlon, 150 F.3d at 1026.

In determining whether a settlement agreement is substantively fair to class members, the court must balance the value of expected recovery against the value of the settlement offer.  See In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  When a settlement was reached prior to class certification, it is subject to heightened scrutiny for purposes of final approval, wherein the recommendations of plaintiffs' counsel are not given a presumption of reasonableness but rather are subject to close review.  See In re Apple Inc. Device Performance Litig., 50 F.4th 769, 782—83 (9th Cir. 2022). Here, the class was certified almost seven months to the day before settlement negotiations began.  (See Order Certifying Class.)  Because the settlement proposed here was not reached prior to class certification, such heightened scrutiny is not necessary.  See In re Apple, 50 F.4th at 782—83.

Plaintiffs' expert calculated the aggregate damages suffered by class members from lost wages to be $253,900,000.00, and the total from lost wages as well as lost health benefits to be $299,600,000.00.  (Dr. Ashenfelter Decl. at ¶ 9.)  The common

settlement fund is $303,000,000.00, which translates to approximately 119% of the estimated damages from lost wages and 101% of the calculated damages for lost wages and health benefits.  (See Pls.' Mot. for Final Approval at 9.)  Plaintiffs propose to allocate that amount as follows: (1) $208,375,652.62 in payments to class members; (2) $90,900,000.00 for plaintiffs' counsel's fees and $3,599,347.38 for costs and expenses; and (3) $125,000.00 in incentive awards to be split equally among the five named plaintiffs.  (See id. at 2-3.)

The portion of the settlement allocated to class member payments -- $208,375,652.62 -- constitutes approximately 68.77% of the maximum valuation.  This represents a strong result for the class and is comfortably within the range of percentage recoveries that California courts have found to be reasonable. See Cavazos v. Salas Concrete, Inc., No. 1:19-cv-62 DAD EPG, 2022 WL 2918361, at *6 (E.D. Cal. July 25, 2022) (collecting cases). Based on these figures, the average payment per class member is $26,998.66.  This five-figure payout also represents a strong result for the class.

Each class member's individual share of the settlement will be determined by the school, sport, and year(s) in which he or she worked" where an individual class member's "allocation will be based on the actual compensation paid during the class period to the lowest-compensated, non-wage-fixed coach who worked on the same team at the same time."  (Pls.' Mot. for Final Approval at 13—14.)  Or, in rare cases where this method is not an option due to limited data, based on an estimate.  (Id. at

14.)

Plaintiffs faced numerous hurdles in this antitrust litigation, including proving all elements of the claims, obtaining and maintaining class certification, establishing liability, and the costliness of litigation and potential appeals on these issues.

In light of the risks associated with further litigation and the relative strength of defendant's arguments, the court finds that the value of the settlement counsels in favor of granting final approval.  The court further finds the method of processing class member claims to be adequate.  The court is also satisfied that counsel's requested fees are reasonable and support approval of the settlement, which it will address in greater detail below.

4.   Equitable Treatment of Class Members

Finally, the court must consider whether the Settlement Agreement "treats class members equitably relative to each other."  See Fed. R. Civ. P. 23(e)(2)(D).  In doing so, the court determines whether the settlement "improperly grant[s] preferential treatment to class representatives or segments of the class."  Hudson, 2020 WL 2467060, at *9 (quoting Tableware, 484 F. Supp. at 1079).

Here, the Settlement Agreement does not improperly discriminate between any segments of the class, as all class members are entitled to monetary relief based on the amount of time worked as a volunteer coach and the school for which the class member worked.  (See Pls.' Mot. for Prelim. Approval at 13—

12

22.)  The Settlement Agreement aims to make class members whole and so calculates the awards due to each member individually, applying formulas and methodologies that "fairly reflect the contours of the labor market and the but-for compensation each Class Member would have received absent the Wage Fix."  (Pls.' Mot. for Final Approval at 22; see also Docket No. 171-2 (Plan of Allocation) at ¶ 10.)

Payments may differ as between individual class members, but that is not a function of preferential treatment or other improper discrimination between class segments because payments to class members are individually calculated using the same formula.  (Plan of Allocation at ¶¶ 11—14.)  Any differences in the awards distributed to individual class members will result not from inequitable treatment in the Settlement Agreement, but from differences in the underlying damages suffered by individual claimants.  (Pls.' Mot. for Final Approval at 22.)  The court finds this is a relevant difference and does not undermine a finding if equitable treatment as required under Rule 23(e)(2)(D).

Also, the court notes that the Settlement Agreement and the Plan of Allocation include various procedural and structural protections that further serve to guarantee equitable treatment of and between class members.

First, the agreement sets a compensation floor whereby all class members are guaranteed to receive no less than $5,000.00.  (Pls.' Mot. for Final Approval at 22.)  The formulas and processes to be used in calculating an individual class

member's award include a "scaled recognized loss" whereby an individual class member's award will be "scaled up" to $5,000.00 if the initial calculation of their damages falls below that threshold.  (Plan of Allocation at ¶ 13.)

Second, the Plan of Allocation provides that the Settlement Administrator will prepare a "Distribution Report" that will contain, among other information, (i) "a list of purported Class Members who filed Claim Forms that were rejected and the reasons for the rejections"; (ii) "a list of challenges (if any) to the Claim Forms that were rejected and the reasons for rejecting the challenges"; and (iii) "the date any such Claimant whose challenge was rejected was informed by A.B. Data of that rejection."  (Id. at ¶ 17.)

Third, the Plan of Allocation also provides class members with terms outlining resolution of any disputes that arise between claimants and the Claims Administrator.  (Id. at ¶¶ 26–29.)  These procedures further formalize the procedures whereby the Claims Administrator will apprise a claimant of his or her rights to challenge decisions of the Claims Administrator in court.  (Id.)

Finally, the court finds the Settlement Agreement does not treat class members and class representatives in an inequitable manner.  As the court discusses in greater detail below, see discussion infra Section II.C., the Settlement Agreement treats class members and class representatives the same except only for the proposed service awards, but those award amounts are less than the average settlement payment per class

14

member whether calculated in gross or after deducting fees, id.

Accordingly, the court finds the Settlement Agreement satisfies the equitable treatment requirements imposed under Rule 23.  See Fed. R. Civ. P. 23(e)(2)(D).

### 5.  Remaining *Hanlon* Factors

In addition to the factors already considered as part of the court's analysis under Rule 23(e)(A)-(D), the court must also examine "the extent of the discovery completed . . ., the presence of government participation, and the reaction of class members to the proposed settlement."  Hanlon, 150 F.3d at 1026.

As explained above, counsel engaged in thorough informal and formal discovery.  This factor thus weighs in favor of final approval of the settlement.

The seventh Hanlon factor pertains to government participation.  See Hanlon, 150 F.3d at 1026.  As there is no government participation in this case, this factor is neutral.

The eighth Hanlon factor, the reaction of the class members to the proposed settlement, also weighs in favor of final approval.  See Hanlon, 150 F.3d at 1026.  The class has expressed "enthusiastic support . . . sharing the many ways in which the substantial relief provided by the Settlement . . . will have life-changing impacts."  (See Pls.' Mot. for Final Approval at 1.)  At the time of filing, only 12 class members had opted out and none had objected.  (Miller Decl. at ¶ 21.)

In sum, the four factors that the court must evaluate under Rule 23(e) and the eight Hanlon factors, taken as a whole, weigh heavily in favor of approving the settlement.  The court

will therefore grant final approval of the Settlement Agreement.

II.   Motion for Attorneys' Fees, Costs, and Service Awards

    A.   Attorneys' Fees

        Federal Rule of Civil Procedure 23(h) provides, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  If a negotiated class action settlement includes an award of attorneys' fees, that fee award must be evaluated in the overall context of the settlement.  Knisley v. Network Assocs., 312 F.3d 1123, 1126 (9th Cir. 2002); Monterrubio v. Best Buy Stores, L.P., 291 F.R.D. 443, 455 (E.D. Cal. 2013) (England, J.).  The court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).

        "Under the 'common fund' doctrine, 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'"  Staton v. Boeing Co., 327 F.3d 938, 967 (9th Cir. 2003) (quoting Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980)).  In common fund cases, the district court has discretion to determine the amount of attorneys' fees to be drawn from the fund by employing either the percentage method or the lodestar method.  Id.  The court may also use one method as a "cross-check[ ]" upon the other method.  See Bluetooth Headset, 654 F.3d at 944.

16

Like other complex antitrust class actions, this case presented both counsel and the class with a risk of no recovery at all, as already discussed above.  Plaintiffs' counsel took on this matter on a contingency basis.  (Pls.' Mot. for Fees at 2.) The nature of contingency work inherently carries risks that counsel will sometimes recover very little to nothing at all, even for cases that may be meritorious.  See Kimbo v. MXD Group, Inc., No. 2:19-cv-166 WBS KNJ, 2021 WL 492493, at *7 (E.D. Cal. Feb. 10, 2021).

Where counsel succeed in vindicating rights on behalf of a class, they depend on recovering a reasonable percentage-of-the-fund fee award to enable them to take on similar risks in future cases.  See id.  Plaintiffs' counsel argues that, in light of the result obtained and substantial risk taken in this case, a $90,900,000.00 fee constituting 30% of the fund is reasonable. (See Pls.' Mot. for Fees at 2.)  To support their position, plaintiffs cite numerous antitrust class action cases in this circuit -- awarding below and above $100 million -- wherein attorneys' fees exceeded 30% of the common fund.  (See id. at 14—15.)

The Ninth Circuit has established 25% of the fund as the "benchmark" award that should be given in common fund cases. Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).  But as plaintiffs point out, "courts in this circuit have approved fees that exceeded that benchmark in many cases."  Osegueda v. Northern California Inalliance, No. 18-cv-835 WBS EFB, 2020 WL 4194055, at *6 (E.D. Cal. July 21, 2020)

(citation modified).  "A fees award amounting to '33 1/3% of the total settlement value' is considered 'acceptable.'"  Id. at *6; see also Watson v. Tennant Co., No. 2:18-cv-2462 WBS DB, 2020 WL 5502318, at *7 (E.D. Cal. Sep. 11, 2020) (awarding 33.33% of settlement fund).  Given that the requested fee is in line with the typical practice in the Ninth Circuit and in this district, the court agrees that plaintiffs' counsel's requested percentage of the common fund is reasonable.

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award."  Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002).  See In re Bluetooth Headset, 654 F.3d at 941-42.  As part of this lodestar calculation, the court may consider factors such as the "level of success" or "results obtained" by plaintiffs' counsel.  See id.

To determine whether counsel has employed a "reasonable hourly rate" for purposes of calculating the lodestar amount, the court must look to the "prevailing market rates in the relevant community."  Gonzalez v. City of Maywood, 729 F.3d 1196, 1206 (9th Cir. 2013) (quoting Blum v. Stenson, 465 886, 895 (9th Cir. 2001)).  "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits."  Id. (quoting Prison Legal News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010) (internal quotation marks omitted)).  Within this geographic community, the district court should "tak[e] into consideration the experience, skill, and reputation of the attorney [or paralegal]."  Dang v. Cross, 422

F.3d 800, 813 (9th Cir. 2005) (internal quotation marks omitted).

Plaintiffs direct the court's attention to an exception to the local forum rule, whereby a non-local rate "may be used if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization to properly handle the case." Smart v. Nat'l Collegiate Athletic Ass'n, No. 2:22-cv-2125 WBS CSK, 2025 WL 1248794, at *7 (E.D. Cal. Apr. 30, 2025) (quoting Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997)).  Counsel argue that the reasoning this court applied in Smart also applies in here because "this case was likewise a large, complex antitrust matter (indeed, larger and arguably more complex than Smart)." (Pls.' Mot. for Fees at 18—19.)  Thus, counsel argue that "[u]sing a non-local rate is especially appropriate in large, complex antitrust cases, which require a high degree of specialization and a level of risk that few law firms are willing to take on."  (Id. at 18.)

Counsel represent that they have dedicated a combined total of over 35,622.50 hours of work to this case.  (Joint Decl. at ¶ 45.)  They have also submitted billing summary charts to confirm this number.  (Docket Nos. 172-1 at 6, 172-2 at 9, 172-3 at 6, 172-4 at 1.)

Across their firms, the typical hourly rates for the partners working on this case were $925.00 to $1,400.00, while the typical rates for the non-partner associates ranged from $400.00 to $850.00.  (Docket Nos. 172-1 at 6, 172-2 at 9, 172-3 at 6, 172-4 at 1.)  Counsel represent that these rates are

"reasonable and in line with rates charged for similarly large and complex work by professionals with similar levels of experience and comparable reputations."  (Joint Decl. at ¶ 49 (citing Smart v. NCAA, No. 2:22-cv-02125-WBS-CSK (E.D. Cal. July 2, 2025), Dkt. No. 82-1 at 34).)

According to counsel, "[t]here are relatively few plaintiff-side complex litigation firms that specialize in large antitrust cases and are willing to front the substantial attorney time and expenses to litigate a nationwide case of this scale." (Joint Decl. at ¶ 49.)  Yet, here, the firms representing the class all "specialize in litigating nationwide antitrust cases." (Id.)  More pertinently, counsel argue that "[f]ew practicing attorneys could offer that first-hand experience with litigating these types of claims, on behalf of a similar class of coaches, against the same defendant."  (Id. at ¶ 50.)  Finally, counsel represents that the result achieved in this action -- more than 100% of alleged damages -- supports the requested fees.  (See Pls.' Mot. for Fees at 7.)

In light of the evidence presented of counsels' reputation in litigating matters of this kind, alongside the skill and specialization put to use in achieving the exceptional result in this case and the lack of available local counsel, the court is satisfied that a non-local rate is appropriate and thus that counsel's requested rate is reasonable.

Counsel have provided a list of attorneys who worked on the matter along with their rates and hours worked.  (Docket Nos. 172-1 at 6, 172-2 at 9, 172-3 at 6, 172-4 at 1.)  Based on

20

35,622.50 hours billed at the stipulated rates, the lodestar figure is $26,662,017.50.  The requested amount of $90,900,000.00 exceeds the lodestar figure by a factor of 3.41.  However, this multiplier is within the acceptable range for a case this complex and is, therefore, reasonable.  Ziegler v. GW Pharmaceuticals, PLC, No. 21-cv-1019 BAS MSB, 2024 WL 1470532 (S.D. Cal. Apr. 3, 2024) (affirming fee award with lodestar multiplier of 2.87); see also Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1051 (9th Cir. 2002) (same, with 3.65).

Accordingly, the court finds the requested fees to be reasonable and will grant counsel's motion for attorneys' fees.

B.   Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." In re Heritage Bond Litig., No. 02-cv-1475, 2005 WL 1594403, at *23 (C.D. Cal. June 10, 2005).  Costs may be recovered where they "have been adequately documented and reasonably incurred for the benefit of the class."  Odrick v. UnionBancal Corp., No. C 10-5565 SBA, 2012 WL 6019495 (N.D. Cal. Dec. 3, 2012).

Counsel's litigation expenses and costs total $3,599,347.38.  (Joint Decl. at ¶¶ 53—54.)  These expenses include research fees, expert consultation fees, travel expenses, transcript fees, service fees, mediation fees, and other court costs.  (Id.)  Counsel has documented these costs and shown their benefit to the class.  (See id. at ¶ 55.)  The court finds these are reasonable litigation expenses.  Therefore, the court will

grant class counsel's request for costs in the amount of $3,599,347.38.

C.    Service Award

"Incentive awards are fairly typical in class action cases." Rodriguez, 563 F.3d at 958. These awards are "particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant reputational risk by bringing suit against his or her former employers." Wagner v. Cnty. of Inyo, No. 1:17-cv-969 DAD JLT, 2018 WL 5099761, at *7 (E.D. Cal. Oct. 18, 2018) (citing Rodriguez, 563 F.3d at 958–59).

Nevertheless, the Ninth Circuit has cautioned that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . ." Radcliffe v. Experian Info. Solutions, Inc., 715 F.3d 1157, 1164 (9th Cir. 2013). In the Ninth Circuit, an incentive award of $5,000.00 is presumptively reasonable. Davis v. Brown Shoe Co., Inc., No. 1:13-cv-1211 LJO BAM, 2015 WL 6697929, at *11 (E.D. Cal. Nov. 3, 2015).

In assessing the reasonableness of incentive payments, the court should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions" and "the amount of time and effort the plaintiff expended in pursuing the litigation." Staton v. Boeing Co., 327 F.3d 938, 977 (9th Cir. 2003) (citation omitted).

Although a $5,000.00 award is considered presumptively reasonable, in this circuit service awards are by no means capped

at $5,000.00.  Courts can, and many do, approve incentive awards that are far larger.  Van Franken v. Atl. Richfield Co., 901 F. Supp. 294, 300 (N.D. Cal. 1995) (authorizing an incentive award in the amount of $50,000.00); In re College Athlete NIL Litig., 2025 WL 3171376, at *3 (N.D. Cal. July 11, 2025) (approving service awards of $125,000.00 for each of three class representatives); Le v. Zuffa, LLC, No. 15-cv-1045, ECF 1065 at 5 (D. Nev. Mar. 3, 2025) (granting service awards of $250,000.00 for each of the five class representatives).

To evaluate whether an uncommonly large award is appropriate, some of the factors that courts consider include "the actions the plaintiff has taken to protect the interest of the class, the degree to which the class has benefited from those actions, [and] the amount of time and effort the plaintiff expended in pursuing the litigation."  Staton, 327 F.3d at 977 (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998)).

A court may also take into consideration the level of risk the class representatives faced by filing suit and by representing the class.  See Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 335 (N.D. Cal. 2014) (granting approval of a service award partly because the class representatives "risked their professional reputation as well as the possibility of retaliation.").  Ultimately, the court must balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."  Id.

Here, plaintiffs seek $25,000.00 incentive awards for

each of the five named plaintiffs, totaling $125,000.00.  (See Pls.' Mot. for Fees at 21-26.)  Noting the unusually large amount of the requested service awards and the number of awards sought, at the preliminary approval stage, this court advised that to receive final approval, plaintiffs' counsel needed to "provide a more substantial report . . . of the class representatives' contributions to this action meriting the requested award amounts which should also explain the necessity for having five representatives."  (Prelim. Approval Order at 11.)

According to plaintiffs' counsel, each of the five class representatives was essential in prosecuting this case and securing a favorable outcome for the class.  (See Pls.' Mot. for Fees at 21—26.)  The class representatives "collectively devoted hundreds of hours assisting in the case."  (Id. at 22.)  As well, each undertook significant risk in bringing this litigation and did so at the potential cost of their reputations and coaching careers.  (Id. at 23.)  For instance, plaintiffs note that "part of NCAA's strategy int his case was to question the coaching competency of the class representatives" and "openly asserted that none of the class representatives were skilled enough to qualify for paid coaching positions."  (Id.)

Counsel explains that it was a deliberate choice and part of the litigation strategy to have exactly five class representatives.  (See id. at 25.)  Any other number of representatives may have been unable to "demonstrate sufficient commonality" to for purposes of class certification.  (Id.) "Ultimately, having a bench of five representatives, each with

24

their individual perspectives, proved critical to navigating class certification, working with Dr. Ashenfelter to design a damages model grounded in the real-world realities of the coaching market, and ultimately securing an excellent result for the Class." (Id. at 26.)

Thus, although the requested service award of $25,000.00 far exceeds the threshold of presumptive reasonableness, the essential contributions of each of the five class representatives weighs heavily in favor of finding the award reasonable.

The weight shifts further in that direction when the proposed award is considered "in light of the size of the settlement and the average payout to other class members." (Id. at 24.) Here, "the total service awards represent a minuscule portion of the overall settlement fund—less than 0.04%." (Id.) Further, the individual award amounts are less than the gross recovery of the average class member. (Id.)

Accordingly, the court finds that each of the five class representatives expended considerable time and effort. In light of plaintiffs' efforts, the risks incurred in bringing this action, and the degree of success enjoyed by the class, the court finds the requested incentive awards to be reasonable and will approve the awards.

III. Conclusion

Based on the foregoing, the court will approve the settlement set forth in the Settlement Agreement as fair, reasonable, and adequate. The Settlement Agreement shall be

25

binding upon all participating class members who did not exclude themselves.  The court will also approve the proposed allocation of attorneys' fees, litigation expenses, and service awards.

IT IS THEREFORE ORDERED that plaintiffs' unopposed motions for final approval of the class action settlement (Docket No. 171), and for attorneys' fees, litigation costs, and service awards (Docket No. 172) be, and the same hereby are, GRANTED.

ACCORDINGLY, IT IS ORDERED THAT:

(1)   This Judgment incorporates by reference the definitions in the Agreement, and all capitalized terms used herein shall have the same meanings as set forth in the Agreement, unless otherwise set forth herein.

(2)   This Court has jurisdiction over the subject matter of the Litigation and over all parties to the Litigation, including all Class Members.

(3)   The Court hereby reaffirms its determination that the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) are satisfied, including for settlement and judgment purposes.  The Class is defined as: "All persons who, from March 17, 2019, to June 30, 2023, worked for an NCAA Division I sports program other than baseball in the position of 'volunteer coach,' as designated by NCAA Bylaws."

(4)   Pursuant to Federal Rule of Civil Procedure 23, the Court hereby approves the Settlement set forth in the Agreement and finds that:

a. said Agreement and the Settlement contained therein are, in all respects, fair, reasonable,

and adequate and in the best interest of the Class;

b. there was no collusion in connection with the Agreement;

c. the Agreement was the product of informed, arm's length negotiations among competent, able counsel; and

d. the record is sufficiently developed and complete to have enabled Plaintiffs and Defendant to have adequately evaluated and considered their respective positions.

(5)   Accordingly, the Court authorizes and directs implementation and performance of all the terms and provisions of the Agreement, as well as the terms and provisions hereof. Except as to any individual claim of those Persons (identified in Exhibit 1 attached hereto) who have validly and timely requested exclusion from the Class, the Court hereby dismisses the Litigation and all claims asserted therein with prejudice.  The Parties are to bear their own costs, except as and to the extent provided in the Agreement, herein, and in any other order of the Court.

(6)   The terms of the Agreement and of this Judgment shall be forever binding on the Released Parties (regardless of whether or not any individual Class Member submits a Proof of Claim or seeks or obtains a distribution from the Net Settlement Fund), as well as their respective successors, heirs, and assigns.

27

(7)   Upon the Effective Date, and as provided in the Agreement, Plaintiffs shall have, and each and every Releasing Plaintiff Party shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever waived, released, resolved, compromised, settled, relinquished, discharged, and dismissed each and every one of the Released Claims (including unknown claims) against each and every one of the Released Defendant Parties, whether or not such Class Member executes and delivers the Proof of Claim and Release or shares in the Net Settlement Fund.  Claims to enforce the terms of the Agreement are not released.

(8)   Upon the Effective Date, and as provided in the Agreement, the Releasing Plaintiff Parties will be forever barred and enjoined from commencing, instituting, maintaining, prosecuting, or continuing to prosecute any action or other proceeding in any forum (including, but not limited to, any state or federal court of law or equity, arbitration tribunal, or administrative forum), asserting any of the Released Claims against any of the Released Defendant Parties.

(9)   Upon the Effective Date, the Releasing Plaintiff Parties shall be deemed to have covenanted not to sue any Released Defendant Parties on the basis of any Released Claims. The foregoing release is given regardless of whether Plaintiffs or any Class Member: (i) executed and delivered a Proof of Claim and Release; (ii) received the Notice; (iii) participated in the Settlement Fund; (iv) filed an objection to the Settlement, the proposed Plan of Allocation, or any application by Plaintiffs'

Counsel for attorneys' fees and expenses; or (v) had their claims approved or allowed.  Nothing contained herein shall bar any action or claim to enforce the terms of the Agreement or this Judgment.

(10) Upon the Effective Date, and as provided in the Agreement, each of the Released Defendant Parties shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, resolved, compromised, settled, relinquished, and discharged all Released Claims (including unknown claims) against the Releasing Plaintiff Parties.  Claims to enforce the terms of the Agreement are not released.

(11) The Court finds and concludes that the Parties and their respective counsel have complied in all respects with the requirements of Rule 11 of the Federal Rules of Civil Procedure in connection with the institution, prosecution, defense, and settlement of the Litigation.

(12) Neither this Judgment nor the Agreement (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the negotiations leading to the execution of the Agreement, nor any proceedings taken pursuant to or in connection with the Agreement, and/or approval of the Settlement (including any arguments proffered in connection therewith) shall be offered against the Released Defendant Parties or the Releasing Plaintiff Parties as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the parties as to the truth of

any facts alleged, validity, merit, or deficiency of any claim or defense that was or could have been asserted in this Litigation, that damages recoverable under the Complaint would not have exceeded the Settlement Amount, or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way referred to for any other reason as against any of the parties, in any civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Agreement.

(13) The notice of the pendency and proposed Settlement of the Litigation given to the Class was the best notice practicable under the circumstances, including the individual notice to all Members of the Class who could be identified through reasonable effort.  Said notice provided the best notice practicable under the circumstances of those proceedings and of the matters set forth therein, including the proposed Settlement set forth in the Agreement, to all Persons entitled to such notice, and said notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.  No Class Member is relieved from the terms of the Settlement, including the Releases provided for therein, based upon the contention or proof that such Class Member failed to receive actual or adequate notice.  A full opportunity has been offered to Class Members to object to the proposed Settlement and to participate in the hearing thereon.  The Court further finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, were fully discharged and that the statutory

waiting period has elapsed.  Thus, the Court hereby determines that all Class Members who have not validly requested exclusion are bound by this Judgment.

(14) Huntington Bank is appointed as the Escrow Agent. The Court approves the establishment of the escrow account as a Qualified Settlement Fund ("QSF") pursuant to Internal Revenue Code § 468B and the Treasury Regulations promulgated thereunder, and retains continuing jurisdiction as to any issue that may rise in connection with the formulation or administration of the QSF. The Escrow Agent shall maintain the Settlement Fund in accordance with the requirements set forth in the Agreement.  All funds held by the Escrow Agent shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Agreement and further order(s) of the Court.

(15) No Released Defendant Party shall have any liability, obligation, or responsibility whatsoever for the administration of the Settlement or disbursement of the Net Settlement Fund.

(16) Neither the Agreement nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Agreement or the Settlement: (a) is, or may be deemed to be, or may be used as an admission of, or evidence of, the validity of any Released Plaintiff Parties' Claims, or of any wrongdoing or liability of Defendant or the Released Defendant Parties; (b) is, or shall be deemed to be, or shall be used as an admission of any fault or omission of any Released Defendant Party in any statement, release, or written

31

documents issued, filed, or made; or (c) is, or may be deemed to be, or may be used as an admission of, or evidence of, any fault or omission of any of the Defendant or Defendants' Released Persons in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. Released Defendant Parties may file the Agreement and/or this Judgment from this Litigation in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

(17) Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of this Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees, expenses, and interest in the Litigation; (d) hearing and determining applications for approval of the Plan of Allocation; and (e) all parties herein for the purpose of construing, enforcing, and administering the Agreement.

(18) A separate order shall be entered approving the Plan of Allocation. That order shall in no way affect or delay the finality of this Judgment and shall not affect or delay the Effective Date of the Settlement.

32

(19) The Court's orders entered during the course of the Litigation relating to the confidentiality of information shall survive this Settlement subject to the terms of any such orders.

(20) In the event that the Settlement does not become effective in accordance with the terms of the Agreement, or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to Defendant, the provisions in Paragraph 6.5 of the Agreement will control.

(21) Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Agreement.

(22) The Court directs immediate entry of this Judgment by the Clerk of the Court.

AND IT IS FURTHER ORDERED THAT:

(1)  Class Counsel's requested award of attorneys' fees in the amount of 30% of the $303,000,000.00 Settlement Fund (plus accrued interest), i.e., a fee award of $90,900,000.00 plus accrued interest, is within the applicable range of reasonable attorneys' fees percentage-of-recovery awards established by relevant precedent.

(2)  The percentage-of-recovery method of calculating attorneys' fees is appropriate in this Action, as the percentage-of recovery method is the prevailing practice in the Ninth Circuit in determining the award of attorneys' fees in common fund cases.

(3)   In evaluating requests for an award of attorneys' fees, courts in the Ninth Circuit consider the factors set forth in Rule 23(h) of the Federal Rules of Civil Procedure and in Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048-50 (9th Cir. 2002).   In making this award of fees to Class Counsel, this Court has considered these factors and finds that:

a. The Settlement will create a fund of $303,000,000.00 in cash for the benefit of the members of the Class, which is an excellent result for the Class;

b. The Action involves complex factual and legal issues and, in the absence of the Settlement, would involve lengthy proceedings whose resolution would be uncertain;

c. Class Counsel pursued the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy on behalf of the Class;

d. Class Counsel are experienced litigators who understand the claims and defenses and class action issues of the Action;

e. Class Counsel undertook numerous and significant risks on behalf of the Class with no guarantee that they would be compensated;

f. Class Counsel expended substantial time and effort pursuing the litigation on behalf of the Class; had Class Counsel not achieved the

34

Settlement, there would remain a significant risk that the Class may have recovered less or nothing from Defendant; and

g. The amount of attorneys' fees is appropriate to the specific circumstances of this Action, and consistent with awards in similar cases.

(4)   While a lodestar crosscheck is not required in the Ninth Circuit, such a check further supports the reasonableness of the fee award, as a lodestar multiplier of 3.41 is well within the range of multipliers approved in this Circuit.

(5)   Notice to the Class indicated that Class Counsel would seek an award of attorneys' fees up to 30% the Settlement Fund.

(6)   Accordingly, Class Counsel's request for an award of 30% of the gross $303,000,000.00 Settlement Fund (plus accrued interest), i.e., an award of $90,900,000.00 plus accrued interest, to be paid in three equal installments corresponding to Defendant's three equal payments into the Settlement Fund, is granted.

(7)   The Court finds that Class Counsel's request for reimbursement of their reasonably incurred expenses should be granted.  From the inception of litigation, Class Counsel have incurred $3,599,347.38 in litigation expense.  While the majority of the expenses were incurred for the work of economic experts, other essential expenses for the prosecution of the Action included regular e-discovery and data hosting costs, computer research, court reporting and deposition transcripts, subpoena

35

services, mediation costs, travel and accommodations, printing, filing fees, and costs associated with trial preparation.  These collective expenses were reasonably incurred and expended for the direct benefit of the Class and should therefore be reimbursed.

(8)   Notice to the Class indicated that Class Counsel would seek reimbursement of reasonable litigation costs and expenses not to exceed $5,000,000.00.

(9)   Accordingly, Class Counsel's request for reimbursement of litigation costs and expenses in the amount of $3,599,347.38 is granted.

(10) The Court finds that Class Counsel's request for service awards in the amount of $25,000.00 for each of the five Class Representatives -- Shannon Ray, Khala Taylor, Peter Robinson, Katie Sebbane, and Rudy Barajas -- is appropriate.

(11) In making these service awards to the five Class Representatives, this Court finds that each of the Class Representatives expended considerable time and effort to aid in the prosecution of this Action, including:

a. filing suit to protect the interests of absent class members;

b. advising Class Counsel on the relevant facts and assisting in formulating case strategy;

c. working with Class Counsel to identify and produce documents responsive to Defendant's discovery requests;

      d. working with Class Counsel to develop, write, and review their responses to Defendant's interrogatories to ensure their accuracy;

      e. preparing for their depositions, which included studying Plaintiffs' theories of liability, class certification issues, and preparation for questions (including review of their document productions);

      f. sitting for a full day deposition;

      g. participating in regular meetings with Class Counsel for updates on the litigation;

      h. attending court hearings (including the motion to dismiss hearing and the class certification hearing), which required some to engage in significant travel;

      i. consulting with Class Counsel before, during, and after settlement negotiations; and

      j. continuing to assist counsel during the settlement approval process.

(12) Notice to the Class indicated that Class Counsel would seek service awards of up to $25,000.00 for each of the five Class Representatives.

(13) Accordingly, Class Counsel's request for service awards of $25,000.00 for each of the five Class Representatives is granted.

(14) Without affecting the finality of this Order in any respect, this Court reserves jurisdiction over any matters related to or ancillary to this Order.

IT IS SO ORDERED

Dated:   May 11, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

38